UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

AKO K. BURRELL,

                              Plaintiff,

v.                                                          9:22-CV-0102
                                                            (BKS/ML)
CHARLIE DURKIN, Lieutenant, Clinton Corr.
Facility; KING, Sergeant, Clinton Corr. Facility;
D. LASHWAY, Correctional Officer, Clinton
Corr. Facility; DEVINS, Correctional Officer,
Clinton Corr. Facility; MARY BETH GILLEN,
Nurse, Clinton Corr. Facility, formerly known
as Mary Beth; and KELLY, Correctional Officer,
Clinton Corr. Facility,

                              Defendants.
_____

APPEARANCES:                                                OF COUNSEL:

AKO K. BURRELL
    *Pro Se* Plaintiff
Attica Correctional Facility
Post Office Box 149
Attica, New York 14011

LETITIA A. JAMES                                            NICHOLAS W. DORANDO,
Assistant Attorney General                                  ESQ.
    Counsel for Defendants                                  MATTHEW P. REED, ESQ.
The Capitol                                                 Assistant Attorneys General
Albany, New York 12224


MIROSLAV LOVRIC, United States Magistrate Judge

## REPORT and RECOMMENDATION

        Currently before the Court, in this civil rights action filed by Ako K. Burrell ("Plaintiff")

against defendants Charlie Durkin, King, D. Lashway, Devins, Mary Beth Gillen, and Kelly

(collectively "Defendants") who are—or were at the relevant time—employed at Clinton

Correctional Facility ("Clinton"), are Plaintiff's motion for summary judgment pursuant to Fed.

R. Civ. P. 56 and Defendants' cross motion for summary judgment pursuant to Fed. R. Civ. P.

56.  (Dkt. Nos. 65, 68.)  For the reasons set forth below, I recommend that Plaintiff's motion for

summary judgment be denied and Defendants' motion for summary judgment be granted in part

and denied in part.

## I.    RELEVANT BACKGROUND

### A.    Plaintiff's Claims

At this procedural posture, Plaintiff asserts the following ten claims: (1) one claim of

excessive force against Defendant Kelly in violation of the Eighth Amendment and 42 U.S.C. §

1983 related to an unjustified cavity search on September 21, 2021; (2) one claim of excessive

force against Defendant Lashway in violation of the Eighth Amendment and 42 U.S.C. § 1983

related to an unnecessarily aggressive cavity search on October 5, 2021; (3) one claim of

excessive force against Defendant Lashway in violation of the Eighth Amendment and 42 U.S.C.

§ 1983 related to placing his elbow on Plaintiff's throat; (4) one claim of excessive force against

Defendant Durkin in violation of the Eighth Amendment and 42 U.S.C. § 1983 related to

slapping Plaintiff and grabbing Plaintiff's butt on October 5, 2021; (5) one claim of excessive

force against Defendant Devins in violation of the Eighth Amendment and 42 U.S.C. § 1983

related to squeezing Plaintiff's testicles; (6) one claim of retaliation against Defendant Durkin in

violation of the First Amendment and 42 U.S.C. § 1983 related to filing a false misbehavior

report in response to Plaintiff's PREA[1] complaint; (7) one claim of retaliation against Defendant

---

[1]      Although undefined by the parties, the Court presumes that the parties are referring to the
Prison Rape Elimination Act of 2003, § 2 et seq., 42 U.S.C. § 15601 et seq.

Lashway in violation of the First Amendment and 42 U.S.C. § 1983 related to placing his elbow

on Plaintiff's throat in response to Plaintiff's PREA complaint against Defendant Durkin; (8) one

claim of retaliation against Defendant Gillen in violation of the First Amendment and 42 U.S.C.

§ 1983 related to denying medical treatment in response to Plaintiff's PREA complaint against

Defendant Durkin; (9) one claim of deliberate medical indifference against Defendant King in

violation of the Eighth Amendment and 42 U.S.C. § 1983 related to his refusal to file a report

and telling medical that Plaintiff was playing games after Plaintiff fell off a stretcher; and (10)

one claim of deliberate medical indifference against Defendant Durkin in violation of the Eighth

Amendment and 42 U.S.C. § 1983 related to his order that Plaintiff be denied medical attention

and refusal to file a report after Plaintiff fell off a stretcher.  (Dkt. Nos. 1, 4.)

### B.    Plaintiff's Statement of Undisputed Material Facts

Unless otherwise noted, the following facts were asserted and supported by Plaintiff in

his Statement of Material Facts and not denied by Defendants in their response.  (*Compare* Dkt.

No. 65, Attach. 1 [Pl.'s Statement of Material Facts], *with* Dkt. No. 68, Attach. 1 [Defs.' Resp.].)

1.      Plaintiff was incarcerated at Clinton on or about September 28, 2021.

2.      Plaintiff was in the recreation area of D-block of Clinton on a date in September

2021.

3.      On a date in September 2021, Defendant Kelly escorted Plaintiff from the

recreation area, back to his cell, to the tier office.

4.      Sometime in September 2021, Plaintiff reported an injury and sought medical care

from Defendant Gillen.

5.      On September 28, 2021, Dr. D'Amico was notified that Plaintiff alleged that an

officer stuck his fingers up Plaintiff's rectum and that Plaintiff wished to file a complaint

pursuant to the Prison Rape Elimination Act.

6.      Plaintiff was issued a misbehavior report by Defendant Durkin.  The misbehavior report mentioned that Plaintiff complained of chest pain.

7.      On October 5, 2021, Plaintiff interacted with Defendant Durkin near the tier office.

8.      Plaintiff sought medical attention after the interaction with Defendant Durkin.

9.      Defendant Durkin ordered Plaintiff to be transported to the medical unit on a stretcher.

10.     Plaintiff complied and was transported by stretcher to the medical unit.

11.     Defendant Lashway was present when Plaintiff was on the stretcher.

12.     Defendant King was present when Plaintiff was on the stretcher.

13.     Defendant Gillen was aware of Plaintiff's reported PREA complaints.

14.     Plaintiff was referred to the Office of Mental Health ("OMH").

15.     Plaintiff received a misbehavior report written by Defendant Durkin for NY DOCCS violations 106.10, 107.11, 104.12, 107.20, and 104.13.

16.     Upon Plaintiff's admission to OMH he was strip searched.  Defendant Devin was present for the strip search.

17.     Plaintiff was admitted to OMH cell OBS #12.

18.     Plaintiff submitted sick call request forms in April 2022—after the commencement of this action—that related to, *inter alia*, injuries he allegedly sustained on October 5, 2021.

19.     Plaintiff was found guilty of the charges in the misbehavior report issued by Defendant Durkin.  Plaintiff was sanctioned to time in the Special Housing Unit ("SHU") and loss of privileges.

20.    Plaintiff appealed the disposition of the misbehavior report issued by Defendant Durkin, and that appeal was denied.

21.    Defendant Durkin admits to filing a misbehavior report against Plaintiff.

**C.    Defendants' Statement of Undisputed Material Facts**

Unless otherwise noted, the following facts were asserted and supported by Defendants in their Statement of Material Facts and not denied by Plaintiff in a response.  (*Compare* Dkt. No. 68, Attach. 1 [Defs.' Statement of Material Facts], *with* Dkt. No. 71 [Pl.'s Resp.].)

1.    On September 21, 2021, Plaintiff was under keeplock confinement pending the outcome of a tier hearing on a misbehavior report that was issued on or about September 2, 2021.[2]

2.    On the morning of September 21, 2021, Plaintiff was taken from the recreational yard by—among others—Defendant Kelly, to take him to a hearing on the misbehavior report of September 2, 2021.[3]

3.    When Plaintiff was removed from the recreational yard, he was placed in a waist chain and handcuffs.[4]

---

[2]    Although Plaintiff denies this fact as asserted, he fails to cite to any portion of the record to dispute it.  As a result, the undersigned deems this fact admitted. *N.Y. Teamsters v. Express Servs., Inc.*, 426 F.3d 640, 648-49 (2d Cir. 2005) (upholding grant of summary judgment where "[t]he district court, applying Rule 7.1[a][3] strictly, reasonably deemed [movant's] statement of material facts to be admitted" because the non-movant submitted a responsive Rule 7.1[a][3] statement that "offered mostly conclusory denials of [movant's] factual assertions and failed to include any record citations"); *Jamison v. Metz*, 865 F. Supp. 2d 204, 207 n.1 (N.D.N.Y. 2011) (Suddaby, J.) ("[W]herever [the *pro se*] Plaintiff has [willfully] failed to cite record evidence in support of his denials of properly supported facts . . . the Court has deemed such facts admitted to the extent that they are not clearly in dispute."), *rev'd in part on other grounds*, 541 F. App'x 15, 17-19 (2d Cir. 2013).

[3]    *See*, *supra*, note 2.

[4]    *See*, *supra*, note 2.

4.      Plaintiff was taken to his cell in D-block, four gallery and was given time to change out of his sweatshirt and sweatpants to his state green jumpsuit and allowed to gather his legal materials, then was placed into mechanical restraints and taken to the tier office.

5.      In the tier office, Plaintiff complained of chest pains.  Plaintiff was taken to the infirmary where he was evaluated by Defendant Gillen.[5]

6.      Plaintiff denied having chest pain to Defendant Gillen but complained of having cold-like symptoms.[6]

7.      Defendant Gillen assessed Plaintiff's vital data and gave Plaintiff allergy medications and cough syrup for his alleged cold symptoms.[7]

8.      On September 28, 2021, Plaintiff was seen at approximately 11:25 a.m., by Nurse Bordeau for a complaint of sexual abuse at the hands of an unnamed correction officer, which was alleged to have happened at approximately 10:00 a.m., that day.[8]

9.      On September 28, 2021, Defendant Gillen submitted an email to the Assistant Deputy Superintendent PREA Compliance Manager.

10.     On September 28, 2021, Plaintiff was medically examined by Dr. D'Amico, where Plaintiff exhibited no signs of trauma.  Dr. D'Amico noted the same and determined Plaintiff's sexual abuse complaint to not be credible.[9]

---

[5]      Plaintiff denies this fact and asserts that "there is no date of when this occurred."  Based on the context, it is clear that this fact relates to the incident alleged to have occurred on September 21, 2021.

[6]      *See*, *supra*, note 5.

[7]      *See*, *supra*, note 5.

[8]      *See*, *supra*, note 2.

[9]      *See*, *supra*, note 2.

11.    On October 5, 2021, Plaintiff was in the tier office hallway, which is monitored by cameras.[10]

12.    The camera footage captured by the tier office hallway depicts an interaction between Defendant Durkin and Plaintiff.

13.    At approximately 9:15 a.m., following Defendant Durkin's repeated instructions to remain quiet and Plaintiff's continued disobedience of those instructions, Defendant Durkin removed Plaintiff's legal documents temporarily.  Plaintiff began complaining of chest pains, stated that he wished to report a PREA, and claimed that he had just been sexually assaulted.[11]

14.    Within approximately five minutes of Plaintiff's complaint of chest pains, a stretcher was brought to the tier office by four incarcerated individuals employed as porters and Defendants King and Lashway.[12]

---

[10]    *See*, *supra*, note 2.

[11]    *See*, *supra*, note 2.

[12]    *See*, *supra*, note 2.  In addition, Plaintiff appears to add additional assertions to attempt to place this fact in context (Dkt. No. 71 at 5, ¶ 26 [asserting that the four porters "were not trained to utilize a stretcher, my care, my custody, & control was not there (sic) responsibility."]), which is improper.  As a result, the undersigned deems this fact admitted.  *See Maioriello v. New York State Office for People With Developmental Disabilities*, 272 F. Supp. 3d 307, 311 (N.D.N.Y. 2017) (Suddaby, C.J.) ("[T]hroughout Plaintiff's Rule 7.1 Response, she 'admits' many of the facts asserted by Defendants in their Rule 7.1 Statement but then includes additional facts and/or legal argument in those responses. . . . Where this occurs, the Court will deem those facts admitted and disregard the additional factual assertions and/or argument that Plaintiff provides in her responses."); *Baity v. Kralik*, 51 F. Supp. 3d 414, 417 (S.D.N.Y. 2014) (holding that plaintiff's response to defendant's Rule 56.1 Statement failed to comply with the rule because "counsel neither admits nor denies a particular fact, but instead responds with equivocal statements such as: 'Admit, but defendant omits the balance of plaintiff's testimony'"); *Goldstick v. The Hartford, Inc.*, 00-CV-8577, 2002 WL 1906029, at *1 (S.D.N.Y. Aug. 19, 2002) (striking plaintiff's Rule 56.1 Statement, in part, because plaintiff added "argumentative and often lengthy narrative in almost every case the object of which is to 'spin' the impact of the admissions plaintiff has been compelled to make").

15.     Defendant Durkin instructed that Plaintiff be taken to medical to be checked out before being taken to the Behavioral Health Unit ("BHU").[13]

16.     Defendant Durkin ordered Plaintiff onto the stretcher.  Plaintiff then got onto the stretcher under his own power, was secured to the stretcher with straps, and was removed from the tier hallway.[14]

17.     Plaintiff was taken up a single flight of steps by the porters, and was transferred to a gurney while escorted by Defendants Lashway and King.  Defendant Durkin did not accompany Plaintiff to medical.[15]

18.     Plaintiff was taken to medical, where he was evaluated.[16]

19.     While in the medical area, Plaintiff stated that he wanted to kill himself, and was taken to the OMH area by Defendant Lashway.[17]

20.     Plaintiff was also referred to the BHU by Defendant Durkin.[18]

21.     On October 7, 2021, Plaintiff was admitted to OMH, and was brought to the OMH Frisk area at 11:45 a.m.[19]

---

[13]     *See*, *supra*, note 2.

[14]     Plaintiff fails to explicitly confirm or deny this fact.  (Dkt. No. 71 at 5, ¶ 28.)  However, based on the commentary that Plaintiff included in his response, he appears to admit the fact. (*Id.*)  As a result, the undersigned deems it admitted.

[15]     *See*, *supra*, note 2.

[16]     *See*, *supra*, notes 2, 12.

[17]     *See*, *supra*, notes 2, 12.

[18]     *See*, *supra*, note 2.

[19]     *See*, *supra*, notes 2, 12.

22.     Pursuant to OMH and DOCCS policy, Plaintiff was subject to a strip frisk and was thereafter changed into an OMH smock and slippers.[20]

23.     A strip frisk of Plaintiff was conducted in the presence of Correction Sergeant Scott, Correction Officer Ashline, and Defendant Devins.[21]

24.     At the conclusion of the search, C.O. Ashline noted that no contraband had been found, and marked that no force had been used on a form 1140SHU.[22]

25.     According to medical records, medical staff saw Plaintiff on several occasions throughout the remainder of Plaintiff's time at Clinton, which ended in April of 2022.[23]

26.     Defendant Gillen responded to numerous sick call slips.[24]

27.     Plaintiff received X-Ray imaging on or about October 26, 2021, relative to complaints of a broken foot.[25]

28.     Defendant Durkin issued a misbehavior report to Plaintiff for failure to obey a direct order, providing false information, harassment, creating a disturbance, and demonstration, regarding the events of October 5, 2021.

---

[20]    Plaintiff's response to Defendants' Statement of Material Facts appears to omit a response to this asserted fact.  (Dkt. No. 71 at 6, ¶¶ 50-51.)  However, Plaintiff's response to the next asserted fact admits that he was "given a smock & slippers."  (Dkt. No. 71 at 6, ¶ 51.)

[21]    *See*, *supra*, note 2.

[22]    *See*, *supra*, note 2.  Plaintiff asserts that he was not given the Dkt. No. 68, Attach. 3 at 5. (Dkt. No. 71 at 6, ¶ 54.)  However, Plaintiff failed to submit an affidavit or declaration showing that, for specified reasons, he cannot present facts essential to justify his opposition pursuant to Rule 56(d) of the Fed. R. Civ. P.

[23]    *See*, *supra*, note 2.

[24]    *See*, *supra*, note 2.

[25]    *See*, *supra*, note 2.  In addition, Plaintiff appears to admit this fact acknowledging that "he did receive a X-ray."  (Dkt. No. 71 at 7, ¶ 57.)

29.    Following a hearing on the misbehavior report, Plaintiff was found guilty of all charges, except demonstration.

30.    Upon an appeal by Plaintiff, the hearing was upheld.[26]

31.    At all relevant times, Clinton's grievance system was fully functioning and available for incarcerated individuals.[27]

32.    Individuals incarcerated at Clinton have access to the Central Office Review Committee ("CORC") to appeal facility-level grievance determinations.

33.    As of June 2023, Plaintiff had used the grievance appeals system in excess of one hundred times.[28]

34.    With respect to the relevant time period and allegations in this action, Plaintiff filed the following two grievances at Clinton: (1) Grievance CL-0883-21 entitled "Fell Off Stretcher/No Treatment," and (2) Grievance CL-0882-21 entitled "Grievances not filed."[29]

35.    Plaintiff also filed an additional grievance, which was given number CL-0881-21 alleging "a sexual assault by Lt. Durkin & Sgt Mason. D. Lashway," as well as grieving that "Lt. Durkin forcing [him] to be carried on a stretcher."  Pursuant to Department policy, in such cases, the sexual assault components are treated separately, and were given PREA Log numbers 21-

---

[26]    Plaintiff's response to Defendants' Statement of Material Facts appears to omit a response to this asserted fact.  (Dkt. No. 71 at 7, ¶¶ 59-60.)

[27]    *See*, *supra*, note 2.

[28]    *See*, *supra*, note 2.  Plaintiff states that he "has no proof of one hundred appeals filed." (Dkt. No. 71 at 8, ¶ 62.)  However, Defendants cite to admissible evidence in the record to support the fact asserted.  (Dkt. No. 68, Attach. 1 at 10, ¶ 64 [citing Dkt. No. 68, Attach. 13 at 42-49.)

[29]    *See*, *supra*, note 2.

0056 and 0057, and the remaining contention related to Defendant Durkin was addressed in grievances CL-0882-21 and CL-0883-21.[30]

36.    Plaintiff did not file other grievances relative to the allegations in this matter at Clinton.[31]

37.    To date, CORC has not received grievances relative to: (1) an unnecessarily rough body cavity search on September 21, 2021 by Defendant Kelly; (2) an unnecessarily rough body cavity search on October 5, 2021 by Defendant Lashway; (3) Defendant Devins squeezing Plaintiffs testicles; (4) Defendant Durkin filing a false Inmate Misbehavior Report; (4) Defendant Lashway assaulting Plaintiff by placing his elbow on Plaintiffs throat; (5) Defendant King's conduct in refusing to report an incident; and (6) Defendant Durkin ordering staff to deny Plaintiff medical attention or failing to report an incident.[32]

D.    **Parties' Briefing on the Motions for Summary Judgment**

1.    **Plaintiff's Memorandum of Law**

Generally, in support of his motion for summary judgment, Plaintiff argues that his declaration and the declarations of Defendants, Defendants' interrogatories, Defendants' answer, and Defendants' declarations are contradictory and "there is clearly a genuine issue of fact." (Dkt. No. 65, Attach. 3 at 2-3.)  Plaintiff argues that the factual disputes are material and directly relate to whether the actions of Defendants were malicious and sadistic.  (*Id*. at 3.)  Plaintiff

---

[30]    *See*, *supra*, note 2.

[31]    *See*, *supra*, note 2.

[32]    *See*, *supra*, note 2.

argues that "[a] reasonable jury could find for the Plaintiff based on the facts in the Plaintiff's declaration, & summary judgment must therefore be denied." (*Id*.)

### 2.    Defendants' Opposition and Cross-Motion for Summary Judgment

Generally, in opposition to Plaintiff's motion for summary judgment and in support of their cross-motion for summary judgment, Defendants assert the following four arguments: (1) Plaintiff is not entitled to summary judgment, (2) Plaintiff failed to exhaust his administrative remedies before commending this action; (3) Plaintiff's claims must be dismissed on their merits; and (4) in the alternative, Defendants are entitled to dismissal of Plaintiff's claims based on the doctrine of qualified immunity. (*See generally* Dkt. No. 68, Attach. 2.)

More specifically, Defendants assert that Plaintiff argues that material questions of fact exist in this matter and, incongruously, that he is entitled to summary judgment. (Dkt. No. 68, Attach. 2 at 5.) As a result, Defendants argue that Plaintiff's motion lacks the condition precedent for summary judgment pursuant to Fed. R. Civ. P. 56, and must be denied. (*Id*.)

Moreover, Defendants assert that Plaintiff filed two grievances at Clinton but did not exhaust his administrative remedies with respect to (1) a body cavity search on September 21, 2021, by Defendant Kelly; (2) a body cavity search on October 5, 2021, by Defendant Lashway; (3) Defendant Devins squeezing Plaintiff's testicles; (4) Defendant Durkin filing a false inmate misbehavior report; (5) Defendant Lashway assaulting Plaintiff by placing his elbow on Plaintiff's throat; (6) Defendant King's conduct in refusing to report a use of force incident; and (7) Defendant Durkin ordering staff to deny Plaintiff medical attention or failing to report an incident. (Dkt. No. 68, Attach. 2 at 5-9.) Thus, Defendants argue that Plaintiff failed to exhaust his administrative remedies and his claims related to those allegations must be dismissed. (*Id*.)

Third, Defendants argue that Plaintiff's claims must be dismissed on their merits.  (Dkt. No. 68, Attach. 2 at 9-23.)  With respect to Plaintiff's excessive force claims, Defendants argue that the Second Circuit precedent in *Jeffreys v. City of New York*—which directs that summary judgment may be awarded when (1) there is nothing in the record to support allegations of excessive force, aside from the plaintiff's own contradictory and incomplete testimony, even after drawing all inferences in the light most favorable to the plaintiff, and (2) the court determines that "no reasonable person" could credit his testimony—is applicable here.  (*Id.* at 9-17.)  More specifically, Defendants assert that Plaintiff's allegations regarding the interaction with (1) Defendant Durkin on October 5, 2021, (a) the Complaint, Plaintiff's deposition testimony, and Plaintiff's summary judgment moving papers, offer differing versions of the alleged interaction, (b) the video of the interaction contradicts Plaintiff's allegations, and (c) the medical records do not support Plaintiff's allegations (*id.* at 10-12); (2) Defendant Kelly (a) Plaintiff solely relies on his own testimony but his allegations of the event have changed as to date, location, actors, and intensity throughout this litigation, (b) instead, the overwhelming proof shows that (i) on September 21, 2021, he was escorted by—among others—Defendant Kelly to a hearing regarding a misbehavior report dated September 2, 2021, (ii) in the tier office he complained of chest pains and was taken to the infirmary where he was evaluated by Defendant Gillen, and (iii) Plaintiff did not complain of a sexual assault on September 21, 2021, and when Plaintiff did complain of sexual assault on September 28, 2021, a physical examination by Dr. D'Amico determined Plaintiff's claims to not be credible (*id.* at 12-14); (3) Defendant Lashway (a) Plaintiff's allegations are inconsistent with his deposition testimony, which reflected an unsupported escalation of the claims, and (b) the objective proof does not support Plaintiff's claims in that, (i) Plaintiff's medical records demonstrate that there was no bruising or

scratching at Plaintiff's neck, and (ii) Defendant Lashway was not present for Plaintiff's OMH admission strip frisk (*id*. at 14-16); and (4) Defendant Devins the evidence is clear that his only involvement in Plaintiff's OMH strip search was observational (*id.* at 16-17). Defendants argue that Plaintiff's retaliation claims must fail with respect to (1) Defendant Durkin because Plaintiff was issued a misbehavior report for an incident that was captured on video, which was upheld by the hearing officer and on appeal, and would have been issued even in the absence of Plaintiff's expressed intent to file a PREA complaint (Dkt. No. 68, Attach. 2 at 18-19); (2) Defendant Lashway because there is no causal nexus between the alleged retaliatory act (Defendant Lashway's application of force) and Plaintiff's speech (*id.* 19); and (3) Defendant Gillen because Plaintiff's medical records show that he was repeatedly seen by medical providers throughout his time in Clinton and there is thus, no evidence that a retaliatory act occurred (*id*. at 20). Further, Defendants argue that Plaintiff's deliberate medical indifference claims must fail with respect to (1) Defendant Durkin because (a) Plaintiff's medical records demonstrate that he did not suffer any injury at or around the time of his alleged fall from a stretcher, and (b) Plaintiff was evaluated at the infirmary after his alleged fall; (2) Defendant King because (a) there is no objective evidence that Plaintiff suffered any injury and subsequent medical evaluations showed no signs of injury, and (b) Plaintiff's medical record shows that he was repeatedly seen by medical providers throughout his time at Clinton. (Dkt. No. 68, Attach. 2 at 20-23.)

Fourth, in the alternative, Defendants argue that they are entitled to dismissal of Plaintiff's claims based on the doctrine of qualified immunity. (*Id*. at 23-24.)

### 3. Plaintiff's Reply in Support of His Motion for Summary Judgment and Response in Opposition to Defendants' Cross Motion for Summary Judgment

Generally, in further support of his motion for summary judgment, and in opposition to Defendants' cross-motion for summary judgment, Plaintiff asserts the following four arguments:

(1) Plaintiff is entitled to summary judgment; (2) Plaintiff exhausted his administrative remedies with respect to all of his claims; (3) Plaintiff's claims must be granted on their merits; and (4) Defendants are not entitled to dismissal based on the doctrine of qualified immunity. (*See generally* Dkt. No. 71, Attach. 1 at 4-12.)

More specifically, Plaintiff first argues that Defendants admitted and conceded "practically all the facts [and] characterizations asserted by Plaintiff in support of his motion." (Dkt. No. 71, Attach. 1 at 5.) Plaintiff argues that because "material questions of fact exist in this matter . . . he is . . . entitled to summary judgment." (*Id*.)

Second, Plaintiff argues that during his time at Clinton, he filed grievances, appealed to the Clinton Superintendent, and appealed to CORC, on the following issues: (1) a body cavity search on September 21, 2021, by Defendant Kelly; (2) a body cavity search on October 5, 2021; (3) Defendant Devins squeezing Plaintiff's testicles; (4) Defendant Durkin filing a false misbehavior report; (5) Defendant Lashway assaulting Plaintiff by placing his elbow on Plaintiff's throat; (6) Defendant King's conduct refusing to report a use of force incident; and (7) Defendant Durkin ordering staff to deny Plaintiff medical attention or failing to report an incident. (Dkt. No. 71, Attach. 1 at 6.) Plaintiff argues that his grievances were opened and destroyed due to there being no grievance lockbox available for him to use. (*Id*.) Plaintiff argues that the IGRC was not processing his grievances. (*Id*.)

Third, Plaintiff argues that, on the merits, his claims must be granted. (Dkt. No. 71, Attach. 1 at 7-11.) More specifically, Plaintiff argues that, with respect to his excessive force claims against (1) Defendant Durkin, he was assaulted on October 5, 2021, in the tier office and the video was a reflection of the second time that Defendant Durkin approached him; (2) Defendant Kelly, he was assaulted on September 21, 2021, in the D-block recreation area; during

the assault Defendant Kelly pushed Plaintiff into the wall, conducted a pat frisk, and inserted his fingers into Plaintiff's rectum; (3) Defendant Lashway, (a) on October 5, 2021, Defendant Lashway shoved his elbow into Plaintiff's throat causing injuries that still exist to present date, and (b) on October 7, 2023,[33] Defendant Lashway threatened Plaintiff to plead guilty "to a Tier III or be killed," and (4) Defendant Devins, squeezed Plaintiff's testicles after Plaintiff was "admitted to OBS." (Dkt. No. 71, Attach. 1 at 7-9.) Plaintiff argues that, with respect to his retaliation claims (1) Plaintiff reported a PREA and Defendant Durkin placed him in SHU in retaliation, which is an adverse action; (2) Defendant Lashway assaulted Plaintiff on the stretcher for reporting a PREA against Defendant Durkin; (3) Defendant Gillen denied Plaintiff medical care and gave Plaintiff "an ultimatum to drop the PREAs." (*Id*. at 9.) Plaintiff argues that, with respect to his deliberate medical indifference claims, those claims survive because (1) Defendant Durkin assaulted Plaintiff causing a ruptured blood vessel, swollen face, and fractured nose; (2) Plaintiff's fall from the stretcher was witnessed and acknowledged by Defendant Lashway in his interrogatory answers (that Attorney Durando refused to provide); (3) Plaintiff was not examined by a qualified nurse—to assist him in response to his injuries; (4) Defendant King witnessed Plaintiff's fall off the stretcher and attack by Defendant Lashway, but worked with Defendant Lashway to send Plaintiff to the SHU pursuant to Defendant Durkin's orders; and (5) Plaintiff was seen by Dr. D'Amico on September 9, 2021, but was never seen by a nurse or doctor for nerve damage to his neck, vision impairments, concussion, nose bleeds, chronic headaches, immobility—inability to stand for extended periods, no feeling in left hand, fractured foot, and no feeling in right foot. (*Id*. at 10-11.)

---

[33]    The undersigned presumes that Plaintiff's recitation of this date was in error and that he intended to say this incident happened on October 7, 2021.

Fourth, Plaintiff argues that Defendants have clearly deviated from the reasonable execution and discharge of their duties by assaulting him, placing him in the SHU, denying him medical care, and retaliating against him for reporting RPEA, and thus, are not entitled to dismissal of his claims pursuant to the doctrine of qualified immunity. (*Id.* at 11-12.)

## II.    RELEVANT LEGAL STANDARDS

### A.    Standard Governing A Motion For Summary Judgment

Under Fed. R. Civ. P. 56, summary judgment is warranted if "the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute of fact is "genuine" if "the [record] evidence is such that a reasonable jury could return a verdict for the [non-movant]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).[34] As for the materiality requirement, a dispute of fact is "material" if it "might affect the outcome of the suit under the governing law . . . . Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson*, 477 U.S. at 248.

In determining whether a genuine issue of material fact exists, the Court must resolve all ambiguities and draw all reasonable inferences against the movant. *Anderson*, 477 U.S. at 255. In addition, "[the movant] bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the . . . [record] which it believes demonstrate[s] the absence of any genuine issue of material fact." *Celotex v. Catrett*, 477 U.S. 317, 323-24 (1986). However, when the movant has met its initial burden, the non-movant must

---

[34]    As a result, "[c]onclusory allegations, conjecture and speculation . . . are insufficient to create a genuine issue of fact." *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998) (citation omitted). As the Supreme Court has explained, "[The non-movant] must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986).

come forward with specific facts showing a genuine issue of material fact for trial.  Fed. R. Civ. P. 56(a), (c), (e).

Implied in the above-stated burden-shifting standard is the fact that, where a non-movant willfully fails to respond to a motion for summary judgment, a district court has no duty to perform an independent review of the record to find proof of a factual dispute–even if that non-movant is proceeding *pro se*.[35]  (This is because the Court extends special solicitude to the *pro se* litigant largely by ensuring that he or she has received notice of the consequences of failing to properly respond to the motion for summary judgment.)[36]  As has often been recognized by both the Supreme Court and Second Circuit, even *pro se* litigants must obey a district court's procedural rules.[37]

Of course, when a non-movant willfully fails to respond to a motion for summary judgment, "[t]he fact that there has been no [such] response . . . does not . . . [by itself] mean that the motion is to be granted automatically."  *Champion v. Artuz*, 76 F.3d 483, 486 (2d Cir. 1996).  Rather, as indicated above, the Court must assure itself that, based on the undisputed material facts, the law indeed warrants judgment for the movant.  *Champion*, 76 F.3d at 486; *Allen v. Comprehensive Analytical Grp., Inc.*, 140 F. Supp. 2d 229, 232 (N.D.N.Y. 2001) (Scullin, C.J.); N.D.N.Y. L.R. 56.1.  What the non-movant's failure to respond to the motion does is lighten the movant's burden.

---

[35]     *Cusamano v. Sobek*, 604 F. Supp. 2d 416, 426 & n.2 (N.D.N.Y. 2009) (Suddaby, J.) (citing cases).

[36]     *Cusamano*, 604 F. Supp. 2d at 426 & n.3 (citing cases).

[37]     *Cusamano*, 604 F. Supp. 2d at 426-27 & n.4 (citing cases).

For these reasons, this Court has often enforced Local Rule 56.1(b) by deeming facts set forth in a movant's statement of material facts to be admitted, where (1) those facts are supported by evidence in the record, and (2) the non-movant has willfully failed to properly respond to that statement[38]–even when the non-movant was proceeding *pro se*.[39]

Similarly, in this District, where a non-movant has willfully failed to respond to a movant's properly filed and facially meritorious memorandum of law, the non-movant is deemed to have "consented" to the legal arguments contained in that memorandum of law under Local Rule 7.1(a)(3).[40]  Stated another way, when a non-movant fails to oppose a legal argument asserted by a movant, the movant may succeed on the argument by showing that the argument possesses facial merit, which has appropriately been characterized as a "modest" burden.  *See* N.D.N.Y. L.R. 7.1(a)(3) ("Where a properly filed motion is unopposed and the Court determined that the moving party has met its burden to demonstrate entitlement to the relief requested therein . . . ."); *Rusyniak v. Gensini*, 07-CV-0279, 2009 WL 3672105, at *1, n.1 (N.D.N.Y. Oct.

---

[38]     Among other things, Local Rule 56.1 (previously Local Rule 7.1(a)(3)) requires that the non-movant file a response to the movant's Statement of Material Facts, which admits or denies each of the movant's factual assertions in matching numbered paragraphs, and supports any denials with a specific citation to the record where the factual issue arises.  N.D.N.Y. L. R. 56.1.

[39]     *Cusamano*, 604 F. Supp. 2d at 427 & n.6 (citing cases); *see also Prestopnik v. Whelan*, 253 F. Supp. 2d 369, 371 (N.D.N.Y. 2003) (Hurd, J.) (holding that the Court is not required to "perform an independent review of the record to find proof of a factual dispute.").

[40]     *See*, *e.g.*, *Beers v. GMC*, 97-CV-0482, 1999 U.S. Dist. LEXIS 12285, at *27-31 (N.D.N.Y. March 17, 1999) (McCurn, J.) (deeming plaintiff's failure, in his opposition papers, to oppose several arguments by defendants in their motion for summary judgment as consent by plaintiff to the granting of summary judgment for defendants with regard to the claims that the arguments regarded, under Local Rule 7.1(a)(3) (previously Local Rule 7.1(b)(3)); *Devito v. Smithkline Beecham Corp.*, 02-CV-0745, 2004 WL 3691343, at *3 (N.D.N.Y. Nov. 29, 2004) (McCurn, J.) (deeming plaintiff's failure to respond to "aspect" of defendant's motion to exclude expert testimony as "a concession by plaintiff that the court should exclude [the expert's] testimony" on that ground).

30, 2009) (Suddaby, J.) (collecting cases); *Este-Green v. Astrue*, 09-CV-0722, 2009

WL2473509, at *2 & n.3 (N.D.N.Y. Aug. 7, 2009) (Suddaby, J.) (collecting cases).

### B.    Standard Governing Exhaustion of Administrative Remedies

Under the Prison Litigation Reform Act ("PLRA"), "[n]o action shall be brought with

respect to prison conditions under section 1983 . . . by a prisoner confined in any jail, prison, or

other correctional facility until such administrative remedies as are available are exhausted."  42

U.S.C. § 1997e(a); *see also Ross v. Blake*, 136 S. Ct. 1850, 1854-55 (2016) ("The [PLRA]

mandates that an inmate exhaust 'such administrative remedies as are available' before bringing

suit to challenge prison conditions.").  "[T]he PLRA's exhaustion requirement applies to all

inmate suits about prison life, whether they involve general circumstances or particular episodes,

and whether they allege excessive force or some other wrong."  *Porter v. Nussle*, 534 U.S. 516,

532 (2002).  "There is no question that exhaustion is mandatory under the PLRA and that

unexhausted claims cannot be brought in court."  *Jones v. Bock*, 549 U.S. 199, 211 (2007).

The PLRA requires "proper exhaustion," which means using all steps required by the

administrative review process applicable to the institution in which an inmate is confined and

doing so properly.  *Jones*, 549 U.S. at 218 (citing *Woodford v. Ngo*, 548 U.S. 81, 88 (2006)); *see*

*also Amador v. Andrews*, 655 F.3d 89, 96 (2d Cir. 2011) (exhaustion necessitates "'using all

steps that the [government] agency holds out, and doing so properly'" (quoting *Woodford*, 548

U.S. at 90)).  In New York State prisons, DOCCS has a well-established three-step incarcerated

grievance program ("IGP"), in which, (1) the inmate must file a grievance with the Inmate

Grievance Resolution Committee ("IGRC") within twenty-one days of the alleged occurrence,

(2) the inmate must then appeal an adverse decision by the IGRC to the superintendent of the

facility within seven days after receipt of the IGRC's response, and (3) the inmate must then

appeal an adverse decision by the superintendent to the CORC within seven days after receipt of the superintendent's response.  7 N.Y.C.R.R. § 701.5; *McGee v. McGready*, 16-CV-4187, 2018 WL 2045094, at *2 (S.D.N.Y. Apr. 30, 2018).

"[W]hen a grievance concerns staff harassment, DOCCS procedures provide for an expedited review that allows for the complaint to bypass IGRC review and proceed before the Superintendent in the first instance." *Jackson v. Jackson*, 16-CV-8516, 2021 WL 981849, at *4 (S.D.N.Y. Mar. 16, 2021); *see* 7 N.Y.C.R.R. § 701.8.  Under the expedited procedure, the Superintendent has twenty-five days to respond to the grievance.  7 N.Y.C.R.R. § 701.8.  If the Superintendent fails to respond within twenty-five days, the inmate may appeal directly to CORC.  *Id.* § 701.8(g).  If the Superintendent does respond, the inmate has seven days from receipt of the response to appeal to CORC.  *Id.* § 701.8(h).  The IGP Supervisor has discretion to grant exceptions to the time limits for filing or appealing grievances.  *See id.* § 701.6(g).  Whether or not the Superintendent timely responds, the procedure to appeal a determination of the Superintendent to CORC is to file "a notice of decision to appeal (form #2133) with the inmate grievance clerk."  *Id.* § 701.8(g)-(h).[41]  Inmates who have been transferred to a different facility can get their appeal to the appropriate grievance clerk by "mail[ing] the signed appeal form back to the IGP supervisor at the facility where the grievance was originally filed."  *Id.* § 701.6(h)(2).

"CORC is required to provide, through IGP staff, written confirmation that an appeal has been received, and if the inmate does not receive such confirmation within forty-five days, he 'should contact the IGP supervisor in writing to confirm that the appeal was filed and transmitted

---

[41]    The procedure to appeal to CORC under the normal, non-expedited procedures is the same.  7 N.Y.C.R.R. § 701.5(d)(1)(i).

to CORC.'" *Ruiz v. Link*, 20-CV-0235, 2022 WL 3020254, at *4 (S.D.N.Y. July 29, 2022)

(quoting 7 N.Y.C.R.R. § 701.5(d)(3)(i)).  The IGP requires CORC to respond to an appeal within

thirty days of receipt.  7 N.Y.C.R.R. § 701.5(d)(3)(ii).  If CORC has received an appeal and fails

to rule within those thirty days, the inmate is considered to have exhausted his administrative

remedies and may file suit.  *Hayes v. Dahlke*, 976 F.3d 259, 270 (2d Cir. 2020).

While the PLRA mandates exhaustion of administrative remedies, it also "contains its

own, textual exception to mandatory exhaustion."  *Ross*, 136 S. Ct. at 1858.  More specifically,

section 1997e(a) provides that only those administrative remedies that "are available" must first

be exhausted.  42 U.S.C. § 1997e(a); *see also Ross*, 136 S. Ct. at 1858 ("[T]he exhaustion

requirement hinges on the availability of administrative remedies[.]") (quotation marks and

citations omitted).  In the PLRA context, the Supreme Court has determined that "availability"

means that "an inmate is required to exhaust those, but only those, grievance procedures that are

capable of use to obtain some relief for the action complained of."  *Ross*, 136 S. Ct. at 1859

(quotation marks and citations omitted).

The *Ross* Court identified three circumstances in which a court may find that internal

administrative remedies are not available to prisoners under the PLRA.  *Id.* at 1859-60.  First,

"an administrative procedure is unavailable when (despite what regulations or guidance materials

may promise) it operates as a simple dead end—with officers unable or consistently unwilling to

provide any relief to aggrieved inmates."  *Id.* at 1859.  "Next, an administrative scheme might be

so opaque that it becomes, practically speaking, incapable of use."  *Id.*  Finally, an administrative

remedy is not "available" when "prison administrators thwart inmates from taking advantage of a

grievance process through machination, misrepresentation, or intimidation."  *Id.* at 1860.  In

*Williams v. Corr. Officer Priatno*, 829 F.3d 118, 123 n.2 (2d Cir. 2016), the Second Circuit noted

that "the three circumstances discussed in *Ross* do not appear to be exhaustive[.]" The illustrations of unavailability in *Ross* nonetheless guide the Court's inquiry. *Mena v. City of New York*, 13-CV-2430, 2016 WL 3948100, at *4 (S.D.N.Y. July 19, 2016).

Because non-exhaustion is an affirmative defense, the defendant bears the burden of showing that a prisoner has failed to satisfy the exhaustion requirements. *See Jones*, 549 U.S. at 216. The plaintiff must then establish the IGP grievance procedure was unavailable to him under *Ross*. *Id.*

### C.    Standard Governing Excessive Force Claims

The Eighth Amendment protects prisoners from "cruel and unusual punishment" at the hands of prison officials. *Wilson v. Seiter*, 501 U.S. 294, 296-97 (1991); *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). This includes punishments that "involve the unnecessary and wanton infliction of pain." *Gregg v. Georgia*, 428 U.S. 153, 173 (1976). The Eighth Amendment's prohibition against cruel and unusual punishment encompasses the use of excessive force against an inmate, who must prove two components: (1) subjectively, that the defendant acted wantonly and in bad faith, and (2) objectively, that the defendant's actions violated "contemporary standards of decency." *Blyden v. Mancusi*, 186 F.3d 252, 262-63 (2d Cir. 1999) (internal quotations omitted) (citing *Hudson v. McMillian*, 503 U.S. 1, 8 (1992)).

Although "a *de minimis* use of force will rarely suffice to state a constitutional claim," *Romano v. Howarth*, 998 F.2d 101, 105 (2d Cir. 1993), the malicious use of force to cause harm constitutes an Eighth Amendment violation per se because in such an instance "contemporary standards of decency are always violated." *Blyden*, 186 F.3d at 263 (citing *Hudson*, 503 U.S. at 9). The key inquiry into a claim of excessive force is "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Hudson*,

503 U.S. at 7 (citing *Whitley v. Albers*, 475 U.S. 312, 321-22 (1986)); *see also Johnson v. Glick*, 481 F.2d 1028, 1033 (2d Cir. 1973).

"To determine whether a defendant acted maliciously, several factors should be examined including, 'the extent of the injury and the mental state of the defendant, as well as the need for the application of force; the correlation between that need and the amount of force used; the threat reasonably perceived by the defendants; and any efforts made by the defendants to temper the severity of a forceful response.'" *Scott v. Coughlin*, 344 F.3d 282, 291 (2d Cir. 2003) (quoting *Romano*, 998 F.2d at 105).

### D.      Standard Governing Retaliation Claims

"To prevail on a First Amendment retaliation claim, an inmate must establish (1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected conduct and the adverse action." *Hayes v. Dahlke*, 976 F.3d 259, 272 (2d Cir. 2020) (cleaned up).  As the Second Circuit has repeatedly cautioned, "[c]ourts properly approach prisoner retaliation claims 'with skepticism and particular care,' because 'virtually any adverse action taken against a prisoner by a prison official—even those otherwise not rising to the level of a constitutional violation—can be characterized as a constitutionally proscribed retaliatory act.'" *Davis v. Goord*, 320 F.3d 346, 352 (2d Cir. 2003) (quoting *Dawes v. Walker*, 239 F.3d 489, 491 (2d Cir. 2001), *overruled on other grounds by Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002)); *see also Phelps v. Kapnolas*, 308 F.3d 180, 187 n.6 (2d Cir. 2002).

"[A]dverse action" for the purposes of a retaliation claim has been defined as "retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising . . .

constitutional rights . . . [o]therwise the retaliatory act is simply de minimis and therefore outside

the ambit of constitutional protection." *Davis*, 320 F.3d at 353 (citing *Dawes*, 239 F.3d at 493).

To establish a causal connection between protected activities and the adverse action, the

court may consider a number of factors, including "(1) the outcome of any hearing concerning

the allegedly retaliatory charges; (2) the inmate's prior disciplinary record; (3) any statements

made by the defendant concerning his motivation; and[] (4) the temporal proximity between the

protected activity and the defendant's adverse action." *Williams v. Muller*, 98-CV-5204, 2001

WL 936297, at *3 (S.D.N.Y. Aug. 17, 2001) (citing *Colon v. Coughlin*, 58 F.3d 865, 873 (2d

Cir. 1995) *abrogated, in part, on other grounds by Tangreti v. Bachmann*, 983 F.3d 609 (2d Cir.

2020)).  However, with respect to temporal proximity at the summary judgment stage, the

Second Circuit has "consistently required some further evidence of retaliatory animus before

permitting a prisoner to proceed to trial on a retaliation claim." *Washington v. Afify*, 681 F.

App'x 43, 46 (2d Cir. 2017).

### E.    Legal Standard Governing Deliberate Indifference to Serious Medical Needs Under the Eighth Amendment

"A prison official's 'deliberate indifference' to a substantial risk of serious harm to an

inmate violates the Eighth Amendment." *Farmer v. Brennan*, 511 U.S. 825, 828 (1994) (quoting

*Helling v. McKinney*, 509 U.S. 25, 25 (1993)).  Within that framework, "[t]he Cruel and Unusual

Punishments Clause of the Eighth Amendment imposes a duty upon prison officials to ensure

that inmates receive adequate medical care." *Salahuddin v. Goord*, 467 F.3d 263, 279 (2d Cir.

2006); *accord, Estelle v. Gamble*, 429 U.S. 97, 103 (1976).  However, "[b]ecause society does

not expect that prisoners will have unqualified access to health care, deliberate indifference to

medical needs amounts to an Eighth Amendment violation only if those needs are 'serious.'"

*Hudson v. McMillian*, 503 U.S. 1, 9 (1992) (citing *Estelle*, 429 U.S. at 103-04).  In this context, a

prison official violates the Eighth Amendment only when two requirements are satisfied. *Farmer*, 511 U.S. at 834.

### 1.    Objective Requirement–Serious Medical Needs

"The first requirement is objective: the alleged deprivation of adequate medical care must be 'sufficiently serious.'" *Salahuddin*, 467 F.3d at 279 (citation and internal quotation marks omitted); *accord*, *Farmer*, 511 U.S. at 834.  Evaluation of the objective prong involves two inquiries: (1) "whether the prisoner was actually deprived of adequate medical care," and (2) "whether the inadequacy in medical care is sufficiently serious."  *Salahuddin*, 467 F.3d at 279-80.

With regard to the first inquiry, because a prison official need only provide "reasonable care," one who acts reasonably in response to an inmate's health risk "cannot be found liable under the Cruel and Unusual Punishments clause."  *Id.* at 279-80 (quoting *Farmer*, 511 U.S. at 847).  "The word 'adequate' reflects the reality that '[p]rison officials are not obligated to provide inmates with whatever care the inmates desire.'"  *Banks v. Annucci*, 48 F. Supp. 3d 394, 408-09 (N.D.N.Y. 2014) (Hurd, J.) (quoting *Jones v. Westchester Cnty. Dept. of Corrs. Med. Dept.*, 557 F. Supp. 2d 408, 413 (S.D.N.Y. 2008)).

With regard to the second inquiry, determining whether the alleged inadequacy was "sufficiently serious" involves an examination of "how the offending conduct is inadequate and what harm, if any, the inadequacy has caused or will likely cause the prisoner."  *Salahuddin*, 467 F.3d at 280 (citation omitted).  If the unreasonable medical care alleged was a "failure to provide any treatment" for the inmate's medical condition, courts examine whether the condition itself is sufficiently serious.  *Id.*; *see also Smith v. Carpenter*, 316 F.3d 178, 185-86 (2d Cir. 2003) ("There is no need to distinguish between a prisoner's underlying 'serious medical condition'

and the circumstances of his 'serious medical need' when the prisoner alleges that prison officials have failed to provide general treatment for his medical condition.") (footnote omitted). "Factors relevant to the seriousness of a medical condition include whether 'a reasonable doctor or patient would find [it] important and worthy of comment,' whether the condition 'significantly affects an individual's daily activities,' and whether it causes 'chronic and substantial pain.'" *Salahuddin*, 467 F.3d at 280 (quoting *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998)); *accord, Rodriguez v. Manenti*, 606 F. App'x 25, 26 (2d Cir. 2015) (summary order); *Hathaway v. Coughlin*, 99 F.3d 550, 553 (2d Cir. 1996) ("Objectively, the alleged deprivation must be 'sufficiently serious,' in the sense that 'a condition of urgency, one that may produce death, degeneration, or extreme pain' exists.") (citation omitted). "A finding of a serious medical need 'is necessarily contextual and fact-specific,' and thus 'must be tailored to the specific circumstances of each case.'" *Shenk v. Cattaraugus Cnty.*, 305 F. App'x 751, 753 (2d Cir. 2009) (summary order) (quoting *Smith*, 316 F.3d at 185).

However, "[i]n cases where the inadequacy is in the medical treatment given," as opposed to a complete absence of treatment, "the seriousness inquiry is narrower." *Salahuddin*, 467 F.3d at 280. "For example, if the prisoner is receiving on-going treatment and the offending conduct is an unreasonable delay or interruption in that treatment, the seriousness inquiry 'focus[es] on the challenged delay or interruption in treatment rather than' [the inmate's medical condition]." *Id.* (quoting *Smith*, 316 F.3d at 185). "In other words, the Court asks 'whether, from an objective standpoint, the temporary deprivation was sufficiently harmful to establish a constitutional violation.'" *Kidkarndee v. Koenigsmann*, 12-CV-0502, 2014 WL 1239319, at *14 (N.D.N.Y. Mar. 25, 2014) (Suddaby, J., adopting Report-Recommendation of Hummel, M.J.) (quoting *Frank v. Cnty. of Ontario*, 884 F. Supp. 2d 11, 19 (W.D.N.Y. 2012)).

## 2.    Subjective Requirement–Deliberate Indifference

"The second requirement for an Eighth Amendment violation is subjective: the charged official must act with a sufficiently culpable state of mind." *Salahuddin*, 467 F.3d at 280.  "[A] complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment." *Estelle*, 429 U.S. at 106; *accord, Daniels v. Williams*, 474 U.S. 327, 331-33 (1986) (explaining that "injuries inflicted by governmental negligence are not addressed by the United States Constitution").

"[D]eliberate indifference [for purposes of an Eighth Amendment claim] describes a state of mind more blameworthy than negligence," *Farmer*, 511 U.S. at 835, equivalent to "subjective recklessness, as the term is used in criminal law." *Salahuddin*, 467 F.3d at 280; *Smith*, 316 F.3d at 184.  "This mental state requires that the charged official act or fail to act while actually aware of a substantial risk that serious inmate harm will result." *Salahuddin*, 467 F.3d at 280; *accord, Farmer*, 511 U.S. at 837-38 ("An act or omission unaccompanied by knowledge of a significant risk of harm might well be something society wishes to discourage, and if harm does result society might well wish to assure compensation.  The common law reflects such concerns when it imposes tort liability on a purely objective basis.").  Because this inquiry is subjective, "[p]rison officials may . . . introduce proof that they were not so aware, such as testimony that 'they knew the underlying facts but believed (albeit unsoundly) that the risk to which the facts gave rise was insubstantial or nonexistent.'" *Salahuddin*, 467 F.3d at 280 (quoting *Farmer*, 511 U.S. at 844).  However, "evidence that the risk was obvious or otherwise must have been known to a defendant is sufficient to permit a jury to conclude that the defendant was actually aware of it." *Brock v. Wright*, 315 F.3d 158, 164 (2d Cir. 2003).  "Whether a course of treatment was the

product of sound medical judgment, negligence, or deliberate indifference depends on the facts

of the case." *Chance*, 143 F.3d at 703.

## III.    ANALYSIS

### A.    Whether Plaintiff Is Entitled to Summary Judgment

After carefully considering the matter, for the reasons set forth in Defendants'

memorandum of law (Dkt. No. 68, Attach. 2 at 5), I recommend that Plaintiff's motion for

summary judgment (Dkt. No. 65) be denied.  Plaintiff argues that issues of fact remain for trial.

As a result, Plaintiff— as the movant—failed to establish that there is no genuine dispute as to

any material fact and that he is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a);

*Anderson*, 477 U.S. at 247.

### B.    Whether Defendants Are Entitled to Summary Judgment

After carefully considering the matter, the undersigned answers this question in the

affirmative, in part, and in the negative, in part.

#### 1.    Exhaustion

As set forth in Defendants' memorandum of law and supporting declarations, Plaintiff

failed to exhaust his administrative remedies by appealing to CORC the following eight claims:

(1) excessive force against Defendant Kelly related to the cavity search on September 21, 2021;

(2) excessive force against Defendant Lashway related to the unnecessarily rough cavity search;

(3) excessive force against Defendant Lashway for his elbow placement on Plaintiff's throat after

Plaintiff fell off the stretcher on October 5, 2021; (4) excessive force against Defendant Devins

for squeezing Plaintiff's testicles; (5) retaliation against Defendant Durkin related to the filing of

a false misbehavior report on October 5, 2021; (6) retaliation against Defendant Lashway for his

elbow placement on Plaintiff's throat; (7) deliberate medical indifference against Defendant

King for refusing to report an incident after watching Plaintiff fall off the stretcher on October 5,

2021; and (8) deliberate medical indifference against Defendant Durkin for ordering staff to deny Plaintiff medical attention and failing to report an unusual incident after Plaintiff fell off the stretcher on October 5, 2021.[42]  (Dkt. No. 68, Attach. 2 at 5-9; Dkt. No. 68, Attach. 13.) Although Plaintiff argued that he filed "grievances and appeals to the Clinton IGP, Superintendent, & C.O.R.C." regarding those eight claims, Plaintiff fails to present evidence in admissible format to establish a genuine dispute of material fact for trial that he exhausted his administrative remedies.  (Dkt. No. 71, Attach. 1 at 6.)

Instead, Plaintiff stated under penalty of perjury that he filed his grievances "addressed to IGRC" then "filed his grievances to C.O.R.C., the Attorney General, NYS Police . . . . [and] filed a complaint to the Prisoner Legal Service[.]"  (Dkt. No. 71, Attach. 1 at 17; *see* Dkt. No. 71, Attach. 1 at 77 [Plaintiff's purported appeal dated October 18, 2021, addressed to Rachel Seguin "And any other party who represent the C.O.R.C. in the matter of appeals"]; Dkt. No. 71, Attach. 1 at 83 [Plaintiff's letter dated October 8, 2021, addressed to the New York State Department of Law]; Dkt. No. 71, Attach. 1 at 85 [Plaintiff's letter dated October 21, 2021, addressed to the New York State Police].)  However, mailing an appeal directly to CORC does not result in proper exhaustion of administrative remedies.  *See Fox v. Gifford*, 20-CV-0797, 2023 WL 4210870, at *9 (N.D.N.Y. Feb. 16, 2023) (Lovric, M.J.) (citing *Ruiz v. Link*, 20-CV-0235, 2022 WL 3020254, at *5 (S.D.N.Y. July 28, 2022) (holding that "[n]othing in the record indicates that

---

[42]     Consequently, Defendants' argument regarding Plaintiff's failure to exhaust his administrative remedies does not apply to the following two claims: (1) excessive force claim against Defendant Durkin for slapping Plaintiff's butt on October 5, 2021, before his disciplinary hearing; and (2) retaliation claim against Defendant Gillen for denying medical treatment in response to Plaintiff's PREA complaint.  (*Compare* Dkt. No. 4 at 11-28 [outlining which of Plaintiff's claims survived *sua sponte* review of the Complaint pursuant to 28 U.S.C. § 1915(e) and 28 U.S.C. § 1915A(b)], *with* Dkt. No. 68, Attach. 2 at 8-9 [Defendants' memorandum of law outlining which of Plaintiff's claims have not been properly exhausted].)

Plaintiff followed [the proper] procedure; rather, it appears he tried to mail his appeal directly to CORC, and CORC never received the document. . . . Accordingly, Plaintiff failed to properly follow the grievance procedure and has failed to exhaust his administrative remedies.")) (noting that "if Plaintiff had mailed the appeal solely to CORC, he would not have properly exhausted his administrative remedies."), *report and recommendation adopted by* 2023 WL 2403742 (N.D.N.Y. Mar. 8, 2023) (Sharpe, J.); *Valverde v. Folks*, 19-CV-8080, 2022 WL 836310, at *6 (S.D.N.Y. Mar. 21, 2022) ("Plaintiff did not properly comply with [the] prison grievance procedural rules.  Plaintiff . . . mailed his appeal statement directly to CORC.  However, to appeal a decision denying a grievance, an inmate must submit the appeal, not directly to CORC, but to the grievance supervisor of the facility where the grievance was originally filed for forwarding to that facility's grievance clerk."); *Wilkinson v. Banks*, 02-CV-0361, 2007 WL 2693636, at *6 (W.D.N.Y. Sept. 10, 2007) ("[N]o dispute exists that [the *pro se* plaintiff] did not follow correct procedure in attempting to appeal that grievance to CORC.  He did not file his appeal with the Inmate Grievance Clerk as required by the regulations, but rather mailed it directly to CORC.").

Moreover, Plaintiff's claim that he informed other government officials of his grievances, does not excuse his failure to exhaust.  Indeed, it is well-settled that "[s]uch correspondence does not satisfy exhaustion and falls outside of the grievance procedures."  *Rodriguez v. Cross*, 15-CV-1079, 2017 WL 2791063, at *4 (N.D.N.Y. May 9, 2017) (Hummel, M.J.) (collecting cases), *report and recommendation adopted by* 2017 WL 2790530 (N.D.N.Y. June 27, 2017) (Suddaby, C.J.); *see Geer v. Champan*, 15-CV-0952, 2016 WL 6091699, at *5 (N.D.N.Y. Sept. 26, 2016) (Baxter, M.J.) ("It is well-settled that writing letters to prison officials, or other officials, is

insufficient to properly exhaust administrative remedies."), *report and recommendation adopted by* 2016 WL 6090874 (N.D.N.Y. Oct. 18, 2016) (Sharpe, J.).

Similarly, to the extent Plaintiff claims his grievances were not answered, that does not excuse his failure to exhaust.  As set forth above in Part II.B. of this Order and Report-Recommendation, "a prisoner must proceed through all three levels of the IGP to satisfy the PLRA's exhaustion requirement.  *Cohen*, 2017 WL 3311244, at *6.  "Thus, where a prisoner files a grievance, and the IGRC does not respond, the inmate must nevertheless exhaust his appeals to the facility superintendent and the CORC."  *Hernandez v. Coffey*, 99-CV-11615, 2003 WL 22241431, at *4 (S.D.N.Y. Sept. 29, 2003); *see also Muhammad v. Corr. Officer Douglas*, 15-CV-0935, 2016 WL 3082657, at *4 (S.D.N.Y. May 26, 2016) ("Compliance requires an inmate to appeal properly to the CORC, even if the inmate receives no response from the IGRC at the first step of exhaustion."); *Arce v. Keane*, 01-CV-2648, 2004 WL 439428, at *2 (S.D.N.Y. Mar. 9, 2004) ("An inmate's failure to appeal a grievance is not excused because he has received no response to his initial grievance.").  Only after an inmate has properly exhausted all three levels of review, may an inmate seek relief pursuant to Section 1983.  *Torres v. Carry*, 672 F. Supp. 2d 338, 344 (S.D.N.Y. 2009).

To the extent that Plaintiff's opposition is construed as arguing that the administrative remedies were not "available" to him, I find that argument unpersuasive for four reasons.  First, Plaintiff successfully filed a grievance with the inmate grievance office, which indicates that the procedure was "available" to him.  (Dkt. No. 71 at 8, ¶ 63); *see Cohen*, 2017 WL 3311244, at *6 (holding that where the plaintiff claimed he "turned in grievances to the IG Office" that "indicates that the procedure was 'available' to him.").  Second, Plaintiff appears to assert that because a lockbox was not provided in the Clinton SHU pursuant to Directive 4040, the entire

grievance process was unavailable to him. (Dkt. No. 71, Attach. 1 at 6-7.) However, Directive

4040 does not mandate the use of lockboxes and instead permissibly reads, "[w]here available,

SHU inmates shall use centrally located IGP deposit boxes to send grievance forms and IGP

correspondence to the IGP office." (Dkt. No. 71, Attach. 1 at 61.) Third, Plaintiff acknowledges

that he "filed his grievances to C.O.R.C." (Dkt. No. 71, Attach. 1 at 17, ¶ 13), which reflects

improper compliance with exhaustion requirements as opposed to the process being unavailable

to him. Fourth, "courts in this Circuit have granted summary judgment for failure to exhaust

administrative remedies, even for a prisoner confined to a SHU or whose ability to directly file a

grievance or make a copy may be limited, when the plaintiff provided no documentation or

minimal corroborative details." *Jackson v. Moore*, 21-CV-1001, 2023 WL 4710869, at *6-7

(N.D.N.Y. Apr. 14, 2023) (Baxter, M.J.) (citing *Sankara v. Montgomery*, 16-CV-0885, 2018 WL

4610686, at *8 (N.D.N.Y. June 25, 2018) (Dancks, M.J.) ("Plaintiff's conclusory allegations that

the DOCCS IGP was unavailable to him [while confined to the SHU] were insufficient to

withstand summary judgment," where the plaintiff "provided no evidence that he actually did

write grievances; when they were written; the content of the grievances . . . the officers named in

the grievance(s) . . . ; the specific steps taken by Plaintiff to provide them to an officer to send to

the grievance office; and any specific follow up with the grievance office[.]"), *report and*

*recommendation adopted*, 2018 WL 3408135 (N.D.N.Y. July 13, 2018) (Scullin, J.); *Simpson v.*

*Price*, 19-CV-1413, 2021 WL 7367083, at *9 (N.D.N.Y. Dec. 29, 2021) (Baxter, M.J.) (in the

absence of any documentary evidence to corroborate plaintiff's alleged attempt to file a grievance

from the SHU, the court concludes that plaintiff's completely unsupported, unclear, and vague

implication that the grievance was not properly processed does not suffice to avoid summary

judgment), *report and recommendation adopted*, 2022 WL 336540 (N.D.N.Y. Feb. 4, 2022)

(D'Agostino, J.); *Ozzborn v. Cornell*, 17-CV-1039, 2021 WL 2227829, at \*5 (N.D.N.Y. June 2, 2021) (Baxter, M.J.) (Plaintiff claimed that he filed a grievance from the SHU by leaving a plain envelope addressed to the grievance committee for the mail personnel to collect; but, because he never received a response, he presumed that the grievance was never submitted. Because plaintiff never followed up on his grievance and successfully filed numerous other grievances in the recent past, he has failed to demonstrate that his administrative remedies were unavailable to him)), *report and recommendation adopted by*, 2023 WL 4711091 (July 24, 2023) (Suddaby, J.).

As a result, I recommend that Defendants' motion for summary judgment (Dkt. No. 68) seeking dismissal of some of Plaintiff's claims for failure to exhaust his administrative remedies, be granted.[43]

### 2.    Merits

#### a.    Excessive Force

##### i.    Defendant Durkin

For the reasons set forth in Defendants' memorandum of law, I recommend that Plaintiff's excessive force claim against Defendant Durkin be dismissed on the merits. (Dkt. No. 68, Attach. 2 at 10-12.) The following is intended to supplement, not supplant, those reasons.

Although in his unsworn memorandum of law in response to Defendants' cross motion for summary judgment Plaintiff stated that the video of his interaction with Defendant Durkin (Dkt. No. 68, Attach. 14) was "manipulated to depict a narrative to create & conform a defense," Plaintiff fails to submit any admissible proof to support this assertion and create a genuine

---

[43]    As set forth above in note 42, to the extent that the Court adopts this recommendation, the following two claims would remain: (1) excessive force claim against Defendant Durkin for slapping Plaintiff's butt on October 5, 2021, before his disciplinary hearing; and (2) retaliation claim against Defendant Gillen for denying medical treatment in response to Plaintiff's PREA complaint.

dispute of material fact for trial.  (Dkt. No. 71, Attach. 1 at 8.)  Instead, Plaintiff's sworn

affidavit merely states in a conclusory fashion that he was "assaulted" by Defendant Durkin.

(Dkt. No. 71, Attach. 1 at 16.)  Moreover, Plaintiff testified during his deposition that although

his memory of the interaction with Defendant Durkin is "great" and "beautiful, . . . the video [of

the alleged assault] is going to be immaculate."  (Dkt. No. 68, Attach. 6 at 66.)  However, as

identified by Defendants, the video of the interaction between Plaintiff and Defendant Durkin

refutes Plaintiff's claims.  (Dkt. No. 68, Attach. 2 at 10-12.)

        As set forth by Defendants, the three requirements of *Jeffreys v. City of New York*, 426

F.3d 549, 554 (2d Cir. 2005) are met here and "no reasonable person" could credit Plaintiff's

version of the events.  (*Id*.)  As a result, I recommend that Defendants' motion for summary

judgment of Plaintiff's excessive force claim against Defendant Durkin be dismissed on the

merits.

### ii.        Defendant Kelly

        In the alternative, if Plaintiff's excessive force claim against Defendant Kelly is not

dismissed for Plaintiff's failure to exhaust administrative remedies as set forth above in Part

III.B.1. of this Report and Recommendation, I recommend that it be dismissed on the merits for

the reasons set forth in Defendants' memorandum of law.[44]  (Dkt. No. 68, Attach. 2 at 12-14.)

---

[44]        However, the undersigned rejects Defendants' arguments that, if Plaintiff's excessive
force claims against Defendants Lashway and Devins survive their failure to exhaust
administrative remedies arguments, that they should be dismissed on the merits.  (Dkt. No. 68,
Attach. 2 at 14-17.)  Although Defendants highlight several inconsistencies between Plaintiff's
testimony and (1) the medical records, and (2) an affidavit from Correction Officer Ashline
swearing that Defendant Lashway was not present and Defendant Devins was merely an
observer during the OMH admission search on October 7, 2021 (Dkt. No. 68, Attach. 2 at 14-
16), the undersigned concludes that after drawing all reasonable inferences in the light most
favorable to Plaintiff, a reasonable person could credit Plaintiff's testimony.  Defendants did not
submit video evidence of the incidents with Defendants Lashway and Devins.  (*See generally*
Dkt. No. 68.)  Moreover, Plaintiff's allegations have not changed the date, location, and involved

Of note, the undersigned emphasizes Defendants' contention that a jury, at trial, would be required to believe changes in the date, location, people involved, and intensity of the attack currently alleged by Plaintiff, which differ substantially from those alleged in the Complaint. (*Id.*)  In addition, the undersigned notes that Plaintiff asserts in his opposition to Defendants' exhaustion argument that he exhausted claims regarding a "body cavity search September 21, 2021 by C.O. Kelly."  (Dkt. No. 71, Attach. 1 at 6.)  However, Plaintiff simultaneously attempts to argue that the incident with Defendant Kelly occurred on September 28, 2021.  (Dkt. No. 65, Attach. 1 at 1.)

### b.    Retaliation

#### i.    Defendant Durkin

In the alternative, if Plaintiff's retaliation claim against Defendant Durkin is not dismissed for Plaintiff's failure to exhaust administrative remedies as set forth above in Part III.B.1. of this Report and Recommendation, I recommend that it be dismissed on the merits for the reasons set forth in Defendants' memorandum of law.  (Dkt. No. 68, Attach. 2 at 18-19.)  The following is intended to supplement, not supplant, those reasons.

"[I]t is well-settled that, even where plaintiff *can* make a showing of retaliatory motive, the defendant may be entitled to summary judgment if she can show that the alleged retaliatory action would have occurred even without the improper motivation."  *Stevens v. Duquette*, 20-CV-0853, 2022 WL 2292975, at *8 (N.D.N.Y. Apr. 19, 2022) (Baxter, M.J.) (citing *Greer v.*

---

actors.  In deciding a motion for summary judgment, "[t]he role of the court is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried."  *Cuff ex rel. B.C. v. Valley Cent. Sch. Dist.*, 677 F.3d 109, 119 (2d Cir. 2012).  "'Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge.'"  *Barrows v. Seneca Foods Corp.*, 512 F. App'x 115, 117 (2d Cir. 2013) (quoting *Redd v. New York Div. of Parole*, 678 F.3d 116, 174 (2d Cir. 2012)).

*Mehiel*, 805 F. App'x 25, 29 (2d Cir. 2020)), *report-recommendation adopted by*, 2022 WL

2292047 (N.D.N.Y. June 24, 2022) (Sannes, J.).  The defendant bears the burden of making the

showing that she would have taken exactly the same action in the absence of an improper

motive.  *Greer*, 805 F. App'x at 29 (citing *Scott v. Coughlin*, 344 F.3d 282, 288 (2d Cir. 2003)).

 Here, Plaintiff's retaliation claim against Defendant Durkin is further subject to dismissal

because Defendant Durkin had a non-retaliatory basis for filing a misbehavior report and would

have taken the same action even if he had known of Plaintiff's PREA complaint.  (Dkt. No. 68,

Attach. 7 at ¶ 21.)  More specifically, the video of the interaction between Plaintiff and

Defendant Durkin reveals that Plaintiff committed some "'if not all, of the prohibited conduct

charged in the misbehavior report.'"  *Flynn v. Ward*, 15-CV-1028, 2018 WL 3195095, at *12

(N.D.N.Y. June 7, 2018) (Hummel, M.J.) (quoting *Gayle v. Gonyea*, 313 F.3d 677, 682 (2d Cir.

2002)), *report and recommendation adopted by*, 2018 WL 3193201 (N.D.N.Y. June 28, 2018)

(Sharpe, J.).  I find that Plaintiff would have been subjected to discipline for violating facility

policy and a direct order, whether or not Defendant Durkin harbored a retaliatory motive.  *See*

*Woods v. Chadwick*, 21-CV-0662, 2023 WL 2864805, at *5 (N.D.N.Y. Jan. 30, 2023) (Baxter,

M.J.) (recommending that summary judgment be granted where the plaintiff acknowledged that

he violated established rules and procedures but claimed that he was issued a misbehavior report

in retaliation for protected conduct), *report and recommendation adopted by*, 2023 WL 2568890

(N.D.N.Y. Mar. 20, 2023) (Suddaby, J.); *Logan v. Graham*, 18-CV-0291, 2019 WL 8015209, at

*14 (N.D.N.Y. Nov. 26, 2019) (Lovric, M.J.) (citing *Flynn*, 2018 WL 3195095, at *12; *Hynes v.*

*Squillace*, 143 F.3d 653, 657 (2d Cir. 1998) (concluding that the plaintiff's admission of the

underlying conduct established a "proper, non-retaliatory reason[] for filing the misbehavior

report.")) (holding that "Defendants have established a non-retaliatory reason for the filing of the

misbehavior report" where the plaintiff admitted that he committed prohibited conduct charged in the misbehavior report), *report and recommendation adopted by*, 2020 WL 871197 (N.D.N.Y. Feb. 21, 2020) (Hurd, J.).

As a result, I recommend that, in the alternative, Defendants' motion for summary judgment be granted with respect to Plaintiff's retaliation claim against Defendant Durkin for the alleged filing of a misbehavior report in retaliation for Plaintiff's PREA complaint.

### ii.    Defendant Lashway

In the alternative, if Plaintiff's retaliation claim against Defendant Lashway is not dismissed for Plaintiff's failure to exhaust administrative remedies as set forth above in Part III.B.1. of this Report and Recommendation, I recommend that it be dismissed on the merits for the reasons set forth in Defendants' memorandum of law.  (Dkt. No. 68, Attach. 2 at 19.)  The following is intended to supplement, not supplant, those reasons.

"[I]t is difficult to establish one defendant's retaliation for complaints against another defendant."  *Hare v. Hayden*, 09-CV-3135, 2011 WL 1453789, at *4 (S.D.N.Y. Apr. 14, 2011) (citing *Wright v. Goord*, 554 F.3d 255, 274 (2d Cir. 2009)).

Here, Plaintiff argues in his unsworn response memorandum of law that Defendant Lashway "assaulted Plaintiff on the stretcher for reporting a PREA against [Defendant] Durkin, as he stated."  (Dkt. No. 71, Attach. 1 at 9.)  However, Plaintiff fails to identify any admissible evidence in the record establishing why Defendant Lashway would "assault" Plaintiff on Defendant Durkin's behalf, beyond Plaintiff's conclusory assertion in his unsworn memorandum of law.  *See Hill v. Chalanor*, 128 F. App'x 187, 189 (2d Cir. 2005) (holding that the plaintiff's claim of a causal connection between defendant "Oliver's threats and the alleged actions of the other defendants in connection with Hill's medical care is wholly unsupported.") *Flynn v. Ward*,

15-CV-1028, 2018 WL 3195095, at *12 (N.D.N.Y. June 7, 2018) (Hummel, M.J.) (recommending dismissal of retaliation claims where "[t]he record lacks any evidence establishing why Alsante would file a false misbehavior report against Flynn, on Wellenstein's behalf, beyond Flynn's conclusory allegations.").  Without more, the evidence does not present a genuine issue of material fact for a jury to resolve.  *Flynn*, 2018 WL 3195095; *see Wright*, 554 F.3d at 274 (dismissing retaliation claim against a correction officer when the only alleged basis for retaliation was a complaint about an incident involving another correction officer); *Alicea v. Maly*, 12-CV-0203, 2015 WL 4326114, at *14-15 (N.D.N.Y. July 14, 2015) (D'Agostino, J.) (dismissing retaliation claim which alleged that Correction Officer Trinidad retaliated against the plaintiff for protected actions he took with respect to Correction Officer Freeman, where the plaintiff alleged a close personal friendship between Trinidad and Freeman and the record was "devoid of any specifics, but replete with conclusions"); *Roseboro v. Gillespie*, 791 F. Supp. 2d 353, 369 (S.D.N.Y. 2011) (plaintiff failed to provide any basis to believe that a correction counselor would retaliate for a grievance that she was not personally named in); *Ciaprai v. Goord*, 02-CV-0915, 2005 WL 3531464, at *9 (N.D.N.Y. Dec. 22, 2005) (Sharpe, J.) (entering summary judgment on retaliation claim where the plaintiff cited only past grievances filed against correction officers other than the officer who disciplined the plaintiff).

Moreover, the identity of the speaker Plaintiff refers to is unclear when Plaintiff contends that the assault occurred "for reporting a PREA against [Defendant] Durkin, as he stated."  (Dkt. No. 71, Attach. 1 at 9 [emphasis added].)  It is also unclear what the unidentified speaker allegedly said.  The Complaint alleges that Defendant Lashway "placed his forearm and elbow on [Plaintiff's] throat and stated 'Shut up, pussy.'"  (Dkt. No. 1 at 8, ¶ 46.)  Plaintiff testified during his deposition that Defendant Lashway called him "racial slurs" while applying pressure

to Plaintiff's throat. (Dkt. No. 68, Attach. 6 at 87-88.) Although the Court does not condone either of these alleged slurs, neither suggests a causal connection between the alleged act and Plaintiff's protected conduct in filing a PREA complaint against Defendant Durkin.[45]

As a result, I recommend that, in the alternative, Defendants' motion for summary judgment be granted with respect to Plaintiff's retaliation claim against Defendant Lashway for the placing of his elbow on Plaintiff's throat in retaliation for Plaintiff's PREA complaint against Defendant Durkin.

### iii. Defendant Gillen

After carefully considering the matter, I recommend that Defendants' motion for summary judgment on Plaintiff's retaliation claim against Defendant Gillen be denied.[46]

Contrary to Defendants' contention that the "only support for this claim are several sick call slips from . . . two months following the filing of this Action," Plaintiff's deposition

---

[45]    Although not asserted by Plaintiff, to the extent that Plaintiff relied on the temporal proximity between his protected conduct and the alleged adverse action by Defendant Lashway, the Second Circuit has consistently required some further evidence of retaliatory animus before permitting a prisoner to proceed to trial on a retaliation claim." *Washington v. Afify*, 681 F. App'x 43, 46 (2d Cir. 2017); *see also Thomas v. Waugh*, 13-CV-0321, 2015 WL 5750945, at *4 (N.D.N.Y. Sept. 30, 2015) (D'Agostino, J. adopting Report-Recommendation on *de novo* review) (citing *Slattery v. Swiss Reinsurance Am. Corp.*, 248 F.3d 87, 95 (2d Cir. 2001)) ("temporal proximity alone is insufficient to establish an inference of retaliation.").

[46]    The parties appear to agree that Plaintiff's PREA complaint was protected speech and that the refusal to provide medical attention can constitute an adverse action. *See Jusino v. Gallagher*, 21-CV-0689, 2022 WL 2078159, at *8 (D. Conn. June 9, 2022) (citing *Abreu v. Lipka*, 778 F. App'x 28, 33 (2d Cir. 2019) ("[W]ithholding of medication could constitute sufficiently adverse actions that would deter a prisoner of ordinary firmness from exercising his rights.") (cleaned up)) ("[A] failure to provide medical care can constitute adverse action for purposes of First Amendment retaliation."); *Hayes v. Dahkle*, 16-CV-1368, 2018 WL 7356343, at *14 (N.D.N.Y. Dec. 11, 2018) (Hummel, M.J.) (citing *Gill v. Piplypchak*, 389 F.2d 379, 384 (2d Cir. 2004)) (holding that "plaintiff has satisfied the first prong of the test as he has engaged in a protected activity" by the filing of a PREA complaint), *rev'd in part on other grounds*, 976 F.3d 259 (2d Cir. 2020).

testimony supports his claim.  Although difficult to follow, drawing all reasonable inferences in

Plaintiff's favor—as the Court must at this juncture—Plaintiff appeared to testify that Defendant

Gillen declined to provide Plaintiff with a complete medical evaluation because of his pending

PREA complaint.  (Dkt. No. 68, Attach. 6 at 51-53.)  Plaintiff testified that Defendant Durkin—

the person against whom the PREA complaint was filed—urged Defendant Gillen to refuse to

medically treat Plaintiff because of the pending PREA complaint and that Defendant Gillen

"ultimately made the choice out of her mouth that no, [Plaintiff] would not be" medically

evaluated.  (*Id.* at 52.)  This sworn deposition testimony is sufficient to establish an issue of fact

for trial regarding the causal connection between Plaintiff's protected speech (the PREA

complaint against Defendant Durkin) and Defendant Gillen's adverse action (refusal to provide

medical treatment).

 As a result, I recommend that Defendants' motion for summary judgment on Plaintiff's

retaliation claim against Defendant Gillen be denied.[47]

### 3. Qualified Immunity

 Qualified immunity shields government employees from liability under Section 1983 in

two circumstances: "(1) their conduct did not violate clearly established rights of which a

reasonable person would have known, or (2) it was objectively reasonable to believe that their

---

[47] Further, I reject Defendants' arguments that if Plaintiff's deliberate indifference claims against Defendants King and Durkin are not dismissed for failure to exhaust his administrative remedies, they should be dismissed on the merits.  (Dkt. No. 68, Attach. 2 at 20-23.)  There are issues of fact that remain for trial with respect to the merits of Plaintiff's deliberate indifference claims.  Although Defendants assert that the medical records do not demonstrate any injuries around the time of Plaintiff's alleged fall from a stretcher on October 5, 2021, a reasonable juror could credit Plaintiff's version of events that the medical providers refused to treat his injuries and he was never seen by a LPN or doctor for the injuries that Defendants Durkin and King were aware of.  As a result, to the extent that the Court does not dismiss Plaintiff's medical indifference claims against Defendants King and Durkin for failure to exhaust administrative remedies, I recommend that those claims survive Defendants' motion for summary judgment.

acts did not violate these clearly established rights." *Cornejo v. Bell*, 592 F.3d 121, 128 (2d Cir.

2010) (internal quotation marks, alteration, and citations omitted). "A right is clearly established

when the contours of the right are sufficiently clear that a reasonable official would understand

that what he is doing violates that right." *Jackler v. Byrne*, 658 F.3d 225, 242 (2d Cir. 2011)

(internal quotation marks, alterations, and citation omitted).

Qualified immunity attaches if "officers of reasonable competence could disagree on the

legality of the action at issue in its particular factual context." *Dancy v. McGinley*, 843 F.3d 93,

106 (2d Cir. 2016) (internal quotation marks and citation omitted). In essence, the doctrine of

qualified immunity provides protection to "all but the plainly incompetent or those who

knowingly violate the law." *Dancy*, 843 F.3d at 106 (citation omitted).

I reject Defendants' arguments that they are protected from liability as a matter of law by

the doctrine of qualified immunity. Defendants appear to merely repeat arguments from

elsewhere in their brief without meaningfully applying the law to the facts of the case. (Dkt. No.

68, Attach. 2 at 23-24 [arguing that "[i]nsofar as the Defendants have not deviated from the

reasonable execution and discharge of their duties, as set forth above, Defendants are entitled to

summary judgment based upon the doctrine of qualified immunity."].) Therefore, the

undersigned recommends that "[t]he Court . . . deline[] to consider at this time whether

[Defendants] are protected by qualified immunity." *Osorio v. Westchester Cnty.*, 18-CV-5629,

2019 WL 3958443, at *1 n.2 (S.D.N.Y. Aug. 21, 2019).

Moreover, Defendants have not identified any ambiguity in the applicable legal standard.

*cf. Deskovic v. City of Peekskill*, 894 F. Supp. 2d 443, 467 (S.D.N.Y. 2012) (denying a qualified

immunity application where the defendant "ha[d] not identified any changes in the legal

standards").

As a result, the undersigned rejects Defendants' qualified immunity argument and recommends that the Court deny their motion insofar as it seeks to dismiss Plaintiff's claims based on the doctrine of qualified immunity.

**ACCORDINGLY**, it is respectfully

**RECOMMENDED** that Plaintiff's motion for summary judgment (Dkt. No. 65) pursuant to Fed. R. Civ. P. 56, be **DENIED**; and it is further respectfully

**RECOMMENDED** that Defendants' cross-motion for summary judgment (Dkt. No. 68) be **GRANTED** to the extent that it sought dismissal of (1) the following eight claims for failure to exhaust administrative remedies: (a) excessive force against Defendant Kelly,[48] (b) excessive force against Defendant Lashway related to an unnecessarily aggressive cavity search, (c) excessive force claim against Defendant Lashway related to placing his elbow on Plaintiff's throat, (d) excessive force against Defendant Devins, (e) retaliation claim against Defendant Durkin,[49] (f) retaliation claim against Defendant Lashway,[50] (g) medical indifference claim against Defendant King, and (h) medical indifference claim against Defendant Durkin; and (2) Plaintiff's excessive force claim against Defendant Durkin based on the merits; and be **DENIED** to the extent that it sought dismissal of Plaintiff's retaliation claim against Defendant Gillen; and it is further

---

[48]    In the alternative, it is recommended that Plaintiff's excessive force claim against Defendant Kelly be dismissed on the merits.

[49]    In the alternative, it is recommended that Plaintiff's retaliation claim against Defendant Durkin be dismissed on the merits.

[50]    In the alternative, it is recommended that Plaintiff's retaliation claim against Defendant Lashway be dismissed on the merits.

**ORDERED** that the Clerk of the Court shall file a copy of this Report-Recommendation on the docket of this case and serve a copy upon the parties in accordance with the local rules.[51]

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen (14) days within which to file written objections to the foregoing report.[52] Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993) (citing *Small v. Sec. of Health & Human Servs.*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(e), 72.

Dated: December 12 , 2023
       Binghamton, New York

Miroslav Lovric
U.S. Magistrate Judge

---

[51]    The Clerk shall also provide Plaintiff with copies of all unreported decisions cited herein in accordance with *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam).

[52]    If you are proceeding *pro se* and served with this report, recommendation, and order by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date that the report, recommendation, and order was mailed to you to serve and file objections. FED. R. CIV. P. 6(d). If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday. FED. R. CIV. P. 6(a)(1)(C).

2009 WL 3672105
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Walter RUSYNIAK; and Anthony Rusyniak, Plaintiffs,
v.
Ena Paola GENSINI; Gunilla De Montaigu;
and Concha Futura, S.A., Defendants.

No. 5:07–CV–0279 (GTS/GHL).
|
Oct. 30, 2009.

**Attorneys and Law Firms**

Costello, Cooney & Fearon, PLLC, Robert M. Smith, Esq.,
Kristen L. Pickard, Esq., of Counsel, Syracuse, NY, for
Plaintiffs.

Hiscock & Barclay, LLP, Robert A. Barrer, Esq., of Counsel,
Syracuse, NY, for Defendants Gunilla De Montaigu and
Concha Futura, S.A.

Greene, Hershdorfer & Sharpe, Victor J. Hershdorfer, Esq., of
Counsel, Syracuse, NY, for Defendant Ena Paola Gensini.

---

### *MEMORANDUM DECISION and ORDER*

GLENN T. SUDDABY, District Judge.

**\*1** Currently pending before the Court in the above-
captioned action is a motion by Defendants containing two
alternative requests for relief: (1) a request for reconsideration
of Part III.D.5 of the Court's Decision and Order of May
5, 2009, denying Defendants' request for dismissal of all of
Plaintiffs' claims due to the doctrine of *forum non conveniens;*
and (2) a request for dismissal of the First Cause of Action
of Plaintiffs' Third Amended Complaint (asserting a claim of
violation of Panama law) as barred by the three-year statute of
limitations set forth in the certified translation of Article 1652
of the Panamanian Code. (Dkt. No. 61.) For the reasons set
forth below, Defendants' motion is granted in part, and denied
in part.

### I. REQUEST FOR RECONSIDERATION
To the extent that Defendants' motion requests
reconsideration of the Court's decision to denying their

request for dismissal of all of Plaintiffs' claims due to the
doctrine of *forum non conveniens,* that motion is untimely.

Defendants' motion was filed on June 8, 2009. (Dkt. No.
61.) The Order of which reconsideration was sought was
entered on May 5, 2009. (Dkt. No. 56.) *See* N.D.N.Y.
L.R. 7.1(g) (setting ten-day deadline for motions for
reconsideration). Defendants' attempt to characterize the
Order of which reconsideration is sought as being the Court's
Text Order of May 29, 2009, is unconvincing. That Text
Order merely indicates the extent to which Plaintiffs' signed
Third Amended Complaint fails to comport with the Court's
Decision and Order of May 5, 2009 (and was issued in
response to Plaintiffs' request for guidance). Even liberally
construed, Defendants' motion for reconsideration expressly
and repeatedly challenges the substance of the Court's Order
of May 5, 2009 (specifically, Part III.D.5. thereof), and only
that Order. (*See, e.g.,* Dkt. No. 61, Part 2, ¶ 4; Dkt. No. 61,
Part 4, Points II and III.)

In any event, even if the Court were to consider the
merits of Defendants' motion for reconsideration, the Court
would deny that motion as without cause: there has been
no intervening change of controlling law, no previously
unavailable evidence, and there exists no clear error of law or
manifest injustice with regard to the relevant portion of the
prior decision in question.

For these reasons, Defendants' request for reconsideration is
denied.

### II. REQUEST FOR DISMISSAL OF FIRST CAUSE OF ACTION
To the extent that Defendants' motion alternatively requests
the dismissal of the First Cause of Action of Plaintiffs'
Third Amended Complaint (asserting a claim of violation of
Panama law) as barred by the three-year statute of limitations
set forth in the certified translation of Article 1652 of the
Panamanian Code, that motion is granted.

Defendants are correct that Plaintiffs failed, in their response
papers, to oppose this request. (*See* Dkt. No. 63.) The closest
that Plaintiffs come to opposing this request is when, in a
supplemental letter request, they (correctly) point out that
Defendants have improperly broadened the target of their
Panamanian-statute-of-limitations argument from Plaintiffs'
First Cause of Action to all of Plaintiffs' causes of action.
(Dkt. No. 66; *see also* Dkt. No. 61, Part 4, at 7–8.) As a
result of Plaintiffs' failure to address Defendants' argument

regarding Plaintiffs' First Cause of Action, Defendants' burden on this motion is somewhat lightened with regard to that cause of action. [1]

**\*2** After carefully reviewing the parties' motion papers, and Plaintiffs' Third Amended Complaint, the Court finds that Defendants have met their lightened burden on their motion to dismiss Plaintiff's First Cause of Action. The Court reaches this conclusion based on substance of the certified translation provided by Defendants (i.e., the certified translation of Article 1652 of the Commercial Code of the Republic of Panama). (Dkt. No. 61, Part 3.) The Court reaches this conclusion also based on the reasons stated in Part III.D.7.a. of the Court's Order of May 5, 2009. (*See* Dkt. No. 56, at 44–47.) *See also* 🔖 *Rusyniak v. Gensini,* 629 F.Supp.2d 203, 231–33 (N.D.N.Y.2009) (Suddaby, J.).

For these reasons, Defendants' request to dismiss Plaintiff's First Cause of Action is granted.

**ACCORDINGLY,** it is

**ORDERED** that Defendants' motion (Dkt. No. 61) is *GRANTED* **in part,** and *DENIED* **in part,** in accordance with the above Decision and Order; and it is further

**ORDERED** that Defendants' motion for reconsideration of the May 5, 2009 Decision and Order is *DENIED,* however, the First Cause of Action of Plaintiffs' Third Amended Complaint (Dkt. No. 58) is *DISMISSED* as barred by the three-year statute of limitations set forth in the certified translation of Article 1652 of the Panamanian Code; and it is further

**ORDERED** that counsel for all parties are directed to attend an in-person pretrial conference on **NOVEMBER 19, 2009 at 2:00 p.m.** in Judge Suddaby's chambers in Syracuse, New York, at which counsel are directed to appear with settlement authority.

**All Citations**

Not Reported in F.Supp.2d, 2009 WL 3672105

---

### Footnotes

1    *See Cossey v. David,* 04–CV–1501, 2007 WL 3171819, at \*7 (N.D.N.Y. Oct. 29, 2007) (Lowe, M.J. *adopted by* Scullin, J.) (noting that, where plaintiffs do not respond to defendants' argument made in their summary judgment motion, plaintiffs are deemed to have consented to defendants' argument, and thus defendants must only satisfy "their modest burden of demonstrating entitlement to the relief requested through that argument"); 🔖 *Saunders v. Ricks,* 03–CV–598, 2006 WL 3051792, at \*9 (N.D.N.Y. Oct. 18, 2006) (Lowe, M.J. *adopted by* Hurd, J.) ("By failing to respond to Defendants' first argument ... Plaintiff may be deemed to have consented to that argument under Local Rule of Practice 7.1(b)(3). Thus, Plaintiff's claim against those Defendants may be dismissed on that ground alone [provided that] ... Defendants have met their modest threshold burden to demonstrate entitlement to the relief requested in their motion for summary judgment."); *Beers v. GMC,* 97–CV–0482, 1999 U.S. Dist. LEXIS 12285, at \*27–31 (N.D.N.Y. March 17, 1999) (McCurn, J.) (deeming plaintiff's failure, in his opposition papers, to oppose several arguments by defendants in their motion for summary judgment as consent by plaintiff to the granting of summary judgment for defendants with regard to the claims that the arguments regarded, under Local Rule 7.1[b][3] ).

---

2009 WL 2473509
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Donna ESTE–GREEN, Plaintiff,
v.
Michael J. ASTRUE, Comm'r
of Social Security, Defendant.

No. 5:09–CV–0722 (GTS/GHL).
|
Aug. 7, 2009.

West KeySummary

1    **Social Security**  Exhaustion of other
    remedies

    Representative for a social security payee
    failed to exhaust her administrative remedies
    before filing her claim since there was no
    final decision after a hearing. The Social
    Security Administration (SSA) garnished the
    representative's wages after attempting to work
    out a repayment plan since the representative
    was overpaid on behalf of the payee. The
    representative contacted the SSA to complain
    about the garnishment and shortly thereafter, the
    representative filed the action with the Small
    Claims Court, without having a hearing or final
    order from the Commissioner of Social Security.

    Social Security Act, § 205(g), 42 U.S.C.A. §
    405(g).

    27 Cases that cite this headnote

**Attorneys and Law Firms**

Donna Este–Green, Hempstead, NY, pro se.

Hon. Andrew T. Baxter, United States Attorney for the
Northern District of New York, William H. Pease, Esq.,
Assistant U.S. Attorney, of Counsel, Syracuse, NY.

*DECISION and ORDER*

Hon. GLENN T. SUDDABY, District Judge.

**\*1**  Currently before the Court, in this *pro se* action filed
by Donna Este–Green ("Plaintiff") to recover funds allegedly
owed to her by the Social Security Administration, is a motion
by Michael J. Astrue, Commissioner of Social Security
("Defendant") to dismiss the action pursuant to Fed.R.Civ.P.
12(b)(1) for lack of subject matter jurisdiction due to
Plaintiff's failure to exhaust her administrative remedies
before filing suit. (Dkt. No. 3.) Plaintiff has not opposed the
motion. For the reasons set forth below, Defendant's motion
is granted, and Plaintiff's Complaint is dismissed.

**I. BACKGROUND**

**A. Procedural History**
On or around May 27, 2009, Plaintiff brought this
action in Small Claims Court, City of Ithaca, County
of Tompkins ("Small Claims Court"), naming the Social
Security Administration ("SSA") as Defendant. (Dkt. No. 1,
Part 3.) Liberally construed, Plaintiff's Complaint alleges that
the SSA wrongfully garnished her wages in the amount of
five hundred seventy-one dollars ($571.00). (*Id.*) On June 24,
2009, the United States Attorney's Office for the Northern
District of New York removed this case from the Small
Claims Court, pursuant to the exclusive original jurisdiction
of the District Court under 42 U.S.C. §§ 405(g)-(h)
and 1383(c)(3), "because Plaintiff's claim appeared to
relate to the payment of Social Security benefits to her as
representative payee for the account of Albertina King." (Dkt.
No. 3.)

**B. Relevant Facts**
In 1999, Plaintiff had been acting as representative payee
for Albertina King, who had been receiving Social Security
benefits under Title II of the Act. (Dkt. No. 3.) In October
1999, the SSA issued an overpayment to Plaintiff on Albertina
King's account. (*Id.*) In March 2001, the SSA and Plaintiff
arranged a repayment plan pursuant to which Plaintiff agreed
to repay the amount due the SSA in fifty-dollar installments
beginning on April 15, 2001. (*Id.*) In October 2007, the
SSA sent a letter to Plaintiff, in which the SSA stated the
following: (1) Plaintiff had been overpaid as representative
payee; (2) Plaintiff had the right to question the decision

about her overpayment and to ask that the SSA not recover the overpayment; (3) the SSA's past attempts to recover this overpayment had not been successful; (4) there are actions that the SSA can take to recover the money, including wage garnishment; (5) Plaintiff could prevent the wage garnishment by taking certain steps within sixty days of the letter, including repaying the debt, agreeing to a definite repayment plan and repaying the debt according to that plan, asking the SSA to review the finding that she owed the amount stated and that the SSA had the right to collect it, asking the SSA to waive collection of the overpayment, or asking the SSA to review its plan to collect up to fifteen percent of her disposable pay. (*Id.*) In addition, the letter informed Plaintiff of how she could repay the SSA. (*Id.*)

**\*2** Plaintiff returned this letter to the SSA, stating that the overpayment was not her fault. (*Id.*) Plaintiff indicated that she could not afford the amount owed, and that the money that she received was used for the payee's burial. (*Id.*) In March, 2008, Plaintiff spoke with a supervisor of the SSA by telephone and negotiated a repayment plan agreement for installments of twenty dollars ($20). (*Id.*) On April 29, 2008, the SSA sent Plaintiff a billing statement indicating her debt of five hundred seventy-one dollars ($571), and that a minimum payment of twenty dollars ($20) must reach the SSA by May 15, 2008. (*Id.*) On May 6, 2008, documentation issued in connection with the administrative garnishment of Plaintiff's wages was returned to the SSA from Plaintiff's employer, stating that Plaintiff was no longer employed there. (*Id.*)

On April 17, 2009, the SSA issued an order to Plaintiff's employer to garnish her wages. (*Id.*) Plaintiff's employer completed this order and returned it to the SSA. (*Id.*) On May 21, 2009, Plaintiff contacted the SSA to complain about the garnishment. (*Id.*) Shortly thereafter, Plaintiff filed this action with the Small Claims Court, and the Complaint was mailed to the SSA on May 27, 2009.

## II. APPLICABLE LEGAL STANDARDS

### A. Standard Governing Motions to Dismiss for Lack of Subject Matter Jurisdiction

"A case is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it." *Makarova v. United States,* 201 F.3d 110, 113 (2d Cir.2000) (citing Fed.R.Civ.P. 12[b][1] ). With regard to a challenge to a determination by the Social Security

Administration, "[a]ny individual may seek judicial review under 42 U.S.C. § 405(g) 'after any final decision of the Commissioner of Social Security made after a hearing to which he was a party, irrespective of the amount in controversy." *Diagnostic Cardioline Monitoring of New York, Inc. v. Leavitt,* 171 F. App'x. 374, 375 (2d Cir. March 17, 2006) (citing 42 U.S.C. § 405[g] ). "This final-decision-after-a-hearing requirement is critical to the federal court's grant of subject matter jurisdiction over these claims." *Leavitt,* 171 F. App'x. at 375 (citing *Weinberger v. Salfi,* 422 U.S. 749, 763–64 [1975] ). "In the absence of a final decision after a hearing, the federal court lacks subject matter jurisdiction to entertain the claim, and it must be dismissed." *Id.* (citation omitted).

### B. Standard Governing Unopposed Motions

"Where a properly filed motion is unopposed and the Court determines that the moving party has met its burden to demonstrate entitlement to the relief requested therein, the non-moving party's failure to file or serve any papers as required by this Rule shall be deemed as consent to the granting or denial of the motion, as the case may be, unless good cause shown." N.D.N.Y. L.R. 7.1(b)(3). Defendant's motion to dismiss was properly filed, and Plaintiff has failed to oppose them. Therefore, the Court must determine whether Defendant has met her burden to "demonstrate entitlement to the relief requested" under Local Rule 7.1(b)(3). [1] An inquiry into whether a movant has met its "burden to demonstrate entitlement" to dismissal under Local Rule 7.1(b)(3) is a more limited endeavor than a review of a contested motion. Specifically, under such an analysis, the movant's burden has appropriately been characterized as "modest." [2] This is because, as a practical matter, the burden requires only that the movant present an argument that is "facially meritorious." [3]

## III. ANALYSIS

**\*3** After carefully considering the file in this action, including Defendant's motion to dismiss and Plaintiff's Complaint, the Court finds that Defendant has met his lightened burden on his unopposed motion: he has demonstrated entitlement to the relief requested by presenting an argument that is facially meritorious. Even if the Court were to subject Defendant's motion to the more rigorous scrutiny appropriate for contested motions, the Court would find that Defendant has met his burden: Plaintiff failed to exhaust her administrative remedies prior to commencing

this action.[4] As a result, the Court lacks subject matter jurisdiction over Plaintiff's claims, and her Complaint is dismissed.

**ACCORDINGLY,** it is

**ORDERED** that Plaintiff's Complaint is ***DISMISSED.*** The clerk is directed to enter judgment and close the case.

**All Citations**

Not Reported in F.Supp.2d, 2009 WL 2473509

## Footnotes

1    *See also* Fed.R.Civ.P. 7(b)(1) (requiring motions to, *inter alia,* "state with particularity the grounds therefor").

2    *See, e.g., Ciaprazi v. Goord,* 02–CV0915, 2005 WL 3531464, at *8 (N.D.N.Y. Dec.22, 2005) (Sharpe, J.; Peebles, M.J.) (characterizing defendants' threshold burden on a motion for summary judgment as "modest") [citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 323–324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) ]; *accord, Saunders v. Ricks,* 03–CV–0598, 2006 WL 3051792, at *9 & n. 60 (N.D.N.Y. Oct.18, 2006) (Hurd, J., adopting Report–Recommendation of Lowe, M.J.), *Smith v. Woods,* 03–CV–0480, 2006 WL 1133247, at *17 & n. 109 (N.D.N.Y. Apr.24, 2006) (Hurd, J., adopting Report–Recommendation of Lowe, M.J.); *see also Race Safe Sys. v. Indy Racing League,* 251 F.Supp.2d 1106, 1109–1110 (N.D.N.Y.2003) (Munson, J.) (reviewing merely whether record contradicted defendant's arguments, and whether record supported plaintiff's claims, in deciding unopposed motion to dismiss, under Local Rule 7.1[b][3] ); *Wilmer v. Torian,* 96–CV–1269, 1997 U.S. Dist. LEXIS 16345, at *2 (N.D.N.Y. Aug. 29, 1997) (Hurd, M.J.) (applying prior version of Rule 7.1[b][3], but recommending dismissal because of plaintiff's failure to respond to motion to dismiss *and* the reasons set forth in defendants' motion papers), *adopted by* 1997 U.S. Dist. LEXIS 16340, at *2 (N .D.N.Y. Oct. 14, 1997) (Pooler, J.); *accord, Carter v. Superintendent Montello,* 95–CV–989, 1996 U.S. Dist. LEXIS 15072, at *3 (N.D.N.Y. Aug. 27, 1996) (Hurd, M.J.), *adopted by* 983 F.Supp. 595 (N.D.N.Y.1996) (Pooler, J.).

3    *See, e.g., Hernandez v. Nash,* 00–CV–1564, 2003 U.S. Dist. LEXIS 16258, at *7–8, 2003 WL 22143709(N.D.N.Y. Sept. 10, 2003) (Sharpe, M.J.) (before a motion to dismiss may be granted under Local Rule 7.1[b] [3], "the court must review the motion to determine whether it is *facially meritorious"* ) [emphasis added; citations omitted]; *accord,* Topliff v. Wal–Mart Stores East LP, 04–CV–0297, 2007 U.S. Dist. LEXIS 20533, at *28 & n. 43, 2007 WL 911891 (N.D.N.Y. March 22, 2007) (Lowe, M.J.); Hynes v. Kirkpatrick, 05–CV–0380, 2007 U.S. Dist. LEXIS 24356, at *5–6 & n. 2 (N.D.N.Y. March 21, 2007) (Lowe, M.J.); *Sledge v. Kooi,* 04–CV–1311, 2007 U.S. Dist. LEXIS 26583, at *28–29 & n. 40, 2007 WL 951447 (N.D.N.Y. Feb. 12, 2007) (Lowe, M.J.), *adopted by* 2007 U.S. Dist. LEXIS 22458 (N.D.N.Y. March 28, 2007) (McAvoy, J.); *Kele v. Pelkey,* 03–CV–0170, 2006 U.S. Dist. LEXIS 95065, at *5 & n. 2, 2006 WL 3940592 (N.D.N.Y. Dec. 19, 2006) (Lowe, M.J.), *adopted by* 2007 U.S. Dist. LEXIS 4336 (N.D.N.Y. Jan. 22, 2007) (Kahn, J.).

4    As noted by Defendant in his motion to dismiss, because Plaintiff failed to follow the required SSA regulations before bringing this action, there is no final decision for the Court to review under 42 U.S.C. § 405(g).

---

**End of Document**                                      © 2023 Thomson Reuters. No claim to original U.S. Government Works.

2018 WL 2045094
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Tony MCGEE, Plaintiff,

v.

Correction Officer MCGREADY, et al., Defendants.

16-CV-4187 (NSR)
|
Signed 04/30/2018

**Attorneys and Law Firms**

Tony McGee, Brooklyn, NY, pro se.

Colleen Kelly Faherty, State of New York Office of the Attorney General, New York, NY, for Defendants.

OPINION & ORDER

NELSON S. ROMÁN, United States District Judge

**\*1** Plaintiff, Tony McGee ("Plaintiff"), an incarcerated pro se inmate at Sing Sing Correctional Facility, brings this action pursuant 42 U.S.C. § 1983 against Inmate Grievance Supervisor Anthony Black ("Black"), former Corrections Counselor Mary Jackson ("Jackson"), Sergeant Murray or Murphy ("Sgt. Murray"), Sergeant Poole ("Sgt. Poole") and several other corrections officers.[1] Before this court is Defendant Black and Jackson's motion to dismiss the amended complaint as against them based on failure to plead a plausible claim, failure to exhaust administrative remedies, and qualified immunity. For the foregoing reasons, the motion is GRANTED.

**FACTUAL BACKGROUND**

The following facts are taken from Plaintiff's Amended Complaint and are deemed true for the purpose of this motion.

Plaintiff alleges that on or about July 22, 2013, while in the mess hall he was assaulted by a fellow "gang related Hispanic inmate" who made a derogatory or offensive statement. In response to the statement, Plaintiff punched the inmate in the face resulting in an altercation. During the fight, Plaintiff was repeatedly punched about the face causing several lacerations. Plaintiff alleges that a "Black Correction Officer"[2] was present in the mess hall, observed the incident, and failed to prevent it and/or failed to intervene.

On or about July 11, 2013, approximately eleven days prior to the altercation, Plaintiff spoke to Jackson and requested that he be placed in protective custody because he was threatened and being targeted by "gang-related Hispanic inmates." Jackson purportedly prepared a request for "voluntary protective custody," and informed Plaintiff he would be contacted sometime later. Later that day, Plaintiff was interviewed by Sgt. Murray concerning his request for protective custody. Plaintiff purportedly informed Sgt. Murray of the threats and being targeted. Plaintiff was once again informed he would be contacted sometime later. Plaintiff's request was not granted. Plaintiff suggests had he been placed in protective custody, as requested, he would not have been assaulted and injured. Additionally, Plaintiff asserts that Defendant Black failed to process multiple sick-call grievances by failing to forward them to Central Office Review Committee ("CORC"). Plaintiff asserts claims under the Eight and Fourteenth Amendments.

**STANDARD OF REVIEW**

**Rule 12(b)(6)**

On a 12(b)(6) motion, dismissal is proper unless the complaint "contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007) ). When there are well-pled factual allegations in the complaint, "a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Id. at 679.* The critical inquiry is whether the plaintiff has pled sufficient facts to nudge the claims "across the line from conceivable to plausible." *Twombly,* 550 U.S. at 555. A motion to dismiss will be denied where the allegations "allow[ ] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal,* 556 U.S. at 678.

**\*2** Where a pro se Plaintiff is concerned, Courts must construe the pleadings in a particularly liberal fashion. *Harris v. Mills,* 572 F.3d 66, 72 (2d Cir. 2009). The Court must therefore interpret the pleading "to raise the strongest arguments that [it] suggest[s]." *Harris v. City of N.Y.,* 607 F.3d 18, 24 (2d Cir. 2010) (internal quotations and citation

omitted). Nevertheless, a pro se plaintiff's pleading must contain factual allegations that sufficiently "raise a right to relief above the speculative level" (*Jackson v. N. Y.S. Dep't of Labor,* 709 F. Supp. 2d 218, 224 (S.D.N.Y. 2010) ), and the Court's duty to construe the complaint liberally is not "the equivalent of a duty to re-write it." *Geldzahler v. New York Medical College,* 663 F. Supp. 2d 379, 387 (S.D.N.Y. 2009).

**Exhaustion**

The Prison Litigation Reform Act ("PLRA") precludes the filing of an action "with respect to prison conditions under [42 U.S.C. § 1983] ... by a prisoner confined in any jail, prison or other correction facility until such administrative remedies as are available are exhausted." *Williams v. Corr. Officer Priatno,* 829 F.3d 118, 122 (2d Cir. 2016) (internal quotations omitted). Whether an inmate has exhausted all administrative remedies turns on a review of "the state prison procedures [available] and the prisoner's grievance...." *See* *Espinal v. Goord,* 558 F.3d 119, 124 (2d Cir. 2009) citing *Jones v. Bock,* 549 U.S. 199, 218 (2007). Grievances at DOCCS are governed by the Inmate Grievance Program ("IGP"), which is based on a three-tiered system. *Id.* at 125. To adjudicate an inmate complaint: "(1) the prisoner files a grievance with the Inmate Grievance Resolution Committee ("IGRC"), (2) the prisoner may appeal an adverse decision by the IGRC to the superintendent of the facility, and (3) the prisoner then may appeal an adverse decision by the superintendent to the CORC. *Id.;* see also N.Y. Comp. Codes. R. & Regs., tit. 7, § 701.7 (1999).

Notably, exhaustion is an affirmative defense, not a pleading requirement; thus, inmate plaintiffs need not "specially plead or demonstrate exhaustion in their complaints." *Jones,* 549 U.S. at 216. Instead, Defendants must demonstrate lack of exhaustion. *Colon v. N. Y.S. Dep't of Corr. & Cmty. Supervision,* No. 15-CV-7432(NSR), 2017 WL 4157372, at *5 (S.D.N.Y. Sept. 15, 2017) citing *Key v. Toussaint,* 660 F. Supp. 2d 518, 523 (S.D.N.Y. 2009).

Dismissal on a 12(b)(6) motion for failure to exhaust is permissible where "it is clear on the face of the complaint that the plaintiff did not satisfy the PLRA exhaustion requirement." *Williams,* 829 F.3d at 122; see also *Parris v. N.Y.S. Dep't Corr. Servs.,* 947 F. Supp. 2d 354, 261 (S.D.N.Y. 2013) (citing *Johnson v. Westchester Cnty. Dep't*

*of Con: Med. Dep't,* No. 10-CV-6309, 2011 WL 2946168, at *2 (S.D.N.Y. July 19, 2011) for proposition that denial of motion was appropriate where complaint was ambiguous as to exhaustion). Further, on such a motion, where a court is confined to the four corners of the complaint, the documents attached thereto, and things of which it is entitled to take judicial notice (see, e.g., *Kleinman v. Elan Corp.,* 706 F.3d 145, 152 (2d Cir. 2013); *Gonzalez v. Hasty,* 651 F.3d 318, 321 (2d Cir. 2011) ), a court is only permitted to consider outside documents related to exhaustion and submitted by defendants under limited circumstances. See, *Smith v. Miller,* No. 15-CV-9561 (NSR), 2017 WL 4838322, at *5 (S.D.N.Y. Oct. 23, 2017) (noting courts can take judicial notice of administrative records in Section 1983 cases in limited circumstances). Those include instances where "the complaint a) was the standard pro se form complaint that has a check-box regarding exhaustion, b) contained allegations clearly stating that the inmate had exhausted his administrative remedies, or c) clearly pointed to the fact that the inmate had, in fact, not exhausted." *Cohn,* 2017 WL 4157372, at *5.

**Qualified Immunity**

**\*3** "Qualified immunity shields federal and state officials from money damages unless a plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Ashcroft v. al-Kidd,* 563 U.S. 731, 735 (2011) citing *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982). "If the law was clearly established, the immunity defense ordinarily should fail, since a reasonably competent public official should know the law governing his conduct." *Harlow,* 457 U.S. at 818-19. It is within the Court's discretion to determine the order in which the two prongs are analyzed. *Pearson v. Callahan,* 555 U.S. 223, 236 (2009).

DISCUSSION

Plaintiff asserts § 1983 claims under the Eighth Amendment against Defendants Black and Johnson. The essence of Plaintiff's claim is a failure to protect. Plaintiff's complaint suggest that Defendants' failure in processing or approving his request for voluntary confinement resulted in

his subsequent assault. Or, construing the allegations liberally as the Court is required to do, but for Defendants' failure in placing him in voluntary protective custody, Plaintiff would not have been attacked and injured by a fellow inmate.

Plaintiff's 1983 complaint is that he was subjected to cruel and unusual punishment in violation of the Eighth Amendment, made applicable to the States by the Fourteenth.

See 🔖 *Estelle v. Gamble,* 429 U.S. 97, 102 (1976) citing 🔖 *Robinson v. California,* 370 U.S. 660 (1962). "To prevail on an Eighth Amendment claim, an inmate must first show that his injury is objectively a 'sufficiently serious' one." *Brims v. Burdi,* No. 03-CV-3159 (WHP), 2014 WL 1403281, at *2 (S.D.N.Y. June 23, 2004)*Brims v. Burdi,* No. 03-CV-3159 (WHP), 2014 WL 1403281, at *2 (S.D.N.Y. June 23, 2004) quoting 🔖 *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir. 1998). Additionally, a plaintiff must "show that the defendant had knowledge of [the] prisoner's problem and was deliberately indifferent to [the] prisoner's plight." 🔖 *Calhoun v. N. Y State Div. of Parole Officers,* 999 F.2d 647, 654 (2d Cir. 1993) citing 🔖 *Sample v. Diecks,* 885 F.2d 1099, 1110 (3d Cir. 1989).

Deliberate indifference requires a showing that the conditions of incarceration posed a substantial risk of serious harm, and that prison officials possessed sufficient culpable intent. 🔖 *Hayes v. New York City Dep't Of Corr.,* 84 F.3d 614, 620 (2d Cir. 1996) citing 🔖 *Farmer v. Brennan,* 511 U.S. 825, 834 (1994).The deliberate indifference requires a two prongs analysis: substantial risk of serious harm, objective prong; and sufficient culpable intent, subjective prong. 🔖 *Farmer,* 511 U.S. at 834; 🔖 *Hathaway v. Coughlin,* 99 F.3d 550, 553 (2d Cir. 1996). Here, the objective prong is meet and not disputed.

Subjectively, the prison official acts with the requisite sufficient culpable state of mind when he (or she) "has knowledge that an inmate faces a substantial risk of serious harm and he disregards that risk by failing to take reasonable measures to abate the harm." 🔖 *Hayes,* 84 F.3d at 620. Courts have denied deliberate indifference claims based upon surprise attacks. See 🔖 *Fernandez v. N.Y.C. Dep't of Corr.,* No. 08-CV-4294 (KMW), 2010 WL 1222017, at *4 (S.D.N.Y. Mar. 29, 2010); 🔖 *Zimmerman v. Macomber,* No. 95-CV-0882(DAB), 2001 WL 946383 (S.D.N.Y. Aug.

21, 2001). Plaintiff alleges he provided advance notice to Jackson and Black of threats and a possible attack. Plaintiff's allegation also suggest he identified the attacker(s), "gang related Hispanic inmates" at the facility. Plaintiff's allegations suggest that Black and Jackson failed to take reasonable measures to abate the impending attack. Thus, Plaintiff has pled a plausible Eighth Amendment claim.

**\*4** Plaintiff's Eighth Amendment claim, however, fails for failure to exhaust his administrative remedies. This case involves the use of the pro se form complaint which contains the equivalent of a check-box exhaustion section. The amended complaint is clear as to whether Plaintiff alleges he grieved his claims. Plaintiff explicitly states he filed grievances concerning, *inter alia,* the "5 sick call request," the "non-protection grievances" and the "foreseeable assault." (See Amended Compl., Sect. IV., E (1).) Because the exhaustion issue is an integral part of the prisoner's claims, the Court may refer to materials outside of the complaint on a 12(b)(6) motion in determining whether a plaintiff has exhausted. See 🔖 *Smart v. Goode,* No. 04-CV-8850 (RWS), 2008 WL 591230, at *2 (S.D.N.Y. Mar. 3, 2008) (recognizing that the Court's previous opinion "[did] not faithfully capture the subtlety of exhaustion doctrine in the Second Circuit" and that the Court should have addressed non-exhaustion as an affirmative defense).

In support of their motion, Defendants submit a declaration from Karen Bellamy ("Bellamy"), the Director of the Inmate Grievance Program ("IGP"). Bellamy avers that she is the custodian of records maintained by the CORC, which is tasked with rendering administrative decisions on grievances filed by inmates. Based upon her review of the records, she found that Plaintiff made other complaints concerning meals, conditions of the facility, and "problems with security staff" on December 17, 2013. Plaintiff, however, did not file a grievance concerning the July 22nd incident nor his request for voluntary confinement. Though Plaintiff attempts to rebut Defendants' showing, mere conclusory statements in opposition is insufficient. Accordingly, Plaintiff's Eighth Amendment claims must be dismissed.

Plaintiff also asserts a claim based on Defendant Black's failure to process his grievances, including his "5 sick call grievances." It is well settled that in order to succeed on a 🔖 § 1983 claim, Plaintiff must show that he has been deprived of a constitutional or other federal right. 🔖 42 U.S.C. § 1983. Inmate grievances procedures are undertaken voluntarily by

McGee v. McGready, Not Reported in Fed. Supp. (2018)

Case 9:22-cv-00102-BKS-ML    Document 78    Filed 12/13/23    Page 53 of 373

the states and are not constitutionally required. *Johnson v. New York City Dep't of Health,* No. 06-CV-13699 (BSJ) (FM), 2008 WL 5378124, at *3 (S.D.N.Y. Dec. 22, 2008) (internal citation omitted). Accordingly, a failure to process a prisoner's grievance(s) does not in itself give rise to a constitutional claim. *Swift v. Tweddell,* 582 F. Supp. 2d 437, 445-46 (W.D.N.Y. 2008) (internal citations omitted). This claim must therefore be dismissed.

## CONCLUSION

For the foregoing reasons, Defendants' motion is GRANTED in part and DENIED in part. Plaintiff's Eighth Amendment and claims premised on the failure to process his grievances are dismissed. The Clerk of the Court is respectfully directed to terminate the motion at ECF No. 29. The parties are directed to confer, complete and submit to the Court a completed case management plan (blank form attached) within thirty (30) days of the date of this opinion.

SO ORDERED.

Attachment

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

Rev. Jan. 2002

---------------------------------------------x

                                                    CIVIL CASE DISCOVERY PLAN
                    Plaintiff(s),                   AND SCHEDULING ORDER

        - against -

                    Defendant(s).        _____ CV _____ (NSR)

---------------------------------------------x

This Civil Case Discovery Plan and Scheduling Order is adopted, after consultation with counsel, pursuant to Fed. R. Civ. P. 16 and 26(f):

1.  All parties [consent] [do not consent] to conducting all further proceedings before a Magistrate Judge, including motions and trial, pursuant to 28 U.S.C. § 636(c). The parties are free to withhold consent without adverse substantive consequences. (If all parties consent, the remaining paragraphs of this form need not be completed.)

2.  This case [is] [is not] to be tried to a jury.

3.  Joinder of additional parties must be accomplished by _____.

4.  Amended pleadings may be filed until _____ _____.

5.  Interrogatories shall be served no later than _____, and responses thereto shall be served within thirty (30) days thereafter. The provisions of Local Civil Rule 33.3 [shall] [shall not] apply to this case.

6.  First request for production of documents, if any, shall be served no later than _____.

7.  Non-expert depositions shall be completed by ____ _____ _____.

    a.  Unless counsel agree otherwise or the Court so orders, depositions shall not be held until all parties have responded to any first requests for production of documents.

    b.  Depositions shall proceed concurrently.

    c.  Whenever possible, unless counsel agree otherwise or the Court so orders, non-party depositions shall follow party depositions.

8.  Any further interrogatories, including expert interrogatories, shall be served no later than _____.

9.  Requests to Admit, if any, shall be served no later than _____.

10. Expert reports shall be served no later than _____.

11. Rebuttal expert reports shall be served no later than _____.

12. Expert depositions shall be completed by _____.

13. Additional provisions agreed upon by counsel are attached hereto and made a part hereof.

14. **ALL DISCOVERY SHALL BE COMPLETED BY** _____.

15. Any motions shall be filed in accordance with the Court's Individual Practices.

16. This Civil Case Discovery Plan and Scheduling Order may not be changed without leave of Court (or the assigned Magistrate Judge acting under a specific order of reference).

17. The Magistrate Judge assigned to this case is the Hon. _____.

18. If, after entry of this Order, the parties consent to trial before a Magistrate Judge, the Magistrate Judge will schedule a date certain for trial and will, if necessary, amend this Order consistent therewith.

19. The next case management conference is scheduled for _____, at _____. (The Court will set this date at the initial conference.)

SO ORDERED.

Dated: White Plains, New York
       _____

                                    _____
                                    Nelson S. Román, U.S. District Judge

**All Citations**

Not Reported in Fed. Supp., 2018 WL 2045094

**Footnotes**

1       The operative complaint is the Amended Complaint filed February 2, 2017. (ECF No. 22.)

2       In his complaint, Plaintiff appears to identify the "Black Correction Officer" as C.O. Javier Caban.

---

**End of Document**                              © 2023 Thomson Reuters. No claim to original U.S. Government Works.

2021 WL 981849
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Robert JACKSON, Plaintiff,

v.

C.O. Angela JACKSON, et al., Defendants.

16-CV-08516 (PMH)
|
Signed 03/16/2021

**Attorneys and Law Firms**

Robert Jackson, Beacon, NY, pro se.

Amanda Yoon, NYS Office of the Attorney General, New York, NY, Rebecca Lynn Johannesen, Colorado Department of Law, Denver, CO, for Defendants.

## MEMORANDUM OPINION AND ORDER

PHILIP M. HALPERN, United States District Judge:

**\*1** Plaintiff Robert Jackson ("Plaintiff"), proceeding *pro se* and *in forma pauperis*, brings this action under ⚑ 42 U.S.C. § 1983 against Correction Officers Angela Jackson, M. Walker, and J. James (collectively, "Defendants"). (Doc. 2, "Compl."). Specifically, Plaintiff alleges that in June 2015 —while incarcerated at Sing Sing Correctional Facility in Ossining, New York ("Sing Sing")—Defendants violated his constitutional rights by: (1) using excessive force against him, in violation of the Eighth Amendment; and (2) filing a false internal complaint against him, in violation of the Fourteenth Amendment. (*See generally id.*).

On July 10, 2017, Defendants moved under Federal Rule of Civil Procedure 12(b)(6) to dismiss Plaintiff's due process claim along with all claims for monetary damages against them in their official capacities. (Doc. 16). By Opinion & Order dated April 20, 2018, Judge Román granted Defendants' motion and granted Plaintiff leave "to file an Amended Complaint ... on or before June 19, 2018." (Doc. 19 at 8). Despite securing an extension of the time within which to file his amended pleading, Plaintiff failed to do so. Consequently, the only claim remaining in this action is one for excessive force against Defendants in their individual capacities.

Defendants filed an Answer on August 30, 2018 (Doc. 22) and, with leave of Court, filed an Amended Answer on October 2, 2019. (Doc. 29, "Am. Ans."). Shortly thereafter, in an Order issued on October 22, 2019, Judge Román "waive[d] the Initial Pre-trial Conference and direct[ed] the parties to confer and complete a Case Management Plan and Scheduling Order...." (Doc. 30). Although Plaintiff filed a proposed discovery plan on November 19, 2019 (Doc. 32), Defendants filed a letter the following day to request both an extension of time within which to submit a proposed discovery schedule and a pre-motion conference to discuss an anticipated motion for summary judgment on the sole issue of administrative exhaustion (Doc. 31). There was no further activity on the docket in this case until it was reassigned to this Court in April 2020.[1]

On April 13, 2020, the Court granted Defendants' request, set a briefing schedule for the extant summary judgment motion, and directed Defendants to mail a copy of that Order to Plaintiff; Defendants filed an affidavit of service the same day. (Doc. 33; Doc. 34). Approximately one month later, on May 6, 2020, Defendants filed a letter requesting an extension of the briefing schedule. (Doc. 36). In that letter, Defendants noted also that upon "confer[ring] with the New York State Division of Parole," they had learned that Plaintiff had been released from custody and was believed to be residing at an address in New York, New York. (*Id.*). In an endorsement dated May 7, 2020, the Court granted Defendants' request to extend the briefing schedule and directed Defendants to serve a copy of that Order on Plaintiff; Defendants filed an affidavit of service the next day indicating that the Order had been mailed to Plaintiff's address in New York City. (Doc. 37; Doc. 38).

**\*2** Defendants filed their motion for summary judgment on June 15, 2020. (Doc. 39; Doc. 40, "Def. Br."). On July 23, 2020, Defendants filed a letter noting that Plaintiff's time to oppose the pending motion had passed and requesting that the Court consider the motion unopposed. (Doc. 44). The Court endorsed the letter on July 24, 2020, extended Plaintiff's time to file an opposition to August 24, 2020 *sua sponte*, and advised that "[i]f plaintiff fails to file his opposition by August 24, 2020, the motion will be deemed fully submitted and unopposed." (Doc. 45). The Court also instructed Defendants to serve a copy of that Order on Plaintiffs (*id.*); Defendants filed an affidavit of service that reflected mailings to both Fishkill and the address in New York City shortly thereafter. (Doc. 46). The Court has received no communications from

Jackson v. Jackson, Not Reported in Fed. Supp. (2021)

Case 9:22-cv-00102-BKS-ML    Document 78    Filed 12/13/23    Page 56 of 373

Plaintiff since November 2019 and, as such, considers the motion fully submitted and unopposed.

For the reasons set forth below, Defendants' motion for summary judgment is GRANTED.

## BACKGROUND

The facts, as recited below, are taken from the Complaint, Defendants' Local Civil Rule 56.1 Statement (Doc. 42, "56.1 Stmt."), and the admissible evidence submitted by the parties.[2]

### I. The Underlying Incident

Plaintiff's factual allegations, *in toto*, are as follows:

> After an arguement [sic] with C.O. Jackson in the messhall[,] I was taken to the bridge area where the defendants beat me into a seizure, then fabricated a misbehavior report to justify their actions.

(Compl. at 4). Plaintiff maintains that this incident occurred on June 4, 2015. (*Id.*).

### II. Plaintiff's Grievance

Plaintiff filed the Grievance on June 17, 2015. (Quick Aff. ¶ 9; Quick Ex. B). Therein, Plaintiff complained that as he "was walking out [of] the messhall" on June 4, 2015, "C.O. Ms. Jackson and ... other[s] ... beat me down...." (Quick Ex. B). On August 14, 2015, following an investigation into Plaintiff's complaint, the Sing Sing Superintendent issued a written decision denying the Grievance. (Quick Aff. ¶ 11; Quick Ex. C). In full, the Superintendent's written decision reads as follows:

> Grievant claims staff harassment.

> The grievant was interviewed by a supervisor. The grievant had nothing further to add to his original complaint and provided no witnesses.

> Staff involved were interviewed and provided a written report denying the allegations of wrongdoing or harassing the grievant.

> Based on the investigation conducted, insufficient evidence could be found to substantiate the grievant [sic] allegations. Grievance is denied.

(Quick Ex. C). The Superintendent's decision advised that Plaintiff had seven days to appeal the determination to CORC, should he choose to do so (*id.*); however, there is no record that Plaintiff ever appealed to CORC (Quick Aff. ¶ 12; Seguin Aff. ¶¶ 6-7; Seguin Ex. B).

## STANDARD OF REVIEW

 **\*3**  Pursuant to Federal Rule of Civil Procedure 56, a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A fact is 'material' if it 'might affect the outcome of the suit under the governing law,' and is genuinely in dispute 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.' " *Liverpool v. Davis*, 442 F. Supp. 3d 714, 722 (S.D.N.Y. 2020) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). " 'Factual disputes that are irrelevant or unnecessary' are not material and thus cannot preclude summary judgment." *Sood v. Rampersaud*, No. 12-CV-5486, 2013 WL 1681261, at \*1 (S.D.N.Y. Apr. 17, 2013) (quoting *Anderson*, 477 U.S. at 248). The Court's duty, when determining whether summary judgment is appropriate, is "not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried." *Id.* (quoting *Wilson v. Nw. Mut. Ins. Co.*, 625 F.3d 54, 60 (2d Cir. 2010)). Indeed, the Court's function is not to determine the truth or weigh the evidence; the task is material issue spotting, not material issue determining. Therefore, "where there is an absence of sufficient proof as to one essential element of a claim, any factual disputes with respect to other elements of the claim are immaterial...." *Bellotto v. Cty. of Orange*, 248 F. App'x 232, 234 (2d Cir. 2007) (quoting *Salahuddin v. Goord*, 467 F.3d 263, 281 (2d Cir. 2006)). Claims simply cannot proceed in the absence of sufficient proof as to an essential element.

"It is the movant's burden to show that no genuine factual dispute exists," 🚩 *Vermont Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004) (citing 🚩 *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970)), and a court must "resolve all ambiguities and draw all reasonable inferences in the non-movant's favor." *Id.* (citing 🚩 *Giannullo v. City of New York*, 322 F.3d 139, 140 (2d Cir. 2003)). Once the movant has met its burden, the non-movant "must come forward with specific facts showing that there is a genuine issue for trial." 🚩 *Liverpool*, 442 F. Supp. 3d at 722 (quoting 🚩 *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)). The non-movant cannot defeat a summary judgment motion by relying on "mere speculation or conjecture as to the true nature of the facts...." *Id.* (quoting 🚩 *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 12 (2d Cir. 1986)). However, "[i]f there is any evidence from which a reasonable inference could be drawn in favor of the opposing party on the issue on which summary judgment is sought, summary judgment is improper." *Sood*, 2013 WL 1681261, at *2 (citing 🚩 *Sec. Ins. Co. of Hartford v. Old Dominion Freight Line Inc.*, 391 F.3d 77, 83 (2d Cir. 2004)).

Should there be no genuine issue of material fact, the movant must also establish its "entitlement to judgment as a matter of law." *In re Davis New York Venture Fund Fee Litig.*, 805 F. App'x 79, 80 (2d Cir. 2020) (quoting 🚩 *FIH, LLC v. Found. Capital Partners LLC*, 920 F.3d 134, 140 (2d Cir. 2019)). Stated simply, the movant must establish that the law favors the judgment sought. 🚩 *Gonzalez v. Rutherford Corp.*, 881 F. Supp. 829, 834 (E.D.N.Y. 1995) (explaining "that summary judgment is appropriate only when ... law supports the moving party"); *Linares v. City of White Plains*, 773 F. Supp. 559, 560 (S.D.N.Y. 1991) (summary judgment is appropriate when "the law so favors the moving party that entry of judgment in favor of the movant ... is proper"). This standard applies equally to claims for relief and affirmative defenses. *Giordano v. Market Am., Inc.*, 599 F.3d 87, 93 (2d Cir. 2010) ("The same standard applies whether summary judgment is granted on the merits or on an affirmative defense...."). [3]

**\*4** The Court is, of course, mindful that "[*p*]*ro se* litigants are afforded a special solicitude," which includes reading their filings "to raise the strongest arguments they suggest." 🚩 *Mortimer v. City of New York*, No. 15-CV-7186, 2018 WL 1605982, at *9 (S.D.N.Y. Mar. 29, 2018) (internal quotation

marks omitted). "It is through this lens of leniency towards *pro se* litigants that this Court must consider a defendant's motion for summary judgment against a *pro se* plaintiff," 🚩 *Adams v. George*, No. 18-CV-2630, 2020 WL 5504472, at *5 (S.D.N.Y. Sept. 8, 2020), but the mere fact that a litigant is *pro se* "does not relieve the plaintiff of his duty to meet the requirements necessary to defeat a motion for summary judgment," 🚩 *Jorgensen v. Epic/Sony Records*, 351 F.3d 46, 50 (2d Cir. 2003) (internal quotation marks omitted). Where, as here, a *pro se* litigant fails to oppose a motion for summary judgment, the motion may be granted as unopposed only "if: (1) the plaintiff has received adequate notice that failure to file any opposition may result in dismissal of the case; and (2) the Court is satisfied that the facts as to which there is no genuine dispute show that the moving party is entitled to judgment as a matter of law." *McNair v. Ponte*, No. 17-CV-2976, 2020 WL 3402815, at *3 (S.D.N.Y. June 18, 2020) (quoting *Warren v. Chem. Bank*, No. 96-CV-6075, 1999 WL 1256249, at *2 (S.D.N.Y. Dec. 22, 1999)). [4]

## ANALYSIS

The Prison Litigation Reform Act ("PLRA") provides that "[n]o action shall be brought with respect to prison conditions under 🚩 section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as available are exhausted." 🚩 42 U.S.C. § 1997e(a). This provision "applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes," *Hernández v. Coffey*, 582 F.3d 303, 305 (2d Cir. 2009) (quoting 🚩 *Porter v. Nussle*, 534 U.S. 516, 532 (2002)), and it is " 'mandatory': [a]n inmate 'shall' bring 'no action' (or said more conversationally, may not bring any action) absent exhaustion of available administrative remedies." 🚩 *Ross v. Blake*, 136 S.Ct. 1850, 1856 (2016) (citation omitted). "Moreover, the PLRA 'requires proper exhaustion, which means using all steps that the prison grievance system holds out.' " *Ayala-Rosario v. Westchester Cty.*, No. 19-CV-3052, 2020 WL 3618190, at *4 (S.D.N.Y. July 2, 2020) (quoting 🚩 *Williams v. Priatno*, 829 F.3d 118, 122 (2d Cir. 2016)). This "means that 'prisoners must complete the administrative review process in accordance with the applicable procedural rules—rules that are defined not by the PLRA, but by the prison grievance process itself.' " *Gottesfeld v. Anderson*,

Jackson v. Jackson, Not Reported in Fed. Supp. (2021)

Case 9:22-cv-00102-BKS-ML    Document 78    Filed 12/13/23    Page 58 of 373

No. 18-CV-10836, 2020 WL 1082590, at *6 (S.D.N.Y. Mar. 6, 2020) (quoting ⚑ *Johnson v. Killian*, 680 F.3d 234, 238 (2d Cir. 2012)). Accordingly, the Court looks to the process available to Plaintiff. *See* *Dinkins v. New York*, No. 19-CV-08447, 2020 WL 5659554, at *6 (S.D.N.Y. Sept. 23, 2020).

There are three levels of review for inmate grievances at Sing Sing. *See generally* ⚑ *Amador v. Andrews*, 655 F.3d 89, 96-97 (2d Cir. 2011) (outlining the three-step process). First, a grievance is reviewed by the Inmate Grievance Resolution Committee ("IGRC"), a facility-level body consisting of inmates and facility staff members. (Quick Ex. A §§ 701.4, 701.5(a)-(b); Senguin Ex. A § 701.4, 701.5(a)-(b)). Second, should the inmate be dissatisfied with the IGRC's determination, he may appeal that decision to the Superintendent. (Quick Ex. A § 701.5(c); Senguin Ex. A § 701.5(c)). Finally, if the Superintendent's conclusions are unfavorable, the inmate may appeal that decision to CORC. (Quick Ex. A § 701.5(d); Senguin Ex. A § 701.5(d)). However, when a grievance concerns staff harassment, DOCCS procedures provide for an expedited review that allows for the complaint to bypass IGRC review and proceed before the Superintendent in the first instance. (*See* Quick Ex. A § 701.8; Senguin Ex. A § 701.8). Both the Superintendent and CORC are required to "date stamp all" grievances or appeals forwarded to them for review (Quick Ex. A §§ 701.5(c)(3), 701.5(d)(3)(i); Senguin Ex. A §§ 701.5(c)(3), 701.5(d)(3)(i)) and require entities to maintain files "for the current calendar year plus the previous four calendar years" (Quick Ex. A § 701.6(k)(3); Senguin Ex. A § 701.6(k) (3)).

 **\*5** Quick represents, as custodian of records maintained by the IGP at Sing Sing, that grievances "are collected from the IGRC mailbox and processed" daily, in accordance with

DOCCS procedures. (Quick Aff. ¶ 5). Quick's records reveal that Plaintiff filed the Grievance on June 17, 2015, that the Grievance was forwarded directly to the Superintendent as one concerning staff harassment, and that the Superintendent performed an investigation and issued a written decision denying the Grievance on August 14, 2015. (*Id.* ¶¶ 9-11; Quick Ex. B). However, both Quick and Seguin represent affirmatively that they have no record of Plaintiff taking the final step of appealing the Superintendent's decision to CORC. (Quick Aff. ¶12; Seguin Aff. ¶¶ 6-7).

Even while granting Plaintiff—who filed nothing in opposition to this motion, and, in fact, has filed nothing in this case at all since November 2019 (*see* Doc. 32)—every conceivable benefit of the doubt to which a *pro se* litigant is entitled, there is no genuine issue of material fact on the instant motion. Consequently, summary judgment is proper here because: (1) Defendants established that Plaintiff failed to exhaust his administrative remedies and, as such, also their entitlement to summary judgment on the affirmative defense of Plaintiff's failure to exhaust his administrative remedies as required by the PLRA; and (2) Plaintiff was warned that failure to file an opposition would result in the Court concluding that the motion was unopposed.[5]

## CONCLUSION

Based upon the foregoing, the motion for summary judgment is GRANTED.

**SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2021 WL 981849

---

**Footnotes**

1    There are two docket entries reflecting reassignment of this matter from Judge Román to this Court on different dates. (*See* Apr. 3, 2020 Entry; Apr. 13, 2020 Entry).

2    In support of the instant motion, defense counsel filed a Declaration annexing two affidavits (with exhibits) for the Court's consideration. (Doc. 41). The first affidavit is from Quandera T. Quick ("Quick"), the Inmate Grievance Program ("IGP") Supervisor at Sing Sing. (Doc. 41-1, "Quick Aff." ¶ 1). This affidavit attaches as exhibits copies of: (1) New York State Department of Corrections and Community Supervision Directive

Jackson v. Jackson, Not Reported in Fed. Supp. (2021)

Case 9:22-cv-00102-BKS-ML    Document 78    Filed 12/13/23    Page 59 of 373

("DOCCS") No. 4040 (*id.* 5-21, "Quick Ex. A"); (2) Plaintiff's June 4, 2015 Grievance ("Grievance") (*id.* at 22-23, "Quick Ex. B"); and (3) the written decision issued by Michael Capra, Sing Sing's Superintendent, on August 14, 2015 (*id.* at 24-25, "Quick Ex. C"). The second affidavit is from Rachael Seguin ("Seguin"), the Assistant Director of the IGP for DOCCS and custodian of records for the Central Office Review Committee ("CORC"). (Doc. 41-2, "Seguin Aff."). This affidavit attaches as exhibits copies of: (1) DOCCS Directive No. 4040 (*id.* at 4-20, "Seguin Ex. A"); and (2) the results of a search for appeals filed with the CORC (*id.* at 21-23, "Seguin Ex. B").

3    "[T]he failure to exhaust administrative remedies in compliance with the [Prison Litigation Reform Act] is an affirmative defense" and it "may be waived" by a defendant who fails to raise it. *Banks v. Cty. of Westchester*, 168 F. Supp. 3d 682, 693 n.3 (S.D.N.Y. 2016) (internal quotation marks omitted). Here, Defendants' Fourth Affirmative Defense was failure to comply with 42 U.S.C. § 1997e. (Am. Ans. ¶ 14).

4    Given the Court's conclusion that there is no genuine issue of material fact as to exhaustion, it does not need to reach Defendants' request for an evidentiary hearing should the Court find otherwise.

5    Even if the Court did not grant Defendants' motion for summary judgment, it would dismiss the action with prejudice under Federal Rule of Civil Procedure 41(b) as a result of Plaintiff's failure to prosecute this action. Indeed, Plaintiff has not filed anything in this case since he filed a proposed discovery schedule more than a year ago.

---

**End of Document**                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

Ruiz v. Link, Not Reported in Fed. Supp. (2022)

Case 9:22-cv-00102-BKS-ML    Document 78    Filed 12/13/23    Page 60 of 373

2022 WL 3020254
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Michael RUIZ, Plaintiff,

v.

P. LINK, J. Reyes, Patrick Squire, Michael Blot,
Deborah Macdonald, and John Does #1-3, Defendants.

No. 20-CV-235 (CS)
|
Signed July 29, 2022

**Attorneys and Law Firms**

Michael Ruiz, Comstock, New York, Pro Se Plaintiff.

Kathryn Martin, Assistant Attorney General, Office of the
Attorney General of the State of New York, White Plains,
New York, Counsel for Defendants.

**OPINION & ORDER**

Seibel, District Judge

**\*1** Before the Court is Defendants' motion for summary
judgment. (ECF No. 66.) For the reasons set forth below,
Defendants' motion is GRANTED.

**I. BACKGROUND**

The following facts are based on Defendants' Local Civil
Rule 56.1 Statement, (ECF No. 68 ("D's 56.1 Stmt.")), and
supporting materials, and are undisputed unless otherwise
noted. [1]

**A. Facts**

Plaintiff Michael Ruiz is incarcerated in the custody of the
New York State Department of Corrections and Community
Supervision ("DOCCS"). (D's 56.1 Stmt. ¶ 1.) Plaintiff's
claims arose while he was held at Green Haven Correctional
Facility. (*Id.* ¶ 2.) Plaintiff brings this lawsuit in connection
with an altercation in the prison yard on April 6, 2019 and
the medical treatment he received thereafter. (*Id.* ¶¶ 3-4.)
He alleges excessive force claims against Defendants Link,
Reyes, Squire and Blot, and a claim of deliberate indifference
to medical needs against Defendant MacDonald. [2]

**\*2** The altercation and medical treatment at issue occurred
on April 6, 2019. (Ds' 56.1 Stmt. ¶¶ 3-4.) That same day,
Plaintiff was transferred from Green Haven to Sing Sing
Correctional Facility. (*Id.* ¶ 22.) While at Sing Sing, Plaintiff
filed a grievance, dated April 9, 2019, [3] alleging that on
April 6, 2019, correction officers used excessive force against
him, and medical staff failed to properly treat him. (D's 56.1
Stmt. ¶ 24; *see* ECF No. 71-6.) The grievance was denied
by the Sing Sing Superintendent on July 26, 2019. (D's 56.1
Stmt. ¶ 25; ECF No. 71-7.) Plaintiff testified at his deposition
that he did not receive a copy of the Superintendent's denial
until October 9, 2019, when he received a memo from Sing
Sing's Inmate Grievance Program ("IGP") Supervisor, dated
August 30, 2019. (P's Depo. at 79:22-80:13; *see* ECF No.
65-6.) The letter informed Plaintiff that his grievance had
been answered on July 26, 2019 and forwarded to Plaintiff at
that time; the Supervisor included with the memo a copy of
the Superintendent's July 26 denial. (*Id.*) The bottom portion
of the Superintendent's denial letter is a form the inmate
can fill out if he wishes to appeal; it states, "[R]eturn this
copy to your Inmate Grievance Clerk." (ECF No. 71-7.) [4]
By the time Plaintiff received the letter and the copy of
the Superintendent's denial on October 9, Plaintiff had been
transferred out of Sing Sing and was being held in the Special
Housing Unit ("SHU") at Elmira Correctional Facility. (Ds'
56.1 Stmt. ¶ 26; P's Depo. at 78:8-19, 78:25-79:21.) [5]

DOCCS records reflect that the Central Office Review
Committee ("CORC") never received any appeal of the
Superintendent's denial of Plaintiff's grievance. (D's 56.1
Stmt. ¶ 28.) Further, DOCCS records reflect that CORC did
not receive any correspondence from Plaintiff at all during
2019 or 2020. (*Id.* ¶ 29; *see* ECF No. 70 ("Seguin Decl.")
¶ 13.) Plaintiff asserted in his deposition that he filled out
the appeal form on October 10, 2019 and "forwarded it to
CORC ... [b]y mail." (P's Depo. at 80:24-81:4; *see id.* at
82:20-83:7.) Plaintiff did not specify the address to which he
mailed the appeal, but stated that he requested and received
the address from the law library. (*Id.* at 82:3-19.) Plaintiff did
not receive an acknowledgement of receipt or answer from
CORC. (*Id.* at 81:5-7.) After several months, he filed this
lawsuit. (*Id.* at 81:8-13.)

**B. Procedural History**

Plaintiff filed his original complaint on January 8, 2020,
bringing claims under 42 U.S.C. § 1983 against eight

Ruiz v. Link, Not Reported in Fed. Supp. (2022)

Case 9:22-cv-00102-BKS-ML    Document 78    Filed 12/13/23    Page 61 of 373

Green Haven employees in their individual capacities for violations of the Eighth Amendment. (ECF No. 2.) The case was reassigned to me on February 14, 2020. At a pre-motion conference on August 28, 2020 in anticipation of a potential motion to dismiss, I granted Plaintiff leave to amend his Complaint. (*See* Minute Entry dated Aug. 28, 2020.) The Amended Complaint was filed on September 18, 2020. (ECF No. 30.) Defendants answered on April 8, 2021. (ECF No. 44.)

On May 11, 2021, I held a status conference and set a discovery schedule, (ECF No. 51), which was extended twice, (ECF Nos. 57, 60). At the close of discovery, Defendants filed a pre-motion letter in anticipation of their motion for summary judgment. (ECF No. 64.)[6] I held a pre-motion conference on November 16, 2021 and set a briefing schedule for Defendants' motion. (*See* Minute Entry dated Nov. 16, 2021.) On December 29, 2021, Defendants filed their motion papers. (ECF Nos. 66-71.) Plaintiff's opposition was initially due on January 27, 2022. Approximately one to two weeks before the due date Plaintiff left two phone messages with my chambers, requesting an extension of the briefing schedule and permission to file a motion to obtain counsel. (*See* ECF No. 74.) On January 19, 2022, I entered an Order extending Plaintiff's time to respond to the motion to February 28, 2022, and advising him of his right to file a motion asking the Court to seek volunteer counsel. (*Id.*) On March 18, 2022, I received a letter from Plaintiff (dated March 14, 2022), indicating that his opposition was ready, and he just wanted permission to file it late; I granted an extension to April 6, 2022, and noted there would be no further extensions. (ECF No. 76.) On April 28, 2022, after no opposition was received, I deemed the motion fully submitted. (ECF No. 78.)

## II. LEGAL STANDARD

 **\*3**  Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "[T]he dispute about a material fact is 'genuine' ... if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is "material" if it "might affect the outcome of the suit under the governing law .... Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* On a motion for summary judgment, "[t]he evidence of the non-movant is to

be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255.

The movant bears the initial burden of demonstrating "the absence of a genuine issue of material fact," and, if satisfied, the burden then shifts to the non-movant to "present evidence sufficient to satisfy every element of the claim." *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008). "The mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." *Anderson*, 477 U.S. at 252. Moreover, the non-movant "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), and "may not rely on conclusory allegations or unsubstantiated speculation," *Fujitsu Ltd. v. Fed. Express Corp.*, 247 F.3d 423, 428 (2d Cir. 2001) (cleaned up).

"A party asserting that a fact cannot be or is genuinely disputed must support the assertion by ... citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations ... admissions, interrogatory answers, or other materials ...." Fed. R. Civ. P. 56(c)(1). Where a declaration is used to support or oppose the motion, it "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the ... declarant is competent to testify on the matters stated." *Id.* 56(c)(4); *see Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 310 (2d Cir. 2008). In the event that "a party fails ... to properly address another party's assertion of fact as required by Rule 56(c), the court may ... consider the fact undisputed for purposes of the motion" or "grant summary judgment if the motion and supporting materials – including the facts considered undisputed – show that the movant is entitled to it." Fed. R. Civ. P. 56(e).

*Pro se* litigants must be afforded "special solicitude," *Tracy v. Freshwater*, 623 F.3d 90, 101 (2d Cir. 2010), "particularly where motions for summary judgment are concerned," *Jackson v. Fed. Express*, 766 F.3d 189, 195 (2d Cir. 2014). Where, as here, the non-moving party fails to respond to the movant's summary judgment motion, "the district court may not grant the motion without first examining the moving party's submission to determine if it

Ruiz v. Link, Not Reported in Fed. Supp. (2022)

Case 9:22-cv-00102-BKS-ML    Document 78    Filed 12/13/23    Page 62 of 373

has met its burden of demonstrating that no material issue of fact remains for trial." *Vt. Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004) (cleaned up). "If the evidence submitted in support of the summary judgment motion does not meet the movant's burden of production, then summary judgment must be denied even if no opposing evidentiary matter is presented." *Id.* (cleaned up) (emphasis omitted).

### III. DISCUSSION

#### A. Exhaustion Under the PLRA

The Prison Litigation Reform Act ("PLRA") provides that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). Exhaustion is required for "all inmate suits about prison life, whether they involve general circumstances or particular episodes." *Porter v. Nussle*, 534 U.S. 516, 532 (2002). The PLRA mandates that a plaintiff use "all steps that the agency holds out, and do[ ] so properly" – that is, in accordance with the applicable agency rules. *Amador v. Andrews*, 655 F.3d 89, 96 (2d Cir. 2011) (cleaned up). Exhaustion of available administrative remedies "must be complete prior to commencement of suit" and "[t]he fact that a grievance is filed, or the process is completed, subsequent to commencement of suit will not salvage an otherwise premature filing." *Chalif v. Spitzer*, No. 05-CV-1355, 2008 WL 1848650, at *13 (N.D.N.Y. Apr. 23, 2008) (cleaned up).

**\*4** For inmates in New York State prison, administrative exhaustion requires compliance with DOCCS' three-tiered IGP, in which (1) the inmate must file a grievance with the Inmate Grievance Resolution Committee ("IGRC") within twenty-one days of the alleged occurrence, (2) the inmate must then appeal an adverse decision by the IGRC to the superintendent of the facility within seven days after receipt of the IGRC's response, and (3) the inmate must then appeal an adverse decision by the superintendent to the CORC within seven days after receipt of the superintendent's response. *See* N.Y. Comp. Codes R. & Regs. tit. 7, § 701.5 (2022); *McGee v. McGready*, No. 16-CV-4187, 2018 WL 2045094, at *2 (S.D.N.Y. Apr. 30, 2018).

"[W]hen a grievance concerns staff harassment, DOCCS procedures provide for an expedited review that allows for the complaint to bypass IGRC review and proceed before the Superintendent in the first instance." *Jackson v. Jackson*, No. 16-CV-8516, 2021 WL 981849, at *4 (S.D.N.Y. Mar. 16, 2021); *see* N.Y. Comp. Codes R. & Regs. tit. 7, § 701.8. Under the expedited procedure, the Superintendent has twenty-five days to respond to the grievance. N.Y. Comp. Codes R. & Regs. tit. 7, § 701.8(f). If the Superintendent fails to respond within twenty-five days, the inmate may appeal directly to CORC. *Id.* § 701.8(g). If the Superintendent does respond, the inmate has seven days from receipt of the response to appeal to CORC. *Id.* § 701.8(h). The IGP Supervisor has discretion to grant exceptions to the time limits for filing or appealing grievances. *See id.* § 701.6(g). Whether or not the Superintendent timely responds, the procedure to appeal a determination of the Superintendent to CORC is to file "a notice of decision to appeal (form #2133) with the inmate grievance clerk." *Id.* § 701.8(g)-(h). [7] Inmates who have been transferred to a different facility can get their appeal to the appropriate grievance clerk by "mail[ing] the signed appeal form back to the IGP supervisor at the facility where the grievance was originally filed." *Id.* § 701.6(h)(2).

CORC is required to provide, through IGP staff, written confirmation that an appeal has been received, and if the inmate does not receive such confirmation within forty-five days, he "should contact the IGP supervisor in writing to confirm that the appeal was filed and transmitted to CORC." *Id.* § 701.5(d)(3)(i). The IGP requires CORC to respond to an appeal within thirty days of receipt. *Id.* § 701.5(d)(3)(ii). If CORC has received an appeal and fails to within those thirty days, the inmate is considered to have exhausted his administrative remedies and may file suit. *Hayes v. Dahlke*, 976 F.3d 259, 270 (2d Cir. 2020).

#### B. Plaintiff's Failure to Exhaust

Defendants have met their burden to demonstrate that Plaintiff failed to follow IGP procedures with regard to his CORC appeal and that CORC never received Plaintiff's appeal. Accordingly, Plaintiff failed to "properly" exhaust administrative remedies prior to filing suit. *See Amador*, 655 F.3d at 96.

Plaintiff testified that once he received the Superintendent's adverse decision on October 9, 2021, he filled out the appeal statement and "forwarded it to CORC ... [b]y mail." (P's Depo.

Ruiz v. Link, Not Reported in Fed. Supp. (2022)

Case 9:22-cv-00102-BKS-ML    Document 78    Filed 12/13/23    Page 63 of 373

at 80:24-81:4.) He never received confirmation that his appeal was received or any response from CORC, and after a few months he filed this lawsuit. (*Id.* at 81:8-13.)

The IGP required Plaintiff to forward the appeal to the Inmate Grievance Clerk. N.Y. Comp. Codes R. & Regs. tit. 7, § 701.8(g)-(h). The form at the bottom of the Superintendent's letter also notified Plaintiff that the appeal to CORC had to be transmitted via the Inmate Grievance Clerk. (*See* ECF No. 71-7.) The IGP specifically provides that Plaintiff, having been transferred to a different facility from that in which he originally filed his grievance, should get his appeal to the proper Inmate Grievance Clerk by "mail[ing] the signed appeal form back to the IGP supervisor at the facility where the grievance was originally filed." *Id.* § 701.6(h)(2). Nothing in the record indicates that Plaintiff followed this procedure; rather, it appears he tried to mail his appeal directly to CORC, and CORC never received the document. (*See* Seguin Decl. ¶¶ 12-13 (CORC never received appeal of Plaintiff's grievance, nor did it receive any other correspondence from Plaintiff during 2019 or 2020); ECF No. 71-8 (CORC records showing no receipt of appeal)).

**\*5** Accordingly, Plaintiff failed to properly follow the grievance procedure and has failed to exhaust his administrative remedies. *See Valverde v. Folks*, No. 19-CV-8080, 2022 WL 836310, at \*6 (S.D.N.Y. Mar. 21, 2022) ("Plaintiff did not properly comply with [the] prison grievance procedural rules. Plaintiff ... mailed his appeal statement directly to CORC. However, to appeal a decision denying a grievance, an inmate must submit the appeal, not directly to CORC, but to the grievance supervisor of the facility where the grievance was originally filed for forwarding to that facility's grievance clerk."); *Wilkinson v. Banks*, No. 2-CV-361, 2007 WL 2693636, at \*6 (W.D.N.Y. Sep. 10, 2007) ("[N]o dispute exists that [the *pro se* plaintiff] did not follow correct procedure in attempting to appeal that grievance to CORC. He did not file his appeal with the Inmate Grievance Clerk as required by the regulations, but rather mailed it directly to CORC.") (cleaned up).

## C. Availability of Administrative Remedies

Although the Supreme Court has deemed exhaustion mandatory, there are circumstances under which administrative remedies may be deemed "unavailable" to an inmate, such that an inmate is not required to exhaust. *Ross v. Blake*, 578 U.S. 632, 642 (2016). The Supreme Court identified three circumstances where administrative

remedies may be unavailable. *See id.* at 643-44. First, "an administrative procedure is unavailable when (despite what regulations or guidance materials may promise) it operates as a simple dead end – with officers unable or consistently unwilling to provide any relief to aggrieved inmates." *Id.* at 643. Second, "an administrative scheme might be so opaque that it becomes, practically speaking, incapable of use." *Id.* Third, administrative remedies are unavailable where "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Id.* at 644. "If the defendant has met its burden of establishing the existence and applicability of the grievance policy, the *plaintiff* bears the burden of establishing *de facto* unavailability." *Saeli v. Chautauqua County*, 36 F.4th 445, 453 (2d Cir. 2022) (emphasis in original).

Plaintiff has submitted no opposition to the instant motion and has not argued that administrative procedures were unavailable to him. *See Dowling v. Barkman*, No. 17-CV-647, 2019 WL 7971868, at \*5 (N.D.N.Y. Dec. 20, 2019) ("Given Plaintiff's failure to oppose the Motion, no basis appears on the record for concluding that DOCCS' grievance procedure was unavailable to him."), *report and recommendation adopted sub nom. Dowling v. Schleicher*, 2020 WL 103480 (N.D.N.Y. Jan. 8, 2020). Even if that were not the case, the record does not reflect that any of the above-listed circumstances apply.

First, nothing in the record suggests that Plaintiff did not receive a response from CORC because the grievance process was operating as a "dead end" – rather, it appears that CORC never received Plaintiff's appeal because of Plaintiff's failure to send the appeal to the appropriate official. (*See* P's Depo. at 80:24-81:4; Seguin Decl. ¶¶ 12-13; ECF No. 71-8.) Similarly, the record is bereft of evidence that the IGP is unavailable to inmates generally. *See White v. Veile*, 709 F. App'x 35, 38 (2d Cir. 2017) (summary order) (affirming summary judgment for failure to exhaust administrative remedies where plaintiff did not "present[ ] any evidence about the outcomes in the grievance system in general" or "show[ ] that prison officials are consistently unwilling to grant relief").

Second, as set out above, the relevant procedures are not opaque. The IGP clearly sets out the process for appealing a grievance to CORC through the Inmate Grievance Clerk – including the instructions under § 701.6(h)(2) for an inmate who has been transferred from one facility to another to send

Ruiz v. Link, Not Reported in Fed. Supp. (2022)

Case 9:22-cv-00102-BKS-ML    Document 78    Filed 12/13/23    Page 64 of 373

an appeal to the appropriate facility's IGP Supervisor. Plaintiff testified that he is familiar with the grievance process, (*see* P's Depo. at 18:3-19:6), and the Superintendent's denial stated that the appeal to CORC had to go through the Inmate Grievance Clerk, (*see* ECF No. 71-7).

**\*6** Third, while there is some evidence in the record that Plaintiff sought information from the "law library officer" while he was in the SHU at Elmira and appears to have been given a mailing address for CORC,[8] this fact alone is insufficient to establish that a prison official thwarted his ability to successfully appeal to CORC. Plaintiff has not suggested that he asked how to appeal and was told to mail his appeal to CORC, or that he asked the law library officer for anything other than the address of CORC. There is simply no evidence of machination, intimidation or misrepresentation.

That the breakdown of the grievance procedure here was due to Plaintiff's failure to follow it, rather than to its unavailability, is highlighted by the fact that when Plaintiff did not receive confirmation that CORC was in possession of his appeal within the forty-five days envisioned by the regulations, instead of following the IGP and writing to Sing Sing's IGP Supervisor – an official with whom he had recently communicated, (*see* P's Depo. at 79:22-80:13, 81:14-21) – to confirm that the appeal was filed, *see* N.Y. Comp. Codes R. & Regs. tit. 7, § 701.5(d)(3)(i), he simply waited a few months and then filed this lawsuit. (P's Depo. at 79:25-80:8, 81:5-13).[9]

In short, "[g]iven the lack of evidence that Plaintiff's appeal to CORC was ever filed, or ever followed up on, it is not that the full scope of administrative remedies was not available to Plaintiff – rather, Plaintiff failed to fully exhaust the administrative remedies available to him." *Houston v. Coveny*, No. 14-CV-6609, 2020 WL 2494439, at \*3 (W.D.N.Y. May 14, 2020); *see Litchmore v. Williams*, No. 11-CV-7546, 2013 WL 3975956, at \*6 (S.D.N.Y. Aug. 5, 2013) (no "sufficient basis in the record to find that administrative remedies were unavailable" where, among other things, there was "no evidence here that the plaintiff's appeal was actually mailed, intercepted, or ignored" and "DOCCS has no record of any appeal filed with CORC").[10]

### IV. CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment is GRANTED. The Clerk of Court is respectfully directed to terminate the pending motion, (ECF No. 83), enter judgment for Defendants, and close the case.

### SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2022 WL 3020254

---

### Footnotes

1    Plaintiff did not file a responsive Rule 56.1 Statement or any papers in opposition to this motion. Local Civil Rule 56.1 requires that the party opposing a motion for summary judgment submit a counterstatement responding to the moving party's statement of material facts, indicating which facts are admitted and which the opposing party contends are in dispute and require a trial. L.R. 56.1(b). Under the Local Rule, "[i]f the opposing party ... fails to controvert a fact so set forth in the moving party's Rule 56.1 statement, that fact will be deemed admitted." 🔖 *Giannullo v. City of N.Y.*, 322 F.3d 139, 140 (2d Cir. 2003) (citing L.R. 56.1(c)). *Pro se* litigants are not excused from this requirement. *SEC v. Tecumseh Holdings Corp.*, 765 F. Supp. 2d 340, 344 n.4 (S.D.N.Y. 2011). As Defendants served Plaintiff with the requisite notice pursuant to Local Civil Rule 56.2, (*see* ECF No. 72), I have discretion to consider any properly supported facts in Defendants' Local Civil Rule 56.1 Statement admitted. (The Court will send Plaintiff copies of any unpublished decisions cited in this Opinion and Order.) But granting Plaintiff solicitude, I have considered his deposition testimony, (ECF No. 71-2 ("P's Depo.")), statements in his complaint and amended complaint, both of which are sworn under penalty of perjury pursuant to 28 U.S.C. § 1746, (ECF Nos. 2, 30), and his letter in response to Defendants'

Ruiz v. Link, Not Reported in Fed. Supp. (2022)

Case 9:22-cv-00102-BKS-ML    Document 78    Filed 12/13/23    Page 65 of 373

pre-motion letter, (ECF No. 65). *See* *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 73 (2d Cir. 2001) ("[W]hile a court is not required to consider what the parties fail to point out in their Local Rule 56.1 statements, it may in its discretion opt to conduct an assiduous review of the record even where one of the parties has failed to file such a statement.") (cleaned up).

2  Defendants move for summary judgment on all of Plaintiff's claims on the ground that he failed to exhaust his administrative remedies, and in the alternative for summary judgment only on Plaintiff's deliberate medical indifference claim. (*See* ECF No. 67 at 1.) Because I resolve the motion on the basis of failure to exhaust administrative remedies, I do not describe the specific allegations further.

3  Defendants state in their Rule 56.1 statement that Plaintiff's grievance is dated April 22, 2019, but that is the date on which the grievance was stamped as received by the facility. (*See* ECF No. 71-6.)

4  The form is captioned "Appeal Statement," and below the caption it reads: "If you wish to refer the above decision of the Superintendent please sign below and return this copy to your Inmate Grievance Clerk. You have seven (7) calendar days from your receipt of this notice to file your appeal.* Please state why you are appealing this decision to C.O.R.C." The asterisk leads to a statement about how to request an exception to the time limit. Below the language quoted above are several lines for the inmate to explain why he is appealing, and then signature lines for the inmate and the Grievance Clerk.

5  Plaintiff notes that it is possible he had not previously received the Superintendent's denial because much of the time he was at Sing Sing he was housed in the Office of Mental Health ("OMH") unit after several suicide attempts between June and September of 2019. (P's Depo. at 78:5-19.)

6  Plaintiff responded by letter dated November 8, 2021, but that letter was not received and docketed until November 24, 2021. (*See* ECF No. 65.)

7  The procedure to appeal to CORC under the normal, non-expedited procedures is the same. *See* N.Y. Comp. Codes R. & Regs. tit. 7, § 701.5(d)(1)(i).

8  Plaintiff testified as his deposition as follows:

   [Q.] So how do you know where to send the grievance appeal? ...

   A. You can actually get the address from the law library that they provide in the facility. They have all the information of addresses, names, stuff like that.

   Q. And is that what you did? You went to the law library?

   A. Yes, ma'am. I was in the special housing unit at the time, so the law library officer will actually come to you and take your request and then return the request by the next day.

   (P's Depo. at 82:6-19.)

9  Plaintiff's response to the question whether he ever followed up with CORC – that he "tried checking [the appeal], but it had already been months they hadn't responded, so I proceeded with my civil Complaint," (P's Depo. at 81:8-13) – not only contains no information about what he did to check, but suggests at most that he asked about the status of his appeal at or about the same time that he filed this lawsuit.

10 Having so found, I need not and do not address the merits of Plaintiff's medical indifference claim.

**End of Document** © 2023 Thomson Reuters. No claim to original U.S. Government Works.

Mena v. City of New York, Not Reported in Fed. Supp. (2016)

Case 9:22-cv-00102-BKS-ML    Document 78    Filed 12/13/23    Page 67 of 373

2016 WL 3948100
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Jonathan MENA, Plaintiff,
v.
CITY OF NEW YORK, et al., Defendants.

No. 13-cv-2430 (RJS)
|
Signed 07/19/2016

**Attorneys and Law Firms**

Jonathan Mena, Stormville, NY, pro se.

Omar Javed Siddiqi, Ryan Glenn Shaffer, New York City Law Department, New York, NY, for Defendants.

OPINION AND ORDER

RICHARD J. SULLIVAN, District Judge

**\*1** Plaintiff Jonathan Mena, who is currently incarcerated and proceeding *pro se*, brings this action pursuant to 📗 42 U.S.C. § 1983 ("📗 Section 1983") against Correction Officer Benjamin Eason ("Defendant"), alleging violations of the Eighth Amendment. Now before the Court is Defendant's motion for summary judgment. For the reasons set forth below, the motion is granted.

I. BACKGROUND

A. Facts [1]

On September 9, 2012, while incarcerated at the Otis Bantum Correctional Center ("OBCC") on Rikers Island, Plaintiff was placed in an intake cell in the OBCC's receiving area, which he shared with two other individuals. (56.1 Stmt. ¶¶ 2–3.) Plaintiff alleges that the cell was extremely cold, vermin-infested, and too small to accommodate three men. (*See* Doc. No. 54-1 ("Compl.") 4, 8.) Plaintiff further alleges that these conditions, coupled with the constant noise made by the two other inmates, prevented him from sleeping for the entire 60-hour period that he was held in the cell. (*See id.* at 4.) Consequently, he asked Defendant, who was on duty, to

transfer him to a different cell. (56.1 Stmt. ¶¶ 7–8.) According to Plaintiff, Defendant responded that there was "nothing he could do" about the situation. (*Id.* ¶ 9; *see also* Doc. No. 54-2 ("Mena Dep.") 59:5-8.)

Plaintiff avers that he filed a grievance with the OBCC to complain about his experience in the cell. (*See* Compl. at 7.) The New York City Department of Correction ("DOC") has an administrative grievance procedure, known as the Inmate Grievance and Request Program ("IGRP"), for inmates housed at facilities such as the OBCC. The IGRP, which was available and in effect at all times relevant to this lawsuit, requires that inmates first file a complaint with the Inmate Grievance Resolution Committee ("IGRC") within ten days of the complained-of act. (56.1 Stmt. ¶¶ 11–12; *see also* Doc. No. 54-3 ("IGRP Directive") § IV(D)(1).) The IGRC then attempts to resolve the grievance informally within five days, and if the grievance is not informally resolved, then the inmate may request a formal hearing before the IGRC. (56.1 Stmt. ¶ 12; *see also* IGRP Directive §§ IV(G)-(H).) An inmate may appeal the IGRC's decision to the commanding officer, or her designee, and subsequent appeals may be taken to the Central Office Review Committee ("CORC"). (56.1 Stmt. ¶ 13; *see also* IGRP Directive §§ IV(I)-(J).) The CORC's decision is the final and binding decision of the DOC; if an inmate disputes the decision of the CORC, he may independently appeal to the Board of Correction. (IGRP Directive at 47.) Finally, if an inmate does not receive a timely disposition at any point throughout the grievance process, he has the option of either granting an extension of time to the relevant decisionmaker (i.e., the IGRC, the commanding officer, or the CORC) or appealing and proceeding to the next level of review. (56.1 Stmt. ¶ 14; *see also* IGRP Directive §§ IV(D)(9)(b), (10).)

**\*2** As Plaintiff himself acknowledges, after submitting the grievance and receiving no response, he neither granted the DOC an extension of time nor appealed. (*See* Compl. 7–8; Opp'n 6.) In his Complaint, Plaintiff admits that he is "still waiting" for a disposition of his grievance, but does not indicate any steps he has taken to appeal any decision before the IGRC. (*See* Compl. 7.) In response to a question on the Southern District of New York Prison Complaint form asking a plaintiff to "set forth any additional information that is relevant to the exhaustion of your administrative remedies," Plaintiff repeated a number of his substantive allegations against the OBCC staff, but did not state any information relevant to the grievance process. (*Id.* at 5.) And in his opposition brief in connection with this motion, Plaintiff again notes that he filed "several grievances about the issues

in question," but he does not indicate any specific steps he took to appeal to the IGRC or to pursue any other avenue of appellate review within the IGRP. (Opp'n 6.)

## B. Procedural History

On April 11, 2013, Plaintiff commenced this action by filing a complaint against the City of New York, Correction Officer Jaquon Pickwood ("Pickwood"), Correction Officer Sauda Abdul-Malik ("Abdul-Malik"), and Defendant (collectively, "Defendants"), pursuant to Section 1983, asserting violations of his constitutional rights under the Eighth and Fourteenth Amendments. (*See* Doc. No. 1.) On December 9, 2013, Defendants moved to dismiss the Complaint. (Doc. No. 18.) On September 17, 2014, the Court granted Defendants' motion to dismiss with respect to Plaintiff's claims against the City of New York, Pickwood, and Abdul-Malik, and Plaintiff's Fourteenth Amendment claims against Defendant for failure to state a claim upon which relief can be granted, but denied Defendants' motion to dismiss with respect to Plaintiff's Eighth Amendment claim against Officer Eason. (Doc. No. 29.) On September 11, 2015, following the completion of discovery, Defendant filed the instant motion for summary judgment, along with his brief and his 56.1 Statement, arguing that Plaintiff failed to exhaust administrative remedies, that his Eighth Amendment conditions of confinement claim failed on the merits, and that in any event, Defendant was entitled to qualified immunity. (Doc. Nos. 53–55, 57.) Defendant also filed a notice pursuant to Local Civil Rule 56.2 alerting Plaintiff of his obligation to submit a responsive statement and informing him of the consequences of not doing so. (Doc. No. 56.) In accordance with Local Rule 56.2, this notice included copies of Federal Rule of Civil Procedure 56 and Local Civil Rule 56.1. (*Id.*) On October 14, 2015, Plaintiff filed a brief opposing summary judgment and submitted several exhibits (*see* Doc. No. 58), but he failed to submit a responsive 56.1 Statement. Defendant submitted his reply on October 22, 2015. (Doc. No. 59 ("Reply").)

## II. LEGAL STANDARD

Pursuant to Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter

of law." Fed. R. Civ. P. 56(a). There is "no genuine dispute as to any material fact" where (1) the parties agree on all facts (that is, there are no disputed facts); (2) the parties disagree on some or all facts, but a reasonable fact-finder could never accept the nonmoving party's version of the facts (that is, there are no genuinely disputed facts), *see Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); or (3) the parties disagree on some or all facts, but even on the nonmoving party's version of the facts, the moving party would win as a matter of law (that is, none of the factual disputes are material), *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In determining whether a fact is genuinely disputed, the court "is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments." *Weyant v. Okst*, 101 F.3d 845, 854 (2d Cir. 1996). Nevertheless, to show a genuine dispute, the nonmoving party must provide "hard evidence," *D'Amico v. City of N.Y.*, 132 F.3d 145, 149 (2d Cir. 1998), "from which a reasonable inference in [its] favor may be drawn," *Binder & Binder PC v. Barnhart*, 481 F.3d 141, 148 (2d Cir. 2007) (internal quotation marks omitted). "Conclusory allegations, conjecture, and speculation," *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998), as well as the existence of a mere "scintilla of evidence in support of the [nonmoving party's] position," *Anderson*, 477 U.S. at 252, are insufficient to create a genuinely disputed fact. A moving party is "entitled to judgment as a matter of law" on an issue if (1) it bears the burden of proof on the issue and the undisputed facts meet that burden; or (2) the nonmoving party bears the burden of proof on the issue and the moving party " 'show[s]'– that is, point[s] out ... – that there is an absence of evidence [in the record] to support the nonmoving party's [position]." *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).

**\*3** Typically, a "nonmoving party's failure to respond to a [Local Civil] Rule 56.1 statement permits the court to conclude that the facts asserted in the statement are uncontested and admissible." *T.Y. v. N.Y.C. Dep't of Educ.*, 584 F.3d 412, 418 (2d Cir. 2009) (citing *Gubitosi v. Kapica*, 154 F.3d 30, 31 n.1 (2d Cir. 1998)). "This general rule

Mena v. City of New York, Not Reported in Fed. Supp. (2016)

Case 9:22-cv-00102-BKS-ML    Document 78    Filed 12/13/23    Page 69 of 373

applies equally" to cases involving a *pro se* nonmoving party who has been provided adequate notice of the consequences of failing to properly respond to a summary judgment motion.

*Pierre-Antoine v. City of N.Y.*, No. 04-cv-6987 (GEL), 2006 WL 1292076, at *3 (S.D.N.Y. May 9, 2006); *see also Gilliam v. Trustees of Sheet Metal Workers' Nat'l Pension Fund*, No. 03-cv-7421 (KMK), 2005 WL 1026330, at *1 n.2 (S.D.N.Y. May 3, 2005). Even so, the Court "may in its discretion opt to conduct an assiduous review of the record even where one of the parties has failed to file such a statement," *Holtz*, 258 F.3d at 73, and the Court is obligated to construe *pro se* litigants' submissions liberally, *see McEachin v. McGuinnis*, 357 F.3d 197, 200 (2d Cir. 2004).

Here, Plaintiff failed to submit a responsive Rule 56.1 statement, even though Defendant, pursuant to Local Civil Rule 56.2, sent Plaintiff notice of his obligations under Local Civil Rule 56.1 and Federal Rule of Civil Procedure 56 and sent copies of both rules. (Doc. No. 56). In light of Plaintiff's *pro se* status, the Court has exercised its discretion to independently review the record, which reveals no controverted facts. *See Holtz*, 258 F.3d at 73. In fact, as discussed below, Plaintiff's own submissions confirm the material facts contained in Defendant's Rule 56.1 Statement.

## III. DISCUSSION

Defendant argues that summary judgment should be granted because Plaintiff has failed to comply with the administrative exhaustion requirement of the Prison Litigation Reform Act of 1995 (the "PLRA"). The Court agrees.

Under the PLRA, inmates bringing claims with respect to prison conditions under Section 1983 must exhaust the administrative remedies that are available at that prison before proceeding in federal court. 42 U.S.C. § 1997e(a). The PLRA's exhaustion requirement is "mandatory," thus "foreclosing judicial discretion." *Ross v. Blake*, 136 S. Ct. 1850, 1857 (2016); *see also Woodford v. Ngo*, 548 U.S. 81, 84 (2006) (describing the "invigorated exhaustion provision" as "[a] centerpiece of the PLRA's effort to reduce the quantity of prisoner suits" (citations and quotation marks omitted)). Accordingly, "the law is well-settled that the failure to take an available administrative appeal, even when the

initial grievance receives no response, constitutes a failure to exhaust available administrative remedies." *Garvin v. Rivera*, No. 13-cv-7054 (RJS), 2015 WL 3999180, at *3 (S.D.N.Y. June 29, 2015); *accord Johnson v. N.Y.C. Dep't of Corr.*, No. 13-cv-6799 (CM), 2014 WL 2800753, at *6 (S.D.N.Y. June 16, 2014) ("Assuming that [p]laintiff filed a timely grievance ... and received no response within five business days[,] ... [p]laintiff ... could have taken the next step and requested a hearing."); *Leacock v. N.Y.C. Health Hosp. Corp.*, No. 03-cv-5440 (RMB) (GWG), 2005 WL 483363, at *7 (S.D.N.Y. Mar. 1, 2005) ("[T]hat [plaintiff] allegedly did not receive a response to her grievance does not excuse her from failing to exhaust the appellate remedies available to her."); *Burns v. Moore*, No. 99-cv-966 (LMM) (THK), 2002 WL 91607, at *8 (S.D.N.Y. Jan. 24, 2002) ("Thus, even if [p]laintiff received no response to his initial grievance, [p]laintiff could have sought the next level of review, in this case, to the prison superintendent.").

**\*4** At the OBCC, where Plaintiff was incarcerated, an inmate must exhaust several layers of review, even if the inmate does not receive a timely disposition at the initial stages. (56.1 Stmt. ¶ 12–14.) Here, as Plaintiff reveals in his own complaint and brief in opposition to the motion for summary judgment, he did not exhaust the OBCC administrative procedure. (Compl. 7–8; Opp'n 6.) Rather, he indicates that he filed a grievance but otherwise did not appeal or seek further review through the IGRP process. (Compl. 7–8 (noting that he is "still waiting" for disposition of his grievances and did not seek review at the next levels within IGRP); Opp'n 6 (noting that he filed "several grievances about the issues in question," but omitting reference to any specific steps taken to appeal)). Accordingly, Plaintiff failed to satisfy the PLRA exhaustion requirement.

The Court next considers whether there is any basis for excusing Plaintiff's failure to exhaust administrative remedies at the IGRP. Last month, the Supreme Court forcefully disapproved of judge-made exceptions to the PLRA's exhaustion requirement, stressing the mandatory language of the statute. *See Ross*, 136 S. Ct. at 1862 ("Courts may not engraft an unwritten 'special circumstances' exception onto the PLRA's exhaustion requirement.") In doing so, the Supreme Court expressly rejected the Second Circuit's prior framework under *Giano v. Goord*, 380 F.3d 670 (2d Cir. 2004), and, by extension, *Hemphill v. New York*, 380 F.3d 680, 686 (2d Cir. 2004), which recognized a

Case 9:22-cv-00102-BKS-ML    Document 78    Filed 12/13/23    Page 70 of 373

Mena v. City of New York, Not Reported in Fed. Supp. (2016)

"special circumstances" exception to the PLRA's exhaustion requirement. *See Williams v. Priatno*, No. 14-4777, ___ F.3d. ____, ____, 2016 WL 3729383, at *4 (2d Cir. July 12, 2016) ("[T]o the extent that our special circumstances exception ... permits plaintiffs to file a lawsuit in federal court without first exhausting administrative remedies that were, *in fact*, available to them, those aspects of *Giano* and *Hemphill* are abrogated by *Ross*.").

Thus, post-*Ross*, the lone surviving exception to the PLRA's exhaustion requirement is that embedded in its text: that an inmate need only exhaust those administrative remedies that are "available" to him. *Ross, 136 S. Ct. at 1862*; *see also* 43 U.S.C. § 1997e(a). An inmate's failure to exhaust may therefore be excused when his prison's grievance mechanisms are literally or constructively "unavailable." *Ross, 136 S. Ct. at 1858–59*. The Supreme Court described three scenarios in which administrative procedures could be "officially on the books," but "not capable of use to obtain relief," and therefore unavailable. *Id.* While not exhaustive, these illustrations nonetheless guide the Court's inquiry. *See Williams, 2016 WL 3729383, at *4 n.2*. First, an administrative procedure is unavailable when "it operates as a simple dead end – with officers unable or consistently unwilling to provide any relief to inmates." *Ross, 136 S. Ct. at 1859*. If prison administrators either lack the necessary authority to provide any relief or possess authority but consistently decline to exercise it, the administrative channels are not "available" within the meaning of the PLRA. *Id.*; *see also Booth v. Churner*, 523 U.S. 731, 736, 738 (2001) ("[T]he modifier 'available' requires the possibility of some relief."). Second, an administrative procedure is unavailable where it is "so opaque that it becomes, practically speaking, incapable of use." *Id.* To meet this high bar, the administrative remedy must be "essentially 'unknowable.' " *Id.* Finally, "a grievance process is rendered unavailable when prison administrators thwart inmates from taking advantage of it through machination, misrepresentation, or intimidation." *Ross, 136 S. Ct. at 1860*.

Here, Plaintiff has not alleged – let alone shown – that the administrative procedures at the OBCC were unavailable to him. Although Plaintiff's initial grievance received no response, this alone is insufficient to show that the IGRP acted as a mere dead end. As stated earlier, "the law is well-settled" that an inmate's "failure to take an available administrative appeal, even when the initial grievance receives no response,

constitutes a failure to exhaust available administrative remedies." *Garvin, 2015 WL 3999180, at *3* (collecting authorities). In short, the DOC's untimeliness in this case is not enough to demonstrate the unavailability of an administrative remedy. This is especially true in light of the IGRP's built-in appeal mechanism, whereby inmates may directly proceed to the next level of review in the event of the DOC's failure to respond to a grievance. (*See* IGRP Directive § IV(D)(9)(b), (10).) Furthermore, Plaintiff has not introduced any facts to indicate that prison officials at OBCC are "consistently unwilling to provide any relief to aggrieved inmates." *Ross, 136 S. Ct. at 1859*.

**\*5** Nor has Plaintiff pointed to any evidence that the IGRP was "so opaque that it [became], practically speaking, incapable of use" and therefore "essentially unknowable." *Ross, 136 S. Ct. at 1859*. While the Second Circuit recently found that certain administrative grievance procedures at a different New York State facility met this standard, the Second Circuit's decision hinged on the "extraordinary circumstances" specific to the case before it, for which the applicable grievance regulations gave "no guidance whatsoever." *See Williams, 2016 WL 3729383, at *1, *5*. Specifically, the plaintiff in *Williams* was housed in a special housing unit and segregated from the regular prison population; therefore, he gave his grievance complaint to a correction officer to file on his behalf. *Williams, 2016 WL 3729383, at *2*. However, the plaintiff in *Williams* alleged that the correction officer to whom he gave his complaint failed to file it, *id.*, and because the Second Circuit concluded that the applicable grievance regulations gave "no guidance whatsoever to an inmate whose grievance was never filed," *id.* at 5, it reversed the District Court's dismissal for failure to exhaust. Here, by contrast the IGRP expressly guides inmates in Plaintiff's position who have filed a grievance but have not received a timely response and directs them to either grant an extension of time to the relevant decisionmaker or to appeal to the next level of review. (*See* IGRP Directive §§ IV(D)(9)(b), (10).) In light of the IGRP's unambiguous directive, Plaintiff has clearly failed to show that the IGRP was "essentially unknowable." *See Ross, 136 S. Ct. at 1859*.

Finally, the Court turns to the third scenario contemplated by the Supreme Court, in which "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Id.* at 1859. Plaintiff has not demonstrated, or even suggested,

Mena v. City of New York, Not Reported in Fed. Supp. (2016)

Case 9:22-cv-00102-BKS-ML    Document 78    Filed 12/13/23    Page 71 of 373

that prison administrators obstructed or interfered with his access to administrative remedies. *See, e.g.,* 🚩 *Winston v. Woodward*, No. 05-cv-3385 (RJS), 2008 WL 2263191, at *10 (S.D.N.Y. May 30, 2008) (concluding that plaintiff's failure to exhaust administrative remedies was not excused in light of his "failure to put forth any corroborating evidence, either direct or circumstantial, to support his claims that he suffered retaliation in the form of threats, harassment and mail tampering"). Thus, this exception to the exhaustion requirement is also clearly inapplicable.

Therefore, the Court concludes, as a matter of law, that Plaintiff has failed to exhaust administrative remedies available to him through the IGRP and has failed to offer any facts to prove that administrative remedies were not available to him. Because Plaintiff's claims are barred for failure to comply with the administrative exhaustion requirement of the PLRA, Defendant's motion for summary judgment is granted. [2]

## IV. CONCLUSION

For the reasons stated above, IT IS HEREBY ORDERED that Defendant's motion for summary judgment is GRANTED.

Although Plaintiff has paid the filing fee in this action and has not applied to proceed *in forma pauperis*, the Court nevertheless certifies pursuant to 🚩 28 U.S.C. § 1915(a)(3) that, in the event Plaintiff seeks to appeal this Order *in forma pauperis*, any appeal would not be taken in good faith.

The Clerk is respectfully directed to terminate the motion pending at docket number 53, to mail a copy of this order to Plaintiff, and to close this case.

SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2016 WL 3948100

## Footnotes

1    The following facts are drawn from Defendant's unopposed Local Civil Rule 56.1 Statement. (Doc. No. 55 ("56.1 Statement" or "56.1 Stmt.").) In deciding Defendant's motion for summary judgment, the Court has also considered Plaintiff's submission in opposition to summary judgment (Doc. No. 58 ("Opp'n")), and has conducted an independent review of the record, notwithstanding Plaintiff's failure to submit a statement compliant with Local Civil Rule 56.1. *See* 🚩 *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 73 (2d. Cir. 2001) (noting that district court "may in its discretion opt to conduct an assiduous review of the record even when" a party has failed to comply with Local Civil Rule 56.1 (citations and quotation marks omitted)).

2    Although Defendant has raised other grounds for summary judgment, including that Plaintiff has failed to establish an Eighth Amendment conditions of confinement claim, and that Defendant is entitled to qualified immunity, the Court finds it unnecessary to address these other arguments because of Plaintiff's failure to exhaust remedies.

**End of Document**                                                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

2001 WL 936297
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Ulysses WILLIAMS, Plaintiff,
v.
Robert MULLER, Defendant,

No. 98 CIV. 5204(BSJ).
|
Aug. 17, 2001.

**Attorneys and Law Firms**

Ulysses Williams, Pro Se, Orleans Correctional Facility, Albion, for Plaintiff.

Eliot Spitzer, Attorney General of the State of New York, Of Counsel: Susan H. Odessky, New York, for Defendant.

MEMORANDUM AND ORDER

DUFFY, D.J.

**\*1** Plaintiff, Ulysses Williams ("Williams" or "plaintiff"), proceeding *pro se,* is currently an inmate at Orleans Correctional Facility in Albion, New York. From late 1997 until early 1998, the time period relevant for this lawsuit, plaintiff was incarcerated at Fishkill Correctional Facility ("Fishkill"). On December 12, 1997, plaintiff filed a grievance alleging that Officer C. Madura ("Madura") and Officer Robert Muller ("Muller" or "defendant") "spread malicious rumors to the inmate population that [plaintiff] was illegally selling Inmate Liaison Committee ("ILC") supplies" in retaliation against prior grievances that plaintiff had allegedly filed against the officers. *See* Ex. A. On January 15, 1998, the Superintendent of the Inmate Grievance Program denied plaintiff's grievance seeking suspension of the two officers.

Plaintiff's complaint in this action, dated February 20, 1998, reasserts his December 12, 1997 retaliation claim against Muller, pursuant to 42 U.S.C. § 1983. In addition, plaintiff complains of a second act of retaliation under § 1983 by Muller, allegedly made in response to plaintiff's filing of the December 12, 1997 grievance. On January 9, 2001, Muller moved for summary judgment pursuant to Rule 56(c) of the

Federal Rules of Civil Procedure. Because plaintiff has failed to establish either of his retaliation claims, defendant's motion for summary judgment is granted in its entirety. [1]

*FACTS*

On December 12, 1997, plaintiff filed a grievance against correction officers Madura and Muller, alleging that they had spread rumors that plaintiff had been illegally selling supplies from the ILC—an inmate organization within the facility—to other inmates. *See* Ex. A. Furthermore, plaintiff claims that he "encountered several confrontations with other inmates due to such rumors; in which could have ended in physical conflict." *See* Pl.'s Aff. at 7. Plaintiff alleges that defendant spread such rumors with the intention of provoking such "confrontations." *Id.* Plaintiff does not deny that he was found in possession of ILC supplies, but he alleges that he was in charge of issuing such supplies and that therefore his possession was lawful.

On January 15, 1998, the Superintendent of Fishkill ruled that plaintiff's grievance was baseless. *See* Ex. A. The Superintendent stated that prison officials had found "excessive ILC supplies" in plaintiff's locker. *Id.* Plaintiff appealed the Superintendent's findings, and on January 28, 1998, the New York State Department of Correctional Services ("DOCS") Central Office Review Committee ("CORC") upheld the Superintendent's denial of the grievance.

Plaintiff alleges that a little over a month after he filed the December 12, 1997 grievance, Muller retaliated against him by filing a meritless Inmate Misbehavior Report. *See* Ex. F. Muller contends that on January 14, 1998, while stationed on the stairwell of Fishkill's A–Floor monitoring inmate traffic, he questioned plaintiff as to the contents of the bag which plaintiff was carrying. Allegedly plaintiff refused to answer his questions. Furthermore, Muller contends that plaintiff yelled at him. According to defendant, this confrontation blocked inmate traffic in the hallway for fifteen minutes. *See* Ex. G. Muller alleges that he gave plaintiff a direct order to step to the side and to stop yelling. Plaintiff allegedly refused to do so and demanded to see a sergeant "right now." A sergeant was notified and plaintiff was escorted to the Special Housing Unit ("SHU"). *Id.*

**\*2** In his deposition, plaintiff denied all allegations that he behaved inappropriately. As a result of plaintiff's alleged conduct, however, Muller filed an Inmate Misbehavior Report against plaintiff, charging him with failure to comply with

search procedures, disobeying a direct order, threatening an officer, and creating a disturbance. *Id.* Plaintiff plead "not guilty" to these charges, and a hearing was held on January 19, 1998. At the conclusion of the hearing, plaintiff was found guilty of all charges and sentenced to thirty days of keeplock, under which he lost his right to receive packages, his commissary privileges, and his telephone privileges. *See* Ex. E.

On January 20, 1998, plaintiff appealed from this disciplinary action. According to defendant, plaintiff appealed on the grounds that the thirty day period of loss of privileges should have begun on the date of his confinement on January 14, 1998, rather than on the date of the hearing on January 19, 1998. *See* Ex. F. Although evidence exists that plaintiff wrote in his appeal that he was not challenging the merits of the disciplinary report itself, plaintiff disputes this finding and claims he appealed the merits of the misbehavior report as well as the length of his confinement. *See* Ex. F. Plaintiff's appeal was denied. *See* Ex. A.

One month later, on February 20, 1998, plaintiff filed the instant complaint. On July 22, 1998, Chief Judge Thomas P. Griesa, U .S.D.J., partially dismissed the complaint filed *in forma pauperis* under 28 U.S.C.1915(a) as to defendants Commissioner Glenn S. Goord and Superintendent Wayne L. Strack, and under 28 U.S.C.1915(d) as to defendant Lieutenant Officer Iacovino.

Muller moved to dismiss the remaining claims and on April 25, 2000, Judge Barbara S. Jones, U.S.D.J., dismissed the first five of plaintiff's claims because plaintiff had failed to exhaust administrative remedies within the prison grievance system before filing suit in a federal court, as required by the Prisoner Litigation Reform Act, 42 U.S.C. § 1997e(a). *See Williams v. Muller,* 2000 WL 487954 at *3 (S.D.N.Y. Apr. 25, 2000).* Judge Jones denied defendant's motion to dismiss with respect to claims six and seven stating § 1983 claims for retaliation because plaintiff had succeeded in exhausting the administrative remedies for these claims. Muller now moves for summary judgment as to both retaliation claims. For the reasons set forth below, his motion is granted in its entirety.

*LEGAL STANDARD*

*A. Summary Judgment* [2]

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). On a motion for summary judgment, the moving party has the burden of showing "that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett,* 477 U.S. 317, 325 (1986). If satisfied, the nonmoving party must then "set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e); *Williams v. Smith,* 781 F.2d 319, 323 (2d Cir.1986). While the court must construe all evidence and inferences in favor of the nonmoving party, to sustain its burden, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87 (1986). "Mere conclusory allegations or denials will not suffice." [3] *Williams,* 781 F.2d at 323.

*B. Standard for Retaliation Claims*

**\*3** Prisoners have a constitutional right to "petition the government for the redress of grievances, and prison officials may not retaliate against prisoners for the exercise of that right." *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1995). Nonetheless, courts recognize that retaliation claims may be easily fabricated and that some prisoners file such claims with frequency. Thus, courts must examine prisoner retaliation claims with "scepticism and particular care." *Id.*

To prevail on a retaliation claim, a plaintiff must demonstrate that he 1) engaged in constitutionally protected conduct and that 2) such conduct was a "substantial or motivating factor" behind the prison official's allegedly retaliatory acts. *Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir.1996) (citations omitted). Constitutionally protected conduct has been broadly defined, and may include not only the filing of prison grievances, but even the wearing of religious headgear. *See Nicholas v. Tucker,* 89 F.Supp.2d 475, 477 (2d Cir.2000). Retaliatory acts have been defined as "otherwise routine administrative decisions [that] are made in retaliation for the exercise of constitutionally protected rights." *Smith v. Deckelbaum,* 2000 WL 1855128 at *3 (S.D.N.Y. Dec. 19, 2000) (citations omitted). While courts have broadly defined actionable retaliation in a prison setting, not every response

to a prisoner's exercise of a constitutional right is actionable.
See *Dawes v. Walker*, 239 F.3d 489, 492 (2d Cir.2001).

A number of factors can be considered in determining whether a causal connection exists between the plaintiff's protected activity and the prison official's actions: (1) the outcome of any hearing concerning the allegedly retaliatory charges; (2) the inmate's prior disciplinary record; (3) any statements made by the defendant concerning his motivation; and, (4) the temporal proximity between the protected activity and the defendant's adverse action. *See Colon*, 58 F.3d at 872–73. Finally, even if a prison official acts with retaliatory intent, as long as his act is motivated by both "proper and improper reasons," a plaintiff's retaliation claim will fail. *Lowrance v. Achtyl*, 20 F.3d 529, 535 (2d Cir.1994).

*DISCUSSION*

*A. Plaintiff's Retaliation Claim for "Spreading Rumors"*
Plaintiff has failed to establish his first retaliation claim. According to this claim, Muller violated plaintiff's constitutional rights when he spread rumors about plaintiff in retaliation for grievances that plaintiff had filed previously against Muller. *See* Ex. D. Plaintiff further alleges that such rumors incited his fellow prisoners to "confront" him. *See* Pl.'s Aff. at 7. Although plaintiff has not specifically identified or produced copies of any such prior grievances, Muller admits that plaintiff had filed the "same complaint" against him twice before. *See* Ex. A. Because I must construe all inferences in favor of the nonmoving party, I posit for the purpose of this discussion that plaintiff has established that he engaged in "protected activity."

**\*4** However, even accepting that plaintiff did in fact file a prior grievance which motivated Muller to spread rumors about him, plaintiff's retaliation claim still must fail as the spreading of rumors alone does not amount to a constitutional violation.

As indicated above, courts treat prisoners' claims of retaliation with great skepticism, and such claims typically must include an administrative action against a prisoner that is improperly motivated. *See Dawes*, 239 F.3d at 492; *see also Graham*, 89 F .3d at 80. The retaliatory action must be sufficient to "deter a similarly situated individual of ordinary

firmness from exercising his or her constitutional right." *Dawes*, 239 F.3d at 493.

If the alleged retaliatory act does not inhibit or punish an inmate's right of free speech it is considered *de minimis*. *Id.* "Many verbal responses by officials of resentment or even ridicule" are not actionable. *Id.* at 493 (citing *Riley v. Coutu*, 172 F.R.D. 228, 235 (E.D.Mich.1997)). In the instant case, the alleged spreading of rumors constitutes just such a "verbal response." Although plaintiff claims the rumors were intended to incite the inmates to harm plaintiff, no physical harm occurred. Therefore, even if Muller did indeed spread rumors about plaintiff, such actions on his part do not give rise to a retaliation claim.

For the reasons set forth above, plaintiff has failed to establish the second element of his first retaliation claim. This claim, therefore, is dismissed.

*B. Plaintiff's Retaliation Claim for the a "False" Misbehavior Report*
Plaintiff's second claim asserts that Muller filed a "false" misbehavior report against him in retaliation for plaintiff's December 12, 1997 grievance. *See* Ex. E. Plaintiff succeeds in establishing the first prong of this retaliation claim, in that the filing of his December 12, 1997 grievance was indeed protected activity. However, a retaliation claim must also establish a causal link between the protected activity and the alleged retaliatory act. Plaintiff has failed to prove such a connection exists.

According to Muller, he issued the misbehavior report against plaintiff because plaintiff violated prison disciplinary rules. Muller alleges that plaintiff failed to obey his direct orders, threatened him, and failed to comply with search procedures. *See* Exs. G. Plaintiff contends that he complied with Muller's search of his person and of his bag, that he did not yell or threaten Muller, and that Muller issued a report against him solely as an act of retaliation. [4] *See* Ex. H at 127–28.

As discussed above, a court can consider four factors in determining whether a causal connection exists between a plaintiff's protected activity and a prison official's action. The first factor a court can examine is the outcome of any hearing concerning the allegedly retaliatory charges. *See Colon*, 58 F.3d 865 at 872. In the instant case, plaintiff faced a disciplinary hearing on January 15, 1998 where he

was charged with creating a disturbance, refusing a direct order, making threats, and refusing to be searched. *See* Ex. E. Plaintiff was found guilty of all charges and sentenced to thirty days of keeplock. Plaintiff then appealed the length of his confinement and, as he alleges, the merits of the report as well. [5] *See* Ex. F, H at 138–40. Plaintiff's appeal was denied. *See* Ex. A. This outcome strongly suggests the existence of proper reasons for Muller's actions, and raises an inference of non-retaliation.

**\*5** The second factor that a court can look to is an inmate's prior disciplinary record. In the instant case, plaintiff had been disciplined previously at Fishkill for making illegal copies, for smuggling, and for stealing. [6] *Id.* at 58–62. Plaintiff's disciplinary record further weakens his retaliation claim.

The third factor a court can evaluate is any statement made by the defendant concerning his motivation for his allegedly retaliatory acts. In the instant case, plaintiff has offered no evidence, besides conclusory allegations, of statements made by Muller concerning his motivation for filing the report. The final factor a court can review is the temporal proximity between the protected activity and the retaliatory action. Muller issued his report four weeks after plaintiff filed his grievance. Although such a time period could conceivably be considered as evidence of temporal proximity, such evidence is merely circumstantial and, standing alone, is not enough for a retaliation claim to survive summary judgment. *See Williams v. Goord,* 111 F.Supp.2d 280, 290 (S.D.N.Y.2000).

Thus, even if temporal proximity is established, plaintiff's second retaliation claim cannot survive Muller's motion for summary judgment. *See Crawford v. Braun,* 2001 WL 127306 at \*6 (S.D.N.Y. Feb. 9, 2001). Plaintiff's second retaliation claim, therefore is dismissed.

*CONCLUSION*

For the foregoing reasons, Williams has failed to factually support either of his retaliation claims pursuant to 42 U.S.C. § 1983. Therefore, Muller's motion for summary judgment is granted. The Clerk of the Court is hereby ordered to close this case.

SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2001 WL 936297

---

## Footnotes

1    Because plaintiff's retaliation claims are dismissed on the merits, I find it unnecessary to address defendant's allegations that plaintiff failed to show physical injury to support his claim of emotional damages pursuant to 42 U.S.C. § 1997e(e) or that defendant is shielded from liability under the Eleventh Amendment.

2    When a party proceeds *pro se,* he is entitled to some form of notice of the requirements necessary to oppose summary judgment. *See McPherson v. Coombe,* 174 F.3d 276, 280–82 (2d Cir.1999). In the instant case, defendant's filing of his "Notice to Pro Se Litigant" adequately informed plaintiff of his pleading requirements.

3    Because Williams is proceeding *pro se,* however, I have given the allegations in his pleadings a particularly liberal construction. *See Haines v. Kerner,* 404 U.S. 519, 520 (1972).

4    Plaintiff originally claimed that a corrections officer and an inmate, "Barnet," witnessed this incident. However, in his deposition, plaintiff alleged that he forgot the name of the officer and he reaffirmed his withdrawal of Barnet as a witness. *See* Ex. H at 133–37.

WESTLAW   © 2023 Thomson Reuters. No claim to original U.S. Government Works.

5      As indicated *supra,* there is some dispute as to whether plaintiff actually appealed the merits of the misbehavior report. *See* Pl.'s Aff. at 8. However, a determination as to whether he did, or did not, appeal the merits of the report has no bearing on this decision.

6      Plaintiff's disciplinary record includes behavior prior to his arrival at Fishkill. Notably, plaintiff was disciplined for a "movement violation" and for disobeying a direct order at Coxsackie Correctional Facility. *See* Ex. H at 56–57. Furthermore, plaintiff was disciplined for fighting with another inmate at Auburn Correctional Facility. *Id.* at 63. Finally, at Orleans Correctional Facility, plaintiff was disciplined for giving an officer "the birdie." *Id.* at 64.

---

**End of Document**

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

---

2014 WL 1239319
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Srisdi KIDKARNDEE, Plaintiff,

v.

Carl J. KOENIGSMANN, Chief Med. Dir., Doccs;
M.D. Pang Kooi, Facility Health Servs. Dir.,
Auburn Corr. Facility; and Nancy Ryerson, Nurse
Practitioner, Auburn Corr. Facility, Defendants.

No. 9:12–CV–0502 (GTS/CFH).
|
Signed March 25, 2014.

**Attorneys and Law Firms**

Srisdi Kidkarndee, Auburn, NY, pro se.

Hon. Eric T. Schneiderman, Attorney General for the State
of New York, Kevin B. Hickey, Esq., Assistant Attorney
General, of Counsel, Albany, NY, for Defendants.

***DECISION and ORDER***

GLENN T. SUDDABY, District Judge.

**\*1** Currently before the Court, in this *pro se* prisoner civil
rights action filed by Srisdi Kidkarndee ("Plaintiff") against
the three above-captioned New York State correctional
employees ("Defendants"), are (1) Defendants' motion
for summary judgment, (2) United States Magistrate
Judge Christian F. Hummel's Report–Recommendation
recommending that Defendants' motion be granted, and
(3) Plaintiff's Objections to the Report–Recommendation.
(Dkt.Nos.32, 41, 44.) For the reasons set forth below,
Magistrate Judge Hummel's ReportRecommendation is
accepted, Defendants' motion is granted, and Plaintiff's
Complaint is dismissed.

**I. RELEVANT BACKGROUND**

**A. Plaintiff's Complaint**
Generally, construed with the utmost of special liberality,
Plaintiff's Complaint asserts the following four claims against
Defendants: (1) a claim that Defendants were deliberately
indifferent to Plaintiff's serious medical needs in violation

of the Eighth Amendment; (2) a claim that Defendants
denied Plaintiff due process in violation of the Fourteenth
Amendment; (3) a claim that Defendants infringed on
Plaintiff's right of free speech and/or freedom of religion
in violation of the First Amendment; and (4) a claim that
Defendants denied Plaintiff access to counsel in violation of
the Sixth Amendment. (*See generally* Dkt. No. 1.)

Because this Decision and Order is intended primarily for
the review of the parties, the Court will not recite the factual
allegations supporting these claims in Plaintiff's Complaint.
Rather, the Court will merely note that, in its memorandum
of law, Defendants have accurately summarized those factual
allegations. (Dkt. No. 32, Attach. 3, at 3–5 [attaching pages
"1" through "3" of Defs.' Memo. of Law].)

**B. Parties' Briefing on Defendants' Motion**
Generally, in their memorandum of law in chief, Defendants
assert the following two arguments: (1) based on the current
record, Plaintiff cannot adduce admissible record evidence in
support of either the objective prong or the subjective prong
of his claim of deliberate indifference to a serious medical
need under the Eighth Amendment; and (2) his remaining
claims fail to allege facts plausibly suggesting, and/or are
unsupported by admissible record evidence establishing, a
violation of the First, Sixth or Fourteenth Amendment,
particularly due to the lack of injury, the lack of personal
involvement, the lack of racial animus, and the fact that the
claims were asserted not by Plaintiff but by the inmate who
assisted Plaintiff in drafting his Complaint. (*See generally*
Dkt. No. 32, Attach. 3.)

Generally, in his opposition memorandum of law, Plaintiff
asserts the following two arguments: (1) based on the current
record, there is (at least) a genuine dispute of material fact
regarding whether Plaintiff possessed a serious medical need
during the time in question, and whether Defendants acted
with deliberate indifference to that serious medical need; and
(2) the factual allegations of Plaintiff's Complaint, and the
record evidence on Defendants' motion, should be viewed
even more strongly than usual in favor of Plaintiff, given that
he is proceeding *pro se,* he has a limited grasp of the English
language, he made numerous requests for the appointment of
counsel, and much of his own deposition is non-responsive
and thus incomplete. (Dkt. No. 39.)

**\*2** Generally, in their reply letter-brief, Defendants assert
the following three arguments: (1) despite the fact that
both Defendants and the Court served Plaintiff with a

notice of the consequences of failing to properly respond to Defendants' motion, Plaintiff failed to file a Response to Defendants' Statement of Material Facts (or even an affidavit), effectively admitting all of the properly supported factual assertions contained in that Statement; (2) even setting aside these admissions, no admissible record evidence exists from which a rational fact finder could conclude that (a) Plaintiff suffered a heart attack in 2011 (as opposed to some less-severe condition), (b) Defendants acted with a sufficiently culpable mental state with regard to Plaintiff's health condition; and (3) at the very least, Plaintiff has conceded that summary judgment should be granted in favor of Defendant Koenigsman. (Dkt. No. 40.)

### C. Magistrate Judge Hummel's Report–Recommendation

Generally, in his Report–Recommendation, Magistrate Judge Hummel concluded that Plaintiff's Complaint should be dismissed in its entirety for each of the reasons stated by Defendants in their memoranda of law. (*See generally* Dkt. No. 41.) In so doing, Magistrate Judge Hummel rejected the arguments asserted by Plaintiff in his opposition memorandum of law. (*Id.*) For example, in response to Plaintiff's argument that many of his deposition responses were unresponsive, Magistrate Judge Hummel stated as follows:

> [Plaintiff] does not point to specific deposition statements that are unresponsive. Conversely, a review of the record shows that the interpreter provided coherent answers that are supported by other record evidence. Further, [Plaintiff] had ample opportunity during his deposition to object to the interpreter's competency and qualifications. Furthermore, [Plaintiff] acknowledged he was provided an opportunity to make corrections to the deposition transcript, yet he failed to take advantage of that opportunity. Despite [Plaintiff's] *pro se* status and limited English proficiency, [Plaintiff] could have employed 'Inmate O's' assistance to make such corrections, which he failed to do. Given the above,

> [Plaintiff's] objection to the deposition is without merit. *See Risch v. Hulihan,* No. 09–CV–330, 2010 WL 5463339, at *2–3 (N.D.N.Y. Dec. 29, 2010) (denying plaintiff's request to strike his deposition from the record based on similar reasoning).

(Dkt. No. 39, at 2–3, n. 3.)

### D. Plaintiff's Objections

Generally, in his Objections, Plaintiff asserts the following six arguments: (1) Plaintiff is entitled to a *de novo* review of the entire Report–Recommendation because of his status as a *pro se* litigant, and because he "objects to the Magistrate's Report and Recommendation ... in its entirety"; (2) Magistrate Judge Hummel erred by not striking Plaintiff's deposition transcript, as requested by Plaintiff, because "*none* of the questions regarding plaintiff's claims and or medical condition [was] answered with any specificity"; (3) Magistrate Judge Hummel erred by not appointing Plaintiff counsel to assist him, and his interpreter, during the deposition; (4) Magistrate Judge Hummel erred by interpreting Plaintiff's 2011 Upstate Medical Center discharge summary as indicating that Plaintiff "had [suffered] two heart attacks in the past, the last one occurring four years prior"; (5) Magistrate Judge Hummel erred by failing to *sua sponte* review 134 pages of documents adduced by Plaintiff (without a Responsive Statement of Material Facts or even an affidavit) for evidence explaining *why* Plaintiff had three heart stents inserted (i.e., because Defendants' misdiagnosis and failure to treat caused Plaintiff's heart condition to worsen); and (6) Magistrate Judge Hummel erred by failing to recognize that factual issues exist regarding whether Defendants Kooi and Ryerson were personally involved in the constitutional violations asserted. (Dkt. No. 44.)

## II. GOVERNING LEGAL STANDARDS

### A. Standard Governing Review of a Report–Recommendation

**\*3** When a *specific* objection is made to a portion of a magistrate judge's reportrecommendation, the Court subjects that portion of the report-recommendation to a *de novo* review. Fed.R.Civ.P. 72(b)(2); 28 U.S.C. § 636(b)(1)(C). To be "specific," the objection must, with

particularity, "identify [1] the portions of the proposed findings, recommendations, or report to which it has an objection and [2] the basis for the objection." N.D.N.Y. L.R. 72.1(c). [1]  When performing such a *de novo* review, "[t]he judge may ... receive further evidence...." 28 U.S.C. § 636(b)(1). However, a district court will ordinarily refuse to consider evidentiary material that could have been, but was not, presented to the magistrate judge in the first instance. [2] Similarly, a district court will ordinarily refuse to consider argument that could have been, but was not, presented to the magistrate judge in the first instance. [3]

When only a *general* objection is made to a portion of a magistrate judge's report-recommendation, the Court subjects that portion of the report-recommendation to only a *clear error* review. Fed.R.Civ.P. 72(b)(2),(3); Fed.R.Civ.P. 72(b), Advisory Committee Notes: 1983 Addition. [4] Similarly, when an objection merely reiterates the *same arguments* made by the objecting party in its original papers submitted to the magistrate judge, the Court subjects that portion of the report-recommendation challenged by those arguments to only a *clear error* review. [5] Finally, when *no* objection is made to a portion of a report-recommendation, the Court subjects that portion of the report-recommendation to only a *clear error* review. Fed.R.Civ.P. 72(b), Advisory Committee Notes: 1983 Addition. When performing such a "clear error" review, "the court need only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation." *Id.* [6]

After conducing the appropriate review, the Court may "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b) (1)(C).

### B. Standard Governing a Motion for Summary Judgment

Under Fed.R.Civ.P. 56, summary judgment is warranted if "the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(a). In determining whether a genuine issue of material fact exists, the Court must resolve all ambiguities and draw all reasonable inferences against the moving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986). In addition, "[the moving party] bears the initial responsibility of informing the district court of the basis

for its motion, and identifying those portions of the ... [record] which it believes demonstrate[s] the absence of any genuine issue of material fact." *Celotex v. Catrett,* 477 U.S. 317, 323–24 (1986). However, when the moving party has met this initial responsibility, the nonmoving party must come forward with specific facts showing a genuine issue of material fact for trial. Fed.R.Civ.P. 56(a),(c),(e).

**\*4** A dispute of fact is "genuine" if "the [record] evidence is such that a reasonable jury could return a verdict for the novmoving party." *Anderson,* 477 U.S. at 248. As a result, "[c]onclusory allegations, conjecture and speculation ... are insufficient to create a genuine issue of fact." *Kerzer v. Kingly Mfg.,* 156 F.3d 396, 400 (2d Cir.1998) [citation omitted]. As the Supreme Court has famously explained, "[The nonmoving party] must do more than simply show that there is some metaphysical doubt as to the material facts" [citations omitted]. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 585–86 (1986).

As for the materiality requirement, a dispute of fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson,* 477 U.S. at 248. "Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* [citation omitted].

Implied in the above-stated burden-shifting standard is the fact that, where a nonmoving party willfully fails to adequately respond to a motion for summary judgment, a district court has no duty to perform an independent review of the record to find proof of a factual dispute-even if that nonmoving party is proceeding *pro se.* [7] (This is because the Court extends special solicitude to the *pro se* litigant largely by ensuring that he or she has received not ice of the consequences of failing to properly respond to the motion for summary judgment.) [8] As has often been recognized by both the Supreme Court and Second Circuit, even *pro se* litigants must obey a district court's procedural rules. [9] For this reason, this Court has often enforced Local Rule 7.1(a) (3) by deeming facts set forth in a moving party's statement to have been admitted where the nonmoving party has willfully failed to properly respond to that statement [10] —even where the nonmoving party was proceeding *pro se* in a civil rights case. [11]

## III. ANALYSIS

Even when construed with the utmost of special liberality, Plaintiff's Objections specifically challenge only five portions of Magistrate Judge Hummel's ReportRecommendation. *See, supra,* Part I.D. of this Decision and Order. As explained above in Part II .A. of this Decision and Order, each of those portions must be subjected to a *de novo* review. After carefully reviewing the relevant filings in this action, the Court can find no error in those portions of the Report–Recommendation: Magistrate Judge Hummel employed the proper standards, accurately recited the facts, and reasonably applied the law to those facts. (*See generally* Dkt. No. 41.) The Court rejects each of Plaintiff's specific objections as unsupported by the record, immaterial to the motion, and/or contrary to the law.

The remaining portions of Magistrate Judge Hummel's Report–Recommendation are entitled to only a clear-error review. *See, supra,* Part II.A. of this Decision and Order. [12] After carefully reviewing the relevant filings in this action, the Court can find no clear error in the remaining portions of the Report–Recommendation. (*Id.*)

 **\*5** As a result, the Court accepts and adopts the Report–Recommendation in its entirety for the reasons stated therein. (Dkt. No. 41.) The Court would add only three brief points.

First, to the extent Plaintiff's First, Sixth and Fourteenth Amendment claims are dismissed on the alternative ground that are unsupported by factual allegations plausibly suggesting a claim, such a dismissal is permissible under the circumstances. To the extent that an argument in a motion for summary judgment is based exclusively on the factual allegations of a complaint, a dismissal under Fed.R.Civ.P. 12(b)(6) is permissible. *Schwartz v. Compagnie General Transatlantique,* 405 F.2d 270, 273–74 (2d Cir.1968) ("Where appropriate, a trial judge may dismiss for failure to state a cause of action upon motion for summary judgment."). [13] Moreover, it is not necessary to afford a *pro se* plaintiff an opportunity to amend his complaint before dismissal where the defects in his claims are substantive rather than merely formal, such that any amendment would be futile. *Foman v. Davis,* 371 U.S. 178, 182 (1962); *Cuoco v. Moritsugu,* 222 F.3d 99, 112 (2d Cir.2000); *Ruffolo v. Oppenheimer & Co.,* 987 F.2d 129, 131 (2d Cir.1993) (citations omitted); *Cortec Indus., Inc. v. Sum Holding L.P.,* 949 F.2d 42, 48 (2d Cir.1991); *Health–Chem Corp. v. Baker,* 915 F.2d 805,

810 (2d Cir.1990); *Brown v. Peters,* 95–CV–1641, 1997 WL 599355, at \*1 (N.D.N.Y. Sept. 22, 1997) (Pooler, J.). Here, the Court finds that the defects in Plaintiff's First, Sixth and Fourteenth Amendment claims are substantive rather than merely formal. Finally, Plaintiff's First, Sixth and Fourteenth Amendment claims are dismissed primarily on a lack of supporting record evidence.

Second, each of the factual assertions contained in Defendants' Statement of Material Facts is supported by an accurate record citation. (Dkt. No. 32, Attach.2.) Moreover, Plaintiff was provided with two notices of the consequences of failing to properly oppose Defendants' motion. (Dkt. No. 32, Attach. 1; Dkt. No. 34.) Indeed, he was given an extension of the deadline by which to file his papers in opposition to Defendants' motion. (Dkt. No. 37.) Despite these facts, Plaintiff failed to file a Response to Defendants' Statement of Material Facts. (*See generally* Dkt. No. 39.) As a result, the facts asserted in Defendants' Statement of Material Facts are deemed admitted. The Court notes that it has no duty to *sua sponte* sift through the record on a summary judgment motion in search of a factual dispute, even for a *pro se* litigant. *See, supra,* note 7 of this Decision and Order. Finally, such a *sua sponte* review would not save Plaintiff's Complaint from dismissal.

Third, the most prominent defect in Plaintiff's Eighth Amendment claim is the lack of admissible record evidence from which a rational fact finder could conclude that Defendants acted with a sufficiently culpable mental state in treating Plaintiff's heart condition in 2011 and 2012. Deliberate indifference describes a state of mind more blameworthy than negligence; deliberate indifference is a state of mind akin to *criminal recklessness.* *Cusamano v. Sobek,* 604 F.Supp.2d 416, 494 & nn. 176, 177 (N.D.N .Y. 209) (Suddaby, J.) (citing cases). While Plaintiff might disagree with the medical care he was provided, such disagreement does not give rise to a claim under the Eighth Amendment. As the Second Circuit once observed,

> **\*6** It must be remembered that the State is not constitutionally obligated, much as it may be desired by inmates, to construct a perfect plan for [medical] care that exceeds what the average reasonable person would expect or avail herself of in life outside the prison walls. [A] correctional

facility is not a health spa, but a prison in which convicted felons are incarcerated. Common experience indicates that the great majority of prisoners would not in freedom or on parole enjoy the excellence in [medical] care which plaintiff [ ] understandably seeks .... We are governed by the principle that the objective is not to impose upon a state prison a model system of [medical] care beyond average needs but to provide the minimum level of [medical] care required by the Constitution.... The Constitution does not command that inmates be given the kind of medical attention that judges would wish to have for themselves....

🚩 *Dean v. Coughlin,* 804 F.2d 207, 215 (2d Cir.1986) [internal quotations and citations omitted].

**ACCORDINGLY,** it is

**ORDERED** that Magistrate Judge Hummel's Report–Recommendation (Dkt. No. 41) is *ACCEPTED* and *ADOPTED* in its entirety; and it is further

**ORDERED** that Defendants' motion for summary judgment (Dkt. No. 32) is *GRANTED* in its entirety; and it is further

**ORDERED** that Plaintiff's Complaint (Dkt. No. 1) is *DISMISSED.*

## REPORT–RECOMMENDATION AND ORDER [1]

CHRISTIAN F. HUMMEL, United States Magistrate Judge.

Plaintiff *pro se* Srisdi Kidkarndee ("Kidkarndee"), an inmate currently in the custody of the New York State Department of Corrections and Community Supervision ("DOCCS"), brings this action pursuant to 🚩 42 U.S.C. § 1983 alleging that defendants, three DOCCS medical personnel, violated his constitutional rights under the Eighth Amendment. Compl. (Dkt. No. 1). [2] Presently pending is defendants' motion for summary judgment pursuant to Fed.R.Civ.P. 56. Dkt. No. 32.

Kidkarndee opposes this motion. Dkt. No. 39. Defendants filed a reply. Dkt. No. 40. For the following reasons, it is recommended that defendants' motion be granted.

## I. Background

The facts are related in the light most favorable to Kidkarndee as the non-moving party. [3] *See* subsection II(A) *infra.* At all relevant times, Kidkarndee was incarcerated at Auburn Correctional Facility ("Auburn").

## A. Introduction

Kidkarndee's medical record shows that on July 23, 2008 he had a heart attack, also known as a myocardial infarction. Dkt. No. 33 at 10. Since then, Auburn's cardiology department has been monitoring Kidkarndee. Kooi Decl. (Dkt. No. 32–7) ¶ 10; *see, e.g.,* Dkt. No. 33 at 10, 125–26, 133. Kidkarndee alleged that he had a heart attack on or around September 29, 2011 and some time in March 2011. Compl. at 4. The record is devoid of any evidence indicating that Kidkarndee suffered a heart attack since 2008 or in 2011. [4] Kooi Decl. ¶ 11; *see* Dkt. No. 33 at 16, 57.

**\*7** Kidkarndee contends that he has several other medical issues including: high blood pressure; asthma; lower back injury; damage in the upper-spine; knee damage; and sensitive wrists and arms. Compl. at 6. Kidkarndee alleged that he incurred these injuries as a Thai soldier in the 1970s. *Id.* In 2010, Kidkarndee had X-rays taken of his lumbar spine, cervical spine, and right knee. Kooi Decl. ¶ 26; Dkt. No. 33 at 12–15. The X-rays indicated that Kidkarndee's right knee was normal and his spine showed degenerative changes; however, no treatment was required at the time. Kooi Decl. ¶ 26; Dkt. No. 33 at 12–15. Kidkarndee's medical record contains no entry indicating Kidkarndee had ever complained of wrist pain. Kooi Decl. ¶ 27. Kidkarndee's speciality care records show that he saw specialists in cardiology (Dkt. No. 33 at 125–26, 133), physical therapy (*id.* at 112), endocrinology (*id.* at 121), and optometry (*id.* at 35, 135). Kidkarndee takes twenty prescription pills daily for his medical conditions, in particular for pain relief, diarrhea, high blood pressure, and coronary artery disease ("CAD"). Kidkarndee Dep. (Dkt. No. 32–6) at 8:2–4, 22, 22, 9:2–5, 7–12, 24.

Kidkarndee further testified that Auburn was providing him an improper diet consisting of expired foods and foods that adversely affect his health such as tuna, to which he is allergic, and bologna, which increases his blood pressure. Kidkarndee Dep. at 21:1–12; 23:15–25. By letter dated February 20, 2012, Kidkarndee was advised he was terminated from the therapeutic diet meal program for accruing more than three unexcused absences from the diet within one week.[5] Dkt. No. 33 at 94.

### B. February 27, 2011–November 7, 2011

On February 27, 2011, Kidkarndee was seen at emergency sick call for complaints of chest pain. Kooi Decl. ¶ 13; Dkt. No. 33 at 16. Kidkarndee was given nitroglycerin but because it yielded poor results, he was assessed via video at Auburn by Erie County Medical Center and then transferred to SUNY Upstate Medical Center ("Upstate Medical"). Kooi Decl. ¶ 14; Dkt. No. 33 at 16. On March 1, 2011, Kidkarndee was discharged and diagnosed with bronchitis and hypokalemia.[6] Dkt. No. 33 at 16. Upstate Medical's discharge summary indicated that Kidkarndee had two heart attacks in the past, the last one occurring four years prior, and recommended that Kidkarndee follow-up with a prison facility physician within one week. Id. at 18–19. Kidkarndee was given an antibiotic to treat bronchitis and potassium chloride to treat hypokalemia. Id. at 16, 21.

On March 25, 2011, defendant Nurse Practitioner Ryerson saw Kidkarndee for complaints of chronic diarrhea and provided medication for relief. Dkt. No. 33 at 130. On May 24, 2011, Ryerson saw Kidkarndee to confirm a cardiology appointment and have Kidkarndee sign a Contract for Specialty Care Appointment form. Ryerson Decl. (Dkt. No. 32–8) ¶ 13; Dkt. No. 33 at 31.

**\*8** On June 13, 2011, non-party Cardiologist Dr. Patel followed up with Kidkarndee at Auburn. Dkt. No. 33 at 125. On July 14, 2011, Dr. Patel saw Kidkarndee and noted Kidkarndee's electrocardiogram ("EKG") was "ok." Dkt. No. 33 at 133.

On September 29, 2011, Kidkarndee was admitted to Auburn Memorial Hospital based on complaints of chest pain. Kooi Decl. ¶ 16; Dkt. No. 33 at 54. Kidkarndee was diagnosed with chest pains, CAD, hypertension, hypercholesterolemia, and adrenal insufficiency. Kooi Decl. ¶ 16; Dkt. No. 33

at 57. He was transferred to Upstate Hospital for further observation. Kooi Decl. ¶ 17; Dkt. No. 33 at 58–59. Upstate Hospital's discharge summary dated October 3, 2011 indicates that Kidkarndee was diagnosed with "atypical chest pain most likely musculoskeletal."[7] Kooi Decl. ¶ 17; Dkt. No. 33 at 59. Upstate Hospital directed Kidkarndee to follow up with a cardiologist at his correctional facility within two to four weeks and with his primary care provider within one week. Kooi Decl. ¶ 18; Dkt. No. 33 at 60, 76.

Kidkarndee contends that on or around October 20, 2011, contrary to defendant Dr. Kooi's assurance, Kidkarndee was denied a recommended follow-up exam at Upstate Hospital. Compl. ¶ 5. Instead, Kidkarndee was sent to Oneida Correctional Facility ("Oneida") and seen by a nurse who failed to check his heart rate. Id.

On November 7, 2011, Dr. Patel saw Kidkarndee, prescribed him medication to treat his blood pressure, and directed him to follow up with cardiology in six months. Kooi Decl. ¶ 19; Dkt. No. 33 at 143. On November 8, 2011, Dr. Kooi ordered the medication that Dr. Patel prescribed. Kooi Decl. ¶ 20; Dkt. No. 33 at 89.

### C. January 9, 2012–November 7, 2012

On January 9, 2012, Kidkarndee was seen at emergency sick call with complaints of chest pain. Kooi Decl. ¶ 21; Dkt. No. 33 at 92. Kidkarndee had stopped taking his prescription medication since January 5, 2012. Kooi Decl. ¶ 21; Dkt. No. 33 at 92. An EKG was done and it showed no changes. Kooi Decl. ¶ 21; Dkt. No. 33 at 92. On January 13, 2012, Kidkarndee had a basic metabolic panel of bloodwork done as well as another EKG. Kooi Decl. ¶ 22; Dkt. No. 33 at 92.

On January 19, 2012, Ryerson saw Kidkarndee. Ryerson Decl. ¶ 14; Dkt. No. 33 at 93. Ryerson noted that an EKG conducted earlier that day indicated no changes. Ryerson Decl. ¶ 14; Dkt. No. 33 at 93. Ryerson directed Kidkarndee to have his blood pressure checked weekly and saw no need for further treatment at that time. Ryerson Decl. ¶ 14; Dkt. No. 33 at 93.

On January 20, 2012, Ryerson treated Kidkarndee's complaints of night time cough, heaviness in the chest, and vomiting. Ryerson Decl. ¶ 15; Dkt. No. 33 at 93. Ryerson noted that despite claims of vomiting, Kidkarndee's mucous membranes were moist. Ryerson Decl. ¶ 15; Dkt. No. 33 at

93. Ryerson prescribed Kidkarndee a nasal decongestant for coughs but did not see any indicated need for further treatment at that time. Ryerson Decl. ¶ 15; Dkt. No. 33 at 93.

*9  Kidkarndee contends that by letter dated February 17, 2012, Dr. Koenigsmann denied him medical care because of his inmate status.[8] Compl. at 7. Kidkarndee contends that Dr. Koenigsmann should have ordered subordinates to provide him with further medical treatment such as ordering a magnetic resonance imaging ("MRI") and blood tests. *Id.* at 8.

On March 19, 2012, Dr. Kooi ordered that Kidkarndee be transferred to Auburn Memorial for complaints of chest pains, where his chest pains were opined to be possibly gastrointestinal-related. Dkt. No. 33 at 105. On May 14, 2012, Dr. Patel saw Kidkarndee and ordered that Kidkarndee be scheduled for a follow up appointment in one year. Kooi Decl. ¶ 25; Dkt. No. 33 at 142.

### D. Dr. Kooi

As the Facility Health Services Director at Auburn, Dr. Kooi is responsible for determining whether an inmate requires a specialty care referral. Kooi Decl. ¶¶ 3, 8. Once an inmate is approved by DOCCS's Division of Health Services ("DHS") to see a specialist and receives treatment, Dr. Kooi defers to the treatment plan prescribed by the specialist for that specific condition. *Id.* ¶ 9.

Kidkarndee alleged that on multiple occasions, he sought medical attention from Dr. Kooi for the constant pain he was experiencing throughout his body. Compl. at 5. This pain was caused by the work he performed while incarcerated. *Id.* Kidkarndee testified that he complained to Dr. Kooi about a knee injury but Dr. Kooi opined that the knee was fine.[9] Kidkarndee Dep. at 26:8–27:5. Kidkarndee also had to have surgery in the region of his buttocks and Dr. Kooi performed the surgery without first administering an anesthetic. *Id.* at 27:23–28:10. Kidkarndee further testified that he requested a full body MRI was denied. *Id.* at 29:13–30:18. Kidkarndee further contends Dr. Kooi denied his request to see a specialist. Compl. at 5.

Kidkarndee maintains that Dr. Kooi resented him because Dr. Kooi is Korean and during World War II, Kidkarndee's ancestors fought and won against Dr. Kooi's ancestors.[10] Compl. at 5; Kidkarndee Dep. at 32:8–33:1. Dr. Kooi attested

that he is Malaysian of Chinese descent. Kooi Decl. ¶ 31. Kidkarndee also reasons that Dr. Kooi denied him certain medical treatments because they are too costly. *Id.* at 34:15–16.

### E. Nurse Ryerson

Kidkarndee contends that Nurse Ryerson has the authority to review an inmate's medical records and prescribe certain treatments to alleviate pain until an inmate is examined by a physician. Compl. at 6–7. However, Kidkarndee contends that Ryerson denied him medical attention on multiple occasions for asthma and pain in the lower back, upper back, knees, wrists, or arms. *Id.*

As a Nurse Practitioner at Auburn, Ryerson treats inmates by appointment and on an emergency basis when there is a need for an inmate to see a nurse practitioner or a medical doctor. Ryerson Decl. ¶¶ 2, 7. Ryerson was authorized to prescribe medication, refer inmates for specialty care, and create treatment plans. *Id.* ¶ 8. If an inmate presents a need to be referred for specialty care, Ryerson makes a referral to DHS for approval. *Id.* ¶¶ 9–10. Once DHS approves a referral and the inmate receives treatment, Ryerson defers to the specialist's treatment plan and any treatment plan created by Dr. Kooi. *Id.* ¶¶ 10–11. On all occasions that Ryerson treated Kidkarndee, no complaints were made concerning his asthma, lower back, upper back, knees, wrists, or arms. *Id.* ¶ 21.

### F. Dr. Koenigsmann

*10  Kidkarndee contends that defendant Dr. Koenigsmann did not provide him the best treatment available. Koenigsmann Dep. at 13:13–15:20. Specifically, Kidkarndee wanted a new form of coronary treatment involving laser for treating his CAD. *Id.* Kidkarndee contends that Dr. Koenigsmann "was formally made aware of the 'seriousness' of [his] ... medical condition(s)" by reviewing his file and determining whether to provide Kidkarndee with medical care. Compl. at 7.

As the Deputy Commissioner and Chief Medical Officer of DOCCS, Dr. Koenigsmann is responsible for the overall medical care provided to inmates. Koenigsmann Decl. (Dkt. No. 32–9) ¶¶ 2, 4. To ensure that appropriate care is provided to inmates, Dr. Koenigsmann relies on, *inter alia,* primary

care providers, regional medical directors, and regional health services administrators. *Id.* ¶ 4. Dr. Koenigsmann has never been Kidkarndee's personal physician and has never provided Kidkarndee's with medical treatment. *Id.* ¶ 5. Dr. Koenigsmann also has limited involvement in specialty care referrals. *Id.* ¶ 6. He reviews requests for certain types of medical procedures; however, decisions regarding specialty care services are made by an outside review agency, presumably DHS, and/or a regional medical director. *Id.*

When Dr. Koenigsmann's office receives an inmate correspondence, it is docketed on an internal correspondence tracking system and automatically assigned to a regional health services administrator for investigation and response. Koenigsmann Decl. ¶ 12. Generally, Dr. Koenigsmann generally does not see inmate correspondences addressed to him. *Id.* ¶ 13. Dr. Koenigsmann's office received letters sent by Kidkarndee to the New York State Attorney General and DOCCS's employees that are connected to this action. *Id.* ¶ 14. These letters were assigned to a regional health services administrator who responded to them on Dr. Koenigsmann's behalf. *Id.* ¶ 15; *see, e.g.,* Dkt. No. 1–1 at 1. Dr. Koenigsmann maintains he had no knowledge of these letters until the preparation of his declaration. Koenigsmann Decl. ¶¶ 14–15; *see, e.g.,* Dkt. No. 32–9 at 6–14. Dr. Koenigsmann is not involved in the inmate grievance process and has never been asked to respond to any inmate grievances.[11] Koenigsmann Decl. ¶¶ 16, 18.

## II. Discussion[12]

Kidkarndee contends that: (1) defendant Dr. Kooi was deliberately indifferent to his medical conditions by denying him treatment for bodily pain, a specialty care referral, a specialist-recommended follow-up evaluation, and medical care at Oneida; (2) defendant Ryerson was deliberately indifferent to his medical conditions by denying him care; and (3) defendant Dr. Koenigsmann was deliberately indifferent to his medical conditions by refusing to provide him the best treatment available and direct subordinates to provide him with medical attention. Defendants argue that Kidkarndee's complaint should be dismissed based on lack of personal involvement and merit. In his response to defendants' motion, Kidkarndee concedes that Dr. Koenigsmann should be dismissed from this action based on the lack of his personal involvement. Dkt. No. 39 at 12.

### A. Legal Standard

**\*11** A motion for summary judgment may be granted if there is no genuine issue as to any material fact if supported by affidavits or other suitable evidence and the moving party is entitled to judgment as a matter of law. The moving party has the burden to show the absence of disputed material facts by informing the court of portions of pleadings, depositions, and affidavits which support the motion. FED. R. CIV. P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). Facts are material if they may affect the outcome of the case as determined by substantive law. *Anderson v. Liberty Lobby,* 477 U.S. 242, 248 (1986). All ambiguities are resolved and all reasonable inferences are drawn in favor of the non-moving party. *Skubel v. Fuoroli,* 113 F.3d 330, 334 (2d Cir.1997).

The party opposing the motion must set forth facts showing that there is a genuine issue for trial. The non-moving party must do more than merely show that there is some doubt or speculation as to the true nature of the facts. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986). It must be apparent that no rational finder of fact could find in favor of the non-moving party for a court to grant a motion for summary judgment. *Gallo v. Prudential Residential Servs.,* 22 F.3d 1219, 1223–24 (2d Cir.1994); *Graham v. Lewinski,* 848 F.2d 342, 344 (2d Cir.1988).

When, as here, a party seeks judgment against a *pro se* litigant, a court must afford the non-movant special solicitude. *See Triestman v. Fed. Bureau of Prisons,* 470 F.3d 471, 477 (2d Cir.2006). As the Second Circuit has stated,

[t]here are many cases in which we have said that a *pro se* litigant is entitled to "special solicitude," ... that a *pro se* litigant's submissions must be construed "liberally,"... and that such submissions must be read to raise the strongest arguments that they "suggest,".... At the same time, our cases have also indicated that we cannot read into *pro se* submissions claims that are not "consistent" with the *pro se* litigant's allegations, ... or arguments that the submissions themselves do not "suggest," ... that we should not "excuse frivolous or vexatious filings by *pro se* litigants," ... and that *pro se* status "does not exempt a party from compliance with relevant rules of procedural and substantive law...."

*Id.* (citations and footnote omitted); *see also* 🚩*Sealed Plaintiff v. Sealed Defendant # 1,* 537 F.3d 185, 191–92 (2d Cir.2008) ("On occasions too numerous to count, we have reminded district courts that 'when [a] plaintiff proceeds *pro se,* ... a court is obliged to construe his pleadings liberally.' " (citations omitted)). However, the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion; the requirement is that there be no genuine issue of material fact. 🚩*Anderson,* 477 U.S. at 247–48.

**\*12** Pursuant to this District's Local Rule 7.1(a)(3), facts set forth in a moving party's Statement of Material Facts are deemed admitted where the nonmoving party has failed to properly respond to that statement, even if the nonmoving party is proceeding *pro se.* ⚠️*Cusamano v. Sobek,* 604 F.Supp.2d 416, 426–27 (N.D.N.Y.2009); N .D.N.Y.L.R. 7.1(a)(3). [13] As such, where a nonmovant has failed to cite record evidence in support of his denials of properly supported facts provided by defendants, such facts are admitted to the extent they are not clearly in dispute.

### B. Personal Involvement

" '[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under 🚩§ 1983.' " "🚩*Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (quoting *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir.1991)). Thus, supervisory officials may not be held liable merely because they held a position of authority. *Id.;* 🚩*Black v. Coughlin,* 76 F.3d 72, 74 (2d Cir.1996). However, supervisory personnel may be considered "personally involved" if:

(1) [T]he defendant participated directly in the alleged constitutional violation;

(2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong;

(3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom;

(4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts; or

(5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

🚩*Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995) (citing 🚩*Williams v. Smith,* 781 F.2d 319, 323–24 (2d Cir.1986)). [14]

### 1. Dr. Kooi

Defendants argue that Dr. Kooi was not personally involved with respect to Kidkarndee's claim of denied treatment at Oneida. Kidkarndee contends that Dr. Kooi denied him a follow-up evaluation and instead sent him to Oneida where its medical personnel failed to treat him. Assuming Kidkarndee was denied medical care at Oneida, this claim does not allege that Dr. Kooi directly failed to treat Kidkarndee at Oneida or was notified of Oneida's failure to treat Kidkarndee. 🚩*Colon,* 58 F.3d at 873. Kidkarndee does not allege that Dr. Kooi had created a policy that allowed for unconstitutional practices to occur at Oneida, was grossly negligent his supervision, or exhibited deliberate indifference by failing to act on information indicating that Kidkarndee was unconstitutionally denied medical care. *Id.* The record is devoid of any evidence indicating that Dr. Kooi worked at Oneida and instructed Oneida's personnel to deprive Kidkarndee of medical attention. As such, there is no genuine issue of fact showing that Dr. Kooi was personally involved in denying Kidkarndee medical care at Oneida. 🚩*Celotex,* 477 U.S. at 323.

**\*13** Accordingly, defendants' motion on this ground should be granted.

### 2. Dr. Koenigsmann

Kidkarndee argues that Dr. Koenigsmann was deliberately indifferent to his medical needs by refusing him the best available treatment and direct subordinates to provide him with medical attention. Dr. Koenigsmann attested that, as a supervisor, he relies on other healthcare providers to ensure that appropriate care is provided and has never personally treated Kidkarndee. Dr. Koenigsmann also attested that while he reviews requests for specialty care referrals, he does not ultimately decide whether to provide a referral. The gravamen of Kidkarndee's complaints against Dr. Koenigsmann is that

because he was in a position of power, he was always involved with anything that occurred in conjunction with his medical care at Auburn. However, an attempt to establish personal involvement based upon the supervisory role Dr. Koenigsmann occupied is inappropriate. *Wright,* 21 F.3d at 501 (holding that a position in a hierarchical chain of command, without more, is insufficient to support a showing of personal involvement).

Kidkarndee also contends that he addressed letters and grievances to Dr. Koenigsmann, who responded by denying him medical care. Kidkarndee contends that these correspondences served as notice to Dr. Koenigsmann for ongoing constitutional violations. However, merely writing letters and grievances to a defendant is insufficient to establish notice and personal involvement. *Smart v. Goord,* 441 F.Supp.2d 631, 643 (S.D.N.Y.2006) ("Commissioner ... cannot be held liable on the sole basis that he did not act in response to letters of protest sent by [plaintiff]...."). Similarly, receipt of a letter or grievance, without personally investigating or acting on the letter or grievance, is insufficient to establish personal involvement. *See, e.g., Rivera v. Fischer,* 655 F.Supp.2d 235, 238 (W.D.N.Y.2009) (citing cases); *Boddie v. Morgenthau,* 342 F.Supp.2d 193, 203 (S.D.N.Y.2004) ("While mere receipt of a letter from a prisoner is insufficient to establish individual liability ... [p]ersonal involvement will be found ... where a supervisory official receives and acts on a prisoner's grievance or otherwise reviews and responds to a prisoner's complaint.").

While personnel from Dr. Koenigsmann's office responded to Kidkarndee's letters, such conduct remains insufficient to establish Dr. Koenigsmann's personal involvement in the alleged constitutional violations. This is because it is within the purview of a superior officer to delegate responsibility to others. *See Vega v. Artus,* 610 F.Supp.2d 185, 198 (N.D.N.Y.2009) (finding no personal involvement where "the only involvement of the supervisory official was to refer the inmate's complaint to the appropriate staff for investigation.") (citing *Ortiz–Rodriquez v. N.Y. State Dep't of Corr. Servs.,* 491 F.Supp.2d 342, 347 (W.D.N.Y.2007)). Furthermore, Kidkarndee does not contend that Dr. Koenigsmann created a policy or custom under which unconstitutional practices occurred. Additionally, conclusory allegations about negligent supervision and a failure to train are insufficient to establish personal involvement. Moreover, Kidkarndee concedes that Dr. Koenigsmann was not personally involved in the alleged violations and should be dismissed from this action.

**\*14** Accordingly, defendants' motion on this ground should be granted.

## C. Medical Indifference

The Eighth Amendment prohibition extends to the provision of medical care. *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994). The test for a § 1983 claim is twofold. First, the prisoner must show that the condition to which he was exposed was sufficiently serious. *Farmer v. Brennan,* 511 U.S. 825, 834 (1994). Second, the prisoner must show that the prison official demonstrated deliberate indifference by having knowledge of the risk and failing to take measures to avoid the harm. *Id.* "[P]rison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted." *Id.* at 844.

" 'Because society does not expect that prisoners will have unqualified access to healthcare,' a prisoner must first make [a] threshold showing of serious illness or injury" to state a cognizable claim. *Smith v. Carpenter,* 316 F.3d 178, 184 (2d Cir.2003) (quoting *Hudson v. McMillian,* 503 U.S. 1, 9 (1992)). Since there is no distinct litmus test, a serious medical condition is determined by factors such as "(1) whether a reasonable doctor or patient would perceive the medical need in question as 'important and worthy of comment or treatment,' (2) whether the medical condition significantly affects daily activities, and (3) the existence of chronic and substantial pain." *Brock v. Wright,* 315 F.3d 158, 162–63 (2d Cir.2003) (citing *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998)). The severity of the denial of care should also be judged within the context of the surrounding facts and circumstances of the case. *Smith,* 316 F.3d at 185.

> If, on the other hand, a plaintiff's complaint alleges that treatment was provided but was inadequate, the second inquiry of the objective

test is narrowly confined to that specific alleged inadequacy, rather than focusing upon the seriousness of the prisoner's medical condition. For example, if the prisoner is receiving on-going treatment and the offending conduct is an unreasonable delay or interruption in that treatment, [the focus of the] inquiry [is] on the challenged delay of interruption in treatment, rather than the prisoner's underlying medical condition alone.

*Lewis v. Wallace,* No. 11–CV–0867 (DNH/DEP), 2013 WL 1566557, at *6 (N.D.N.Y.) *adopted by,* No. 11–CV–0867 (DNH/DEP), 2013 WL 1566555 (N.D.N.Y. Apr. 12, 2013) (citing *Salahuddin v. Goord,* 467 F.3d 263, 280 (2d Cir.2006)) (internal quotation marks omitted). In other words, the Court asks "whether, from an objective standpoint, the temporary deprivation was sufficiently harmful to establish a constitutional violation." *Frank v. Cnty. of Ontario,* 884 F.Supp.2d 11, 19 (W.D.N.Y.2012) (citing *Smith,* 316 F.3d at 186).

Deliberate indifference requires the prisoner "to prove that the prison official knew of and disregarded the prisoner's serious medical needs." *Chance,* 143 F.3d at 702. Thus, prison officials must be "intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed." *Estelle v. Gamble,* 429 U.S. 97, 104 (1976). "Mere disagreement over proper treatment does not create a constitutional claim" as long as the treatment was adequate. *Chance,* 143 F.3d at 703. Thus, "disagreements over medications, diagnostic techniques (e.g., the need for X-rays), forms of treatment, or the need for specialists ... are not adequate grounds for a section 1983 claim." *Sonds v. St. Barnabas Hosp. Corr. Health Servs.,* 151 F.Supp.2d 303, 312 (S.D.N.Y.2001).

**\*15** In this case, Kidkarndee asserts that Dr. Koenigsmann failed to treat his CAD and Ryerson failed to treat his high blood pressure, asthma, lower back injury, damage to the upper spine and knee, as well as wrists and arms. However, Kidkarndee does not specify which physical conditions Dr. Kooi failed to treat. Assuming Kidkarndee contends that

defendants failed to treat all of his medical conditions, such individual ailments do not constitute a sufficiently serious condition under the objective prong.

With regard to Kidkarndee's CAD, it is undisputed that Kidkarndee suffered a heart attack in July 2008 and continues to have a heart condition that requires ongoing monitoring and treatment. However, Kidkarndee's medical records do not indicate that he suffered another heart attack thereafter. The record shows that Kidkarndee suffered from chest pains on February 27, 2011 and September 29, 2011, both of which required hospital visitations. However, neither hospital visitation produced diagnoses of a heart attack. Rather, the February visit resulted with diagnoses of bronchitis and hypokalemia and the September visit resulted with a diagnosis of musculoskeletal-related chest pains. While a severe heart condition can be sufficiently serious for purposes of an Eighth Amendment analysis, chest pains alone are not enough. *Hutchinson v. New York State Corr. Officers,* No. 02–CV–2407 (CBM), 2003 WL 22056997, a *5 (S.D.N.Y. Sept. 4, 2003) (citations omitted) (reasoning case law instructs that defendant's failure to treat chest pains does not make out an Eighth Amendment deliberate indifference claim); *cf. Mandala v. Coughlin,* 920 F.Supp. 342, 353 (E.D.N.Y.1996) ("Ignoring a prisoner's complaints of chest pains where the prisoner later died of a heart attack" constitutes a serious medical need) (citing *Miltier v. Beorn,* 896 F.2d 848, 852–53 (4th Cir.1990)). Thus, Kidkarndee's medical conditions involving his chest pains does not meet the objective prong.

Similarly, Kidkarndee's remaining ailments do not satisfy the objective prong of the Eighth Amendment analysis. While Kidkarndee contends that he suffers from high blood pressure, asthma, and physical pain from using stairs, the record is otherwise bereft of any details describing his pain. Kidkarndee generally described that he incurred his injuries as a Thai soldier and while working in prison; however, he does not describe when each injury occurred and when the pain began. As the Second Circuit noted, "[it is] the particular risk of harm faced by a prisoner due to the challenged deprivation of care, rather than the severity of the prisoner's underlying medical condition, considered in the abstract, that is relevant for Eighth Amendment purposes." *Smith v. Carpenter,* 316 F.3d 178, 186–87 (2d Cir.2003) (citing *inter* alia *Chance,* 143 F.3d 698)); *see also Price v. Reilly,* 697 F.Supp.2d 344, 359–60 (E.D.N.Y.2010) (citing the same). Furthermore, Kidkarndee failed to adduce any

evidence showing that denied medical attention on Dr. Kooi's part had caused him any objectively serious harm other than the conclusory allegation that he is in "constant pain."

*See* 🗂 *Smith,* 316 F.3d at 188–89 ("Although [plaintiff] suffered from an admittedly serious underlying condition, he presented no evidence that the [deprivation itself] ... resulted in permanent or on-going harm to his health...."). Therefore, Kidkarndee has failed to satisfy the objective prong of the Eighth Amendment analysis, rendering his Eighth Amendment claims meritless. Nevertheless, assuming Kidkarndee has satisfied the objective prong, his claims against defendants must also fail because of his failure to establish the subjective prong.

### 1. Dr. Kooi

**\*16** Despite his conclusory allegations, Kidkarndee has failed to establish the subjective prong of the Eighth Amendment analysis against Dr. Kooi. Kidkarndee first contends that Dr. Kooi failed to treat him on multiple occasions concerning the constant pain he experiences throughout the body. Aside from one incident where Dr. Kooi opined that there was nothing wrong with Kidkarndee's knee, Kidkarndee does not identify which specific medical conditions Dr. Kooi knew of and intentionally denied or delayed him access to medical attention. 🗂 *Chance,* 143 F.3d at 702; *Estelle,* 429. U.S. at 104. With respect to his knee, Kidkarndee does not substantiate claim with any other allegations such as when the incident occurred. "At most ... [Kidkarndee] has shown only his personal dissatisfaction, and disagreement, with Dr. [Kooi's] diagnosis and with the care he has received." *Boatwright v. Canfield,* 680 F.Supp.2d 468, 470 (W.D.N.Y.2010) (citations omitted). This does not amount to an Eighth Amendment violation. As such, Kidkarndee's claim based on denied treatment for his physical pain must fail.

Kidkarndee contends that Dr. Kooi denied him a specialty care referral and a MRI test in part because such care is too costly. "Prison officials have broad discretion in determining the nature and character of medical treatment afforded to inmates." *Jordan v. Fischer,* 773 F.Supp.2d 255, 276 (N.D.N.Y.2011) (citing *Sonds,* 151 Supp.2d at 311). Furthermore, a prisoner "does not have the right to treatment of his choice." *Id.* (citing 🗂 *Dean v. Coughlin,* 804 F.2d 207, 215 (2d Cir.1986). Here, Kidkarndee fails to identify what kind of specialist he desired and when the denial

occurred. Further, this claim amounts to nothing more than a disagreement over the need for specialists and diagnostic techniques, which is not an adequate ground for a 🗂 § 1983 claim. 🗂 *Chance,* 143 F.3d at 703; 🗂 *Sonds,* 151 F.Supp.2d at 312. Moreover, the record belies the claim involving specialty care. Dr. Kooi did in fact referred Kidkarndee to specialty care. Record evidence shows that Kidkarndee had seen specialists in cardiology, physical therapy, endocrinology, and optometry. Thus, Kidkarndee's claim based on the denial of specialty care as well as an MRI test is without merit and must be dismissed.

Kidkarndee next contends that Dr. Kooi refused him a follow-up evaluation at Upstate Hospital after being discharged on October 3, 2011 and denied him treatment at Oneida. This claim cannot stand. First, Upstate Hospital recommended a follow-up at Kidkarndee's prison facility, not at Upstate Hospital. Second, Kidkarndee's disagreement with treatment location is a mere disagreement that is not cognizable under 🗂 § 1983. 🗂 *Chance,* 143 F.3d at 703; 🗂 *Sonds,* 151 F.Supp.2d at 312. Third, the record indicates that Kidkarndee indeed was seen by Dr. Patel in November 2011 during a follow-up evaluation. At that evaluation, Dr. Patel ordered another follow-up with the cardiology department in six months. Finally, Kidkarndee has failed to adduce record evidence indicating that Dr. Kooi had sent Kidkarndee to Oneida and with the knowledge that care would be denied. 🗂 *Estelle,* 429 U.S. at 104. As such, Kidkarndee has failed to show a genuine issue of fact with respect to Dr. Kooi's alleged deliberate indifference to his medical needs. 🗂 *Celotex,* 477 U.S. at 323.

**\*17** Finally, Kidkarndee contends that Dr. Kooi deprived him of an anesthetic during a surgery. However, Kidkarndee asserts this as a mere afterthought during his deposition. Further, he does not make any allegations as to whether he experienced pain or any adverse effects from going under the surgery without being administered an anesthetic. Moreover, assuming the deprivation constituted negligence or even medical malpractice, it "does not, without more, engender a constitutional claim." 🗂 *Chance,* 143 F.3d at 703 (citing 🗂 *Estelle,* 429 U.S. at 105–06). While medical malpractice involving a physician's conscious disregard of a substantial risk of serious harm may rise to the level of deliberate indifference, there is no such evidence in the record. *Id.* (citing *Hathaway,* 99 F.3d at 553).

Accordingly, defendants' motion on this claim should be granted.

### 2. Nurse Ryerson

Kidkarndee has failed to show that Ryerson knew of and disregarded his serious medical needs. *Chance,* 143 F.3d at 702. Kidkarndee contends that Ryerson failed to treat his medical conditions of high blood pressure, asthma, lower back injury, damage to the upper spine and knee, as well as his sensitive wrists and arms. However, Kidkarndee does not assert when Ryerson had denied him care for these conditions. Conversely, the record shows that Ryerson saw and treated Kidkarndee on multiple occasions for various medical conditions, including diarrhea, cardiology-related issues, high blood pressure, coughs, and vomiting. Further, Ryerson attested, and the medical record indicates, that Kidkarndee never complained to Ryerson about his asthma or pain in his lower back, upper back, knees, wrists, or arms. Given that defendants' contentions are supported by record evidence and Kidkarndee has failed to cite to record evidence in support of the contrary, Kidkarndee has failed to show a genuine issue of material of fact with respect to the subjective prong for the Eighth Amendment claim against Ryerson.

Accordingly, defendants' motion on this ground should be granted.

### 3. Dr. Koenigsmann

Kidkarndee's Eighth Amendment claim against Dr. Koenigsmann must also fail on the merits. Kidkarndee specifically contends that Dr. Koenigsmann denied him new medical technology that could better treat his heart problems. As previously discussed, prison officials have wide discretion in determining the kind of medical treatment provided to an inmate and an inmate does not have a right to choose his preferred choice of treatment. *Jordan,* 773 F.Supp.2d at 276 (citing *Sonds,* 151 Supp.2d at 311, *Dean v. Coughlin,* 804 F.2d 207, 215 (2d Cir.1986)). Here, Kidkarndee is not entitled to his choice of coronary treatment. Further, this denial is not of a course of medical treatment, but rather, a different kind of treatment. As discussed above, this amounts to nothing than a mere disagreement with treatment plans, which is not cognizable in a § 1983 action. *Chance,* 143 F.3d at 703; *Sonds,* 151 F.Supp.2d at 312.

**\*18** Accordingly, defendants' motion on this ground should be granted.

### III. Conclusion

For the reasons stated above, it is hereby **RECOMMENDED** that defendants' motion for summary judgment (Dkt. No. 32) be **GRANTED** and Kidkarndee's complaint (Dkt. No. 1) be **DISMISSED** as to all claims and all defendants.

Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court "within fourteen (14) days after being served with a copy of the ... recommendation." N.Y.N.D.L.R. 72 .1(c) (citing 28 U.S.C. § 636(b)(1)(B)-(C)). **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993); *Small v. Sec'y of HHS,* 892 F.2d 15 (2d Cir.1989); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e).

Filed Sept. 23, 2013.

**All Citations**

Not Reported in F.Supp.3d, 2014 WL 1239319

### Footnotes

1  *See also* *Mario v. P & C Food Markets, Inc.,* 313 F.3d 758, 766 (2d Cir.2002) ("Although Mario filed objections to the magistrate's report and recommendation, the statement with respect to his Title VII claim

was not specific enough to preserve this claim for review. The only reference made to the Title VII claim was one sentence on the last page of his objections, where he stated that it was error to deny his motion on the Title VII claim '[f]or the reasons set forth in Plaintiff's Memorandum of Law in Support of Motion for Partial Summary Judgment.' This bare statement, devoid of any reference to specific findings or recommendations to which he objected and why, and unsupported by legal authority, was not sufficient to preserve the Title VII claim.").

2   *See* *Paddington Partners v. Bouchard,* 34 F.3d 1132, 1137–38 (2d Cir.1994) ("In objecting to a magistrate's report before the district court, a party has no right to present further testimony when it offers no justification for not offering the testimony at the hearing before the magistrate.") [internal quotation marks and citations omitted]; *Pan Am. World Airways, Inc. v. Int'l Bhd. of Teamsters,* 894 F.2d 36, 40, n. 3 (2d Cir.1990) (district court did not abuse its discretion in denying plaintiff's request to present additional testimony where plaintiff "offered no justification for not offering the testimony at the hearing before the magistrate"); *cf. U.S. v. Raddatz,* 447 U.S. 667, 676, n. 3 (1980) ("We conclude that to construe § 636(b)(1) to require the district court to conduct a second hearing whenever either party objected to the magistrate's credibility findings would largely frustrate the plain objective of Congress to alleviate the increasing congestion of litigation in the district courts."); Fed.R.Civ.P. 72(b), Advisory Committee Notes: 1983 Addition ("The term 'de novo' does not indicate that a secondary evidentiary hearing is required.").

3   *See Zhao v. State Univ. of N.Y.,* 04–CV–0210, 2011 WL 3610717, at * 1 (E.D.N.Y. Aug. 15, 2011) ("[I]t is established law that a district judge will not consider new arguments raised in objections to a magistrate judge's report and recommendation that could have been raised before the magistrate but were not.") (internal quotation marks and citation omitted); *Hubbard v. Kelley,* 752 F.Supp.2d 311, 312–13 (W.D.N.Y.2009) ( "In this circuit, it is established law that a district judge will not consider new arguments raised in objections to a magistrate judge's report and recommendation that could have been raised before the magistrate but were not.") (internal quotation marks and citation omitted).

4   *See also Brown v. Peters,* 95–CV–1641, 1997 WL 599355, at *2–3 (N.D.N.Y. Sept. 22, 1997) (Pooler, J.) [collecting cases], *aff'd without opinion,* 175 F.3d 1007 (2d Cir.1999).

5   *See Mario,* 313 F.3d at 766 ("Merely referring the court to previously filed papers or arguments does not constitute an adequate objection under either Fed.R.Civ.P. 72(b) or Local Civil Rule 72.3(a)(3)."); *Camardo v. Gen. Motors Hourly–Rate Emp. Pension Plan,* 806 F.Supp. 380, 382 (W.D.N.Y.1992) (explaining that court need not consider objections that merely constitute a "rehashing" of the same arguments and positions taken in original papers submitted to the magistrate judge); *accord, Praileau v. Cnty. of Schenectady,* 09–CV–0924, 2010 WL 3761902, at *1, n. 1 (N.D.N.Y. Sept. 20, 2010) (McAvoy, J.); *Hickman ex rel. M.A.H. v. Astrue,* 07–CV–1077, 2010 WL 2985968, at *3 & n. 3 (N.D.N.Y. July 27, 2010) (Mordue, C.J.); *Almonte v. N.Y.S. Div. of Parole,* 04–CV–0484, 2006 WL 149049, at *4 (N.D.N.Y. Jan. 18, 2006) (Sharpe, J.).

6   *See also Batista v. Walker,* 94–CV–2826, 1995 WL 453299, at *1 (S.D.N.Y. July 31, 1995) (Sotomayor, J.) ("I am permitted to adopt those sections of [a magistrate judge's] report to which no specific objection is made, so long as those sections are not facially erroneous.") (internal quotation marks and citations omitted).

7   *Cusamano v. Sobek,* 604 F.Supp.2d 416, 426 & n. 2 (N.D.N.Y.209) (Suddaby, J.) (citing cases).

8   *Cusamano,* 604 F.Supp.2d at 426 & n. 3 (citing cases).

9    ⚠️ *Cusamano,* 604 F.Supp.2d at 426–27 & n. 4 (citing cases).

10   Among other things, Local Rule 7.1(a)(3) requires that the nonmoving party file a response to the moving party's Statement of Material Facts, which admits or denies each of the moving party's factual assertions in matching numbered paragraphs, and supports any denials with a specific citation to the record where the factual issue arises. N.D.N.Y. L.R. 7.1(a)(3).

11   ⚠️ *Cusamano,* 604 F.Supp.2d at 427 & n. 6 (citing cases).

12   The Court notes that Plaintiff's attempt to obtain a *de novo* review of the entire Report–Recommendation merely by relying on his *pro se* status and conclusorily objecting to the Magistrate's Report and Recommendation "in its entirety" is without avail. *See, supra,* Part II.A. of this Decision and Order.

13   In such a circumstance, the Court need not give prior notice to the party whose pleading is being analyzed. *See Katz v. Molic,* 128 F.R.D. 35, 37–38 (S.D.N.Y.1989) ("This Court finds that ... a conversion [of a Rule 56 summary judgment motion to a Rule 12(b)(6) motion to dismiss the complaint] is proper with or without notice to the parties.").

1    This matter was referred to the undersigned for report and recommendation pursuant to 🏷️ 28 U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(c).

2    Kidkarndee testified that "Inmate O" had drafted this complaint as well as several grievances on behalf of Kidkarndee because Kidkarndee's English is poor. Kidkarndee Dep. (Dkt. No. 32–6) at 41:6–43:1. While "Inmate O" does not speak Thai, Kidkarndee testified that "Inmate O" understood some of his English and ailments. *Id.* at 41:22–23. Federal courts have recognized *pro se* inmate complaints that are drafted with other inmates' assistance. *Levan v. Thomas,* No. CV–10–2278–PHX–GMS (LOA), 2011 WL 285843, at *2 n. 2 (D.Ariz. Jan. 27, 2011); *Soto v.. Olukunle Obadina,* No. 10–CV–260–MJR, 2010 WL 4103354, at *1 (S.D.Ill. Oct. 18, 2010) (all unpublished opinions are attached to this Report–Recommendation as exhibits).

3    In his response to defendants' motion, Kidkarndee asserts that his deposition testimony should be stricken because the Thai interpreter employed for the deposition failed to provide responsive answers to defendants' questions. Kidkarndee Resp. (Dkt. No. 39) at 5. Kidkarndee does not point to specific deposition statements that are unresponsive. Conversely, a review of the record shows that the interpreter provided coherent answers that are supported by other record evidence. Further, Kidkarndee had ample opportunity during his deposition to object to the interpreter's competency and qualifications. Furthermore, Kidkarndee acknowledged he was provided an opportunity to make corrections to the deposition transcript, yet he failed to take advantage of that opportunity. Despite Kidkarndee's *pro se* status and limited English proficiency, Kidkarndee could have employed "Inmate O's" assistance to make such corrections, which he failed to do. Given the above, Kidkarndee's objection to the deposition is without merit. *See Risch v. Hulihan,* No. 09–CV–330, 2010 WL 5463339, at *2–3 (N.D.N.Y. Dec. 29, 2010) (denying plaintiff's request to strike his deposition from the record based on similar reasoning). Accordingly, Kidkarndee's objection to the deposition is denied and the Court proceeds to consider the deposition as record evidence.

4    Kidkarndee testified that altogether, he has had three heart stents. Kidkarndee Dep. (Dkt. No. 32–6) at 6:22–24. A stent is a "slender rod- or threat-like device used to provide support for tubular structures ...." *Dorland's Illustrated Med. Dictionary* 1577 (28th ed.1994) [hereinafter "DORLAND'S"].

5    Kidkarndee has attempted to allege an Eighth Amendment claim against prison officials based on being provided an improper diet. The intentional failure to provide an inmate with a medically prescribed diet over a prolonged period of time can constitute deliberate indifference. *Davidson v. Desai,* 817 F.Supp.2d 166, 189

(W.D.N.Y.2011) (citing *Abdush–Shahid v. Coughlin,* 933 F.Supp. 168, 180 (N.D.N.Y.1996) (citing 🚩 *Robles v. Coughlin,* 725 F.2d 12, 15 (2d Cir.1983)). Here, the record shows that Kidkarndee was terminated from the diet program because he missed a certain number of meals. While an issue of fact exists as to why Kidkarndee missed those meals and whether Kidkarndee was notified that unexcused absences may be cause for termination from the diet program, Kidkarndee does not indicate how he was adversely affected by the termination. Moreover, record evidence shows that Kidkarndee was returned to the program four days after the initial discontinuance. Dkt. No. 39–1 at 45–46. Given the lack of evidence indicating that Kidkarndee was harmed in any manner as well as the relatively short period of time that Kidkarndee was subjected to an improper diet, Kidkarndee has failed to establish this claim. Accordingly, Kidkarndee's potential Eighth Amendment claim based on the denial of a medically prescribed diet must fail.

6    Hypokalemia refers to "abnormally low potassium concentration in the blood; it may result from excessive potassium loss by the renal or the gastrointestinal route, from decreased intake, or from transcellular shifts." DORLAND'S at 807.

7    Kidkarndee's treating physician at Auburn Memorial opined, "[a]t this time, I do not feel that this is a cardiac chest pain. I would suspect more of [gastrointestinal] GI related pain." Dkt. No. 33 at 55.

8    To the extent that Kidkarndee attempted to make a potential First Amendment retaliation claim or Fourteenth Amendment equal protection claim against Dr. Koenigsmann, such claims are without merit. A correspondence dated January 12, 2012 addressed to Kidkarndee from the Inmate Grievance Program Director indicates that Kidkarndee's grievance regarding medical care was pending Central Office Review Committee ("CORC") disposition. Dkt. No. 1–1 at 4. The correspondence does not suggest that the matter was referred to Dr. Koenigsmann. Another correspondence was addressed to Kidkarndee from a regional health services administrator, who advised Kidkarndee that, pursuant to Directive # 4040, they do not handle grievances. Dkt. No. 1–1 at 1. There is nothing in either letter advising Kidkarndee that he was denied medical treatment because of his inmate status nor is such evidence contained in the record. Accordingly, Kidkarndee's potential First and Fourteenth Amendment claims must be dismissed.

9    Kidkarndee testified that he experiences knee pain when he uses stairs. Kidkarndee Dep. at 31:2–6.

10    Liberally construing Kidkarndee's allegations, as is required by the governing law, *see* Subsection II(A) *infra,* Kidkarndee was attempting to claim that Dr. Kooi violated his First Amendment right against retaliation when Dr. Kooi denied Kidkarndee medical treatment based on racial animus. To state an actionable claim for retaliation under the First Amendment, a prisoner must establish by a preponderance of the evidence that: (1) the speech or conduct at issue was protected; (2) the defendant took adverse action against the plaintiff; and

(3) there was a causal connection between the protected speech and the adverse action. 🚩 *Gill v. Pidlypchak,* 389 F.3d 379, 380 (2d Cir.2004) (internal quotation marks and citation omitted); 🚩 *Tafari v. McCarthy,* 714 F.Supp.2d 317, 347 (N.D.N.Y.2010). Here, Kidkarndee fails to show any causal connection based on racial animus, particularly in part due to kidkarndee's mistaken belief that Dr. Kooi is of Korean descent. As such,

Kidkarndee's allegations also fail to satisfy a Fourteenth Amendment equal protection claim. 🚩 *Phillips v. Girdich,* 408 F.3d 124, 129 (2d Cir.2005) ("To prove a violation of the Equal Protection Clause ... a plaintiff must demonstrate that he was treated differently than others similarly situated as a result of intentional or purposeful discrimination."). Accordingly, Kidkarndee's potential First and Fourteenth Amendment claims against Dr. Kooi must fail.

11    The DOCCS "IGP [Inmate Grievance Program] is a three-step process that requires an inmate to: (1) file a grievance with the IGRC [Inmate Grievance Resolution Committee]; (2) appeal to the superintendent within four working days of receiving the IGRC's written response; and (3) appeal to the CORC [Central Office

Case 9:22-cv-00102-BKS-ML    Document 78    Filed 12/13/23    Page 93 of 373

Review Committee] ... within four working days of receipt of the superintendent's written response." 🚩 *Abney v. McGinnis,* 380 F.3d 663, 668 (2d Cir.2004) (internal citations omitted).

12    Kidkarndee sues defendants under the Sixth Amendment. Compl. at 10. Kidkarndee's Sixth Amendment right to counsel claim must be dismissed because he makes no allegations in either his pleadings or deposition to support it. Such a conclusory and unsubstantiated allegation is insufficient to withstand defendants' summary judgment motion.

13    Northern District of New York Local Rule 7.1 provides in part:

> Any motion for summary judgment shall contain a Statement of Material Facts. The Statement of Material Facts shall set forth, in numbered paragraphs, each material fact about which the moving party contends there exists no genuine issue. Each fact listed shall set forth a specific citation to the record where the fact is established.
>
> ...
>
> The opposing party shall file a response to the Statement of Material Facts. The non-movant's response shall mirror the movant's Statement of Material Facts by admitting and/or denying each of the movant's assertions in matching numbered paragraphs. Each denial shall set forth a specific citation to the record where the factual issue arises. The nonmovant's response may also set forth any additional material facts that the non-movant contends are in dispute in separately numbered paragraphs. *The Court shall deem admitted any properly supported facts set forth in the Statement of Material Facts that the opposing party does not specifically controvert.*

N.D.N.Y.L.R. 7.1(a)(3) (emphasis in original).

14    Various courts in the Second Circuit have postulated how, if at all, the *Iqbal* decision affected the five *Colon* factors which were traditionally used to determine personal involvement. 🚩 *Pearce v. Estate of Longo,* 766 F.Supp.2d 367, 376 (N.D.N.Y.2011), *rev'd in part on other grounds sub nom.,* 🚩 *Pearce v. Labella,* 473 F. App'x 16 (2d Cir.2012) (recognizing that several district courts in the Second Circuit have debated *Iqbal's* impact on the five *Colon* factors); *Kleehammer v. Monroe Cnty.,* 743 F.Supp.2d 175 (W.D.N.Y.2010) (holding that "[o]nly the first and part of the third *Colon* categories pass *Iqbal's* muster...."); 🚩 *D'Olimpio v. Crisafi,* 718 F.Supp.2d 340, 347 (S.D.N.Y.2010) (disagreeing that *Iqbal* eliminated *Colon's* personal involvement standard).

---

**End of Document**        © 2023 Thomson Reuters. No claim to original U.S. Government Works.

2023 WL 2410870

Only the Westlaw citation is currently available.

United States District Court, N.D. New York.

Javell **FOX**, Plaintiff,

v.

C.O. Andrej L. **GIFFORD**, formerly

known as C.O. **Gifford**, Defendant.



9:20-CV-0797

(GLS/ML)

|

Signed February 16, **2023**

*** Start Section

...

**Attorneys and Law Firms**

JAVELL **FOX**, Pro Se Plaintiff, Wallkill Correctional Facility, Box G, Wallkill, New York 12589.

LETITIA A. JAMES, Attorney General for the State of New York, PETER A. MCDANIEL, ESQ., Assistant Attorney General, Counsel for Defendant, The Capitol, Albany, New York 12224.

**REPORT-RECOMMENDATION**

MIROSLAV LOVRIC, United States Magistrate Judge

**\*1** Currently before the Court, in this civil rights action filed by Javell **Fox** ("Plaintiff") against C.O. Andrej L. **Gifford** ("Defendant"), is Defendant's motion for summary judgement pursuant to Fed. R. Civ. P. 56. (Dkt. No. 33.) For the reasons set forth below, I recommend that Defendant's motion for summary judgement be denied.

**I. RELEVANT BACKGROUND**

**A. Plaintiff's Claims**

At this procedural posture, Plaintiff alleges the following two claims against Defendant: (1) a claim of retaliation in violation of the First Amendment and 42 U.S.C. § 1983, and (2) a claim that his right to equal protection of the law pursuant to the Fourteenth Amendment and 42 U.S.C. § 1983 was violated. (Dkt. Nos. 1, 14.) More specifically, Plaintiff alleges that on October 6, 2017, while confined at Auburn Correctional Facility ("Auburn"), he was improperly placed in keeplock confinement after an...

*** Start Section

... Statement of Material Facts Not In Dispute and, in any event, he disputed all arguments raised in the summary judgment motion and reply; (2) there is no punishment for not having an identification; (3) even if Plaintiff was interviewed by a Lieutenant in Attica and forgot, it was passed the time for the Superintendent to respond when Plaintiff appealed to CORC, thus, he did exhaust his administrative remedies; and (4) corrections officers lie and cover up acts of retaliation for one another "all the time," Plaintiff was keeplocked, and Plaintiff submitted an unsworn declaration signed by witness Damon Hunter stating that he witnessed Plaintiff in keeplock from August 30, 2018, to September 2, 2018, and he "overheard C.O[.]s and Sgts state that inmate Javell **Fox** was keeplocked for his mohawk hairstyle." (Dkt. No. 51 at 1-3, 5.)

**5. Defendant's Sur-Surreply**

**\*5** Generally, in response to Plaintiff's surreply, Defendant argues: (1) that Plaintiff's sur-reply should not be considered because he did not obtain permission from the Court pursuant to N.D.N.Y. L.R. 7.1(a)(1), (2) Plaintiff did receive Defendant's Statement of Material Facts Not In Dispute; (3) the declaration of Mr. Hunter is inadmissible evidence and does not support Plaintiff's claims here that he was placed in keeplock on October 6, 2017. (Dkt. No. 56.)

**II. RELEVANT LEGAL STANDARDS**

**A. Standard Governing A Motion For Summary Judgment**

Under Fed. R. Civ. P. 56, summary judgment is warranted if "the movant shows that there is no genuine dispute as to any material fact...

*** Start Section

..., in this District, where a non-movant has willfully failed to respond to a movant's properly filed and facially meritorious memorandum of law, the non-movant is deemed

to have "consented" to the legal arguments contained in that memorandum of law under Local Rule 7.1(a)(3). [13] Stated another way, when a non-movant fails to oppose a legal argument asserted by a movant, the movant may succeed on the argument by showing that the argument possesses facial merit, which has appropriately been characterized as a "modest" burden. *See* N.D.N.Y. L.R. 7.1(a)(3) ("Where a properly filed motion is unopposed and the Court determined that the moving party has met its burden to demonstrate entitlement to the relief requested therein...."); *Rusyniak v. Gensini*, 07-CV-0279, 2009 WL 3672105, at *1, n.1 (N.D.N.Y. Oct. 30, 2009) (Suddaby, J.) (collecting cases); *Este-Green v. Astrue*, 09-CV-0722, 2009 WL 2473509, at *2 & n.3 (N.D.N.Y. Aug. 7, 2009) (Suddaby, J.) (collecting cases).

**B. Standard Governing Exhaustion of Administrative Remedies**

Under the Prison Litigation Reform Act ("PLRA"), "[n]o action shall be brought with respect to prison conditions under section 1983 ... by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a); *see also* Ross v. Blake, 136 S. Ct. 1850, 1854-55 (2016) ("The [PLRA] mandates that an inmate exhaust 'such administrative remedies as are available' before bringing suit to challenge prison conditions."). "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or...

\*\*\* Start Section

... necessitates " 'using all steps that the [government] agency holds out, and doing so properly' " (quoting Woodford, 548 U.S. at 90)). In New York State prisons, DOCCS has a well-established three-step incarcerated grievance program ("IGP"), in which, (1) the inmate must file a grievance with the Inmate Grievance Resolution Committee ("IGRC") within twenty-one days of the alleged occurrence, (2) the inmate must then appeal an adverse decision by the IGRC to the superintendent of the facility within seven days after receipt of the IGRC's response, and (3) the inmate must then appeal an adverse decision by the superintendent to the CORC within seven days after receipt of the superintendent's response. 7 N.Y.C.R.R. § 701.5; *McGee v. McGready*, 16-CV-4187, 2018 WL 2045094, at *2 (S.D.N.Y. Apr. 30, 2018).

"[W]hen a grievance concerns staff harassment, DOCCS procedures provide for an expedited review that allows for the complaint to bypass IGRC review and proceed before the Superintendent in the first instance." *Jackson v. Jackson*, 16-CV-8516, 2021 WL 981849, at *4 (S.D.N.Y. Mar. 16, 2021); *see* 7 N.Y.C.R.R. § 701.8. Under the expedited procedure, the Superintendent has twenty-five days to respond to the grievance. 7 N.Y.C.R.R. § 701.8. If the Superintendent fails to respond within twenty-five days, the inmate may appeal directly to CORC. *Id.* § 701.8(g). If the Superintendent does respond, the inmate has seven days from receipt of the response to appeal to CORC. *Id.* § 701.8(h). The IGP Supervisor has discretion to grant exceptions to the time limits for filing or appealing grievances. *See id.* § 701.6(g). Whether or not the Superintendent timely responds, the procedure to appeal a determination of the Superintendent to CORC is to file "a notice of decision to appeal (form #2133) with the inmate grievance clerk." *Id.* § 701.8(g)-(h). [14] Inmates who have been transferred to a different facility can get their appeal to the appropriate grievance clerk by "mail[ing] the signed appeal form back to the IGP supervisor at the facility where the grievance was originally filed." *Id.* § 701.6(h)(2).

"CORC is required to provide, through IGP staff, written confirmation that an appeal has been received, and if the inmate does not receive such confirmation within forty-five days, he 'should contact the IGP supervisor in writing to confirm that the appeal was filed and transmitted to CORC.' " *Ruiz v. Link*, 20-CV-0235, 2022 WL 3020254, at *4 (S.D.N.Y. July 29, 2022) (quoting 7 N.Y.C.R.R. § 701.5(d)(3)(i)). The IGP requires CORC to respond to an appeal within thirty days of receipt. 7 N.Y.C.R.R. § 701.5(d)(3)(ii). If CORC has received an appeal and fails to rule within those thirty days, the inmate is considered to have exhausted his administrative remedies and may file suit. Hayes v. Dahlke, 976 F.3d 259, 270 (2d Cir. 2020).

While the PLRA mandates exhaustion of administrative remedies, it also "contains its own, textual exception to mandatory exhaustion." Ross, 136 S. Ct. at 1858. More specifically, section 1997e(a) provides that only those administrative remedies that "are available" must first be exhausted. 42 U.S.C. § 1997e(a); *see also* Ross, 136 S. Ct. at 1858 ("[T]he exhaustion...

\*\*\* Start Section

... it operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates." *Id.* at 1859. "Next, an administrative scheme might be so opaque that it becomes, practically speaking, incapable of use." *Id.* Finally, an administrative remedy is not "available" when "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Id.* at 1860. In *Williams v. Corr. Officer Priatno*, 829 F.3d 118, 123 n.2 (2d Cir. 2016), the Second Circuit noted that "the three circumstances discussed in *Ross* do not appear to be exhaustive[.]" The illustrations of unavailability in *Ross* nonetheless guide the Court's inquiry. *Mena v. City of New York*, 13-CV-2430, 2016 **WL** 3948100, at *4 (S.D.N.Y. July 19, 2016).

Because non-exhaustion is an affirmative defense, the defendant bears the burden of showing that a prisoner has failed to satisfy the exhaustion requirements. *See Jones*, 549 U.S. at 216. The plaintiff must then establish the IGP grievance procedure was unavailable to him under *Ross*. *Id.*

### C. Standard Governing Claims of Retaliation Pursuant to the First Amendment

"To prevail on a First Amendment retaliation claim under 42 U.S.C. § 1983, a prisoner must demonstrate: (1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected conduct and the adverse action." *Vidal v. Valentin*, 16-CV-5745, 2019 **WL** 3219442, at *6 (S.D.N.Y. July 17, 2019); *see also Davis v. Goord*, 320 F.3d 346, 352 (2d Cir. 2003). A claimant meets the first element by demonstrating that he filed a grievance, which is a "constitutionally protected activity." *Davis*, 320 F.3d at 352-53; *see also Vidal*, 2019 **WL** 3219442, at *6 (explaining it "is well supported by case law" that the submission of a grievance constitutes a protected activity) (collecting cases); *Smith v. Hash*, 904-CV-0074, 2006 **WL** 2806464, at *6 (N.D.N.Y. Sept. 28, 2006) (Kahn, J.) ("Smith's filing of a grievance was clearly an assertion of a constitutional right protected by the First Amendment"). A claimant can meet the second element by demonstrating that he was subject to "retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising constitutional rights." *Gill v. Pidlypchak*, 389

F.3d 379, 381 (2d Cir. 2004); *see also Williams v. City of New York*, 19-CV-3347, 2022 **WL** 130409, at *22 (S.D.N.Y. Jan. 14, 2022) (quoting *Smith v. Maypes-Rhynders*, 07-CV-11241, 2009 **WL** 874439, at *4 (S.D.N.Y. Mar. 31, 2009)) ("Whether an action is 'sufficiently adverse to deter someone of ordinary firmness from exercising his rights is a question of fact.' "). Finally, "[i]n considering whether a causal connection exists, a court may infer an improper or retaliatory motive in the adverse action from: (1) the temporal proximity of the filing to the grievance and the disciplinary action; (2) the inmate's prior good disciplinary record; (3) vindication at a hearing on the matter; and (4) statements by the defendant regarding his motive for disciplining the plaintiff." *Williams*, 2022 **WL** 130409, at *24; *see also Speaks v. Saeed*, 14-CV-6826, 2022 **WL** 541767, at *8 (E.D.N.Y. Feb. 23, 2022).

### D. Standard Governing Equal Protection Claims Pursuant to the Fourteenth Amendment

The Equal Protection Clause requires that the government treat all similarly situated people alike. *City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985). Specifically, the Equal Protection Clause "bars the government from selective adverse treatment of individuals compared with other similarly situated individuals if 'such selective treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person.' " *Bizzarro v. Miranda*, 394 F.3d 82, 86 (2d Cir. 2005) (quoting *LeClair v. Saunders*, 627 F.2d 606,...

\*\*\* Start Section

..., Plaintiff included a letter dated December 3, 2017, titled "Grievance Appeal to CORC # AUB 72924-17." (Dkt. No. 42 at 9.) In his opposition memorandum of law, Plaintiff asserts that he never received a response from the Superintendent "and forwarded the grievance on or around December 3, 2017 to CORC." (Dkt. No. 42 at 3 [citing Dkt. No. 42 at 9].)

Resolving all ambiguities and drawing all reasonable inferences against Defendant, it could be inferred that Plaintiff sent the letter titled "Grievance Appeal to CORC # AUB 72924-17" (Dkt. No. 42 at 9) to the Auburn grievance clerk and to CORC. As Defendant argues, if Plaintiff had mailed the appeal solely to CORC, he would not have properly exhausted his administrative remedies. (Dkt. No.

48 at 9); *Ruiz*, 2022 **WL** 3020254, at *5 (citing *Valverde v. Folks*, 19-CV-8080, 2022 **WL** 836310, at *6 (S.D.N.Y. Mar. 21, 2022)) ("Plaintiff did not properly comply with [the] prison grievance procedural rules. Plaintiff ... mailed his appeal statement directly to CORC. However, to appeal a decision denying a grievance, an inmate must submit the appeal, not directly to CORC, but to the grievance supervisor of the facility where the grievance was originally filed for forwarding to that facility's grievance clerk."); *Wilkinson v. Banks*, 02-CV-0361, 2007 **WL** 2693636, at *6 (W.D.N.Y. Sept. 10, 2007) ("[N]o dispute exists that [the *pro se* plaintiff] did not follow correct procedure in attempting to appeal that grievance to CORC. He did not file his appeal with the Inmate Grievance Clerk as required by the regulations, but rather mailed it directly to CORC.")) (holding that the plaintiff did not properly exhaust administrative remedies where he tried to mail his appeal directly to CORC, and CORC never received the document). However, here, there is evidence in the record from which it is reasonable to infer that Plaintiff mailed the appeal to the grievance clerk as required by the regulations.

Moreover, I find that Plaintiff's alleged appeal to CORC was timely. Grievance AUB-72924-17 was received on or about October 16,...

\*\*\* Start Section
... F.3d 305 (2d Cir. 2011) to determine whether Plaintiff properly exhausted his administrative remedies. [15]

### B. Plaintiff's Retaliation Claim

In the context of inmate retaliation claims, adverse action is viewed objectively and requires the Court to ask whether the action taken with respect to the inmate "would deter a similarly situated individual of ordinary firmness from exercising ... constitutional rights." *Gill v. Pidlypchak*, 389 F.3d at 381 (quoting *Davis v. Goord*, 320 F.3d 346, 353 (2d Cir. 2003)). Courts have long recognized that if the alleged retaliation is not something that would deter an individual from exercising their rights, the alleged conduct is *de minimis* and "outside the ambit of constitutional protection." *McFadden v. Friedman*, 12-CV-0685, 2015 **WL** 5603433, at *9 (N.D.N.Y. Sept. 23, 2015) (Suddaby, J.). The filing of a false misbehavior report that results in some form of punishment that cannot be labeled *de minimis* has been found sufficient to constitute adverse action. *See, e.g., Reed v. Doe No. 1*, 11-CV-0250, 2012 **WL** 4486086, at *5 (N.D.N.Y. July

26, 2012) (Peebles, M.J.) (finding that the "filing of a false misbehavior report can qualify as an adverse action for the purposes of a First Amendment retaliation" where the report resulted in a fourteen-day term in keeplock confinement), *report and recommendation adopted*, 2012 **WL** 4486085 (N.D.N.Y. Sept. 27, 2012) (McAvoy, J.). However, the mere filing of a misbehavior report alone, without evidence of other repercussions does not constitute an adverse action.

*Bartley v. Collins*, 95-CV-10161, 2006 **WL** 1289256, at *7 (S.D.N.Y. May 10, 2006) (finding misbehavior report that resulted in plaintiff's temporary loss of privileges did not amount to adverse action but misbehavior report that resulted in keeplock confinement for ten days did). Being placed in keeplock status can constitute an adverse action. *Gill v. Pidlypchak*, 389 F.3d at 383.

Here, the record, viewed in the light most favorable to Plaintiff, indicates that he was in keeplock from October 6, 2017, until he was transferred to Attica on some date after October 16, 2017. [16] (Dkt. No. 33, Attach. 9 at 41-48.) Plaintiff testified that on the day he was scheduled to be transferred to Attica, he received a false misbehavior report, an improper "hearing" was held at his cell, he was found guilty of not having an identification, and he was sentenced to time served in keeplock. [17] (Dkt. No. 33, Attach. 9 at 37, 41-44.) Plaintiff testified that while in keeplock he was denied meatless meals, recreation, and telephone privileges. (*Id.* at 37, 39-40.)

**\*11** That period of—at least—ten days of keeplock, the loss of privileges because of his keeplock status, and the misbehavior report are sufficient to at least raise a question of fact as to whether Plaintiff suffered an adverse action. *See Bishop v. Stotler*, 21-CV-1027, at *3 (N.D.N.Y. Jan. 19, **2023**) (Stewart, M.J.) (citing *Wells v. Wade*, 96-CV-1627, 2000 **WL** 1239085, at *4 (S.D.N.Y. Aug. 31, 2000) ("a rational trier of fact could find that the filing of a frivolous misbehavior report that resulted in thirteen days of pre-hearing 'keeplock' confinement would be likely to chill a person of ordinary firmness from continuing to engage in activity protected by the First Amendment namely, pursuing a prison grievance."); *see also Barnes v. Craft*, 04-CV-1269, 2008 **WL** 3884369, at *11 n.53 (N.D.N.Y. Aug. 18, 2008) (Mordue, C.J.) (citing cases)) (holding that the "period of eleven days [in keeplock] is sufficient to at least raise a question of fact as to whether [the p]laintiff suffered an adverse action.").

Although Defendant highlights evidence in the record indicating that Plaintiff was not on keeplock status (Dkt. No. 33, Attach. 10), the record also includes Plaintiff's sworn deposition testimony stating that he was in keeplock (Dkt. No. 33, Attach. 9 at 41-48). This evidentiary disagreement is best resolved by a trier of fact.

Moreover, the undersigned must consider whether Plaintiff has produced evidence sufficient to create a genuine issue of fact for trial regarding the causal connection between his purported protected...

*** Start Section

... placed in keeplock immediately upon returning to his unit after the interaction with Defendant. (*Id.*) Taken together these facts could, in the view most favorable to Plaintiff, support a finding of a causal connection.

Defendant denies any retaliatory motive or knowledge of Plaintiff suing other DOCCS officers. (Dkt. No. 33, Attach. 6 at ¶ 12.) Despite this denial, Defendant acknowledges that on October 6, 2017, in the Auburn yard, Plaintiff handed him a "half of a piece of paper, which Plaintiff identified as a court order permitting him to maintain his Mohawk hairstyle for religious reasons. (Dkt. No. 33, Attach. 6 at ¶ 7.) Although "[a] lack of knowledge regarding the allegedly protected activity defeats a retaliation claim," *Girard v. Cuttle*, 15-CV-0187, 2018 **WL** 4190140, at *7 (N.D.N.Y. Aug. 10, 2018) (Stewart, M.J.), *report and recommendation adopted by*, 2018 **WL** 4188431 (N.D.N.Y. Aug. 31, 2018) (McAvoy, J.), *aff'd*, 826 F. App'x 41 (2d Cir. 2020), here there is a dispute about key facts underlying Plaintiff's claim—whether Defendant made comments about Plaintiff's pending lawsuit and whether his knowledge of Plaintiff's pending lawsuit precipitated Plaintiff's placement in keeplock.

As a result, I recommend that Defendant's motion for summary judgment with respect to the retaliation claim be dismissed.

### C. Plaintiff's Equal Protection Claim

After carefully considering the matter, I recommend that the Court deny Defendant's motion for summary judgment with respect to Plaintiff's equal protection. I find Defendant's

arguments with respect to Plaintiff's equal protection claim, unpersuasive for the following two reasons.

**\*12** First, I reject Defendant's assertion that there is no evidence in the record that other incarcerated individuals at Auburn are permitted to wear their hairstyles pursuant to their cultural and religious norms without punishment or harassment. (Dkt. No. 33, Attach. 11 at 18-19.) Plaintiff's verified complaint asserts that "Other racial groups are allowed to wear [their] cultural hairstyles.... without harassment, discrimination[,] or punishment." (Dkt. No. 1 at 4, ¶ 5); *see West v. Harkness*, 17-CV-0621, 2022 **WL** 1555364, at *6 n.10 (N.D.N.Y. May 17, 2022) (Suddaby, C.J.) (citing *Patterson v. Cnty. of Oneida*, 375 F.3d 206, 219 (2d Cir. 2004) ("[A] verified pleading ... has the effect of an affidavit and may be relied upon to oppose summary judgment."); *Fitzgerald v. Henderson*, 251 F.3d 345, 361 (2d Cir. 2001) (holding that plaintiff "was entitled to rely on [his verified amended complaint] in opposing summary judgment"), *cert. denied*, 536 U.S. 922 (2002); *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1993) ("A verified complaint is to be treated as an affidavit for summary judgment purposes.")) ("The Court notes that a Verified Complaint has the force and effect of an affidavit or declaration for purposes of a motion for summary judgment."); *McAllister v. Call*, 10-CV-0610, 2014 **WL** 5475293, at *3 (N.D.N.Y. Oct. 29, 2014) (Scullin, J.) (finding allegations in plaintiff's verified complaint sufficient to controvert facts in Statement of Material Facts on motion for summary judgment). More specifically, Plaintiff asserts that Caucasian inmates who identify as Arian culture are permitted to wear "the skin haircut," other Caucasian inmates who identify as "Viking culture" wear long hair, other Caucasian inmates who identify with "military culture" wear a crew cut, Jamaican or west Indian Black inmates wear dreadlocks. (Dkt. No. 1 at 4, ¶¶ 5-6.) In addition, Plaintiff asserts that at Auburn, Jewish inmates wear their hair in two curls that hang below each side of their ears, Rastafarian inmates wear dreadlocks, Native American prisoners are...

*** Start Section

...s

Slip Copy, 2023 WL 2410870

# Footnotes

1    Defendant cites to his declaration at paragraph 6 in support of this asserted fact. (Dkt. No. 33, Attach. 1 at ¶ 3 [citing Dkt. No. 33, Attach. 6 at ¶ 6].) However, paragraph 6 of Defendant's declaration refers to attaching Directive 4914 to his declaration as exhibit A. (Dkt. No. 33, Attach. 6 at ¶ 6.) Nonetheless, support for this fact as asserted exists at paragraph 7 of Defendant's declaration. (Dkt. No. 33, Attach. 6 at ¶ 7.)

2    *See*, *supra*, note 1. Nonetheless, support exists for this fact as asserted. (Dkt. No. 33, Attach. 6 at ¶ 8.)

3    Plaintiff filed his opposition papers after the deadline set by this Court, "and his *pro se* status does not excuse compliance with Court Orders." *Bowden v. City of Buffalo*, 15-CV-656, 2021 **WL** 1162879, at *3 n.1 (W.D.N.Y. Mar. 26, 2021) (citing *Johnson v. U.S. Dep't of Homeland Sec.*, 09-CV-0975, 2010 **WL** 2560485, at *2 (N.D.N.Y. June 24, 20210) (McAvoy, J.) ("Plaintiff's *pro se* status does not excuse his failure to be informed of this Court's rules and procedures and to comply with the deadline for filing opposition papers.")). While I will consider Plaintiff's opposition papers for purposes of this Report and Recommendation, any future late filings may be summarily rejected.

4    This action was commenced on or about July 14, 2020. (Dkt. No. 1 at 10.)

5    However, Plaintiff's opposition did not include a photograph and the "declaration" of Ariel Myers is inadmissible for the reasons set forth *infra*, at note 18.

6    Pursuant to N.D.N.Y. L.R. 7.1(a)(1) a surreply is not permitted. Notwithstanding, because Defendant was permitted leave to file a sur-surreply, the Court considered Plaintiff's submission. In the future, Plaintiff is directed to comply with the Court's rules and procedures.

7    As a result, "[c]onclusory allegations, conjecture and speculation ... are insufficient to create a genuine issue of fact." ⚠ *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998) (citation omitted). As the Supreme Court has explained, "[The non-movant] must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986).

8    ⚠ *Cusamano v. Sobek*, 604 F. Supp. 2d 416, 426 & n.2 (N.D.N.Y. 2009) (Suddaby, J.) (citing cases).

9    ⚠ *Cusamano*, 604 F. Supp. 2d at 426 & n.3 (citing cases).

10   ⚠ *Cusamano*, 604 F. Supp. 2d at 426-27 & n.4 (citing cases).

11   Among other things, Local Rule 56.1 (previously Local Rule 7.1(a)(3)) requires that the non-movant file a response to the movant's Statement of Material Facts, which admits or denies each of the movant's factual assertions in matching numbered paragraphs, and supports any denials with a specific citation to the record where the factual issue arises. N.D.N.Y. L. R. 56.1.

12   ⚠ *Cusamano*, 604 F. Supp. 2d at 427 & n.6 (citing cases); *see also* *Prestopnik v. Whelan*, 253 F. Supp. 2d 369, 371 (N.D.N.Y. 2003) (Hurd, J.) (holding that the Court is not required to "perform an independent review of the record to find proof of a factual dispute.").

13   *See*, *e.g.*, *Beers v. GMC*, 97-CV-0482, 1999 U.S. Dist. LEXIS 12285, at *27-31 (N.D.N.Y. March 17, 1999) (McCurn, J.) (deeming plaintiff's failure, in his opposition papers, to oppose several arguments by defendants in their motion for summary judgment as consent by plaintiff to the granting of summary judgment for defendants with regard to the claims that the arguments regarded, under Local Rule 7.1(a)(3) (previously

Local Rule 7.1(b)(3))); *Devito v. Smithkline Beecham Corp.*, 02-CV-0745, ⚐ 2004 **WL** 3691343, at *3 (N.D.N.Y. Nov. 29, 2004) (McCurn, J.) (deeming plaintiff's failure to respond to "aspect" of defendant's motion to exclude expert testimony as "a concession by plaintiff that the court should exclude [the expert's] testimony" on that ground).

14    The procedure to appeal to CORC under the normal, non-expedited procedures is the same. 7 N.Y.C.R.R. § 701.5(d)(1)(i).

15    "[T]he Second Circuit has held that factual disputes concerning exhaustion under the PLRA must be determined by courts rather than juries." *Coley v. Garland*, 19-CV-0382, **2023 WL** 346242, at *4 (N.D.N.Y. Jan. 20, **2023**) (Kahn, J.) (citing ⚐ *Messa v. Goord*, 652 F.3d 305, 308-09 (2d Cir. 2011) ("[Plaintiff] argues that, unlike other aspects of exhaustion, which he concedes are properly resolved by the court, determining whether an inmate asserts a valid excuse for non-exhaustion is a task for the jury. We are not persuaded.")).

16    In reaching this conclusion, the Court did not consider the "declaration" that Plaintiff included with his sur-reply from Damon Hunter. (Dkt. No. 51 at 5.) First, Mr. Hunter's "declaration" is unsworn and was not filed under penalty of perjury pursuant to 28 U.S.C. § 1746. (*Id.*) Second, the dates during which Mr. Hunter states that he witnessed Plaintiff in keeplock (August 30, 2018, to September 2, 2018) are not relevant to the issues currently before the Court.

...

2023 WL 2403742
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Javell FOX, Plaintiff,

v.

C.O. Andrej L. GIFFORD, Defendant.

9:20-cv-797 (GLS/ML)
|
Signed March 8, 2023

**Attorneys and Law Firms**

FOR THE PLAINTIFF: Javell Fox, Pro Se, 12-B-1626, Walkill Correctional Facility, Box G, Walkill, NY 12589.

FOR THE DEFENDANT: HON. LETITIA JAMES, New York State Attorney General, PETER A. McDANIEL, Assistant Attorney General, The Capitol, Albany, NY 12224.

## **ORDER**

Gary L. Sharpe, Senior District Judge

 **\*1** The above-captioned matter comes to this court following a Report-Recommendation (R & R) by Magistrate Judge Miroslav Lovric, duly filed February 16, 2023. (Dkt. No. 57.) Following fourteen days from the service thereof, the Clerk has sent the file, including any and all objections filed by the parties herein.

No objections having been filed, and the court having reviewed the R & R for clear error, it is hereby

**ORDERED** that the Report-Recommendation (Dkt. No. 57) is **ADOPTED** in its entirety; and it is further

**ORDERED** that defendant's motion for summary judgment (Dkt. No. 33) is **DENIED**; and it is further

**ORDERED** that an exhaustion hearing pursuant to 🚩 *Messa v. Goord*, 652 F.3d 305 (2d Cir. 2011) will be scheduled in due course to determine whether plaintiff properly exhausted his administrative remedies; and it is further

**ORDERED** that the matter is referred to Magistrate Judge Miroslav Lovric to conduct the aforementioned exhaustion hearing and prepare a report-recommendation; and it is further

**ORDERED** that the Clerk provide a copy of this Order to the parties in accordance with the Local Rules of Practice.

**IT IS SO ORDERED.**

**All Citations**

Slip Copy, 2023 WL 2403742

    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

2022 WL 836310
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Angel VALVERDE, Plaintiff,

v.

J.D. FOLKS, Correction Officer, et al., Defendants.

1:19-cv-08080-MKV
|
Signed 03/21/2022

**Attorneys and Law Firms**

Sofia Connie Aranda, Aranda Law Firm, PLLC, New York, NY, for Plaintiff.

John Roach Doran, Jonathan James Wilson, New York State Office of the Attorney General, New York, NY, for Defendants Folks, J.D., L. Brown, "John" Gonzalez, John Mayes, John Orrico, T.A. Cunningham.

Anthony Michael DeFazio, Anthony DeFazio Law PC, Beacon, NY, for Defendant "Jane" Frangella.

OPINION AND ORDER GRANTING DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT

MARY KAY VYSKOCIL, United States District Judge:

 **\*1** Incarcerated Plaintiff Angel Valverde, brings this action against Defendants Correction Officer ("CO") Jaquan Folks, CO Tyrone Cunningham, CO Lawton Brown, Sergeant ("Sgt") Julio Gonzalez, Lieutenant ("Lt") Alfonso Orrico, Commissioner's Hearing Officer ("CHO") Robert Mayes, and Nurse Gina Frangella (collectively, "Defendants"), alleging various constitutional violations stemming from two use of force incidents that occurred while Plaintiff was detained at Sing Sing Correctional Facility ("Sing Sing"). (Third Amended Complaint ("TAC") [ECF No. 70]).

Defendants have moved for summary judgment. [ECF No. 121]. Prior to this motion, Defendants filed a Local Civil Rule 56.1 Statement with their pre-motion letter in anticipation of filing this Motion for Summary Judgment. [ECF No. 114]. Plaintiff filed a Local Civil Rule 56.1 Counter-Statement with his opposition to the Defendant's pre-motion letter. (Pl. 56.1 [ECF No. 116-1]). In support of their motion, Defendants filed a memorandum of law (Def. Br. [ECF No. 121-2]), a

Local Civil Rule 56.1 Statement and Counterstatement (Def. 56.1 [ECF No. 121-1]), the Declaration of Melissa M. Pickett, the Inmate Grievance Program Supervisor for the New York State Department of Corrections and Community Supervision ("DOCCS"), with several exhibits, (Pickett Decl. [ECF No. 121-3]), the Declaration of Rachael Sequin, the Assistant Director of the Inmate Grievance Program at DOCCS, with several exhibits, (Sequin Decl. [ECF No. 121-5]), the Declaration of Robert Mayes, a CHO at DOCCS, with several exhibits, (Mayes Decl. [ECF No. 121-7]), the Transcript of the December 28, 2020 Deposition of Plaintiff Angel Valverde (Valverde Tr. [ECF No. 121-9]), the Transcript of the February 19, 2021 Deposition of Defendant Lt Alfonso Orrico (Orrico Tr. [ECF No. 121-10]), and the Transcript of the January 11, 2021 Deposition of Defendant Gina Frangella (Frangella Tr. [ECF No. 121-11]). In opposition to Defendants' motion, Plaintiff filed a memorandum of law (Pl. Opp'n. [ECF No. 124]), and several exhibits, including the Affidavit of Angel Valverde, (Valverde Aff. [ECF No. 124-9]), and the Affidavit of Geraldo Mena, an inmate at Sing Sing, (Mena Aff. [ECF No. 124-12]). Defendants filed a Reply. (Def. Reply [ECF No. 125]).

For the following reasons, Defendants' Motion for Summary Judgment is granted.

**BACKGROUND**

**I. Factual Background**

 **A. The Use Of Force Incidents**

**1. Initial Use Of Force**

On August 29, 2018, Plaintiff was in custody at Sing Sing. (Def. Br. 2; Pl. Opp'n 1). At about 8:30 p.m. on that day, Plaintiff was involved in a use of force incident with CO Algarin, a non-party, and CO Folks. (Def. 56.1 ¶ 30; Pl. 56.1 ¶ 30). The parties dispute what precipitated, and the details regarding, this use of force incident.

Defendants contend that Plaintiff left his cell and refused the orders of CO Algarin to return to his cell. (Def. 56.1 ¶ 30). Plaintiff then attacked CO Algarin, who defended himself. (Def. 56.1 ¶ 30). Defendants allege that, during this struggle, another inmate, Geraldo Mena, reached through the bars on his own cell and grabbed and stabbed CO Algarin. (Def. 56.1 ¶ 30). During the struggle, CO Folks responded to the scene and

Case 9:22-cv-00102-BKS-ML    Document 78    Filed 12/13/23    Page 103 of 373

Valverde v. Folks, Not Reported in Fed. Supp. (2022)

ordered Plaintiff to stop assaulting CO Algarin. (Def. 56.1 ¶ 30). After Plaintiff failed to comply with his orders, CO Folks tackled and restrained Plaintiff. (Def. 56.1 ¶ 30).

**\*2** Plaintiff contends that he had left his cell after his door was opened to see why his cell had been opened. (Valverde Tr. 63:5–10, 62:11–14). He contends that CO Algarin confronted Plaintiff outside his cell about grievances Plaintiff had filed against other COs. (Valverde Tr. 63:15-17; Mena Aff. ¶ 3). CO Algarin then assaulted Plaintiff and they both fell on the ground. (Valverde Tr. 64:4–9; Mena Aff. ¶ 4). CO Folks arrived and began to beat Plaintiff with a baton while CO Algarin continued to punch Plaintiff in the back. (Valverde Tr. 65:4–5, 9–11, 66:18–24; Mena Aff. ¶ 5). CO Folks struck Plaintiff in the back three or four times, returned Plaintiff to his cell, and locked the cell door. (Valverde Tr. 67:3–4, 68:5–6, 11–12; Mena Aff. ¶ 8).

### 2. The Medical Clinic Incident

It is uncontested that after this first use of force incident, Plaintiff was escorted to the medical clinic, where he was placed in a "keeplock bullpen." (Def. 56.1 ¶ 30; Valverde Tr. 72:12–19). The parties dispute what happened after Plaintiff was placed in the bullpen.

Defendants contend that, upon arriving at the medical clinic, CO Algarin informed Lt Orrico that Plaintiff and an unidentified inmate had assaulted him. (Def. 56.1 ¶ 17). Lt Orrico left the medical clinic to retrieve inmate cards, which contained photos of the inmates. (Def. 56.1 ¶ 18). Upon Lt Orrico's return, CO Algarin identified Mr. Mena as the other assailant and Lt Orrico ordered that Mr. Mena be escorted to the medical clinic for assessment. (Def. 56.1 ¶ 20). Lt Orrico then left the medical clinic to assist in other parts of the facility. (Def. 56.1 ¶ 21).

Defendants state that at the same time, Plaintiff was taken to an emergency room where he was seen by Nurse Frangella. (Def. 56.1 ¶ 27). After the initial examination, Nurse Frangella left the emergency room and closed the curtain to the room behind her. (Def. 56.1 ¶ 28). Defendants contend that CO Cunningham removed Plaintiff's restraints, at which point Plaintiff reached for his groin area and threatened to cut the officers. (Def. 56.1 ¶ 32). CO Cunningham, fearing that Plaintiff was reaching for a weapon, grabbed Plaintiff and brought him to the ground. (Def. 56.1 ¶ 32). He struggled with Plaintiff until Plaintiff again was placed in restraints. (Def.

56.1 ¶ 32). Nurse Frangella then returned and treated Plaintiff. (Def. 56.1 ¶ 29).

Plaintiff contends that after he was placed in the bullpen, Lt Orrico smacked the window of the bullpen and angrily told Plaintiff that he was "going to learn today." (Valverde Tr. 78:22–23, 79:1–3; Valverde Aff. ¶ 20). Within a couple of minutes, several officers arrived at the hospital, and a female officer warned Plaintiff "you know what's coming." (Valverde Aff. ¶ 21–22). Plaintiff was escorted from the bullpen to the examination room. (Valverde Aff. ¶ 24; Mena Aff. ¶ 18). At that time, Lt Orrico and CO Folks were standing in the doorway of the room next to the examination room. (Valverde Aff. ¶ 24; Mena Aff. ¶ 18).

Plaintiff claims that he was told to sit down in a chair while Nurse Frangella examined him. (Valverde Tr. 83:4–7). At this point, several officers entered the examination room and Nurse Frangella left. (Valverde Tr. 83:9–10; Mena Aff. ¶ 20). Before exiting the room, Nurse Frangella pulled a curtain divider to cover the door window. (Valverde Tr. 83:9–12). It is at this point that Plaintiff contends he was assaulted by the officers, including by CO Brown and CO Cunningham. (Valverde Tr. 83:5–8, 84:11–12, 14–17, 18–20, 86:24–25, 87:2–3; Mena ¶ 22). After the assault, Plaintiff was escorted by CO Brown from the examination room to the bullpen. (Valverde Aff. ¶ 25; Valverde Tr. 145:6–8; Mena Aff. ¶ 24–25). As he was exiting the examination room, Plaintiff saw CO Folks and Lt Orrico standing in the doorway of the room next to the examination room. (Valverde Aff. ¶ 25; Mena Aff. ¶ 24–25).

**\*3** Plaintiff was later escorted back to the examination room and Nurse Frangella returned to examine him. (Valverde Tr. 89:21). When she returned, she saw Lt Orrico standing outside the room. (Frangella Tr. 21:20–22:12).

### B. December 11, 2018 Disciplinary Hearing

On August 31, 2018, CO Richardson, a non-party, delivered to Plaintiff two Tier III Inmate Misbehavior Reports ("tickets"), one for each of the two use of force incidents involving Plaintiff on August 29, 2018. (Def. 56.1 ¶¶ 39–40; Pl. 56.1 ¶¶ 39–40). The first ticket was issued by CO Folks and accused Plaintiff of refusing direct orders and assaulting a staff member. (Def. 56.1 ¶¶ 30–31; Pl. 56.1 ¶¶ 30–31). That ticket charged Plaintiff with the following rules violations: (1) Rule 100.11 – assault on staff; (2) Rule 102.10 – threats; (3) Rule 104.11 – violent conduct; (4) Rule 104.13 – creating a disturbance; and (5) Rule 106.10 – refusing a direct

Case 9:22-cv-00102-BKS-ML    Document 78    Filed 12/13/23    Page 104 of 373

Valverde v. Folks, Not Reported in Fed. Supp. (2022)

order. (Def. 56.1 ¶¶ 30–31; Pl. 56.1 ¶¶ 30–31). The second ticket was issued by CO Cunningham and accused Plaintiff of threatening and assaulting staff members. (Def. 56.1 ¶¶ 32–33; Pl. 56.1 ¶¶ 32–33). The second ticket charged Plaintiff with the following rules violations: (1) Rule 100.11 – assault on staff; (2) Rule 102.10 – threats; (3) Rule 104.11 – violent conduct; (4) Rule 104.13 – creating a disturbance; and (5) Rule 106.10 – refusing a direct order. (Def. 56.1 ¶¶ 32–33; Pl. 56.1 ¶¶ 32–33).

CHO Mayes was assigned to conduct the Tier III Hearing for both tickets. (Def. 56.1 ¶ 34; Pl. 56.1 ¶ 34). The disciplinary hearing took place at Downstate Correctional Facility ("Downstate") over several months to accommodate the availability of witnesses and obtain documentation. (Def. 56.1 ¶¶ 35–36; Pl. 56.1 ¶¶ 35–36). Plaintiff was provided with the assistance of Hearing Assistant Cicala. (Def. 56.1 ¶ 43; Pl. 56.1 ¶ 43). During the hearing, CHO Mayes granted Plaintiff's request that seven inmates be called to testify, (Def. 56.1 ¶¶ 45, 63; Pl. 56.1 ¶¶ 45, 63), although Plaintiff later withdrew his request for one of the inmates to testify, (Def. 56.1 ¶ 51; Pl. 56.1 ¶ 51), and another inmate refused to testify (Def. 56.1 ¶ 77; Pl. 56.1 ¶ 77). CHO Mayes also granted Plaintiff's requests to call seventeen staff members to testify at his hearing. (Def. 56.1 ¶¶ 52–57, 65–69, 73–74; Pl. 56.1 ¶¶ 52–57, 65–69, 73–74). CHO Mayes denied Plaintiff's request to call two staff members who were not present for either incident and did not have relevant information. (Def. 56.1 ¶¶ 71–72; Pl. 56.1 ¶¶ 71–72).

CHO Mayes denied Plaintiff's request to recall two inmates, Mr. Mena and Edgar Mills. (Def. 56.1 ¶¶ 80–81; Pl. 56.1 ¶¶ 80–81). Defendants assert that their testimony was not relevant because the requested testimony was for those inmates to read the tickets they received for their involvement in the August 29, 2018 incidents, (Def. 56.1 ¶¶ 80–81), though Plaintiff contends that the information in those tickets was relevant, (Pl. 56.1 ¶¶ 80–81). CHO Mayes denied Plaintiff's request for video footage of the medical clinic as not relevant or material to the issues present at the hearing because the footage requested was for a timeframe after the incidents occurred, (Def. 56.1 ¶ 93), although Plaintiff contests the basis for that denial, (Pl. 56.1 ¶ 93).

 **\*4**  At the conclusion of the hearing, CHO Mayes found Plaintiff guilty of two of the ten charges against him, specifically Rule 104.11 – violent conduct and Rule 106.10 – refusing direct order, as described in the August 29, 2018 Misbehavior Report authored by CO Folks. (Mayes Decl. Ex.

C 4–5). Plaintiff was provided with the written disposition, which summarized the evidence on which CHO Mayes relied. (Def. 56.1 ¶ 102; Pl. 56.1 ¶ 102).

In his decision, CHO Mayes relied on the ticket issued by CO Folks, the testimony of the witnesses, Plaintiff's testimony, photographs, and a redacted copy of the preliminary Unusual Incident Report Packet. (Mayes Decl. Ex. C 7–12). He concluded that there was substantial evidence to support the two charges against Plaintiff. (Mayes Decl. ¶46; Mayes Decl. Ex. C 7–12). CHO Mayes sentenced Plaintiff to one hundred and eighty days of confinement in the Special Housing Unit and one hundred eighty days of loss of package, commissary, and phone privileges. (Mayes Decl. ¶45; Mayes Decl. Ex. C 5).

### C. Inmate Grievance Process

On November 7, 2018, Plaintiff submitted a grievance to the Inmate Grievance Resolution Committee ("IGRC"), alleging that CO Folks, CO Cunningham, CO Brown, Sgt Gonzalez, and Lt Orrico were involved in excessive force incidents with Plaintiff on August 29, 2018. (Picket Decl. ¶ 9, Ex. B (Plaintiff's November 7, 2018 Grievance)). The grievance also alleged that Lt Orrico and Nurse Frangella failed to intervene in the alleged excessive force incidents and that Nurse Frangella attempted to cover up said incidents. (Picket Decl. ¶ 9, Ex. B (Plaintiff's November 7, 2018 Grievance)). Following a facility investigation, the Superintendent issued a decision denying the grievance. (Picket Decl. ¶ 11, Ex. C (Superintendent's denial)). This decision was mailed to the Plaintiff at his then current facility, Fishkill Correctional Facility, on January 8, 2018. (Picket Decl. ¶ 11, Ex. C (Superintendent's denial)). Upon denial of the grievance, Plaintiff was advised that he could appeal the decision to the Central Office Review Committee ("CORC") by completing the appeals form attached to the decision and returning it to Downstate. (Picket Decl. ¶ 11, Ex. C (Superintendent's denial)).

Plaintiff contends that he submitted his appeal to the CORC on January 11, 2019. (Valverde Aff. ¶ 4, Ex. 2 (Appeal Statement)). However, there is no record of this appeal having been filed. (Picket Decl. ¶ 12; Sequin Decl. ¶¶ 12–14, Ex. B). Plaintiff claims that there is no record of the appeal because prison officials interfered with his outgoing mail. On January 17, 2019, Plaintiff submitted a grievance to complain that he was not getting responses to his grievances. (Valverde Aff. ¶ 5, Ex. 3). On January 20, 2019, Plaintiff wrote Superintendent Leroy Fields to complain about the

missing outgoing mail. (Valverde Aff. ¶ 6, Ex. 4). On January 25, 2019, Plaintiff wrote to Governor Andrew M. Cuomo requesting assistance. (Valverde Aff. ¶ 7, Ex. 5). On February 7, 2019, Plaintiff received a letter from Jeff McKoy, Deputy Commissioner for Program Services regarding the problems with his mail. (Valverde Aff. ¶ 9, Ex. 7). In that letter, Mr. McKoy advised that he had investigated the matter and found no evidence of staff misconduct and that all mail was being processed appropriately. (Valverde Aff. ¶ 9, Ex. 7). Plaintiff had previously complained about issues with his mail. (Valverde Aff. ¶¶ 10–19, Ex. 8–16).

## II. Procedural History

**\*5** On August 29, 2019, Plaintiff commenced this action with the filing of his initial Complaint. (Compl. [ECF No. 2]). He was later given leave to amend his complaint three times. In his Third Amended Complaint (the operative pleading), Plaintiff alleges (1) a section 1983 claim under the Eighth Amendment for excessive force against all Defendant Officers, (TAC ¶¶ 87–92); (2) a section 1983 claim under the Eighth Amendment for deliberate indifference against Defendant Michael Capra, the superintendent of Sing Sing; (3) a section 1983 claim under the Eighth Amendment for procedural due process violations against CHO Mayes and Defendant Robert Morton, the superintendent of Downstate, (TAC ¶¶ 100–104); and (4) a section 1983 claim for a failure to intervene against CO Folks, CO Cunningham, CO Brown, Sgt Gonzales, Nurse Frangella, Lt Orrico, and Mr. Capra, (TAC ¶¶ 105–110). On September 30, 2020, this Court granted the motion of Mr. Morton and Mr. Capra to dismiss Plaintiff's TAC with respect to the claims made against them. *See Valverde v. Folks*, No. 1:19-CV-08080-MKV, 2020 WL 5849515 (S.D.N.Y. Sept. 30, 2020). The remaining Defendants now move for summary judgment on the remaining claims. [ECF No. 121].

## LEGAL STANDARD

A party is entitled to summary judgment when there is no "genuine dispute as to any material fact" and the undisputed facts warrant judgment for the moving party as a matter of law. Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). The moving party has the initial burden of demonstrating the absence of a disputed issue of material fact. *Celotex v. Catrett*, 477 U.S. 317, 322–23 (1986). Once the motion for summary judgment is properly

made, the burden shifts to the nonmoving party, which "must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 250.

At all times, the ultimate burden remains on the party that has the burden of proof under the law. The Court must view the record "in the light most favorable to the opposing party," *Tolan v. Cotton*, 572 U.S. 650, 657 (2014) (citation omitted), and must "resolve all ambiguities and draw all reasonable inferences against the movant," *Caronia v. Phillip Morris USA, Inc.*, 715 F.3d 417, 427 (2d Cir. 2013) (citation omitted).

However, a party "may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (citation omitted). Rather, to survive a summary judgment motion, the opposing party must establish a genuine issue of fact by "citing to particular parts of materials in the record." Fed. R. Civ. P. 56(c)(1)(A); *see also Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009). To defeat a motion for summary judgment, the non-moving party must demonstrate more than "some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The non-moving party "cannot defeat the motion by relying on the allegations in [its] pleading, or on conclusory statements, or on mere assertions that affidavits supporting the motion are not credible." *Gottlieb v. Cnty. of Orange*, 84 F.3d 511, 518 (2d Cir. 1996) (citation omitted). "Mere conjecture or surmise by the nonmovant in support of his or her case is inadequate." *UMB Bank, N.A. v. Bluestone Coke, LLC*, No. 20-CV-2043 (LJL), 2020 WL 6712307, at \*3 (S.D.N.Y. Nov. 16, 2020) (quoting *Am. Home Assurance Co. v. Jamaica*, 418 F. Supp. 2d 537, 546 (S.D.N.Y. 2006)).

## DISCUSSION

## I. Plaintiff Failed To Exhaust Administrative Remedies

Defendants first argue that summary judgment should be granted with respect to all Defendants on the grounds that Plaintiff failed to properly exhaust his administrative remedies prior to filing this action. (Def. Br. 8–13). Under the Prisoner Litigation Reform Act, "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined

Case 9:22-cv-00102-BKS-ML    Document 78    Filed 12/13/23    Page 106 of 373

Valverde v. Folks, Not Reported in Fed. Supp. (2022)

in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). The exhaustion requirement "applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532 (2002). The PLRA "requires proper exhaustion, which 'means using all steps that the [prison grievance system] holds out, and doing so properly.' " *Williams v. Correction Officer Priatno*, 829 F.3d 118, 122 (2d Cir. 2016) (internal citations omitted). "Proper exhaustion demands compliance with [a prison grievance system's] deadlines and other critical procedural rules because no adjudicative system can function effectively without imposing some orderly structure on the course of its proceedings." *Id.* (citation omitted).

**\*6** The PLRA contains one textual exception to mandatory exhaustion. Under § 1997e(a), the exhaustion requirement depends on the " 'availab[ility]' of administrative remedies: An inmate, that is, must exhaust available remedies, but need not exhaust unavailable ones." *Ross v. Blake*, 578 U.S. 632, 642 (2016). In *Ross*, the Supreme Court delineated "three kinds of circumstances in which an administrative remedy, although officially on the books, is not capable of use to obtain relief." *Id.* at 643. The Supreme Court explained that an administrative remedy is unavailable when: (1) "it operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates"; (2) "an administrative scheme might be so opaque that it becomes, practically speaking, incapable of use. In this situation, some mechanism exists to provide relief, but no ordinary prisoner can discern or navigate it"; or (3) "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Id.* at 643–44. The Second Circuit recently noted "that the three circumstances discussed in *Ross* do not appear to be exhaustive," but declined to opine on what other circumstances might render an otherwise available administrative remedy actually incapable of use. *Williams*, 829 F.3d at 123 n.2.

At the relevant time, Downstate maintained an inmate grievance procedure pursuant to DOCCS Directive 4040. (Pickett Decl. ¶ 3). That procedure required inmates to follow a three-step process. Inmates first file a grievance with the facility IGRC within 21 days of the alleged occurrence. 7 N.Y.C.R.R. § 701.5 (a)–(b). Once the IGRC renders a decision on the grievance, the inmate could appeal that decision by filing an appeal with the facility Superintendent. 7 N.Y.C.R.R. § 701.5(c). After the facility Superintendent renders a decision on the grievance appeal, the inmate may appeal the Superintendent's decision to the DOCCS' CORC. 7 N.Y.C.R.R. § 701.5(d). Claims of harassment by staff are addressed by an expedited process, which essentially skips the step of review by the IGRC. *See* 7 N.Y.C.R.R. § 701.8. Claims of excessive force, failure to intervene, and cover-ups may be grieved through this process. (Pickett Decl. ¶ 8).

It is undisputed that Plaintiff filed a grievance for the excessive force incidents that allegedly took place on August 29, 2018. (Pickett Decl., ¶ 9, Ex. C; Pl. Opp'n 11). Plaintiff's grievance was denied and he was advised that if he wished to appeal the decision to CORC, he had to sign the appeal statement and return it to the Inmate Grievance Clerk within seven days of receipt. (Pickett Decl., ¶ 11, Ex. C; Pl. Opp'n 11). There is no record of Plaintiff filing any notice of appeal with the Inmate Grievance Clerk at Downstate, (Pickett Decl., ¶ 12), nor is there any record of Plaintiff filing an appeal with CORC, (Seguin Decl., ¶¶ 12–14).

Plaintiff first argues that he did in fact file his appeal with CORC. (Pl. Opp'n 14). He contends that it was never filed because prison administrative officials thwarted Plaintiff's appeal by interfering with his mail. (Pl. Opp'n 12–15). Plaintiff also asserts that regardless of his failed attempt to file his appeal, the grievance program at Downstate is so opaque that it is incapable of use. (Pl. Opp'n 15–16).

### A. Plaintiff Improperly Filed His Appeal

As a preliminary matter, the undisputed record makes clear that Plaintiff did not properly comply with Downstate's prison grievance procedural rules. Plaintiff attests that he mailed his appeal statement directly to CORC. (Valverde Aff. ¶ 4; Pl. Opp'n 11). However, to appeal a decision denying a grievance, an inmate must submit the appeal, not directly to CORC, but to the grievance supervisor of the facility where the grievance was originally filed for forwarding to that facility's grievance clerk. 7 N.Y.C.R.R. §§ 701.5(d)(1), 701.6(h)(2). In fact, the appeal form Plaintiff claims to have submitted states that the appeal needs to be submitted to the facility grievance clerk, not directly to CORC. (Valverde Aff. Ex. 2). The PLRA requires "compliance with [the prison grievance system's] ... procedural rules because no adjudicative system can function effectively without imposing some orderly structure on the

**Valverde v. Folks, Not Reported in Fed. Supp. (2022)**

Case 9:22-cv-00102-BKS-ML    Document 78    Filed 12/13/23    Page 107 of 373

course of its proceedings." *Williams,* 829 F.3d at 122 (citation omitted). Plaintiff's failure to properly comply with the procedural rules to appeal his grievance bars his claim here.

### B. Plaintiff's Assertion That Prison Officials Thwarted His Appeal Is Speculative

**\*7** Putting aside that the likely explanation for why Plaintiff's appeal was never filed with CORC was that, as discussed above, he improperly filed it, Plaintiff's claim that Defendants interfered with his mail is wholly speculative. In support of his assertion that Defendants interfered with his mail, Plaintiff submits only his own sworn affidavit. (Valverde Aff. ¶ 2). None of Plaintiff's "evidence" even suggests that he had any personal knowledge of any mail tampering. Plaintiff also now contends that he filed several correspondences and a grievance regarding mail tampering, (Valverde Aff. ¶ 5–7, Exs. 3–5), but, again, none of his assertions even purport to be based on any personal knowledge of any such tampering or interference with his mail. Conversely, Plaintiff's own evidence includes a letter from Jeff McKoy, Deputy Commissioner for Program Services, in which Mr. McKoy attested to have investigated the matter and found no evidence of staff misconduct and that all mail was being processed appropriately. (Valverde Aff. ¶ 9, Ex. 7). As such, Plaintiff's claim that prison officials tampered with his mail and impeded his ability to appeal his grievance is pure conjecture that does not preclude the Court from granting Defendants judgment as a matter of law. *See Flores v. United States,* 885 F.3d 119, 122 (2d Cir. 2018) ("[C]onclusory statements, conjecture, or speculation by the party resisting the motion will not defeat summary judgment." (citation omitted)).

### C. The Administrative Scheme Is Not Opaque

Plaintiff also asserts that the grievance program is so opaque that it is incapable of use. (Pl. Opp'n 15–16). He cites to NYCRR § 701.5(3)(i), which states that "[i]f a grievant does not receive a copy of the written notice of receipt within 45 days of filing an appeal, the grievant should contact the IGP Supervisor in writing to confirm that the appeal was filed and transmitted." He points out that under NYCRR § 701.6 (g)(1)(b), "[a]n exception to the time limit [to file an appeal] may not be granted more than 45 days after the date of the decision unless the late appeal asserts a failure to implement the decision." Plaintiff asserts that under this scheme, there is no procedure for an inmate to remedy a

deficiently filed appeal because by the time they learn the appeal was deficiently filed, it will be too late to file the appeal. (Pl. Opp'n 15).

However, to establish that a grievance program is so opaque that it is incapable of use, the program must be more than merely ambiguous, it must be "so confusing that ... no reasonable prisoner can use them." *Ross,* 578 U.S. at 644 (citation and internal quotation marks omitted). The DOCCS rules clearly provide that if a grievant does not receive confirmation of CORC's receipt of an appeal within 45 days of its submission, he should correspond with the grievance supervisor asking for that confirmation. NYCRR § 701.5(3) (i). Plaintiff's contention that NYCRR § 701.5(3)(i) appears to conflict with NYCRR § 701.6 (g)(1)(b) is without merit because the 45-day limit for filing grievances and appeals is only a restriction on the facility grievance supervisor, not CORC. *See* NYCRR § 701.6 (g)(1)(b). As such, it is possible that if Plaintiff had sought an extension to file an appeal from CORC, he could have received one. Plaintiff never did so.

Plaintiff primarily relies on *Williams v. Correction Officer Priatno,* 829 F.3d 118 (2d Cir. 2016), in support of his argument that the grievance program here is opaque. However, that case is inapposite. (Pl. Opp'n 13–14). In *Williams,* an inmate in a special housing unit (the "SHU") attempted to file a grievance for officer misconduct by giving the grievance to a correction officer to forward to the grievance office on his behalf, in accordance with DOCCS grievance procedures that apply to inmates in the SHU. 829 F.3d 118, 120–21. A week later, the inmate spoke with the facility superintendent and asked why he had not received a response to his grievance, and the superintendent informed the inmate that she had no knowledge of the grievance and would have to look into it. *Id.* at 121. About a week after that conversation, the inmate was transferred to a new facility and never received a response to the grievance. *Id.* Taking the inmate's allegations as true, the Second Circuit held that the "regulations simply do not contemplate the situation in which Williams found himself, making it practically impossible for him to ascertain whether and how he could pursue his grievance." *Id.* at 124. The court found that "the regulations give no guidance whatsoever to an inmate whose grievance was never filed[,] ... do not describe a mechanism for appealing a grievance that was never filed[,] ... [and thus,] the process to appeal an unfiled and unanswered grievance is

Case 9:22-cv-00102-BKS-ML    Document 78    Filed 12/13/23    Page 108 of 373

Valverde v. Folks, Not Reported in Fed. Supp. (2022)

prohibitively opaque, such that no inmate could actually make use of it." *Id.* at 124, 126.

**\*8** Here, unlike *Williams*, Plaintiff concedes that his initial grievance was processed and answered. (Pl. Opp'n 11). Moreover, Plaintiff concedes that after being transferred to a different facility, he received the Superintendent's decision denying his grievance. (Pl. Opp'n 11). Plaintiff had an avenue to appeal the denial of his grievance, however he filed the appeal form improperly and it does not appear that he made any attempt to ever ask the grievance supervisor for confirmation that his appeal was received.

* * *

Plaintiff has failed to exhaust the administrative remedies available to him and therefore his claims here are barred under section 1997e(a) of the PLRA. As such, all Defendants are entitled to judgment as a matter of law. The Court need not separately address the merits of the claims against the individual defendants or decide whether the conflicting accounts of the Defendants and Plaintiff create a material issue of fact precluding summary judgment. Nonetheless, the Court addresses the merits of the claims against Nurse Frangella and CHO Mayes below because there can be no argument that there are genuine issues of material fact with respect to the claims made against them and that Nurse Frangella and CHO Mayes are entitled to judgment as a matter of law.

### II. The Failure To Intervene Claim Against Nurse Frangella Fails To State A Cognizable Claim

Even had Plaintiff properly exhausted the administrative remedies available to him, he still cannot state a section 1983 claim for a failure to intervene against Nurse Frangella. It has long been recognized that the duty to intervene to protect the constitutional rights of citizens from infringement by law enforcement officers applies to *law enforcement officials*, not non-police state actors. *See Terebesi v. Torreso*, 764 F.3d 217, 243 (2d Cir. 2014) ("It is widely recognized that all law enforcement officials have an affirmative duty to intervene to protect the constitutional rights of citizens from infringement by other law enforcement officers in their presence." (quoting *Anderson v. Branen*, 17 F.3d 552, 557 (2d Cir. 1994))); *see also Rendely v. Town of Huntington*, No. 2;03-CV-03805-ENV, 2006 WL 5217083, at \*6 (E.D.N.Y. Aug. 30, 2006) (finding that defendants, who were civilian employees, "and

thus not law enforcement officials, [ ] had no authority or duty to intervene" to prevent police officers from violating the plaintiff's constitutional rights; *Phoenix v. Reddish*, 175 F. Supp. 2d 215, 220 (D. Conn. 2001) ("[T]here is no Supreme Court or Second Circuit authority that imposes an affirmative duty on a non-police state actor ... to intervene to prevent a police officer from conducting an unlawful search and seizure."). Nurse Frangella is a registered nurse (Def. 56.1 ¶ 26; Pl. 56.1 ¶ 26), not a "law enforcement official." She had no affirmative duty to intervene to protect Plaintiff's constitutional rights from infringement and therefore is entitled to judgment as a matter of law on Plaintiff's claims.

Plaintiff argues that "[s]imilar to the law enforcement duty to intervene to protect the constitutional rights of citizens from infringement by other law enforcement officers in their presence, nurses have a duty to protect their patients from foreseeable harm." (Pl. Opp'n 18). In support of his argument, Plaintiff cites to *N.X. v. Cabrini Med. Ctr.*, 97 N.Y.2d 247, 249, 765 N.E.2d 844 (N.Y. 2002). In *Cabrini Medical Center*, the New York Court of Appeals was presented with the question of whether hospital nurses who were in close proximity to a patient had a "duty to protect" that patient when she was sexually assaulted by another hospital employee. *Id.* at 254. *Cabrini Medical Center* is inapposite since it involved state tort claims and did not consider federal constitutional violations. Moreover, *Cabrini Medical Center* did not address a nurse's duty to intervene to protect a plaintiff from constitutional violations perpetrated by *law enforcement*.

### III. The Procedural Due Process Claims Against CHO Mayes Fail As A Matter Of Law

**\*9** CHO Mayes is also entitled to judgment as a matter of law on Plaintiff's Due Process claims, independent from Plaintiff's failure to exhaust the administrative remedies available to him. Plaintiff alleges that CHO Mayes violated his due process rights by: (1) improperly denying Plaintiff the ability to call certain witnesses and introduce video footage; (2) ignoring "factual inconsistencies in written and oral testimonies"; and (3) issuing "an insufficient written decision." (TAC ¶ 102).

The undisputed record makes clear that Plaintiff was afforded ample due process by CHO Mayes. He was granted permission to call twenty-four witnesses (seven inmates and seventeen staff) and to present documentary evidence. The hearing was conducted over several months to accommodate

witnesses and Plaintiff was provided with a hearing assistant to help him.

Due process protections do not afford a prison inmate the "full panoply of rights" due to a defendant in a criminal prosecution. *Sira v. Morton*, 380 F.3d 57, 69 (2d Cir. 2004) (quoting *Wolff v. McDonnell*, 418 U.S. 539, 556 (1974)). Nonetheless, an inmate is entitled to "advance written notice of the charges against him; a hearing affording him a reasonable opportunity to call witnesses and present documentary evidence; a fair and impartial hearing officer; and a written statement of the disposition, including the evidence relied upon and the reasons for the disciplinary action taken." *Id.* Any disciplinary action that results must be supported by at least some reliable evidence. *Id.* Analyzing whether the "some evidence" standard is satisfied does not require examination of the entire record, independent assessment of the credibility of witnesses, or weighing of the evidence. *Gaston v. Coughlin*, 249 F.3d 156, 163 (2d Cir. 2001). The question is whether there is *any* evidence in the record that could support the conclusion reached by the disciplinary board. *Id.*

Although an inmate facing disciplinary proceedings should be allowed to call witnesses and present documentary evidence, this right must be balanced against the needs to maintain institutional safety and correctional goals. *Wolff*, 418 U.S. at 566. There is also no requirement that an inmate be allowed to present evidence that is irrelevant, *Elder v. McCarthy*, 967 F.3d 113, 124 (2d Cir. 2020), or that would unduly delay "the penological need to provide swift discipline in individual cases," *Ponte v. Real*, 471 U.S. 491, 495 (1985). Further, "any violations" of an inmate's "qualified right" to call witnesses or present documents "are reviewed for harmless error." *Pilgrim v. Luther*, 571 F.3d 201, 206 (2d Cir. 2009) (internal quotation marks omitted).

Here, the record is clear that Plaintiff was provided ample due process protections at his hearing. Plaintiff received advance written notice of the charges against him when CO Richardson gave him a copy of each of the two Tier III tickets on August 31, 2018. (Def. 56.1 ¶¶ 39–40; Pl. 56.1 ¶¶ 39–40). Plaintiff was permitted to mount a defense by introducing documentary evidence and by calling numerous witnesses and posing questions to those witnesses. (Def. 56.1 ¶¶ 45–57, 63, 65–69, 73–74, 77; Pl. 56.1 ¶¶ 45–57, 63, 65–69, 73–74, 77). CHO Mayes issued a written statement of the

evidence relied on in reaching his decision and the reason for the punishment imposed. (Mayes Decl. Ex. C 7–12).

Plaintiff first argues that CHO Mayes' written statement was constitutionally deficient because "only six lines describe the basis of the hearing officer's decision." (Pl. Opp'n 20). Putting aside that CHO Mayes' report is thoroughly detailed, (*see* Mayes Decl. Ex. C), Plaintiff's argument is also without any support in the law. There is no minimum page requirement for a disciplinary written decision. It need only contain "the evidence the factfinder relied on and the reasons for the disciplinary action." *Williams v. Chuttey*, 767 F. App'x 105, 109 (2d Cir. 2019).

**\*10** Plaintiff contends that CHO Mayes did not rely on reliable evidence in support of his findings. (Pl. Opp'n 21). He cites to the testimony of five witnesses whose testimony controverts the findings of CHO Mayes. (Pl. Opp'n 21). However, in determining whether Plaintiff's due process rights were violated, the Court need not independently assess the credibility of witnesses or weight the evidence. "Instead, the relevant question is whether there is any evidence in the record that could support the conclusion reached by the disciplinary board." *Gaston*, 249 F.3d at 163 (internal quotation marks omitted) (emphasis omitted). Here, CHO Mayes' findings were supported by evidence that was before him. (*See* Mayes Decl. Ex. C 7–12). This evidence included, among other things, the misbehavior report authored by CO Folks, the multiple witnesses who testified, and the documentary evidence reviewed at the disciplinary hearing. (Def. 56.1 ¶¶ 45–57, 63, 65–69, 73–74, 77; Pl. 56.1 ¶¶ 45–57, 63, 65–69, 73–74, 77). That Plaintiff may disagree with CHO Mayes' findings of fact does not mean that CHO Mayes violated his constitutional rights.

Plaintiff also takes issue with the fact that CHO Mayes denied Plaintiff's requests to present certain witnesses and documentary evidence during the hearing. (Pl. Opp'n 21–22). Plaintiff first complains that he was not allowed to present documentation regarding the recovery of a weapon used against CO Algarin, (Pl. Opp'n 21), and testimony of a witness whose cell was searched for that weapon (Pl. Opp'n 21–22). However, a prisoner's right to call witnesses or present documents "can be denied on the basis of irrelevance or lack of necessity." *Kingsley v. Bureau of Prisons*, 937 F.2d 26, 30 (2d Cir. 1991). This evidence was irrelevant because Plaintiff was not found guilty of assaulting CO Algarin with a weapon. (*See* Mayes Decl. Ex. C 14).

Valverde v. Folks, Not Reported in Fed. Supp. (2022)

Case 9:22-cv-00102-BKS-ML    Document 78    Filed 12/13/23    Page 110 of 373

Plaintiff also complains that CHO Mayes denied Plaintiff's request to recall Mr. Mena as a witness to read his misbehavior report from the day of the use of force incident. (Pl. Opp'n 21–22). Plaintiff contends that Mr. Mena's testimony was relevant because he witnessed some of the events surrounding the use of force incident. (Pl. Opp'n 21). However, CHO Mayes explained that he declined to call Mr. Mena because Plaintiff merely wanted Mr. Mena to read his own misbehavior report, which CHO Mayes determined was irrelevant to Plaintiff's own conduct. (Mayes Decl. Ex. C 105–06). The CHO could of course also read the report for himself. Moreover, even if this determination was in error, that error was harmless. *See Pilgrim*, 571 F.3d at 206. CHO Mayes' decision was supported by substantial evidence, (Def. 56.1 ¶¶ 45–57, 63,

65–69, 73–74, 77; Pl. 56.1 ¶¶ 45–57, 63, 65–69, 73–74, 77), which clearly meets the "some evidence" standard, *see*

⚑ ⚠ *Sira*, 380 F.3d at 69.

## CONCLUSION

For the reasons stated herein, Defendants' Motion for Summary Judgment is GRANTED.

**SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2022 WL 836310

---

**End of Document**
© 2023 Thomson Reuters. No claim to original U.S. Government Works.

2007 WL 2693636
Only the Westlaw citation is currently available.
United States District Court,
W.D. New York.

Darrell WILKINSON, Plaintiff,
v.
Randy BANKS, et al, Defendants.

No. 02-CV-361.
|
Sept. 10, 2007.

**Attorneys and Law Firms**

Kathryn Rainbolt, Ithaca, NY, Betsy Hutchings, Law Office of Tom Terrizzi, Buffalo, NY, for Plaintiff.

Kim S. Murphy, Michael J. Russo, New York State Attorney General's Office, Buffalo, NY, for Defendants.

ORDER

RICHARD J. ARCARA, Chief Judge.

**\*1** This case was referred to Magistrate Judge Marian W. Payson, pursuant to 28 U.S.C. § 636(b)(1). On July 1, 2005, defendants filed a motion for summary judgment. On June 28, 2007, Magistrate Judge Payson filed a Report and Recommendation, recommending that defendants' motion for summary judgment be granted.

Plaintiff filed objections to the Report and Recommendation on July 13, 2007, and defendants filed a response thereto. Oral argument on the objections was held on September 5, 2007.

Pursuant to 28 U.S.C. § 636(b)(1), this Court must make a *de novo* determination of those portions of the Report and Recommendation to which objections have been made. Upon a *de novo* review of the Report and Recommendation, and after reviewing the submissions and hearing argument from the parties, the Court adopts the proposed findings of the Report and Recommendation.

Accordingly, for the reasons set forth in Magistrate Judge Payson's Report and Recommendation, defendants' motion

for summary judgment is granted. The Clerk of Court shall take all steps necessary to close the case.

SO ORDERED.

*REPORT & RECOMMENDATION*

MARIAN W. PAYSON, United States Magistrate Judge.

*PRELIMINARY STATEMENT*

By Order of Hon. Richard J. Arcara, Chief Judge, United States District Judge for the Western District of New York, dated November 14, 2006, all dispositive motions in the above-captioned case have been referred to this Court for report and recommendation pursuant to 28 U.S.C. §§ 636(b)(1)(B)-(C). (Docket # 53).

Plaintiff Darrell Wilkinson has brought suit under 42 U.S.C. § 1983 against various officers of the New York State Department of Correctional Services ("DOCS"), alleging that they assaulted him and failed to protect him while he was incarcerated at the Southport Correctional Facility, in violation of the Eighth and Fourteenth Amendments. (Docket # 1). Currently pending before the Court is defendant's motion for summary judgment on the grounds that plaintiff did not fully exhaust his administrative remedies before filing suit as required by the Prison Litigation Reform Act. (Docket # 40).

*FACTUAL BACKGROUND*

According to Wilkinson's Complaint, during the morning hours of May 28, 1999, an incident occurred in the A-block of the Southport Correctional Facility ("Southport") between an unidentified inmate and members of the correctional staff. Later that morning, while Wilkinson was in an exercise pen, several inmates allegedly initiated a chant relating to the earlier incident, thereby creating a "tense" atmosphere. During this period of time, correctional officers arrived at the exercise pen to escort Wilkinson to his cell. Although the usual procedure was to transfer Wilkinson with his hands handcuffed in front of him, on this day, Wilkinson was handcuffed with his hands behind his back. After he was handcuffed, several correctional officers allegedly entered Wilkinson's exercise pen and assaulted him, then dragged him to his cell by the collar of his shirt and placed him on

a stretcher. One of the correctional officers directed that a "spit mask" be placed on Wilkinson because he was having trouble breathing as a result of the blood in his mouth and nose. The spit mask, Wilkinson states, caused him to experience further difficulties breathing. Wilkinson alleges that as the result of the assault, he received lacerations to the top of his head and abrasions and bruises to his face. In addition, Wilkinson claims that the assault caused him to suffer headaches, dizziness and emotional distress. (Docket # 1).

**\*2** On July 1, 1999, Wilkinson filed a grievance with the Inmate Grievance Resolution Committee ("IGRC") complaining that he had not received adequate medical care for pain and injuries "since [he] was jumped by officers." (Docket # 41, Ex. A). The grievance described various injuries and pain he claimed to suffer and sought evaluation by a physician and psychiatrist. (*Id.*). The grievance was reviewed by the IGRC on July 7, 1999, and the committee granted Wilkinson's request for medical attention, noting that Wilkinson "ha[d] been put on the list to see the Facility Doctor." (*Id.*). On July 8, 1999, Wilkinson wrote a letter to the Superintendent of Southport again complaining that he had not received adequate medical care as a result of an incident in which officers "jumped" him and requesting examination by a physician and psychiatrist. (*Id.*). Wilkinson never filed any appeal of his grievance to the Superintendent or to the Central Office Review Committee ("CORC"). (Docket # 43 at ¶¶ 3-4; # 48 at ¶ 1).

Wilkinson filed a second grievance on August 1, 1999. In this grievance, Wilkinson described the alleged assault that occurred on May 28, 1999 and complained about ongoing medical problems he was experiencing. (Docket # 41, Ex. B). He requested examination by a psychiatrist and "a back and head specialist," as well as a prescription for pain medication. (*Id.*). The requested relief was denied by the IGRC on August 6, 1999, noting that Wilkinson had been seen by a surgeon, was awaiting an appointment with a psychiatrist and had been prescribed pain relievers. (*Id.*). Wilkinson did not appeal the denial either to the Superintendent or to CORC. (Docket # 41, Ex. B; # 43 at ¶¶ 6; # 48 at ¶ 1).

Several months later, on November 28, 2000, Wilkinson was transferred from Southport to the Elmira Correctional Facility ("Elmira"). At Elmira, on July 1, 2001, Wilkinson filed a grievance alleging that he had been assaulted at Southport on May 28, 1999. The grievance described the alleged assault in substantial detail, as well as the resulting injuries he

suffered. Wilkinson did not identify any particular relief he was seeking. He stated that he had not previously filed a grievance relating to the assault because he feared retaliation. (Docket # 41, Ex. C).

On July 10, 2001, in response to the grievance, Floyd Bennett, Jr ., Superintendent of Elmira, directed that an investigation be conducted. Seven days later, Superintendent Bennett formally responded to the grievance using DOCS's Form 2133. The response stated:

> This grievance concerns an alleged event that occurred May 28, 1999. Directive 4040 V A 1 states in part, "an inmate must submit a complaint to the clerk within fourteen (14) calendar days of an alleged occurrence ...."
>
> Grievance is returned as untimely.

(*Id.*). The form contained a preprinted notice at the bottom entitled "Appeal Statement," which advised Wilkinson that if he wished to "refer" the Superintendent's decision, he must sign the document and return it to the Inmate Grievance Clerk. It further advised that he must file his appeal within four working days from receipt of "this notice." (Docket # 41, Ex. D).

**\*3** On July 30, 2001, Wilkinson sent directly to CORC a document entitled "Appeal of Superintendent's Determination of Inmate Grievance Filed." (Docket # 41, Ex. E). The document noted that his grievance had been denied by Superintendent Bennett on the grounds of untimeliness and raised four arguments, separately denoted as Points I, II, III and IV, in an effort to explain why he had not filed a grievance for over one year following the incident. In conclusion, the document stated, "I am therefore respectfully requesting that this matter herein raised, and enclosed, be fully investigated as to its meritorious claim, and find within your determination a favorable decision in regards to this unprovoked brutal assault against my person." (*Id.*).

On August 9, 2001, Thomas Eagen, Director of the Inmate Grievance Program, wrote to Wilkinson and returned the July 30 document to him. The letter explained, "[DOCS's] policy, Directive # 4040, Inmate Grievance Program, (IGP), provides inmates with an orderly, fair and simple method of resolving grievances pursuant to the Correction Law. The directive makes no provision for an inmate to refer grievances directly to [CORC]." (Docket # 41, Ex. F). Wilkinson claims not to have received Eagen's letter or the returned documents, and he took no further action with respect to the grievance. (Docket

# 49 at ¶ 20). Wilkinson initiated this lawsuit almost one year later on May 16, 2002. (Docket # 1).

## DISCUSSION

In their Answers to Wilkinson's Complaint, defendants have asserted as an affirmative defense that Wilkinson failed to exhaust his administrative remedies. (Docket5-11). By court order, discovery has been limited thus far to the issue of exhaustion. (Docket # 18). Following completion of discovery on that issue, defendants have filed the pending motion for summary judgment relating to the sole issue whether Wilkinson has exhausted his administrative remedies. (Docket # 40).

## I. *Standard for Summary Judgment*

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). In reaching this determination, the court must assess whether there exist any disputed material facts and, in so doing, must resolve all ambiguities and draw all reasonable inferences against the moving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248-49, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Coach Leatherware Co., Inc. v. AnnTaylor, Inc.,* 933 F.2d 162, 166-67 (2d Cir.1991).

A fact is "material" only if it has some effect on the outcome of the suit. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. at 248; *Catanzaro v. Weiden,* 140 F.3d 91, 93 (2d Cir.1998). A dispute regarding a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248; *see also Bryant v. Maffucci,* 923 F.2d 979, 982 (2d Cir.), *cert. denied,* 502 U.S. 849, 112 S.Ct. 152, 116 L.Ed.2d 117 (1991).

*4   The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact, after which the nonmoving party must come forward with sufficient evidence to support a jury verdict in its favor; the motion will not be defeated based upon conjecture, surmise or the existence of "metaphysical doubt" concerning the facts. *Bryant v. Maffucci,* 923 F.2d at 982 (citing *Matsushita*

*Elec. Indus. Co., Ltd. v. Zenith Radio Corp. .,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)). The party seeking to avoid summary judgment "must do more than make broad factual allegations and invoke the appropriate statute. The [party] must also show, by affidavits or as otherwise provided in Rule 56 ..., that there are specific factual issues that can only be resolved at trial." *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1995); *see also Driscoll v. Townsend,* 60 F.Supp.2d 78, 80 (W.D.N.Y.1999).

As the Second Circuit has explained:

> [T]he trial court's task at the summary judgment motion stage of the litigation is carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution.... [I]t must be kept in mind that only by reference to the substantive law can it be determined whether a disputed fact is material to the resolution of the dispute.

*Gallo v. Prudential Residential Servs., Ltd. P'ship,* 22 F.3d 1219, 1224 (2d Cir.1994).

## II. *Analysis*

The Prison Litigation Reform Act ("PLRA") provides that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal Law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U .S.C. § 1997e(a). In other words, the PLRA requires an inmate to exhaust all available remedies before initiating a lawsuit in federal court relating to prison conditions.

Defendants argue that they are entitled to summary judgment because Wilkinson failed to properly exhaust his administrative remedies with regard to the claims alleged in his Complaint, as required by the PLRA.

(Docket # 44). Wilkinson opposes the motion, arguing both that administrative remedies were unavailable to him and alternatively, if they were available, that special circumstances existed to justify his failure to comply strictly with the procedures for pursuing those remedies. (Docket # 50).

**A. *New York State DOCS Grievance Procedures:*** Before turning to the applicable caselaw, it is helpful to summarize the relevant procedures for filing grievances by prisoners housed in facilities within the New York State DOCS system. The procedures, which comprise a three-step grievance process, are set forth in regulations codified at 7 N.Y.C.R.R. § 701.7.

Under the regulations applicable when the alleged assault at issue in this case occurred, an inmate was required to file a grievance with the IGRC, a committee composed of inmates and prison officials, within fourteen calendar days of the occurrence at issue.[1] 7 N.Y.C.R.R. § 701.7(a)(1); *see* Hemphill v. New York, 380 F.3d 680, 682 (2d Cir.2004). The IGRC was obligated to review and resolve the complaint within seven days; the committee was authorized to conduct hearings, if necessary, and to render a written decision within two days following that hearing. 7 N.Y.C.R.R. §§ 7017(a)(3) and (4). If the decision was unsatisfactory to the inmate and he wished to challenge it, he was required to file an appeal to the superintendent of his correctional facility within four days. 7 N.Y.C.R.R. § 701.7(b). The superintendent then had ten days within which to respond, and his response was required to include "simple directions" on how to appeal his determination to CORC. *Id.* Pursuant to the regulations, appeals to CORC had to be filed with the Inmate Grievance Clerk within four working days of receipt of the superintendent's decision, and CORC had twenty days within which to issue a decision. *See* 7 N.Y.C.R.R. §§ 701.7(c)(1) and (4); Hemphill v. New York, 380 F.3d at 682.

**\*5 B. *Legal Framework:*** Although the PLRA's requirement that a prisoner exhaust his available administrative remedies before commencing a Section 1983 lawsuit is "mandatory," Porter v. Nussle, 534 U.S. 516, 524, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002), the Second Circuit has recognized certain "caveats" to that requirement. Giano v. Goord, 380 F.3d 670, 677 (2d Cir.2004). Those caveats, which may excuse a prisoner's non-exhaustion, fall within three categories:

> when (1) administrative remedies are not available to the prisoner; (2) defendants have either waived the defense of failure to exhaust or acted in such a way as to estop them from raising the defense; or special circumstances, such as a reasonable misunderstanding of the grievance procedures, justify the prisoner's failure to comply with the exhaustion requirement.

Ruggiero v. County of Orange, 467 F.3d 170, 175 (2d Cir.2006) (citing Hemphill, 380 F.3d at 686). According to the court, these caveats reflect the recognition that rigid application of the exhaustion requirement in certain circumstances would unjustly bar suits "simply because the plaintiff failed to follow prison grievance procedures to the letter." Giano v. Goord, 380 F.3d at 677.

Since this motion was fully briefed, the United States Supreme Court decided Woodford v. Ngo, --- U.S. ----, 126 S.Ct. 2378, 165 L.Ed.2d 368 (2006), which presented the question whether "a prisoner can satisfy the [PLRA's] exhaustion requirement," 42 U.S.C. § 1997e(a), by filing an untimely or otherwise procedurally defective administrative grievance or appeal." 126 S.Ct. at 2382. In answer to that question, the Court held that the PLRA requires "proper exhaustion," which "means using all steps the agency holds out, and doing so *properly* (iso that the agency addresses the issues on the merits)." Id. at 2385 (internal quotations omitted). *See* Ruggiero v. County of Orange, 467 F.3d at 176 (interpreting *Woodford* as holding that PLRA exhaustion mandates "compliance with an agency's deadlines and other critical procedural rules") (quoting Woodford v. Ngo, 126 S.Ct. at 2386).

Justice Breyer's concurring opinion in *Woodford* has led lower courts within this Circuit to determine that the *Hemphill* framework continues to have vitality after *Woodford*. In his opinion, Justice Breyer noted that the Second Circuit has "interpreted the statute in a manner similar to that which the

Court ... adopts [in *Woodford* ] [and] ha[s] concluded that the PLRA's proper exhaustion requirement is not absolute." *Id.* at 2393. Citing *Giano,* he expressly entreated lower courts to "similarly consider any challenges that petitioner may have concerning whether his case falls into a traditional exception that the statute implicitly incorporates." *Id.*

Although the Second Circuit has not directly addressed the effect that *Woodford* has on the *Giano/Hemphill* framework discussed *supra, see* 🚩 *Ruggiero,* 467 F.3d at 176 (declining to reach issue because outcome was same whether *Woodford* or *Giano* applied), several lower courts have concluded that in the absence of a contrary determination by the Circuit, application of the *Giano/Hemphill* caveats is still appropriate. *See, e.g., Bester v. Dixion,* 2007 WL 951558, *8 (N.D.N.Y. Mar.27, 2007);* 🚩 *Lawyer v. Gatto,* 2007 WL 549440, *4 n. 4 (S.D.N.Y. Feb.21, 2007);* 🚩 *Hairston v. LaMarche,* 2006 WL 2309592, *6 n. 9 (S.D.N.Y. Aug.10, 2006);* 🚩 *Collins v. Goord,* 438 F.Supp.2d 399, 411 n. 13 (S.D.N.Y.2006). Notably, those decisions, like this one, have concluded that the result would be the same under either analysis. [2]

*\*6 C. Did Wilkinson Comply with the Grievance Procedures?:* The first question to consider on this motion is whether Wilkinson complied with DOCS's rules and regulations for filing and appealing grievances when he grieved the alleged assault that gives rise to this lawsuit. If he did, resort to the *Giano/Hemphill* caveats would be entirely unnecessary.

Although Wilkinson's papers do not state so explicitly, they may reasonably be read to concede that Wilkinson did not comply with all of the necessary procedural requirements. Even if the first and second grievances filed on July 2, 1999 and August 2, 1999, respectively, could be read to complain of the alleged assault, no dispute exists that Wilkinson did not appeal either to CORC, the third-level of the grievance process. There is likewise no dispute that the third grievance, which plainly complained of the alleged assault, was not filed by Wilkinson until approximately thirteen months after the event, well-beyond the applicable fourteen-day deadline under the grievance procedures. Finally, no dispute exists that Wilkinson did not follow correct procedure in attempting to appeal that grievance to CORC. [3] He did not file his appeal with the Inmate Grievance Clerk as required by the regulations, *see* 7 N.Y.C.R.R. § 701.7(c)(1), but rather mailed it directly to CORC.

Based on the documentary record before this Court, the timeliness of Wilkinson's appeal to CORC of his third grievance also appears questionable. The Superintendent's denial of Wilkinson's grievance is dated July 17, 2001; Wilkinson's appeal to CORC is dated July 30, 2001. (Docket # 47, Ex. 4). Under applicable regulations, Wilkinson had four days from *receipt* of the Superintendent's denial within which to appeal, *see* 7 N.Y.C.R.R. § 70. The timeliness of his appeal cannot be resolved at this stage, however, because the record contains no evidence as to when Wilkinson received the denial notice. Indeed, no evidence was presented concerning DOCS's usual procedures for notifying inmates of such denials, such as, whether denials are customarily mailed or hand-delivered. Nor was any evidence presented concerning whether CORC rejects all appeals that are untimely regardless of the length of the delay. In the absence of such evidence, a finding that Wilkinson did not appeal within the prescribed time frame would be unjustified.

Returning to the demonstrable procedural infirmities, Wilkinson makes no attempt to justify his failure to appeal his first and second grievances. With respect to the third grievance, by contrast, he argues that its procedural infirmities should be excused under both the first and third *Giano/ Hemphill* caveats. Taking first the question of its timeliness, Wilkinson argues that the thirteen-month delay was justified by the fact that during twelve of those months, the law in this Circuit did not require exhaustion of administrative remedies for prisoner claims of assault or excessive force. [4] *See* 🚩 *Nussle v. Willette,* 224 F.3d 95, 106 (2d Cir.2000) ("exhaustion of administrative remedies is not required for claims of assault or excessive force brought under 🚩 § 1983"), *rev'd,* 🚩 *Porter v. Nussle,* 534 U.S. at 516. It was not until May 29, 2001, that the Supreme Court decided 🚩 *Booth v. Churner,* 532 U.S. 731, 741 n. 6, 121 S.Ct. 1819, 149 L.Ed.2d 958 (2001), holding that "Congress has provided in 🚩 § 1997e(a) that an inmate must exhaust irrespective of the forms of relief sought and offered through administrative remedies." Considering this jurisprudential evolution, I agree with Wilkinson that his grievance, filed within four weeks of *Booth v. Churner,* should be considered timely. *See* 🚩 *Rodriguez v. Westchester County Jail Corr. Dep't,* 372 F.3d 485, 487 (2d Cir.2004) (prisoner's belief that exhaustion of excessive force claims was not required was

reasonable because Second Circuit itself held that view until it was rejected by Supreme Court).

**\*7** Turning next to the question of Wilkinson's failure to file his appeal to CORC with the Inmate Grievance Clerk, he maintains that unclear and confusing directions by the Superintendent of Elmira made an appeal to CORC "unavailable" within the meaning of the first *Giano/Hemphill* caveat. He further contends that his interpretation of those directions as sanctioning the transmission of his appeal directly to CORC was reasonable and constitutes "special circumstances" warranting application of the third caveat. (Docket # 50 at 10). Defendants vigorously disagree that the challenged directions justify relief under either caveat.

### D. *Application of the Giano/Hemphill Caveats*

**1. Were Administrative Remedies Available to Wilkinson?:** Application of the three-part inquiry dictated by *Hemphill* begins with the question "whether administrative remedies were in fact 'available' to the prisoner." *Hemphill,* 380 F.3d at 686 (quoting *Abney v. McGinnis,* 380 F.3d 663, 667 (2d Cir.2004)). In answering that question, "courts should be careful to look at the applicable set of grievance procedures, whether city, state, or federal." *Id.* at 668 (internal quotations omitted). Courts must then examine whether statements made or actions taken by DOCS officials conflicted with those procedures, thereby rendering them in fact unavailable to the prisoner. *See, e.g., Wheeler v. Goord,* 2005 WL 2180451, \*6 (N.D.N.Y. Aug.29, 2005) (summary judgment inappropriate where plaintiff's failure to file appeal to CORC "could be attributed to his reliance upon the alleged representation to him by prison officials that to grieve the matter he should write to Sergeant Coffee"); *Barad v. Comstock,* 2005 WL 1579794, \*6 (W.D.N.Y. June 30, 2005) ("the [c]ourt must ask whether administrative remedies existed, and if so whether defendants' actions rendered those remedies unavailable to plaintiff"); *Jeffers v. Goord,* 2005 WL 928628, \*6 (N.D.N.Y. Apr.4, 2005) ("[p]rison officials may prevent a prisoner from utilizing a remedy by incorrectly representing to the prisoner that his complaint is not grievable, or that it is grievable only though another avenue").

As described above, at the time of the alleged incident at issue in this case, DOCS had a well-established process for filing and appealing grievances by prisoners concerning conditions in their correctional facilities. *See* 7 N.Y.C.R.R. §§ 701. 1, *et seq. See also Abney v. McGinnis,* 380 F.3d at 668 ("DOCS

has a well-established administrative grievance procedure for prisoners called the Inmate Grievance Program"). That system involved a sequential three-step process culminating with review by CORC of adverse grievance determinations. The applicable regulations provided that in order to file a grievance or an appeal thereof to the Superintendent and thereafter to CORC, the grievance or appeal needed to be filed with the Inmate Grievance Clerk. 7 N.Y.C.R.R. §§ 701.7(a)(1), (b)(1) and (c)(1). As Thomas Eagen, Director of the Inmate Grievance Program, has explained in his affidavit accompanying the instant motion, this requirement of filing through a centralized location facilitates the tracking and orderly processing of grievances by ensuring that they are logged into a computer database, that a receipt is sent to the inmate and that all the information necessary for CORC to review the grievance is forwarded to CORC. (Docket # 41, ¶ 5).

**\*8** In this case, nothing in the record suggests that the established right of a prisoner to appeal to CORC was unavailable to Wilkinson. Wilkinson filed a grievance regarding the alleged assault after he was transferred to Elmira. The grievance was apparently passed directly to Superintendent Bennett,[5] who thereafter denied the grievance as untimely. Pursuant to applicable regulations, as well as DOCS Directive 4040,[6] Wilkinson had four days from receipt of that decision within which to appeal to CORC by filing with the Inmate Grievance Clerk. 7 N.Y.C.R.R. § 701.7(c)(1); DOCS Directive 4040 at 7. Wilkinson has not alleged that any DOCS officials or employees prevented or impeded his efforts to file an appeal with the Clerk, nor has he claimed that any member of the DOCS staff informed him that he could or should not file with the Clerk.

Rather, Wilkinson argues that the appeal instructions on the form containing Superintendent Bennett's denial of his grievance were sufficiently confusing to render "unavailable" his appeal to CORC. It bears noting that the instructions were not individualized directions from the Superintendent. They were instead preprinted instructions that apparently appear on every DOCS Form 2133. Specifically, the bottom third of the form contains the caption "Appeal Statement." Directly below that heading, the following language is contained:

> If you wish to refer the above decision of the Superintendent, please sign below and return this copy to your Inmate Grievance Clerk. You have

four (4) working days from receipt of this notice to file your appeal. Please state why you are appealing this decision to C.O.R.C.

(Docket # 47, Ex. 4). Wilkinson contends that these instructions were unclear and confusing, leading him to believe that he had two options available: the first to "refer" the Superintendent's decision by returning the form to the Inmate Grievance Clerk; the second to appeal to CORC within four days of the receipt of the form. As to the second option, he further maintains, the instructions did not obligate him to file with the Clerk, rather than to forward his appeal directly to CORC, as he did.

For the reasons discussed *infra,* I do not believe that Wilkinson's interpretation of the challenged language was reasonable. That fact, coupled with the absence of any evidence suggesting that defendants or other DOCS personnel said or did anything to preclude or dissuade Wilkinson from filing his appeal to CORC with the Inmate Grievance Clerk, compels the conclusion that administrative remedies were in fact available to Wilkinson. *See Hemphill,* 380 F.3d at 688 ("[t]he test for deciding whether the ordinary grievances were available must be an objective one: that is, would a similarly situated individual of ordinary firmness have deemed them available") (internal quotations omitted).

**2. Did Special Circumstances Exist to Justify Wilkinson's Failure to Comply with Grievance Procedures?:** In *Giano,* the Second Circuit made clear that "there are certain special circumstances in which, though administrative remedies may have been available and though the defendant may not have been estopped from asserting the affirmative defense of non-exhaustion, the prisoner's failure to comply with administrative procedural requirements may nevertheless have been justified." *Giano,* 380 F.3d at 676 (citing *Berry v. Kerik,* 366 F.3d 85, 87-88 (2d Cir.2004)) (internal quotation omitted). Whether non-compliance is in fact justified must be judged by examining "the circumstances which might understandably lead usually uncounselled prisoners to fail to grieve in the normally required way." *Id.* at 678.

**\*9** Such circumstances, the court has further clarified, may include a prisoner's reliance on a reasonable, if ultimately

incorrect, interpretation of prison grievance regulations. *Hemphill,* 380 F.2d at 690; *Giano,* 380 F.3d at 678-79. In *Giano,* for example, the court held that a prisoner's failure to file a separate grievance as to the incident giving rise to the federal claim was justified by his reasonable belief that DOCS regulations provided that his sole recourse was to appeal his related disciplinary conviction. *Giano,* 380 F.3d at 678-79. In *Hemphill,* the court remanded the case to the district court to determine, "in light of *Giano,"* whether the prisoner's interpretation of DOCS regulations to permit him to seek relief directly from the superintendent was reasonable and justified his failure to file a grievance with the IGRC. *Hemphill,* 380 F.3d at 689-90.

I read *Giano* and *Hemphill* to require that a prisoner's mistaken construction of DOCS regulations or directions be *reasonable,* an interpretation that is consonant with the view taken by other lower courts. *See, e.g., Dukes v. Doe,* 2006 WL 1628487, *6 (S.D.N.Y. June 12, 2006); *Barad v. Comstock,* 2005 WL 1579794 at *7; *Jeffers v. Goord,* 2005 WL 928628 at *7. *Accord Brownell v. Krom,* 446 F.3d 305, 313 (2d Cir.2006); *Johnson v. Testman,* 380 F.3d 691, 697 (2d Cir.2004). In this case, Wilkinson maintains that he reasonably understood the directions on Form 2133 to afford him two different avenues to seek redress of the Superintendent's denial of his grievance: to "refer" that decision by forwarding a copy of it to the Inmate Grievance Clerk or to appeal it to CORC within four days. (Docket # 50 at 11). Because I find such an interpretation to be objectively unreasonable, even if genuine, I further find that Wilkinson's non-compliance cannot be considered justified by special circumstances.

First, the belief that DOCS rules afforded a prisoner dissatisfied with a Superintendent's grievance decision two separate avenues of review is belied by the heading placed directly above the instructions. That heading states "Appeal Statement," contains the challenged instructions and provides room for the prisoner to write a response to the instructions, "Please state why you are appealing this decision to C.O.R.C." The heading does not identify or suggest two options, appeal or referral.

Moreover, the specific instructions themselves, interpreted the way Wilkinson argues, make little sense. If "referral" is a review option distinct from appeal to CORC, the directions do not indicate to whom or what body the referral is being made.

It would be reasonable to expect that if a prisoner is to make a choice between review of one type or another, he would be provided at the very least with the identities of the reviewing parties. In addition, the directions provide that an appeal to CORC must be taken within four days, while they contain no similar instructions concerning the time frame within which a referral must be made. Conversely, the instructions for referral prescribe the manner of filing, that is, by returning the form to the Inmate Grievance Clerk, while the instructions for appeal contain no such prescription. Only by taking the instructions as a whole, and reading them to refer to a prisoner's right to appeal to CORC, do they make sense. Read together in this manner, the instructions identify the body by whom review may be sought (CORC), the manner in which review may be sought (by forwarding the form to the Inmate Grievance Clerk) and the deadline by which review may be sought (four days from receipt of the Superintendent's decision).

**\*10** The manner of filing grievances and appeals thereof, that is, by forwarding them to the Inmate Grievance Clerk, cannot be considered a trivial procedural requirement. As Director Eagen has explained, this requirement ensures that grievances are logged into a central, systemwide database and uniformly and efficiently processed. (Docket # 41, ¶ 5). When an appeal to CORC is received by a Clerk, the appeal is inputted and an acknowledgment of receipt of the appeal is then sent to the prisoner. That receipt, of course, facilitates the prisoner's ability to demonstrate that he timely filed in the event that he does not receive a disposition by CORC. In addition, processing grievances and appeals in a uniform manner helps to keep together the relevant documents related to the grievance, enabling the Clerk to forward to CORC all necessary paperwork relating to a particular appeal. *See* 7 N.Y.C.R.R. § 701.7(c)(2). Considering the legitimate and important policies served by the filing requirement, as well as the fact that it was one of only two instructions for filing appeals to CORC (where to file and when to file), Wilkinson's failure to file his appeal with the Clerk should not be viewed as insubstantial noncompliance. [7]

Finally, although Wilkinson does not explicitly argue that his procedural non-compliance should be excused under the second *Giano/Hemphill* caveat-whether defendants' actions estop them from raising the defense of failure to exhaust-Wilkinson's reliance on *Warren v. Purcell,* 2004 WL 1970642 (S.D.N.Y. Sept.3, 2004), may be read to suggest such a contention. [8] (Docket # 50 at 15-16). In *Warren,* the prisoner filed a grievance relating to medical inattention, which was

returned to him with instructions to "feel free to correct the noted problems and to resubmit the grievance." *Id.* at \*6. The form also stated that the grievance "needs to be investigated [and][i]t will take a minute before a response." *Id.* According to the court, those apparently conflicting statements-that the prisoner needed to refile and that the prisoner should await the results of DOCS's investigation-estopped the defendants from relying on the defense on non-exhaustion. *Id.* at 6 (it was "wholly due to [DOCS's] own failure to provide simple guidance on how appropriately to proceed that plaintiff failed to exhaust his administrative remedies").

Because I find that the instructions at issue in this case, unlike those at issue in *Warren,* were not inconsistent or unclear, Wilkinson's reliance on *Warren* is misplaced. Moreover, Wilkinson has pointed to no actions or statements other than the challenged instructions on which an estoppel argument may be premised. *See Ruggiero,* 467 F.3d at 178 ("[i]n our prior cases recognizing that defendants' actions may estop them from raising non-exhaustion as a defense, each prisoner alleged that defendants took affirmative action to prevent him from availing himself of grievance procedures"). Thus, even if Wilkinson's brief could be read to contain an estoppel argument, I find it to be no more availing than his other arguments to excuse his procedural non-compliance.

**\*11 E. *Does the Dispute Whether Wilkinson Received Eagen's Letter Preclude Summary Judgment?:*** Wilkinson's final argument is that the factual dispute concerning his receipt of Director Eagen's letter precludes summary judgment. (Docket # 50 at 20-21). I disagree.

For purposes of this motion, I agree with Wilkinson that a factual dispute exists whether he in fact received Director Eagen's letter dated August 9, 2001, informing him that his appeal document was being returned to him because it had not properly been filed. While Eagen affirms he sent it (Docket # 41, ¶ 6), Wilkinson swears he did not receive it. (Docket # 49, ¶ 20). In my opinion, this dispute is not material to this motion. I recommend that judgment be granted in favor of defendants because I find that Wilkinson's interpretation of the Superintendent's directions, which he offers as justification for his failure to comply with proper grievance procedures, was unreasonable and thus could not constitute special circumstances. Whether he received Director Eagen's letter does not change that analysis. [9]

Accordingly, I find that Wilkinson failed to exhaust his administrative remedies, and it is therefore my

recommendation that defendants' motion for summary judgment on that basis be granted.

### CONCLUSION

For the foregoing reasons, it is the recommendation of this Court that defendants' motion for summary judgment on the grounds of non-exhaustion **(Docket # 40)** be **GRANTED.**

Pursuant to 28 U.S.C. § 636(b)(1), it is hereby **ORDERED,** that this Report and Recommendation be filed with the Clerk of the Court.

**ANY OBJECTIONS** to this Report and Recommendation must be filed with the Clerk of this Court within ten (10) days after receipt of a copy of this Report and Recommendation in accordance with the above statute, Fed.R.Civ.P. 72(b), 6(a) and 6(e) and Local Rule 72.3(a)(3).

The district court will ordinarily refuse to consider on *de novo* review arguments, case law and/or evidentiary material which could have been, but was not, presented to the magistrate judge in the first instance. *See e.g.* Paterson-Leitch Co., Inc. v. Massachusetts Mun. Wholesale Elec. Co., 840 F.2d 985 (1st Cir.1988).

*Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order.* Thomas v. Arn, 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); Small v. Secretary of Health and Human Servs., 892 F.2d 15 (2d Cir.1989); Wesolek v. Canadair Ltd., 838 F.2d 55 (2d Cir.1988).

The parties are reminded that, pursuant to Rule 72.3(a)(3) of the Local Rules for the Western District of New York, "written objections shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for such objection and shall be supported by legal authority." *Failure to comply with the provisions of Rule 72.3(a)(3), or with the similar provisions of Rule 72.3(a)(2) (concerning objections to a Magistrate Judge's Decision and Order), may result in the District Court's refusal to consider the objection .*

 **\*12** Let the Clerk send a copy of this Order and a copy of the Report and Recommendation to the attorneys for the Plaintiff and the Defendant.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in F.Supp.2d, 2007 WL 2693636

### Footnotes

1    The full text of the regulations in effect at the relevant time are attached as Exhibit 1 to the Affirmation of Betsy Hutchings, dated October 17, 2005 (Docket # 47), submitted in opposition to the pending motion.

2    Although the parties have not briefed the effect of *Woodford* on the facts of this case, I do not believe that such briefing is necessary. If anything, the standard enunciated in *Woodford* is stricter than that set forth in *Giano* and *Hemphill.* Because I find that even under application of the *Giano/Hemphill* caveats, Wilkinson has failed to exhaust, supplemental briefing concerning an equivalent or stricter standard would serve no useful purpose.

3    I easily reject defendants' contention that the document Wilkinson sent to CORC should not be considered an appeal, but should rather be viewed as correspondence. (Docket # 52 at 2). There is no requirement that a grievance be filed on a particular form. *See* 7 N.Y.C.R.R. § 701.7(a)(1).

   Here, Wilkinson's document was captioned, "Appeal of Superintendent's Determination of Inmate Grievance Filed" and contained a preliminary statement, four separate arguments challenging the Superintendent's determination that the grievance was untimely and a conclusion identifying the relief

sought. The document looks and reads much like an appellate brief and should be treated as an appeal. (*See* Docket # 47, Ex. 4).

4    While the grievance itself states that Wilkinson did not file his grievance until thirteen months after the incident out of fear of retaliation by correctional officers at Southport, that fear would not explain his failure to file a grievance for seven months following his transfer from Southport to Elmira.

5    The regulations and directives provide for expedited review by the Superintendent, bypassing the IGRC, of grievances alleging employee "misconduct or harassment." 7 N.Y.C.R.R. §§ 701.11(b) (2) and (3); DOCS Directive 4040 (June 8, 1998), at 11.

6    Section VB.5 of Directive 4040 then in effect provided:

> Within four (4) working days after receipt of the superintendent's written response to the grievance, the inmate or any direct party to the grievance may appeal the superintendent's action to the CORC by filing an appeal (Form # 2133) with the grievance clerk.

DOCS Directive 4040 at 7.

7    Wilkinson argues that his non-compliance should be viewed as inconsequential under the doctrine of substantial compliance. *See* Docket # 50 at 18. Although it is hardly free from doubt whether the doctrine of substantial compliance has any application in this context, *see* *McCoy v. Goord,* 255 F.Supp.2d 233, 246 (S.D.N.Y.2003) ("[t]he standard is not one of ... substantial compliance"), I conclude, for the reasons discussed above, that Wilkinson's failure to file his appeal with the proper official cannot be considered insubstantial compliance.

8    Wilkinson may not have argued estoppel because the DOCS's official whose actions are at issue, the Superintendent of Elmira, is not a defendant and indeed worked at a facility different from the one in which the alleged assault occurred. *Collins v. Goord,* 438 F.Supp.2d at 415 n. 16 ("[a]lthough plaintiff's allegations suggest an estoppel argument, it is appropriate to deny summary judgment on 'availability' grounds because the officials who allegedly obstructed plaintiff's grievance are from a different facility ... than the defendants").

9    In fact, Wilkinson himself states that even if he had received the letter, he still would not have known what to do to properly appeal to CORC. (Docket # 49, ¶ 22).

---

**End of Document**

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

Case 9:22-cv-00102-BKS-ML    Document 78    Filed 12/13/23    Page 121 of 373

Rodriguez v. Cross, Not Reported in Fed. Supp. (2017)

KeyCite Yellow Flag - Negative Treatment

Distinguished by Sawyer v. Locy, N.D.N.Y., December 16, 2020

2017 WL 2791063

Only the Westlaw citation is currently available.

United States District Court, N.D. New York.

Edy RODRIGUEZ, Plaintiff,

v.

J. CROSS, Sergeant, Clinton
Correctional Facility; et al., Defendants.

No. 15-CV-1079 (GTS/CFH)

|

Signed 05/09/2017

**Attorneys and Law Firms**

Edy Rodriguez, East Elmhurst, NY, pro se.

Ryan E. Manley, Harris, Conway & Donovan, Christopher J. Hummel, New York State Attorney General, Albany, NY, for Defendants.

**REPORT-RECOMMENDATION AND ORDER** [1]

Christian F. Hummel, U.S. Magistrate Judge

**\*1** Plaintiff pro se Edy Rodriguez ("Plaintiff"), an inmate who was, at all relevant times, in the custody of the New York Department of Corrections and Community Supervision ("DOCCS"), brings this action pursuant to 42 U.S.C. § 1983, alleging that Sergeant ("Sgt.") J. Cross, Sgt. R. Furnia, Correction Officer ("C.O.") G. Falcon, and C.O. J. Roberts (collectively "Defendants") violated his constitutional rights under the First and Eighth Amendments. Dkt. No. 1 ("Compl."). [2]

Presently pending is defendants' motion for summary judgment pursuant to Federal Rule of Civil Procedure ("Fed. R. Civ. P.") 56(a) for plaintiff's failure to exhaust administrative remedies before commencing this action. Dkt. No. 26. Plaintiff filed a response in opposition to defendants' motion. Dkt. No. 34. Defendants filed a reply. Dkt. No. 39.

**I. Background**

The facts are reviewed in the light most favorable to plaintiff as the non-moving party. See subsection II(A) infra. At the relevant times giving rise to plaintiff's claims, plaintiff was an inmate incarcerated at Clinton Correctional Facility ("Clinton").

On July 10, 2014, plaintiff wrote a letter to Sgt. Cross "complaining about being harassed" by staff at Clinton. Compl. at 4. Plaintiff further alleges that he was taken out of his cell on July 14, 2014, brought to the second floor of the facility's hospital, and subjected to a "beating" by defendants. Compl. at 4-5. Sgt. Cross grabbed him by the hair; Sgt. Furnia punched him; and C.O. Falcon and C.O. Roberts punched him in the face, back, and neck. Id. at 4. Plaintiff alleges "each one of the blows" he suffered was from the named defendants, as well as other officers he cannot identify by name. Id. at 5-6. After the alleged incident, plaintiff was seen by a nurse with "about ten" officers present in the room, where he admits "having no choice," but to tell the nurse that officers had just beat him up. See Affirmation of Christopher J. Hummel ("Hummel Aff."), Dkt. No. 26-1, Exhibit ("Exh.") A [3] at 59-60. [4]

While at Clinton, plaintiff filed five grievances. See Declaration of Christine Gregory ("Gregory Decl."), Dkt. No. 26-3 Exh. A at 6. Only one grievance was appealed. Declaration of Jeffrey Hale ("Hale Decl."), Dkt. No. 26-2 ¶¶ 12-13. The subject matter of the single appealed grievance does not concern the matter before the Court. Id. ¶ 12. The only grievance filed that is pertinent to the pending motion was filed on July 29, 2014. See Gregory Decl. Exh. B at 8. This grievance alleges that plaintiff suffered "an assault by (C.O.)" and, following the assault, did not receive appropriate medical care. Id. The investigation into the July 29, 2014 grievance concluded that plaintiff saw his medical provider, and medicine was given to him without any further action. Id. at 10. The investigation did not mention anything about an assault. Id.

**\*2** Plaintiff alleges that he filed a grievance regarding the incidents described in his complaint, but an unidentified Sergeant destroyed the grievance. Compl. at 2. He also alleges that he was beaten by correction staff for filing the grievance. Id. Plaintiff also states that he filed a handwritten grievance (not on a grievance form) on July 19, 2014, regarding the July 14, 2014 incident. See Hummel Aff. Exh. A at 93. Plaintiff

Case 9:22-cv-00102-BKS-ML   Document 78   Filed 12/13/23   Page 122 of 373

Rodriguez v. Cross, Not Reported in Fed. Supp. (2017)

alleges that he sent a copy of this grievance to his mother and instructed her to send it directly to Clinton "[f]rom outside." Id. at 94. Defendants have no record of this grievance being filed. See Gregory Decl. Exh. A at 6. Plaintiff never inquired further about the July 19, 2014 grievance, but maintains that he has handwritten copies of the grievance since he did not have access to carbon paper when he originally drafted this grievance. See Hummel Aff. Exh. A at 94-95, 96-97. The July 19, 2014 grievance was drafted while plaintiff was in keeplock. Id. at 93.

Plaintiff further alleges, in his response to defendants' motion for summary judgment, that defendants have total control over facility mail and any failure to exhaust administrative remedies occurred because defendants strategically removed grievances from the mailbox to cover up their use of excessive force against plaintiff. See Dkt. No. 34 at 4. Plaintiff further alleges a general belief that there is a pattern of prison officials threatening and retaliating against inmates for filing grievances, thus making administrative remedies unavailable. Id. at 6. Lastly, plaintiff alleges that there is an "unwritten posture" at Clinton where inmates are not given grievance forms unless they provide a clear description of their complaint, or the complaint does not involve staff misconduct. Id. at 8.

## II. Discussion [5]

Plaintiff alleges that defendants retaliated against him in violation of the First Amendment, used excessive force against him in violation of the Eighth Amendment, and violated his Due Process rights under the First and Fourteenth Amendments. See Compl. at 7. Defendants argue that plaintiff's complaint should be dismissed in its entirety as plaintiff failed to exhaust his administrative remedies with respect to the causes of action outlined in the Complaint. See Defendants' Memorandum of Law, Dkt. No. 26-5 at 3.

### A. Legal Standard For Motions Pursuant to Fed. R. Civ. P. 56(a)

"A court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). The moving party has the burden of showing the absence of disputed material facts by providing the Court with portions of "pleadings, depositions, answers

to interrogatories, and admissions on file, together with the affidavits, if any," which support the motion. FED. R. CIV. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). A fact is material if it may affect the outcome of the case as determined by substantive law, such that "a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). "In determining whether summary judgment is appropriate, [the Court] will resolve all ambiguities and draw all reasonable inferences against the moving party." Skubel v. Fuoroli, 113 F.3d 330, 334 (2d Cir. 1997).

To avoid summary judgment, a non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Carey v. Crescenzi, 923 F.2d 18, 19 (2d Cir. 1991) (quoting Matsushita Elec. Indus. Co., Ltd. V. Zenith Radio Corp., 475 U.S. 574, 586 (1986)). A non-moving party must support such assertions by evidence showing the existence of a genuine issue of material fact. Carey, 923 F.2d at 19. "When no rational jury could find in favor of the non-moving party because the evidence to support is so slight, there is no genuine issue of material fact and a grant of summary judgment is proper." Gallo v. Prudential Services, Ltd. Partnership, 22 F.3d, 1219, 1224 (2d Cir. 1994).

**\*3** Where, as here, a party seeks judgment against a pro se litigant, a court must afford the non-movant special solicitude.

See Triestman v. Fed. Bureau of Prisons, 470 F.3d 471, 477 (2d Cir. 2006). As the Second Circuit has stated,

[t]here are many cases in which we have said that a pro se litigant is entitled to "special solicitude," ... that a pro se litigant's submissions must be construed "liberally," ... and that such submissions must be read to raise the strongest arguments that they "suggest," .... At the same time, our cases have also indicated that we cannot read into pro se submissions claims that are not "consistent" with the pro se litigant's allegations, ... or arguments that the submissions themselves do not "suggest," ... that we should not "excuse frivolous or vexatious filings by pro se litigants," ... and that pro se status "does not exempt a party from compliance with relevant rules of procedural and substantive law" ....

Case 9:22-cv-00102-BKS-ML    Document 78    Filed 12/13/23    Page 123 of 373

Rodriguez v. Cross, Not Reported in Fed. Supp. (2017)

*Id.* (citations and footnote omitted); *see also* Sealed Plaintiff v. Sealed Defendant, 537 F.3d 185, 191–92 (2d Cir. 2008).

## B. Exhaustion of Administrative Remedies

The Prison Litigation Reform Act ("PLRA") requires that a prisoner exhaust any administrative remedies available to him or her before bringing an action for claims arising out of his or her incarceration. Porter v. Nussle, 534 U.S. 516, 524 (2002); *see also* Woodford v. Ngo, 548 U.S. 81, 82 (2006). The exhaustion requirement applies " 'to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong.' " Mauldin v. Kiff, No. 11-CV-107-A, 2014 WL 2708434, at *4 (W.D.N.Y. June 16, 2014) (quoting Porter, 534 U.S. at 532). Further, the exhaustion requirement applies even where the prisoner seeks relief not available in the administrative grievance process, such as monetary damages. Porter, 534 U.S. at 524. To exhaust administrative remedies, the inmate must complete the full administrative review process set forth in the rules applicable to the correctional facility in which he or she is incarcerated. Jones v. Bock, 549 U.S. 199, 218 (2007) (internal citation omitted).

Although the Supreme Court has deemed exhaustion mandatory, the Second Circuit has recognized that "certain caveats apply." Ruggiero v. County of Orange, 467 F.3d 170, 175 (2d Cir. 2006) (citation omitted). Until recently, courts in this District followed a three-part test established by the Second Circuit in Hemphill v. New York, 380 F.3d 680, 686 (2d Cir. 2004). Under the test established in Hemphill, a plaintiff's failure to exhaust could be excused if a plaintiff established that his or her failure to exhaust was justified by "special circumstances." *Id.* However, the Supreme Court recently held that "[c]ourts may not engraft an unwritten 'special circumstances' exception onto the PLRA's exhaustion requirement." Ross v. Blake, 136 S. Ct. 1850, 1862 (2016). As such, the special circumstances exception previously promulgated by the Second Circuit in Hemphill is no longer consistent with the statutory requirements of the

PLRA. Williams v. Priatno, 829 F.3d 118, 123 (2d Cir. 2016).

**\*4** Although the Supreme Court's decision in Ross eliminates the "special circumstances" exception promulgated by Hemphill, courts must still consider the PLRA's "textual exception to mandatory exhaustion." Ross, 136 S. Ct. at 1858. Under this exception, courts must determine whether administrative remedies were "available" to a prisoner. *Id.* The Supreme Court identified three circumstances where administrative remedies may be unavailable to a prisoner. First, "an administrative procedure is unavailable when (despite what regulations or guidance materials may promise) it operates as a simple dead end —with officers unable or consistently unwilling to provide any relief to aggrieved inmates." *Id.* at 1859 (citing Booth v. Churner, 532 U.S. 731, 736, 738 (2001)). "Next, an administrative scheme might be so opaque that it becomes, practically speaking, incapable of use." *Id.* Lastly, administrative remedies are unavailable where "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Id.* at 1860.

Here, there is no genuine dispute that at all relevant times, DOCCS had in place a three-step inmate grievance program. N.Y. COMP. CODES R. & REGS. tit. 7, § 701.5. First, the inmate must file a complaint with an inmate grievance program ("IGP") clerk within twenty-one days of the alleged incident. *Id.* at § 701.5(a)(1). An IGP representative has sixteen calendar days to informally resolve the issue. *Id.* at § 701.5(b)(1). If no informal resolution occurs, the Inmate Grievance Review Committee ("IGRC") must hold a hearing within sixteen days of receipt of the grievance and must issue a written decision within two working days after the conclusion of the hearing. *Id.* §§ 701.5(b)(2)(i)-(ii). If the determination is unfavorable to the inmate, the inmate may appeal the IGRC's determination to the facility superintendent within seven calendar days of receipt of the determination. *Id.* § 701.5(c)(1). If the superintendent's determination is unfavorable to the inmate, the inmate may appeal to the Central Office Review Committee ("CORC") within seven days after receipt of the superintendent's determination. *Id.* §§ 701.5(d)(i)-(ii). CORC must "review each appeal, render a decision on the grievance, and transmit its decision to the facility, with reasons stated, for the [inmate], the grievance clerk, the superintendent, and any direct parties within thirty

(30) calendar days from the time the appeal was received." Id. § 701.5(d)(3)(ii).

### 1. Application

First, the Court will address whether there is any genuine dispute that plaintiff failed to exhaust his administrative remedies. Courts in the Second Circuit have consistently held that any informal resolutions or relief outside of the administrative procedures do not satisfy exhaustion requirements. See, e.g., Macias v. Zenk, 495 F.3d 37, 43 (2d Cir. 2007) (holding that regardless of whether prison officials know of plaintiff's complaints in a "substantive sense," procedural exhaustion of remedies must still occur); Ruggiero v. Cty. of Orange, 467 F.3d 170, 177-78 (2d Cir. 2006); Perez v. City of N.Y., No. 14 CIV. 07502(LGS), 2015 WL 3652511, at *4 (S.D.N.Y. June 11, 2015) ("Plaintiff's allegation that he advised others of his grievance does not excuse his failure to exhaust the administrative process.").

Here, subsequent to the alleged events giving rise to the matter before the Court, plaintiff states he and family members contacted the Inspector General's Office to complain about prison conditions and concerns of plaintiff's safety. See Hummel Aff. Exh. A at 89, 90. Such correspondence does not satisfy exhaustion and falls outside of the grievance procedures. See Geer v. Chapman, No. 9:15-CV-952(GLS/ ATB), 2016 WL 6091699, at *5 (N.D.N.Y. Sept. 26, 2016), report and recommendation adopted, No. 9:15-CV-952 (GLS/ATB), 2016 WL 6090874 (N.D.N.Y. Oct. 18, 2016) ("It is well-settled that writing letters to prison officials, or other officials, is insufficient to properly exhaust administrative remedies."); Salmon v. Bellinger, No. 9:14-CV-0827(LEK/DJS), 2016 WL 4411338, at *4 (N.D.N.Y. July 5, 2016), report and recommendation adopted by, No. 9:14-CV-0827(LEK/DJS), 2016 WL 4275733 (N.D.N.Y. Aug. 12, 2016) (holding that letters sent to the Inspector General do not satisfy exhaustion procedures).

**\*5** After the alleged incident of excessive force, plaintiff was seen by a nurse in a room with "about ten" officers present, where he admits "having no choice" but to tell the nurse that the officers had beat him up. Hummel Aff. Exh. A at 59-60. Plaintiff alleges filing grievances on July 19, 2014 and July 29, 2014 that mention the assault. See id. at 93; Gregory Decl. Exh. B at 6, 8-10. Defendants state that there is no record of appeal on any grievances pertaining to the alleged assault. Gregory Decl. ¶ 15. While plaintiff's complaints were aired verbally and in writing, plaintiff failed to utilize the procedures required to exhaust administrative remedies. Timmons v. Schriro, No. 14-CV-6606(RJS), 2015 WL 3901637, at *3 (S.D.N.Y. June 23, 2015) ("[T]he law is well-settled that informal means of communicating and pursuing a grievance, even with senior prison officials, are not sufficient under the PLRA."). Thus, there is no genuine dispute that plaintiff failed to exhaust administrative remedies.

As a result, the Court must determine whether administrative remedies were in fact available to plaintiff. See Ross, 136 S. Ct. at 1858 ("An inmate ... must exhaust available remedies, but need not exhaust unavailable ones"); Mena v. City of New York, No. 13-cv-2430(RJS), 2016 WL 3948100, at *4 (S.D.N.Y. July 19, 2016) (citing Ross, 136 S. Ct. at 1862) ("[T]he lone surviving exception to the PLRA's exhaustion requirement is that embedded in its text: that an inmate need only exhaust those administrative remedies that are 'available' to him."). Plaintiff sets forth three factual arguments as to why administrative remedies were not available to him. First, plaintiff alleges that the grievance procedures were unavailable to him because he was denied access to paper and writing instruments. See Compl. at 3. Next, plaintiff alleges that he was physically beaten when he attempted to take steps to utilize the grievance process. Id. Lastly, plaintiff suggests that he never received a response to his grievance, his mail was tampered with, and his letters were not delivered. See Hummel Aff. Exh. A at 91-92, 94.

### a. Lack of Paper and Pen to Complete Grievance Procedures

The third prong of Ross is triggered by plaintiff's argument that he was denied access to pen and paper, as it shows an alleged attempt to stop him from taking part in the grievance process. When a plaintiff-inmate asserts that a defendant-facility withheld pens, courts have granted summary judgment against a plaintiff when "the record does not show that '[p]laintiff indicated to prison officials that he needed a pen so he could file a grievance or that prison officials refused to provide him a pen for this purpose." Mena v. City of N.Y., No. 12 CIV. 6838(GBD), 2013 WL 3580057, at *2 (S.D.N.Y. July 10, 2013). When an inmate argues that a correction officer denies him access to pen or paper, even assuming the allegations are true, courts examine whether the

Case 9:22-cv-00102-BKS-ML    Document 78    Filed 12/13/23    Page 125 of 373

Rodriguez v. Cross, Not Reported in Fed. Supp. (2017)

inmate was drafting other documents during the same time period, or whether they were able to access materials from other sources. See Williams v. Ramos, No. 13 CV 826(VLB), 2015 WL 864888, at *3 (S.D.N.Y. Feb. 9, 2015) ("It is unclear how plaintiff was able to submit [other] grievances if defendants took his pens and paper and threatened him ... Moreover, when defendants allegedly stole his pens and papers, plaintiff testified he was able to file grievances on his commissary sheet."); Lahoz v. Orange Cty. Jail, No. 08 CIV. 4364(RWS), 2010 WL 1789907, at *3 (S.D.N.Y. Apr. 29, 2010) (stating that an inmate was not deprived of writing materials when he drafted a handwritten letter during the same time period as the grievance process).

Here, the Court notes contradictory statements within the complaint pertaining to plaintiff's access to writing instruments or paper. When prompted as to why facts relating to the complaint were not presented in the grievance program, plaintiff asserts that he was denied a paper or pen. Compl. at 3. However, plaintiff also states that he wrote a grievance, the grievance was destroyed by a Sergeant, and he was beaten in retaliation for writing the grievance. See id. at 2. The only time plaintiff asserts that he was denied a paper and pen was when he was taken to the Special Housing Unit ("SHU")[6] on July 14, 2014 after the alleged incident. See id. at 3; Hummel Aff. Exh. A at 68. In fact, records indicate that plaintiff filed grievances on July 19, July 29, August 4, and November 19 of that same year.[7] Gregory Decl. Exh. A at 6. Plaintiff does not allege any difficulties obtaining a pen and paper after the July 2014 SHU stay, but rather, admits having "a piece of paper that an inmate had and a pen" on at least one occasion. See id. at 94.

**\*6** Lastly, in his response to defendants' motion for summary judgment, plaintiff alleges that there is an "unwritten posture" at Clinton where inmates are not given grievance forms unless they provide a clear description of their complaint, or if their complaint does not involve staff misconduct. Dkt. No. 34 at 8. Such general allegations without any factual support are insufficient to show that procedures were unavailable, coupled with the fact that, grievances can and have been submitted by plaintiff on plain paper. N.Y. COMP. CODES R. & REGS. tit. 7, § 701.5(a)(1) ("If this form is not readily available, a complaint may be submitted on plain paper."); see Veloz v. N.Y., 339 F. Supp. 2d 505, 516 (S.D.N.Y. 2004), aff'd, 178 Fed.Appx. 39 (2d Cir. 2006) (granting summary judgment where plaintiff does not allege that any

specific officer thwarted his efforts to timely file a grievance); Hummel Aff. Exh. A at 94.

Even if the Court assumes that plaintiff was denied access to pen and paper while in the SHU, the grievances filed in July 2014 were filed within the twenty-one calendar days required, and his subsequent failure to exhaust administrative remedies regarding those grievances is unaffected by any denial of pen and paper that occurred in the past. Thus, the Court rejects plaintiff's argument as there is no genuine dispute of fact that administrative remedies were unavailable due a lack of writing instruments or paper.

### b. Allegation that Grievance Was Not Received and Mail Tampering

Courts have long held that where an inmate does not receive a response to a written grievance, the inmate must appeal to the next level of review. See Khudan v. Lee, No. 12-cv-8147(RJS), 2015 WL 5544316, at *5 (S.D.N.Y. Sept. 17, 2015) (dismissing a plaintiff's complaint where plaintiff failed to appeal to the next level of review after not receiving a response to his filed grievance); see also Veloz v. New York, 339 F. Supp. 2d 505, 516 (S.D.N.Y. 2004), aff'd, 178 Fed.Appx. 39 (2d Cir. 2006) ("[P]laintiff's allegation that these particular grievances were misplaced or destroyed by correctional officers ultimately does not relieve him of the requirement to appeal these claims to the next level once it became clear to him that a response to his initial filing was not forthcoming.").

However, recent decisions by courts in the Second Circuit have addressed the availability of administrative remedies when an inmate's grievance is unfiled and unanswered. These cases have focused on the second prong of the Ross test, where a grievance process becomes unusable for an inmate. Ross, 136 S. Ct. at 1859. In Williams v. Priatno, the Second Circuit held that when an inmate's grievance is not filed, "the regulations plainly do not describe a mechanism for appealing a grievance." See 829 F.3d at 126. Thus, "the process to appeal an unfiled and unanswered grievance is prohibitively opaque, such that no inmate could actually make use of it." Id. The Williams ruling relied upon a scenario where an inmate is housed in a SHU and personally gives a grievance to a correction officer, as required by grievance procedures. Id. at 120-21. Additionally, adding to the

"opaque" nature of the procedures, the plaintiff in Williams followed up when he did not receive a response after a week, but was subsequently transferred one week later without any resolution or knowledge of his grievance being filed. Williams, 829 F.3d at 120-21. Ultimately, the Williams Court held that "in giving his grievance to the correction officer, [the plaintiff] exhausted all administrative remedies that were available to him." Id. at 126.

Here, in his September 19, 2016 deposition, plaintiff sets forth facts suggesting prison staff filtered his mail and "when they [saw] grievances" they were thrown to the side, not delivered, "and were never [ ] seen." See Hummel Aff. Exh. A at 91-92. The grievance that plaintiff allegedly filed on July 19, 2014 was sent to the Clinton grievance office by his mother. Id. at 94. Plaintiff never received a response on the grievance or followed up on the status of the grievance. Id. Without concrete facts, plaintiff states that his grievance was not resolved because "no civilian ... picks up your grievances. It's officers." Id. at 91. Plaintiff's allegations of mail tampering are conclusory and weakened by the fact that other correspondence, including complaints, were sent and received during the general time period material to the issues before the Court. Johnson v. Fraizer, No. 16-CV-6096(CJS), 2016 WL 7012961, at *4 (W.D.N.Y. Dec. 1, 2016) ("Plaintiff makes only a conclusory statement that his mailing was not allowed to leave the facility[,] ... his contention ... is belied by his admission that he was able to send other complaints about the matter to various New York State officials at around the same time."); see Hummel Aff. Exh. A at 89, 94 (providing an example where plaintiff successfully sent legal mail to his mother).

*7  In plaintiff's response in opposition to defendants' motion for summary judgment, he raises general complaints about defendants having total control over facility mail and defendants strategically removing grievances from the mailbox to cover up their excessive use of force against plaintiff and other inmates. See Dkt. No. 34 at 2. Plaintiff's bare assertions do not excuse exhaustion requirements. Courts in this Circuit have continuously held that mere contentions or speculation of grievances being misplaced by officers do not create a genuine issue of material fact when there is no evidence to support the allegations. Khudan, 2016 WL 4735364, at *6 (citations omitted) (holding that under Ross, mere stand alone contentions of mail tampering without support and particularity cannot deem administrative remedies unavailable); Veloz, 339 F. Supp. 2d at 516

(holding that summary judgment is proper where the plaintiff contends that officers misplaced his grievances, but offers no evidence to support his claim). In Khudan, the court did not consider or rely upon conclusory allegations when plaintiff attested he "was informed by other [unnamed] inmates that grievances routinely go 'missing.' " Khudan, 2016 WL 4735364, at *6. This is similar to plaintiff's conclusory theory of injustice and displeasure with mail procedures, and other "recurrent pattern[s]" in New York correctional facilities. Dkt. No. 34 at 2, 4; see Khudan, 2016 WL 4735364, at *6 ("Plaintiff's accusations, which 'stand alone' and are 'unsupported,' are insufficient to withstand summary judgment.") (quoting Bolton v. City of N.Y., No. 13-CV-5749(RJS), 2015 WL 1822008, at *2 (S.D.N.Y. Apr. 20, 2015)).

Courts have denied a defendant's motion for summary judgment when faced with an unanswered and unfiled grievance drafted in SHU. See, e.g., Juarbe v. Carnegie, No. 9:15-CV-01485(MAD/DEP), 2016 WL 6901277, at *1, 4 (N.D.N.Y. Nov. 23, 2016). This is distinguishable from plaintiff's alleged July 19, 2014 grievance drafted in keeplock. [8] Such a difference in inmate housing supports the notion that, "the Second Circuit's decision hinged on the 'extraordinary circumstances' specific to the case before it." Mena v. City of N.Y., No. 13-CV-2430(RJS), 2016 WL 3948100, at *5 (S.D.N.Y. July 19, 2016) (quoting Williams, 829 F.3d at 119); see N.Y. COMP. CODES R. & REGS. tit. 7, § 701.7 (explaining that there are different grievance filing procedures for an inmate housed in the SHU). Inmates not housed in the SHU are in a different position to SHU inmates when determining if grievance procedures are "essentially unknowable" or unavailable. Id. at *5 (quoting Ross v. Blake, 136 S. Ct. at 1859).

Plaintiff never followed up on the July 19, 2014 grievance. Hummel Aff. Exh. A at 94-95. However, on July 29, 2014, he filed a grievance in the facility that included medical complaints, but also a reference to the alleged assault on July 14, 2014. See Gregory Decl. Exh. B at 8. The Clinton grievance department received and responded to this grievance. Id. This grievance was not appealed. Id. ¶ 15. Even assuming, as the Court must on this motion, that plaintiff's allegations of mail tampering are true, he did not exhaust his administrative remedies when he failed to appeal the July 29, 2014 grievance to the next level of review. The fact that this grievance was subsequently filed

Case 9:22-cv-00102-BKS-ML   Document 78   Filed 12/13/23   Page 127 of 373

Rodriguez v. Cross, Not Reported in Fed. Supp. (2017)

and not appealed within close proximity to the July 19, 2014 grievance, coupled with three unrelated grievances filed within the next year, demonstrates that plaintiff's situation does not rise to the level where the grievance process is "opaque," unavailable, or unascertainable. See Hill v. Tisch, No. 02CV3901(DRH/AYS), 2016 WL 6991171, at *7 (E.D.N.Y. Nov. 29, 2016) (finding that the plaintiff failed to demonstrate that the grievance "procedures were essentially unknowable"); Gregory Decl. Exh. A at 6.

### c. Allegation that Plaintiff Suffered Retaliation and Physical Beatings

Plaintiff's pleadings also suggest an inquiry under the third prong of Ross, whether "machination, misrepresentation, or intimidation" occurred. See Ross, 136 S. Ct. at 1860. Specifically, plaintiff alleges that he did not comply with the grievance procedures because he was subjected to physical beatings, retaliation, and intimidation after complaining about conditions at Clinton. See Compl. at 3, 4, 7. For these reasons, he believed the grievance procedures were unavailable. See id. at 2-3.

**\*8** Specific threats of retaliation or intimidation by prison employees can render administrative remedies unavailable. Ross, 136 S. Ct. at 1860 & n.3. However, a generalized fear of retaliation is insufficient to overcome a failure to exhaust administrative remedies. Salmon, 2016 WL 4411338, at *5. Estoppel is found where "verbal and physical threats of retaliation, physical assault, denial of grievance forms or writing implements, and transfers" occur showing that defendants acted affirmatively to prevent an inmate from availing him or herself of the grievance procedures. Id. at *5 (quoting Amador v. Andrews, 655 F.3d 89, 103 (2d Cir. 2011)). In Riles, the Second Circuit affirmed a district court's ruling that prison officials' alleged threats did not interfere with exhaustion efforts when plaintiff stated he was threatened "if he pushed the issue," but then subsequently filed a grievance in spite of the alleged threats. See Riles v. Buchanan, 656 Fed.Appx. 577, 581 (2d Cir. 2016) (summary order).

Relying on Ross, courts have carved out factual limitations to the third prong of unavailability concerning fear of retaliation. See, e.g., Aviles v. Tucker, No. 14-CV-08636(NSR), 2016 WL 4619120, at *3-4 (S.D.N.Y. Sept. 1, 2016) (citing

Ross, 136 S. Ct. at 1860). In Aviles, the court noted a longstanding rule that general beliefs of retaliation or fears do not excuse the exhaustion requirement. Aviles, 2016 WL 4619120, at *4 (citations omitted). Circumstances that have met the threshold of unavailability by means of intimidation have included widespread beatings with assertions of fear for one's life, in conjunction with the plaintiff withholding all complaints until he was transferred to a different facility. See, e.g., id. (quoting Thomas v. Cassleberry, No. 03-cv-6394L, 2007 WL 1231485, at *2 (W.D.N.Y. Apr. 24, 2007)). Allegations of threats are conclusory where a plaintiff's allegation "does not indicate who threatened him, when he was threatened, or how he was threatened." See Johnson v. Fraizer, No. 16-CV-6096(CJS), 2016 WL 7012961, at *5 (W.D.N.Y. Dec. 1, 2016). In contrast, this Court has denied a summary judgment motion when a plaintiff alleged he was threatened by a specific correction that the officer would "break [plaintiff's] bones," and another specific correction officer threatened to beat plaintiff "a [sic] inch from life" if he filed a grievance. Galberth v. Durkin, No. 914CV115(BKS/ATB), 2016 WL 3910270, at *3 (N.D.N.Y. July 14, 2016).

Here, plaintiff offers conclusory allegations in his complaint that "[he] was beaten" while attempting to access Clinton's grievance program. Compl. at 2, 3. Plaintiff offers no information of when or how he was threatened or beaten after the July 14, 2014 incident. Some instances of threats alleged by plaintiff refer to a time period before he filed a grievance and he does not state how any specific threat or subsequent act of violence impacted his ability to exhaust administrative remedies related to the events that occurred on July 14, 2014. See Aviles, 2016 WL 4619120, at *4 (finding grievance procedures available where plaintiff offers conclusory allegations of fear and does not substantiate what specific fears or past acts preclude him from advancing in grievance procedures); Harrison v. Stallone, No. 9:06-CV-902(LEK/GJD), 2007 WL 2789473, at *5 (N.D.N.Y. Sept. 24, 2007) ("It has been held that a 'general fear' of retaliation is not sufficient to excuse the exhaustion requirement.... If an inmate could simply state that he feared retaliation, there would no point in having a grievance procedure.") (citations omitted); see, e.g., Hummel Aff. Ex. A at 58. Much of plaintiff's fear is generalized. For instance, he notes that corrections officers become agitated when they see legal mail and "that's when harassment comes." Hummel Aff. Ex. A at 92. By his own admission, plaintiff denies any actual physical force being used against him that prohibited

him from taking part in the grievance program. Hummel Aff. Ex. A at 99; see Salmon, 2016 WL 4411338, at *5 (stating there must be affirmative actions or specific instances of physical assault or threats of retaliation for plaintiff to show unavailability of the grievance process).

**\*9** The Court notes that plaintiff directly contradicted allegations in his complaint by statements made in his deposition. While the complaint alleges conclusory instances of being "beaten by staff," plaintiff admits that other than being cut on his face by an inmate in the yard on October 5, 2015, there has not been any other physical force used against him by inmates or correction officers since July 14, 2014. Hummel Aff. Ex. A at 99; Compl. at 3. This statement contradicts plaintiff's allegations of being beaten by staff. See Williams v. Doe, No. 12-CV-1147(HKS), 2016 WL 4804057, at *5 (W.D.N.Y. Sept. 14, 2016) (granting a motion for summary judgment after noting that any triable issue of fact on exhaustion of administrative remedies can be eliminated when plaintiff's prior representations to the court are "flatly contradict[ed]").

Further, this Court finds that plaintiff's failure to follow the grievance procedures cannot be excused by fears or intimidation, when he simultaneously made his complaints known through other means. After the alleged incident, plaintiff was seen by a nurse in a room with "about ten" officers, where he admits "having no choice," but to tell the nurse that they had beaten him. Hummel Aff. Exh. A at 57-58. Plaintiff also aired his complaints and concerns in writing outside of the grievance procedures, clearly identifying his complaints in full substance, including the identification of those who committed acts against him. See, e.g., Hummel Aff. Exh. A at 93; Gregory Decl. Exh. A at 8. Similarly in Johnson v. Fraizer, the Court rejected plaintiff's argument that administrative remedies were unavailable where the plaintiff alleged he was threatened by correction officers but continued to make and send formal complaints to prison officials and other New York State officials. Johnson v. Fraizer, No. 16-CV-6096 (CJS), 2016 WL 7012961, at *5 (W.D.N.Y. Dec. 1, 2016). By plaintiff's own admission, it is clear that he sought to file the initial grievance and tell others about his complaints, which disprove any claim of intimidation or fear of retaliation. Quick v. Omittee, No. 14-CV-1503(TJM/CFH), 2016 WL 5219732, at *4 (N.D.N.Y. Aug. 11, 2016), report and recommendation adopted, No. 914CV1503 (TJM/CFH), 2016 WL 5107125 (N.D.N.Y. Sept. 20, 2016) (holding

that fear of physical retaliation or assaults does not deem grievance procedures unavailable when plaintiff continuously sought to file complaints with officials). Like in Quick, where the plaintiff filed formal internal grievances and the grievance procedures were deemed available, here the plaintiff alleges drafting two internal grievances outlining the alleged July 14, 2014 incident. See id. at * 4; Hummel Aff. Exh. A at 93; Gregory Decl. Exh. B at 8. Thus, plaintiff has not shown that administrative remedies were unavailable due to intimidation and threats.

In conclusion, the Court finds that defendants have met their burden in showing that there is no genuine issue of material fact as to plaintiff's failure to exhaust administrative remedies. Accordingly, the Court recommends that defendants' motion be granted.

### III. Conclusion

For the reasons stated above, it is hereby

**RECOMMENDED** that defendants' motion for summary judgment (Dkt. No. 26) on plaintiff Edy Rodriguez's complaint (Dkt. No. 1) be **GRANTED**; and it is further

**RECOMMENDED** that plaintiff Edy Rodriguez's complaint (Dkt. No. 1) be **DISMISSED** in its entirety, without prejudice; and it is further

**ORDERED,** that the Clerk of the Court serve a copy of this Report-Recommendation and Order upon the parties in this action, pursuant to local rules.

Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** Roldan v. Racette, 984 F. 2d 85, 89 (2d Cir. 1993); Small v. Sec'y of HHS, 892 F. 2d 15 (2d Cir. 1989); 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72, 6(a), 6(e).

### All Citations

Not Reported in Fed. Supp., 2017 WL 2791063

**Rodriguez v. Cross, Not Reported in Fed. Supp. (2017)**

Case 9:22-cv-00102-BKS-ML    Document 78    Filed 12/13/23    Page 129 of 373

**Footnotes**

1    This matter was referred to the undersigned for report and recommendation pursuant to ⚑ 28 U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(c).

2    On March 27, 2017, this Court granted plaintiff an extension until May 1, 2017 to file a motion to amend his complaint. Dkt. No. 38. The deadline has expired and plaintiff has not filed a motion to amend his complaint.

3    Exhibit A to the Affirmation of Christopher J. Hummel is a transcript of plaintiff's deposition, held on September 19, 2016 at Great Meadow Correctional Facility. See Dkt. No. 26-1.

4    When citing documents within the record, the Court uses the page numbers generated by CM/ECF.

5    All unpublished opinions cited to by the Court in this Report-Recommendation and Order are, unless otherwise noted, attached to this Report-Recommendation and Order.

6    SHUs exist in all maximum and certain medium security facilities. The units "consist of single-occupancy cells grouped so as to provide separation from the general population...." ⚑ N.Y. COMP. CODES R. & REGS. tit. 7, § 300.2(b). Inmates are confined in a SHU as discipline, pending resolution of misconduct charges, for administrative or security reasons, or in other circumstances as required. Id. at pt. 301.

7    Both the August and November grievances are unrelated to the cause of action before the Court. Gregory Decl. Exh. A at 6.

8    "Keeplock is a form of disciplinary confinement segregating an inmate from other inmates and depriving him of participation in normal prison activities." Green v. Bauvi, 46 F.3s 189, 192 (2d Cir. 1995); ⚑ N.Y. COMP. CODES R. & REGS. tit. 7, § 301.6.

---

**End of Document**                                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

2017 WL 2790530
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Edy RODRIGUEZ, Plaintiff,

v.

J. CROSS, Sergeant, Clinton Corr. Fac.; R.
Furnia, Sergeant, Clinton Corr. Fac.; G. Falcon,
Corr. Officer, Clinton Corr. Fac.; and J. Roberts,
Corr. Officer, Clinton Corr. Fac., Defendants.

9:15-CV-1079 (GTS/CFH)
|
Filed 06/27/2017

**Attorneys and Law Firms**

EDY RODRIGUEZ, No. 8951602009, Anna M. Kross
Center, 18-18 Hazen Street, East Elmhurst, New York 11370,
Pro Se.

HON. ERIC T. SCHNEIDERMAN, OF COUNSEL:
CHRISTOPHER J. HUMMEL, ESQ. Assistant Attorney
General, The Capitol Albany, New York 12224, Attorney
General for the State of New York, Counsel for Defendants.

## DECISION and ORDER

HON. GLENN T. SUDDABY, Chief United States District
Judge

 **\*1** Currently before the Court, in this *pro se* prisoner
civil rights action filed by Edy Rodriguez ("Plaintiff")
against the four above-captioned employees of the New
York State Department of Corrections and Community
Supervision at Clinton Correctional Facility in Dannemora,
New York ("Defendants"), are Defendants' motion for
summary judgment seeking dismissal of Plaintiff's Complaint

for failure to exhaust his administrative remedies, and United
States Magistrate Judge Christian F. Hummel's Report-
Recommendation recommending that Defendants' motion be
granted and that Plaintiff's Complaint be dismissed in its
entirety without prejudice. [1] (Dkt. Nos. 26, 40.) Plaintiff has
not filed an Objection to the Report-Recommendation despite
having received an extension of the filing deadline, which has
expired. (Dkt. No. 42.)

After carefully reviewing the relevant papers herein,
including Magistrate Judge Hummel's thorough Report-
Recommendation, the Court can find no clear-error in
the Report-Recommendation. [2] Magistrate Judge Hummel
employed the proper standards, accurately recited the facts,
and reasonably applied the law to those facts. (Dkt. No.
40.) As a result, the Report-Recommendation is accepted
and adopted in its entirety for the reasons set forth therein;
Defendants' motion for summary judgment is granted; and
Plaintiff's Complaint is dismissed in its entirety without
prejudice.

**ACCORDINGLY**, it is

**ORDERED** that Magistrate Judge Hummel's Report-
Recommendation (Dkt. No. 40) is **ACCEPTED** and
**ADOPTED** in its entirety; and it is further

**ORDERED** that Defendants' motion for summary judgment
(Dkt. No. 26) is **GRANTED**; and it is further

**ORDERED** that Plaintiff's Complaint (Dkt. No. 1) is
**DISMISSED** in its entirety without prejudice; and it is further

**ORDERED** that the Clerk of the Court shall enter Judgment
for Defendants and close this action.

**All Citations**

Not Reported in Fed. Supp., 2017 WL 2790530

## Footnotes

1       The Court notes that Assistant Attorney General Christopher J. Hummel is of no relation to U.S. Magistrate
        Judge Christian F. Hummel.

Rodriguez v. Cross, Not Reported in Fed. Supp. (2017)

2    When no objection is made to a report-recommendation, the Court subjects that report-recommendation to only a clear error review. Fed. R. Civ. P. 72(b), Advisory Committee Notes: 1983 Addition. When performing such a "clear error" review, "the court need only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation." *Id.*; *see also Batista v. Walker*, 94-CV-2826, 1995 WL 453299, at *1 (S.D.N.Y. July 31, 1995) (Sotomayor, J.) ("I am permitted to adopt those sections of [a magistrate judge's] report to which no specific objection is made, so long as those sections are not facially erroneous.") (internal quotation marks omitted).

---

**End of Document**                                                © 2023 Thomson Reuters. No claim to original U.S. Government Works.

2017 WL 2790530
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Edy RODRIGUEZ, Plaintiff,

v.

J. CROSS, Sergeant, Clinton Corr. Fac.; R.
Furnia, Sergeant, Clinton Corr. Fac.; G. Falcon,
Corr. Officer, Clinton Corr. Fac.; and J. Roberts,
Corr. Officer, Clinton Corr. Fac., Defendants.

9:15-CV-1079 (GTS/CFH)
|
Filed 06/27/2017

**Attorneys and Law Firms**

EDY RODRIGUEZ, No. 8951602009, Anna M. Kross
Center, 18-18 Hazen Street, East Elmhurst, New York 11370,
Pro Se.

HON. ERIC T. SCHNEIDERMAN, OF COUNSEL:
CHRISTOPHER J. HUMMEL, ESQ. Assistant Attorney
General, The Capitol Albany, New York 12224, Attorney
General for the State of New York, Counsel for Defendants.

## **DECISION and ORDER**

HON. GLENN T. SUDDABY, Chief United States District
Judge

 **\*1** Currently before the Court, in this *pro se* prisoner
civil rights action filed by Edy Rodriguez ("Plaintiff")
against the four above-captioned employees of the New
York State Department of Corrections and Community
Supervision at Clinton Correctional Facility in Dannemora,
New York ("Defendants"), are Defendants' motion for
summary judgment seeking dismissal of Plaintiff's Complaint

for failure to exhaust his administrative remedies, and United
States Magistrate Judge Christian F. Hummel's Report-
Recommendation recommending that Defendants' motion be
granted and that Plaintiff's Complaint be dismissed in its
entirety without prejudice. [1] (Dkt. Nos. 26, 40.) Plaintiff has
not filed an Objection to the Report-Recommendation despite
having received an extension of the filing deadline, which has
expired. (Dkt. No. 42.)

After carefully reviewing the relevant papers herein,
including Magistrate Judge Hummel's thorough Report-
Recommendation, the Court can find no clear-error in
the Report-Recommendation. [2] Magistrate Judge Hummel
employed the proper standards, accurately recited the facts,
and reasonably applied the law to those facts. (Dkt. No.
40.) As a result, the Report-Recommendation is accepted
and adopted in its entirety for the reasons set forth therein;
Defendants' motion for summary judgment is granted; and
Plaintiff's Complaint is dismissed in its entirety without
prejudice.

**ACCORDINGLY**, it is

**ORDERED** that Magistrate Judge Hummel's Report-
Recommendation (Dkt. No. 40) is **ACCEPTED** and
**ADOPTED** in its entirety; and it is further

**ORDERED** that Defendants' motion for summary judgment
(Dkt. No. 26) is **GRANTED**; and it is further

**ORDERED** that Plaintiff's Complaint (Dkt. No. 1) is
**DISMISSED** in its entirety without prejudice; and it is further

**ORDERED** that the Clerk of the Court shall enter Judgment
for Defendants and close this action.

**All Citations**

Not Reported in Fed. Supp., 2017 WL 2790530

---

**Footnotes**

1    The Court notes that Assistant Attorney General Christopher J. Hummel is of no relation to U.S. Magistrate
     Judge Christian F. Hummel.

2 When no objection is made to a report-recommendation, the Court subjects that report-recommendation to only a clear error review. Fed. R. Civ. P. 72(b), Advisory Committee Notes: 1983 Addition. When performing such a "clear error" review, "the court need only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation." *Id.*; *see also Batista v. Walker*, 94-CV-2826, 1995 WL 453299, at *1 (S.D.N.Y. July 31, 1995) (Sotomayor, J.) ("I am permitted to adopt those sections of [a magistrate judge's] report to which no specific objection is made, so long as those sections are not facially erroneous.") (internal quotation marks omitted).

---

**End of Document** © 2023 Thomson Reuters. No claim to original U.S. Government Works.

Case 9:22-cv-00102-BKS-ML    Document 78    Filed 12/13/23    Page 134 of 373

Geer v. Chapman, Not Reported in Fed. Supp. (2016)

2016 WL 6091699
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Pakenauth GEER, Plaintiff,

v.

Officer CHAPMAN, et al., Defendants.

9:15-CV-952 (GLS/ATB)
|
Signed 09/26/2016

**Attorneys and Law Firms**

PAKENAUTH GEER, Plaintiff pro se.

MICHAEL G. McCARTIN, Asst. Attorney General for Defendants.

**REPORT-RECOMMENDATION**

ANDREW T. BAXTER, United States Magistrate Judge

**\*1** This matter has been referred to me for Report and Recommendation pursuant to 🔖 28 U.S.C. § 636(b) and LOCAL RULES N.D.N.Y. 72.3(c). Plaintiff originally filed this action in the Eastern District of New York, against several defendants, alleging violations of his constitutional rights. (Dkt. No. 1, 4). On June 29, 2015, the Honorable Carol Bagley Amon, Chief Judge in the Eastern District of New York found that the complaint did not state a claim for various reasons.[1] (Dkt. No. 5). Chief Judge Amon dismissed without prejudice to plaintiff filing an amended complaint only with respect to his First Amendment retaliation claim. (*Id.*)

On July 22, 2015, the Pro Se Office in the Eastern District of New York received plaintiff's proposed amended complaint. (Dkt. No. 6). The proposed amended complaint alleged that plaintiff's typewriter was "smashed" by defendants Chapman, McFarren, and McMillan. (Dkt. No. 6 at 1). On July 29, 2015, after reviewing the complaint for sufficiency, Chief Judge Amon transferred plaintiff's amended complaint to the Northern District of New York. (Dkt. No. 8). Chief Judge Amon found that "[s]pecifically, he claims that defendant corrections officers, who he alleges are employed at Washington Correctional Facility, took adverse action against him because he has filed lawsuits against other officers and prison officials. (*Id.* at 1). Chief Judge Amon

also found that the events of which plaintiff complained took place in the Northern District of New York. (*Id.* at 2). Thus, venue was improper in the Eastern District, and the case was transferred to the Northern District of New York "in the interest of justice." (*Id.* at 1-3).

On July 30, 2015, prior to the transfer,[2] plaintiff filed a motion to amend the amended complaint. (Dkt. No. 9). On October 14, 2015, the Honorable Gary L. Sharpe, reviewed plaintiff's submissions, including the first amended complaint and plaintiff's newly filed motion to amend. (Dkt. No. 14). Judge Sharpe interpreted plaintiff's first amended complaint as alleging 1) harassment; 2) wrongful destruction of personal property; 3) First Amendment retaliation; and 4) First Amendment denial of access to courts. (Dkt. No. 14 at 5).

Judge Sharpe dismissed plaintiff's first, second, and fourth claims. (Dkt. No. 14 at 6-11). Plaintiff's first and second claims were denied on the merits and on the basis of res judicata because plaintiff brought the same claims in a previously dismissed Northern District of New York action. *Geer v. McFarren*, No. 9:14-CV-0589, Dkt. No. 1. Judge Sharpe noted that plaintiff brought his retaliation claim in 14-CV-589, but that claim had been dismissed "without prejudice." (Dkt. No. 14 at 7, n.7). Judge Sharpe denied plaintiff's motion to amend. (*Id.* at 11-12). Thus, the only remaining claim in this action is that defendants Chapman, McFarren, and McMillan destroyed plaintiff's typewriter in retaliation for plaintiff filing lawsuits against other corrections officers and prison officials as stated in the first amended complaint (Dkt. No. 6).[3] (Dkt. No. 14 at 9).

**\*2** Presently before the court is the defendants' motion for summary judgment pursuant to Fed. R. Civ. P. 56. (Dkt. No. 23). Plaintiff has not responded to the motion, notwithstanding two notices from the court of his response deadline.[4] (Dkt. Nos. 24, 25). For the following reasons, this court agrees with defendants and will recommend dismissal of the amended complaint.

**DISCUSSION**

**I. Facts**

Plaintiff alleges that on April 26, 2014, Officers Chapman and McMillan "ordered" Officer McFarren to smash plaintiff's typewriter at the end of Officer McFarren's "count." (Amended Complaint ("AC") at 1). Plaintiff claims

Case 9:22-cv-00102-BKS-ML    Document 78    Filed 12/13/23    Page 135 of 373

Geer v. Chapman, Not Reported in Fed. Supp. (2016)

that this "order" was issued because plaintiff "filed lawsuits against many officers and officials." (*Id.*) The second page of the amended complaint appears to be a June 13, 2014 letter that plaintiff wrote to Attorney General ("AG") Eric Schneiderman, in which plaintiff mentions that the defendants broke his typewriter,[5] but essentially complains about subsequent events. Plaintiff states that he ordered another typewriter, which allegedly arrived at the facility on June 13, 2014.[6] However, in his letter to AG Schneiderman, plaintiff claims that unnamed officials refused to allow him to pick up the package, even after he was notified of its arrival. (*Id.*)

## II. Summary Judgment

**\*3** Summary judgment is appropriate where there exists no genuine issue of material fact and, based on the undisputed facts, the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56; *Salahuddin v. Goord*, 467 F.3d 263, 272–73 (2d Cir. 2006). "Only disputes over ["material"] facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986). It must be apparent that no rational finder of fact could find in favor of the non-moving party for a court to grant a motion for summary judgment. *Gallo v. Prudential Residential Servs.*, 22 F.3d 1219, 1224 (2d Cir. 1994).

The moving party has the burden to show the absence of disputed material facts by informing the court of portions of pleadings, depositions, and affidavits which support the motion. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party satisfies its burden, the nonmoving party must move forward with specific facts showing that there is a genuine issue for trial. *Salahuddin v. Goord*, 467 F.3d at 273. In that context, the nonmoving party must do more than "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). However, in determining whether there is a genuine issue of material fact, a court must resolve all ambiguities, and draw all inferences, against the movant. *See United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962); *Salahuddin*, 467 F.3d at 272.

## III. Exhaustion of Administrative Remedies

### A. Legal Standards

The Prison Litigation Reform Act, (PLRA), 42 U.S.C. § 1997e(a), requires an inmate to exhaust all available administrative remedies prior to bringing a federal civil rights action. The exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and regardless of the subject matter of the claim. *See Giano v. Goord*, 380 F.3d 670, 675-76 (2d Cir. 2004) (citing *Porter v. Nussle*, 534 U.S. 516, 532 (2002)). Inmates must exhaust their administrative remedies even if they are seeking only money damages that are not available in prison administrative proceedings. *Id.* at 675.

The failure to exhaust is an affirmative defense that must be raised by the defendants. *Jones v. Bock*, 549 U.S. 199, 216 (2007); *Johnson v. Testman*, 380 F.3d 691, 695 (2d Cir. 2004). As an affirmative defense, it is the defendants' burden to establish that plaintiff failed to meet the exhaustion requirements. *See, e.g, Key v. Toussaint*, 660 F. Supp. 2d 518, 523 (S.D.N.Y. 2009) (citations omitted).

The Supreme Court has held that in order to properly exhaust an inmate's administrative remedies, the inmate must complete the administrative review process in accordance with the applicable state rules. *Jones v. Bock*, 549 U.S. at 218-19 (citing *Woodford v. Ngo*, 548 U.S. 81 (2006)). In *Woodford*, the Court held that "proper" exhaustion means that the inmate must complete the administrative review process in accordance with the applicable procedural rules, including deadlines, as a prerequisite to bringing suit in federal court. 548 U.S. at 90-103.

The grievance procedure in New York is a three-tiered process. The inmate must first file a grievance with the Inmate Grievance Resolution Committee ("IGRC"). N.Y. Comp. Codes R. & Regs., tit. 7 §§ 701.5(a)(1) and (b). An adverse decision of the IGRC may be appealed to the Superintendent of the Facility. *Id.* § 701.5(c). Adverse decisions at the Superintendent's level may be appealed to the Central Office Review Committee ("CORC"). *Id.* § 701.5(d). The court also notes that the regulations governing the Inmate Grievance Program encourage the inmate to "resolve his/her complaints through the guidance and counseling unit, the program area directly affected, or other existing channels (informal or formal) prior to submitting a grievance." *Id.* § 701.3(a)

Case 9:22-cv-00102-BKS-ML    Document 78    Filed 12/13/23    Page 136 of 373

Geer v. Chapman, Not Reported in Fed. Supp. (2016)

(Inmate's Responsibility). There is also a special section for complaints of harassment. *Id.* § 701.8.

**\*4** Until recently, the Second Circuit utilized a three-part inquiry to determine whether an inmate had properly exhausted his administrative remedies. *See Brownell v. Krom*, 446 F.3d 305, 311-12 (2d Cir. 2006) (citing *Hemphill v. State of New York*, 380 F.3d 680, 686 (2d Cir. 2004)). The *Hemphill* inquiry asked (1) whether the administrative remedies were available to the inmate; (2) whether defendants' own actions inhibiting exhaustion estops them from raising the defense; and (3) whether "special circumstances" justify the inmate's failure to comply with the exhaustion requirement. *Id.*

However, the Supreme Court has now made clear that courts may not excuse a prisoner's failure to exhaust because of "special circumstances." *Ross v. Blake*, ___ U.S. ___, 136 S. Ct. 1850, 1857) (2016). " '[M]andatory exhaustion statutes like the PLRA establish mandatory exhaustion regimes, foreclosing judicial discretion.' " *Riles v. Buchanan*, No. 15-3336-pr, 2016 WL 4572321, at *2 (2d Cir. Sept. 1, 2016) (quoting *Ross*, ___ U.S. at ___, 136 S. Ct. at 1857). Although *Ross* did away with the "special circumstances" exception, the other two factors in *Hemphill* – availability and estoppel – are still valid. The court in *Ross* referred to "availability" as a "textual exception" to mandatory exhaustion, and "estoppel" has become one of the three factors in determining availability. *Ross*, ___ U.S. at ___, 136 S. Ct. at 1858. Courts evaluating whether an inmate has exhausted his or her administrative remedies must focus on whether those remedies were "available" to the inmate. *Id. See Riles*, 2016 WL 4572321 at *2. An administrative procedure is "unavailable" when

> (1) "it operates a simple dead end – with officers unable or consistently unwilling to provide any relief to aggrieved inmates; (2) it is "so opaque that is [sic] becomes, practically speaking, incapable of use"; or (3) "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation."

*Riles, supra* (quoting *Ross*, ___ U.S. at ___, 136 S. Ct. at 1859-60).

In *Ross*, the Supreme Court gave examples of the circumstances under which each of the above would apply. *Ross*, ___ U.S. at ___, 136 S. Ct. at 1859-60. The first circumstance listed above involves a case in which the relevant "administrative procedure" lacks the authority to provide "any" relief. *Id.* at 1859. The second example is when the administrative procedure "exists," but is so complicated or "opaque" that no ordinary prisoner could "discern or navigate it." *Id.* Finally, administrative remedies are not available if prison administrators prevent inmates from taking advantage of the grievance process by misleading or threatening them, preventing their use of the administrative procedure. *Id.* at 1860.

### B. Application

Defendants argue that plaintiff has failed to exhaust his administrative remedies with respect to his First Amendment retaliation claim. Defendants state that plaintiff failed to grieve the retaliation claim through the DOCCS three-level grievance mechanism. (Def.s' Mem of Law at 3-7). Defendants have filed the declaration of Karen Bellamy, the Director of the Inmate Grievance Program for the Department of Corrections and Community Supervision ("DOCCS"). (Bellamy Decl. ¶ 1) (Dkt. No. 23-2). Director Bellamy states that she has searched the CORC records to determine whether plaintiff ever filed a grievance appeal to the CORC relating to the destruction of plaintiff's typewriter at Washington in April of 2014. (Bellamy Decl. ¶ 2). Director Bellamy declares that there are no such appeals. (*Id.*) She has attached as Exhibit A to her declaration a computer print-out listing the one CORC appeal filed by plaintiff, which is not related to the retaliation issue that he raises in this amended complaint. (Bellamy Decl. ¶ 3 & Ex A). According to the computer print-out, on June 21, 2013, plaintiff filed a grievance complaining that his legal mail was not sent out. (Bellamy Decl. Ex. A at 1). The CORC appeal was decided on January 22, 2014. (*Id.*) It is the only grievance appeal brought by plaintiff that appears on the CORC list of closed cases. (*Id.*)

**\*5** Plaintiff was deposed on February 12, 2016 at Washington Correctional Facility. (Pl.'s Dep.) (Dkt. No. 23-5). At his deposition, plaintiff testified that he wrote letters to the grievance committee, the Attorney General, and the Superintendent, but that was "the extent" of his exhaustion. (Pl.'s Dep. at 44-45). Plaintiff testified that he did not write to anyone else because a previous grievance was denied, and when he wrote to the CORC, "they sent me back to them so

Case 9:22-cv-00102-BKS-ML    Document 78    Filed 12/13/23    Page 137 of 373

Geer v. Chapman, Not Reported in Fed. Supp. (2016)

I say I have wasted my time." (*Id.* at 46). Defense counsel asked:

> Q. You are describing a situation in which you wrote to the Central Office?
>
> A. Yes.
>
> Q. But that was about a different matter not about the typewriter?
>
> A. Yes. I didn't write to them about this, because it's going to be the same. They're going to say I have to put it through a grievance and I have to put it through the superintendent and they don't answer. They won't answer.

(Pl.'s Dep. at 46). It is clear that plaintiff did not file a grievance [7] or appeal it properly because he did not think that he was going to get results, because he filed a previous grievance that was denied. He believed that doing so would be a "waste of time." He believed that he would not get an answer, but had no basis for that statement. The fact that his legal mail grievance was denied at the CORC level did not justify plaintiff's failure to exhaust his retaliation grievance or any other grievance that he may have had. It is well-settled that writing letters to prison officials, or other officials, is insufficient to properly exhaust administrative remedies.

*See* *Macias v. Zenk*, 495 F.3d 37, 44-45 (2d Cir. 2007) (informal steps, putting officials on "notice" are insufficient to exhaust administrative remedies); *Gizewski v. NY DOCCS*, No. 9:14-CV-124, 2016 WL 3661434, at *14 (N.D.N.Y. July 5, 2016) (notice through informal channels, including verbal complaints, is insufficient to exhaust administrative remedies).

As stated above, attached to the complaint, there is a letter that plaintiff "wrote" to the Attorney General on June 13, 2014, stating that the letter was "another" notice of intention to file a claim. (AC at 2). The letter is in reference to the subsequent typewriter incident, and also states that plaintiff has already filed a lawsuit about the broken typewriter. [8] (*Id.*)

This is not a situation in which the administrative procedure was "unavailable" as discussed in *Ross, supra*. The grievance procedure was not complex. Plaintiff was not moved from Washington until long after the incident. Plaintiff was well-aware of how to bring a proper grievance because he had at least one previous grievance that was appealed to the CORC. Finally, there is no claim that the defendants prevented him from filing a grievance regarding the incident. Plaintiff's belief that bringing a grievance would be a waste of his time because it would be denied, or his unfounded belief that "they" would not answer, is not sufficient to justify his failure to exhaust. Thus, plaintiff has failed to exhaust his administrative remedies, and the complaint may be dismissed on that basis.

**\*6 WHEREFORE**, based on the findings above, it is

**RECOMMENDED**, that defendant's motion for summary judgment (Dkt. No. 23) be **GRANTED**, and the complaint **DISMISSED IN ITS ENTIRETY**.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen (14) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993) (citing *Small v. Sec. of Health & Human Servs.*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(e), 72.

Dated: September 26, 2016.

**All Citations**

Not Reported in Fed. Supp., 2016 WL 6091699

## Footnotes

Geer v. Chapman, Not Reported in Fed. Supp. (2019)

Case 9:22-cv-00102-BKS-ML    Document 78    Filed 12/13/23    Page 138 of 373

1    Chief Judge Amon found that some of plaintiff's claims were barred by res judicata, and in addition, his property claims could not be brought in federal court. (Dkt. No. 5 at 3-4, 5-6). Chief Judge Amon also found that plaintiff's claim for retaliation failed to state a claim. (Dkt. No. 5 at 4-5).

2    Although the transfer order was signed on July 29, 2015 (Dkt. No. 8), the case was electronically transferred on August 5, 2015. (Dkt. No. 10).

3    The operative pleading is Dkt. No. 6.

4    On June 23, 2016, plaintiff filed a letter, complaining that, because defense counsel had failed to include an "errata sheet" with his motion, plaintiff could not respond to the motion for summary judgment. (Dkt. No. 26). Plaintiff apparently believed that defendants were required to file such a "sheet" because an "errata sheet" was sent with the transcript of plaintiff's deposition. (Dkt. No. 26). When plaintiff received his copy of his deposition, he appears to have utilized the errata sheet to make arguments about the merits of the action while citing to specific pages of the deposition. Defense counsel responded to plaintiff's allegations, and on June 28, 2016, I issued a Text Order, informing plaintiff that defendants did produce an errata sheet with their deposition transcript. I directed the Clerk to send plaintiff a copy of the errata sheet, but denied plaintiff's "request" that defendants produce another "errata sheet" before plaintiff responded to the summary judgment motion. My June 28, 2016 Text Order was "returned undeliverable" because plaintiff had been released to the Buffalo Federal Detention Center. (Dkt. No. 29). Plaintiff ultimately filed a change of address, indicating that he had been moved to the Federal Detention Center. (Dkt. No. 30). The court sent the Text Order to plaintiff's new address, but plaintiff still failed to respond to the summary judgment motion. (Dkt. No. 31).

5    The letter states that it was "another notice of intention to file a claim, in which my typewriter are [sic] broken by officer McFarren and I've filed a lawsuit for my broken typewriter; so now I've order another typewriter from Union Supply Direct ...." (AC at 2).

6    It appears that plaintiff wrote the letter to the Attorney General on the same day that he was allegedly prevented from obtaining the new typewriter from the package room. The letter also states that the typewriter was "shipped" on June 13, 2014, which is not possible if it arrived on June 13, 2014 and plaintiff wrote the letter on June 13, 2014. However, the court finds that plaintiff may have written the incorrect date or he has interpreted "shipping" as "arriving."

7    During his deposition, plaintiff stated that, before he wrote to the Attorney General, he "wrote" to the superintendent and the grievance committee. (Pl.'s Dep. at 44). Plaintiff stated that he knew they would not respond.

8    Plaintiff may be referring to the lawsuit that he brought in 2014 regarding the broken typewriter that was mentioned by Judge Sharpe in his October 14, 2015 order in this case. *Geer v. McFarren*, No. 9:14-CV-589 (DNH/TWD). The court notes that the complaint in 14-CV-589 states that he filed a grievance with the grievance committee and the superintendent. He also alleged that he sent the complaint to the CORC, but no action was taken. As shown herein, there was no appeal to the CORC of any grievance filed by plaintiff, relating to his claims in this case.

---

**End of Document**                                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

Geer v. Chapman, Not Reported in Fed. Supp. (2016)

Case 9:22-cv-00102-BKS-ML    Document 78    Filed 12/13/23    Page 139 of 373

2016 WL 6090874

Only the Westlaw citation is currently available.

United States District Court, N.D. New York.

Pakenauth GEER, Plaintiff,

v.

Officer CHAPMAN et al., Defendants.

9:15-cv-952 (GLS/ATB)

|

Signed 10/18/2016

**Attorneys and Law Firms**

FOR THE PLAINTIFF: PAKENAUTH GEER, 05-A-1952, BUFFALO FEDERAL DETENTION FACILITY, 4250 Federal Drive, Batavia, New York 14020.

FOR THE DEFENDANTS: HON. ERIC T. SCHNEIDERMAN, New York State Attorney General, The Capitol, OF COUNSEL: MICHAEL G. MCCARTIN, Assistant Attorney General, Albany, New York 12224.

## **ORDER**

Gary L. Sharpe, Senior District Judge

**\*1** The above-captioned matter comes to this court following an Report-Recommendation by Magistrate Judge Andrew T. Baxter, duly filed on September 26, 2016. (Dkt.

No. 32.) Following fourteen days from the service thereof, the Clerk has sent the file, including any and all objections filed by the parties herein.

No objections having been filed, and the court having reviewed the Report-Recommendation for clear error, it is hereby

**ORDERED** that the Report-Recommendation (Dkt. No. 32) is **ADOPTED** in its entirety; and it is further

**ORDERED** that defendants' motion for summary judgment (Dkt. No. 23) be **GRANTED**; and it is further

**ORDERED** that the plaintiff's amended complaint, (Dkt. No. 6), is **DISMISSED IN ITS ENTIRETY**; and it is further

**ORDERED** that the Clerk is directed to close the case; and it is further

**ORDERED** that the clerk of the court serve a copy of this order upon the parties in accordance with this court's Local Rules.

**IT IS SO ORDERED.**

October 18, 2016.

**All Citations**

Not Reported in Fed. Supp., 2016 WL 6090874

---

**End of Document**                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

Cohen v. Welch, Not Reported in Fed. Supp. (2017)

Case 9:22-cv-00102-BKS-ML    Document 78    Filed 12/13/23    Page 140 of 373

2017 WL 3311244
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Matththius COHEN, Plaintiff,

v.

Matthew WELCH, et al., Defendants.

9:16-cv-00593 (FJS/TWD)
|
Signed 07/11/2017

**Attorneys and Law Firms**

MATTTHIUS COHEN, 15-A-4146, Clinton Correctional Facility, P.O. Box 2000, Dannemora, NY 12929, pro se.

HON. ERIC T. SCHNEIDERMAN, Attorney General of the State of New York, OF COUNSEL: RYAN W. HICKEY ESQ., Assistant Attorney General, The Capitol, Albany, NY 12224, Counsel for Defendants.

**ORDER AND REPORT-RECOMMENDATION**

THÉRÈSE WILEY DANCKS, United States Magistrate Judge

**\*1** This matter has been referred to the undersigned for Report and Recommendation by the Honorable Frederick J. Scullin, Jr., Senior United States District Judge, pursuant to 28 U.S.C. § 636(b) and Northern District of New York Local Rule 72.3(c). Pro se Plaintiff Matththius Cohen, an inmate in the custody of the New York State Department of Corrections and Community Supervision ("DOCCS"), brings this action pursuant to 42 U.S.C. § 1983, alleging that on May 13, 2016, Corrections Officer ("C.O.") Welch, C.O. Corrigeux, and Sergeant ("Sgt.") Vesneski subjected him to excessive force and failed to intervene in violation of his Eighth Amendment rights. (See generally Dkt. No. 23.) Presently before the Court is Defendants' motion to dismiss for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6) on the ground that Plaintiff failed to exhaust administrative remedies. (Dkt. No. 26.) Plaintiff has responded in opposition to Defendants' motion. (Dkt. Nos. 29 and 35.) For the reasons set forth below, the Court recommends that Defendants' motion be granted.

**I. BACKGROUND AND PROCEDURAL HISTORY**
The following relevant facts are derived from the face of Plaintiff's amended complaint and are accepted as true for the purposes of deciding the pending motion to dismiss.

Erickson v. Pardus, 551 U.S. 89, 94 (2007).

On May 13, 2016, Plaintiff was performing his assigned duties as a porter at Upstate Correctional Facility ("Upstate") and was "zambonieing [sic] around the controle [sic] tower." (Dkt. No. 23 at 6.[1]) C.O. Welch and several other officers approached the area with an inmate who was under escort to his cell. Id. C.O. Welch yelled at Plaintiff to get out of their way, which Plaintiff did. Id. Shortly thereafter, C.O. Welch tracked Plaintiff down in the B gallery of 11 Building and began yelling at him in a racially offensive manner about Plaintiff's alleged failure to get out of the officers' way. Id. at 7. C.O. Welch also threatened Plaintiff with serious physical harm. Id. at 8. The "work crew officer" told C.O. Welch to "lock [Plaintiff] up." Id. C.O Welch brutally assaulted Plaintiff. Id. Neither C.O. Corrigeux nor Sgt. Vesneski acted to stop the assault. Id. at 9.

Thereafter, while under escort by C.O. Welch, C.O. Corrigeux, and Sgt. Vesneski, C.O. Welch subjected Plaintiff to racial insults and ongoing threats of serious harm. Id. Specifically, C.O. Welch told Plaintiff that if Plaintiff reported the assault, he would suffocate Plaintiff with his pillow during the night. See id. In the course of returning Plaintiff to his cell in 12 Building, C.O. Corrigeux attempted to break the pinky and ring fingers on Plaintiff's right hand by bending them sideways; Sgt. Vesneski directed C.O. Corrigeux to stop. Id. at 10. Plaintiff alleges that he "turned in grievances," to the "IG Office," counselors, program committee, commissioner, and superintendent but they have "never been answerd [sic]." Id. at 2-3.

**\*2** Plaintiff's complaint, signed and dated May 14, 2016, was received by the Court on May 23, 2016. (Dkt. No. 1.) By Decision and Order dated July 25, 2016, only Plaintiff's Eighth Amendment excessive force and failure to intervene claims against C.O. Welch, C.O. Corrigeux, and "Sgt. Doe" survived the Court's sua sponte review. (Dkt. No. 10.) On October 11, 2016, Plaintiff filed an amended complaint substituting "Sgt. Vesneski" for "Sgt. Doe." (Dkt. No. 24.[2])

Case 9:22-cv-00102-BKS-ML    Document 78    Filed 12/13/23    Page 141 of 373

Cohen v. Welch, Not Reported in Fed. Supp. (2017)

Defendants now move to dismiss Plaintiff's amended complaint for failure to state a claim. (Dkt. No. 26.[3]) Plaintiff opposes Defendants' motion. (Dkt. Nos. 29 and 35.)

## II. LEGAL STANDARD

A defendant may move to dismiss a complaint under Federal Rule of Civil Procedure 12(b)(6) on the ground that the complaint fails to state a claim upon which relief can be granted. In order to state a claim upon which relief can be granted, a complaint must contain, *inter alia*, "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The requirement that a plaintiff "show" that he or she is entitled to relief means that a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is *plausible* on its face.' " *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (emphasis added) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007)). "Determining whether a complaint states a plausible claim for relief ... requires the ... court to draw on its judicial experience and common sense.... [W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged— but it has not shown—that the pleader is entitled to relief." *Id.* at 679 (internal citation and punctuation omitted).

A complaint may be dismissed pursuant to Rule 12(b)(6) only where it appears that there are not "enough facts to state a claim that is plausible on its face." *Twombly,* 550 U.S. at 570. While Rule 8(a)(2) "does not require detailed factual allegations ... it demands more than an unadorned, the-defendant-unlawfully-harmed-me-accusation." *Iqbal,* 556 U.S. at 678 (citation and internal quotations omitted). A complaint which "tenders 'naked assertion[s]' devoid of 'further factual enhancement' " does not suffice. *Id.* (citation omitted).

"In reviewing a complaint for dismissal under Rule 12(b) (6), the court must accept the material facts alleged in the complaint as true and construe all reasonable inferences in the plaintiff's favor." *Hernandez v. Coughlin,* 18 F.3d 133, 136 (2d Cir. 1994) (citation omitted). However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal,* 556 U.S. at 678 (citing *Twombly,* 550 U.S. at 555).

**\*3** Where a party is proceeding *pro se,* the court is obliged to "read [the *pro se* party's] supporting papers liberally, and ... interpret them to raise the strongest arguments that they suggest." *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir. 1994) (citations omitted); *see also Harris v. Mills,* 572 F.3d 66, 72 (2d Cir. 2009) (courts remain obligated to construe *pro se* complaints liberally even after *Twombly*). "The mandate to read the papers of *pro se* litigants generously makes it appropriate to consider a plaintiff's papers in opposition to a defendant's motion to dismiss as effectively amending the allegations of the plaintiff's complaint, to the extent that those factual allegations are consistent with the allegations of the plaintiff's complaint." *Robles v. Bleau,* No. 9:07-CV-0464 (TJM), 2008 WL 4693153, at *6 and n.41 (N.D.N.Y. Oct. 22, 2008)[4] (collecting cases); *see also Donhauser v. Goord,* 314 F. Supp. 2d 119, 121 (N.D.N.Y. 2004) ("where a *pro se* plaintiff is faced with a motion to dismiss, it is appropriate for the court to consider materials outside of the complaint to the extent they 'are consistent with the allegations in the complaint.' "), *vacated in part on other grounds,* 317 F. Supp. 2d 160 (N.D.N.Y. 2004); *see also Gill v. Mooney,* 824 F.2d 192, 195 (2d Cir. 1987) (in reviewing district court's dismissal of *pro se* plaintiff's claim, the Second Circuit considered the plaintiff's affidavit submitted in opposition to motion to dismiss).

## III. DISCUSSION

### A. Exhaustion of Administrative Remedies

Under the Prison Litigation Reform Act ("PLRA"), "[n]o action shall be brought with respect to prison conditions under section 1983 ... by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a); *see also Ross v. Blake,* — U.S. ——, 136 S. Ct. 1850, 1854-55 (2016). "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle,* 534 U.S. 516, 532 (2002). "There is no question that exhaustion is mandatory under

Case 9:22-cv-00102-BKS-ML   Document 78   Filed 12/13/23   Page 142 of 373

Cohen v. Welch, Not Reported in Fed. Supp. (2017)

the PLRA and that unexhausted claims cannot be brought in court." *Jones v. Bock*, 549 U.S. 199, 211 (2007).

Failure to exhaust is an affirmative defense that must be raised by the defendants. *Jones*, 549 U.S. at 216; *Johnson v. Testman*, 380 F.3d 691, 695 (2d Cir. 2004). However, "inmates are not required to specially plead or demonstrate exhaustion in their complaints." *Jones*, 549 U.S. at 216. Nevertheless, dismissal is appropriate if it is clear from the face of the complaint that the plaintiff failed to exhaust administrative remedies. *Id.* at 215-16; *Lee v. O'Harer*, No. 9:13-CV-1022 (TJM/ATB), 2014 WL 7343997, at *3 (N.D.N.Y. Dec. 23, 2014) ("Dismissal under Rule 12(b)(6) for failure to exhaust is appropriate if such failure is evidenced on the face of the complaint and incorporated documents.").

The PLRA requires "proper exhaustion," which means using all steps required by the administrative review process applicable to the institution in which an inmate is confined and doing so properly. *Jones*, 549 U.S. at 218 (citing *Woodford v. Ngo*, 548 U.S. 81, 88 (2006)); *see also Amador v. Andrews*, 655 F.3d 89, 96 (2d Cir. 2011) (exhaustion necessitates "using all steps that the [government] agency holds out, and doing so properly") (internal quotations omitted).

In New York State prisons, DOCCS has a well-established three-step Inmate Grievance Program ("IGP"). N.Y. Comp. Codes R. & Regs. ("N.Y.C.R.R.") tit. 7, § 701.5. First, an inmate must file a complaint with the facility's IGP clerk within twenty-one days of the alleged occurrence. *Id.* § 701.5(a)(1). A representative of the facility's Inmate Grievance Resolution Committee ("IGRC") has sixteen calendar days from receipt of the grievance to informally resolve the issue. *Id.* § 701.5(b)(1). If there is no such informal resolution, the full IGRC conducts a hearing within sixteen calendar days of receipt of the grievance, *id.* § 701.5(b)(2), and issues a written decision within two working days of the conclusion of the hearing. *Id.* § 701.5(b)(3).

 **\*4** Second, a grievant may appeal the IGRC's decision to the facility's superintendent within seven calendar days of receipt of the IGRC's written decision. *Id.* § 701.5(c)(1). If the grievance involves an institutional issue (as opposed to a DOCCS-wide policy issue), the superintendent must issue a written decision within twenty calendar days of receipt of the

grievant's appeal. *Id.* § 701.5(c)(3)(ii). Grievances regarding DOCCS-wide policy issues are forwarded directly to the Central Office Review Committee ("CORC") for a decision under the process applicable to the third step. *Id.* § 701.5(c)(3)(i).

Third, a grievant may appeal to CORC within seven working days of receipt of the superintendent's written decision. *Id.* § 701.5(d)(1)(i). CORC is to render a written decision within thirty calendar days of receipt of the appeal. *Id.* § 701.5(d)(3)(ii).

There are also special procedures that may be used when the grievance is categorized as "harassment." *Id.* § 701.8. A grievance alleging harassment by staff may be sent directly to the superintendent, and the superintendent must issue a decision within twenty-five days. CORC has thirty days to resolve any appeal. *Id.* §§ 701.8(f), 701.8(i) (incorporating by reference § 701.5(d)(2)(h)).

As set forth above, at each step of the IGP, a decision must be rendered within a specified time period. "Where the IGRC and/or superintendent do not timely respond, an inmate must appeal 'to the next step.' " *Eleby v. Smith*, No. 9:15-CV-0281 (TJM/DEP), 2017 WL 986123, at *4 (N.D.N.Y. Jan. 9, 2017) (quoting 7 N.Y.C.R.R. § 701.6(g)(2)); *see also Smith v. Kelly*, 985 F. Supp. 2d 275, 281 (N.D.N.Y. 2013) (Suddaby, J.) ("[A]ny failure by the IGRC or the superintendent to timely respond to a grievance ... can—and must—be appealed to the next level ... to complete the grievance process.").

Generally, if a plaintiff fails to follow each of the required three steps of the IGP, including receipt of a decision from CORC, prior to commencing litigation, he has failed to exhaust his administrative remedies as required under the PLRA. *See Ruggerio v. Cnty. of Orange*, 467 F.3d 170, 176 (2d Cir. 2006) ("[T]he PLRA requires proper exhaustion, which means using all steps that the agency holds out, and doing so *properly* (so that the agency addresses the issues on the merits.") (internal quotations and citations omitted)).

While the PLRA mandates exhaustion of administrative remedies, it also "contains its own, textual exception to mandatory exhaustion." *Ross*, 136 S. Ct. at 1858. More specifically, section 1997e(a) provides that only those administrative remedies that "are available" must first be exhausted. 42 U.S.C. § 1997e(a); *see also Ross*, 136

S. Ct. at 1858 ("[T]he exhaustion requirement hinges on the availability of administrative remedies[.]" (quotations and citations omitted)). In the PLRA context, the Supreme Court has determined that "availability" means that "an inmate is required to exhaust those, but only those, grievance procedures that are capable of use to obtain some relief for the action complained of." *Ross*, 136 S. Ct. at 1859 (quotations and internal citations omitted).

The *Ross* Court identified three circumstances in which a court may find that internal administrative remedies are not available to prisoners under the PLRA. *Id.* at 1859-60.[5] First, "an administrative procedure is unavailable when (despite what regulations or guidance materials may promise) it operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates." *Id.* at 1859. "Next, an administrative scheme might be so opaque that it becomes, practically speaking, incapable of use." *Id.* Finally, an administrative remedy is not "available" when "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Id.* at 1860. Whether a plaintiff has exhausted his administrative remedies is a question of law to be decided by the court. *See Snider v. Melindez*, 199 F.3d 108, 113-14 (2d Cir. 1999).

### B. Analysis

**\*5** Defendants argue that it is clear from Plaintiff's filings that Plaintiff failed to exhaust his administrative remedies before filing suit in federal court. (Dkt. No. 26-1 at 8.) The Court agrees.

Specifically, Plaintiff's claims arise from events that took place on May 13, 2016. (Dkt. No. 23 at 6.) Plaintiff also claims he "turned in grievances" to the "IG Office" but they had "never been answered [sic]." *Id.* at 2-3. Plaintiff then filed this action on May 14, 2016, just one day after the alleged incidents. (Dkt. No. 1 at 15.[6]) Plaintiff's complaint was received and formally filed by the Court on May 23, 2016, only ten days after the alleged events occurred. *Id.* Under the regulations, the first step of the grievance process should be completed within sixteen calendar days after receipt of the grievance. 7 N.Y.C.R.R. § 701.5(b). If an inmate appeals an adverse decision to the superintendent, the superintendent must generally decide the issue within twenty calendar days from the time the appeal was received. *Id.* § 701.5(c). Finally,

CORC must decide an appeal within thirty calendar days from the date that such an appeal is filed. *Id.* § 701.5(d).

In light of this procedure and based on the facts alleged in the amended complaint, it is implausible that Plaintiff was able to exhaust his administrative remedies before commencing this action. *See, e.g., Lopez v. Cipolini*, 136 F. Supp. 3d 570, 581-82 (S.D.N.Y. 2015) (dismissing complaint for failure to exhaust where plaintiff commenced action ten days after alleged incidents occurred); *Perez v. City of New York*, No. 14 Civ. 07502 (LGS), 2015 WL 3652511, at \*3 (S.D.N.Y. June 11, 2015) (dismissing action where complaint was signed one week after the events in question allegedly occurred); *Price v. City of New York*, No. 11 Civ. 6170 (TPG), 2012 WL 3798227, at \*3 (S.D.N.Y. Aug. 30, 2012) (granting motion to dismiss where it would have been impossible for the plaintiff to have exhausted his administrative remedies in the twenty-one days between the alleged incident and the filing of his initial complaint).

Plaintiff's claim that he informed other prison officials, including the Commissioner and Superintendent of his grievances, does not excuse his failure to exhaust. (*See* Dkt. No. 23 at 2.) Indeed, it is well-settled that "[s]uch correspondence does not satisfy exhaustion and falls outside of the grievance procedures." *Rodriguez v. Cross*, No. 15-CV-1079 (GTS/CFH), 2017 WL 2791063, at \*4 (N.D.N.Y. May 9, 2017) (collecting cases); *see also Geer v. Chapman*, No. 9:15-CV-952(GLS/ATB), 2016 WL 6091699, at \*5 (N.D.N.Y. Sept. 26, 2016) ("It is well-settled that writing letters to prison officials, or other officials, is insufficient to properly exhaust administrative remedies.").

**\*6** Similarly, Plaintiff's claim that his grievances were never answered does not excuse his failure to exhaust. (*See* Dkt. No. 23 at 3.) As discussed above, a prisoner must proceed through all three levels of the IGP to satisfy the PLRA's exhaustion requirement. "Thus, where a prisoner files a grievance, and the IGRC does not respond, the inmate must nevertheless exhaust his appeals to the facility superintendent and the CORC." *Hernandez v. Coffey*, No. 99-civ-11615 (WHP), 2003 WL 22241431, at \*4 (S.D.N.Y. Sept. 29, 2003); *see also Muhammad v. Corr. Officer Douglas*, No. 15-CV-0935 (NSR), 2016 WL 3082657, at \*4 (S.D.N.Y. May 26, 2016) ("Compliance requires an inmate to appeal properly to the CORC, even if the inmate receives no response from the IGRC at the first step of exhaustion."); *Arce v. Keane*, No. 01 Civ. 2648 (BSJ), 2004 WL 439428, at \*2 (S.D.N.Y. Mar. 9, 2004) ("An inmate's failure to appeal a grievance is not

excused because he has received no response to his initial grievance."). Only after an inmate has properly exhausted all three levels of review, including receipt of a decision from CORC, may an inmate seek relief pursuant to ⚑ Section 1983. *See* ⚑ *Torres v. Carry*, 672 F. Supp. 2d 338, 344 (S.D.N.Y. 2009).

Nevertheless, Plaintiff maintains his administrative remedies were not "available." (Dkt. No. 35.) Specifically, Plaintiff argues that "[w]hen prison [sic] officials fail to timely respond to a grievance, the prisoner has exhausted 'available' administrative remedies under the PLRA." *Id.* at 1. Plaintiff further maintains that his Eighth Amendment claims should not be dismissed because his grievances were not "answerd [sic] in a timly [sic] fashion which made [Plaintiff] feel very unsafe and that [his] life was in danger," thereby leaving Plaintiff with "no other option" but "to file the [§] 1983 for [his] safety." *Id.* Neither argument is convincing.

As an initial matter, Plaintiff claims he turned in grievances to the IG Office, which indicates that the procedure was "available" to him. Further, as discussed above, even if Plaintiff did not receive a timely response from the IGRP, he was required to complete steps two and three of the IGP. *See* ⚑ *Heyliger v. Gebler*, 624 Fed.Appx. 780, 782 (2d Cir. 2015) ("Under the regulations ... if at any step of the grievance process[ ] an inmate did not receive a response within the specified timeframe, he was nonetheless permitted to appeal to the next step. Thus, when [the plaintiff] did not receive a written response from the IGRC, appeal to the superintendent was still an available administrative remedy.") (quotation marks, alteration, citation, and footnote omitted); *see also* ⚑ *Warren v. Bealey*, No. 9:12-CV-1318 (TJM/RFT), 2014 WL 4715863, at *9 n.8 (N.D.N.Y. Sept. 22, 2014) ("in the event that the IGRC or superintendent ... do not respond to an initial grievance within the period prescribed, it remains the prisoner's responsibility to file an appeal with the CORC") (collecting cases). Indeed, "[o]nly upon exhaustion of these three levels of review may a prisoner seek relief pursuant to ⚑ § 1983 in federal court." *Id.* at 9. (citations omitted).

Moreover, to the extent Plaintiff argues "special circumstances" justify his failure to comply with the exhaustion requirements before commencing this action, "that avenue has been foreclosed." ⚑ *Riles v. Buchanan*, 656 Fed.Appx. 577, 581 (2d Cir. 2016). Specifically, the Supreme Court has held that "[c]ourts may not engraft an unwritten 'special circumstances exception' onto the PLRA's exhaustion requirement." ⚑ *Ross*, 136 S. Ct. at 1862; *see also* ⚑ *Williams*, 829 F.3d at 123 (*Hemphill* and *Giano* have been abrogated by *Ross* to the extent those decisions established the "special circumstances" exception from the exhaustion of administrative remedies requirement in the PLRA). As the Second Circuit explained in *Williams*, "*Ross* largely supplants our *Hemphill* inquiry by framing the exception issue entirely within the context of whether administrative remedies were actually available to the aggrieved inmate." ⚑ *Williams*, 829 F.3d at 123.

**\*7** Lastly, any efforts Plaintiff may have made *since* the filing of his complaint would not cure his failure to exhaust because the PLRA requires that administrative remedies be exhausted *before* commencing a lawsuit. *See* 🚩 *Neal*, 267 F.3d at 121 ("[E]xhausting administrative remedies after a complaint is filed will not save a case from dismissal."); *see also* *Chalif v. Spitzer*, No. 9:05-CV-1355 (LEK/DEP), 2008 WL 1848650, at *13 (N.D.N.Y. Apr. 23, 2008) (complete exhaustion must have occurred prior to the time the action was commenced); *e.g.*, *Pettus v. McCoy*, No. 9:04-CV-0471 (TJM), 2006 WL 2639369, at *1 (N.D.N.Y. Sept. 13, 2006) (dismissing action because the inmate-plaintiff filed the complaint "prior to fully completing the administrative review process").

Based upon the foregoing, the Court recommends granting Defendants' Rule 12(b)(6) motion for failure to state a claim.

### C. Dismissal of Action

The Second Circuit has "recognized that failure to exhaust administrative remedies is usually a 'curable, procedural flaw' that can be fixed by exhausting those remedies and then reinstituting the suit." 🚩 *Neal*, 267 F.3d at 123 (quoting ⚑ *Snider v. Melindez*, 199 F.3d 108, 111-12 (2d Cir. 1999)). Thus, where a claim is dismissed for failure to exhaust administrative remedies, dismissal without prejudice is appropriate if the time permitted for pursuing administrative remedies has not expired. ⚑ *Berry v. Kerik*, 366 F.3d 85, 86-87 (2d Cir. 2004); *see, e.g.*, *Pettus*, 2006 WL 2639369, at *1-2 (dismissing complaint without prejudice for failure to exhaust). However, if a prisoner has failed to exhaust available administrative remedies and the time in which to exhaust has expired, it is proper for the court to dismiss the complaint with prejudice because any attempt to exhaust

Cohen v. Welch, Not Reported in Fed. Supp. (2017)

Case 9:22-cv-00102-BKS-ML    Document 78    Filed 12/13/23    Page 145 of 373

would be futile. *Id.* at 86; *see, e.g., Hilbert v. Fischer*, No. 12 Civ. 3843(ER), 2013 WL 4774731, at *7 (S.D.N.Y. Sept. 5, 2013) (collecting cases).

Here, the time in which Plaintiff had to exhaust his May 13, 2016, Eighth Amendment claims has likely expired. However, because Plaintiff has raised an "availability" argument in his opposition to Defendants' motion, out of an abundance of caution and in deference to Plaintiff's *pro se* status, the Court recommends dismissal without prejudice to refile following complete exhaustion of available administrative remedies.

**WHEREFORE**, it is hereby

**RECOMMENDED** that Defendants' Rule 12(b)(6) motion to dismiss (Dkt. No. 26) be **GRANTED**, and it is further

**RECOMMENDED** that Plaintiff's amended complaint (Dkt. No. 23) be **DISMISSED WITHOUT PREJUDICE** for failure to exhaust administrative remedies; and it is further

**ORDERED** that the Clerk provide Plaintiff with a copy of this Order and Report-Recommendation, along with copies of the unpublished decisions cited herein in accordance with the Second Circuit decision in *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam).

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report. [7] Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW**. *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72.

**All Citations**

Not Reported in Fed. Supp., 2017 WL 3311244

## Footnotes

1    Page references to documents identified by docket number are to the numbers assigned by the CM/ECF docketing system maintained by the Clerk's Office.

2    The Court notes that Plaintiff's amended complaint is a photocopy of the original complaint with references to "Sgt. Doe" (also referred to as "[o]n duty [Sergeant] during incident" or "[o]n duty 11 Building [Sergeant]") crossed-out and replaced with the handwritten name "Vesneski." The amended complaint is otherwise identical to the original complaint. (*Compare* Dkt. No. 1 *with* Dkt. No. 23.)

3    On October 26, 2016, C.O. Welch and C.O. Corrigeux filed their motion to dismiss for failure to state a claim. (Dkt. No. 26.) Shortly thereafter, Sgt. Vesneski received a copy of the summons and amended complaint. (Dkt. No. 30.) By text order entered December 21, 2016, Sgt. Vesneski's request to join in the pending motion to dismiss for failure to exhaust administrative remedies was granted. (Dkt. Nos. 32 and 34.)

4    The Court will provide Plaintiff with copies of all unpublished decisions cited herein in accordance with the Second Circuit's decision in *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam).

5    According to the Second Circuit, "the three circumstances discussed in *Ross* do not appear to be exhaustive[.]" *Williams v. Corr. Officer Priatno*, 829 F.3d 118, 123 n.2 (2d Cir. 2016).

6    Under the "prison mailbox rule," a *pro se* complaint submitted by a prisoner is deemed "filed" at the time it was delivered to "prison authorities for forwarding to the court clerk." *Houston v. Lack*, 487 U.S. 266, 276

(1988); ⚑ *Noble v. Kelly*, 246 F.3d 93, 97 (2d Cir. 2001). The date that a complaint is signed is the date that the prisoner is presumed to have handed that complaint to a prison guard for mailing. *See Garraway v. Broome Cnty.*, No. 5:03-CV-0681 (TJM), 2006 WL 931729, at *3-4 (N.D.N.Y. Apr. 7, 2006). The final page of Plaintiff's original complaint is dated May 14, 2016, and bears Plaintiff's signature. (Dkt. No. 1 at 15.)

7    If you are proceeding *pro se* and are served with this Order and Report-Recommendation by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date the Order and Report-Recommendation was mailed to you to serve and file objections. Fed. R. Civ. P. 6(d). If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday. Fed. R. Civ. P. 6(a)(1)(C).

---

**End of Document**                              © 2023 Thomson Reuters. No claim to original U.S. Government Works.

---

2003 WL 22241431
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Jose HERNANDEZ, Plaintiff,

v.

Kevin R. COFFEY, C.O., Lawrence J. Featherston, C.O.
James Chamberlain, Sgt., M. Taylor, Nurse, Defendants.

No. 99 Civ. 11615(WHP).
|
Sept. 29, 2003.

## Synopsis

Inmate brought a pro se § 1983 action against corrections officers, alleging civil rights violations. On a defense motion for judgment on the pleadings, the District Court, Pauley, J., held that the inmate failed to satisfy the Prison Litigation Reform Act's (PLRA) exhaustion requirement.

Motion granted.

West Headnotes (3)

**[1]** **Courts** 🔑 In General; Retroactive or Prospective Operation

Supreme court decision establishing that the Prison Litigation Reform Act (PLRA) requires a prisoner to exhaust every claim he wishes to assert prior to filing a claim in district court applies retroactively to prisoners who filed their suits prior to the Supreme Court's pronouncement. Civil Rights of Institutionalized Persons Act, § 7(a), as amended, 🚩42 U.S.C.A. § 1997e(a).

2 Cases that cite this headnote

**[2]** **Prisons** 🔑 Particular Cases

Inmate's alleged complaint letters to the Commissioner of the New York Department of Corrections, a county district attorney, and the State Police did not satisfy the Prison Litigation Reform Act's (PLRA) exhaustion

requirement. Civil Rights of Institutionalized Persons Act, § 7(a), as amended, 🚩42 U.S.C.A. § 1997e(a); 🚩N.Y. Correction Law § 139; N.Y. Comp.Codes R. & Regs tit. 7, § 701.7(a)(1).

7 Cases that cite this headnote

**[3]** **Civil Rights** 🔑 Criminal Law Enforcement; Prisons

Inmate claiming civil rights violations in connection with an alleged attack by corrections officers failed to satisfy the Prison Litigation Reform Act's (PLRA) exhaustion requirement, as required to file § 1983 suit, where he did not exhaust his administrative appeals or advance any excuse for his failure to exhaust. Civil Rights of Institutionalized Persons Act, § 7(a), as amended, 🚩42 U.S.C.A. § 1997e(a); 🚩N.Y. Correction Law § 139; N.Y. Comp.Codes R. & Regs tit. 7, § 701.7(a)(1).

17 Cases that cite this headnote

## Attorneys and Law Firms

Jose Hernandez, Sullivan Correctional Facility, Fallsburg, New York, Plaintiff, pro se.

Susan H. Odessky, Assistant Attorney General, State of New York, Office of the Attorney General, New York, New York, for Defendants.

*MEMORANDUM AND ORDER*

PAULEY, J.

**\*1** *Pro se* plaintiff, Jose Hernandez, brings this action against defendants Correction Officer Kevin R. Coffey, Corrections Officer Lawrence J. Featherston, Sergeant James Chamberlain, and M. (Michelle) Taylor, all employed at Downstate Correction Facility ("Downstate"), for civil rights violations pursuant to 42 U.S.C. § 1983 (2003). Defendants move for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure based on Hernandez's failure to exhaust his available administrative

remedies prior to the initiation of this action. For the following reasons, defendants' motion is granted.

### Background

The Complaint alleges a horrific attack by the New York State Department of Correctional Services ("DOCS") personnel on Hernandez while he was incarcerated at Downstate. Hernandez was transiting through Downstate to Clinton Correctional Facility ("Clinton") following his appearance in New York State Family Court, King County. Following the attack, Hernandez was warned that if he told anyone about it he would be killed.

The alleged attack and events in its wake occurred on November 5 and 6, 1998. Hernandez commenced this action on November 29, 1999, alleging that the defendants beat him, and denied him medical care, in violation of his constitutional rights to due process and to be free from cruel and unusual punishment.

In his Complaint, and in an affidavit submitted to this Court on May 16, 2002, [1] Hernandez alleges that he exhausted the administrative remedies available to him by sending letters to Glenn S. Goord, the Commissioner of DOCS, the New York State Police, and William B. Grady, District Attorney of the "Poughkeepsie area." [2] Hernandez further indicated that as a result of these letters, no action was taken and "no results" were achieved.

### Discussion

The applicable legal standards for a Rule 12(c) motion for judgment on the pleadings are the same as a Rule 12(b)(6) motion to dismiss for failure to state a claim. *King v. American Airlines, Inc.,* 284 F.3d 352, 356 (2d Cir.2002); *Bunting v. Nagy,* No. 01 Civ. 5716(SHS), 2003 WL 21305339, at *2 (S.D.N.Y. June 6, 2003). The Court must accept as true the allegations contained in the Complaint and draw all reasonable inferences in favor of the nonmoving party. *King,* 284 F.3d at 356; *Burnette v. Carothers,* 192 F.3d 52, 56 (2d Cir.1999). Dismissal of a complaint pursuant to Rule 12(c) is appropriate only where "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley*

*v. Gibson,* 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); *accord Sheppard v. Beerman,* 18 F.3d 147, 150 (2d Cir.1994). Further, as with a 12(b)(6) motion, a *pro se* litigant such as Hernandez is allowed a special latitude in responding to a motion for judgment on the pleadings. *See Bunting,* 2003 WL 21305339, at *2.

Defendants present this Court with a single challenge to the Complaint. Defendants argue that judgment on the pleadings should be granted because, accepting the allegations contained in the Complaint as true and drawing all reasonable inferences in favor of the non-moving party, Hernandez failed to exhaust his administrative remedies as required by *Porter v. Nussle,* 534 U.S. 516, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002). Hernandez contends that he filed both formal and informal grievances, but that no action was taken by DOCS, and thus his remedies should be deemed exhausted. [3]

### I. *Failure to Exhaust Administrative Remedies*
**\*2** As Amended, the Prison Litigation Reform Act of 1996 ("PLRA"), 42 USC § 1997e(a) provides:

> No action shall be brought with respect to prison conditions under section 1983 of this title, or another Federal law, by a prisoner confined in any jail, prison or other correctional facility until such administrative remedies as are available are exhausted.

This provision of the PLRA imposes a mandatory exhaustion requirement on incarcerated plaintiffs prior to filing an action with the Court. *See Porter,* 534 U.S. at 524; *Brown v. Commissioner,* No. 99 Civ. 976(WHP), 2003 WL 1571699, at *3 (S.D.N.Y. Mar.26, 2003); *Baskerville v. Blot,* 224 F.Supp.2d 723, 728-29 (S.D.N.Y.2003); *Harris v. Totten,* 244 F.Supp.2d 229, 232 (S.D.N.Y.2003). The effectiveness of the administrative remedy is no longer a prerequisite to the exhaustion requirement. *Porter,* 534 U.S. at 524.

Prior to the Supreme Court's decision in *Porter,* the law in the Second Circuit was that the " 'prison conditions' phrase

[in the PLRA] cover[ed] only conditions affecting prisoners generally, not single incidents that immediately affect only particular prisoners, such as corrections officers' use of excessive force." *Porter,* 534 U.S. at 516. However, the Supreme Court, in *Porter,* held that "the PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter,* 534 U.S. at 516.

Thus, after *Porter* it is clear that the PLRA requires a prisoner to exhaust every claim he wishes to assert prior to filing a claim in district court. *See Muhammad v. Pico,* No. 02 Civ. 1052(AJP), 2003 WL 21792158, at *7-8 (S.D.N.Y. Aug.5, 2003); *Brown,* 2003 WL 1571699, at *2; *Harris,* 244 F.Supp.2d at 232. Subsequent to *Porter,* courts in the Second Circuit have routinely ruled that excessive force and deliberate indifference claims, such as plaintiff's, are subject to the PLRA's exhaustion requirements. *See, e.g.,* *Lawrence v. Goord,* 304 F.3d 198, 199 (2nd Cir.2002); *Harris,* 244 F.Supp.2d at 232-33. Accordingly, all of Hernandez's claims are subject to the PLRA's exhaustion requirement.

[1] Hernandez argues that he should not be subject to *Porter* because the law in the Second Circuit when he filed this action did not require administrative exhaustion for claims such as his. Assuming *arguendo* that plaintiff's analysis is correct, there is no question that the law as enunciated in *Porter* applies retroactively to prisoners such as Hernandez who filed their suits prior to the Supreme Court's pronouncement in *Porter. See Brown,* 2003 WL 1571699, at *3; *Harris,* 244 F.Supp.2d at 232 n. 2; *Espinal v. Goord,* No. 01 Civ. 6569(NRB), 2002 WL 1585549, at *2 n. 3; *Hemphill v. New York,* 198 F.Supp.2d 546, 549-50 (S.D.N.Y.2002). Moreover, application of the *Porter* rule to plaintiff is neither inequitable nor unconstitutional since the Second Circuit's decisions on which plaintiff relies "were not handed down until well after the time when [plaintiff] failed to file a timely grievance," which in this case was late 1998. *Hemphill,* 198 F.Supp.2d at 550; *see, e.g., Lawrence v. Goord,* 238 F.3d 182 (2d Cir.2001), *vacated by Goord v. Lawrence,* 535 U.S. 901, 122 S.Ct. 1200, 152 L.Ed.2d 139 (2002); *Nussle v. Willette,* 224 F.3d 95 (2d Cir.2000), *vacated by Porter,* 534 U.S. 516, 122 S.Ct. 983, 152 L.Ed.2d 12.

A. *DOCS' Grievance Procedures*

**\*3** [2] DOCS has a well-established three-step administrative inmate grievance program ("IGP") to resolve inmate grievances. *See* N.Y. Correction Law § 139; N.Y. Comp.Codes R. & Regs. tit. 7, § 701 .7(a)(1). The IGP requires the inmate to: (1) file a complaint with the Inmate Grievance Review Committee ("IGRC"); (2) appeal to the facility superintendent; and (3) appeal to the DOCS Central Office Review Committee ("CORC") in Albany. N.Y. Comp.Codes R. & Regs tit. 7, § 701.7(a)(1); *see also* *Brown,* 2003 WL 1571699, at *3 (explaining IGP process); *Harris,* 244 F.Supp.2d at 233 (same); *Hemphill,* 198 F.Supp.2d at 548 (same).

A prisoner's remedies are not deemed exhausted until he goes though all three levels of the IGP. Thus, once an inmate files a grievance, he must exhaust all administrative appeals in order to satisfy the PLRA's exhaustion requirement. [4] *Brown,* 2003 WL 1571699, at *3; *Rivera v. Goord,* 253 F.Supp.2d 735, 746 (S.D.N.Y.2003); *Harris,* 244 F.Supp.2d at 232; *Kearsey v. Williams,* No. 99 Civ. 8646(DAB), 2002 WL 1268014, at *2 (S.D.N.Y. June 6, 2002); *Waters v. Schneider,* No. 01 Civ. 5217(SHS), 2002 WL 727025, at *1-2 (S.D.N.Y. Apr.23, 2002); *Hemphill,* 198 F.Supp.2d at 548-49; *see also Sulton v. Wright,* 265 F.Supp.2d 292, 296 (S.D.N.Y.2003) ("Inmates must therefore exhaust all administrative remedies, at all levels of appeal, in order for their claims to survive a motion to dismiss."); *Sedney v. Hasse,* No. 02 Civ. 2583(DC), 2003 WL 21939702, at *4 (S.D.N.Y. Aug.17, 2003) ("A prisoner has not exhausted his administrative remedies until he goes through all three levels of the grievance procedure."). Prison officials are entitled to require strict compliance with the existing grievance procedures. *Sedney,* 2003 WL 21939702, at *4; *Baskerville,* 224 F.Supp.2d at 730; *Hemphill,* 198 F.Supp.2d at 549. To satisfy the PLRA exhaustion requirement, inmates must follow procedures established by New York State rather than "invent their own grievance procedures." *Hemphill,* 198 F.Supp.2d at 549.

Both in his Complaint and affidavit, Hernandez acknowledges that he never filed a formal IGP grievance for his claims in this action. Instead, he asserts that he

sought to resolve his grievance by writing to Glenn S. Goord, the Commissioner of DOCS, the Dutchess County District Attorney and the State Police in Albany. However, it is well settled that complaint letters to DOCS or prison officials do not satisfy the PLRA's exhaustion requirements. *See Sedney,* 2003 WL 21939702, at *4 (noting that courts have "repeatedly held that complaint letters to the DOCS Commissioner or the facility Superintendent do not satisfy the PLRA's exhaustion requirements."); *Muhammad,* 2003 WL 21792158, at *8 ("District court decisions in this circuit have repeatedly held that complaint letters to DOCS Commissioner or the facility Superintendent do not satisfy the PLRA's exhaustion requirements."); *Harris,* 244 F.Supp.2d at 233 ("However, letters to prison officials do not satisfy the exhaustion requirement of the PLRA where the inmate has failed to follow the established grievance procedures."); *Hemphill,* 198 F.Supp.2d at 549 ("[A] letter to the Superintendent has been expressly held to be 'insufficient' to warrant considering a matter 'effectively grieved.' "); *Beatty v. Goord,* 210 F.Supp.2d 250, 255-56 (S.D.N.Y.2000) (holding that writing letters to the Superintendent is not sufficient to comply with the IGP). The same rationale for requiring strict compliance with the IGP applies with equal force to the State Police and the District Attorney. Thus, Hernandez's complaint letters are insufficient to exhaust his administrative remedies.

**\*4** **[3]** Perhaps recognizing his deficiencies, Hernandez asserts in opposition to defendants' motion, that he filed a timely grievance. (Opp. at 5-6, 9-10.) Specifically, he now claims to have filed a grievance at Clinton on November 10, 1998, but asserts it was never answered, and that he did not receive a grievance number or hearing. (Opp. at 5 & Ex. F.) Hernandez also contends that he sent a request for a response to the chairperson of the inmate grievance office at Clinton on February 15, 2000. (Opp. at 6 & Ex. I.) These new allegations contradict Hernandez's earlier statements concerning his exhaustion efforts. However, this Court need not decide whether to accept Hernandez's new allegations because even if they are true, he still has not properly exhausted his administrative remedies.

As noted above, a prisoner must proceed though all three levels of the IGP to satisfy the PLRA's exhaustion requirement. *Brown,* 2003 WL 1571699, at *3; *Rivera,* 253 F.Supp.2d at 746; *Harris,* 244 F.Supp.2d at 232; *Waters v. Schneider,* No. 01 Civ. 5217(SHS), 2002 WL 727025, at *1 (S.D.N.Y. Apr.23, 2002); *Hemphill,* 198 F.Supp.2d at 548-49. Thus, where a prisoner files a grievance, and the IGRC does not respond, the inmate must nevertheless exhaust his appeals to the facility superintendent and the CORC. *Brown,* 2003 WL 1571699, at *3; *Harris,* 244 F.Supp.2d at 232; *Kearsey,* 2002 WL 1268014, at *2; *Waters,* 2002 WL 727025, at *1; *Hemphill,* 198 F.Supp.2d at 548-49; *see also Saunders v. Goord,* No. 98 Civ. 8501(JGK), 2002 WL 1751341, at *3 (S.D.N.Y. July 29, 2002) ("Even if the plaintiff did not receive responses directed toward some grievances, the plaintiff was required, at a minimum, to make reasonable attempts to appeal those grievances before bringing an action in federal court...."). Hernandez's latest allegations do not establish that he pursued his available appeals within the IGP. Even assuming that plaintiff's request for a response was a level two appeal under the IGP, it is clear that plaintiff never appealed to the CORC in Albany, and thus his claims are unexhausted. *Brown,* 2003 WL 1571699, at *3; *Benitez v. Straley,* No. 01 Civ. 181(RCC), 2002 WL 31093608, at *3 (S.D.N.Y. Sept.18, 2002); *Saunders,* 2002 WL 1751341, at *3; *Kearsey,* 2002 WL 1268014, at *2; *Waters,* 2002 WL 727025, at *1; *Hemphill,* 198 F.Supp.2d at 548.

Finally, Hernandez has not advanced any excuse for his failure to exhaust his administrative remedies under the IGP. The circumstances of this case do not warrant a determination that Hernandez exhausted his administrative remedies. [5] For example, he does not allege that anyone hindered his ability to file a grievance. Although Hernandez alleges that he was threatened with retaliation, he does not allege that those threats hindered him in any way. It is evident that he was not hindered from reporting the alleged incident because he wrote to DOCS officials and the District Attorney's office complaining about the attack at Downstate.

*Conclusion*

**\*5** Accordingly, Hernandez's failure to exhaust available administrative remedies compels judgment on the pleadings in defendant's favor and dismissal of the Complaint. Dismissal of an action for failure to comply with the PLRA's exhaustion requirement is without prejudice. *Morales v.*

*Mackalm,* 278 F.3d 126, 128 (2d Cir.2002) (per curiam). Defendant's motion for judgment on the pleadings is granted and the Complaint is dismissed without prejudice. The Clerk fo the Court is directed to close this case.

**All Citations**

Not Reported in F.Supp.2d, 2003 WL 22241431

## Footnotes

1   At a pre-trial conference on May 3, 2002, this Court directed Hernandez to submit a sworn affidavit explaining how he exhausted his administrative remedies concerning the instant claims, and attaching any copies of grievances or letters he alleges were part of that process. The Court received such an affidavit from Hernandez on May 16, 2002. (Affidavit of Jose Hernandez, dated May 10, 2002 ("Hernandez Aff.").)

2   Plaintiff also notes that he sent a letter complaining about the incidents to then-Chief Judge Thomas P. Griesa of the Southern District of New York. Then-Chief Judge Griesa subsequently replied to plaintiff's letter by sending him instructions on how to file a civil lawsuit. (Hernandez Aff'. ¶ 6.)

3   Defendants attach several documents to their motion for judgment on the pleadings, and argue that the Court may consider them without converting the motion to one for summary judgment under Rule 56 because they are incorporated by reference into the Complaint. Without determining whether defendants are correct, this Court will not consider the documents defendants submitted since this Court finds that defendants' motion must be granted based on the four corners of the Complaint and plaintiff's affidavit.

4   The Second Circuit and some courts in this district have found that a prisoner can be deemed to have informally exhausted his remedies if a resolution of the issue in the prisoner's favor has been reached. *See, e.g., Marvin v. Goord,* 255 F.3d 40, 43 n. 3 (2d Cir.2001); *Sedney v. Hasse,* No. 02 Civ. 2583(DC), 2003 WL 21939702, at *4 (S.D.N.Y. Aug.17, 2003); *Rivera,* 253 F.Supp.2d at 746. Notably, Hernandez alleges precisely the opposite, namely that despite his many pleas and letters, a resolution on this matter was never reached. Thus, he cannot be deemed to have informally exhausted his remedies.

5   Moreover, although Hernandez does not make such an argument, to the extent that he could argue that his noncompliance with the IGP requirements was due to his transfer from Downstate back to Coxsackie the day after the incident, that argument is unavailing. First, "New York's Inmate Grievance Program contains provisions that allow prisoners to pursue grievances even after their transfer out of the facility where their claims arose." *Timmons v. Pereiro,* No. 00 Civ. 1278(LAP), 2003 WL 179769, at *2 (S.D.N.Y. Jan.27, 2003); *see also Delio v. Morgan,* No. 00 Civ. 7167(LTS), 2003 WL 21373168, at *3 (S.D.N.Y. Jun.13, 2003) (rejecting transfer argument and relying on 7 N.Y.C.R.R. § 701.3(k)(2)). Finally, such an argument would indirectly raise a futility argument, and it is well-settled that futility of the administrative remedy is not an excuse for failure to exhaust. *Santiago v. Meinsen,* 89 F.Supp.2d 435, 440-41 (S.D.N.Y.2000); *accord Paulino v. Amicucci,* No. 02 Civ. 208(LAP), 2003 WL 174303, at *3 (S.D.N.Y. Jan.27, 2003).

**End of Document**                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

Case 9:22-cv-00102-BKS-ML    Document 78    Filed 12/13/23    Page 152 of 373

Al Hajj Ash Sheikh Siraj Abdul Aziz Muhammad v...., Not Reported in Fed....

2016 WL 3082657
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

AL HAJJ ASH SHEIKH SIRAJ ABDUL
AZIZ **MUHAMMAD**, Plaintiff,

v.

CORRECTION **OFFICER DOUGLAS**, Defendant.

No.



15

-

CV

-

0935

(NSR)

|

Signed May 25, **2016**

|

Filed 05/26/**2016**

*** Start Section

...

**Attorneys and Law Firms**

Al Hajj Ash Sheikh Siraj Abdul Aziz **Muhammad**, Wallkill, NY, pro se

Yan Fu, New York State Attorney General, New York, NY, for Defendant.

OPINION & ORDER

NELSON S. ROMÁN, United States District Judge

**\*1** Plaintiff Al Hajj Ash Sheikh Siraj Abdul Aziz **Muhammad** brings this action *pro se* against Defendant Correction **Officer Douglas** relating to Defendant's order that Plaintiff remove his beard while incarcerated at Downstate Correctional Facility ("Downstate") and Plaintiff's subsequent keeplock confinement.[1] Before the Court is Defendant's motion to dismiss (ECF No. 23). For the following reasons, Defendant's motion to dismiss is GRANTED.

**BACKGROUND**

The following facts are derived from the § 1983 Complaint filed by Plaintiff (ECF No. 2) and Plaintiff's opposition papers (ECF No. 22).[2] Defendant submitted additional materials in support of the motion to dismiss, including an affidavit of Jeffrey Hale (Assistant Director of the Inmate Grievance Program at the New York State Department of Corrections and Community Supervision ("DOCCS")) and a printout record of Plaintiff's grievances. (ECF...

*** Start Section

.... Because Plaintiff has not been given an opportunity to respond to a motion for summary judgment, the Court will not convert the motion and will only consider the allegations in the Complaint and Plaintiff's opposition papers. *See Hernandez v. Coffey*, 582 F.3d 303, 307 (2d Cir. 2009) (quoting ⚑ *Groden v. Random House, Inc.*, 61 F.3d 1045, 1052 (2d Cir. 1995)) ("a district court acts properly in converting a motion for judgment on the pleadings into a motion for summary judgment when the motion presents matters outside the pleadings," so long as "the court give[s] 'sufficient notice to an opposing party and an opportunity for that party to respond'.").

**\*2** On June 26, 2012, Plaintiff was received into custody by DOCCS at Downstate. (Compl. at III.B.) Defendant was the **officer** assigned to reception that day. (*Id.*) Plaintiff informed Defendant that in his property bag he possessed a court order from the New York State Supreme Court exempting Plaintiff from complying with DOCCS Directive 4914, which requires an inmate to shave his face (the "State Court Order"). (*Id.* at IV.) Plaintiff showed Defendant the State Court Order, but Defendant ordered Plaintiff to have his beard removed. (*Id.*) Plaintiff refused to sit in the barber chair, was charged with disobeying a direct order, and was placed in keeplock until his hearing. (*Id.*) Plaintiff was placed in keeplock for 10 days. (Plaintiff's Response to Defendant's Motion to Dismiss ("Pl.'s Opp."), ECF No. 22 at 4.) At his hearing, Plaintiff presented the hearing **officer** with the State Court Order and also pointed out that the version of DOCCS Directive 4914 in the reception area at Downstate was outdated. (Compl. At IV.) Thereafter, the hearing **officer** dismissed Plaintiff's ticket. (*Id.*)

Plaintiff contends that as a result of being confined in keeplock, he suffered "psychological deprivation from

Case 9:22-cv-00102-BKS-ML    Document 78    Filed 12/13/23    Page 153 of 373

Al Hajj Ash Sheikh Siraj Abdul Aziz Muhammad v...., Not Reported in Fed....

religious services"; was "subjected to cold meals"; and was segregated from the general prison population during recreation time. (*Id.* at IV.A.) He also suffered physical injuries to his right knee after falling off his bed. (*Id.*)

Plaintiff alleges that he informed the Inmate Grievance Resolution Committee ("IGRC") at Downstate about Defendant's conduct. (*Id.* at II.B.) In particular, Plaintiff alleges he mailed a formal grievance to the IGRC. (Pl.'s Opp. at 4-5, Ex. G.) Plaintiff later wrote to the IGRC at Downstate regarding the disposition of the grievance, and on September 17, 2012, Plaintiff received a response...

*** Start Section

... the elements of a cause of action will not do." *Starr v. Sony BMG Music Entm't*, 592 F.3d 314, 321 (2d Cir. 2010). A court should accept non-conclusory allegations in the complaint as true and draw all reasonable inferences in the plaintiff's favor. *Ruotolo v. City of N.Y.*, 514 F.3d 184, 188 (2d Cir. 2008). "[T]he duty of a court 'is merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof.' " *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 113 (2d Cir. 2010) (quoting *Cooper v. Parsky*, 140 F.3d 433, 440 (2d Cir. 1998)).

"*Pro se* complaints are held to less stringent standards than those drafted by lawyers, even following *Twombly* and *Iqbal.*" *Thomas v. Westchester*, No. 12-CV-6718 (CS), 2013 WL 3357171 (S.D.N.Y. July 3, 2013); *see also Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009). The court should read *pro se* complaints "to raise the strongest arguments that they suggest." *Pabon v. Wright*, 459 F.3d 241, 248 (2d Cir. 2006). Even so, "pro se plaintiffs ... cannot withstand a motion to dismiss unless their pleadings contain factual allegations sufficient to raise a right to relief above the speculative level." *Jackson v. N.Y.S. Dep't of Labor*, 709 F. Supp. 2d 218, 224 (S.D.N.Y. 2010) (internal quotation marks omitted). Dismissal is justified where "the complaint lacks an allegation regarding an element necessary to obtain relief," and the "duty to liberally construe a plaintiff's complaint [is not] the equivalent of a duty to rewrite it." *Geldzahler v. N.Y. Med. Coll.*, 663 F. Supp. 2d 379,...

*** Start Section
... shall be brought with respect to prison conditions under section 1983 of this title ... by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). "The PLRA's exhaustion requirement 'applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong.' " *Giano v. Goord*, 380 F.3d 670, 675 (2d Cir. 2004) (quoting *Porter v. Nussle*, 534 U.S. 516, 532 (2002)).

Exhausting all remedies "means using all steps that the agency holds out, and doing so properly (so that the agency addresses the issues on the merits)." *Washington v. Chaboty*, No. 09-cv-9199 (PGG), 2015 WL 1439348, at *6 (S.D.N.Y. Mar. 30, 2015) (quoting *Hernandez*, 582 F.3d at 305) (internal quotation marks and citations omitted). A plaintiff must invoke all available administrative mechanisms, including appeals, "through the highest level for each claim." *Varela v. Demmon*, 491 F. Supp. 2d 442, 447 (S.D.N.Y. 2007); *Veloz v. New York*, 339 F. Supp. 2d 505, 514 (S.D.N.Y. 2004). The defendants bear the burden of demonstrating that the plaintiff's claim is not exhausted. *Key v. Toussaint*, 660 F. Supp. 2d 518, 523 (S.D.N.Y. 2009). "[A] motion to dismiss pursuant to Rule 12(b)(6) for failure to exhaust should be granted only if 'nonexhaustion is clear from the face of the complaint.' " *Lopez v. Cipolini*, No. 14-cv-2441 (KMK), 2015 WL 5732076, at *4 (S.D.N.Y. Sept. 30, 2015) (citing *Lovick v. Schriro*, No. 12-cv-7419, 2014 WL 3778184, at *4 (S.D.N.Y. July 25, 2014) (alterations and internal quotation marks omitted)); *Lee v. O'Harer*, No. 13-cv-1022, 2014 WL 7343997, at *3 (S.D.N.Y. Dec. 23, 2014) ("Dismissal under Rule 12(b)(6) for failure to exhaust is appropriate if such failure is evidenced on the face of the complaint and incorporated documents."); *Sloane v. Mazzuca*, No. 04-cv-8266, 2006 WL 3096031, at *4 (S.D.N.Y. Oct. 31, 2006) ("[B]y characterizing non-exhaustion as an affirmative defense, the Second Circuit suggests that the issue of exhaustion is generally not amenable to resolution by way of a motion to dismiss." (internal quotation marks omitted)).

A person detained or incarcerated at a DOCCS facility must exhaust all of the steps of the DOC Inmate Grievance Resolution Program ("IGRP"). *See Robinson v. Henschel*, No. 10-cv-6212 (PGG), 2014 WL 1257287, at *10 (S.D.N.Y. March 26, 2014) ("the PLRA requires complete exhaustion in accordance with the administrative procedures within

Case 9:22-cv-00102-BKS-ML    Document 78    Filed 12/13/23    Page 154 of 373

Al Hajj Ash Sheikh Siraj Abdul Aziz Muhammad v...., Not Reported in Fed....

[DOCCS]") (internal quotation marks and citations omitted). The IGRP provides a three-tiered process for adjudicating inmate complaints: (1) the prisoner files a grievance with the IGRC, (2) the prisoner may appeal an adverse decision by the IGRC to the superintendent of the facility, and (3) the prisoner then may appeal an adverse decision by the superintendent to the CORC. *See* Espinal v. Goord, 558 F.3d 119, 125 (2d Cir. 2009) (citing N.Y. Comp. Codes R. & Regs., tit. 7, § 701.7 (1999)).

Defendant argues that Plaintiff failed to exhaust his grievance because he did not appeal to the CORC. Plaintiff, meanwhile, alleges that he...

*** Start Section

... response from the IGRC that it did not have a record of receiving his grievance and directed Plaintiff to file a grievance at the facility in which he was currently housed (Gouverneur Correctional Facility). (Pl.'s Opp., Ex. G.) Plaintiff contacted the CORC about the underlying incident, but the CORC informed Plaintiff that it had no record of his grievance. (Compl. at C.1.) In his opposition brief, Plaintiff argues that he sent a copy of the State Court Order to the CORC. (Pl.'s Opp. at 5.)

**\*4** Though Plaintiff appears to have attempted to seek redress for his grievance with the IGRC and the CORC, case law is clear that "[a]n inmate must fully comply with the procedural rules of the local administrative agency." *Harris v. Gunsett*, No. 12-cv-3578 (PAC) (JCF), 2013 **WL** 3816590, at *1 (S.D.N.Y. July 22, 2013) (citing *Espinal*, 558 F.3d at 124). Compliance requires an inmate to appeal properly to the CORC, even if the inmate receives no response from the IGRC at the first stage of exhaustion. *See* Torres v. Carry, 691 F. Supp. 2d 366, 370 (S.D.N.Y. 2009) (citing *Arce v. Keane*, No. 01-cv-2648, 2004 **WL** 439428, at *2 (S.D.N.Y. Mar. 9, 2004) ("An inmate's failure to appeal a grievance is not excused because he has received no response to his initial grievance."); *Hernandez v. Coffey*, No. 99-cv-11615, 2003 **WL** 22241431, at *4 (S.D.N.Y. Sept. 29, 2003) ("where a prisoner files a grievance, and the IGRC does not respond, the inmate must nevertheless exhaust his appeals to the facility superintendent and the CORC")). It is apparent from the face of the Complaint that Plaintiff did not properly exhaust his grievance. Even assuming Plaintiff did file a grievance with the IGRC, as he alleges, Plaintiff failed to appeal that grievance to the CORC. Indeed, Plaintiff was on notice that he had not properly appealed his grievance to the CORC as

Plaintiff affirmatively alleges that the CORC informed him that it did not have a copy of the grievance. (Compl. at C.1.)

## II. Plaintiff Is Exempt From Exhaustion

The Second Circuit has recognized three situations in which a plaintiff is not required to satisfy the PLRA exhaustion requirement. *Hemphill v. New York*, 380 F.3d 680, 686 (2d Cir. 2004). [3] *See also* Morrison v. Parmele, 892 F. Supp. 2d 485, 488 (W.D.N.Y. 2012), *aff'd*, 2013 **WL** 3214625 (2d Cir. 2013). The failure to exhaust administrative remedies may be excused or Plaintiff's claim may be deemed exhausted: (1) when administrative remedies are not available to the prisoner, (2) when the defendants waive the defense by failing to raise or preserve it, or acted in such a manner that they are estopped from raising it, or (3) when special circumstances exist to justify the prisoner's failure to comply with the exhaustion requirement. *Hemphill*, 380 F.3d at 686.

The test for determining the availability of administrative remedies is "an objective one: that is, would a similarly situated individual of ordinary firmness have deemed them available." *Hemphill*, 380 F.3d at 688 (internal citation and quotation omitted). A remedy must afford " 'the possibility of some relief for the action complained of.' " *Abney v. McGinnis*, 380 F.3d 663, 667 (2d Cir. 2004) (quoting *Booth v. Churner*, 532 U.S. 731, 738 (2001)). "In some circumstances, a defendant's behavior will render an administrative remedy unavailable." *Sloane*, 2006 **WL** 3096031 at *6 (citing *Hemphill*, 380 F.3d at 687).

In *Cruz v. Lee*, this Court determined that the plaintiff was excused from exhausting his grievance regarding retaliation because the administrative grievance process appeared to be unavailable to the plaintiff. No. 14-cv-4870 (NSR) (JCM), **2016 WL** 1060330, at *5 (S.D.N.Y. Mar. 15, **2016**). In that case, the plaintiff alleged that he filed the grievance with the IGRC but was later informed that the grievance could not be located in the IGRC system. *Id.* Thereafter, the plaintiff wrote to his counselor, mental health doctor, and the prison superintendent in an attempt to appeal his grievance. *Id.* This Court concluded:

> **\*5** Accepting all allegations as true, it is clear that Plaintiff attempted to

Case 9:22-cv-00102-BKS-ML Document 78 Filed 12/13/23 Page 155 of 373

Al Hajj Ash Sheikh Siraj Abdul Aziz Muhammad v...., Not Reported in Fed....

grieve his protective custody claim. When Plaintiff reasonably believed that his grievances were not being filed, he tried to grieve his complaints by writing letters of appeal. Further, in light of the fact that Plaintiff has filed numerous grievances in the past, he is clearly familiar with the grievance process and aware of the steps he must take before...

**\*\*\* Start Section**
... interests that justify the impinging conduct; the burden remains with the prisoner to show that these [articulated] concerns were irrational." *Id.* at 275 (internal quotations and citations omitted).

 **\*6** Even assuming Plaintiff can establish that Directive 4914 substantially burdens his sincerely held religious beliefs, various courts in this Circuit have previously determined that Directive 4914 is reasonably related to legitimate penological interests. *See Singh v. Goord,* 520 F. Supp. 2d 487, 507 (S.D.N.Y. 2007) ("numerous courts have held that Directive 4914's initial shave requirement serves a legitimate penological interest in maintaining prison security and a record of prisoners' appearances in case of escape.") (citing *Young v. Goord,* No. 01-cv-626, 2005 **WL** 562756, at \*2 (E.D.N.Y. Mar. 10, 2005), *aff'd,* 192 Fed.Appx. 31 (2d Cir. 2006) ("The legitimacy of the penological interest in policing the facial hair of inmates is clear. Corrections officials specifically, and law enforcement generally, must be able to accurately identify present, former and escaped prisoners by their physical appearance."); *Solomon v. Chin,* 96-cv-2619, 1998 **WL** 473953, at \*3 (S.D.N.Y. Aug. 10, 1998); *Ross,* 669 F. Supp. at 1240-41; *Phillips v. Coughlin,* 586 F. Supp. 1281 (S.D.N.Y. 1984)). *See also Benjamin v. Coughlin,* 905 F.2d 571, 575, n.3 (2d Cir. 1990) (citing *Fromer v. Scully,* 874 F.2d 69, 76 (2d Cir. 1989)). Accordingly, Plaintiff cannot state a First Amendment claim on the basis of Directive 4914, and the Court dismisses this claim.

**IV. Plaintiff Cannot State a Claim Based on the Violation of Directive 4914**

The Complaint appears to assert a claim premised upon Defendant's violation of Direction 4914. (Compl. at IV.) However, "the law is settled that the failure to follow a [DOCCS] Directive or prison regulation does not give rise to a federal constitutional claim." *Rivera v. Wohlrab,* 232 F. Supp. 2d 117, 123 (S.D.N.Y. 2002) (citing *Hyman v. Holder* No. 96-cv-7748, 2001 **WL** 262665, at \*6 (S.D.N.Y. Mar. 15, 2001)). While such a theory of liability "may give rise to state law claims, [it does not] constitute [a] due process violation[ ] of a constitutional nature." *Rivera,* 232 F. Supp. 2d at 123. "Thus, a § 1983 claim brought in federal court is not the appropriate forum to urge violations of prison regulations ...; rather, in order to prevail on a § 1983 claim, the allegations asserted must constitute violations of constitutional due process standards." *Id.* (citation omitted). Therefore, the Court dismisses Plaintiff's claim that Defendant violated Directive 4914.

**V. Plaintiff Fails to State a Claim Arising From Pre-Hearing Keeplock**
Finally, the Court turns to Plaintiff's allegation that his pre-hearing confinement in keeplock...

**\*\*\* Start Section**
...*n,* 132 F.3d 133, 136 (2d Cir. 1998). "To establish a due process violation, it is necessary to prove that the state has created a protected liberty interest and that the process due was denied." *Id.* "To identify a protectable liberty interest under the *Sandin* framework, prisoners must establish that a given restraint imposes an '*atypical and significant hardship* on the inmate in relation to the ordinary incidents of prison life.' " *Id.* (quoting *Sandin v. Conner,* 515 U.S. 472, 482 (1995) (emphasis added)). The Court must undertake a "detailed, fact-intensive inquir[y] into the scope of the prisoner's alleged deprivation" to determine whether a keeplock confinement constitutes an atypical and significant hardship. *Sales v. Barizone,* No. 03-cv-6691 (RJH), 2004 **WL** 2781752, at \*6 (S.D.N.Y. Dec. 2, 2004) (citing *Sims v. Artuz,* 230 F.3d 14, 23 (2d Cir. 2000)). Courts consider "factors such as (1) the extent to which the conditions of the disciplinary segregation differ from other routine prison conditions and (2) the duration of the disciplinary segregation imposed compared to discretionary confinement." *Sales,* 2004 **WL** 2781752, at \*6 (internal quotations and citations omitted).

Case 9:22-cv-00102-BKS-ML    Document 78    Filed 12/13/23    Page 156 of 373

Al Hajj Ash Sheikh Siraj Abdul Aziz Muhammad V..., Not Reported in Fed....

*7 In the present case, the allegations regarding Plaintiff's keeplock confinement do not constitute atypical and significant hardship. *See Saulter*, 1997 **WL** 177887, at *2 (collecting cases) ("Courts in this District have routinely held that the New York prison system's practice of placing prisoners in keeplock confinement does not amount to an atypical and significant hardship in relation to the ordinary incidents of prison life."). First, a confinement for a period of 10 days is neither atypical nor significant. *See Pampalone v. Young*, No. 95-cv-2348 (SHS), 1996 **WL** 511569, at *3 (S.D.N.Y. Aug. 7, 1996) (collecting cases) ("[T]he decisions in the Second circuit are unanimous that keeplock or SHU confinement of 30 days or less in New York prisons is *not* an 'atypical or significant hardship' under *Sandin*."). Additionally, the allegations regarding the conditions of Plaintiff's keeplock confinement do not rise to the level of atypical and undue hardship. With respect to Plaintiff's argument that his keeplock confinement imposed a hardship on his ability to observe his religious practices, the Second Circuit has held that "[c]onfinement in keeplock does not deprive prisoners of [the right to participate in congregate religious services.]" *Salahuddin v. Coughlin*, 993 F.2d 306, 308 (2d Cir. 1993) (citing *Young v. Coughlin*, 866 F...

*** Start Section

... hardly severe, particularly given the short time frame of Plaintiff's keeplock confinement. [5] Accordingly, Plaintiff's allegations fail as a matter of law to state a claim under the Due Process Clause of the Fourteenth Amendment.

## CONCLUSION

For the foregoing reasons, Defendant's motion to dismiss is GRANTED, and Plaintiff's complaint is dismissed. The Court respectfully directs the Clerk to terminate the motion at ECF No. 23 and close the case.

SO ORDERED.

### All Citations

Not Reported in Fed. Supp., 2016 WL 3082657

---

## Footnotes

1    "Keeplock confinement is 'a form of administrative segregation in which the inmate is confined to his cell, deprived of participation in normal prison routine, and denied contact with other inmates,' " *Saulter v. Hanslmaier*, No, 94-cv-6855 (JFK), 1997 **WL** 177887, at *1 (S.D.N.Y. Apr. 14, 1997) (quoting *Gittens v. LeFevre*, 891 F.2d 38, 39 (2d Cir. 1989)) (citing N.Y. Comp. Codes R. & Regs. tit. 7, Section 251-1.6 (1988)).

2    Given Plaintiff's *pro se* status, the Court accepts as true the facts alleged in Plaintiff's opposition papers. *Mahon v. McCall*, No. l3-CV-2076 (RA), 2014 **WL** 4589855, at *1 (S.D.N.Y. Sept. 15, 2014) (citing *Nielsen v. Rabin*, 746 F.3d 58, 62-64 (2d Cir. 2014); *Gill v. Mooney*, 824 F.2d 192, 195 (2d Cir. 1987)).

3    While the Second Circuit has left unresolved the continuing vitality of the *Hemphill* exceptions in light of the Supreme Court's ruling in *Woodford v. Ngo, Hemphill* remains good law, and the Court must therefore consider whether any exceptions apply to Plaintiff's failure to exhaust. *See Woodford v. Ngo*, 548 U.S. 81, 126 S.Ct. 2378, 165 L.Ed.2d 368 (2006); *Amador v. Andrews*, 655 F.3d 89, 102 (2d Cir. 2011) (recognizing that *Woodford* called the latter two *Hemphill* exceptions into question but declining to resolve the issue). But *see Messa v. Goord*, 652 F.3d 305, 309-10 (2d Cir. 2011) (treating the *Hemphill* exemptions as good law

Al Hajj Ash Sheikh Siraj Abdul Aziz Muhammad V...., Not Reported in Fed....

Case 9:22-cv-00102-BKS-ML    Document 78    Filed 12/13/23    Page 157 of 373

and finding that a prisoner is not entitled to a jury trial on the issue of whether he has asserted a valid excuse for non-exhaustion).

...

2004 WL 439428
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

George ARCE, Plaintiff,

v.

John P. KEANE, Thomas J. Miller,
and Ronald K. Krom, Defendants.

No. 01 Civ. 2648(BSJ).
|
March 9, 2004.

**Synopsis**
**Background:** State prisoner brought civil rights action against correctional officers.

**Holdings:** On defendants' motion to dismiss, the District Court, Jones, J., held that:

[1] prisoner failed to exhaust his administrative remedies under Prison Litigation Reform Act (PLRA);

[2] letters written to prison officials were not sufficient to exhaust prisoner's administrative remedies;

[3] prisoner reasonably could not have believed that he was being instructed to not file grievance;

[4] comment from corrections officer could not be read as preventing or obstructing state prisoner from filing grievance or appealing denial of grievance; and

[5] futility was not exception to exhaustion requirement.

Motion granted.

West Headnotes (5)

**[1]** **Civil Rights** 🔑 **Criminal law enforcement; prisons**

State prisoner failed to exhaust his administrative remedies under Prison Litigation Reform

Act (PLRA) before bringing § 1983 claim, although he filed two formal written grievances; prisoner failed to appeal denial or lack of response to those grievances to superintendent of correctional facility, and prisoner's failure to appeal grievance could not otherwise be excused. 🚩 42 U.S.C.A. § 1983; Civil Rights of Institutionalized Persons Act, § 7(a), as amended, 🚩 42 U.S.C.A. § 1997e(a); N.Y.Comp. Codes R. & Regs. title 7, § 701.8.

24 Cases that cite this headnote

**[2]** **Civil Rights** 🔑 **Criminal law enforcement; prisons**

Letters written to prison officials were not sufficient to exhaust state prisoner's administrative remedies under Prison Litigation Reform Act (PLRA) before bringing 🚩 § 1983 claim. 🚩 42 U.S.C.A. § 1983; Civil Rights of Institutionalized Persons Act, § 7(a), as amended, 🚩 42 U.S.C.A. § 1997e.

2 Cases that cite this headnote

**[3]** **Civil Rights** 🔑 **Criminal law enforcement; prisons**

State prisoner asserting 🚩 § 1983 claim reasonably could not have believed that he was being instructed to not file grievance, and, therefore, he was not eligible for exception to exhaustion requirement under Prison Litigation Reform Act (PLRA) for not appealing his grievance to superintendent, on allegation that corrections officers commented that prisoner was already on list to be transferred to single cell and that he should "save the paper and the time," i.e., stop sending written complaints; comment was made in response to prisoner's "Housing Style Change Request Form," prisoner subsequently filed his grievance, and corrections officers did not otherwise impede or prevent his efforts to follow grievance procedure. 🚩 42 U.S.C.A. § 1983; Civil Rights of Institutionalized Persons Act, § 7, 🚩 42 U.S.C.A. § 1997e.

8 Cases that cite this headnote

**[4]    Civil Rights** 🚩 Criminal law enforcement; prisons

Comment from corrections officer, that requests of state prisoner to be transferred to single cell "[were] not necessary and need not be addressed," could not be read as preventing or obstructing state prisoner from filing grievance or appealing denial of grievance, and consequently, when prisoner sued under

🚩 § 1983 he was not eligible for exception to exhaustion requirement under Prison Litigation Reform Act (PLRA) for not appealing his grievance to superintendent, since comment was made after prisoner filed his grievance.

🚩 42 U.S.C.A. § 1983; Civil Rights of Institutionalized Persons Act, § 7, 🚩 42 U.S.C.A. § 1997e.

7 Cases that cite this headnote

**[5]    Prisons** 🚩 Exhaustion of Other Remedies

Futility is not an exception to the exhaustion requirement under the Prison Litigation Reform Act (PLRA). Civil Rights of Institutionalized Persons Act, § 7, 🚩 42 U.S.C.A. § 1997e.

1 Case that cites this headnote

*Opinion*

JONES, J.

**\*1** Plaintiff George Arce, an incarcerated inmate, brings this action against Defendants pursuant to 🚩 42 U.S.C. § 1983. After the appointment of counsel, Plaintiff filed an amended complaint on July 12, 2002. Defendants move to dismiss the amended complaint on the grounds that (1) Plaintiff failed to exhaust his administrative remedies; (2) Plaintiff's Amended Complaint fails to state a claim; and (3) they are entitled to qualified immunity. For the reasons explained below, the Court finds that Plaintiff has failed to exhaust his

administrative remedies and GRANTS Defendants' motion to dismiss. [1]

*BACKGROUND*

While incarcerated at Woodbourne Correctional Facility ("Woodbourne"), Plaintiff, who suffers from asthma, was originally housed in a single cell in Woodbourne's C–Block. (Compl.¶ 8). [2] On December 18, 1997, Plaintiff was moved out of his single cell into a dormitory, which also housed cigarette smokers. (Compl.¶ 12). After this move, Plaintiff made a series of complaints—in the form of letters or conversations—to Defendants Keane, Krom, and Miller, in which he advised them of his health condition and requested that he be housed in a non-smoking environment. (Compl.¶¶ 13–14, 18–19, 21–23, 26–28). Plaintiff suffered several asthma attacks, which he attributes to exposure to secondhand smoke in his dormitory, during this period. (Compl.¶¶ 15, 17, 35). Plaintiff's wife also attempted to contact Defendant Keane, via letter and telephone, requesting that her husband be moved to a non-smoking cell. (Compl.¶ 20).

On January 5, 1998, a medical review of Plaintiff was conducted. The doctor who evaluated Plaintiff concluded that Plaintiff should be placed in a single cube beside a window and, if placed in a cell, Plaintiff should be housed only with a non-smoker. (Compl.¶ 24). The doctor's instructions notwithstanding, Plaintiff was not given alternate housing accommodations, and his asthma attacks continued through March of 1998.

On January 13, 1998, Plaintiff spoke to Defendants Keane and Krom and asked them to transfer him to a non-smoking cell. (Compl.¶¶ 26–27). Plaintiff's requests were refused. One week later, on January 20, 1998, after complaining to Defendant Miller, Plaintiff was moved to another dormitory, which was occupied by more smokers than the previous dormitory in which he had been housed. (Compl.¶ 28, 30). Plaintiff contends that this move was made in retaliation for his complaints regarding his housing accommodations.

After his transfer to the second dormitory, Plaintiff submitted a "Housing Style Change Request Form" requesting a change of his housing location. (Compl. ¶ 32). Plaintiff received the following written response: "Your [sic] already on the single cell list, save the paper and time." (Compl.¶ 33).

After several additional attempts to speak to Defendants Keane and Miller about his housing accommodations, Plaintiff filed a grievance with the Inmate Grievance Relations Committee ("IRGC") on March 20, 1998 ("First Grievance"). (Compl.¶ 36). It is unclear from Plaintiff's papers whether he ever received a formal response from the IRGC. For the purposes of this motion, the Court will assume that he did not.

**\*2** Plaintiff did subsequently receive several written responses from Woodbourne indicating that his requests were denied and that Plaintiff had failed to submit a written request for a change of accommodation. (Compl.¶ 39, 41). The response Plaintiff received from Defendant Miller, dated March 24, 1998, "indicat[ed] [Miller] would not consider Arce's requests for a housing change, claiming the prison had no responsibility in the matter. [The request also stated] 'Be advised that cell mate smoking and compatibility issues are regulated by law; therefore, your request for special provisions is not necessary and need not be addressed." (Compl.¶ 42).

On April 17, 1998, Plaintiff filed a second grievance regarding his exposure to secondhand smoke and his asthma ("Second Grievance"). [3] (Compl.¶ 46). Plaintiff received no response to this grievance from the IRGC. Plaintiff was transferred out of Woodbourne on May 18, 1998 and commenced this action on March 28, 2001. (Compl.¶ 49).

## DISCUSSION

The Prison Litigation Reform Act ("PLRA") requires a plaintiff to exhaust all available administrative remedies before filing a complaint in federal court. See 42 U.S.C. § 1997e(a) ("No action shall be brought with respect to prison conditions under section 1979 of the Revised Statutes of the United States (42 U.S.C.1983), or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.") The New York State Department of Correctional Services ("DOCS") has established a three-step grievance process for all prisoner complaints. See N.Y. Comp.Codes R. & Regs. tit. 7, § 701.7. First, an inmate must file a grievance with the IRGC, which is composed of fellow inmates and various prison officials. See id. § 701.7(a). Second, if the inmate is dissatisfied with the IGRC decision, he must appeal to the superintendent of the facility.

See id. § 701.7(b). Third, if the inmate does not receive a favorable decision from the superintendent, he must appeal to the DOCS Central Office Review Committee ("CORC"). See id. § 701.7(c). After the inmate completes his appeal to the CORC, the grievance process is then complete and the inmate, if still dissatisfied, may bring a complaint in the appropriate court. See Hemphill v. New York, 198 F.Supp.2d 546, 548 (S.D.N.Y.2002). "A prisoner has not exhausted his administrative remedies until he goes through all three levels of the grievance procedure." Id.

**[1]** There is no dispute that the PLRA's exhaustion requirement "applies to all inmate suits about prison life." Porter v. Nussle, 534 U.S. 516, 532, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002). Here, Plaintiff failed to exhaust his administrative remedies because, although he filed two formal written grievances, he failed to appeal the denial or lack of response to those grievances to the superintendent of the facility. An inmate's failure to appeal a grievance is not excused because he has received no response to his initial grievance.

**\*3** Among other reasons, Congress enacted § 1997e(a) to give prison officials an opportunity to take corrective actions that might obviate the need for litigation and to assure that adjudication by federal courts would be facilitated by an administrative record that clarifies the contours of a controversy. See Porter, 534 U.S. at 524–25; Booth v. Churner, 532 U.S. 731, 737, 121 S.Ct. 1819, 149 L.Ed.2d 958 (2001). Allowing an inmate to opt out of New York's grievance scheme without filing even one appeal and before receiving any response from prison authorities would undermine these goals. *New York's legislature, recognizing that some grievances will not be answered within seven days, gave prisoners the right to bring their grievances to the attention of the Superintendent even in the absence of an adverse response from the IGRC. See* N.Y. Comp.Codes R. & Regs.,

tit. 7, § 701.8. *It is unreasonable to read these regulations as providing that a federal action is the next and only recourse when the prison fails to respond to an initial grievance.*

*Petty v. Goord,* 2002 U.S. Dist. LEXIS 21197, at *13–14 (S.D.N.Y. Nov. 4, 2002) (emphases added); *see also McNair v. Jones,* 2002 U.S. Dist. LEXIS 17409, at *30 n. 5 (S.D.N.Y. Sept. 18, 2002); *Sims v. Blot,* 2003 U.S. Dist. LEXIS 12729 (S.D.N.Y. July 30, 2003). *But see* 🚩 *John v. N.Y.C. Dep't of Corrs.,* 183 F.Supp.2d 619, 625 (S.D.N.Y.2002) (finding that the plaintiff exhausted administrative remedies under N.Y. Comp.Codes R. & Regs., tit. 7, § 701 where he filed a grievance and received no response because "there was no [adverse] decision to appeal").

**[2]** Nonetheless, Plaintiff maintains that his claims should not be dismissed because they fall within a narrow exception that allows an incarcerated plaintiff to maintain an action "even when the requirements of all administrative remedies have not technically been exhausted." (Pl. Mem. at 10).

Two exceptions to the PLRA's exhaustion requirement were articulated in 🚩 *O'Connor v. Featherstone,* 2002 WL 818085 (S.D.N.Y. April 29, 2002), two months after the Supreme Court reiterated the exhaustion requirement in *Porter v. Nussle. O'Connor* held that an inmate may defeat a motion to dismiss even when administrative remedies have not technically been exhausted if (1) the inmate was led to believe by prison officials that his alleged incident was not a "grievance matter" and assured that his claims were otherwise investigated; or (2) the inmate makes a "reasonable attempt" to exhaust his administrative remedies, especially where it is alleged that corrections officers failed to file the inmate's grievances or otherwise impeded or prevented his efforts. 🚩 *O'Connor,* 2002 WL 818085, at *2. Even assuming that these are valid exceptions to the exhaustion requirement, Plaintiff's arguments are unavailing.

Here, Plaintiff does not allege that corrections officers impeded or prevented his efforts to follow the grievance procedure. Rather he argues that his two formal grievances and numerous letters evidence "substantial and repeated efforts to obtain a remedy under DOCS' procedures," and because Defendants instructed Plaintiff to "save the paper and time" and told him that his requests "[are] not necessary

and need not be addressed," the remedies contemplated by the PLRA "were not 'available' under the meaning of the PLRA." (Pl. Mem. at 13–14).

**\*4** The Court reads Plaintiff's argument as two-fold: First, that Plaintiff's efforts—including his informal letters, oral conversations, and two formal grievances—constitute a "reasonable attempt" to exhaust his administrative remedies; and second, that Defendants' comments that Plaintiff should "save the paper and time" and that Plaintiff's requests "[are] not necessary and need not be addressed" led Plaintiff to believe that his alleged incident was not a "grievance matter" and/or that his complaints were being investigated. Neither argument is convincing.

**[3]** It is well established that writing letters to prison officials is insufficient to exhaust administrative remedies. *E.g.,* 🚩 *Mills v. Garvin,* 2001 WL 286784 at *3 (S.D.N.Y. Mar.2, 2001)* ("letter writing is not the equivalent of an exhaustion of administrative remedies under the PLRA"). Therefore, Plaintiff's letters and conversations with Defendants are not relevant in determining whether he exhausted his administrative remedies. Moreover, Plaintiff could not have reasonably believed that Defendants' statements indicated that he need not follow the three-step grievance procedure. The comment that Plaintiff was already on the list to be transferred to a single cell and that he should "save the paper and the time"—*i.e.,* stop sending written complaints—was made in response to Plaintiff's "Housing Style Change Request Form" and, therefore, Plaintiff could not reasonably believe that he was being instructed not to file a grievance. Furthermore, this comment was made *before* Plaintiff filed his First Grievance. Plaintiff could not have reasonably believed that a comment made before he filed his First Grievance justified his failure to appeal that grievance when he received no response.

**[4]** The second comment, that Plaintiff's requests "[are] not necessary and need not be addressed," was made after Plaintiff filed his First Grievance. However, in his Memorandum of Law, Plaintiff described this comment as being made in a document that "indicat[ed] [Miller] would not consider Arce's requests for a housing change, claiming the prison had no responsibility in the matter." (Pl. Mem. at 7). Such a comment cannot be read as preventing or obstructing Plaintiff from filing a grievance or appealing the denial of a grievance. *Cf. Thomas v. N.Y. State Dep't of Corr. Servs.,* 2003 U.S. Dist. LEXIS 20286, at *13 (S.D.N.Y. Nov. 10, 2003) (dismissing plaintiff's claims for failure to exhaust

even though two prison officials told plaintiff he need not file a grievance; "while [plaintiff] was told that it was not necessary for him to file a grievance, there is no evidence that he was told that he could not file a grievance. Thus, the instructions are properly understood as bad advice, not prevention or obstruction ."). Indeed, Plaintiff does not appear to have relied upon Miller's comment, as he filed a second grievance with the IGRC *after* receiving Miller's March 24, 1998 response. In any event, the Court finds that the types of representations made in this case by prison officials outside of the grievance process do not warrant an exception to the exhaustion requirement. Such an exception is at odds with the Congressional goals of reducing the quantity and improving the quality of prisoner suits by affording corrections officials time and opportunity to address complaints internally before allowing the initiation of a federal case." *Porter,* 534 U.S. at 524–525.

**\*5** **[5]** Finally, Plaintiff argues that an appeal to Defendant Keane was not an "available" administrative remedy, as contemplated by the PLRA, because Keane had refused his previous informal requests and because, in a letter to Plaintiff's counsel dated March 23, 1998, Defendant Keane had denied ever receiving a written request from Arce to be transferred to a non-smoking cell. [4] (Def. Mem. at 13). Plaintiff's argument is unclear, but presumably he is arguing that, in light of Defendant Keane's previous refusals and allegedly false statement that he had not received any written requests from Plaintiff to change his housing accommodations, an appeal to Defendant Keane would have been futile. However, futility will not excuse an inmate's failure to exhaust his administrative remedies. *Cf. Porter,* 534 U.S. at 524 ("Even when the prisoner seeks relief not available in grievance proceedings, notably money damages, exhaustion is a prerequisite to suit."). In any event, even assuming that Defendant Keane would have denied Plaintiff's appeal, Plaintiff still could have obtained relief from the CORC, which would have "afforded corrections officials time and opportunity to address complaints internally before allowing the initiation of a federal case." *Id.* at 525.

### CONCLUSION

Because Plaintiff failed to exhaust his administrative remedies before filing this action, the Court GRANTS Defendants' motion and dismisses Plaintiff's claims without prejudice. *See Morales v. Mackalm,* 278 F.3d 126, 128, 131 (2d Cir.2002) (per curiam) ("clarif[ying] that if a district court dismisses a prisoner's complaint for failure to exhaust administrative remedies, it should do so without prejudice").

The Clerk of the Court is directed to close this case.

SO ORDERED:

**All Citations**

Not Reported in F.Supp.2d, 2004 WL 439428

---

### Footnotes

1    The Court does not reach the other grounds offered by Defendants in support of their motion to dismiss.

2    References to Plaintiff's First Amended Complaint are cited (Compl.¶ __).

3    Defendants dispute the authenticity of these grievances because neither bears an inmate grievance number or the signature of the grievance clerk. (Def. Mem. at 4–5). As this is a motion to dismiss, the Court assumes the truthfulness of Plaintiff's allegations—including his allegations regarding his filing of these two grievances.

4    As superintendent of Woodbourne, an appeal to Defendant Keane would have been the second step in the grievance process.

End of Document                                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

2023 WL 4710869
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Dumar JACKSON, Plaintiff,

v.

N. MOORE, Defendant.

9:21-CV-1001 (GTS/ATB)
|
Signed April 14, 2023

**Attorneys and Law Firms**

DUMAR JACKSON, Plaintiff, pro se.

RACHAEL S. OUIMET, Assistant Attorney General, for Defendant.

### REPORT-RECOMMENDATION

ANDREW T. BAXTER, United States Magistrate Judge

**\*1** In this pro se civil rights action, plaintiff alleges that the defendant violated his Eighth Amendment rights when he failed to protect plaintiff from another inmate. Presently before the court is defendant Correctional Officer ("C.O.") Moore's motion for summary judgment. (Dkt. No. 16). This matter has been referred to me for Report and Recommendation by United States District Judge Glenn T. Suddaby, pursuant to 28 U.S.C. § 636(b) and Local Rule N.D.N.Y. 72.3(c). For the reasons set forth below, this court will recommend granting defendant's motion and dismissing the complaint in its entirety.

### I. Background

#### A. Procedural History

In this civil rights action, plaintiff alleges a constitutional violation occurred while he was incarcerated at Clinton Correctional Facility ("Clinton C.F."), in the custody of the New York State Department of Corrections and Community Supervision ("DOCCS"). Plaintiff filed the original complaint on September 10, 2021. (Dkt. No. 1). On October 25, 2021, the court issued a Decision and Order granting plaintiff's application to proceed in the action in forma pauperis ("IFP"), and conditionally dismissing the original complaint because it failed to state a claim upon which relief may be granted pursuant to 28 U.S.C. § 1915 and 28 U.S.C. § 1915A. (Dkt. No. 4). The court granted plaintiff leave to amend his complaint to "correct[ ] the pleading defects" identified with his original complaint. (*Id.* at 10). Plaintiff availed himself of the opportunity to amend, and the court received plaintiff's amended pleading on or about November 18, 2021. (Dkt. No. 6, "Am. Compl.").

On February 9, 2022, I determined, pursuant to my initial review of the complaint, that plaintiff's amended complaint was accepted for filing and that the only active defendant was C.O. Moore. (Dkt. No. 7 at 3). C.O. Moore filed an answer to the amended complaint on April 14, 2022. (Dkt. No. 12). On December 15, 2022, defendant filed this instant motion for summary judgment (Dkt. No. 16), to which plaintiff responded on February 16, 2023 (Dkt. No. 20).

#### B. Summary of Complaint

The complaint alleges that on September 6, 2018, while plaintiff was confined in Clinton C.F., he was attacked by another inmate when they were released from their keep-lock cells at the same time. (Am. Comp. at 4). Although facility policies and procedures prohibited C.O. Moore from releasing the other inmate "until [plaintiff] was ... back in general population," C.O. Moore nevertheless released both inmates simultaneously, knowing that plaintiff did not have an escort at the time. *Id.* C.O. Moore also "knew there was a race war going on in [Clinton C.F.] with the bloods and the Spanish gangs and let [plaintiff] out of [his] cell with a known gang member posed [sic] a substantial risk of serious harm to [him]." *Id.* Although C.O. Moore observed the inmate run into plaintiff's cell and attack him, C.O. Moore "did nothing to prevent it from happening." Plaintiff was returned to keep-lock after the incident and remained there for an additional 70 days, until November 15, 2018. (Dkt. No. 16-3, Pl.'s Dep. at 18, 27, 79, 88, 95; Internal Movement History, Dkt. No. 20-1 at 31).

### II. Summary Judgment

**\*2** Summary judgment is appropriate where there exists no genuine issue of material fact and, based on the undisputed facts, the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56; *Salahuddin v. Goord*, 467 F.3d 263, 272-73 (2d Cir. 2006). Rule 56(b) provides that a party may file a motion for summary judgment "at any time until 30 days after the close of all discovery." Fed. R. Civ. P. 56(b).

Thus, a party may move for summary judgment in lieu of an answer. *See, e.g.,* ⚑ *Anderson v. Rochester-Genesee Reg'l Transp. Auth.*, 337 F.3d 201, 202 (2d Cir. 2003); *Crenshaw v. Syed*, 686 F. Supp. 2d 234, 236 (W.D.N.Y. 2010); *Riehl v. Martin*, No. 9:13-CV-439 (GLS/TWD), 2014 WL 1289601, at *1-2 (N.D.N.Y. Mar. 31, 2014).

The moving party has the burden to show the absence of disputed material facts by informing the court of portions of pleadings, depositions, and affidavits which support the motion. ⚑ *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party satisfies its burden, the nonmoving party must move forward with specific facts showing that there is a genuine issue for trial. ⚑⚠ *Salahuddin v. Goord*, 467 F.3d at 273. In that context, the nonmoving party must do more than "simply show that there is some metaphysical doubt as to the material facts." ⚑ *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). However, in determining whether there is a genuine issue of material fact, a court must resolve all ambiguities, and draw all inferences, against the movant. *See* ⚑ *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962); ⚑⚠ *Salahuddin*, 467 F.3d at 272. "Only disputes over ['material'] facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986). It must be apparent that no rational finder of fact could find in favor of the non-moving party for a court to grant a motion for summary judgment. ⚑ *Gallo v. Prudential Residential Servs.*, 22 F.3d 1219, 1224 (2d Cir. 1994).

While courts are required to give due deference to a plaintiff's pro se status, that status "does not relieve plaintiff of his duty to meet the requirements necessary to defeat a motion for summary judgment." ⚑ *Jorgensen v. Epic/Sony Records*, 351 F.3d 46, 50 (2d Cir. 2003). Where a party has failed to respond to the movant's statement of material facts as required by Local Rule 7.1(a)(3), the facts in the movant's statement will be accepted as true (1) to the extent they are supported by evidence in the record, and (2) the non-movant, if proceeding pro se, has been specifically advised of the possible consequences of failing to respond to the motion. ⚑ *Champion v. Artuz*, 76 F.3d 483, 486 (2d Cir. 1996).

Although plaintiff received proper notice of his obligation to respond to defendant's summary judgment motion in accordance with Local Rules, the plaintiff did not file a Statement of Material Facts that addressed many of the factual allegations in defendant's Statement, as required by Local Rule 7.1(a)(3). [1] Consequently, the court may accept the properly supported facts contained in the defendants' Rule 7.1 statement (Dkt. No. 16-2) as true for purposes of this motion. *See* ⚑ *Govan v. Campbell*, 289 F. Supp. 2d 289, 295-96 (N.D.N.Y. 2003).

### III. Exhaustion of Administrative Remedies

#### A. Legal Standards

**\*3** The Prison Litigation Reform Act, ("PLRA"), 🚩 42 U.S.C. § 1997e(a), requires an inmate to exhaust all available administrative remedies prior to bringing a federal civil rights action. The exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and regardless of the subject matter of the claim. *See* ⚑ *Giano v. Goord*, 380 F.3d 670, 675-76 (2d Cir. 2004), (citing ⚑ *Porter v. Nussle*, 534 U.S. 516, 532 (2002)), *abrogated on other grounds*, ⚑ *Ross v. Blake*, 578 U.S. 632 (2016). Inmates must exhaust their administrative remedies even if they are seeking only money damages that are not available in prison administrative proceedings. 🚩 *Id.* at 675.

In order to properly exhaust an inmate's administrative remedies, the inmate must complete the administrative review process in accordance with the applicable state rules. ⚑ *Jones v. Bock*, 549 U.S. 199, 218-19 (2007) (citing ⚑ *Woodford v. Ngo*, 548 U.S. 81 (2006)). In *Woodford*, the court held that "proper" exhaustion means that the inmate must complete the administrative review process in accordance with the applicable procedural rules, including deadlines, as a prerequisite to bringing suit in federal court. *Woodford*, 548 U.S. at 90-103.

The grievance procedure in New York is a three-tiered process. The inmate must first file a grievance with the Incarcerated [2] Grievance Resolution Committee ("IGRC"). N.Y. Comp. Codes R. & Regs., tit. 7 §§ 701.5(a)(1) and (b). An adverse decision of the IGRC may be appealed to

the Superintendent of the Facility. *Id.* § 701.5(c). Adverse decisions at the Superintendent's level may be appealed to the Central Office Review Committee ("CORC"). *Id.* § 701.5(d). The court also notes that the regulations governing the Incarcerated[3] Grievance Program ("IGP") encourage the inmate to "resolve his/her complaints through the guidance and counseling unit, the program area directly affected, or other existing channels (informal or formal) prior to submitting a grievance." *Id.* § 701.3(a) (Inmate's Responsibility). There is also a special section for complaints of harassment. *Id.* § 701.8. Complaints of harassment are handled by an expedited procedure which provides that such grievances are forwarded directly to the Superintendent of the facility, after which the inmate must appeal any negative determination to the CORC. *Id.* §§ 701.8(h) and (I), 701.5.

Prior to *Ross v. Blake*, *supra*, the Second Circuit utilized a three-part inquiry to determine whether an inmate had properly exhausted his administrative remedies. *See* 🚩 *Brownell v. Krom*, 446 F.3d 305, 311-12 (2d Cir. 2006) (citing 🚩 *Hemphill v. State of New York*, 380 F.3d 680, 686 (2d Cir. 2004)). The *Hemphill* inquiry asked (1) whether the administrative remedies were available to the inmate; (2) whether defendants' own actions inhibiting exhaustion estops them from raising the defense; and (3) whether "special circumstances" justify the inmate's failure to comply with the exhaustion requirement. *Id.*

In *Ross*, the Supreme Court made it clear that courts may not excuse a prisoner's failure to exhaust because of "special circumstances." 🚩 *Ross v. Blake*, 578 U.S. 632, 640 (2016). "[M]andatory exhaustion statutes like the PLRA establish mandatory exhaustion regimes, foreclosing judicial discretion." 🚩 *Riles v. Buchanan*, 656 F. App'x 577, 580 (2d Cir. 2016) (quoting 🚩 *Ross*, 578 U.S. at 639). Although *Ross* has eliminated the "special circumstances" exception, the other two factors in *Hemphill* – availability and estoppel – are still valid. The court in *Ross* referred to "availability" as a "textual exception" to mandatory exhaustion, and "estoppel" has become one of the three factors in determining availability. 🚩 *Ross*, 578 U.S. at 642. Courts evaluating whether an inmate has exhausted his or her administrative remedies must also consider whether those remedies were "available" to the inmate. *Id.*; *see also* 🚩 *Riles*, 2016 WL 4572321 at *2.

## B. Analysis

**\*4** Defendant C.O. Moore argues that plaintiff's failure-to-protect claim is subject to dismissal, for failure to exhaust administrative remedies, because plaintiff did not file an initial grievance prior to bringing suit, nor did he appeal the denial of any grievance concerning this claim to CORC. (Dkt. No. 16-1, Defendant's Memorandum of Law at 14). In support of his position, defendant has attached to his motion papers the sworn declarations of Rachael Seguin ("Seguin Decl.") (Dkt. No. 16-7), the Director of the IGP for DOCCS, and Christine Gregory, the IGP Supervisor at Clinton C.F. ("Gregory Decl.") (Dkt. No. 16-6). These declarations, and the evidence attached as exhibits thereto, indicate that plaintiff neither filed an initial grievance related to his claim that C.O. Moore failed to protect him from another inmate on September 6, 2018, nor did plaintiff submit an appeal to CORC. (*See* Gregory Decl. ¶¶ 16-20; Seguin Decl. ¶¶ 12-14, Ex. A).

In opposition to defendant's motion, plaintiff alleges that, while confined in his keep-lock cell, he attempted to file a grievance relating to the incident with C.O. Moore by putting a sealed letter on the gate for mail pickup. (Dkt. No. 20 at 2-3; Pl.'s Dep. at 87-89). Plaintiff testified that he remembered the grievance being picked up by an unnamed officer, but does not remember the exact day he mailed the grievance.[4] (Dkt. No. 16-3, Pl.'s Dep. at 87-89, 93). Plaintiff speculates that an unnamed officer on duty threw his grievance away. (Dkt. No. 20 at 2-3; Pl.'s Dep. at 87-89)

Plaintiff acknowledged that he never followed up with respect to his grievance for the 70 days after the incident when he was confined on keeplock; but he alleges that he asked sergeants, officers, and counselors about the status of his grievance and they told plaintiff "they'll get back to you." (Pl.'s Dep. at 93-94). Plaintiff admitted that he did not retain any copies of the purported grievances relative to his complaints against C.O. Moore. (*Id.* at 88).[5]

Plaintiff further testified that he not only understood the grievance process, but also that he participated in an orientation program at Clinton C.F. about how the grievance process works at the facility. (*Id.* at 85-86). He admitted that he filed "a couple" of grievances after the incident concerning other matters, while still residing at Clinton C.F. (*Id.* at 90).

The record before this court clearly established that the defendant did not exhaust administrative remedies with

respect to the failure-to-protect claim against C.O. Moore. Given that an initial grievance was never filed, nor was the claim ever appealed to CORC, the question becomes whether plaintiff's failure to exhaust should be excused.

The defendant has satisfied his initial burden of "establishing ... that a grievance process exist[ed] and applie[d] to the underlying dispute." *Hubbs v. Suffolk County Sheriff's Dep't*, 788 F.3d 54, 59 (2d Cir. 2015) (citation omitted). [6] Thus, plaintiff assumes the burden of producing evidence that one of the exceptions to the administrative exhaustion requirement applies, excusing his failure to exhaust and permitting his claim to survive summary judgment. *Id.* ("If the defendants meet this initial burden, administrative remedies may nonetheless be deemed unavailable if the plaintiff can demonstrate that other factors ... rendered a nominally available procedure unavailable as a matter of fact.") [7]

**\*5** Liberally construed, plaintiff appears to argue that administrative remedies were unavailable to him as a result of C.O. Moore trying "to cover his mistakes up". (Dkt. No. 20 at 2-3). Plaintiff does not offer any support for his claim other than his statement "officers talk like inmates talk. So knowing the incident, knowing I put in a grievance, they wanted to be nosey [sic], and they opened it and never let it get to where it was supposed to go once it was read." (Pl.'s Dep. at 89). During his deposition, plaintiff specifically stated that C.O. Moore was not the person who picked up the grievance. (Pl.'s Dep. at 88-89). Furthermore, plaintiff testified the alleged grievance was sealed, so the unnamed C.O. would have no way of knowing what conduct the grievance was referring to unless (s)he opened the envelope. (Pl.'s Dep. at 92).

As noted above, plaintiff was on keep-lock status when he allegedly attempted to submit a grievance relating to the claim in this action by leaving a sealed envelope for C.O.s to deliver. "Keeplock is a form of disciplinary confinement segregating an inmate from other inmates and depriving him of participation in normal prison activities." *Green v. Bauvi*, 46 F.3d 189, 192 (2d Cir. 1995); N.Y. Comp. Codes R. & Regs. tit. 7, § 301.6. While "[k]eep-lock is similar to serving time in a Special Housing Unit ... [with the inmate] remain[ing] in their assigned cell" (Dkt. No. 16-5, Terry Allen Declaration ¶ 7), plaintiff acknowledged that keep-lock status is "not like if you were in the SHU" (Pl.'s Dep. at 35).

In *Williams v. Priatno*, 829 F.3d 118, 123-27 (2d Cir. 2016), the Second Circuit considered whether administrative remedies had been "actually available" to an inmate plaintiff under *Ross*, after the district court granted the defendants' motion to dismiss for failure to exhaust. The plaintiff alleged that, while housed in a SHU, he drafted a grievance that he delivered to a correction officer to forward to the grievance office on his behalf. *Id.* at 120-121. Approximately two weeks later, the plaintiff was transferred to a different facility. *Id.* at 121. He never received a response to his grievance, and alleged that it was never filed by the officer to whom he had given it. It was undisputed that plaintiff never appealed the grievance. *Id.*

The defendants in *Williams* argued that even if the grievance was never filed, the plaintiff was required to appeal it and complete the grievance process. *Id.* at 124. The defendants relied on a DOCCS regulation that provided that "an inmate may appeal a grievance 'to the next step' if he does not receive a timely response." *Id.* (quoting N.Y. Comp. Codes R. & Regs. tit. 7, § 701.6(g)(2)). The Second Circuit rejected this argument and held that, for an inmate in the plaintiff's situation, the regulatory scheme was so "opaque" and "confusing" as to be practically unavailable. *Id.* The Second Circuit found that DOCCS regulations "only contemplate appeals of grievances that [have been] actually filed ... [and] give no guidance whatsoever to an inmate whose grievance was never filed." *Id.* Thus, *Williams* holds that "the process to appeal an unfiled and unanswered grievance is prohibitively opaque, such that no inmate could actually make use of it." *Id.* at 126. [8] *See also Medina v. Napoli*, 725 F. App'x 51, 53-54 (2d Cir. 2018) (following *Williams* in the context of a summary judgment motion).

Some district court cases in the Second Circuit suggest that *Williams* should be limited to its particular facts, *e.g.*, by not applying its holding to plaintiffs who are not confined in a SHU. [9] *See, e.g.*, *Shaw v. Ortiz*, No. 15-CV-8964, 2016 WL 7410722, at *6 (S.D.N.Y. Dec. 21, 2016) ("the factual scenario here is different from that in *Williams* where the Second Circuit found that part of the IGP's regulatory scheme was 'so opaque and so confusing that ... no reasonable prisoner c[ould] use' it.") (citing *Mena v. City of New York*, No. 13-CV-2430, 2016 WL 3948100, at *5 (S.D.N.Y. July 19, 2016) (finding that the Second Circuit's decision in *Williams* "hinged on the 'extraordinary circumstances' specific to the case before it")); *Blake v. Porlier*, No. 9:18-CV-1008

(DNH/CFH), 2019 WL 7484052, at *6 (N.D.N.Y. Oct. 4, 2019) ("Courts have taken an inmate's housing and level of segregation from the general population into account when determining the availability of grievance procedures.") (citing

*Rodriguez v. Cross*, No. 15-CV-1079 (GTS/CFH), 2017 WL 2791063, at *7 (N.D.N.Y. May 9, 2017) (holding that a plaintiff in keeplock was not entitled to an exhaustion exception when he alleged that his grievance had not been filed due to mail tampering, and subsequently never inquired about it), *report and recommendation adopted*, 2017 WL 2790530 (N.D.N.Y. June 27, 2017)).

**\*6** In any event, unsupported assertions that a plaintiff "filed a grievance but that it was somehow lost or destroyed" have generally been found "insufficient to establish a genuine issue of fact." *Blake v. Porlier*, 2019 WL 7484052, at *5 ("Courts within the Second Circuit have continuously held that 'mere contentions or speculation of grievances being misplaced by officers do not create a genuine issue of material fact when there is no evidence to support the allegations.'

") (quoting *Rodriguez v. Cross*, 2017 WL 2791063, at *5); *Artis v. Dishaw*, No. 9:14-CV-1116 (MAD/ATB), 2016 WL 11266599, at *7 n.13 (N.D.N.Y. Sept. 12, 2016) (finding the plaintiff's failure to exhaust was not excusable, in part, because while the plaintiff "state[d] that some grievances were destroyed ... he ha[d] not submitted any copies of these grievances, nor d[id] he specify when he attempted to file them"), *report and recommendation adopted*, 2017 WL 1076343 (N.D.N.Y. Mar. 22, 2017); *Engles v. Jones*, No. 6:13-CV-6461, 2018 WL 6832085, at *10 (W.D.N.Y. Dec. 28, 2018) ("Plaintiff's unsupported assertion that he filed a grievance but that it was somehow lost or destroyed is insufficient to establish a genuine issue of material fact.") (citing *Scott v. Kastner-Smith*, 298 F. Supp. 3d 545, 555 (W.D.N.Y. 2018)).

Moreover, courts in this Circuit have granted summary judgment for failure to exhaust administrative remedies, even for a prisoner confined to a SHU whose ability to directly file a grievance or make a copy may be limited, when the plaintiff provided no documentation or minimal corroborative details. *See, e.g.*, *Sankara v. Montgomery*, No. 9:16-CV-00885 (FJS/TWD), 2018 WL 4610686, at *8 (N.D.N.Y. June 25, 2018) ("Plaintiff's conclusory allegations that the DOCCS IGP was unavailable to him [while confined to the SHU] were insufficient to withstand summary judgment," where the plaintiff "provided no evidence that he actually did write grievances; when they were written; the content of the

grievances ... the officers named in the grievance(s) ...; the specific steps taken by Plaintiff to provide them to an officer to send to the grievance office; and any specific follow up with the grievance office[.]"), *report and recommendation adopted*, 2018 WL 3408135 (N.D.N.Y. July 13, 2018); *Simpson v. Price*, No. 9:19-CV-1413 (MAD/ATB), 2021 WL 7367083, at *9 (N.D.N.Y. Dec. 29, 2021) (in the absence of any documentary evidence to corroborate plaintiff's alleged attempt to file a grievance from the SHU, the court concludes that plaintiff's completely unsupported, unclear, and vague implication that the grievance was not properly processed does not suffice to avoid summary judgment), *report and recommendation adopted*, 2022 WL 336540 (N.D.N.Y. Feb. 4, 2022); *Ozzborn v. Cornell*, No. 9:17-CV-1039 (MAD/ATB), 2021 WL 2227829, at *5 (N.D.N.Y. June 2, 2021) (Plaintiff claimed that he filed a grievance from the SHU by leaving a plain envelope addressed to the grievance committee for the mail personnel to collect; but, because he never received a response, he presumed that the grievance was never submitted. Because plaintiff never followed up on his grievance and successfully filed numerous other grievances in the recent past, he has failed to demonstrate that his administrative remedies were unavailable to him).[10]

Here, the court does not merely rely on plaintiff's lack of direct evidence, such as copies of the relevant grievances, in finding that he has failed to establish a genuine issue of material fact as to unavailability. Plaintiff in this case has done nothing more than allege in conclusory fashion that he attempted to file a grievance concerning a the September 6, 2018 incident. Plaintiff's testimony about when he attempted to submit the grievance was vague and he did not identify the officer who allegedly collected it. Likewise, he has not supported his claim that unnamed sergeants, officers, and counselors told him "not to worry" with any documentary evidence. *See, e.g.*, *Belile v. Griffin*, No. 9:11-CV-0092 (TJM/DEP), 2013 WL 1776086, at *8 (N.D.N.Y. Feb. 12, 2013) ("Plaintiff's mere threadbare allegations that his grievances were intercepted and discarded, without evidence to support such allegation, including any evidence that identifies which defendant, in particular, is responsible for discarding the grievances, are insufficient to excuse his failure to comply with the IGP [process]"), *report and recommendation adopted*, 2013 WL 1291720 (N.D.N.Y. Mar. 27, 2013).

**\*7** For the above reasons, the court concludes that plaintiff's completely unsupported and vague claim that a grievance he attempted to file against C.O. Moore relative to the September 6, 2018 incident was not properly processed does

not suffice to avoid summary judgment. Accordingly, the court recommends that C.O. Moore be granted summary judgment and the second amended complaint be dismissed against him, on the ground that plaintiff failed to exhaust his administrative remedies.

Dismissal with prejudice is appropriate where the plaintiff had the opportunity to exhaust administrative remedies, failed to do so, and is unable to cure his failure to exhaust. *Berry v. Kerik*, 366 F.3d 85, 87 (2d Cir. 2004). Here, plaintiff's time to file the relevant grievance to CORC in accordance with the rules and regulations has already passed, [11] rendering his failure to exhaust his administrative remedies incurable at this time. As a result, I recommend that plaintiff's complaint be dismissed with prejudice as to these claims. *See Livingston v. Hoffnagle*, No. 17-CV-1158 (MAD/DEP), 2019 WL 409366, at *7 (N.D.N.Y. Feb. 1, 2019) (dismissing without leave to amend, where the exhaustion error would not be cured by permitting the plaintiff leave to amend).

**IV. Eighth Amendment Failure to Protect Claim**

Defendant also seeks summary judgment on the merits of plaintiff's failure to protect claim, arguing, among other things, that plaintiff has failed to establish that C.O. Moore was acting with deliberate indifference to conditions that posed a substantial risk of serious harm to plaintiff. For the following reasons, the court agrees that summary judgment is warranted, in the alternative, on the merits of plaintiff's Eighth Amendment claim.

**A. Legal Standards**

In order to state an Eighth Amendment claim for failure to protect an inmate, the plaintiff must show that he was incarcerated under conditions posing a substantial risk of serious harm, and prison officials acted with deliberate indifference to that risk and the inmate's safety. *Farmer v. Brennan*, 511 U.S. 825, 836, 114 S. Ct. 1970 (1994). The plaintiff must show that prison officials actually knew of and disregarded an excessive risk of harm to the inmate's health and safety. *Id.* at 837, 114 S. Ct. 1970. The defendant must be aware of the facts from which the inference can be drawn that a substantial risk of serious harm exists, and the defendant must also draw that inference. *Id.*

The failure of corrections officers to employ reasonable measures to protect an inmate from violence by other inmates

may rise to the level of an Eighth Amendment violation. *See Ayers v. Coughlin*, 780 F.2d 205, 209 (2d Cir. 1985) (citing *United States v. Bailey*, 444 U.S. 394, 423 (1980)). "Reckless disregard" of plaintiff's right to be free from attacks by other inmates may be shown by the existence of a "pervasive risk of harm to inmates from other prisoners and a failure by prison officials to reasonably respond to that risk." *Knowles v. New York City Dep't of Corr.*, 904 F. Supp. 217, 221-22 (S.D.N.Y. 1995) (citing *Rucco v. Howard*, No. 91 Civ. 6762, 1993 WL 299296, at *4 (S.D.N.Y. Aug. 4, 1993); *Martin v. White*, 742 F.2d 469, 474 (8th Cir. 1984)).

**\*8** An isolated omission by corrections officers generally does not support a claim for deliberate indifference absent circumstances involving evil intent, recklessness, or deliberate indifference. *Coronado v. Goord*, No. 99 Civ. 1674, 2000 WL 1372834, at *4 (S.D.N.Y. Sept. 25, 2000) (citing *Ayers v. Coughlin*, 780 F.2d at 209). Plaintiff may allege a constitutional claim by alleging that the substantial risk of inmate attacks was longstanding, pervasive, well-documented, or expressly noted by prison officials in the past, and that the officials being sued were exposed to information concerning the risk and thus, must have known about it. *Id.* (citing *Farmer*, 511 U.S. at 842-43).

**B. Analysis**

With due regard for plaintiff's status as a pro se litigant, plaintiff has failed to establish that C.O. Moore knew of a particular risk to plaintiff's safety or that C.O. Moore was deliberately indifferent for failing to protect plaintiff. Plaintiff merely offers conclusory, general allegations that C.O. Moore knew about an alleged gang and/or race war happening at Clinton C.F. (Dkt. No. 20 at 2). However, C.O. Moore has, in his sworn declaration, denied having any knowledge about a race war at Clinton C.F. or having any access to information regarding an inmate's gang status. (Moore Decl. ¶¶ 21, 23). Even if C.O. Moore did have access to such records, plaintiff testified that he is not a member of a gang. (Jackson Dep. at 19). Thus, there is nothing in the record other than plaintiff's conclusory allegations establishing that C.O. Moore knew plaintiff was at a substantial risk of harm because of an alleged gang war.

Plaintiff's claim is further undermined by his sworn testimony admitting that he had not had any prior interactions with the inmate who attacked him before the underlying incident.

(Jackson Dep. at 19-20); *Gillard v. Jarvis*, No. 9:11-CV-1021 (LEK/ATB), 2012 WL 7037734, at *7 (N.D.N.Y. Nov. 6, 2012), *report and recommendation adopted*, 2013 WL 474384 (N.D.N.Y. Feb. 7, 2013) ("If plaintiff did not know the inmate who assaulted him, he cannot claim that defendants "knew" and disregarded the serious risk that plaintiff would be assaulted at Clinton by this unknown individual."). Plaintiff has not alleged that he was threatened by the other inmate, or any member of the other inmate's race or gang, prior to this incident. Additionally, neither inmate was in protective custody when they were released form their cells. (Moore Decl. ¶ 14). Plaintiff also testified he never asked for protective custody before or after the incident. (Jackson Dep. at 73).

"Courts routinely deny deliberate indifference claims based upon surprise attacks." *Zimmerman v. Macomber*, No. 95 Civ. 0882, 2001 WL 946383, at *5 (S.D.N.Y. Aug. 21, 2001) (granting summary judgment in favor of the defendants where the plaintiff failed to carry his burden to establish that the defendant had knowledge of a substantial risk to plaintiff's health or safety from an inmate attacker). Here, plaintiff has failed to allege defendants knew of a prior altercation between the plaintiff and his attacker, or of any threats that had been made against the plaintiff. *Fernandez v. N.Y.C. Dep't of Corr.*, No. 08 Civ. 4294, 2010 WL 1222017, at *4 (S.D.N.Y. Mar. 29, 2010); *Clark v. Gardner*, 256 F. Supp.3d 154, 168 (N.D.N.Y. 2017). Because plaintiff has alleged no facts suggesting that C.O. Moore knew of a particular risk to the plaintiff's safety, he has failed to raise a material question of fact as to whether C.O. Moore was deliberately indifferent, and summary judgment is warranted. *Parris v. New York State Dep't Corr. Servs.*, 947 F. Supp.2d 354, 363 (S.D.N.Y. 2013).

**\*9  WHEREFORE**, based on the findings above, it is

**RECOMMENDED**, that Defendant's motion for summary judgment (Dkt. No. 16) be **GRANTED,** and the complaint be **DISMISSED WITH PREJUDICE.**

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen (14) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993) (citing *Small v. Sec'y of Health and Hum. Servs.*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(e), 72.

**All Citations**

Slip Copy, 2023 WL 4710869

---

### Footnotes

1    Defense counsel specifically advised plaintiff of the consequences of failing to respond to the summary judgment motion. (Dkt. No. 16). Counsel forwarded, to plaintiff, a copy of the court's form Notification of the Consequences of Failing to Respond to a Summary Judgment Motion, which provided in pertinent part:

If you do not file a proper response to this motion, the Court may grant the motion and dismiss some or all of your claims. Under Local Rules 7.1(b) and 56.1(b), to file a proper response to this motion, you must submit the following papers:

(1) A response to the defendants' statement of material facts that admits and/or denies each of the defendants' assertions in matching numbered paragraphs, 1 and that supports each denial with citations to record evidence.

* * *

> WARNING: If you do not submit a proper response to the defendants' statement of material facts, the Court may deem you to have admitted the defendants' factual statements.

(Dkt. No. 16 at 4).

2    This committee was formerly known as the "Inmate Grievance Resolution Committee," but has recently been renamed.

3    The program was formerly known as the "Inmate Grievance Program," but has recently been renamed.

4    Plaintiff testified that he filed the grievance "it was in like the same – I want to say around like the 22[nd] or so." (Pl.'s Dep. at 87-88).

5    Plaintiff alleges that he was told "it was a code 49 and that it had to go to the superintendent office." (Dkt. No. 20 at 3).

6    IGP Supervisors Gregory and Seguin stated Clinton C.F. had a fully functioning IGP program at all times relevant to the complaint. (Gregory Decl. ¶ 16; Seguin Decl. ¶ 11). Plaintiff also testified that he filed a grievance for an unrelated matter after the incident and received an unfavorable decision and appealed that decision. (Pl.'s Dep. 90-91).

7    I agree with Magistrate Judge Peebles' cogent analysis that, while the burden of production may shift to a plaintiff with respect to certain aspects of the exhaustion issue, "the ultimate burden of proof with respect to the exhaustion defense remains, at all times, with the defendant." *See, e.g.*, *Bailey v. Fortier*, No. 9:09-CV-0742 (GLS/DEP), 2012 WL 6935254, at *5-6 (N.D.N.Y. Oct. 4, 2012), *report and recommendation adopted*, 2013 WL 310306 (N.D.N.Y. Jan. 25, 2013); *Nelson v. Plumley*, No. 9:12-CV-422 (TJM/DEP), 2015 WL 4326762, at *7-8 (N.D.N.Y. July 14, 2015), *report and recommendation adopted*, 2013 WL 1305338 (N.D.N.Y. Mar. 18, 2013).

8    My summary of *Williams* tracks that of Magistrate Judge Stewart in *Berman v. Durkin*, No. 9:13-CV-136 (LEK/DJS), 2017 WL 1215814, at *8 (N.D.N.Y. Mar. 10, 2017), *report and recommendation adopted*, 2017 WL 1207834 (N.D.N.Y. Mar. 31, 2017).

9    In *Medina v. Napoli*, 725 F. App'x at 53-54, the Second Circuit followed *Williams* in a case involving a SHU inmate, but absent the additional circumstance of a transfer to a different facility, which might have further complicated the inmate's ability to file a grievance.

10    District Judge D'Agostino distinguished *Williams v. Priatno* by noting the various ways in which the plaintiff in *Williams* specified how he followed up with respect to the grievance that he left for delivery from the SHU, which was never filed with the IGP. *Id.* at *4.

11    "Ordinarily, an inmate must first submit 'a complaint,' or grievance, to the facility's IGP clerk within twenty-one days of the alleged occurrence giving rise to his complaint. 7 N.Y.C.R.R. § 701.5(a). Relief from the twenty-one day time limit may be granted by the IGP supervisor based upon mitigating circumstances, provided, however, that '[a]n exception to the time limit may not be granted if the request was made more than 45 days after an alleged occurrence.' " *Nelson v. Plumley*, 2015 WL 4326762, at *2 (citing N.Y.C.R.R. § 701.6(g)(1)(i)(a)).

---

**End of Document**                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

Case 9:22-cv-00102-BKS-ML    Document 78    Filed 12/13/23    Page 171 of 373

Sankara v. Montgomery, Not Reported in Fed. Supp. (2018)

**2018 WL 4610686**
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Ahmadou SANKARA, Plaintiff,

v.

MONTGOMERY, Burgess, Lopez, Defendants.

9:16-CV-00885 (FJS/TWD)

|

Signed 06/25/2018

**Attorneys and Law Firms**

AHMADOU SANKARA, 16-R-0122, Plaintiff pro se, Upstate Correctional Facility, P.O. Box 2001, Malone, New York.

HON. BARBARA D. UNDERWOOD, Attorney General for the State of New York, OF COUNSEL: MATTHEW P. REED, ESQ., The Capitol, Albany, New York 12224, Counsel for Defendants.

**ORDER AND REPORT-RECOMMENDATION**

THÉRÈSE WILEY DANCKS, United States Magistrate Judge

**I. INTRODUCTION**

**\*1** The sole remaining claim in *pro se* Plaintiff Ahmadou Sankara's amended complaint (Dkt. No. 19) in this civil rights action brought under 🚩 42 U.S.C. § 1983 is his Eighth Amendment conditions of confinement claim involving the alleged denial of meals against Defendants Keith Montgomery ("Montgomery"), a Department of Corrections and Community Supervision ("DOCCS") Sergeant at Fishkill Correctional Facility ("Fishkill"); Erik Burgess ("Burgess"), a Corrections Officer ("C.O.") at Fishkill; and Jessica Lopez ("Lopez"), a former C.O. at Fishkill. (Dkt. No. 22 at 22. [1]) Montgomery, Burgess, and Lopez now move for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure on the grounds that Plaintiff has failed to exhaust his administrative remedies and has failed to assert a constitutional violation. (Dkt. Nos. 81 and 81-1.) Plaintiff has filed papers in opposition to Defendants' motion. [2] (Dkt. No. 84.)

For reasons that follow, the Court recommends that Defendants' motion for summary judgment be granted.

**II. FACTUAL BACKGROUND**

Plaintiff, an inmate in the custody of DOCCS, was transferred to Fishkill on August 3, 2016. (Dkt. No. 19 at 11.) In his amended complaint, Plaintiff alleges that his Eighth Amendment conditions of confinement claim is based upon having been deprived of meals by Defendant Burgess on August 3, 2016, and August 4, 2016; by Defendants Lopez and Montgomery on October 10, 2016, and September 24, 2016; and by Montgomery on October 23, 2016, and October 24, 2016. *Id.* At his deposition, Plaintiff testified he was deprived of five meals by the Defendants, which included dinner on August 3 and 4, 2016, and lunch on September 10, 2016, September 23, 2016, and September 24, 2016. (Dkt. No. 81-3 at 19, 21, 26-27.)

**A. Service of Meals in the Fishkill SHU**

Meals are served three times a day in the Special Housing Unit ("SHU") at Fishkill. (Dkt. No. 81-4 at ¶ 7. [3]) Before a meal is served, an announcement is made on the public address system once on each of the two floors notifying inmates of the forthcoming meal, and reminding them to be awake, with their lights on, fully clothed, and with any clothing lines in their cell taken down. *Id.* at ¶¶ 8-9. It is made before meal delivery so that inmates have time to prepare. *Id.* at ¶ 9. The rules for meals are contained in the SHU rulebook given to inmates when they are admitted to the unit. *Id.* at ¶ 10. The rules have a dual purpose: to ensure that food is not contaminated and to meet heightened security concerns in SHU. *Id.* at ¶¶ 11-13. Plaintiff denies having received the rulebook. (Dkt. No. 84 at ¶ 17.)

**\*2** Anywhere from five to seven officers assist in delivering meals, with Defendant Montgomery either leading or following behind the officers to address any problems when he is on duty. *Id.* at ¶¶ 15-17. Inmates who do not comply with the established procedures do not receive a meal. *Id.* at ¶ 18. Failure to comply with the meal distribution procedures is noted as a refusal of chow and recorded in the SHU logbook. *Id.* at ¶ 14.

**B. August 3 and 4, 2016**

Plaintiff claims that on August 3, 2016, the day he arrived at Fishkill, he was deprived of dinner by Defendant Burgess. (Dkt. No. 81-3 at 19, 27.) Plaintiff testified at his deposition

Case 9:22-cv-00102-BKS-ML    Document 78    Filed 12/13/23    Page 172 of 373

Sankara v. Montgomery, Not Reported in Fed. Supp. (2018)

that he received something like a box lunch with bread while en route to Fishkill and should have been given dinner at Fishkill but was not. *Id.* at 20. According to Plaintiff, dinner is served at 3:00 or 4:00pm. *Id.* at 22. Plaintiff claims that he and his bunk mate in SHU were denied dinner by Burgess on August 3, 2016, because his bunk mate was not properly dressed. *Id.* at 20-23, 27. Plaintiff was properly dressed and did not say anything, but his bunk mate began arguing with Burgess, which he was not supposed to do, so Burgess also deprived them of dinner the following day, August 4, 2016. *Id.* at 21, 27.

Plaintiff was very hungry and emotionally frustrated the night of August 3, 2016, because he had not made himself breakfast that morning, the lunch he was given was too small, and he did not receive dinner. *Id.* at 26. Plaintiff did receive both breakfast and lunch on August 4, 2016, missing only dinner. *Id.* at 21-22.

While Burgess recalls Plaintiff and his behavior in SHU, he does not recall the specific dates on which Plaintiff claims Burgess deprived him of a meal. (Dkt. No. 81-5 at ¶ 5.) There is an entry for August 3, 2016, in the SHU logbook in indicating that Plaintiff was not admitted to SHU until 6:48 pm, after dinner would have been served. (Dkt. No. 81-3 at 124.) The logbook appears to note two refusals for dinner on August 4, 2016, but does not list the inmates by name. *Id.* at 131.

### C. September 10, 2016

Plaintiff testified at his deposition that on September 10, 2016, he was denied a haircut by a corrections officer because Plaintiff had allegedly called him a Chinese officer, which Plaintiff denies. (Dkt. No. 81-3 at 32-33.) The officer wrote a misbehavior report on Plaintiff, and when the officer and Montgomery came around serving lunch, Plaintiff, who was standing in front of his door, was told he was not properly dressed and did not receive lunch. *Id.* at 34. Plaintiff did receive dinner on September 10, 2016. *Id.* at 36. Although Montgomery recalls Plaintiff, he does not recall his interactions with Plaintiff on the dates Plaintiff claims not to have received his meals. (Dkt. No. 81-4 at ¶ 20.)

### D. September 23, 2016

On September 23, 2016, recreation ("rec") and lunch were called at the same time. (Dkt. No. 81-3 at 39.) According to Plaintiff, a SHU inmate cannot have rec and chow at the same time. *Id.* Plaintiff was at rec with another inmate. *Id.* 39-40.

When they came in, Plaintiff told the sergeant he had been at rec and needed his lunch. *Id.* at 39. At that time lunch had not yet passed by Plaintiff's door. *Id.* at 39-40. Plaintiff could see the officers and talked to them when the food was next to him, but Plaintiff was not given any. *Id.* at 40. Plaintiff has identified Montgomery as the one who did not give him lunch. *Id.* at 42.

**\*3** Plaintiff was very hungry so he started to kick the door for them to bring his food. *Id.* They did not want to bring his food so he left it alone. *Id.* Plaintiff did receive dinner on September 23, 2016. *Id.* at 41.

### E. September 24, 2016

Plaintiff testified at his deposition that on September 24, 2016, he stopped the Superintendent at Fishkill and started to speak with him about the food issue going on. (Dkt. No. 81-3 at 42.) Montgomery told Plaintiff to talk fast and Plaintiff said he knew Montgomery's name even though he hid it, and that Montgomery was the one who had denied him food September 10 and 23, 2016. *Id.* After the Superintendent left, Montgomery denied Plaintiff lunch again because he had talked to the Superintendent. *Id.* at 42-43. Defendant Lopez came to speak with Plaintiff when he began kicking his door. Plaintiff was told they had already passed and were not coming back, and they walked away. *Id.* at 43. When Plaintiff started kicking the door because he was really hungry, Lopez wrote a misbehavior report on which she stated he had been sleeping. *Id.* Plaintiff testified that of the Defendants only Montgomery was involved in depriving Plaintiff of lunch on September 23, 2016, and that both Montgomery and Lopez were involved on September 24, 2016. *Id.* at 44.

### III. APPLICABLE SUMMARY JUDGMENT LEGAL STANDARDS

Summary judgment may be granted only if the submissions of the parties taken together "show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56; *see* *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The party moving for summary judgment bears the initial burden of showing, through the production of admissible evidence, that no genuine issue of material fact exists. *Salahuddin v. Goord*, 467 F.3d 263, 272-73 (2d Cir. 2006). A dispute of fact is "genuine" if "the [record] evidence is such that a

Case 9:22-cv-00102-BKS-ML    Document 78    Filed 12/13/23    Page 173 of 373

Sankara v. Montgomery, Not Reported in Fed. Supp. (2018)

reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505.

Only after the moving party has met this burden is the nonmoving party required to produce evidence demonstrating that genuine issues of material fact exist. *Salahuddin*, 467 F.3d at 272-73. The nonmoving party must do more than "rest upon the mere allegations ... of the [plaintiff's] pleading" or "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). "Conclusory allegations, conjecture and speculation ... are insufficient to create a genuine issue of fact." *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998).

A party opposing summary judgment is required to submit admissible evidence. *See Spiegel v. Schulmann*, 604 F.3d 72, 81 (2d Cir. 2010) ("It is well established that in determining the appropriateness of a grant of summary judgment, [the court] ... may rely only on admissible evidence.") (citation and internal quotation marks omitted). A plaintiff's verified complaint is to be treated as an affidavit. [4]

*Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995) ("A verified complaint is to be treated as an affidavit ... and therefore will be considered in determining whether material issues of fact exist....") (citations omitted).

**\*4** In *Jeffreys v. City of New York*, 426 F.3d 549, 554 (2d Cir. 2005), the Second Circuit reminded that on summary judgment motions "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could *reasonably* find for the plaintiff." "At the summary judgment stage, a nonmoving party must offer some hard evidence showing that its version of the events is not wholly fanciful." *Id.* (citation and internal quotation marks omitted). "To defeat summary judgment, ... nonmoving parties may not rely on conclusory allegations or unsubstantiated speculation." *Jeffreys*, 426 F.3d at 554 (citation and internal quotation marks omitted). "[T]o satisfy Rule 56(e), affidavits must be based upon 'concrete particulars,' not conclusory allegations." *Schwapp v. Town of Avon*, 118 F.3d 106, 111 (2d Cir. 1997) (citation omitted). "Statements that are devoid of any specifics, but replete with

conclusions, are insufficient to defeat a properly supported motion for summary judgment." *Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 452 (2d Cir. 1999).

In determining whether a genuine issue of material fact exists, the court must resolve all ambiguities and draw all reasonable inferences against the moving party. *Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 309 (2d Cir. 2008). Where a party is proceeding *pro se*, the court is obliged to "read [the pro se party's] supporting papers liberally, and ... interpret them to raise the strongest arguments that they suggest." *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994). However, "a pro se party's 'bald assertion,' unsupported by evidence, is not sufficient to overcome a motion for summary judgment." *Cole v. Artuz*, No. 93 Civ. 5981 (WHP) (JCF), 1999 WL 983876 at \*3 (S.D.N.Y. Oct. 28, 1999) [5] (citing *Carey v. Crescenzi*, 923 F.2d 18, 21 (2d Cir. 1991) ).

## IV. PLAINTIFF'S FAILURE TO COMPLY FULLY WITH N.D.N.Y. L.R. 7.1(a)(3)

While courts are required to give due deference to a plaintiff's *pro se* status, that status "does not relieve [a *pro se*] plaintiff of his duty to meet the requirements necessary to defeat a motion for summary judgment." *Jorgensen v. Epic/Sony Records*, 351 F.3d 46, 50 (2d Cir. 2003). In opposing Defendants' summary judgment motion, Plaintiff failed to respond to the statement of material facts filed by Defendants in the manner required under N.D.N.Y. L.R. 7.1(a)(3) by neglecting to set forth a specific citation to the record in a number of instances where he appears to dispute a statement included in the statement of undisputed facts. [6] (See Dkt. Nos. 81-2 and 84.)

Where a party has failed to respond to the movant's statement of material facts in the manner required under N.D.N.Y. L.R. 7.1(a)(3), the facts in the movant's statement to which Plaintiff has not properly responded will be accepted as true (1) to the extent they are supported by evidence in the record, [7] and (2) the nonmovant, if proceeding *pro se*, has been specifically advised of the possible consequences of failing to respond to the motion. [8] *See Champion, v. Artuz*, 76 F.3d 483, 486 (2d Cir. 1996). However, the Second Circuit, acknowledging a court's broad discretion to determine whether to overlook a failure to comply with local rules, has held that "while a court is not required to

Case 9:22-cv-00102-BKS-ML    Document 78    Filed 12/13/23    Page 174 of 373

Sankara v. Montgomery, Not Reported in Fed. Supp. (2018)

consider what the parties fail to point out in their [local rule statements of material facts], it may in its discretion opt to conduct an assiduous review of the entire record even where one of the parties has failed to file such a statement."

*Holtz v. Rockefeller & Co., Inc.*, 258 F.3d 62, 73 (2d Cir. 2001) (citation and internal quotation marks omitted). In deference to Plaintiff's *pro se* status and the significant degree of effort he has shown in his response to Defendants' material statement of facts (Dkt. No. 84), the Court has opted to review the entire record.

## V. EXHAUSTION OF ADMINISTRATIVE REMEDIES

### A. Legal Standard

**\*5** Montgomery, Burgess, and Lopez seek summary judgment on Plaintiff's Eighth Amendment conditions of confinement claim against them on the ground that Plaintiff failed to exhaust his administrative remedies under the DOCCS Inmate Grievance Procedure ("IGP") with regard to the claim. Under the Prison Litigation Reform Act of 1995 ("PLRA"), "[n]o action shall be brought with respect to prison conditions under section 1983 ... by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."

42 U.S.C. § 1997e(a); *see also* Ross v. Blake, —— U.S. ——, 136 S.Ct. 1850, 1854-55, 195 L.Ed.2d 117 (2016). "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002). "There is no question that exhaustion is mandatory under the PLRA and that unexhausted claims cannot be brought in court." *Jones v. Bock*, 549 U.S. 199, 211, 127 S.Ct. 910, 166 L.Ed.2d 798 (2007).

The PLRA requires "proper exhaustion," which means using all steps required by the administrative review process applicable to the institution in which an inmate is confined and doing so properly. *Jones*, 549 U.S. at 218, 127 S.Ct. 910 (citing *Woodford v. Ngo*, 548 U.S. 81, 88, 126 S.Ct. 2378, 165 L.Ed.2d 368 (2006) ); *see also* *Amador v. Andrews*, 655 F.3d 89, 96 (2d Cir. 2011) (exhaustion necessitates "using all steps that the [government] agency holds out, and doing so properly") (internal quotations

omitted). In New York State prisons, DOCCS has a well-established three-step IGP. *See* N.Y. Comp. Codes R. & Regs. ("N.Y.C.R.R.") tit. 7, § 701.5.

First, an inmate must file a complaint with the facility IGP clerk within twenty-one days of the alleged occurrence. *Id.* § 701.5(a)(1). A representative of the facility's IGRC has sixteen calendar days from receipt of the grievance to informally resolve the issue. *Id.* § 701.5(b)(1). If there is no such informal resolution, the full IGRC conducts a hearing within sixteen calendar days of receipt of the grievance, *id.* § 701.5(b)(2), and issues a written decision within two working days of the conclusion of the hearing. *Id.* § 701.5(b)(3).

Second, a grievant may appeal the IGRC's decision to the facility superintendent within seven calendar days of receipt of the IGRC's written decision. *Id.* § 701.5(c)(1). If the grievance involves an institutional issue (as opposed to a DOCCS-wide policy issue), the superintendent must issue a written decision within twenty calendar days of receipt of the grievant's appeal. *Id.* § 701.5(c)(3)(ii). Grievances regarding DOCCS-wide policy issues are forwarded directly to the Central Office Review Committee ("CORC") for a decision under the process applicable to the third step. *Id.* § 701.5(c)(3)(i).

Third, a grievant may appeal to CORC within seven working days of receipt of the superintendent's written decision. *Id.* § 701.5(d)(1)(i). CORC is to render a written decision within thirty calendar days of receipt of the appeal. *Id.* § 701.5(d)(3)(ii).

Special procedures are used when the grievance involves a claim of staff misconduct. *Id.* § 701.8. A grievance alleging staff misconduct, once it is given a number and recorded, must be sent directly to the superintendent, and the superintendent must issue a decision within twenty-five days. *Id.* § 701.8(f). If the grievant wishes to appeal a decision by the Superintendent to CORC, he must file a notice of decision to appeal with the inmate grievance clerk at the bottom of the Superintendent's decision within seven days of receipt of the decision. *Id.* § 701.8(h). CORC is required to render a written decision within thirty calendar days of receipt of the appeal. *Id.* § 701.8(i) (incorporating § 701.5).

As set forth above, at each step of the IGP, a decision must be rendered within a specified time period. "Where the IGRC and/or superintendent do not timely respond, an inmate must appeal 'to the next step,' " assuming there is another step

Case 9:22-cv-00102-BKS-ML    Document 78    Filed 12/13/23    Page 175 of 373

Sankara v. Montgomery, Not Reported in Fed. Supp. (2018)

in the IGP. *Eleby v. Smith*, No. 9:15-CV-0281 (TJM/DEP), 2017 WL 986123, at *4 (N.D.N.Y. Jan. 9, 2017) (quoting 7 N.Y.C.R.R. § 701.6(g)(2) ); *see also* 🚩 *Smith v. Kelly*, 985 F.Supp.2d 275, 281 (N.D.N.Y. 2013) ("[A]ny failure by the IGRC or the superintendent to timely respond to a grievance ... can and must be appealed to the next level ... to complete the grievance process."). Exhaustion under the DOCCS IGP is not complete until the grievance has been appealed to CORC and CORC has issued a decision. *See* 🚩 *Neal v. Goord*, 267 F.3d 116, 123 (2d Cir. 2001), *overruled on other grounds by* 🚩 *Porter v. Nussle*, 534 U.S. 516, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002); 🚩 *Singh v. Goord*, 520 F.Supp.2d 487, 495 (S.D.N.Y. 2007) (complete exhaustion to CORC, the highest level, is required).

*6 While the PLRA mandates exhaustion of administrative remedies, it also "contains its own, textual exception to mandatory exhaustion." 🚩 *Ross*, 136 S.Ct. at 1858. More specifically, 🚩 section 1997e(a) provides that only those administrative remedies that "are available" must first be exhausted. 🚩 42 U.S.C. § 1997e(a); *see also* 🚩 *Ross*, 136 S.Ct. at 1858 ("[T]he exhaustion requirement hinges on the availability of administrative remedies[.]" (quotations and citations omitted) ). In the PLRA context, the Supreme Court has determined that "availability" means that "an inmate is required to exhaust those, but only those, grievance procedures that are capable of use to obtain some relief for the action complained of." 🚩 *Ross*, 136 S.Ct. at 1859 (quotations and internal citations omitted).

The 🚩 *Ross* Court identified three circumstances in which a court may find that internal administrative remedies are not available to prisoners under the PLRA. 🚩 *Id.* at 1859-60. First, "an administrative procedure is unavailable when (despite what regulations or guidance materials may promise) it operates as a simple dead end with officers unable or consistently unwilling to provide any relief to aggrieved inmates." 🚩 *Id.* at 1859. "Next, an administrative scheme might be so opaque that it becomes, practically speaking, incapable of use." 🚩 *Id.* Finally, an administrative remedy is not "available" when "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." 🚩 *Id.* at 1860.

In 🚩 *Williams v. Corr. Officer Priatno*, 829 F.3d 118, 123 n.2 (2d Cir. 2016), the Second Circuit noted that, "the three circumstances discussed in 🚩 *Ross* do not appear to be exhaustive[.]" The illustrations of unavailability in 🚩 *Ross* nonetheless guide the Court's inquiry. *See* 🚩 *Mena v. City of New York*, No. 13-CV-2430 (RJS), 2016 WL 3948100, at *4 (S.D.N.Y. July 19, 2016).

Because non-exhaustion is an affirmative defense, defendants bear the burden of showing that a prisoner has failed to satisfy the exhaustion requirements. *See* 🚩 *Jones*, 549 U.S. at 216, 127 S.Ct. 910; 🚩 *Johnson v. Testman*, 380 F.3d 691, 695 (2d Cir. 2004), *overruled on other grounds,* 🚩 *Woodford*, 548 U.S. at 94-95, 126 S.Ct. 2378. Plaintiff must then establish that the DOCCS IGP was unavailable to him. *See* 🚩 *Jones*, 549 U.S. at 216, 127 S.Ct. 910.

### B. Analysis

#### 1. Plaintiff's Failure to Exhaust His Administrative Remedies

Fishkill had a fully functioning inmate grievance procedure during the time Plaintiff was housed at the facility. (Dkt. No. 81-7 at ¶ 12.) Fishkill IGP supervisor, Sally Reams ("Reams"), has submitted a declaration describing the DOCCS IGP procedures followed at Fishkill. (*See generally* Dkt. No. 81-9.) According to Reams, she reviewed the records in the Fishkill grievance office where all documents or copies thereof related to a particular grievance dating back to January 1, 2013, are maintained. *Id.* at ¶¶ 9, 12. Her review revealed that Plaintiff was housed at Fishkill from August 3, 2016, to October 31, 2016, and during that time did not file any grievance related to a denial of six meals at Fishkill between August 3, 2016, and October 24, 2016. [9] *Id.* at ¶ 13.

Joseph Cieslak ("Cieslak"), IGP supervisor at Mohawk Correctional Facility ("Mohawk"), to which Plaintiff was moved on October 31, 2016, has described the manner in which the DOCCS IGP is followed at Mohawk. (*See generally* Dkt. No. 81-8.) Cieslak reviewed the grievance records in the grievance office at Mohawk and determined that Plaintiff had not filed any formal grievances while at Mohawk. *Id.* at ¶¶ 9-12.

**\*7** Rachael Seguin, Assistant Director of the DOCCS IGP, has also submitted a declaration in support of Defendants' motion. (Dkt. No. 81-7.) Seguin is the custodian of records maintained by CORC. *Id.* at ¶ 2. The CORC database contains files on inmate appeals to CORC for the current year and the previous four calendar years. *Id.* at ¶ 7. Seguin reviewed the CORC database for appeals related to Plaintiff's claim in this action and determined that he has never appealed a grievance to CORC. *Id.* at ¶¶ 10-11 and pp. 7-8.

The Court finds that the Reams declaration is deficient in showing that Plaintiff failed to file grievances with regard to any of the missed meals since it indicates only that her review of the grievance office records showed that Plaintiff did not file a grievance related to "a denial of meals on six occasions between August 3, 2016 and October 3, 2016." (Dkt. Nos. 81-3 at 38-39; 81-9 at ¶ 13.) However, inasmuch as the Seguin declaration and attached printouts from the CORC database establish that Plaintiff has never filed any appeals with CORC, the Court finds that Defendants have met their burden of establishing that Plaintiff failed to exhaust his administrative remedies with regard to his Eighth Amendment conditions of confinement claim that he was deprived of five meals by Defendants. *See* 🚩 *Jones,* 549 U.S. at 218, 127 S.Ct. 910 (proper exhaustion under the PLRA means using all steps required by the applicable administrative review process).

### 2. Plaintiff's Failure to Sustain His Burden on Availability

The Court also finds that Plaintiff has failed to submit nonconclusory evidence of unavailability under 🚩 *Ross* sufficient to raise a material issue of fact on the question of availability of the DOCCS IGP. In his amended complaint, Plaintiff alleges "... also at Fishkill my SHU appel mail was not go out and my grievance was not go out I was denied food at Fishkill five times in the SHU...." (Dkt. No. 19 at 9.) Plaintiff further alleges "[o]n August 3, 2016 I was transfer from Green facility to Fishkill facility I don't know if Green facility write note to Fishkill facility because same day on June 3, 2016 [August 3, 3016?] I was denied chow the next day I was denie on June 4, 2016 [August 4. 2016?] I write grievance I never receive my grievance respond...." *Id.* at 11.

At his deposition, Plaintiff testified he filed grievances for "any matter that's not procedure" and "for [his] right"

and never received a response. (Dkt. No. 81-3 at 60.) According to Plaintiff, he filed grievances regarding missed meals at Fishkill. 🚩 *Id.* at 73. Plaintiff described the procedure followed in the Fishkill SHU whereby inmates give grievances to the corrections officer who comes around and drops the grievances in a basket and claims that the officers only send out the mail they want to send out. 🚩 *Id.* at 74. Plaintiff claims to have filed grievances all the time and believes that they probably did not go out because he never received a response. *Id.*

Plaintiff testified he wrote to the superintendent about the food situation because he had not heard back from the I.G.R.C. 🚩 *Id.* at 75. The superintendent wrote back and told him to appeal his decision. 🚩 *Id.* at 78. According to Plaintiff, the superintendent told him to appeal to CORC regarding how many times he was denied food in SHU, so he wrote to CORC and retained a copy as was his practice and never received a response. 🚩 *Id.* at 77-78.

In his declaration in reply to the Reams declaration, Plaintiff states that the Fishkill grievance office failed to respond to his grievance of the Eighth Amendment violation. (Dkt. No. 84-1 at 2.) In his declaration in response to the Cieslak declaration, Plaintiff states that Cieslak never filed or responded to any of Plaintiff's grievances at Mohawk. *Id.* at 4. In his declaration in response to the Seguin declaration, the only grievance referenced is a grievance dated June 21, 2017. *Id.* at 6. Although not admissible evidence, Plaintiff repeats in his response to Defendants' material statement of facts that his grievances regarding being denied meals were taken but not sent to the grievance office. (Dkt. No. 84 at ¶ 54.)

**\*8** Plaintiff has done nothing more than allege in conclusory fashion that he attempted to file one or more grievances concerning the denial of meals. He has provided no evidence that he actually did write grievances; when they were written; the content of the grievances, including the specific denial of meals involved in the grievance; the officers named in the grievance(s) as involved in the denials; the specific steps taken by Plaintiff to provide them to an officer to send to the grievance office; and any specific follow up with the grievance office at Fishkill regarding the grievances. Plaintiff has submitted no documentary evidence whatsoever that supports his conclusory assertion that he submitted grievances regarding the denial of meals or demonstrates any follow up on his part when he allegedly received no response.

The Court concludes that Plaintiff's conclusory accusations that the DOCCS IGP was unavailable to him because his grievances were not sent to the grievance office by the officers who picked them up and because he did not receive a response from CORC, unsupported by evidence, are insufficient to withstand summary judgment. *See* 🚩 *Rodriguez v. Cross*, No. 15-CV-1079 (GTS/CFH), 2017 WL 2791063, at *7 (N.D.N.Y. May 9, 2017) ("Courts in this Circuit have consistently held that mere contentions or speculations of grievances being misplaced by officers do not create a genuine issue of material fact [on the availability of the DOCCS IGP] when there is no evidence to support the allegations"); 🚩 *Khudan v. Lee*, No. 12-cv-8147 (RJS), 2016 WL 4735364, at *6 (S.D.N.Y. Sept. 8, 2016) ("Plaintiff's accusations [regarding grievances], which 'stand alone' and are 'unsupported', are insufficient to withstand summary judgment") (quoting 🚩 *Bolton v. City of New York*, No. 13-CV-5749 (RJS), 2015 WL 1822008, at *2 (S.D.N.Y. April 20, 2015) ).

Based upon the foregoing, the Court recommends that all three Defendants be granted summary judgment on the ground that Plaintiff failed to exhaust his administrative remedies with regard to his Eighth Amendment claim.

## VI. Eighth Amendment Claim Regarding Missed Meals
The Court is recommending that Defendants be granted summary judgment on exhaustion grounds. However, if the Court were to consider Defendants claim for entitlement to judgment as a matter of law, it would recommend summary judgment as a matter of law on Plaintiff's Eighth Amendment conditions of confinement claim as well.

### A. Legal Standard for Eighth Amendment Conditions of Confinement Claims for Depriving an Inmate of Meals
The Eighth Amendment "imposes the constitutional limitation upon punishments: they cannot be 'cruel and unusual.' " 🚩 *Rhodes v. Chapman*, 452 U.S. 337, 345, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981). The Eighth Amendment prohibits punishments which "involve the unnecessary and wanton infliction of pain." 🚩 *Id.* at 346, 101 S.Ct. 2392 (quoting 🚩 *Gregg v. Georgia*, 428 U.S. 153, 173, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976) ). "Among 'unnecessary and wanton' inflictions of pain are those that are 'totally without

penological justification.' " 🚩 *Id.* (quoting 🚩 *Gregg,* 428 U.S. at 183, 96 S.Ct. 2909).

The Second Circuit has held that the Constitution requires that prisoners be fed nutritionally adequate food and "under certain circumstances a substantial deprivation of food may well be recognized as being of constitutional dimension." 🚩 *Robles v. Coughlin*, 725 F.2d 12, 15 (2d Cir. 1983); *see also* 🚩 *Jackson v. Marks*, 722 F. App'x 106, 107 (2d Cir. 2018) (Mem) ("[A] substantial deprivation of food can cause serious physical harm sufficient to find cruel and unusual punishment in violation of the Eighth Amendment.") (citation and internal quotation marks omitted).

In order to establish a claim that the denial of food constitutes an Eighth Amendment violation, a prisoner must establish that a "sufficiently serious condition" resulted from not receiving food. *Evans v. Albany County Correctional Facility*, No. 9:05-CV-1400 (GTS), 2009 WL 1401645, at *9 (N.D.N.Y. May 14, 2009) (citation and internal quotation marks omitted). To prove a conditions of confinement claim, a prisoner must also establish that defendant acted with deliberate indifference that defendant "knows of and disregards an excessive risk to inmate health or safety." 🚩 *Phelps v. Kapnolas*, 308 F.3d 180, 185-86 (2d Cir. 2002) (quoting 🚩 *Farmer v. Brennan*, 511 U.S. 825, 837, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994) ). "[T]he [defendant] must both be aware of facts from which the inference could be drawn that a substantial risk of harm exists, and he must also draw that inference." 🚩 *Id.* at 186 (quoting 🚩 *Farmer, id.*). The "deliberate indifference" element is equivalent to standard of "recklessness" as used in criminal law." 🚩 *Id.*

### B. Analysis
**\*9** Plaintiff claims to have missed a total of five meals over a period of fifty-three days as a result of the actions of the Defendants and never to have missed more than one meal on a given day. (Dkt. No. 81-3 at 19, 21, 26-27, 80.) Plaintiff contends Defendant Burgess denied him dinner on August 3 and August 4, 2016; Montgomery denied him lunch on September 10, 23, and 24, 2016; and Lopez with Montgomery denied him lunch on September 24, 2016. (Dkt. No. 81-3 at 19, 21, 27, 32-33, 42, 44, 55-56.) Neither Burgess nor Montgomery has any recollection of interactions with Plaintiff on the days he was allegedly denied meals. (Dkt. Nos. 81-4 at ¶ 20; 81-5 at ¶ 5.)

Case 9:22-cv-00102-BKS-ML    Document 78    Filed 12/13/23    Page 178 of 373

Sankara v. Montgomery, Not Reported in Fed. Supp. (2018)

According to Lopez, she only withheld a meal from Lopez on one occasion because he was lying on his bed under a sheet either asleep or pretending to be asleep. (Dkt. No. 81-6 at ¶¶ 11, 16.) Lopez did not deliver his meal because he was not standing at his door fully dressed as required. *Id.* at ¶ 12. A review of the logbook by Lopez revealed that the denial occurred on September 24, 2016. *Id.* at ¶¶ 14-15. Lopez stated in her declaration that it was not uncommon for Plaintiff to pretend to be asleep during meals so that he could then allege he had been denied the meal and use the allegations to be disrespectful to officers and rile up the inmates. *Id.* at ¶ 13.

The Court finds that denying Plaintiff a single meal, as alleged against Lopez, does not rise to the level of a violation of Plaintiff's rights under the Eighth Amendment. *See Cabassa v. Oshier*, No. 9:11-CV-01237 (MAD/CFH), 2015 WL 5094802, at *5 (N.D.N.Y. Aug. 28, 2015) (denial of a single meal fails to plausibly state an Eighth Amendment claim); ⚠️*Pagan v. Quiros*, No. 3:11-cv-1134 (DJS), 2014 WL 1057016, at *6 (D. Conn. Mar. 18, 2014) (holding that allegation of denial food and drink at one meal "does not constitute a substantial or sufficiently serious deprivation of a basic human need"); *Hankerson v. Nassau County Correctional Facility*, No. 12-CV-5282 (SJF) (WDW), 2012 WL 6055019, at *4 (E.D.N.Y. Dec. 4, 2012) (holding that denial of a single meal "falls far short of a 'substantial deprivation of food' and does not give rise to the level of a constitutional deprivation.").

The Court likewise concludes that Burgess's alleged denial of Plaintiff's dinner on August 3 and 4, 2016, and Montgomery's alleged denial of Plaintiff's lunch on September 10, 23, and 24, 2016, did not rise to the level of a violation of Plaintiff's rights under the Eighth Amendment. One missed meal a day has been found insufficient to establish an Eighth Amendment claim. *See Benitez v. Locastro*, No. 04-CV-423, 2008 WL 4767439, at *7 (N.D.N.Y. Oct. 29, 2008) (claim of one missed meal a day insufficient to establish an Eighth Amendment claim); *Johnson v. Merriman*, No. 1:13-cv-00087-MP-GRJ, 2015 WL 1409529, at *4 (N.D. Fl., Gainesville Div. March 26, 2015) (where the most each of three defendants could have personally deprived plaintiff of meals was one meal a day for a period of three days, the denial of the meals was not sufficiently severe to rise to the level of a constitutional violation).

Moreover, Plaintiff has failed to submit evidence showing that a "sufficiently serious condition" resulted from not receiving food. *See Evans*, 2009 WL 1401645, at *9. Plaintiff testified at his deposition that he was hungry and emotionally frustrated as a result of not having dinner on August 3, 2016, after having failed to make himself breakfast and traveled all day with only a small lunch en route. (Dkt. No. 81-3 at 26.) Plaintiff was hungry and emotionally frustrated after not receiving lunch on September 10, 2016, as well. *Id.* at 37.

**\*10** In sum, the evidence supports a finding by the Court that the claimed denial of meals by each of the three Defendants falls short of that required to support an Eighth Amendment violation, and the evidence does not support a finding that Plaintiff suffered a sufficiently serious condition from any of the three Defendants' denial of a meal or meals.

**ACCORDINGLY**, it is hereby

**RECOMMENDED** that Defendants' motion for summary judgment (Dkt. No. 81) be **GRANTED**; and it hereby

**ORDERED** that the Clerk provide Plaintiff with a copy of this Order and Report-Recommendation, along with copies of the unpublished decisions cited herein in accordance with the Second Circuit decision in 🚩*Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (*per curiam* ). Pursuant to 🚩28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report. [10] Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW**. 🚩*Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing 🚩*Small v. Secretary of Health and Human Services*, 892 F.2d 15 (2d Cir. 1989) ); 🚩28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72.

### All Citations

Not Reported in Fed. Supp., 2018 WL 4610686

## Footnotes

1    Page references to documents identified by docket number are to the numbers assigned by the CM/ECF docketing system maintained by the Clerk's Office.

2    Plaintiff has filed a cross-notice of motion for summary judgment seeking denial of Defendants' summary judgment motion. (Dkt. No. 84-2). Because Plaintiff is not cross-moving for summary judgment in his favor, the Court is treating his notice of motion as opposition to Defendants' motion.

3    Paragraph numbers are used where documents identified by CM/ECF docket number contain consecutively numbered paragraphs.

4    The Court finds that Plaintiff's amended complaint is properly verified under 28 U.S.C. § 1746. (Dkt. No. 19 at 16.)

5    Copies of all unpublished decisions cited herein will be provided to Plaintiff in accordance with *LeBron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam).

6    L.R. 7.1(a)(3) requires the opposing party to file a response to the movant's Statement of Material Facts. Under the rule, the response "shall mirror the movant's Statement of Material Facts by admitting and/or denying each of the movant's assertions in matching numbered paragraphs. Each denial shall set forth a specific citation to the record where the factual issue arises."

7    L.R. 7.1(a)(3) provides that "The Court shall deem admitted any properly supported facts set forth in the Statement of Material Facts that the opposing party does not specifically controvert." However, *see Vermont Teddy Bear Co., Inc. v. 1 800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004) ("[I]n determining whether the moving party has met his burden of showing the absence of a genuine issue for trial, the district court may not rely solely on the statement of undisputed facts in the moving party's [Statement of Material Facts]. It must be satisfied that the citation to evidence in the record supports the assertion.") (citations omitted).

8    Defendants have complied with L.R. 56.2 by providing Plaintiff with the requisite notice of the consequences of his failure to respond to their summary judgment motion. (Dkt. No. 81 at 2.)

9    The Court notes that Reams does not indicate in her declaration whether Plaintiff filed any grievances regarding one or more individual missed meal, or a grievance regarding a number other than six missed meals. (*See* Dkt. No. 81-9 at ¶ 13.) Moreover, Reams has used the dates in Plaintiff's amended complaint rather than the corrected dates in his deposition testimony for the time span during which the missed meals occurred used by her in her review. *Id.*

10   If you are proceeding pro se and are served with this Order and Report-Recommendation by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date the Order and Report-Recommendation was mailed to you to serve and file objections. Fed. R. Civ. P. 6(d). If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday. Fed. R. Civ. 6(a)(1)(C).

**End of Document**                          © 2023 Thomson Reuters. No claim to original U.S. Government Works.

Case 9:22-cv-00102-BKS-ML    Document 78    Filed 12/13/23    Page 181 of 373

Sankara v. Montgomery, Not Reported in Fed. Supp. (2018)

2018 WL 3408135
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Ahmadou SANKARA, Plaintiff,

v.

MONTGOMERY, Burgess and Lopez, Defendants.

9:16-CV-885 (FJS/TWD)
|
Signed 07/13/2018

**Attorneys and Law Firms**

AHMADOU SANKARA, 16-R-122, Coxsackie Correctional Facility, P.O. Box 999, Coxsackie, New York 12051, pro se.

OFFICE OF THE NEW YORK, STATE ATTORNEY GENERAL, OF COUNSEL, MATTHEW P. REED, AAG, The Capitol, Albany, New York 12224, Attorneys for Defendants.

**ORDER**

Frederick J. Scullin, Jr., Senior United States District Judge

 *1  The sole remaining claim in this civil rights action is Plaintiff's Eighth Amendment conditions-of-confinement claim involving the alleged denial of meals against Defendants Keith Montgomery, a Department of Corrections and Community Supervision ("DOCCS") Sergeant at Fishkill Correctional Facility; Erik Burgess, a Corrections Officer at Fishkill Correctional Facility; and Jessica Lopez, a former Corrections Officer at Fishkill Correctional Facility.

Defendants moved for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure on the grounds that Plaintiff had failed to exhaust his administrative remedies and had not asserted a constitutional violation. See Dkt. No. 81. Plaintiff filed papers in opposition to Defendants' motion. See Dkt. No. 84.

In a Order and Report-Recommendation dated June 25, 2018, Magistrate Judge Dancks recommended that this Court grant Defendants' motion for summary judgment. See Dkt. No. 88. Specifically, after thoroughly reviewing the record, she concluded that Plaintiff had failed to exhaust his administrative remedies with regard to his Eighth

Amendment claim. See id. at 9-17. Alternatively, she found that summary judgment was warranted because the evidence fell "short of that required to support an Eighth Amendment violation, and the evidence [did] not support a finding that Plaintiff [had] suffered a sufficiently serious condition [as a result of the] denial of a meal or meals." See id. at 21.

On July 2, 2018, the Court received Plaintiff's objections to Magistrate Judge Danck's recommendations. See Dkt. No. 89.

After reviewing a magistrate judge's recommendations, the district court may accept, reject or modify those recommendations. See 28 U.S.C. § 636(b)(1). The court reviews de novo those portions of the magistrate judge's recommendations to which a party objects. See Pizzaro v. Bartlett, 776 F. Supp. 815, 817 (S.D.N.Y. 1991). " 'If, however, the party "makes only conclusory or general objections, or simply reiterates his original arguments, the Court reviews the Report and Recommendation only for clear error.' " " McAllan v. Von Essen, 517 F. Supp. 2d 672, 679 (S.D.N.Y. 2007) (quotation and other citations omitted).

Plaintiff's objections are, for the most part, general and conclusory. In addition, some of his objections do not refer to his Eighth Amendment claim but, rather, concern claims that this Court has already dismissed. Moreover, to the extent that Plaintiff objects to Magistrate Judge Dancks' recommendations regarding the issue of whether he exhausted his administrative remedies, Plaintiff basically makes the same arguments that he made in opposition to Defendants' motion for summary judgment, which Magistrate Judge Dancks thoroughly reviewed and found no evidence to support Plaintiff's contention that he had filed grievances regarding the denial of meals.

Alternatively, the Court notes that, even if it were to find that Plaintiff had exhausted his administrative remedies with regard to denial of his meals, Defendants would still be entitled to summary judgment on Plaintiff's claim because, as Magistrate Judge Dancks thoroughly explained, the denial of five meals over the course of fifty-three days does not rise to the level of a violation of Plaintiff's Eighth Amendment rights; and, furthermore, the evidence does not support a finding that Plaintiff suffered a sufficiently serious condition as a result of Defendants' denial of those meals.

 *2  Accordingly, having reviewed the entire file in this matter, Magistrate Judge Dancks' June 25, 2018 Order and

Sankara v. Montgomery, Not Reported in Fed. Supp. (2018)

Case 9:22-cv-00102-BKS-ML    Document 78    Filed 12/13/23    Page 182 of 373

Report-Recommendation, and Plaintiff's objections thereto, as well as the applicable law, the Court hereby

**ORDERS** that Magistrate Judge Dancks' June 25, 2018 Order and Report-Recommendation, *see* Dkt. No. 88, is **ACCEPTED in its entirety** for the reasons stated therein; and the Court further

**ORDERS** that Defendants' motion for summary judgment, *see* Dkt. No. 81, is **GRANTED**; and the Court further

**ORDERS** that the Clerk of the Court shall enter judgment in favor of Defendants and close this case.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2018 WL 3408135

---

**End of Document**

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

2021 WL 7367083
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

James SIMPSON, Plaintiff,

v.

R. PRICE, Defendant.

9:19-CV-1413 (MAD/ATB)
|
Signed 12/29/2021

**Attorneys and Law Firms**

JAMES SIMPSON, Plaintiff, pro se.

KONSTANDINOS D. LERIS, Asst. Attorney General for
Defendant.

### REPORT-RECOMMENDATION

ANDREW T. BAXTER, United States Magistrate Judge

**\*1** This matter has been referred to me for Report and
Recommendation, by the Honorable Mae A. D'Agostino,
United States District Judge, pursuant to 28 U.S.C.
§ 636(b) and Local Rules N.D.N.Y. 72.3(c). Plaintiff
brought this civil rights action asserting various allegations
of constitutional violations that occurred while he was
incarcerated at Cayuga Correctional Facility ("Cayuga C.F."),
in the custody of the New York State Department of
Corrections and Community Supervision ("DOCCS").

Plaintiff filed his original complaint on November 15, 2019.
(Dkt. No. 1). By decision and order dated January 3, 2020,
Judge D'Agostino dismissed plaintiff's complaint for failure
to state a claim pursuant to 28 U.S.C. §§ 1915, 1915A.
(Dkt. No. 4). In the same order, Judge D'Agostino granted
plaintiff leave to file an amended complaint in order to cure
some of the defects identified by the court. (*Id.*). Plaintiff
filed an amended complaint on January 21, 2020. (Dkt. No.
5). On March 17, 2020, Judge D'Agostino accepted plaintiff's
amended complaint for filing, only to the extent it asserted
an Eighth Amendment excessive force claim against C.O.
Price. (Dkt. No. 8). On August 27, 2020, plaintiff filed a
motion seeking leave to amend. (Dkt. No. 25). By decision
and order dated September 24, 2020, Judge D'Agostino

granted plaintiff's motion, in part, and accepted the second
amended complaint for filing to the extent it asserted an
Eighth Amendment excessive force claim against C.O. Price
arising from events that occurred on October 10, 2018. (Dkt.
No. 29).

There is some confusion as to what specific claims of Eighth
Amendment excessive force survived initial review by the
district court. [1] For purposes of this report-recommendation,
the court recognizes the surviving claims in plaintiff's second
amended complaint to include (1) an Eighth Amendment
excessive force claim against C.O. Price stemming from
the events that occurred on October 10, 2018, and (2) an
Eighth Amendment excessive force claim against C.O. Price
stemming from the events that occurred on August 9, 2019.

**\*2** Presently before the court is defendant C.O. Price's
motion for summary judgment pursuant to Fed. R. Civ. P.
56, seeking dismissal of the action. (Dkt. No. 41). Plaintiff
responded in opposition to the motion on September 9, 2021.
(Dkt. No. 43). Defendant filed a reply brief on September
16, 2021. (Dkt. No. 44). For the reasons set forth below, the
court recommends granting defendant C.O. Price's motion
for summary judgment and dismissing the second amended
complaint in its entirety.

### I. Summary Judgment

Summary judgment is appropriate where there exists no
genuine issue of material fact and, based on the undisputed
facts, the moving party is entitled to judgment as a matter of
law. Fed. R. Civ. P. 56; Salahuddin v. Goord, 467 F.3d
263, 272–73 (2d Cir. 2006). "Only disputes over ["material"]
facts that might affect the outcome of the suit under the
governing law will properly preclude the entry of summary
judgment." Anderson v. Liberty Lobby, 477 U.S. 242, 248
(1986). It must be apparent that no rational finder of fact
could find in favor of the non-moving party for a court to
grant a motion for summary judgment. Gallo v. Prudential
Residential Servs., 22 F.3d 1219, 1224 (2d Cir. 1994).

The moving party has the burden to show the absence
of disputed material facts by informing the court of
portions of pleadings, depositions, and affidavits which
support the motion. Celotex Corp. v. Catrett, 477 U.S.
317, 323 (1986). If the moving party satisfies its burden,
the nonmoving party must move forward with specific
facts showing that there is a genuine issue for trial.

*Salahuddin v. Goord*, 467 F.3d at 273. In that context, the nonmoving party must do more than "simply show that there is some metaphysical doubt as to the material facts."

*Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). However, in determining whether there is a genuine issue of material fact, a court must resolve all ambiguities, and draw all inferences, against the movant. *See United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962); *Salahuddin*, 467 F.3d at 272.

Local Rules of the Northern District of New York require that a motion for summary judgment be accompanied by a statement of material facts which sets forth, in numbered paragraphs, "a short and concise statement of each material fact about which the moving party contends there exists no genuine issue." Local Rule 56.1(a). [2] The same rule requires the opposing party to file a response to the moving party's statement of material facts, which admits or denies each of the moving party's factual assertions in matching numbered paragraphs, and supports any denials with a specific citation to the record where the factual issues arise. Local Rule 56.1(b). The rule specifically provides that "[t]he Court may deem admitted any properly supported facts set forth in the Statement of Material Facts that the opposing party does not specifically controvert." *Id.*

Credibility assessments and the choice between conflicting versions of a story are generally for a jury to resolve. *Rule v. Brine, Inc.* 85 F.3d 1002, 1011 (2d Cir. 1996). However, the Second Circuit recognized an exception to this rule in *Jeffreys v. City of New York*, 426 F.3d 549 (2d Cir. 2005). In *Jeffreys*, the court held that summary judgment may be granted in the rare case, "where there is nothing in the record to support the plaintiff's allegations, aside from his own contradictory and incomplete testimony, and even after drawing all inferences in the light most favorable to the plaintiff, the court determines that 'no reasonable person' could credit ... his testimony." *Quick v. Quinn*, No. 9:12-CV-1529 (DNH/DEP), 2014 WL 4627106, at *4 (N.D.N.Y. Sept. 11, 2014) (quoting *Jeffreys*, 426 F.3d at 54-55). In order for the court to apply the *Jeffreys* exception, the defendant must satisfy each of the following: (1) "the plaintiff must rely 'almost exclusively on his own testimony,' " (2) the plaintiff's "testimony must be 'contradictory or incomplete,' " and (3) the plaintiff's testimony must be contradicted by evidence produced by the defense. *Id.* (quoting *Benitez*

*v. Ham*, No. 04-CV-1159 (NAM/GHL), 2009 WL 3486379, at *20-21 (N.D.N.Y. Oct. 21, 2009) (adopting report and recommendation) (quoting *Jeffreys*, 426 F.3d at 554)).

## II. Factual Contentions

### A. October 10, 2018

**\*3** Plaintiff alleges that on October 10, 2018, he was advised that he had a medical appointment outside Cayuga C.F. (Second Amended Complaint ("SAC") at 2) (Dkt. No. 30). He informed the correctional officers responsible for his transport that "the leg irons they intended to use were to[o] small for [plaintiff's] ankles." *Id.* The officers ignored plaintiff and proceeded to place him in the small leg irons. *Id.* Fourteen hours later, plaintiff's ankles were severely bruised, "and [his] right ankle had an open wound where the shackle had grounded through [his skin]." *Id.* Approximately a week later, a nurse informed plaintiff that the injury had become a "sever[e] infection necessitating daily attention by medical staff and antibiotics." *Id.*

### B. August 9, 2019

Plaintiff was scheduled to attend a medical appointment at SUNY Upstate Medical University ("SUNY Upstate") on August 9, 2019. (Pl.'s Dep. at 47; Declaration of Richard Price ("Price Decl.") ¶ 10). C.O. Price was the officer responsible for escorting plaintiff to his medical appointment that morning. (Pl.'s Dep. at 49; Price Decl. ¶ 10). Accordingly, C.O. Price contacted plaintiff's dorm by phone at approximately 7:30 a.m., requesting that plaintiff arrive to the draft area by 8:15 a.m. in order to be strip frisked and to otherwise prepare for transport. (Price Decl. ¶ 12). Plaintiff was late, however, and did not arrive to the draft room until 8:45 a.m. (Pl.'s Dep. at 48–49, Price Decl. ¶ 13).

The parties' contentions diverge at this point. According to the plaintiff, when he got to the draft room C.O. Price was "screaming" at him for being late. (Pl.'s Dep. at 51). Plaintiff was subsequently strip frisked, without incident, per facility protocol. (*Id.* at 51–52, 55). After the strip frisk, plaintiff was under the assumption that he was going to be taken to the medical unit to have his ankle wrapped. (*Id.* at 52). Of note, plaintiff testified that he suffers from a medical condition that causes "abbreviations" and "deep imprints" in his skin when compression is applied. (*Id.* at 32–33). Plaintiff also asserted that, due to this medical condition, he had a permit for "big boy" cuffs to be used on his ankles. (*Id.* at 43). Plaintiff

testified that C.O. Price knew plaintiff required larger ankle cuffs. (*Id.* At 56).

Nevertheless, after the strip frisk C.O. Price told plaintiff, "we don't have time for you to go over there to medical to get your leg wrapped." (*Id.* at 52). C.O. Price then put plaintiff in the transport van, and tried to put standard size cuffs on plaintiff's ankles. (*Id.* at 52–53). Plaintiff told C.O. Price he would not wear the smaller cuffs. (*Id.* at 53). When C.O. Price tried forcing the cuffs onto plaintiff's ankles, plaintiff put his cane in front of his legs. (*Id.*). C.O. Price told plaintiff that he was going to "tell ... people that [plaintiff] tried to hit [him] with a cane" if plaintiff didn't allow himself to be placed in the smaller cuffs. (*Id.*). Plaintiff continued to refuse. (*Id.*). C.O. Price made another attempt to place the cuffs on plaintiff's ankles, which caused a "scab" from an old wound to "pop[ ] back open" on plaintiff's leg. (*Id.* at 53, 58–59). Plaintiff testified that C.O. Price had "no choice" then but to let plaintiff out of the van and take him to the medical unit to get his leg wrapped. (*Id.* at 53).

After plaintiff's leg was wrapped, C.O. Price attempted once more to put the smaller cuffs on plaintiff, and threatened to take plaintiff to "the box" if he did not cooperate. (*Id.* at 54). Plaintiff refused, and ultimately C.O. Price got bigger cuffs (however, apparently not the "big boy" cuffs) and placed them onto plaintiff's ankles. (*Id.*). Plaintiff was transferred to SUNY Upstate, and upon his return C.O. Price took him "straight to the box." (*Id.*).

**\*4** C.O. Price has submitted a declaration in support of his pending motion for summary judgement, which alternatively describes the events of August 9th. Upon plaintiff's arrival to the draft room that morning, C.O. Price maintains that he conducted a strip frisk of plaintiff, and then placed plaintiff in mechanical wrist restraints. (*Id.* ¶ 14). Plaintiff was subsequently escorted to the facility van, where C.O. Price attempted to place standard size ankle restraints on him. (*Id.* ¶¶ 14–15). Plaintiff refused and "shoved" his cane at C.O. Price, "almost striking [C.O. Price] in the nose." (*Id.* ¶ 15). Plaintiff proceeded to place his cane between his ankles. (*Id.*). The cane was taken from plaintiff and C.O. Price gave plaintiff several direct orders to allow him to apply the restraints, however plaintiff refused to comply. (*Id.* ¶ 16). C.O. Price did not threaten to take plaintiff to the Special Housing Unit ("SHU"), nor did he threaten him in any other manner. (*Id.*).

Plaintiff eventually told C.O. Price that he had a permit for "big boy" cuffs on file with Cayuga C.F. medical staff. (*Id.* ¶ 17). C.O. Price maintains that he had no knowledge of plaintiff's purported permit at the time, and had escorted plaintiff on previous medical trips where standard size leg restraints were used. (*Id.* ¶¶ 18–20). Nevertheless, C.O. Price stopped attempting to place the ankle restraints on plaintiff and contacted the area supervisor. (*Id.* ¶ 21). They escorted plaintiff from the van to the medical unit, where a nurse placed a gauze bandage around one of plaintiff's ankles. (*Id.* ¶ 22).[3] At the same time, C.O. Price looked for but could not find documentation of plaintiff's purported medical permit for larger ankle restraints, thus a determination was made to use the standard size restraints on plaintiff. (*Id.* ¶ 24). Plaintiff eventually allowed C.O. Price to place his ankles in the standard size leg restraints, and they departed for SUNY Upstate. (*Id.* ¶¶ 25–26). The remainder of the trip went without incident. When they returned, C.O. Price issued plaintiff a misbehavior report charging him with interference with an employee, lying/providing false information, and refusing a direct order. (*Id.* ¶ 28, Ex. B). C.O. Price avers that plaintiff was not injured, nor did he complain of being injured, at any time on August 9, 2019. (*Id.* ¶ 32).

## DISCUSSION

### III. October 10, 2018 Excessive Force Claim

"It is well settled in this Circuit that personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994) (internal quotation marks and citations omitted); *Black v. Coughlin*, 76 F.3d 72, 74 (2d Cir. 1996). The district court interpreted plaintiff's second amended complaint to assert that C.O. Price was one of the officers who escorted plaintiff to his medical appointment. (*See* Dkt. No. 29 at 3). However, at his deposition plaintiff testified to the contrary, confirming that C.O. Price was not involved in the October 10, 2018 incident. (Pl.'s Dep. at 37). Thus, it is undisputed that C.O. Price was not present, or otherwise involved, in the events surrounding plaintiff's allegations of excessive force on October 10, 2018.[4] (*See* Pl.'s Dep. at 37; Price Decl. ¶¶ 5–6, Ex. A). Accordingly, the court recommends that the second amended complaint be dismissed against C.O. Price as it relates to this claim.

## IV. August 9, 2019 Excessive Force Claim

### A. Exhaustion of Administrative Remedies

#### 1. Legal Standards

**\*5** The Prison Litigation Reform Act, ("PLRA"), 42 U.S.C. § 1997e(a), requires an inmate to exhaust all available administrative remedies prior to bringing a federal civil rights action. The exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and regardless of the subject matter of the claim. *See Giano v. Goord*, 380 F.3d 670, 675-76 (2d Cir. 2004) (citing *Porter v. Nussle*, 534 U.S. 516, 532 (2002)). Inmates must exhaust their administrative remedies even if they are seeking only money damages that are not available in prison administrative proceedings. *Id.* at 675.

The failure to exhaust is an affirmative defense that must be raised by the defendants. *Jones v. Bock*, 549 U.S. 199, 216 (2007); *Johnson v. Testman*, 380 F.3d 691, 695 (2d Cir. 2004). As an affirmative defense, it is the defendants' burden to establish that plaintiff failed to meet the exhaustion requirements. *See, e.g., Key v. Toussaint*, 660 F. Supp. 2d 518, 523 (S.D.N.Y. 2009) (citations omitted).

The Supreme Court has held that in order to properly exhaust an inmate's administrative remedies, the inmate must complete the administrative review process in accordance with the applicable state rules. *Jones*, 549 U.S. at 218-19 (citing *Woodford v. Ngo*, 548 U.S. 81 (2006)). In *Woodford*, the Court held that "proper" exhaustion means that the inmate must complete the administrative review process in accordance with the applicable procedural rules, including deadlines, as a prerequisite to bringing suit in federal court. 548 U.S. at 90-103.

The grievance procedure in New York is a three-tiered process. The inmate must first file a grievance with the Inmate Grievance Resolution Committee ("IGRC"). N.Y. Comp. Codes R. & Regs., tit. 7 §§ 701.5(a)(1) and (b). An adverse decision of the IGRC may be appealed to the Superintendent of the Facility. *Id.* § 701.5(c). Adverse decisions at the Superintendent's level may be appealed to the Central Office Review Committee ("CORC"). *Id.* § 701.5(d). The court also

notes that the regulations governing the Inmate Grievance Program encourage the inmate to "resolve his/her complaints through the guidance and counseling unit, the program area directly affected, or other existing channels (informal or formal) prior to submitting a grievance." *Id.* § 701.3(a) (Inmate's Responsibility). There is also a special section for complaints of harassment. *Id.* § 701.8.

Until recently, the Second Circuit utilized a three-part inquiry to determine whether an inmate had properly exhausted his administrative remedies. *See Brownell v. Krom*, 446 F.3d 305, 311-12 (2d Cir. 2006) (citing *Hemphill v. State of New York*, 380 F.3d 680, 686 (2d Cir. 2004)). The *Hemphill* inquiry asked (1) whether the administrative remedies were available to the inmate; (2) whether defendants' own actions inhibiting exhaustion estops them from raising the defense; and (3) whether "special circumstances" justify the inmate's failure to comply with the exhaustion requirement. *Id.*

However, the Supreme Court has now made clear that courts may not excuse a prisoner's failure to exhaust because of "special circumstances." *Ross v. Blake*, 578 U.S. 632, 136 S. Ct. 1850, 1857 (June 6, 2016). " '[M]andatory exhaustion statutes like the PLRA establish mandatory exhaustion regimes, foreclosing judicial discretion.' " *Riles v. Buchanan*, 656 F. App'x 577, 580 (2d Cir. Sept. 1, 2016) (quoting *Ross*, 578 U.S. at ——, 136 S. Ct. at 1857). Although *Ross* did away with the "special circumstances" exception, the other two factors in *Hemphill* – availability and estoppel – are still relevant. The court in *Ross* referred to "availability" as a "textual exception" to mandatory exhaustion, and "estoppel" has become one of the three factors in determining availability. *Ross*, 578 U.S. at ——, 136 S. Ct. at 1858. Courts evaluating whether an inmate has exhausted his or her administrative remedies must focus on whether those remedies were "available" to the inmate. *Id.; see also Riles*, 656 F. App'x at 580. An administrative procedure is "unavailable" when

**\*6** (1) "it operates as a simple dead end – with officers unable or consistently unwilling to provide any relief to aggrieved inmates; (2) it is "so opaque that is [sic] becomes, practically speaking, incapable of use"; or (3) "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation."

Case 9:22-cv-00102-BKS-ML    Document 78    Filed 12/13/23    Page 187 of 373

Simpson v. Price, Not Reported in Fed. Supp. (2021)

*Ross*, 578 U.S. at ——, 136 S. Ct. at 1859-60.

In *Ross*, the Supreme Court gave examples of the circumstances under which each of the above would apply. *Id.* The first circumstance listed above involves a case in which the relevant "administrative procedure" lacks the authority to provide "any" relief. *Id.* at 1859. The second example is when the administrative procedure "exists," but is so complicated or "opaque" that no ordinary prisoner could "discern or navigate it." *Id.* Finally, administrative remedies are not available if prison administrators prevent inmates from taking advantage of the grievance process by misleading or threatening them, preventing their use of the administrative procedure. *Id.* at 1860.

**2. Application**

C.O. Price argues that plaintiff's excessive force claim stemming from the events that occurred on August 9, 2019 is subject to dismissal due to plaintiff's failure to exhaust his administrative remedies. Specifically, C.O. Price contends that plaintiff did not file an initial grievance prior to bringing suit, nor did he appeal the denial of any grievance concerning this claim to CORC. (Defendant's Memorandum of Law at 14). In support of his position, C.O. Price has attached to his motion papers the sworn declarations of Rachael Seguin, the Assistant Director of the Incarcerated Grievance Program ("IGP") for DOCCS, and Morgan Swan, the Incarcerated Grievance Program Supervisor at Cayuga C.F. (*See generally* Declaration of Rachael Seguin ("Seguin Decl."); Declaration of Morgan Swan ("Swan Decl.")) (Dkt. Nos. 41-3; 41-4). These declarations, and the evidence attached as exhibits thereto, provide compelling evidence that plaintiff neither filed an initial grievance, nor appealed to CORC, concerning his claim of excessive force by C.O. Price occurring on August 9, 2019. (*See* Swan Decl. ¶¶ 20–29, Ex. B; Seguin Decl. ¶¶ 15–16).

Plaintiff's response to this defense is equivocal, at best. In a prior pleading, plaintiff asserted that after returning from his medical trip on August 9th and being placed in the SHU, he "sent [three] letters to grievants [sic] I never got mail back or no one came to see me." (Dkt. No. 5 at 11). Plaintiff further alleged that when he got out of the SHU on August 20, 2019, he "went on a court trip so ... could not appeal to the Superintendent within 72 hours[.]" (*Id.*).

At his deposition, plaintiff testified that while in the SHU he made three attempts to file a grievance against C.O. Price. (Pl.'s Dep. at 69–71). Plaintiff initially testified that he heard back from one of the grievances, but admitted that he could not remember if C.O. Price was named in that specific grievance. (*Id.* at 72). Plaintiff then, alternatively, asserted that C.O. Price was not named in all three of the grievances he attempted to file in the SHU, and "he think[s]" C.O. Price was only named in two out of the three. (*Id.*). Plaintiff could not remember if he received a response from either grievance. (*Id.*). Nor could plaintiff remember what the content of his grievances against C.O. Price actually were, with respect to the two he allegedly attempted to file. (*Id.* at 73). Plaintiff testified that he wrote to the grievance office to follow up about his grievance(s) against C.O. Price, but could not remember how many times or the content of his follow-up correspondences. (*Id.* at 73). Plaintiff admittedly did not retain any copies of the purported grievances or follow-up correspondences relative to his complaints against C.O. Price. (*Id.* at 71–73).[5]

**\*7** Plaintiff's position is further confused by the arguments contained in his opposition to the instant motion. There, plaintiff asserts that he filed a grievance in "December of 2018," then appealed the decision to CORC. (Pl.'s Br. at 6). Plaintiff takes the position that, because he did not receive a response from CORC within the 30 day deadline, his administrative remedies should be deemed exhausted. (Pl.'s Br. at 6).

Notwithstanding plaintiff's arguments, the record before this court evidences his failure to exhaust administrative remedies with respect to the latter excessive force claim against C.O. Price, to the extent that an initial grievance was never filed, nor was the claim appealed to CORC. As such, the question becomes whether plaintiff's failure to exhaust should be excused. To this end, the defendant has satisfied his initial burden of "establishing ... that a grievance process exist[ed] and applie[d] to the underlying dispute." *Hubbs v. Suffolk County Sheriff's Dept.*, 788 F.3d 54, 59 (2d Cir. 2015) (citation omitted). DOCCS regulations provide that inmates in the SHU may file grievances by giving the complaint to a correction officer to forward to the grievance clerk. *See* N.Y.C.R.R. tit. 7, § 701.7. Thus, plaintiff assumes the burden of producing evidence that one of the exceptions to the administrative exhaustion requirement applies, excusing his failure to exhaust and permitting his claim to survive summary judgment. *Id.*

Liberally construed, plaintiff appears to argue that administrative remedies were unavailable to him as a result of his confinement in the SHU, and the restrictions imposed on him there. In *Williams v. Priatno,* 829 F.3d 118, 123-27 (2d Cir. 2016), the Second Circuit considered whether administrative remedies had been "actually available" to an inmate housed in the SHU, in the context of grievances allegedly submitted to facility staff, but purportedly never filed. There, the plaintiff alleged that while housed in the SHU, he drafted a grievance that he delivered to a correctional officer to forward to the grievance office on his behalf. *Id.* at 120-21. Approximately two weeks later, the plaintiff was transferred to a different facility. *Id.* at 121. He never received a response to his grievance and alleged that it was never filed by the officer to whom he had given it. It was undisputed the plaintiff never appealed the grievance. *Id.*

The defendants in *Williams* argued that even if the grievance was never filed, the plaintiff was required to appeal it and complete the grievance process. *Id.* at 124. The Second Circuit rejected this argument and held that, for an inmate in the plaintiff's situation, the regulatory scheme was so "opaque" and "confusing" as to be practically unavailable. *Id.* The Second Circuit found that DOCCS regulations "only contemplate appeals of grievances that [have been] actually filed ... [and] give no guidance whatsoever to an inmate whose grievance was never filed." *Id.* "Following the Second Circuits decision in *Williams,* several courts have concluded that where a grievance is both *unfiled* and *unanswered*, the process to appeal ... is prohibitively opaque, such that no inmate could actually make use of it." *Maldonado v. Mandalaywala,* No. 9:17-CV-1303 (BKS/TWD), 2020 WL 1159426, at *15 (N.D.N.Y. Feb. 12, 2020), *report and recommendation adopted,* 2020 WL 1157643 (N.D.N.Y. Mar. 10, 2020) (internal quotation marks omitted) (listing cases).

**\*8** For the following reasons, this court does not find *Williams* to be controlling in the instant matter. At the outset, *Williams* reversed the underlying district court's decision on the defendants' motion to dismiss pursuant to Fed. R. Civ. P. 12(b). Thus, the Second Circuit was compelled to accept as true the allegations in Williams's complaint, including his assertion that a particular correctional officer never filed his grievance relevant to the subject claim. *See Williams v. Priatno,* 829 F.3d at 124. At the summary judgment stage, however, we are presented with a more complete record upon

which to determine the existence of any genuine issues of material fact. *See Chance v. Armstrong,* 143 F.3d 698, 701 (2d Cir. 1998). [6]

Accordingly, in this instance the court need not mechanically accept plaintiff's vague allegation that he "tri[ed] [three] times to file a grievance [with] no response back." (*See* Dkt. No. 5 at 10). Further discovery on the issue of exhaustion has revealed that plaintiff did not satisfy his burden of production of evidence overcoming the defendant's proof that the defendant did not pursue the grievance process that was available to him. Specifically, given plaintiff's uncertainty, and his inability to confirm or document whether he actually attempted to file a complaint against C.O. Price regarding the August 9, 2019 incident, he has not demonstrated a genuine issue of material fact with respect to the availability of the grievance process, notwithstanding the fact that he, like Williams, was confined to the SHU. *See, e.g., Armand v. Mosko,* No. 13-CV-5, 2019 WL 2374948, at *3 (W.D.N.Y. Apr. 9, 2019), *report and recommendation adopted,* 2019 WL 2374001 (W.D.N.Y. June 4, 2019) (rejecting plaintiff's contention of unavailability based on her claim that, while housed in the SHU, she handed grievances to a corrections officer who never filed them, where plaintiff gave conflicting statements that were "unworthy of belief" that she actually filed the relevant grievance).

Notwithstanding plaintiff's allegation that he attempted to file a grievance against C.O. Price concerning the subject incident, plaintiff's contradictory assertions regarding the purported obstruction of his ability to do so undermine his efforts to document a material issue of fact. Plaintiff testified that he filed grievances during his confinement in the SHU, and "no one stopped [him] from filing a grievance." (Pl.'s Dep. at 70). He elaborated that "[i]f they answered, that was the problem.... you file one grievance then you have to be able to get it through. Especially in the hole." (*Id.*).

**\*9** Historically, unsupported assertions that a plaintiff "filed a grievance but that it was somehow lost or destroyed" have generally been found "insufficient to establish a genuine issue of fact." *Blake v. Porlier,* No. 9:18-CV-1008 (DNH/CFH), 2019 WL 7484052, at *5 (N.D.N.Y. Oct. 4, 2019) ("Courts within the Second Circuit have continuously held that 'mere contentions or speculation of grievances being misplaced by officers do not create a genuine issue of material fact when there is no evidence to support the allegations.' ") (quoting *Rodriguez v. Cross,* No. 9:15-CV-1079 (GTS/

Case 9:22-cv-00102-BKS-ML    Document 78    Filed 12/13/23    Page 189 of 373

Simpson v. Price, Not Reported in Fed. Supp. (2021)

CFH), 2017 WL 2791063, at *5 (N.D.N.Y. May 9, 2017));
*Artis v. Dishaw,* No. 9:14-CV-1116 (MAD/ATB), 2016 WL
11266599, at *7 n.13 (N.D.N.Y. Sept. 12, 2016) (finding
the plaintiff's failure to exhaust was not excusable, in part,
because while the plaintiff "state[d] that some grievances
were destroyed ... he ha[d] not submitted any copies of
these grievances, nor d[id] he specify when he attempted
to file them"), *report-recommendation adopted,* 2017 WL
1076343 (N.D.N.Y. Mar. 22, 2019); *Engles v. Jones,* No.
6:13-CV-6461, 2018 WL 6832085, at *10 (W.D.N.Y. Dec.
28, 2018) ("Plaintiff's unsupported assertion that he filed
a grievance but that it was somehow lost or destroyed is
insufficient to establish a genuine issue of material fact.")
(citing *Scott v. Kastner Smith,* 298 F. Supp. 3d 545, 555
(W.D.N.Y. 2018)).

At least one other district court has granted summary
judgment on exhaustion grounds notwithstanding *Williams,*
under circumstances where the plaintiff provided no
specifics related to a grievance purportedly filed during his
confinement in the SHU. *See, e.g., Sankara v. Montgomery,*
No. 9:16-CV-00885 (FJS/TWD), 2018 WL 4610686, at
*8 (N.D.N.Y. June 25, 2018), *report and recommendation
adopted,* 2018 WL 3408135 (N.D.N.Y. July 13, 2018)
("Plaintiff's conclusory allegations that the DOCCS IGP
was unavailable to him [while confined to the SHU] were
insufficient to withstand summary judgment," where the
plaintiff "provided no evidence that he actually did write
grievances; when they were written; the content of the
grievances ... the officers named in the grievance(s) ...;
the specific steps taken by Plaintiff to provide them to an
officer to send to the grievance office; and any specific
follow up with the grievance office[.]"); *see also Tillman v.
Phillips,* No. 9:19-CV-1597 (LEK/CFH), 2021 WL 5233308,
at *7 (N.D.N.Y. Nov. 10, 2021), *report and recommendation
adopted,* 2021 WL 5768393 (N.D.N.Y. Dec. 6, 2021)
(distinguishing the facts in that case from circumstances
outlined in *Sankara,* where plaintiff has provided no specifics
related to grievance purportedly filed in SHU.).

Here, the court does not merely consider plaintiff's lack of
direct evidence, such as copies of the relevant grievances,
in finding that he has failed to establish a genuine issue
of material fact as to unavailability. The court recognizes
that an inmate-plaintiff's ability to process his grievances are
curtailed to some extent while confined to the SHU. *See
Rodriguez v. Cross,* No. 15-CV-1079 (GTS/CFH), 2017
WL 2791063, at *7 (N.D.N.Y. May 9, 2017) ("Inmates not
housed in the SHU are in a different position to SHU inmates

when determining if grievance procedures are 'essentially
unknowable' or unavailable.") (citation omitted).

However, plaintiff in this case has "done nothing more
than allege in conclusory fashion that he attempted to file
[a] ... grievance" concerning excessive force at the hands of
C.O. Price in August 2019. He has provided no specifics
regarding when the grievances were written, their content,
or the steps he took to provide them to an officer to
send to the grievance office. There is also no documentary
evidence to corroborate the fact plaintiff attempted to file
a grievance, such as follow-up correspondences after his
release from SHU. For these reasons, the court concludes
that plaintiff's completely unsupported, unclear and vague
implication that a grievance he attempted to file against C.O.
Price relative to the August 9, 2019 incident was not properly
processed does not suffice to avoid summary judgment.
*Cf. Stephanski v. Allen,* No. 9:18-CV-0076 (BKS/CFH),
2020 WL 806331, at *9 (N.D.N.Y. Jan. 22, 2020), *report
and recommendation adopted,* 2020 WL 777268 (N.D.N.Y.
Feb. 18, 2020) (denying summary judgment despite lack of
direct evidence concerning defendant's interference with the
grievance he attempted to file while in SHU where plaintiff's
allegation of unavailability was supported by his proper
response to defendants' statement of material facts, testimony
under oath on two separate occasions, and some corroborating
documentary evidence.). Accordingly, the court recommends
that C.O. Price be granted summary judgment and the second
amended complaint be dismissed against him as to this claim,
on the ground that plaintiff failed to exhaust his administrative
remedies.

### B. Excessive Force

**\*10** Should the district court disagree with my
recommendation that the second amended complaint be
dismissed on exhaustion grounds, this court alternatively
recommends granting summary judgment on the merits
of plaintiff's Eighth Amendment excessive force claim, as
further discussed below.

### 1. Legal Standard

Inmates enjoy Eighth Amendment protection against the use
of excessive force, and may recover damages under 42
U.S.C. § 1983 for a violation of those rights. *Hudson
v. McMillian,* 503 U.S. 1, 9-10 (1992). To sustain a claim

Case 9:22-cv-00102-BKS-ML   Document 78   Filed 12/13/23   Page 190 of 373

Simpson v. Price, Not Reported in Fed. Supp. (2021)

of excessive force, a plaintiff must still establish both the objective and subjective elements of an Eighth Amendment claim. 🚩 *Blyden v. Mancusi*, 186 F.3d 252, 262 (2d Cir. 1999); 🚩 *Romano v. Howarth*, 998 F.2d 101, 105 (2d Cir. 1993).

In order to satisfy the objective element of the constitutional standard for excessive force, a defendant's conduct must be " 'inconsistent with the contemporary standards of decency.' " 🚩 *Whitely v. Albers*, 475 U.S. 312, 327 (1986) (citation omitted); 🚩 *Hudson*, 503 U.S. at 9. The malicious use of force to cause harm constitutes a per se Eighth Amendment violation, regardless of the seriousness of the injuries. 🚩 *Blyden*, 186 F.3d at 263 (citing 🚩 *Hudson*, 503 U.S. at 9). "The Eighth Amendment's prohibition of 'cruel and unusual' punishments necessarily excludes from constitutional recognition *de minimis* uses of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind." 🚩 *Hudson*, 503 U.S. at 9-10 (citations omitted). " 'Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights.' " 🚩 *Sims*, 230 F.3d at 22 (citation omitted). With respect to this element, the law is clear that "a claim of excessive force may be established even if the victim does not suffer 'serious' ... or 'significant' injury, ... provided that the amount of force used is more than 'de minimis,' or involves force that is 'repugnant to the conscience of mankind.' " 🚩 *Hudson*, 503 U.S. at 7-10.

The subjective element requires a plaintiff to demonstrate the "necessary level of culpability, shown by actions characterized by wantonness." 🚩 *Id.* at 21 (citation omitted). The wantonness inquiry "turns on 'whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm.' " *Id.* (quoting 🚩 *Hudson*, 503 U.S. at 7). In determining whether defendants acted in a malicious or wanton manner, the Second Circuit has identified five factors to consider: the extent of the injury and the mental state of the defendant; "the need for the application of force; the correlation between that need and the amount of force used; the threat reasonably perceived by the defendants; and any efforts made by the defendants to temper the severity of a forceful response." 🚩 *Scott v. Coughlin*, 344 F.3d 282, 291 (2d Cir. 2003).

## C. Application

With respect to the events of August 9, 2019, plaintiff's second amended complaint states that C.O. Price was aware that plaintiff had a "serious medical need" by virtue of "seeing [plaintiff] with a cane and special shoes on [his] feet." (SAC at 2). Plaintiff also avers that the housing officer "called [C.O. Price], letting him know [plaintiff] could not move fast enough because of [an] abscess [on his leg]." (*Id.*). Plaintiff contends that, despite this knowledge, C.O. Price "ignored the seriousness" of plaintiff's condition and "placed a small leg iron over [his] open wound[,]" causing the "wound to reopen to the point that the medical trip was delayed[.]" (*Id.*). Plaintiff then vaguely refers to "[f]oot and ankle injuries-causing infection or disease." (*Id.* at 3). Plaintiff provided additional factual context at his deposition, the majority of which has been previously summarized. In sum, plaintiff maintains that C.O. Price knew that plaintiff had a permit for "big boy" ankle restraints, due to a medical condition. Plaintiff testified that despite this knowledge, C.O. Price attempted to force standard sized ankle restraints on plaintiff because they were running late for a medical appointment, causing an abscess on his ankle to reopen and bleed in the process. (Pl.'s Dep. at 52–56).

**\*11** For the following reasons, this court finds that plaintiff has not established a genuine issue of material fact with respect to either prong of the alleged Eighth Amendment violation. As for the subjective component of plaintiff's excessive force claim, no reasonable fact finder could conclude that C.O. Price used force against the plaintiff maliciously and sadistically to cause harm based on the record presently before this court. Even assuming the truth of plaintiff's allegations, C.O. Price was attempting to place the standard size ankle restraints onto plaintiff because plaintiff had arrived late and they had to "hurry up and go" in order to make the medical appointment. (*See* Pl.'s Dep. at 52). It is undisputed that plaintiff was running late for his medical appointment, and that ankle restraints needed to be applied before he could be transferred out of the facility. Thus, the allegation that C.O. Price caused plaintiff's wound to reopen and bleed as he was attempting to prepare plaintiff for his medical trip, for which they were running late, does not rise to the level of an improper or wanton motive on the part of C.O. Price.

Moreover, the court finds that no reasonable fact finder would credit plaintiff's unsupported allegation that C.O. Price knew plaintiff required larger ankle restraints. C.O. Price has submitted a sworn declaration stating that he had no

**Simpson v. Price, Not Reported in Fed. Supp. (2021)**

Case 9:22-cv-00102-BKS-ML    Document 78    Filed 12/13/23    Page 191 of 373

knowledge of plaintiff's purported medical permit for "big boy" cuffs. (Price Decl. at ¶¶ 18–20). [7] The documentary evidence submitted by C.O. Price in support of his motion, including the August 9, 2019 itinerary and the August 20, 2019 Tier II hearing disposition, support C.O. Price's further contention that plaintiff did not actually have a medical permit for larger ankle restraints in place at the time of the subject incident. (C.O. Price Decl. at ¶ 24, Exs. B, C). Plaintiff has failed to provide any evidence beyond his own conclusory statements in rebuttal. Because plaintiff has not submitted "proof that tends to show that the alleged force used against him was employed maliciously and sadistically to cause harm, he has failed to satisfy the subjective prong of his excessive force claim." *Chambliss v. Rosini,* 808 F. Supp. 2d 658, 669 (S.D.N.Y. 2011) (citing *Engles v. Dunbar*, No. 09 Civ. 2457, 2010 WL 5538517, at *7 (S.D.N.Y. Dec. 30, 2010) (concluding that the subjective component of excessive force test not satisfied where uncontroverted evidence established that force was used not maliciously or sadistically, but instead to transport the plaintiff in order to receive medical attention)).

Nor is the court convinced that plaintiff could satisfy the objective component of his excessive force claim. Courts in this district "routinely dismiss claims of excessive force based on tight handcuffing where an inmate asserts only a *de minimis* injury without plausible allegations of wantonness or maliciousness." *Livingston v. Hoffnagle,* No. 9:19-CV-0353 (GLS/CFH), 2019 WL 7500501, at *4 (N.D.N.Y. Nov. 8, 2019) (listing cases); *see also Burroughs v. Mitchell*, 325 F. Supp.3d 249, 265 (N.D.N.Y. 2018) (dismissing pro se inmate's excessive force claim where he alleged only that the defendants "handcuffed him tightly, which caused cuts to his wrist") (internal quotation marks omitted); *Burroughs v. Petrone*, 138 F. Supp. 3d 182, 213 (N.D.N.Y. 2015) (dismissing excessive force claim based on tight handcuffing where the complaint alleged, without more, that the handcuffs caused "pain, swelling, and bruising") (internal quotation marks and brackets omitted).

Here, plaintiff merely alleges that, in attempting to place restraints on his ankles, C.O. Price "popped open a scab" on plaintiff's leg, causing it to bleed. (Pl.'s Dep. at 53–54, 65). C.O. Price disputes the fact that he caused any injury to plaintiff with the restraints (Price Decl. at ¶ 32), and there is no medical documentation before this court evidencing

the contrary. In any event, the parties agree that plaintiff ultimately had his leg wrapped at the medical unit before being transferred to SUNY Upstate. (Pl.'s Dep. at 53–54; Price Decl. at ¶ 23). Assuming plaintiff's version of the facts, his leg was wrapped but "still bleeding" when he was placed in the SHU. (Pl.'s Dep. at 54). Plaintiff could not recall how long it took for his wound to stop bleeding, but concedes that he did not require stitches and that the wound healed "at some point." (*Id.* at 60–61, 65–66).

**\*12** Plaintiff testified that he did not obtain treatment for the injury, other than wrapping his leg – however, plaintiff concedes that his leg required continuous "wrapping" prior to the alleged incident. (*Id.* at 66). Notwithstanding plaintiff's self-serving assertion that his alleged injury caused him pain which he described as a "9 ½" on a scale of one to ten, given his *de minimis* injury, plaintiff has failed to document a material issue of fact with respect to the objective component of the excessive force standard. *See Warren v. Purcell,* No. 03 Civ. 8736, 2004 WL 1970642, at *8 (S.D.N.Y. Sept. 3, 2004) (officers who placed prisoner in tight restraints did not violate constitution where prisoner suffered de minimis injuries and no improper or wanton motive was alleged for the officers' actions).

**WHEREFORE**, based on the findings above, it is

**RECOMMENDED**, that defendant C.O. Price's motion for summary judgment (Dkt. No. 41) be **GRANTED**, and the second amended complaint **DISMISSED IN ITS ENTIRETY WITH PREJUDICE**.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have 14 days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN 14 DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Secretary of Health and Human Services*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72, 6(a), 6(e).

**All Citations**

Not Reported in Fed. Supp., 2021 WL 7367083

## Footnotes

1    Upon initial review of plaintiff's amended complaint, the district court acknowledged that the pleading was "not a model of clarity," but nevertheless liberally construed it to allege, among other things, an Eighth Amendment excessive force claim against C.O. Price arising out of allegations that C.O. Price tried to place plaintiff in leg shackles that were too small for him on August 9, 2019. (Dkt. No. 8 at 5). In the amended complaint, plaintiff also alleged various constitutional violations stemming from events which took place in October 2018. (*See generally* Dkt. No. 5). These claims did not survive initial review. (*See* Dkt. No. 8 at 2–8). Plaintiff subsequently filed his second amended complaint, which suffered from deficiencies similar to his former pleading. (Dkt. No. 30). Upon review, the district court construed the second amended complaint to allege an Eighth Amendment excessive force claim against C.O. Price concerning the October 2018 events. (Dkt. No. 29). The district court did not consider whether plaintiff properly raised allegations of excessive force against C.O. Price concerning events which took place on August 9, 2019, presumably because the second amended complaint did not specifically identify this time period. However, at his deposition plaintiff explained that his claims against C.O. Price, as set forth in his second amended complaint, stemmed from the events which took place on August 9, 2019. (Plaintiff's Deposition Transcript ("Pl.'s Dep.") at 37, 46–47, 69). Considering plaintiff's testimony, this court interprets the portion of the second amended complaint entitled "Statement of Claim" to address the excessive force claim against C.O. Price that took place on August 9, 2019, although plaintiff has admittedly characterized this claim as one of medical deliberate indifference, as opposed to excessive force. (Dkt. No. 30 at 2–3). At the request of the moving defendant and for the sake of judicial economy, this court will assess whether the latter excessive force claim against C.O. Price survives summary judgment, assuming it was properly pleaded in the first place.

2    Previously Local Rule 7.1(a)(3).

3    C.O. Price denies that plaintiff was taken to medical because of an injury caused by him. (Id. ¶ 23).

4    In his opposition papers, plaintiff appears to argue that this claim should not be dismissed against C.O. Price. (Plaintiff's Brief ("Pl.'s Br.") at 3–5). Plaintiff's argument is misplaced, however, as it only addresses the events which unfolded on August 9, 2019, and why C.O. Price should be held liable for his actions on that day. (*Id.*).

5    Plaintiff testified that he was unable to make or obtain copies of his grievance paperwork while confined in the SHU. (Pl.'s Dep. at 70).

6    In *Chance,* the Second Circuit noted the difference between the motion to dismiss standard of review and summary judgment standard in reversing the district court's dismissal of a complaint pursuant to Rule 12(b):

   It is important to recognize the difference between disposing of a case on a 12(b)(6) motion and resolving the case later in the proceedings, for example by summary judgment. At the 12(b)(6) stage, [t]he issue is not whether a plaintiff is likely to prevail ultimately, but whether the claimant is entitled to offer evidence to support the claims. Indeed it may appear on the face of the pleading that a recovery is very remote and unlikely but that is not the test....

   [Plaintiff] might not be able to prove his claims at trial. *And even at the summary judgment stage, it may well become clear that [plaintiff] cannot proffer sufficient proof to create genuine issues of material fact.* But in his complaint, he has alleged facts that are not impossible to prove and that, if demonstrated, would state a legally cognizable claim.

   *Id.* at 701 (internal quotation marks and citations omitted) (alterations to original and emphasis added).

7   Plaintiff did not respond to the defense's Statement of Material Fact that "C.O. Price had no recollection of such a permit as he had escorted Plaintiff on previous medical trips where standard sized restraints were utilized. Price Decl. ¶ 20." (Dkt. No. 41-5 at 3, ¶ 18).

---

**End of Document**                                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

Case 9:22-cv-00102-BKS-ML    Document 78    Filed 12/13/23    Page 194 of 373

Simpson v. Price, Not Reported in Fed. Supp. (2022)

2022 WL 336540
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

James SIMPSON, Plaintiff,

v.

R. PRICE, C.O., Defendant.

9:19-CV-1413 (MAD/ATB)

|

Signed 02/04/2022

**Attorneys and Law Firms**

JAMES SIMPSON, 18-B-0295, Cayuga Correctional Facility, P.O. Box 1186, Moravia, New York 13118, Plaintiff pro se.

OF COUNSEL: KONSTANDINOS D. LERIS, AAG, OFFICE OF THE NEW YORK, STATE ATTORNEY GENERAL, The Capitol, Albany, New York 12224, Attorneys for Defendant.

**MEMORANDUM-DECISION AND ORDER**

Mae A. D'Agostino, United States District Judge:

**I. INTRODUCTION**

 **\*1** On November 15, 2019, Plaintiff, an inmate in the custody of the New York State Department of Corrections and Community Supervision ("DOCCS"), filed his original complaint in this matter pursuant to 42 U.S.C. § 1983. *See* Dkt. No. 1. On January 3, 2020, the Court dismissed the complaint on initial review and permitted Plaintiff an opportunity to file an amended complaint. *See* Dkt. No. 4. Plaintiff filed his amended complaint on January 21, 2020, which the Court accepted for filing to the extent that it asserted an Eighth Amendment excessive force claim against Defendant Price stemming from events that occurred on August 9, 2019. *See* Dkt. Nos. 5 & 8. Plaintiff was granted leave to file a second amended complaint on September 24, 2020, and the second amended complaint was accepted for filing to the extent that it asserted an additional excessive force claim against Defendant arising from events that occurred on October 10, 2018. *See* Dkt. No. 29.

On August 24, 2021, Defendant moved for summary judgment. *See* Dkt. No. 41. On September 9, 2021, Plaintiff responded to Defendant's motion. *See* Dkt. No. 43. In a Report-Recommendation dated December 29, 2021, Magistrate Judge Baxter recommended that the Court grant Defendant's motion in its entirety and dismiss this case. *See* Dkt. No. 46. In his Report-Recommendation, Magistrate Judge Baxter first found that Defendant was not personally involved in the October 10, 2018 incident. *See id.* at 9. As to the August 9, 2019 excessive force claim, Magistrate Judge Baxter initially found that dismissal is appropriate because Plaintiff failed to exhaust his administrative remedies. *See id.* at 13-21. Alternatively, Magistrate Judge Baxter found that the claim should be dismissed on the merits because Plaintiff failed to establish both the subjective and objective components of an Eighth Amendment excessive force claim. *See id.* at 23-26.

In objections received on January 13, 2022, Plaintiff argues, in an entirely conclusory manner, that he has set forth a valid Eighth Amendment excessive force claim. *See* Dkt. No. 47 at 1-4. Additionally, Plaintiff contends that he was not required to exhaust his claim stemming from the events on August 9, 2019 because of the "futility exception." *Id.* at 2. As set forth below, Defendant's motion for summary judgment is granted in its entirety.

**II. BACKGROUND**

For a complete recitation of the relevant factual background, the parties are referred to Magistrate Judge Baxter's December 29, 2021 Report-Recommendation. *See* Dkt. No. 46.

**III. DISCUSSION**

**A. Standard of Review**
When a party files specific objections to a magistrate judge's report-recommendation, the district court "make[s] a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b)(1)(C). However, when a party files "[g]eneral or conclusory objections, or objections which merely recite the same arguments [that he] presented to the magistrate judge," the court reviews those recommendations for clear error only. *O'Diah v. Mawhir*, No. 9:08-CV-322,

2011 WL 933846, *2 (N.D.N.Y. Mar. 16, 2011) (citations and footnote omitted). After the appropriate review, "the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1)(C).

**\*2** A court may grant a motion for summary judgment only if it determines that there is no genuine issue of material fact to be tried and that the facts as to which there is no such issue warrant judgment for the movant as a matter of law. *See Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 36 (2d Cir. 1994) (citations omitted). When analyzing a summary judgment motion, the court "cannot try issues of fact; it can only determine whether there are issues to be tried." *Id.* at 36–37 (quotation and other citation omitted). Moreover, it is well-settled that a party opposing a motion for summary judgment may not simply rely on the assertions in its pleadings. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986) (quoting Fed. R. Civ. P. 56 (c), (e)).

In assessing the record to determine whether any such issues of material fact exist, the court is required to resolve all ambiguities and draw all reasonable inferences in favor of the nonmoving party. *See Chambers*, 43 F.3d at 36 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)) (other citations omitted). Where the non-movant either does not respond to the motion or fails to dispute the movant's statement of material facts, the court may not rely solely on the moving party's Rule 56.1 statement; rather the court must be satisfied that the citations to evidence in the record support the movant's assertions. *See Giannullo v. City of New York*, 322 F.3d 139, 143 n.5 (2d Cir. 2003) (holding that not verifying in the record the assertions in the motion for summary judgment "would derogate the truth-finding functions of the judicial process by substituting convenience for facts").

"Assessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment." *Jeffreys v. City of New York*, 426 F.3d 549, 553–54 (2d Cir. 2005) (quotation omitted). "However, '[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could *reasonably* find for the plaintiff." *Id.* (quoting *Anderson*, 477 U.S. at 252

(emphasis and alterations in original)). "To defeat summary judgment, therefore, nonmoving parties 'must do more than simply show that there is some metaphysical doubt as to the material facts,' ... and they 'may not rely on conclusory allegations or unsubstantiated speculation.' " *Id.* (quotations omitted).

"[I]n a *pro se* case, the court must view the submissions by a more lenient standard than that accorded to 'formal pleadings drafted by lawyers.' " *Govan v. Campbell*, 289 F. Supp. 2d 289, 295 (N.D.N.Y. 2007) (quoting *Haines v. Kerner*, 404 U.S. 519, 520 (1972)) (other citations omitted). The Second Circuit has opined that the court is obligated to "make reasonable allowances to protect *pro se* litigants" from inadvertently forfeiting legal rights merely because they lack a legal education. *Id.* (quoting *Traguth v. Zuck*, 710 F.2d 90, 95 (2d Cir. 1983)). "However, this does not mean that a *pro se* litigant is excused from following the procedural requirements of summary judgment." *Kotler v. Fischer*, No. 9:09-CV-01443, 2012 WL 929823, *12 (N.D.N.Y. Mar. 19, 2012) (citations omitted). Specifically, "a *pro se* party's 'bald assertion,' completely unsupported by evidence is not sufficient to overcome a motion for summary judgment." *Lee v. Coughlin*, 902 F. Supp. 424, 429 (S.D.N.Y. 1995) (citing *Cary v. Crescenzi*, 923 F.2d 18, 21 (2d Cir. 1991)).

## B. October 10, 2018 Incident

In his second amended complaint, Plaintiff alleges that on October 10, 2018, he had a medical appointment outside of Cayuga Correctional Facility ("Cayuga C.F."). *See* Dkt. No. 30 at 2. Plaintiff informed the correctional officers responsible for his transport that the leg irons that he was placed in were too small for his ankles. *See id.* The officers ignored Plaintiff's complaints, resulting in severe bruises and aggravation of an open wound on his ankle. *See id.*

**\*3** In its initial review of Plaintiff's second amended complaint, the Court read the pleading as alleging that Defendant Price was one of the officers who transported Plaintiff to his medical appointment on October 10, 2018. *See* Dkt. No. 29 at 3. At Plaintiff's deposition, however, he confirmed that Defendant Price was not involved in the October 10, 2018 incident. *See* Dkt. No. 41-1 at 41. Since Defendant Price was not present at the time of the October 10, 2018 incident, the undisputed facts demonstrate that he was not personally involved in any constitutional violation. As

Simpson v. Price, Not Reported in Fed. Supp. (2022)

Case 9:22-cv-00102-BKS-ML    Document 78    Filed 12/13/23    Page 196 of 373

such, Magistrate Judge Baxter correctly determined that this claim must be dismissed due to Defendant's lack of personal involvement. *See* Wright v. Smith, 21 F.3d 496, 501 (2d Cir. 1994).

## C. August 9, 2019 Incident

### 1. Exhaustion of Administrative Remedies

As Magistrate Judge Baxter correctly determined, the excessive force claim stemming from the incident on August 9, 2019 should be dismissed due to Plaintiff's failure to exhaust. The undisputed facts before the Court establish that there is no record of a grievance being filed regarding this incident and that, even if such a grievance was filed, the denial of the grievance was not appealed to the CORC. *See* Dkt. No. 46 at 13-15; Dkt. No. 41-3; Dkt. No. 41-4. Plaintiff attempts to argue that the grievance process was unavailable to him, but his explanations/arguments have evolved over time and are insufficient to establish his burden of demonstrating unavailability, as fully explained by Magistrate Judge Baxter. *See* Dkt. No. 46 at 13-20. Plaintiff has provided no specifics regarding when the alleged grievances were written, their content, or the steps that he took to provide them to an officer to send to the grievance office. Additionally, Plaintiff has failed to provide the Court with any documentary evidence to corroborate that he attempted to file a grievance, such as follow-up correspondence after his release from SHU. As such, the Court finds that Plaintiff's conclusory allegations are insufficient to defeat summary judgment. *See* Sankara v. Montgomery, No. 9:16-cv-885, 2018 WL 4610686, *8 (N.D.N.Y. June 25, 2018) ("Plaintiff's conclusory allegations that the DOCCS IGP was unavailable to him [while confined to the SHU] were insufficient to withstand summary judgment," where the plaintiff "provided no evidence that he actually did write grievances; when they were written; the content of the grievances; ... the officers named in the grievance(s) ...; the specific steps taken by Plaintiff to provide them to an officer to send to the grievance office; and any specific follow up with the grievance office"). Plaintiff's objections to Magistrate Judge Baxter's Report-Recommendation simply reiterate his belief that administrative remedies were unavailable to him in an entirely conclusory fashion. *See* Dkt. No. 47 at 2.

Accordingly, the Court's Defendant's motion for summary judgment as to this claim based on Plaintiff's failure to exhaust the available administrative remedies.

### 2. Merits

Magistrate Judge Baxter also correctly found, in the alternative, that Plaintiff's excessive force claim relating to the August 9, 2019 incident should be dismissed on the merits. This incident again involves the application of leg irons on Plaintiff while he was being transported that were allegedly too small and caused a wound to reopen, resulting in an infection. *See* Dkt. No. 46 at 23.

According to the undisputed facts, on August 9, 2019, Plaintiff had an appointment at SUNY Upstate Medical University at 9:45 a.m. *See* Dkt. No. 41-2 at ¶¶ 10-11. Plaintiff was required to arrive at the departure location at Cayuga C.F. no later than 8:15 a.m. for an 8:30 a.m. departure. *See id.* at ¶¶ 11-12. Plaintiff arrived at the transport location at 8:45 a.m., at which point he was placed in the transport van. *See id.* at ¶¶ 13-14. Once Plaintiff was placed in the van, Defendant attempted to place standard-sized ankle restraints on Plaintiff, which Plaintiff refused. *See id.* at ¶ 15. Plaintiff told Defendant that he would not wear the standard-sized restraints, and that he had a permit for "big boy" cuffs to ease the pressure placed on chronic wounds on his ankles and feet. *See id.* at ¶ 17. At this point, Defendant stopped attempting to place the standard-sized leg restraints on Plaintiff and contacted the area supervisor. *See id.* at ¶ 21. Defendant and the supervisor then escorted Plaintiff from the van to the infirmary, where Plaintiff spoke with Nurse Giovannetti. *See id.* at ¶ 22. Nurse Giovannetti placed a gauze bandage around one of Plaintiff's ankles and, at this point, Plaintiff agreed to continue on the medical trip. *See id.* at ¶ 23.

**\*4** Additionally, while at the infirmary, Defendant and the supervisor checked with the Deputy Superintendent's Office and Medical Office for any documentation concerning a permit approving Plaintiff for larger restraints. *See id.* at ¶ 24. Neither office found any documentation and, therefore, it was determined that standard-sized ankle restraints would be used. *See id.* Upon returning to the van, Plaintiff permitted Defendant to apply the standard-sized restraints without further complaint. *See id.* The delay caused by the trip to the infirmary and checking for the existence of the permit resulted in Plaintiff arriving for his medical appointment thirty-five minutes after the scheduled arrival time. *See id.* at ¶ 26.

As Magistrate Judge Baxter correctly determined, the undisputed facts, beyond Plaintiff's own conclusory assertions, demonstrate that the alleged force was not employed in a sadistic or malicious manner intending to cause harm. As such, he has failed to satisfy the subjective

Case 9:22-cv-00102-BKS-ML    Document 78    Filed 12/13/23    Page 197 of 373

Simpson v. Price, Not Reported in Fed. Supp. (2022)

prong of his excessive force claim. *See* ⚑ *Chambliss v. Rosini*, 808 F. Supp. 2d 658, 669 (S.D.N.Y. 2011) (citation omitted). Moreover, Plaintiff has failed to satisfy the objective prong of his excessive force claim since he has alleged only *de minimis* injury without any plausible allegations of wantonness or maliciousness. *See* *Livingston v. Hoffnagle*, No. 9:19-cv-353, 2019 WL 7500501, *4 (N.D.N.Y. Nov. 8, 2019) (listing cases); *see also* ⚑ *Burroughs v. Mitchell*, 325 F. Supp. 3d 249, 265 (N.D.N.Y. 2018) (dismissing the *pro se* inmate's excessive force claim where he alleged only that the defendants "handcuffed him tightly, which caused cuts to his wrist").

Based on the foregoing, the finds that Defendant is entitled to summary judgment on this alternative ground.

### IV. CONCLUSION

Accordingly, the Court hereby

**ORDERS** that Magistrate Judge Baxter's December 29, 2021 Report-Recommendation (Dkt. No. 46) is **ADOPTED in its entirety** for the reasons set forth therein; and the Court

**ORDERS** that Defendant's motion for summary judgment (Dkt. No. 41) is **GRANTED in its entirety**; and the Court further

**ORDERS** that the Clerk of the Court shall enter judgment in Defendant's favor and close this case; [1] and the Court further

**ORDERS** that the Clerk of the Court shall serve a copy of this Memorandum-Decision and Order on the parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2022 WL 336540

---

### Footnotes

1    In a one-page letter motion dated January 18, 2022, Plaintiff asks the Court "for permission for the defendant to take a voice analysis with my question, about the event that happen [sic] at my cost." Dkt. No. 48. It is entirely unclear what Plaintiff is seeking in this letter motion. However, since the Court has granted Defendant's motion for summary judgment in its entirety, this letter motion is denied as moot.

---

**End of Document**                                  © 2023 Thomson Reuters. No claim to original U.S. Government Works.

Ozzborn v. Cornell, Not Reported in Fed. Supp. (2021)

Case 9:22-cv-00102-BKS-ML    Document 78    Filed 12/13/23    Page 198 of 373

2021 WL 2227829
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Thomas OZZBORN, Plaintiff,

v.

Matthew CORNELL, Correctional officer, Defendant.

9:17-CV-1039 (MAD/ATB)
|
Signed 06/02/2021

**Attorneys and Law Firms**

OF COUNSEL: SCOTT E. RYNECKI, ESQ.,
RUBENSTEIN & RYNECKI, 16 Court Street, Suite 1717,
Brooklyn, New York 11241, Attorneys for Plaintiff.

OF COUNSEL: AIMEE M. COWAN, AAG, OFFICE OF
THE NEW YORK STATE ATTORNEY GENERAL, 300
South State Street, Suite 300, Syracuse, New York 13202,
Attorneys for Defendants.

**MEMORANDUM-DECISION AND ORDER**

Mae A. D'Agostino, U.S. District Judge:

**I. INTRODUCTION**

**\*1** On September 19, 2017, Plaintiff Thomas Ozzborn
("Plaintiff"), a former inmate housed at the Auburn
Correctional Facility ("Auburn CF"), filed a complaint in
the Northern District of New York, pursuant to 42
U.S.C. § 1983 and 28 U.S.C. § 1367, against Defendants
Corrections Officer Matthew Cornell, the New York State
Department of Corrections and Community Supervision
("DOCCS"), and the State of New York (collectively,
"Defendants"). See Dkt. No. 1. On June 22, 2018, the Court
issued a Memorandum-Decision and Order dismissing all
claims against the State Defendants, and the state law assault
and battery and all claims against Defendant Cornell in his
official capacity. Dkt. No. 20. As a result of the Court's
decision, Defendant Cornell is the sole remaining defendant
in this action.

On August 21, 2020, Defendant filed a motion for summary
judgment on Plaintiff's remaining claims of false arrest, false

imprisonment, and denial of a right to a fair trial. Dkt. No.
58. On October 21, 2020, Plaintiff filed an opposition to
Defendant's motion. Dkt. No. 62. Defendant filed a reply
on October 28, 2020. Dkt. No. 63. As set forth below,
Defendant's motion is granted in part and denied in part.

**II. BACKGROUND**

On May 9, 2015, Defendant singled out Plaintiff for a
"random" pat frisk. Dkt. No. 58-2 at ¶ 7. Plaintiff alleges
that days prior to this, Plaintiff had a dispute with Defendant
and afterwards, Defendant threatened Plaintiff, stating "I'm
going to see you later." See Dkt. No. 62-1 at 13. Defendant
asserts that he recovered a three- and one-half-inch sharpened
tweezer prong in Plaintiff's right shoe. Dkt. No. 58-2 at ¶
9. Plaintiff alleges that Defendant planted the weapon in his
shoe. Dkt. No. 62-1 at 2.

DOCCS held a disciplinary hearing on May 14, 2015, and
May 28, 2015. See Dkt. No. 58-2 at ¶ 19. Although Plaintiff
maintained his innocence throughout the hearing, he was
found guilty based on Defendant's allegations and transferred
to the Cayuga County Correctional Facility Special Housing
Unit ("SHU") where he spent seven months in solitary
confinement. See Dkt. No. 62-1 at 14.

Faced with a possible sentence of fifteen years to life, Plaintiff
eventually pled guilty to promoting prison contraband in the
first degree, a class D Felony, and agreed to a two to four-
year prison sentence for that charge. Dkt. No. 58-2 at ¶ 44.
On August 12, 2016, Plaintiff appealed his conviction and it
was affirmed. See id. at ¶ 21.

In December 2016, the Inspector General for DOCCS raided
Auburn CF and uncovered multiple items of contraband in the
possession of prison guards. Dkt. No. 62-1 at 12. Defendant
allegedly admitted to the Cayuga County District Attorney
that he had planted at least one weapon on an inmate. See
id. at 13. The District Attorney provided this information
to Plaintiff's counsel and the judge presiding over Plaintiff's
appeal, stating that he had "recently learned of an infirmity
regarding the credibility" of Defendant and that "his office
would not oppose any motion ... to vacate the previously
entered plea and sentence." Dkt. No. 58-15.

**\*2** After receiving this letter, Plaintiff filed a motion to
dismiss his conviction and indictment. Dkt. No. 62-1 at 11. On
January 19, 2017, Justice Thomas G. Leone vacated Plaintiff's

Case 9:22-cv-00102-BKS-ML    Document 78    Filed 12/13/23    Page 199 of 373

**Ozzborn v. Cornell, Not Reported in Fed. Supp. (2021)**

conviction. *See id.* Plaintiff was released from DOCCS's custody on February 9, 2017. *Id.* at 14.

On September 19, 2017, Plaintiff filed a complaint asserting seven causes of action for violations of state law and constitutional rights: (1) false arrest and false imprisonment pursuant to 42 U.S.C. § 1983 against Defendant Cornell, Dkt. No. 1 at ¶¶ 33-48; (2) false arrest and false imprisonment under New York State law against all Defendants, *see id.* at ¶¶ 48-54; (3) denial of the right to a fair trial pursuant to 42 U.S.C. § 1983 against Defendant Cornell, *see id.* at ¶¶ 55-60; (4) common law assault against all Defendants, *see id.* at ¶¶ 61-64; (5) common law battery against all Defendants, *see id.* at ¶¶ 65-69; (6) municipal liability against the State Defendants, *see id.* at ¶¶ 70-74; and (7) negligent hiring, retention, training, and supervision against the State Defendants, *see id.* at ¶¶ 75-79. On June 22, 2018, the Court issued a Memorandum-Decision and Order dismissing all claims against the State Defendants, the state law assault and battery against Defendant Cornell and all claims against him in his official capacity. Dkt. No. 20.

On August 21, 2020, Defendant filed a motion for summary judgment on Plaintiff's remaining claims, false arrest, false imprisonment, and denial of a right to a fair trial. Dkt. No. 58. On October 21, 2020, Plaintiff filed an opposition to Defendant's motion. Dkt. No. 62. Defendant filed a reply on October 28, 2020. Dkt. No. 63. Defendant's motion is denied-in-part and granted-in-part.

### III. DISCUSSION

#### A. Standard of Review
A court may grant a motion for summary judgment only if it determines that there is no genuine issue of material fact to be tried and that the facts as to which there is no such issue warrant judgment for the movant as a matter of law. *See Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 36 (2d Cir. 1994) (citations omitted). When analyzing a summary judgment motion, the court "cannot try issues of fact; it can only determine whether there are issues to be tried." *Id.* at 36–37 (quotation and other citation omitted). Moreover, it is well-settled that a party opposing a motion for summary judgment may not simply rely on the assertions in its pleadings. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986) (quoting Fed. R. Civ. P. 56 (c), (e)).

In assessing the record to determine whether any such issues of material fact exist, the court is required to resolve all ambiguities and draw all reasonable inferences in favor of the nonmoving party. *See Chambers*, 43 F.3d at 36 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)) (other citations omitted). Where the non-movant either does not respond to the motion or fails to dispute the movant's statement of material facts, the court may not rely solely on the moving party's Rule 56.1 statement; rather the court must be satisfied that the citations to evidence in the record support the movant's assertions. *See Giannullo v. City of New York*, 322 F.3d 139, 143 n.5 (2d Cir. 2003) (holding that not verifying in the record the assertions in the motion for summary judgment "would derogate the truth-finding functions of the judicial process by substituting convenience for facts").

**\*3** " 'Assessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment.' " *Jeffreys v. City of New York*, 426 F.3d 549, 553–54 (2d Cir. 2005) (quotation omitted). "However, '[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could *reasonably* find for the plaintiff." *Id.* at 554 (quoting *Anderson*, 477 U.S. at 252) (emphasis in original). "To defeat summary judgment, therefore, nonmoving parties 'must do more than simply show that there is some metaphysical doubt as to the material facts,' ... and they 'may not rely on conclusory allegations or unsubstantiated speculation.' " *Id.* (quotations omitted).

#### B. Exhaustion
Defendant asserts that Plaintiff's claims are barred because he failed to exhaust his administrative remedies. Dkt. No. 58-1 at 6-17. Plaintiff argues that he repeatedly attempted to exhaust his administrative remedies, but they were unavailable to him. Dkt. No. 62-2 at 15-17. The Court agrees that Plaintiff failed to exhaust his administrative remedies in part.

The Prison Litigation Reform Act ("PLRA") states that "[no] action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available

are exhausted." 🚩 42 U.S.C. § 1997e(a). This exhaustion requirement applies to all suits brought by inmates regarding aspects of prison life. *See* 🚩 *Porter v. Nussle*, 534 U.S. 516, 532 (2002). Inmates must exhaust all available administrative remedies even if they are seeking only money damages that are not available in prison administrative proceedings.

*See* 🚩 *Giano v. Goord*, 380 F.3d 670, 675 (2d Cir. 2004), *abrogated on other grounds by* 🏷 *Ross v. Blake*, 136 S. Ct. 1850 (2016). The failure to exhaust is an affirmative defense that must be raised by the defendants and, as such, it is the defendants' burden to establish that the plaintiff failed to meet the exhaustion requirements. *See* 🏷 *Jones v. Bock*, 549 U.S. 199, 216 (2007); *Key v. Toussaint*, 660 F. Supp. 2d 518, 523 (S.D.N.Y. 2009) (citations omitted).

The Supreme Court has held that in order to properly exhaust an inmate's administrative remedies, the inmate must complete the administrative review process in accordance with the applicable state rules. *See* 🏷 *Jones*, 549 U.S. at 218–19 (citing 🏷 *Woodford v. Ngo*, 548 U.S. 81 (2006)). In *Woodford*, the Court held that "proper" exhaustion means that the inmate must complete the administrative review process in accordance with the applicable procedural rules, including deadlines, as a prerequisite to bringing suit in federal court. *See* 🏷 *Woodford*, 548 U.S. at 90–103.

New York State has a three-step administrative review process, commonly referred to as the Inmate Grievance Program ("IGP"). First, a grievance is submitted to the Inmate Grievance Resolution Committee ("IGRC"), which reviews and investigates the formal complaint before issuing a written determination. *See* 7 N.Y.C.R.R. § 701.5(b). Second, an adverse decision by the IGRC may be appealed to the Superintendent of the Facility. *See id.* § 701.5(c). Third, an adverse decision by the Superintendent may be appealed to the Central Office Review Committee ("CORC"). *See id.* § 701.5(d). If all three levels of review are exhausted, then the prisoner may seek relief in a federal court pursuant to 🏷 section 1983. *See* *Bridgeforth v. DSP Bartlett*, 686 F. Supp. 2d 238, 239 (W.D.N.Y. 2010) (citing 🏷 *Porter*, 534 U.S. at 524).

To the extent a civil rights claim must be exhausted by the grievance process, completion of the three-tiered process, through and including a final decision by the CORC, must be completed before an action asserting that claim may be filed in federal court. *See, e.g., Casey v. Brockley*, No. 9:13-CV-1271, 2015 WL 8008728, *5 (N.D.N.Y. Nov. 9, 2015) ("Receiving a decision from CORC after commencing litigation does not satisfy PLRA's requirement that administrative remedies be exhausted *before* filing suit, and any claim not exhausted prior to commencement of the suit must be dismissed without prejudice") (citing 🚩 *Neal v. Goord*, 267 F.3d 116, 122–23 (2d Cir. 2001), *overruled on other grounds by* 🏷 *Porter*, 534 U.S. 516) (emphasis in original); *Rodriguez v. Rosner*, No. 12-CV-958, 2012 WL 7160117, *8 (N.D.N.Y. Dec. 5, 2012). "[A] post-exhaustion amendment of the complaint cannot cure an exhaustion defect existing at the time the action was commenced." *Guillory v. Haywood*, No. 9:13-CV-1564, 2015 WL 268933, *11 (N.D.N.Y. Jan. 21, 2015) (citing 🚩 *Neal*, 267 F.3d at 122) (other citation omitted).

**\*4** Plaintiff asserts that after the incident he was placed in SHU and began writing a series of grievances but none of them were actually filed because his mail was not going out. Dkt. No. 62-2 at 15-16. Plaintiff contends that among his unsent mail were his grievances and letters to his mother and the catholic priest; none of which were ever delivered. *Id.* Plaintiff claims that he demanded that he be able to file a grievance but that he was ignored. *Id.* Plaintiff asserts that the grievance process was further unavailable to him because —eight months later—he transferred correctional facilities a number of times. *Id.* at 16.

In support of his position, Plaintiff relies on 🏷 *Williams v. Correction Officer Priatno*, 829 F.3d 118 (2d Cir. 2016). In *Williams*, the defendant, a corrections officer, searched through the plaintiff's cell and went through his legal paperwork pertaining to a court case regarding a prior assault he suffered from prison officials. 🏷 *Id.* at 120. The defendant then assaulted the plaintiff in a room with no cameras and told him, " 'this is what running your mouth gets you.' " *Id.* About two weeks later, the plaintiff drafted a grievance and gave it to a corrections officer to submit on his behalf. 🏷 *Id.* at 121. One week later, the plaintiff saw the superintendent and asked about his grievance. *Id.* The superintendent said he was unaware of the grievance and said to follow up, but the plaintiff was transferred to another facility just one week later. *Id.*

The plaintiff never received a response and claimed that the officer never filed it on his behalf. *Id.* The Second

Case 9:22-cv-00102-BKS-ML    Document 78    Filed 12/13/23    Page 201 of 373

Ozzborn v. Cornell, Not Reported in Fed. Supp. (2021)

Circuit accepted this allegation as true. *Id.* at 124. While the court agreed that the plaintiff technically could have filed a new grievance at his new facility, the court held that "the regulatory scheme providing for that appeal is 'so opaque' and 'so confusing that ... no reasonable prisoner [could] use [it].' " *Id.* (quoting *Ross*, 136 S. Ct. at 1859). Specifically, the regulations did not detail how a prisoner was to appeal or exhaust an administrative remedy where an officer failed to file the grievance. *Id.* "The regulations simply do not contemplate the situation in which [the plaintiff] found himself, making it practically impossible for him to ascertain whether and how he could pursue his grievance." *Id.* The plaintiff's transfer only further complicated a confusing situation. *Id.* at 126.

Plaintiff's reliance on *Williams* is misplaced. Unlike *Williams*, Plaintiff does not claim that the grievance process was so opaque that neither he, nor any other reasonable prisoner, could use it. Rather, Plaintiff claims that he knew how to file a grievance was but prevented from doing so. While the overview of the alleged facts in *Williams* have some overlap to those of the present case, the legal arguments and the particular supporting facts are entirely distinct.

For instance, Plaintiff claims that, like *Williams*, his transfer to another correctional facility prevented him from pursuing the incident. However, the plaintiff in *Williams* submitted a grievance, contacted the superintendent to follow up on the status of that grievance, and then was transferred to another correctional facility one week later. *Williams*, 829 F.3d at 120-21. The plaintiff supported this allegation by providing the court with the date he filed the grievance, the procedure for how he filed it, and the timeline for roughly when the subsequent follow-up conversations occurred. *Id.* at 121. Here, Plaintiff provides no specifics regarding the grievances he allegedly filed and did not request an extension to file a new one. *See* Dkt. No. 62-2 at 15-17.

**\*5** Plaintiff's case is more similar to *Rodriguez v. Cross*, No. 15-CV-1079, 2017 WL 2791063, \*6 (N.D.N.Y. May 9, 2017). In *Rodriguez*, the plaintiff complained that he submitted a grievance via mail, the correction officers failed to mail it, and thus, he never received a response. *Id.* The court stated that the plaintiff's bald accusations were insufficient to demonstrate that administrative remedies were unavailable to him. *Id.* at \*6-7. The court also noted that although

the plaintiff never followed up regarding his grievance, he successfully filed another grievance. *Id.* at \*7.

Here, Plaintiff testified at his deposition that he filed a grievance by leaving a plain envelope addressed to the grievance committee for the mail personnel to collect. Dkt. No. 58-9 at 74-75. Plaintiff stated that his grievances were collected but, because he never received a response, he presumed that they were never submitted. *Id.* at 75. Like *Rodriguez*, Plaintiff does not assert that he ever followed up on his grievance or offer any explanation as to why he failed to. *See* Dkt. No. 62-2 at 15-17. Additionally, Plaintiff has successfully filed numerous grievances in the past, including one just two weeks before the incident. *See* Dkt. No. 58-1 at 3; Dkt. No. 58-3 at ¶ 8. As in *Rodriguez*, Plaintiff has failed to demonstrate that his administrative remedies were unavailable to him. Accordingly, the Court grants Defendant's motion for summary judgment as to Plaintiff's false arrest and imprisonment claim.[1]

As to Plaintiff's due process claim, however, the Court finds that Plaintiff was not required to exhaust administrative remedies to pursue that claim. Generally, an inmate bringing a due process claim arising from a prison disciplinary hearing must complete the disciplinary administrative appeal process, not the IGP procedures, to exhaust administrative remedies. *See, e.g.*, *Johnson v. Fraizer*, No. 16-cv-6096, 2016 WL 7012961, \*3 (W.D.N.Y. Dec. 1, 2016) (citation omitted). Here, however, Plaintiff's due process claim alleges that Defendant violated his right to a fair trial by providing fabricated evidence to the Cayuga County District Attorney, which led to criminal charges being brought against Plaintiff. *See* Dkt. No. 1 at ¶¶ 54-59. Nothing in this claim relates to the Tier III disciplinary hearing or Plaintiff's time spent in SHU as a result thereof. Rather, this claim relates solely to the criminal case brought against Plaintiff, which is unrelated to "prison conditions" as contemplated by the PLRA. *See* 42 U.S.C. § 1997e(a); *see also Cheatham v. Saturne*, No. 1:18-cv-3154, 2019 WL 10631254, \*1 (N.D. Ga. Mar. 1, 2019) (discussing cases not subject to the PLRA's exhaustion requirement) (citations omitted).

**\*6** This result is further supported by the fact that Plaintiff would not have been able to pursue this claim until after his conviction was overturned on appeal or otherwise terminated in his favor. Had Plaintiff proceeded with this claim prior to having his conviction vacated, the case would have been dismissed pursuant to *Heck v. Humphrey*, 512 U.S. 477

(1994), because a judgment in Plaintiff's favor on his right to a fair trial/fabricated evidence claim would necessarily imply that his prior conviction was invalid. *See* 🚩 *McDonough v. Smith*, 139 S. Ct. 2149, 2157 (2019) (discussing the favorable termination requirement set forth in *Heck*). As such, the Court finds that Plaintiff was not required to exhaust his administrative remedies under the PLRA before pursuing his right to a fair trial claim relating to the new criminal charges.

Accordingly, the Court grants Defendant's motion for summary judgment as to Plaintiff's false arrest and imprisonment claim but denies the motion as to Plaintiff's due process fair trial claim.

**C. Right to a Fair Trial**

In his third cause of action, Plaintiff alleges that Defendant, in creating and forwarding false evidence, violated his "right to a fair trial under the Due Process Clause of the Fifth, Sixth and Fourteenth Amendments of the United States Constitution." Dkt. No. 1 at ¶ 59. Defendant contends that this claim must be dismissed insofar as it seeks relief under the Fifth and Sixth Amendments because the Fifth Amendment is only applicable to the federal government and the Sixth Amendment is inapplicable to civil actions. *See* Dkt. No. 58-1 at 22-24. With respect to Plaintiff's claim under the Fourteenth Amendment, Defendant contends that it must be dismissed because Plaintiff has presented only conclusory statements and speculation in support of his position that Defendant fabricated evidence. *See id.* at 24-26. The Court disagrees.

"The Due Process Clause guarantees a criminal defendant's 'right to a fair trial.' " 🚩 *Frost v. N.Y.C. Police Dep't*, 980 F.3d 231, 244 (2d Cir. 2020) (quoting 🚩 *Ramchair v. Conway*, 601 F.3d 66, 73 (2d Cir. 2010)). "This right is violated '[w]hen a police officer creates false information likely to influence a jury's decision and forwards that information to prosecutors.' " *Id.* (quoting 🚩 *Ricciuti v. N.Y.C. Transit Auth.*, 124 F.3d 123, 130 (2d Cir. 1997)). "Such violations are 'redressable in an action for damages under 🚩 42 U.S.C. § 1983.' " *Id.* (quotation omitted). "And unlike a malicious prosecution claim, 'a 🚩 Section 1983 claim for the denial of a right to a fair trial based on an officer's provision of false information to prosecutors can stand even if the officer had probable cause to arrest the 🚩 Section 1983 plaintiff.' " *Id.* (quoting 🚩 *Garnett v. Undercover Officer C0039*, 838 F.3d 265, 277–78 (2d Cir. 2016)).

To set forth a claim of the denial of the right to a fair trial, the plaintiff must establish that an "(1) investigating official (2) fabricates evidence (3) that is likely to influence a jury's decision, (4) forwards that information to prosecutors, and (5) the plaintiff suffers a deprivation of liberty as a result."

🚩 *Jovanovic v. City of New York*, 486 Fed. Appx. 149, 152 (2d Cir. 2012). The inquiry as to causation is "whether the liberty deprivations that occurred are legally traceable back even further to [the] earlier investigatory act of fabrication."

🚩 *Zahrey*, 221 F.3d at 352. In a recent decision, however, the Second Circuit made clear that the right to a fair trial can be violated even if the fabricated evidence that was supplied to the prosecutor was not ultimately used at trial.

*See* 🚩 *Frost*, 980 F.3d at 250. Moreover, it is important to note that, although the officer need not directly provide the fabricated evidence to the prosecutor, no causation for this claim would exist if such evidence was never brought to the prosecutor's attention. In other words, the claim only accrues "when fabricated information is forwarded to a prosecutor and results in the deprivation of a defendant's liberty." 🚩 *Soomro v. City of New York*, 174 F. Supp. 3d 806, 815 (S.D.N.Y. 2016) (citation omitted).

**\*7** Initially, the Court finds that it is unnecessary to determine the precise constitutional amendment underpinning Plaintiff's due process right to a fair trial claim. The Second Circuit has noted that its own decisions have been " 'inconsistent as to whether' fabrication of evidence claims 'arise[ ] under the Sixth Amendment right to a fair and speedy trial, or under the due process clauses of the Fifth and Fourteenth Amendments.' " 🚩 *Morse v. Fusto*, 804 F.3d 538, 547 n.7 (2d Cir. 2015) (quotation and other citations omitted). Despite these inconsistencies, the Second Circuit has specifically declined to clarify the issue, noting that regardless of which amendment the right is rooted it, it is undisputed that the "constitutional harm resulting from the falsified information at issue is ... redressable in an action for damages under 🚩 42 U.S.C. § 1983." 🚩 *Garnett v. Undercover Officer C0039*, 838 F.3d 265, 276 n.6 (2d Cir. 2016) (citing 🚩 *Morse v. Fusto*, 804 F.3d 538, 547 n.7 (2d Cir. 2015)). In line with this authority, the Court declines to determine whether the right to a fair trial is rooted in the Sixth Amendment or Fifth and Fourteenth Amendments, or both.

Next, the Court finds that, contrary to Defendant's position, Plaintiff has supported his claim with more than mere speculation and conclusory statements. Defendant relies on a number of cases where the courts dismissed the plaintiffs' right to a fair trial claim because the claims were supported by nothing more than the plaintiffs' speculation that the officers had falsified evidence. *See* Dkt. No. 58-12 at 24-25 (citing cases). Here, however, Plaintiff's claim is supported by considerably more than mere speculation.

For example, in the Investigative Report prepared by the Office of Special Investigations, it was noted that there was sufficient evidence to corroborate the allegation that Defendant made a verbal admission to Cayuga County Assistant District Attorney ("ADA") Brian Leeds wherein Defendant admitted to planting weapons on inmates at Auburn C.F. *See* Dkt. No. 58-17 at 1-2. Further, the investigator searched Defendant's personal locker and vehicle and found various contraband items and "potential inmate style weapons." *Id.* at 6-7. Moreover, based on Defendant's admission that he had planted weapons on inmates to ADA Leeds and the various contraband items found in Defendant's possession, the Office of Special Investigations reviewed all facility Unusual Incident's and Inmate Misbehavior Reports issued by Defendant since 2014. *See id.* at 7. Of the thirty-eight (38) inmates issued a Misbehavior Report by Defendant for a weapon, twenty-two (22) of the inmates alleged that they had been set up with the weapon by Defendant and fifteen (15) of the inmates admitted that the weapon found by Defendant was theirs. *See id.* [2] As a result of the investigation, on July 30, 2017, Defendant was issued a Notice of Discipline for his failure to properly secure contraband or report contraband found and for his failure "to comport himself in a lawful manner by planting evidence on an inmate and for issuing false/misleading Misbehavior Reports and statements during an official questioning conducted by OSI." *Id.* at 8. On February 27, 2018, Defendant resigned from his position as a Corrections Officer with DOCCS. *Id.*

Defendant also relies on a report written by Sgt. Ederer dated May 9, 2015, as well as his deposition testimony. In his report, Sgt. Ederer indicates that Defendant performed a pat frisk of Plaintiff. *See* Dkt. No. 58-12 at 13. Sgt. Ederer stated that Plaintiff admitted to possessing a weapon when questioned by Defendant. *Id.* Sgt. Ederer noted that Defendant recovered a "cutting type weapon sharpened to a point." *Id.* During his deposition on January 7, 2020, Sgt. Ederer verified the authenticity of his May 9, 2015 report. *See* Dkt. No. 58-11 at 32-33. Notably, however, during his deposition Sgt. Ederer

stated that he did not observe the pat frisk or Defendant obtaining the weapon from Plaintiff. *See id.* at 31-32. Sgt. Ederer clarified that his report was based on Defendant's statements to him after the fact, although he claims that Plaintiff admitted to him directly that the weapon was his. *See id.* at 34.

**\*8** Finally, the Court notes that Defendant asserts that Plaintiff confessed multiple times to possessing the weapon. Dkt. No. 58-1 at 21. However, the Court does not find these "admissions" very persuasive. First, Defendant asserts that Plaintiff admitted in an email that the weapon was his. In the email, Plaintiff states, "I KNOW ITS MY FAULT I GOT MORE TIME...." Dkt. No. 58-19 at 2. This statement, which is not placed in the context of the entire email chain, is ambiguous. *Id.* at 1-2.

The conversation begins on February 10, 2016 and the quoted text occurred on March 25, 2016. *Id.* at 1. In between those two emails from Plaintiff, there are two other emails, one from Plaintiff and one from Venessa. *Id.* at 1-2. Following Plaintiff's first email on February 10, he sent a second email the next day that appears to reference an entirely different conversation than the first. *See id.* While the first email appears to reference Plaintiff's legal proceedings for the alleged possession of the weapon, the second email refers only to the relationship between Plaintiff and Venessa, Venessa's relationship with another person, and comments made in another conversation. Further, the pages listed on the document jump from one to thirty-four. *Id.* Thus, the email chain does not provide context as a whole to the conversation and the quoted portion is not particularly damning to Plaintiff by itself.

The phone call the parties reference from May 11, 2016 is also less than clear. During the call, Plaintiff references the weapon and states that he was unwilling to accept a large sentence for having a weapon. Dkt. No. 63. While Plaintiff never states that the weapon was planted on him, he also never states that the weapon was his. *Id.* Rather, Plaintiff continually states that he is fighting the charge and also affirms that he never used the weapon. *Id.* He even states that the judge and district attorney are working against him. *Id.* However, Plaintiff states that he is tired of fighting and is "tapping out." *Id.* Contrary to Defendant's assertions, this call does not arise to the level of an admission of guilt.

Contrary to Defendant's assertions, Plaintiff's right to a fair trial claim is supported by more than mere speculation and

Case 9:22-cv-00102-BKS-ML    Document 78    Filed 12/13/23    Page 204 of 373

Ozzborn v. Cornell, Not Reported in Fed. Supp. (2021)

conclusory statements. As such, the Court finds that questions of fact preclude granting Defendant's motion for summary judgment as to this claim. [3]

**D. Damages**

Defendant argues that because Plaintiff did not suffer a "physical injury" as required by the PLRA, he cannot seek compensatory damages. *See* Dkt. No. 58-1 at 27-28. The Court disagrees.

**\*9** Section 1997e(e) of the PLRA states that "[n]o Federal civil action may be brought by a prisoner confined in a jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury," and "applies to claims in which a plaintiff alleges constitutional violations." 42 U.S.C. § 1997e(e); *see also* Thompson v. Carter, 284 F.3d 411, 416-17 (2d Cir. 2002). While the PLRA limits recovery of damages for mental and emotional injury with no showing of physical injury, the Second Circuit has made clear that "it does not restrict a plaintiff's ability to recover compensatory damages for actual injury, nominal or punitive damages, or injunctive and declaratory relief." Thompson, 284 F.3d at 416.

Here, contrary to Defendant's assertion, Plaintiff is still entitled to recover compensatory damages if he prevails on his right to a fair trial claim based on his loss of a "constitutional liberty interest." Rodriguez v. Touchette, No. 5:19-cv-143, 2020 WL 2322615, \*6 (D. Vt. May 11, 2020) (citations omitted); Holland v. City of New York, 197 F. Supp. 3d 529, 537 (S.D.N.Y. 2016) (collecting cases). Compensatory

damages for intangible deprivations of a plaintiff's liberty and personal rights – as distinct from pain and suffering, mental anguish, and mental trauma – are not barred by the PLRA. *See* Rosado v. Herard, No. 12 Civ. 8943, 2014 WL 1303513, \*13 (S.D.N.Y. Mar. 25, 2014); *see also* Malik v. City of New York, No. 11 Civ. 6062, 2012 WL 3345317, \*16 (S.D.N.Y. Aug. 15, 2012).

Accordingly, the Court denies Defendant's motion for summary judgment insofar as he seeks dismissal of Plaintiff's claim for compensatory damages.

## IV. CONCLUSION

After carefully reviewing the entire record in this matter, the parties' submissions and the applicable law, and for the above-stated reasons, the Court hereby

**ORDERS** that Defendant's motion for summary judgment (Dkt. No. 58) is **GRANTED in part and DENIED in part**; [4] and the Court further

**ORDERS** that the Clerk of the Court shall serve a copy of this Memorandum-Decision and Order on the parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2021 WL 2227829

## Footnotes

1    In the alternative, the Court finds that Plaintiff's false arrest/imprisonment claim fails on the merits. The law is clear that " '[a] plaintiff does not have a claim for false arrest ... under [§] 1983 if, at the time of his arrest ..., he is already in custody or incarcerated on other charges, because there is no deprivation of liberty interests.' " Wong v. LaPierre, No. 8:07-cv-1110, 2011 WL 13248503, \*8 (N.D.N.Y. Mar. 23, 2011) (quotation and other citations omitted); Holmes v. Grant, No. 03 Civ. 3426, 2006 WL 851753, \*14 (S.D.N.Y. Mar. 31, 2006) ("As plaintiff was already incarcerated at the time of the assault proceeding, he suffered no new seizure"); *Goncalves v. Reynolds*, 189 F. Supp. 2d 278, 283 (W.D.N.Y. 2001) (holding that the plaintiff cannot maintain a claim for false arrest where he was already being detained pursuant to earlier charges and based upon his prior convictions); *Perez v. Hewitt*, No. 04 Civ. 10112, 2008 WL 780628, \*2 (S.D.N.Y. Mar. 24, 2008) (noting

that "inmates retain only a 'limited right to bodily privacy' under the Fourth Amendment" and dismissing the plaintiff's false arrest/imprisonment claim because, as an inmate, the plaintiff did "not have a reasonable expectation of privacy in his person"). Although Plaintiff may have been able to bring a malicious prosecution claim against Defendant based on Defendant's alleged fabrication of evidence that was forwarded to the Cayuga County District Attorney's Office that resulted in Plaintiff remaining in state custody beyond the expiration of his original criminal sentence, Plaintiff, who is represented by counsel, did not bring a malicious prosecution claim. *See* Parker v. City of New York, No. 05 Civ. 1803, 2008 WL 110904, *9 (S.D.N.Y. Jan. 7, 2008) (noting that a malicious prosecution claim may exist where "the prisoner's period of incarceration was lengthened as a result of new charges brought against him while he was in custody").

2    One inmate refused to be interviewed.

3    In his motion, Defendant argues that he is entitled to qualified immunity as to Plaintiff's false arrest/ imprisonment claim based on the existence of "arguable probable cause," but fails to raise the qualified immunity defense as to Plaintiff's right to a fair trial claim. *See* Dkt. No. 58-1 at 28-29. Even assuming Defendant had raised this affirmative defense to Plaintiff's right to a fair trial claim, it would necessarily be denied. " 'When a police officer creates false information likely to influence a jury's decision and forwards that information to prosecutors, he violates the accused's constitutional right to a fair trial, and the harm occasioned by such an unconscionable action is redressable in an action for damages under 42 U.S.C. § 1983.' " Garnett, 838 F.3d at 275 (quotation omitted). Here, questions of fact would preclude granting summary judgment based on qualified immunity for the alleged violation of this clearly established right. *See* Ricciuti, 124 F.3d at 130.

4    As a result of this Memorandum-Decision and Order, Plaintiff's only remaining claim is his due process right to a fair trial claim.

---

**End of Document** © 2023 Thomson Reuters. No claim to original U.S. Government Works.

2023 WL 4711091
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Dumar JACKSON, Plaintiff,

v.

Officer MOORE, Corr. Fac. Ofcr.,
Clinton Corr. Fac., Defendant.

9:21-CV-1001 (GTS/ATB)
|
Signed July 24, 2023

**Attorneys and Law Firms**

DUMAR JACKSON, 18-A-2746, Plaintiff, Pro Se, Five Points Correctional Facility, Caller Box 19, Romulus, New York 14541.

HON. LETITIA A. JAMES, Attorney General for the State of New York, RACHEL OUIMET, ESQ., Assistant U.S. Attorney, Counsel for Defendant, The Capitol, Albany, New York 12224.

**DECISION and ORDER**

GLENN T. SUDDABY, United States District Judge

**\*1** Currently before the Court, in this *pro se* prisoner civil rights action filed by Dumar Jackson ("Plaintiff") against Correctional Officer Moore ("Defendant"), are (1)

Defendant's motion for summary judgment, (2) United States Magistrate Judge Andrew T. Baxter's Report-Recommendation recommending that Defendant's motion be granted and Plaintiff's Complaint be dismissed, and (3) Plaintiff's Objection to the Report-Recommendation. (Dkt. Nos. 16, 21, 22.) Because Plaintiff's one-page (four-sentence) Objection fails to specifically challenge any portion of the Report-Recommendation, the Court need review that Report-Recommendation for only clear error. [1] After carefully reviewing the relevant filings in this action, the Court can find no clear error in the Report-Recommendation: Magistrate Judge Baxter employed the proper standards, accurately recited the facts, and reasonably applied the law to those facts. As a result, the Court accepts and adopts the Report-Recommendation for the reasons stated therein, and Plaintiff's Complaint is dismissed with prejudice.

**ACCORDINGLY**, it is

**ORDERED** that Magistrate Judge Baxter's Report-Recommendation (Dkt. No. 21) is **ACCEPTED** and **ADOPTED** in its entirety; and it is further

**ORDERED** that Defendant's motion for summary judgment (Dkt. No. 16) is **GRANTED** in its entirety; and it is further

**ORDERED** that Plaintiff's Complaint (Dkt. No. 1) is **DISMISSED** with prejudice.

**All Citations**

Slip Copy, 2023 WL 4711091

---

**Footnotes**

1    When only a *general* objection is made to a portion of a magistrate judge's report-recommendation, the Court subjects that portion of the report-recommendation to only a *clear error* review. Fed. R. Civ. P. 72(b)(2),(3); Fed. R. Civ. P. 72(b), Advisory Committee Notes: 1983 Addition; *see also Brown v. Peters*, 95-CV-1641, 1997 WL 599355, at \*2-3 (N.D.N.Y. Sept. 22, 1997) (Pooler, J.) [collecting cases], *aff'd without opinion*, 175 F.3d 1007 (2d Cir. 1999). Similarly, when *no* objection is made to a portion of a report-recommendation, the Court subjects that portion of the report-recommendation to only a *clear error* review. Fed. R. Civ. P. 72(b), Advisory Committee Notes: 1983 Addition. When performing such a "clear error" review, "the court need only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation." *Id.*

WESTLAW   © 2023 Thomson Reuters. No claim to original U.S. Government Works.                    1

Case 9:22-cv-00102-BKS-ML    Document 78    Filed 12/13/23    Page 207 of 373

Stevens v. Duquette, Not Reported in Fed. Supp. (2022)

2022 WL 2292975
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Sterling STEVENS, Plaintiff,

v.

Sergeant DUQUETTE and M. Miller, Defendant.

9:20-CV-853 (BKS/ATB)
|
Signed 04/19/2022

**Attorneys and Law Firms**

STERLING STEVENS, Plaintiff, pro se.

DAVID C. WHITE, Asst. Attorney General for Defendant.

**REPORT-RECOMMENDATION**

ANDREW T. BAXTER, United States Magistrate Judge

*1 This matter has been referred to me for Report and Recommendation, by the Honorable Brenda K. Sannes, United States District Judge, pursuant to 28 U.S.C. § 636(b) and Local Rules N.D.N.Y. 72.3(c). In this civil rights action, plaintiff alleges various constitutional violations that occurred while he was incarcerated at Clinton Correctional Facility ("Clinton C.F."), in the custody of the New York State Department of Corrections and Community Supervision ("DOCCS"). Plaintiff filed the complaint on July 30, 2020. (Dkt. No. 1). After the court's initial review of the complaint pursuant to 28 U.S.C. §§ 1915, 1915A, Judge Sannes allowed plaintiff's First Amendment retaliation claims against defendants Sergeant ("Sgt.") Duquette and Correctional Officer ("C.O.") Miller to proceed to litigation. (Dkt. No. 7).

Presently before the court is defendants' motion for summary judgment pursuant to Fed. R. Civ. P. 56, seeking dismissal of the complaint in its entirety. (Dkt. No. 31). Plaintiff responded in opposition to the motion on October 18, 2021 (Dkt. No. 36), and defendants filed a reply brief on October 21, 2021 (Dkt. No. 44). For the reasons set forth below, the court recommends granting defendants' motion for summary judgment and dismissing the complaint on the merits of plaintiff's retaliation claims.

**I. Summary Judgment**

Summary judgment is appropriate where there exists no genuine issue of material fact and, based on the undisputed facts, the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56; Salahuddin v. Goord, 467 F.3d 263, 272–73 (2d Cir. 2006). "Only disputes over ["material"] facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986). It must be apparent that no rational finder of fact could find in favor of the non-moving party for a court to grant a motion for summary judgment. Gallo v. Prudential Residential Servs., 22 F.3d 1219, 1224 (2d Cir. 1994).

The moving party has the burden to show the absence of disputed material facts by informing the court of portions of pleadings, depositions, and affidavits which support the motion. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). If the moving party satisfies its burden, the nonmoving party must move forward with specific facts showing that there is a genuine issue for trial. Salahuddin v. Goord, 467 F.3d at 273. In that context, the nonmoving party must do more than "simply show that there is some metaphysical doubt as to the material facts." Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). However, in determining whether there is a genuine issue of material fact, a court must resolve all ambiguities, and draw all inferences, against the movant. See United States v. Diebold, Inc., 369 U.S. 654, 655 (1962); Salahuddin, 467 F.3d at 272.

Credibility assessments and the choice between conflicting versions of a story are generally for a jury to resolve. Rule v. Brine, Inc. 85 F.3d 1002, 1011 (2d Cir. 1996). However, the Second Circuit recognized an exception to this rule in Jeffreys v. City of New York, 426 F.3d 549 (2d Cir. 2005). In Jeffreys, the court held that summary judgment may be granted in the rare case, "where there is nothing in the record to support the plaintiff's allegations, aside from his own contradictory and incomplete testimony, and even after drawing all inferences in the light most favorable to the plaintiff, the court determines that 'no reasonable person' could credit ... his testimony." Quick v. Quinn, No. 9:12-CV-1529 (DNH/DEP), 2014 WL 4627106, at *4 (N.D.N.Y.

Stevens v. Duquette, Not Reported in Fed. Supp. (2022)

Case 9:22-cv-00102-BKS-ML    Document 78    Filed 12/13/23    Page 208 of 373

Sept. 11, 2014) (quoting *Jeffreys*, 426 F.3d at 54-55). In order for the court to apply the *Jeffreys* exception, the defendant must satisfy each of the following: (1) "the plaintiff must rely 'almost exclusively on his own testimony,' " (2) the plaintiff's "testimony must be 'contradictory or incomplete,' " and (3) the plaintiff's testimony must be contradicted by evidence produced by the defense. *Id.* (quoting *Benitez v. Ham*, No. 04-CV-1159 (NAM/GHL), 2009 WL 3486379, at *20-21 (N.D.N.Y. Oct. 21, 2009) (adopting report and recommendation) (quoting *Jeffreys*, 426 F.3d at 554)).

## II. Factual Contentions

**\*2**  Plaintiff was an inmate in the custody of Clinton C.F. at all times relevant to the underlying complaint. The following is a summary of the facts as stated in the complaint. To the extent that additional facts were developed through discovery, and included in the summary judgment motion, I will discuss them during my analysis of the pending claims.

On June 24, 2019, plaintiff ordered a substantial package of food from an outside vendor. (Complaint ("Compl.") at 4) [1] (Dkt. No. 1). Plaintiff was called to the "package room" on July 10, 2019 to sign for his food package, which weighed twenty-six (26) pounds. (*Id.*). Plaintiff signed for the package, at which time defendant C.O. Miller approached plaintiff with a second package of food items and advised plaintiff that he could not have the items contained in the package she was holding. (*Id.*). Plaintiff requested a "sergeant's review" of C.O. Miller's determination as to the second package. (*Id.*). C.O. Miller informed plaintiff that he "could not have" a "sergeant's review," to which plaintiff responded, "I think I can." (*Id.*). C.O. Miller then stated, "you want to play that game," and "snatched back the [26 lb.] box" that plaintiff had already signed for. (*Id.*).

Concerned about losing items of food in the larger package, plaintiff "declined the sergeant['s] review" and "pleaded with [C.O. Miller] not to take the 26-pound package [he] just signed for." (*Id.*). In response, C.O. Miller "demanded that [plaintiff] put [his] hands on the wall." (*Id.*). Plaintiff complied, and C.O. Miller "walked away to call other officers[,] who came and escorted [plaintiff] back to the clinic and then [his] housing unit, where [he] was placed on keep lock." (*Id.* at 4–5).

Prior to this incident, plaintiff had filed multiple grievances regarding the conduct of correctional officers working

in the package room at Clinton C.F. (*Id.* at 5). Earlier the same day, the Central Office Review Committee had addressed a complaint plaintiff previously filed against a package room officer. (*Id.*). Plaintiff alleges that he also had two other "grievance appeals" concerning "harass[ment]" and "retaliation" by package room officials pending "in Albany[.]" (*Id.*).

On July 11, 2019, C.O. Miller authored a misbehavior report against plaintiff, charging him with, among other things, violating a direct order, creating a disturbance, harassment, and interference with an employee. (Compl. at 5; Dkt. No. 1-3 at 11). On July 12, 2019, plaintiff attended a Tier II disciplinary hearing based on the misbehavior report. (*Id.*). Plaintiff was found guilty of "Refusing a Direct Order (106.10), Facility Packages Violation (180.12), and Creating a Disturbance (104.3)" based on the video recording of the events at issue and the testimony of C.O. Miller. (Compl. at 3, 6, 9; Dkt. No. 1-3 at 16–18). He was sentenced to 30 days of keeplock confinement, as well as loss of recreation, package, commissary, and telephone privileges for thirty days. (*Id.*). Plaintiff also lost his assignment as an Inmate Program Assistant, and his status in honor housing. (Compl. at 9). The disciplinary determination was affirmed on July 19, 2019. (Compl. at 6; Dkt. No. 1-3 at 20). Plaintiff was eventually given the smaller package of food items that C.O. Miller stated he could not have, but the larger package of food items that he had signed for was destroyed. (Compl. at 6–7).

**\*3**  On July 17, 2019, plaintiff was issued a "false" misbehavior report for "dirty" urine. (Compl. at 9; Dkt. No. 1-3 at 33–40). He attended a Tier III disciplinary hearing for the misbehavior report associated with his "dirty" urine on July 30, 2019. (Dkt. No. 1-3 at 52). At the conclusion of the hearing, plaintiff was found guilty and sentenced to 30 days of keeplock confinement. (Compl. at 9). Although the disciplinary determination was eventually overturned, plaintiff spent sixty consecutive days in keeplock confinement as a result of his two "false" misbehavior reports. (*Id.*).

On August 5, 2019, plaintiff submitted an Article 75 complaint to the Commissioner of DOCCS wherein he complained about wrongdoing by, among others, defendant Sgt. Duquette. (Dkt. No. 1-3 at 33–40). Specifically, plaintiff claimed that Sgt. Duquette questioned him on July 15, 2019 about whether he wrote a letter to C.O. Miller and enclosed "an alleged piece of [feces] in tissue[.]" (*Id.* at 39). Plaintiff denied sending the letter, but acknowledged filing a grievance

Case 9:22-cv-00102-BKS-ML    Document 78    Filed 12/13/23    Page 209 of 373

Stevens v. Duquette, Not Reported in Fed. Supp. (2022)

and Article 75 complaint against C.O. Miller. (*Id.*). The next day, he was forced to take a urine test that yielded a "dirty" result, even though he does not use drugs or alcohol. (*Id.*).

On August 27, 2019, Sgt. Duquette also "falsely claimed that he had investigated [plaintiff's] facility claim [regarding destroyed food items related to the July 10, 2019 incident], and found that [plaintiff] refused to sign for [his] package[.]" (Compl. at 3; Dkt. No. 1-3 at 23). Sgt. Duquette concluded that plaintiff's actions created a disturbance, and made him responsible for the disposition of his food package. (Compl. at 6–7; Dkt. No. 1-3 at 23). Plaintiff appealed Sgt. Duquette's finding, which appeal was ultimately dismissed on August 27, 2019. (Compl. at 7; Dkt. No. 1-3 at 23).

## DISCUSSION

### III. Exhaustion of Administrative Remedies

#### A. Legal Standards

The Prison Litigation Reform Act, ("PLRA"), 42 U.S.C. § 1997e(a), requires an inmate to exhaust all available administrative remedies prior to bringing a federal civil rights action. The exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and regardless of the subject matter of the claim. *See Giano v. Goord*, 380 F.3d 670, 675-76 (2d Cir. 2004), (citing *Porter v. Nussle*, 534 U.S. 516, 532 (2002)), abrogated on other grounds by *Ross v. Blake*, 578 U.S. 632 (2016). Inmates must exhaust their administrative remedies even if they are seeking only money damages that are not available in prison administrative proceedings. *Id.* at 675.

In order to properly exhaust an inmate's administrative remedies, the inmate must complete the administrative review process in accordance with the applicable state rules. *Jones v. Bock*, 549 U.S. 199, 218-19 (2007) (citing *Woodford v. Ngo*, 548 U.S. 81 (2006)). In *Woodford*, the Court held that "proper" exhaustion means that the inmate must complete the administrative review process in accordance with the applicable procedural rules, including deadlines, as a prerequisite to bringing suit in federal court. *Woodford*, 548 U.S. at 90-103.

The grievance procedure in New York is a three-tiered process. The inmate must first file a grievance with the Incarcerated [2] Grievance Resolution Committee ("IGRC"). N.Y. Comp. Codes R. & Regs., tit. 7 §§ 701.5(a)(1) and (b). An adverse decision of the IGRC may be appealed to the Superintendent of the Facility. *Id.* § 701.5(c). Adverse decisions at the Superintendent's level may be appealed to the Central Office Review Committee ("CORC"). *Id.* § 701.5(d). The court also notes that the regulations governing the Incarcerated [3] Grievance Program ("IGP") encourage the inmate to "resolve his/her complaints through the guidance and counseling unit, the program area directly affected, or other existing channels (informal or formal) prior to submitting a grievance." *Id.* § 701.3(a) (Inmate's Responsibility). There is also a special section for complaints of harassment. *Id.* § 701.8. Complaints of harassment are handled by an expedited procedure which provides that such grievances are forwarded directly to the Superintendent of the facility, after which the inmate must appeal any negative determination to the CORC. *Id.* §§ 701.8(h) & (I), 701.5.

**\*4** Prior to *Ross v. Blake, supra*, the Second Circuit utilized a three-part inquiry to determine whether an inmate had properly exhausted his administrative remedies. *See Brownell v. Krom*, 446 F.3d 305, 311-12 (2d Cir. 2006) (citing *Hemphill v. State of New York*, 380 F.3d 680, 686 (2d Cir. 2004)). The *Hemphill* inquiry asked (1) whether the administrative remedies were available to the inmate; (2) whether defendants' own actions inhibiting exhaustion estops them from raising the defense; and (3) whether "special circumstances" justify the inmate's failure to comply with the exhaustion requirement. *Id.*

In *Ross*, the Supreme Court made it clear that courts may not excuse a prisoner's failure to exhaust because of "special circumstances." *Ross v. Blake*, 578 U.S. 632, 640 (2016). " " [M]andatory exhaustion statutes like the PLRA establish mandatory exhaustion regimes, foreclosing judicial discretion.' " *Riles v. Buchanan*, 656 F. App'x 577, 580 (2d Cir. 2016) (quoting *Ross*, 578 U.S. at 639). Although *Ross* has eliminated the "special circumstances" exception, the other two factors in *Hemphill* – availability and estoppel – are still valid. The court in *Ross* referred to "availability" as a "textual exception" to mandatory exhaustion, and "estoppel" has become one of the three factors in determining availability. *Ross*, 578 U.S. at

Case 9:22-cv-00102-BKS-ML    Document 78    Filed 12/13/23    Page 210 of 373

Stevens v. Duquette, Not Reported in Fed. Supp. (2022)

642. Courts evaluating whether an inmate has exhausted his or her administrative remedies must focus on whether those remedies were "available" to the inmate. *Id.; see also* Riles, 2016 WL 4572321 at *2.

### B. Application

Defendants argue that plaintiff's retaliation claim against C.O. Miller is subject to dismissal due to plaintiff's failure to exhaust his administrative remedies. Specifically, defendants contend that plaintiff failed to appeal the Superintendent's determination of plaintiff's grievance concerning the July 10, 2019 incident to CORC. In support of their position, the defendants have submitted the sworn declarations of Rachael Seguin, the Assistant Director of the Incarcerated Grievance Program ("IGP") for DOCCS, and Tara Brousseau, the Incarcerated Grievance Program Supervisor at Clinton C.F. (*See generally* Declaration of Rachael Seguin ("Seguin Decl."); Declaration of Tara Brousseau ("Brousseau Decl.")) (Dkt. Nos. 31-6; 31-7). These declarations, and the evidence attached as exhibits thereto, provide compelling evidence that plaintiff did not appeal the grievance identified by defendants as relevant to the underlying claim against C.O. Miller to CORC. Defendants have established that plaintiff filed Grievance No. CLA-8372-19 on or about July 15, 2019. (Brousseau Decl. ¶ 16, Ex. B at 10–11). Grievance No. CLA-8372-19 complained about C.O. Miller's alleged conduct relative to the July 10, 2019 incident. (*Id.*). Defendants have further established that the Superintendent issued a response to Grievance No. CLA-8372-19 on July 30, 2019, in which he concluded that plaintiff's grievance was unsubstantiated. (*Id.* Ex. B at 14). According to the DOCCS records submitted to this court, CORC never received an appeal of Grievance No. CLA-8372-19 from plaintiff. (Seguin Decl. ¶ 14, Ex. A at 7).

Plaintiff disputes the defendants' contention that he did not adequately exhaust his administrative remedies with respect to the July 10, 2019 incident. Plaintiff concedes that he filed Grievance No. CLA-8372-19 on or about July 11, 2019. (Plaintiff's Opposition to Defendants' SJM Part 1 ("Pl.'s Opp. Pt. 1") at 2) (Dkt. No. 36). However, plaintiff contends that this grievance "wasn't answered at all." (*Id.*). Plaintiff maintains that a number was not assigned to his original grievance until plaintiff filed another grievance entitled "Video Footage/False Ticket" on or about August 1, 2019. (*Id.*). The records submitted by both parties reflect that this subsequent grievance was assigned a separate grievance number, Grievance No. CLA-8384-19, and suggests that

the substance of this grievance also concerned, to some extent, the underlying events surrounding the July 10, 2019 incident involving C.O. Miller and plaintiff in the package room. (Brousseau Decl. Ex. A at 7; Pl.'s Opposition to Defendants' SJM Part 2 ("Pl.'s Opp. Pt. 2") at 36, Dkt. No. 36-1).[4] Notably, DOCCS's records indicate that Grievance No. CLA-8384-19 was appealed to and received by CORC on September 19, 2019. (Seguin Decl. Ex. A at 7). It appears that CORC had not issued a response to plaintiff as of July 30, 2020, the date he filed the instant federal action, as Grievance No. CLA-8384-19 was issued a "scheduled date" with CORC of December 10, 2020. (*Id.*).

**\*5** Defendants have highlighted plaintiff's deposition testimony suggesting that the Superintendent's decision concerning plaintiff's initial grievance, Grievance No. CLA-8372-19, would be automatically forwarded to CORC based solely on his request for such action in the body of his grievance. (Affidavit of David White Ex. A ("Pl.'s Dep.") at 21–23; *see also* Brousseau Decl. Ex. B at 11). On this point, the court agrees that plaintiff did not adequately exhaust his administrative remedies with respect to Grievance No. CLA-8372-19 simply by virtue of the language contained in his initial grievance, seeking to somehow streamline the appeals process. However, as previously discussed the record reflects that plaintiff also filed Grievance No. CLA-8384-19, which among other things appears to have included a complaint about the "false" misbehavior report plaintiff received from C.O. Miller relative to the incident at issue. There is no dispute that this grievance was appealed to CORC for purposes of exhaustion.

Defendants do not address Grievance No. CLA-8384-19 in their motion papers, nor have they included a copy of this grievance in order for the court to better determine whether plaintiff adequately described the conduct underlying the claims he now brings in federal court therein. *See* Reynolds v. Stone, No. 9:20-CV-686 (TJM/ML), 2021 WL 3271805, at *9 (N.D.N.Y. May 24, 2021), *report and recommendation adopted,* 2021 WL 3269053 (July 30, 2021) ("[A] review of a prison grievance is 'liberal,' and 'a claim may be exhausted when it is closely related to, but not explicitly mentioned in an exhausted grievance[.]")(citation omitted); Murray v. Gillani, No. 12-CV-401 (LEK/ATB), 2013 WL 838351, at *8 (N.D.N.Y. Feb. 11, 2013), *report and recommendation adopted,* 2013 WL 838306 (N.D.N.Y. Mar. 6, 2013). Nevertheless, the records presently before this court suggest that Grievance No. CLA-8384-19 included allegations in connection to the events underlying plaintiff's claim against

C.O. Miller, and that this grievance was sufficiently appealed through the DOCCS grievance procedure. Defendants have failed to produced any evidence establishing otherwise, and thus have not met their burden on this defense. Accordingly, plaintiff's complaint against C.O. Miller is not subject to dismissal on this basis.

Defendants have alternatively requested this court order an evidentiary hearing to resolve any outstanding issues of fact regarding plaintiff's purported failure to exhaust his administrative remedies. Assuming defendants have sufficiently raised a material question of fact as to this issue, [5] the court need not determine whether an evidentiary hearing on the issue of exhaustion is appropriate based on the below recommendations to dismiss the complaint on the merits of plaintiff's retaliation claims.

## IV. Retaliation

### A. Legal Standards

To state a First Amendment claim of retaliation, an inmate must allege facts plausibly suggesting that (1) the speech or conduct at issue was protected, (2) the defendant took adverse action against the plaintiff, and (3) there was a causal connection between the protected conduct and the adverse action. *Holland v. Goord,* 758 F.3d 215, 225 (2d Cir. 2014)(citations omitted). The court must keep in mind that claims of retaliation are "easily fabricated" and "pose a substantial risk of unwarranted judicial intrusion into matters of general prison administration." *Faulk v. Fisher,* 545 F. App'x 56, 58 (2d Cir. 2013) (quoting *Bennett v. Goord,* 343 F.3d 133, 137 (2d Cir. 2003)). In other words, we must examine prisoners' claims of retaliation with "skepticism and particular care." *Rivera v. Goord,* 119 F. Supp 2d 327, 339 (S.D.N.Y. 2000) (quoting *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir. 1995)). Accordingly, a First Amendment retaliation claim must be supported by "specific and detailed factual allegations," and not stated in "wholly conclusory terms." *Dolan v. Connolly,* 794 F.3d 290, 295 (2d. Cir. 2015) (quoting *Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir. 1983), *overruled on other grounds, Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 122 (2002)).

**\*6** In order to satisfy the final prong, "the causal connection must be sufficient to support an inference that the protected conduct played a substantial part in the adverse action." *Cruz v. Grosso,* No. 9:13-CV-30 (FJS/TWD), 2014 WL 2176256, at \*6 (N.D.N.Y. May 23, 2014) (citing *inter alia Colon,* 58 F.3d at 873). Several factors may be considered in determining whether a causal connection exists between the plaintiff's protected activity and a prison official's actions, including temporal proximity between the protected activity and the alleged retaliatory act, and statements by the defendant concerning his or her motivation. [6] *Cruz,* 2014 WL 2176256, at \*6 (citing *Colon,* 58 F.3d at 872-73). However, temporal proximity alone is not enough to establish a causal connection. The Second Circuit has held that where "timing is the only basis for a claim of retaliation ... an inference of retaliation does not arise." *Thomas v. Waugh,* No. 9:13-CV-0321 (MAD/TWD), 2015 WL 5750945, at \*15 (N.D.N.Y. Sept. 30, 2015) (quoting *Slattery v. Swiss Reinsurance Am. Corp.,* 248 F.3d 87, 95 (2d Cir. 2001)).

### B. Application

#### 1. C.O. Miller

Plaintiff alleges that C.O. Miller issued him a misbehavior report on July 11, 2019 in retaliation for (1) plaintiff having filed other grievances against "package room officers" prior to that date, and (2) plaintiff requesting a sergeant's review of the items C.O. Miller denied him. (Compl. at 4–7). At his deposition, plaintiff testified that before the July 10th incident, he had filed "numerous grievances against package room staff" that worked in the package room both before and during C.O. Miller's placement there. (Pl.'s Dep. at 33). Plaintiff testified that none of the prior grievances were against C.O. Miller. (*Id.*). Plaintiff also referenced another incident prior to July 10th wherein a male correctional officer denied plaintiff one of the food items he had ordered from an outside vendor, because it did not comply with the applicable DOCCS directive. (*Id.* at 46). A female correctional officer (not C.O. Miller) then came up behind the male correctional officer and stated, "Be careful, he going to grieve you." (*Id.*). C.O. Miller was not in the package room that day, but she usually worked there with the female correctional officer who made the comment. (*Id.* at 47).

Plaintiff also testified generally that the correctional officers at Clinton C.F. have "made comments" about how Plaintiff "like[s] to grieve." (*Id.* at 46–47). In his complaint, plaintiff alleged that it was "highly probable" that C.O. Miller was

retaliating against plaintiff for filing previous grievances. (Compl. at 5). At his deposition, Plaintiff testified that he is "sure" C.O. Miller was aware of his prior grievances against correctional officers working in the package room, because C.O. Miller's partner knew that plaintiff was "used to grieving," and plaintiff "believe[d] C.O. Miller [knew] too." (*Id.* at 48).

At the outset, the court finds no basis to conclude that plaintiff's verbal demand for a sergeant's review of C.O. Miller's determination to withhold certain items from plaintiff's food package was protected conduct for purposes of his retaliation claim. Although the Second Circuit has yet to articulate a bright line rule regarding constitutionally-protected oral speech by an inmate, several district courts in this Circuit have held that a verbal confrontation with a correction officer based on an inmate's dissatisfaction with that officer's directive is one example of speech that is not constitutionally-protected activity. *Coleman v. Racette,* No. 9:18-CV-0390 (MAD/CFH), 2021 WL 4312392, at *11 (N.D.N.Y. May 27, 2021) (listing cases), *report and recommendation adopted,* 2021 WL 3508342 (N.D.N.Y. Aug. 10, 2021). Here, plaintiff's failure to comply with C.O. Miller's orders and his request that a sergeant be called "is more in the nature of a confrontation or argument. Thus, it does not constitute protected speech to support a retaliation claim." *Hinton v. Pearson,* No. 3:21-CV-863, 2021 WL 4521994, at *4 (D. Conn. Oct. 4, 2021) (plaintiff's verbal request that a lieutenant be called was not protected speech for first amendment retaliation purposes); *see also Rossi v. Goord,* No. 00-CV-1521, 2006 WL 2811505, at *10 n.16 (N.D.N.Y. Sept. 28, 2006) ("The questioning by an inmate of a lawful order given by a corrections officer, however, does not constitute protected speech deserving of First Amendment protection.") (citation omitted).

**\*7** Plaintiff also claims that C.O. Miller retaliated against him for filing grievances against other correctional officers at Clinton C.F. It is well settled that the filing of prison grievances is a constitutionally protected activity for purposes of an inmate's First Amendment retaliation claim. *Brandon v. Kinter,* 938 F. 3d 21, 40 (2d Cir. 2019) ("The filing of prison grievances is a protected activity.") (citing *Davis v. Goord,* 320 F.3d 346, 352-53 (2d Cir. 2003)). Moreover, the filing of a false misbehavior report "that results in some form of punishment that cannot be labeled *de minimis* has been found sufficient to constitute adverse action." *Gilmore v. Blair,* No. 9:18-CV-463 (GLS/DJS), 2020 WL 5792467, at *6 (N.D.N.Y. June 30, 2020), *report and recommendation adopted,* 2020 WL 5775203 (N.D.N.Y. Sept. 28, 2020) (listing cases). However, even assuming that plaintiff has satisfied the first two prongs of a claim for retaliation, he has failed to show a genuine issue of material fact that his protected conduct, filing grievances against other package room correctional officers, was a substantial or motivating factor in C.O. Miller's issuance of the subject misbehavior report.

As a general matter, it is difficult to establish one defendant's retaliation for complaints against other correctional officers. *See, e.g., Hare v. Hayden,* 09 Civ. 3135, 2011 WL 1453789, at *4 (S.D.N.Y. Apr. 14, 2011) (plaintiff's retaliation claim was dismissed against a correctional officer when the only alleged basis for the retaliatory action was a complaint plaintiff filed involving a different officer) (citing *Wright v. Goord,* 554 F.3d 255, 274 (2d Cir. 2009)); *Guillory v. Ellis,* No. 9:11-CV-600 (MAD/ATB), 2014 WL 4365274, at *18 (N.D.N.Y. Aug. 29, 2014) ("it is difficult to establish one defendant's retaliation for complaints against another defendant"). Nevertheless, this general rule may not apply where there are indications of "a retaliatory purpose— i.e., that the [officer's conduct] was meant to penalize [the plaintiff] for bringing past grievances, and to dissuade future grievances." *Vincent v. Sitnewski,* 117 F. Supp. 3d 329, 338–39 (S.D.N.Y. 2015) (alterations and internal quotation marks omitted). Thus, while a plaintiff who "alleges retaliatory adverse action by one officer for a grievance filed against another officer ... faces a heightened burden of establishing a causal connection," this is not per say barring. *Henderson v. Vanderwerff,* No. 9:13-CV-1537 (MAD/CFH), 2016 WL 660921, at *4 (N.D.N.Y. Feb. 18, 2016).

Here, it is undisputed that plaintiff did not file any previous grievances or complaints against C.O. Miller. C.O. Miller has denied harboring any retaliatory motivation with respect to the misbehavior report she issued against him relative to the July 10, 2019 incident. (Declaration of Megan Miller ("Miller Decl.") ¶ 12). Moreover, plaintiff has not alleged that C.O. Miller made any contemporaneous comments to plaintiff concerning his previously filed grievances against other correctional officers, or even suggested to plaintiff that she was aware of his history of filing grievances against others. The record otherwise lacks any evidence establishing why C.O. Miller would issue a false misbehavior report against plaintiff, beyond plaintiff's conclusory allegations of

her close working relationship with other correctional officers in the package room.

Even assuming C.O. Miller's misbehavior report was "false," as plaintiff suggests, "[i]t is well settled that filing false or unfounded misbehavior charges against an inmate does not give rise to a per se constitutional violation actionable under section 1983." *Burroughs v. Petrone*, 138 F. Supp. 3d 182, 205 (N.D.N.Y. 2015) (internal quotation marks and citation omitted). The Second Circuit has made clear that "a prison inmate has no general constitutional right to be free from being falsely accused in a misbehavior report. There must be more, such as retaliation against the prisoner for exercising a constitutional right." *Boddie v. Schnieder*, 105 F.3d 857, 862 (2d Cir. 1997).

**\*8** Accordingly, based on the record before this court plaintiff has not presented a genuine issue of material fact for a jury to resolve with respect to any retaliatory animus on the part of C.O. Miller. *See Wright v. Goord*, 554 F.3d 244, 274 (2d Cir. 2009) (dismissing retaliation claim against a correction officer when the only alleged basis for retaliation was a complaint about an incident involving another correction officer); *Alicea v. Maly*, No. 12-CV-0203 (MAD/TWD), 2015 WL 4326114, at \*14-15 (N.D.N.Y. July 14, 2015) (dismissing retaliation claim which alleged that C.O. Trinidad retaliated against the plaintiff for protected actions he took with respect to C.O. Freeman, where the plaintiff alleged a close personal friendship between Trinidad and Freeman and the record was "devoid of any specifics, but replete with conclusions"); *Ciaprii v. Goord*, No. 02-CV-0915 (GLS), 2005 WL 3531464, at \*9 (N.D.N.Y. Dec. 22, 2005) (entering summary judgment on retaliation claim where the plaintiff cited only past grievances filed against correction officers other than the officer who disciplined the plaintiff).

Moreover, it is well-settled that, even where plaintiff *can* make a showing of retaliatory motive, the defendant may be entitled to summary judgment if she can show that the alleged retaliatory action would have occurred even without the improper motivation. *Greer v. Mehiel*, 805 F. App'x 25, 29 (2d Cir. 2020) (citing *Scott v. Coughlin*, 344 F.3d 282, 287-88 (2d Cir. 2003)) (citing *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977)). The defendant bears the burden of making the showing that she would have taken exactly the same action in the absence of an improper

motive. *Greer*, 805 F. App'x at 29 (citing *Scott*, 344 F.3d at 288). Here, plaintiff's retaliation claim is further subject to dismissal because C.O. Miller had a non-retaliatory basis for filing a misbehavior report, and would have taken the same action even if she had known of plaintiff's prior grievances against other correctional officers. On July 11, 2019 C.O. Miller cited plaintiff for, among other things, "Refusing a Direct Order" in violation of DOCCS Rule 106.10. (Pl.'s Opp. Pt. 3 at 8). At his deposition, plaintiff admitted to violating this rule in that despite C.O. Miller's verbal directive, he refused to leave the package room without his package. (Pl.'s Dep. at 35–36). Thus, defendants have established a non-retaliatory reason for C.O. Miller's filing of the subject misbehavior report, and dismissal is further warranted on this basis. *See Logan v. Graham*, No. 9:18-CV-0291 (DNH/ML), 2019 WL 8015209, at \*14 (N.D.N.Y. Nov. 26, 2019), *report and recommendation adopted*, 2020 WL 871197 (N.D.N.Y. Feb. 21, 2020) (defendants established non-retaliatory reason for the filing of the underlying misbehavior report where plaintiff admitted to some of the allegations against him). Based on the foregoing, it is recommended that plaintiff's First Amendment retaliation claim against C.O. Miller be dismissed.

### 2. Sgt. Duquette

The district court liberally construed plaintiff's complaint to also allege a retaliation claim against Sgt. Duquette, with respect to plaintiff's "dirty" urine test results and Sgt. Duquette's "false" investigation of plaintiff's claim for destroyed food. (Dkt. No. 7 at 13–14). At his deposition, plaintiff testified that Sgt. Duquette had "lied" during prior sergeant's reviews conducted with respect to plaintiff's packaged food orders. (Pl.'s Dep. at 50–52). Specifically, plaintiff stated that Sgt. Duquette consistently found plaintiff's claims to be "unsubstantiated," despite the favorable evidence provided by plaintiff. (*Id.*). Plaintiff testified that Sgt. Duquette "misrepresent[ed] and put false information" in his investigation of plaintiff's claim for damaged food items. (*Id.* at 64–65). He further stated that Sgt. Duquette "always had a grudge against" plaintiff because of the numerous sergeant's reviews and follow-up investigations he performed in conjunction with plaintiff's complaints. (*Id.* at 65–66).

**\*9** Plaintiff further testified at his deposition that he had since come to learn that his positive drug test results were the result of a DOCCS-wide issue concerning faulty testing

Case 9:22-cv-00102-BKS-ML    Document 78    Filed 12/13/23    Page 214 of 373

Stevens v. Duquette, Not Reported in Fed. Supp. (2022)

equipment, and not issued in retaliation for any of his protected conduct. (*Id.* at 62–63). Although he insisted that it was a "mistake" to test plaintiff for drugs two days in a row "when the situation didn't call for a drug test," plaintiff conceded that Sgt. Duquette had no involvement with plaintiff's positive drug test results. (*Id.* at 62–63).

Based on plaintiff's deposition testimony and the remainder of the summary judgment record, the court finds no basis on which plaintiff maintains a retaliation claim against Sgt. Duquette based on the issues surrounding his positive drug test and/or the meeting at which Sgt. Duquette questioned plaintiff about sending feces to C.O. Miller. The court is thus left to assess plaintiff's allegation that Sgt. Duquette conducted an improper and intentionally false investigation of plaintiff's claim for destroyed food items, in retaliation for plaintiff's consistent request for the review of such matters.

Assuming for the purposes of this court's analysis that plaintiff's allegations satisfy the first and second prong of a retaliation claim, he has nevertheless failed to raise a question of fact as to any retaliatory intent on the part of Sgt. Duquette. According to his sworn declaration, Sgt. Duquette was tasked with conducting an investigation of plaintiff's grievance concerning the July 10, 2019 incident. (Declaration of David Duquette ("Duquette Decl.") ¶¶ 4–6). This included an interview of plaintiff, as well as C.O. Miller. (*Id.*). Sgt. Duquette maintains that his investigation into plaintiff's grievance was conducted in accordance with DOCCS policy and procedures, and that his finding that plaintiff's claim was unsubstantiated was based upon the record and other objective evidence presented. (*Id.* ¶ 7). Sgt. Duquette denies having any retaliatory intentions relative to his investigation of plaintiff's claims arising from the July 10, 2019 incident. (*Id.* ¶ 11).

Conversely, plaintiff offers no evidence to corroborate his claim that Sgt. Duquette investigated his claims with a retaliatory intent. In evaluating whether a causal connection exists between the plaintiff's protected activity and a state official's actions, "a number of factors may be considered, including: (i) the temporal proximity between the protected activity and the alleged retaliatory act; (ii) the [plaintiff's] prior good disciplinary record; (iii) vindication at a hearing on the matter; and (iv) statements by the defendant concerning his motivation." *Baskerville v. Blot,* 224 F. Supp. 2d 723, 732 (S.D.N.Y. 2002) (citing *Colon,* 58 F.3d at 872-73). "The causal connection must be sufficient to support

an inference that the protected conduct played a substantial part in the adverse action." *Id.*

The record lacks any such proof to suggest a causal connection between Sgt. Duquette's unfavorable investigation findings, and plaintiff's grievances/claims. Most relevant, plaintiff was never "vindicated" on the matters as they related to the July 10, 2019 incident, nor has plaintiff alleged that Sgt. Duquette ever made any statements concerning the motivation for his investigation findings. To the extent plaintiff alleges that Sgt. Duquette "fail[ed] to properly investigate" plaintiff's claims, "mere negligence is not enough to support a claim of retaliation[.]" *Brandon v. Kinter,* 938 F.3d 21, 40 (2d Cir. 2019) (citing *Greenwich Citizens Committee, Inc. v. Counties of Warren and Washington Indus. Development Agency,* 77 F.3d 26 (2d Cir. 1996)).

**\*10** Plaintiff's conclusory assertion that Sgt. Duquette held a grudge against plaintiff, without more, is insufficient to overcome the defendants' evidence. *See, e.g., Rucano v. Annucci,* No. 9:18-CV-218 (GTS/CFH), 2021 WL 3293504, at \*19 (N.D.N.Y. May 19, 2021), *report and recommendation adopted sub nom.,* 2021 WL 3292394 (N.D.N.Y. Aug. 2, 2021) ("Plaintiff's "shifting and conclusory assertions to the contrary fail to raise a genuine issue of material fact as to his First Amendment retaliation claim ... and are insufficient to overcome defendants' documentary case."). Based on the foregoing, it is recommended that plaintiff's First Amendment retaliation claim against Sgt. Duquette be dismissed.

**WHEREFORE,** based on the findings above, it is

**RECOMMENDED,** that defendants' motion for summary judgment (Dkt. No. 31) be **GRANTED,** and the complaint **DISMISSED IN ITS ENTIRETY WITH PREJUDICE.**

Pursuant to 28 U.S.C. § 636(b)(1), the parties have 14 days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN 14 DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72, 6(a), 6(e).

Case 9:22-cv-00102-BKS-ML    Document 78    Filed 12/13/23    Page 215 of 373

Stevens v. Duquette, Not Reported in Fed. Supp. (2022)

**All Citations**

Not Reported in Fed. Supp., 2022 WL 2292975

## Footnotes

1    Citations to the parties' motion papers refer to pagination generated by the court's electronic filing system ("CM/ECF").

2    This committee was formerly known as the "Inmate Grievance Resolution Committee," but has recently been renamed.

3    The program was formerly known as the "Inmate Grievance Program," but has recently been renamed.

4    It appears that the hearing officer presiding over plaintiff's Tier II disciplinary hearing relative to the July 11, 2019 misbehavior report relied, in part, on video surveillance of the subject incident in finding plaintiff guilty of the charged violations. (Plaintiff's Opposition to SJM Part 3 ("Pl.'s Opp. Pt. 3") at 9). The video footage relied upon did not include any audio component. (*Id.* at 2, 7). Plaintiff apparently contested the fact that he was found guilty of the violations assessed against him by C.O. Miller in the "false misbehavior report" based on the visual footage alone, and thus authored Grievance No. CLA-8384-19. (*Id.*; *see also* Compl. at 5–6).

5    Admittedly, plaintiff testified that his initial grievance was the "only grievance" he filed against C.O. Miller with respect to the July 10th incident. (Pl.'s Dep. at 58). However, it appears plaintiff's testimony was made in the context of his understanding, perhaps incorrect, that Grievance No. CLA-8372-19 had been consolidated with Grievance No. CLA-8384-19 upon the filing of the latter. (Pl.'s Dep. at 23, 31–32; Pl.'s Opp. Pt. 1 at 2, Pl.'s Opp. Pt. 2 at 5).

6    This court recognizes the existence of other factors, as discussed in *Colon,* applicable only when the alleged adverse action is the issuance of a misbehavior report.

---

**End of Document**                                                      © 2023 Thomson Reuters. No claim to original U.S. Government Works.

2013 WL 2292047
Only the Westlaw citation is currently available.
United States District Court,
E.D. Pennsylvania.

David STEVENS, Plaintiff,
v.
Telford BOROUGH, et al., Defendants.

Civil Action No. 11–7216.
|
May 23, 2013.

**Attorneys and Law Firms**

Martha Sperling, Eastburn & Gray, Doylestown, PA, for Plaintiff.

Christopher P. Gerber, Michael Edward Truncellito, Siana Bellwoar & McAndrew LLP Chester Springs, PA, for Defendants.

### *MEMORANDUM*

JONES, II, District Judge.

 *1 Plaintiff David Stevens ("Plaintiff") brings two remaining claims against Telford Borough ("Telford") Chief of Police Randall Floyd ("Floyd") individually, Borough Manager Mark Fournier ("Fournier") individually, and Telford, (together, "Defendants") arising from Plaintiff's termination from the Telford Police Department. In his First Amended Complaint, Plaintiff brought three claims: 1) Count I, as to all defendants, alleging due process and equal protection violations of Plaintiff's Fifth and Fourteenth Amendment rights pursuant to 42 U.S.C. § 1983; Count II, as to all defendants, alleging a privacy violation of Plaintiff's Fourth and Fourteenth Amendment Rights; and Count III, as to Telford, a *Monell* claim based upon the actions of Floyd and Fournier. Defendants filed a Rule 12(b)(6) Motion for Partial Dismissal of the Complaint, except Plaintiff's 14th Amendment procedural due process claims. This Court granted Defendants' Motion (Dkt. No. 18), and dismissed with prejudice all claims with prejudice except for Plaintiff's *Monell* claim, which was dismissed without prejudice. This Court granted Plaintiff leave to file a Second Amended Complaint. Plaintiff's filed a Second Amended Complaint (Dkt. No. 19) alleging two counts: 1) Count I, as to all defendants, a due process claim [1] brought under the Fifth and Fourteenth Amendments; and 2) Count II, as to all defendants, a *Monell* claim. Only Plaintiff's procedural due process claims and *Monell* claims remain. Before the Court is Defendant's Motion to Dismiss Portions of Plaintiff's Second Amended Complaint (Dkt. No. 20), to wit, Plaintiff's realleged *Monell* claim. [2]

### I. Facts

As the Court recounted in its previous memorandum opinion, the alleged facts here are plain and simple. Plaintiff was employed by Telford as a part-time police officer from June 2008 until November 7, 2010. Second Am. Compl. ¶ 8. On November 5, 2010, Floyd visited Plaintiff, who had been on leave for several weeks, at his home. *Id.* at ¶¶ 9–10. Plaintiff answered the door dressed in his pajamas and barefoot. *Id.* at ¶ 12. Floyd asked Plaintiff to take a blood/drug test. *Id.* Floyd also placed his hand on Plaintiff's arm and gestured towards his vehicle. *Id.* Plaintiff had previously submitted to a drug test just weeks before. *Id.* at ¶¶ 12–13. Plaintiff refused to go with Floyd, and Plaintiff complained that he was being treated like a criminal. *Id.* In response, Floyd instructed Plaintiff to turn in his badge and gun, and said the two of them would talk later. *Id.* at ¶ 13. After consulting Fournier, Floyd terminated Plaintiff's employment on November 7, 2010. *Id.* at ¶¶ 14–15. After Plaintiff received this news, he offered to come to the police station and take a blood test, but Floyd stood by his termination decision. *Id.* at ¶ 15.

### II. Legal Standard

In deciding a motion to dismiss pursuant to Rule 12(b)(6), courts must "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." *Phillips v. Cnty. of Allegheny,* 515 F.3d 224, 233 (3d Cir.2008) (internal quotation marks omitted). After the Supreme Court's decision in *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007), "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678 (citing *Twombly,* 550 U.S. at 556).

This standard, which applies to all civil cases, "asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* at 678; *accord Fowler v. UPMC Shadyside,* 578 F.3d 203, 210 (3d Cir.2009) ("[A]ll civil complaints must contain more than an unadorned, the-defendant-unlawfully-harmed-me accusation.") (internal quotation marks omitted).

## III. Discussion

**\*2** To establish municipal liability under 42 U.S.C § 1983, a plaintiff must demonstrate that the municipality itself, throughout the implementation of a policy or a custom, caused the underlying constitutional violation. *See Monell v. Dept. of Soc. Svcs.,* 436 U.S. 658, 690–91, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). " 'Policy' includes official proclamations made by a municipal decisionmaker with final authority, and 'custom' is defined as "practices of state officials ... so permanent and well settled as to virtually constitute law .'" *Kelly v. Borough of Carlisle,* 622 F.3d 248, 263 (3d Cir.2010) (internal quotation marks and citation omitted). A municipality is not liable under Section 1983, unless the policy or custom was the "moving force" underlying the constitutional violation. *City of Canton, Ohio v. Harris,* 489 U.S. 378, 379, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989).

As described by the Third Circuit, municipalities may be vicariously liable under Section 1983 for the torts of their employees in one of three ways:

(1) the individual acted pursuant to a formal government policy or a standard operating procedure long accepted within the government entity;

(2) the individual himself has final policy-making authority such that his conduct represents official policy; or

(3) a final policy-maker renders the individual's conduct official for liability purposes by having delegated to him authority to act or speak for the government, or by ratifying the conduct or speech after it has occurred.

*Hill v. Borough of Kutztown,* 455 F.3d 225, 245 (3d Cir.2006)

When this Court dismissed without prejudice the *Monell* claim in Plaintiff's First Amended Complaint, this Court identified several deficiencies in that claim.[3] Plaintiff

has addressed these deficiencies and, taking Plaintiff's allegations as true, he has plausibly pleaded a *Monell* claim.

Whereas Plaintiff previously did not identify any offending policy, Plaintiff now alleges that that the absence of a random drug testing policy and the Borough's lack of policy "to deal with officers on leave or who were improperly considered part-time" were constitutionally deficient. *See Wood v. City of Lancaster,* CIV.A .06–3033, 2009 WL 80306 (E.D.Pa. Jan.13, 2009) *aff'd,* 352 F. App'x 641 (3d Cir.2009) (noting that absence of policy may contribute to *Monell* claim). Plaintiff alleges that the lack of policies in these instances created an absence of procedural safeguards and afforded those in change unfettered discretion in violation of the constitution. Plaintiff has also identified Police Chief Floyd and Borough Manager Mark Fournier as those with final policy-making power, as delegated by the Mayor pursuant to the Borough Code. *See* 53 Pa. Stat. Ann. § 46123.1. Unlike in his Amended Complaint, Plaintiff's Second Amended Complaint now identifies a constitutional violation in that Defendant's "circumvent[ion of Plaintiff's] right to a pre-termination hearing" was in violation of Plaintiff's Due Process rights under the Fourteenth Amendment. *Id.* (noting that absence of policy must be proximate cause of alleged injury). Plaintiff also proffers a "failure to train" argument that "[t]he Borough failed to train its decision makers that they needed to afford Due Process protection to nominally part-time officers." Finally, Plaintiff now presents a "liability by ratification" theory on the grounds that the decision not to hold a pre-termination hearing and the decision to terminate Plaintiff was "subsequently ratified by the Mayor and Borough Council."

**\*3** As required by *Monell,* plaintiff has now pleaded the existence of: 1) a policy or lack thereof; 2) a policy maker that effectuated said policy; and 3) a constitutional violation whose "moving force" was the policy in question. *Monell.,* 436 U.S. at 694. As alleged, Plaintiff's pleadings now go beyond a "formulaic recitation" of the *Monell* elements and sufficiently plead *Monell* liability to survive at least the motion to dismiss stage. *See, e.g., Defreitas v. Montgomery Cnty. Corr. Facility,* CIV.A.08–5330, 2010 WL 5584202 (E.D.Pa. Aug.31, 2010) *report and recommendation adopted,* CIV.A.08–5330, 2011 WL 96493 (E.D.Pa. Jan.11, 2011) (allowing *Monell* claim to survive motion to dismiss).

An appropriate Order follows.

***ORDER***

AND NOW, this 22nd day of May, 2013, upon consideration of Defendant's Motion to Dismiss Portions of Plaintiff's Second Amended Complaint (Dkt. No. 20) and the response thereto, it is hereby ORDERED that said motion is DENIED.

Defendants shall answer the Second Amended Complaint within the time allowed by the Federal Rules of Civil Procedure.

**All Citations**

Not Reported in F.Supp.2d, 2013 WL 2292047

# Footnotes

[1]   Plaintiff's styled Count I of his Second Amended Complaint as "⚑ 42 U.S.C. § 1983—Violation of 5th and 14th Amendments: Due Process and Equal Protection Violation." This Court, however, previously dismissed the equal protection claim with prejudice. After Defendants filed their Motion to Dismiss Portions of Plaintiff's Second Amended Complaint, which addressed the equal protection claim, the parties stipulated (Dkt. No. 23) that this Court had already dismissed the Fourteenth Amendment Equal Protection claim with prejudice, and as such, it will not be readdressed by this Court.

[2]   As with the First Motion to Dismiss, Defendants do not move to dismiss Plaintiff's due process claims.

[3]   This Court stated that "[i]t is unclear from the Amended Complaint what Telford's drug testing policy is alleged to be, whether Telford's regulations allegedly provide for random drug testing, or whether Telford's policy (or lack thereof) purportedly caused the Plaintiff's injuries." (Dkt. No. 18 at 6).

---

**End of Document**                                                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

Flynn v. Ward, Not Reported in Fed. Supp. (2018)

Case 9:22-cv-00102-BKS-ML    Document 78    Filed 12/13/23    Page 219 of 373

2018 WL 3195095

Only the Westlaw citation is currently available.

United States District Court, N.D. New York.

Bruce FLYNN, Plaintiff,

v.

Joe WARD and Lief Wellenstein, Defendants.

No. 15-CV-1028 (TJM/CFH)

|

Signed 06/06/2018

|

Filed 06/07/2018

**Attorneys and Law Firms**

Bruce Flynn, 10-A-1558, Elmira Correctional Facility, P.O. Box 500, Elmira, NY 14902, pro se.

Attorney General for the State of New York, OF COUNSEL: BRIAN W. MATULA, ESQ., Assistant Attorney General, The Capitol, Albany, New York 12224-0341, Attorney for Defendant.

**REPORT-RECOMMENDATION AND ORDER** [1]

CHRISTIAN F. HUMMEL, U.S. MAGISTRATE JUDGE

**\*1** Plaintiff pro se Bruce Flynn ("Flynn" or "Plaintiff"), an inmate who was, at all relevant times, in the custody of the New York Department of Corrections and Community Supervision ("DOCCS"), brings this action pursuant to 42 U.S.C. § 1983 against Defendants Acting Superintendent Joe Ward ("Defendant" or "Ward") and C.O. Lief Wellenstein ("Defendant" or "Wellenstein") for violations of his rights under the First Amendment. Dkt. No. 20 ("Am. Compl."). Additional defendants were named, but the claims against them have since been dismissed. Dkt. No. 22. Presently before the undersigned is Defendants' motion for summary judgment and dismissal of the Amended Complaint pursuant to Rule 56 of the Federal Rules of Civil Procedure ("Fed. R. Civ. P."). Dkt. No. 64. Flynn did not oppose the motion. For the following reasons, it is recommended that Defendants' motion be granted in part and denied in part.

**I. Failure to Respond**

Flynn failed to submit any opposition papers to Defendants' motion for summary judgment. Flynn was notified of the consequences of failing to respond to a summary judgment motion by Defendants and the Court. Dkt. Nos. 64-1 and 65. However, "[t]he fact that there has been no response to a summary judgment motion does not ... mean that the motion is to be granted automatically." Champion v. Artuz, 76 F.3d 483, 486 (2d Cir. 1996). Even in the absence of a response, Defendants are entitled to judgment only if the material facts demonstrate their entitlement to judgment as a matter of law. Id.; FED. R. CIV. P. 56(c). While "[a] verified complaint is to be treated as an affidavit ... and [may] be considered in determining whether material issues of fact exist[,]" see Colon v. Coughlin, 58 F.3d 865, 872 (2d Cir. 1995) (citations omitted), Flynn's Amended Complaint is not verified. [2] Thus, the Amended Complaint does not have the "force and effect of an affidavit." See Tafari v. Brown, No. 9:10-CV-1065 (GTS/DRH), 2012 WL 1098447, at \*7, n. 8 (N.D.N.Y. Mar. 30, 2012) (collecting cases). Despite this fact, the Court may consider the exhibits attached to the Amended Complaint. See Dawkins v. Williams, 511 F. Supp. 2d 248, 255 (N.D.N.Y. 2007) (considering the exhibits annexed to the pro se plaintiff's amended complaint when deciding the defendant's motion for summary judgment even though that pleading was not verified). Defendants do not dispute the authenticity of the exhibits and, in fact, utilized the exhibits during Flynn's deposition and cite to the exhibits in support of the motion. Dkt. No. 64-2 ¶¶ 46-48; Dkt. No. 64-4; Dkt. No. 64-7 at 1-2. [3] Additionally, a copy of Flynn's deposition transcript is annexed as an exhibit to Defendants' motion. Dkt. No. 64-4. Consequently, the facts set forth in Defendants' Rule 7.1 Statement of Material Facts [4] are accepted as true, but only as to those facts that are not disputed by Flynn's sworn testimony or the exhibits annexed to the Amended Complaint. See N.D.N.Y. L.R. 7.1(a)(3) ("The Court shall deem admitted any properly supported facts set forth in the Statement of Facts that the opposing party does not specifically controvert.") (emphasis omitted).

**II. Background**

Flynn v. Ward, Not Reported in Fed. Supp. (2018)

Case 9:22-cv-00102-BKS-ML    Document 78    Filed 12/13/23    Page 220 of 373

## A. Facts

**\*2**  The facts are related herein in the light most favorable to Flynn as the nonmoving party. See subsection III(A) infra. The facts recited are for the relevant time period as referenced in the Amended Complaint.

At the time of the incidents described in the Amended Complaint, Flynn was confined in the Long Term Protective Custody Unit ("LTPC") at Mid-State Correctional Facility ("Mid-State C.F."). See generally Am. Compl. Wellenstein was a law library officer at Mid-State C.F. Dkt. No. 64-4 at 35-36. Ward was the Superintendent at Mid-State C.F. Id. at 10. From December 2014 through June 2015, Flynn filed numerous requests for legal materials/legal assistance. Dkt. No. 20-2.

From October 2011 until March 5, 2015, inmates in the LTPC had physical access to the law library from 4:30 p.m. until 5:45 p.m. Dkt. No. 20-1 at 2; Dkt. No. 64-4 at 35-36. On March 5, 2015, Captain Goppert issued a memorandum advising the LTPC Population that their law library services would be "modified." Dkt. No. 20-1 at 1. In accordance with Facility Operations Manual 21.04 [5] and Directive #4833, [6] LTPC inmate requests for legal assistance from the law library must be made in writing and forwarded to the law library officer through the facility mail. Dkt. No. 20-1 at 3. Inmates were permitted two requests each day. Dkt. No. 64-4 at 36; Dkt. No. 64-2 ¶ 34.

### 1. Grievances

On January 6, 2015; February 14, 2015; and February 17, 2015, Flynn filed grievances claiming that Wellenstein refused to make copies of his legal work or perform "word" and "key number searches" on the computer. Dkt. No. 64-5 at 4-7. The grievances were consolidated (MS-28194-15) and on March 11, 2015, the Superintendent responded that Flynn was being properly assisted. [7] Id. at 8. Flynn appealed the decision to the Central Office Review Committee ("CORC"), and, on January 20, 2016, CORC upheld the Superintendent's determination. Id. at 3.

On March 10, 2015, Flynn filed a grievance claiming that Wellenstein refused to accept his March 8, 2015 request and overcharged him for copies. Dkt. No. 20-3 at 12.

**\*3**  On April 5, 2015, Flynn filed a grievance alleging that Wellenstein (1) denied him access to the courts; (2) fraud; (3) destruction of property; (4) refused to provide legal materials or assistance; and (5) refused to respond to weekend requests (MS-21943-15). Dkt. No. 64-5 at 10-16. On May 6, 2015, the Superintendent responded that Flynn's concerns were being properly addressed. [8] Id. at 17. Flynn appealed the decision to CORC and on October 21, 2015, CORC upheld the Superintendent's determination. Id. at 9.

On April 17, 2015, Flynn filed a grievance claiming that Wellenstein unlawfully ordered him to remain out of his cell while he made rounds. Dkt. No. 20-3 at 33.

On April 28, 2015, Flynn filed a grievance claiming that Wellenstein was deliberately harassing him and destroying his documents. Dkt. No. 20-3 at 34.

On April 30, 2015, Flynn filed a grievance charging Wellenstein with repeated verbal harassment. Dkt. No. 20-3 at 42. Flynn claimed that Wellenstein came to his cell, accused Flynn of smoking, entered the cell, and pushed Flynn aside. Id. Flynn alleged that Wellenstein made "a couple of smart remarks" and was "angry" over the numerous grievances Flynn filed. Id.

On May 6, 2015; May 8, 2015; and May 11, 2015, Flynn filed grievances accusing Wellenstein of destroying copies, harassment, and threatening behavior. Dkt. No. 64-5 at 19-21. The grievances were consolidated (MS-21970-15), and, on July 14, 2015, after an investigation, the Superintendent issued a decision denying the grievances. [9] Id. at 22-23. Flynn appealed the decision to CORC and on September 21, 2015, the Superintendent's decision was affirmed. Id. at 18.

On May 14, 2015, Flynn filed a grievance claiming that Wellenstein refused to provide books. Dkt. No. 20-3 at 46.

On July 21, 2015, Flynn filed a grievance claiming that Wellenstein refused to provide envelopes and deliberately amended his documents. Dkt. No. 20-6 at 2.

On August 1, 2015, August 7, 2015, and August 10, 2015, Flynn filed grievances against Wellenstein claiming that he refused to make copies of documents "in retaliation for the 2 most recent grievances against him." Dkt. No. 64-5 at 26-28. The grievances were consolidated (MS-22079-15) and on August 27, 2015, after an investigation, the Superintendent

Case 9:22-cv-00102-BKS-ML    Document 78    Filed 12/13/23    Page 221 of 373

Flynn v. Ward, Not Reported in Fed. Supp. (2018)

denied the grievances. [10] Id. at 29. Flynn appealed the decision to CORC and on October 21, 2015, CORC affirmed the Superintendent's decision. Id. at 24.

On August 20, 2015, Flynn filed a grievance (MS-22105-15) claiming that Wellenstein threatened him and told him, "if I did not stop with my grievances that he, C.O.'s Jordan and Miller were going to set me up again like they have done numerous times in the past." Dkt. No. 20-6 at 10.

On October 23, 2015, Flynn filed a grievance claiming that Wellenstein refused to provide copies and purposefully delayed his access to the courts (MS-22183-15). Dkt. No. 64-5 at 31. On November 10, 2015, after an investigation, the Superintendent determined that Flynn was being provided with Law Library services pursuant to Directive #4483. [11] Id. at 33. Flynn appealed to CORC, and on February 17, 2016, CORC upheld the determination. Id. at 30.

On November 6, 2015, Flynn filed a grievance (MS-22200-15) claiming that Wellenstein's behavior prohibited him from conducting meaningful research. Dkt. No. 64-5 at 37. On December 15, 2015, after an investigation, the Superintendent denied the grievance. [12] Id. at 38. Flynn appealed the decision to CORC, and on March 23, 2016, CORC affirmed the determination. Id. at 36.

*4 On January 14, 2016, Flynn filed a grievance claiming that the photocopier was not functioning properly because Wellenstein manipulated the memory function. Dkt. No. 20-6 at 61.

### 2. Misbehavior Reports

On April 30, 2015, Wellenstein issued a misbehavior report charging Flynn with smoking. [13] Dkt. No. 20-6 at 70. After a Tier II disciplinary hearing, Flynn was sentenced to eighteen days in keeplock confinement. Id. Flynn served his sentence from April 30, 2015 until May 18, 2015. Id.

On August 1, 2015, Officer Koscielniak issued Flynn a misbehavior report charging him with violating facility rules related to smoking. Dkt. No. 20-6 at 6. After a Tier II disciplinary hearing, the hearing officer sentenced Flynn to a thirty day loss of recreation, commissary, and phone/package privileges. Id. at 70. On August 1, 2015, Wellenstein issued a second misbehavior report charging Flynn with

disobeying a direct order. Dkt. No. 20-6 at 5. After a Tier II disciplinary hearing, the hearing officer sentenced Flynn to a thirty day loss of recreation, commissary, and phone/package privileges for thirty days, but the sentence was suspended until November 16, 2015. Id. at 70.

On August 17, 2015, Officer Alsante issued Flynn a misbehavior report charging him with placing a three-way call in violation of facility rules. Dkt. No. 20-6 at 8. Alsante noted that, on August 17, 2015, "[a]t approx. 9:05 p.m., at the request of C.O. J. Jordan, I began monitoring 10-2 SHU phone[.]" Id. As a result of the report, Flynn was placed in keeplock for eighteen days from August 17, 2015 until September 4, 2015. Id. at 8, 70. Flynn appealed the decision to Ward claiming that Jordan asked Alsante to monitor his telephone call "as part of a campaign of harassment that CO Wellenstein has launched against those inmates in 10-2 who are trying to access the law library and [c]ourts." Id. at 9. Flynn further noted:

> CO W has written 4 misbehavior reports against me & encourages other CO's to do the same, as well as monitor our alleged activities, and in this incident no 3-way call was made & this is retaliation for my litigation.

Dkt. No. 20-6 at 9.

On August 24, 2015, Wellenstein issued a misbehavior report charging Flynn with threats and harassment. Dkt. No. 20-6 at 12. Wellenstein reported that Flynn told him, "[o]ne day when I get out, I am going to see you selling flowers on the corner and then I will take care of you the way I want to." Id. After a Tier II disciplinary hearing, Flynn was sentenced to thirty days in keeplock confinement. Id. at 70. The sentence was suspended until December 8, 2015. Id.

On November 12, 2015, Officer U. Upshaw issued Flynn a misbehavior report charging him with smoking, arson, false statements, and possessing flammable material. Dkt. No. 20-6 at 24. After a disciplinary hearing, the charges were dismissed. Id. at 25.

On November 18, 2015, Wellenstein issued a misbehavior report charging Flynn with harassment. Dkt. No. 20-6 at 16.

Flynn v. Ward, Not Reported in Fed. Supp. (2018)

Case 9:22-cv-00102-BKS-ML    Document 78    Filed 12/13/23    Page 222 of 373

The misbehavior report was dismissed by the hearing officer. Am. Compl. ¶ 125.

On December 11, 2015, Wellenstein issued a misbehavior report charging Flynn disobeying a direct order and harassment. Dkt. No. 20-6 at 26. The ticket was dismissed by the hearing officer. Am. Compl. at ¶ 130.

### 3. Legal Work

**\*5** In 2013, Flynn filed a Habeas Corpus petition in this Court. See Flynn v. J. Colvin, No. 9:13-CV-1247 (JKS) (N.D.N.Y. 2013). On October 19, 2015, Flynn filed an action in the Court of Claims against Wellenstein charging him with deliberately destroying legal documents. Dkt. No. 20-6 at 27-28. In 2014 and 2015, Flynn was researching and gathering exhibits in support of a writ of error coram nobis to vacate his conviction. Dkt. No. 64-4 at 17. In 2014 and 2015, Flynn was also working on a petition for the Department of Veterans' Affairs to increase his disability benefits, Article 78 petitions, a foreclosure action, and commenced litigation in the Court of Claims. Dkt. No. 64-4 at 18, 21, 25, 29. On August 24, 2015, Flynn commenced the within action. Dkt. No. 1.

During his deposition, Flynn testified that did not know the procedural posture of any of his actions or petitions, could not recall whether deadlines were in place in any litigation, and could not remember the details of each petition and action. Dkt. No. 64-4 at 17-31. Flynn testified that his legal work was lost and therefore, without being able to refer to his legal records, he could not state whether he suffered any negative consequences in any legal matter. Id. at 31-32, 44, 107.

In June 2016, Flynn was transferred out of Mid-State C.F. Dkt. No. 25.

### B. Procedural History

On August 24, 2015, Flynn filed the Complaint in this action. Dkt. No. 1. In a Decision and Order filed December 4, 2015 ("December Order"), the Court reviewed the Complaint in accordance with 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A, and determined that the Complaint failed to state a claim upon which relief could be granted and, therefore, was subject to dismissal. Dkt. No. 11. In light of his pro se status,

Flynn was afforded an opportunity to submit an amended complaint. Dkt. No. 11 at 18. On February 25, 2016, Flynn filed an Amended Complaint. Dkt. No. 20. Upon review of the Amended Complaint, the Court directed Wellenstein and Ward to respond to the First Amendment claims related to access to the courts and retaliation. Dkt. No. 22 at 14, 26, 29.

### III. Discussion [14]

In the Amended Complaint, Flynn alleges that his First Amendment right to access the courts was violated and further, that Wellenstein retaliated against him for filing grievances. See generally Am. Compl. Defendants move for summary judgment arguing that (1) Flynn failed to allege any "actual injury" to sustain a First Amendment claim; (2) Flynn cannot establish a retaliation claim against Wellenstein; (3) Flynn's supervisory claims against Ward must be dismissed; and (4) Flynn failed to exhaust his administrative remedies with respect to retaliatory conduct. See generally Dkt. No. 64.

### A. Legal Standard

A motion for summary judgment may be granted if there is no genuine issue as to any material fact, it was supported by affidavits or other suitable evidence, and the moving party is entitled to judgment as a matter of law. See FED R. CIV. P. 56(a). The moving party has the burden to show the absence of disputed material facts by providing the court with portions of pleadings, depositions, and affidavits which support the motion. See FED R. CIV. P. 56; Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Facts are material if they may affect the outcome of the case as determined by substantive law. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). All ambiguities are resolved and all reasonable inferences drawn in favor of the non-moving party. See Skubel v. Fuoroli, 113 F.3d 330, 334 (2d Cir. 1997).

**\*6** The party opposing the motion must set forth facts showing that there is a genuine issue for trial, and must do more than show that there is some doubt or speculation as to the true nature of the facts. See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). For a court to grant a motion for summary judgment, it must be apparent that no rational finder of fact could find in favor of the non-moving party. See Gallo v. Prudential Residential

Servs., Ltd. P'ship., 22 F.3d 1219, 1223-24 (2d Cir. 1994); Graham v. Lewinski, 848 F.2d 342, 344 (2d Cir. 1998).

Where, as here, a party seeks judgment against a pro se litigant, a court must afford the non-movant special solicitude.

See Triestman v. Fed. Bureau of Prisons, 470 F.3d 471, 477 (2d Cir. 2006). As the Second Circuit has stated,

> [t]here are many cases in which we have said that a pro se litigant is entitled to "special solicitude," ... that a pro se litigant's submissions must be construed "liberally," ... and that such submissions must be read to raise the strongest arguments that they "suggest," ... At the same time, our cases have also indicated that we cannot read into pro se submissions claims that are not "consistent" with the pro se litigant's allegations, ... or arguments that the submissions themselves do not "suggest," ... that we should not "excuse frivolous or vexatious filings by pro se litigants," ... and that pro se status "does not exempt a party from compliance with relevant rules of procedural and substantive law,"...

Id. (citations and footnote omitted); see also Sealed Plaintiff v. Sealed Defendant, 537 F.3d 185, 191–92 (2d Cir. 2008).

### B. First Amendment

#### 1. Access to Courts

Flynn claims that Wellenstein deliberately "mixed up" and destroyed legal exhibits, refused to accept legal requests, and failed to provide legal materials, assistance, and copies. See generally, Am. Compl. As a result, Flynn claims that he was prevented from filing a writ of coram nobis, a petition for habeas relief, a petition with the Department of Veterans' Affairs, an Article 78 petition, and an appeal with the New York State Retirement System and missed deadlines in pending litigation. See id. Defendants argue, even assuming that Flynn had demonstrated a material issue of fact as to whether Defendants acted deliberately and maliciously in failing to provide him with legal assistance and materials, the record does not support Flynn's conclusory claim that he suffered an actual injury caused by the Defendants. Dkt. No. 64-6 at 4.

Undoubtedly, prisoners have a constitutional right to meaningful access to the courts. See Bounds v. Smith, 430 U.S. 817, 824 (1977); Lewis v. Casey, 518 U.S. 343, 350 (1996) ("The right that Bounds acknowledged was the (already well-established) right of access to the courts."). This right is implicated when prison officials "actively interfer[e] with inmates' attempts to prepare legal documents[ ] or file them[.]" Lewis, 518 U.S. at 350 (internal citations omitted). To establish a denial of access to the courts claim, a plaintiff must satisfy two prongs. First, a plaintiff must show that the defendant acted deliberately and maliciously. See Davis v. Goord, 320 F.3d 346, 351 (2d Cir. 2003). Second, the plaintiff must demonstrate that he suffered an actual injury, "i.e., [the defendant] took or was responsible for actions that hindered a plaintiff's efforts to pursue a legal claim." Monsky v. Moraghan, 127 F.3d 243, 247 (2d Cir. 1997) (internal citations, quotation marks, and alterations omitted) (quoting Lewis, 518 U.S. at 329); Davis, 320 F.3d at 351 (internal quotation marks omitted). "[A] delay in being able to work on one's legal action or communicate with the courts does not rise to the level of a constitutional violation." Benjamin v. Kerik, 102 F. Supp. 2d 157, 164 (S.D.N.Y. 2000) (citation omitted), aff'd sub nom. Benjamin v. Fraser, 264 F.3d 175 (2d Cir. 2001).

**\*7** Here, while Flynn made several claims in his Amended Complaint related to pending legal matters, Flynn testified at his deposition that he could not recall what litigation he was working on in 2015, the procedural posture of any pending litigation, or whether he was subject to any Court imposed deadlines. Dkt. No. 64-4 at 12-31. Flynn testified that he filed actions in the Court of Claims against Wellenstein related to the destruction of his legal work, and that the actions were dismissed, but he could not attribute that dismissal to Wellenstein's actions or inactions. Id. at 25-26, 29, 30. Flynn explained that he could not provide any specific information related to Court deadlines or legal matters because he was compelled to send his legal work home and it was lost. Dkt. No. 64-4 at 18-19, 25, 31, 45. Flynn testified:

> ... Most of my legal work was shipped —sent home. They forced me to send most of my legal work home, so—and I haven't been able to get my legal

Flynn v. Ward, Not Reported in Fed. Supp. (2018)

Case 9:22-cv-00102-BKS-ML    Document 78    Filed 12/13/23    Page 224 of 373

work sent to me. Then they lost a box
of legal work, so.

Dkt. No. 64-4 at 18.

The record however, lacks any facts related to who directed Flynn to send his legal work home, when or what portion of his work was misplaced or lost, and who was responsible for his missing legal work.

Even if the undersigned accepts Flynn's explanation, the docket reports for cases pending in this Court, as well as Flynn's litigation history, belie his First Amendment claims. In October 2013, Flynn filed a Petition for Habeas Corpus relief. See Flynn v. Colvin, No. 9:13-CV-1247 (JKS), Dkt. No. 1 (N.D.N.Y. Oct. 7, 2013). From February 2014 until June 2016, Flynn filed several submissions in that case including various motions, an application for counsel, a reply to his petition, and objections to Court Orders. Id.; Dkt. Nos. 20, 22, 24, 26, 27, 29, 31, 33, 34, 35, 36, 38. In December 2016, the Petition was denied and Judgment was entered. Id.; Dkt. Nos. 47, 48. Nothing in the record suggests that the Petition was denied for failure to comply with deadlines, prosecute, or purse the action.

In August 2015, Flynn commenced the within action by filing an eighteen page complaint with over two hundred pages of exhibits, together with a motion to proceed IFP, an inmate authorization form, a motion to appoint counsel, and a motion for preliminary injunctive relief. Dkt. Nos. 1, 2, 3, 4, 5. From August 2015 until June 2016, Flynn filed letters, motions, and a fifty-four page Amended Complaint. Dkt. No. 6, 8, 10, 12, 16, 18, 20, 23. Flynn has clearly been able to proceed in his litigation of this case, despite his claims otherwise.

In December 2017 and March 2018, the Appellate Division issued Orders dismissing two such petitions. See Flynn v. Annucci, 156 A.D.3d 1105 (3d Dep't 2017); Flynn v. Annucci, 159 A.D.3d 1181, 1182 (3d Dep't 2018). In the 2018 Order, the Court affirmed the disciplinary determination after considering the documentary evidence, hearing testimony, and misbehavior report. Flynn, 159 A.D.3d at 1182. The record lacks facts establishing that these cases were dismissed due to Flynn's inability to prosecute or purse the matters or Defendants' behavior. See Davis, 320 F.3d at 352 (holding that a plaintiff must show that there is "a causal connection between the protected speech and the adverse action.") (citation omitted).

To summarize, Flynn has failed to show that Defendants' actions hindered his efforts to pursue a legal claim. Flynn was able to file several submissions in this Court, demonstrating that Defendants' alleged conduct did not prevent him from litigating actions. Flynn has failed to produce evidence of any type of actual injury which occurred as a result of Defendants' actions. Flynn has failed to identify which legal claims were frustrated, if they were meritorious, and how his access to legal materials, supplies, or the law library would have supported the viability of such claims. In the absence of any evidence that Flynn suffered any actual injury precluding him from pursuing any judicial action, it is recommended that Defendants' motion for summary judgment on this ground should be granted.

### 2. Retaliation

**\*8** To state an actionable claim for retaliation under the First Amendment, a prisoner must establish by a preponderance of the evidence that: (1) the speech or conduct at issue was protected; (2) the defendant took adverse action against the plaintiff; and (3) there was a causal connection between the protected speech and the adverse action. See Gill v. Pidlypchak, 389 F.3d 379, 380 (2d Cir. 2004) (internal quotation marks and citation omitted); Tafari v. McCarthy, 714 F.Supp.2d 317, 347 (N.D.N.Y. 2010). Courts must view retaliation claims with care and skepticism to avoid judicial intrusion into matters of prison administration. See Jackson v. Onondaga Cnty., 549 F. Supp. 2d 204, 214-15 (N.D.N.Y. 2008). Therefore, conclusory allegations alone are insufficient. See id. at 214 (citing Flaherty v. Coughlin, 713 F.2d 10, 13 (2d Cir. 1983) (explaining that "claim[s] supported by specific and detailed factual allegations ... ought usually be pursued with full discovery.") ). If the plaintiff establishes these elements, the burden shifts to the defendants to show by a preponderance of the evidence that they would have taken the same action against the plaintiff absent his engaging in the protected conduct. See Graham v. Henderson, 89 F.3d 75, 79 (2d Cir. 1996).

To satisfy the first element of a retaliation claim, a plaintiff must show that he engaged in a protected activity. See Espinal v. Goord, 558 F.3d 119, 128 (2d Cir. 2009). In the prison context, "adverse action" is objectively defined as conduct "that would deter a similarly situated individual of

ordinary firmness from exercising ... constitutional rights." Davis v. Goord, 320 F.3d 346, 353 (2d Cir. 2003). "[A]dverse action taken for both proper and improper reasons may be upheld if the action would have been taken based on the proper reasons alone." Jackson, 549 F. Supp. 2d at 215.

The plaintiff bears the burden of establishing that "the protected conduct was a substantial or motivating factor in the prison officials' decision to discipline the plaintiff." Gayle, 313 F.3d at 682. A plaintiff "may do so with circumstantial evidence if it is 'sufficiently compelling[.]' " Kotler v. Donelli, 382 F. App'x 56, 57-58 (2d Cir. 2010) (summary order) (quoting Bennett v. Goord, 343 F.3d 133, 137 (2d Cir. 2003) ). "Types of circumstantial evidence that can show a causal connection between the protected conduct and the alleged retaliation include temporal proximity, prior good disciplinary record, finding of not guilty at the disciplinary hearing, and statements by defendants as to their motives." Barclay v. New York, 477 F. Supp. 2d 546, 588 (N.D.N.Y. 2007) (citations omitted). Temporal proximity between the protected activity and the adverse action "must be very close." Meyer v. Shulkin, —— F. App'x ——, 2018 WL 480478, at *2 (2d Cir. Jan. 19, 2018) (citation omitted).

> There is no bright line to define the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship, so courts judge the permissible inferences that can be drawn from temporal proximity in the context of particular cases. However, courts have found that six and eight month gaps between the protected conduct and adverse action were sufficient, while in other circumstances three months was considered too long.

Burton v. Lynch, 664 F.Supp.2d 349, 367 (S.D.N.Y. 2009) (internal quotation marks and citations omitted).

Flynn claims that Wellenstein assaulted him, threatened him, denied him access to the court, and filed misbehavior reports in retaliation for Flynn's grievances against Wellenstein. See generally Am. Compl. It is well-settled that the filing of a grievance constitutes protected speech under the First Amendment. See Graham, 89 F.3d at 80; Franco v. Kelly, 854 F.2d 584, 589 (2d Cir. 1988) ("Moreover, intentional obstruction of a prisoner's right to seek redress of grievances is precisely the sort of oppression that section 1983 is intended to remedy.") (alteration and internal quotation marks omitted); see also Roseboro, 791 F. Supp. 2d at 367 (finding that the filing of a grievance is a protected activity); Mateo v. Fischer, 682 F. Supp. 2d 423, 433 (S.D.N.Y. 2010) (same). Thus, for each allegation, Flynn has satisfied the first prong of First Amendment retaliation analysis. Thus, the Court turns to whether Flynn has established that he suffered an adverse action and a causal connection between the protected conduct and the adverse action.

### a. Assault

**\*9** Flynn alleges that Wellenstein assaulted him on April 30, 2015 in retaliation for filing grievances. See Am. Compl. ¶ 54. With respect to the second prong of the analysis, Defendants claim that the alleged action, i.e., pushing, was de minimis and thus, not an adverse action. The undersigned agrees. Although an alleged assault need not rise to the level of an Eighth Amendment excessive force violation in order to be considered an adverse action for purposes of First Amendment retaliation analysis, Flynn's allegations that Wellenstein "push[ed] him around," see Am. Compl. ¶ 54, are de minimis. See Rivera v. Goord, 119 F. Supp. 2d 327, 340 (S.D.N.Y. 2000) ("[E]ven though [the plaintiff] has alleged that the actions of [the defendants] were motivated by [the plaintiff's] filing of grievances, the alleged acts of retaliation, even if assumed to be true, are de minimis; [the plaintiff] states only that [the defendants] 'shoved' him while taking him to the 'box' (i.e., Green Haven's Special Housing Unit, or "SHU"). Such actions, even if proven at trial, would not chill a person of ordinary firmness from continuing to engage in First Amendment activity."); Sloane v. Mazzuca, No. 04 CV 8266(KMK), 2006 WL 3096031, at *13-14 (S.D.N.Y. Oct. 31, 2006) (concluding that the defendant's conduct of throwing a food tray at plaintiff did not amount to adverse action); cf. Williams v. Hesse, No. 9:16-CV-01343 (GTS/TWD), 2018 WL 1363759, at *7-8 (N.D.N.Y. Feb. 2, 2018) (concluding that the defendants' threats coupled with spitting chewing tobacco in the plaintiff's face that resulted in "severe burning, pain, and a temporary loss of vision in his right

Flynn v. Ward, Not Reported in Fed. Supp. (2018)

Case 9:22-cv-00102-BKS-ML    Document 78    Filed 12/13/23    Page 226 of 373

eye for nearly six hours, and a severe headache for days" constituted adverse action) Moreover, there is no indication that plaintiff sought medical treatment or experienced severe pain or suffering as a consequence of the alleged assault. See Williams, 2018 WL 1363759, at *7-8. Therefore, because the undersigned finds that Wellenstein's alleged assault does not amount to adverse action, it is recommended that Defendants' motion on this ground be granted.

### b. Access to Courts

Flynn alleges that Wellenstein denied him access to the law library and to the courts in retaliation for filing grievances. Dkt. No. 20 ¶¶ 57, 59, 118, 119, 120, 122. Although a defendant's underlying action may not amount to a violation of a constitutionally protected right, this does not preclude such action from consideration as an adverse action. See Shariff v. Poole, 689 F. Supp. 2d 470, 478-79 (W.D.N.Y. 2010). " 'An act in retaliation for the exercise of a constitutional right is actionable under § 1983 even if the act when taken for different reasons would have been proper.' " Id. (quoting Franco, 854 F.2d at 588); see Nei v. Dooley, 372 F.3d 1003, 1007 (8th Cir. 2004) (rejecting the defendants' argument that "[a]s for the inmates' claim that they were retaliated against for filing their lawsuit by being denied access to the prison law library, the officials contend the district court should have construed the claim as one of denied access to the courts, requiring proof of actual injury, rather than one of retaliation) (citation omitted)." Thus, even though the undersigned has recommended dismissal of plaintiff's access to the courts claim, Wellenstein's underlying conduct may still be assessed as adverse action.

It is well-settled that the denying an inmate access to the law library or destroying legal material constitutes adverse action. See Guillory v. Haywood, No. 9:13-CV-01564 (MAD), 2015 WL 268933, at *17 (N.D.N.Y. Jan. 21, 2015) ("Furthermore, refusing to allow Plaintiff to go to the law library knowing that it would prevent an inmate from filing papers in a pending lawsuit in a timely manner would arguably deter a similarly situated individual of ordinary firmness from exercising ... constitutional rights.") (internal quotation marks and citation omitted); see also Jean-Laurent v. Lane, No. 9:11-CV-186 (NAM/TWD), 2013 WL 600213, at *10 (N.D.N.Y. Jan. 24, 2013), report and recommendation adopted, 2013 WL 599893 (N.D.N.Y. Feb. 15, 2013) ("Destruction of Plaintiff's legal material and documents for his Second Circuit appeal

constitutes an adverse action for purposes of the retaliation analysis."). Thus, Flynn has established the second prong of the retaliation analysis.

With respect to the third prong, Flynn must establish a causal connection "sufficient to support the inference 'that the speech played a substantial part' in the [ ] adverse [ ] action." Diesel v. Town of Lewisboro, 232 F.3d 92, 107 (2d Cir. 2000) (quoting Ezekwo v. NYC Health & Hosps. Corp., 940 F.2d 775, 780-81 (2d Cir. 1991) ). As to temporal proximity, the record indicates that on March 10, 2015; April 5, 2015; April 30, 2015; May 6, 2015; May 8, 2015; May 11, 2015; May 14, 2015; July 21, 2015; August 7, 2015; October 23, 2015; and November 6, 2015, Flynn filed grievances against Wellenstein. See Dkt. N. 64-7. Although there is no "bright line" establishing the time frame appropriate for establishing temporal proximity, the short gap between the protected conduct and adverse action appears sufficiently close to support an indication of a causal connection. See Espinal, 558 F.3d at 129 (holding that passage of six months between protected conduct and adverse action sufficiently supported an inference of a causal connection); see, e.g., Morales v. Mackalm, 278 F.3d 126, 131 (2d Cir. 2002) (concluding that the short time frame between grievance and retaliatory action, along with allegation of the defendant's involvement, sufficed to support an inference of a retaliatory motive), abrogated on other grounds, Porter v. Nussle, 534 U.S. 516 (2002).

*10 However, "temporal proximity alone cannot create a genuine issue of material as to whether the motivation behind [the defendant's] actions was retaliation." Parks v. Blanchette, 144 F.Supp.3d 282, 336-37 (D. Conn. 2015). Additional circumstantial evidence supports the conclusion that Wellenstein's conduct may have been motivated by Flynn's complaints. On May 8, 2015, Flynn contends that Wellenstein stated, "don't you dare file any more grievances or I will slap you silly and write misbehavior reports to stop you from requesting anything." Am. Compl. ¶ 56. On May 11, 2015, Wellenstein stated "don't [you] dare request anything or I will write you up. I will set you up for grieving me all the time." Id. ¶ 58. Assessing these statements in the light most favorable to Flynn as the non-moving party, the statements are sufficient to support "an inference of a causal connection between" plaintiff's grievances and Wellenstein's alleged denial of legal materials and/or the law library.

Flynn v. Ward, Not Reported in Fed. Supp. (2018)

Case 9:22-cv-00102-BKS-ML    Document 78    Filed 12/13/23    Page 227 of 373

Baskerville v. Blot, 224 F. Supp. 2d 723, 732 (S.D.N.Y. 2002). Moreover, Wellenstein has not provided an affidavit or other evidence to refute Flynn's testimony. Therefore, there is a genuine triable issue of fact for a jury to consider. See Ramos v. O'Connell, 28 F. Supp. 2d 796, 803 (W.D.N.Y. 1998) (denying summary judgment where the defendants failed to submit affidavits or documents to contradict the plaintiff's account). Therefore, affording plaintiff special solicitude, it is recommended that Defendants' motion on this ground be denied.

#### c. Threats

Verbal harassment and threats are generally not considered conduct "that would deter a similarly situation individual of ordinary firmness of exercising constitutional rights." Cabassa v. Smith, No. 9:08-CV-0480 (LEK/DEP), 2009 WL 1212495, at *7 (N.D.N.Y. Apr. 30, 2009) (citing Gill, 389 F.3d at 380) (additional citation omitted). Verbal threats however, may constitute adverse action for purpose of a First Amendment retaliation if the threats are sufficiently specific. Barrington v. New York, 806 F. Supp. 2d 730, 746 (S.D.N.Y. 2011); see also Ford v. Palmer, 539 F. App'x 5, 6 (2d Cir. 2013) (summary order) (finding that a verbal threat constituted adverse action where corrections officer threatened to poison the plaintiff in retaliation for filing his grievances).

Here, Flynn testified that Wellenstein threatened him and told him not to go to the law library. Dkt. No. 64-4 at 93-94. Upon further questioning, Flynn testified:

Q. Okay. When did he make threats about not going to the law library?

A. I don't recall.

Q. What about threats in writing you up, when did he say that?

A. I don't recall.

Q. Do you recall the sum and substance of any of the conversations about not going to the law library or about writing you up?

A. I don't recall right now.

Dkt. No. 64-4 at 94.

Flynn did not document or report the threats. Dkt. No. 64-4 at 96. Based upon the record, the Court concludes that Wellenstein's alleged threats are not sufficiently specific to constitute adverse action. See Bartley v. Collins, No. 95 Civ. 10161, 2006 WL 1289256, at *2-4 (S.D.N.Y. May 10, 2006) (finding no adverse action where a corrections officer tells a plaintiff that he is going to "get [him]" for filing a lawsuit); Alicea v. Howell, 387 F. Supp. 4 227, 237 (W.D.N.Y. 2005) (finding no adverse action where a prison official told an inmate that he would "have to pay the consequences" for filing a grievance against her).

Accordingly, it is recommended that Defendants' motion for summary judgment and dismissal of retaliation claims on this ground be granted. [15]

#### d. Misbehavior Reports

Flynn alleges that Wellenstein filed misbehavior reports, and directed other officers to file misbehavior reports, in retaliation for grievances. Am. Compl. ¶¶ 55, 70, 71, 73, 79. A defendant's retaliatory filing of a falsified misbehavior report that results in disciplinary segregated confinement constitutes adverse action. See Gill, 389 F.3d at 384 (finding that a false misbehavior report that resulted in the plaintiff's placement in keeplock constituted adverse action). Courts in this Circuit have held that a temporary loss of privileges does not constitute adverse action. See Smith v. City of New York, No. 14 CIV. 5927, 2017 WL 2172318, at *6 (S.D.N.Y. May 16, 2017); see also Monko v. Cusack, No. 9:11-CV-1218 (GTS/TWD), 2013 WL 5441724, at *11 (N.D.N.Y. Sept. 27, 2013) ("... the temporary loss of privileges such as the post-adjustment privileges lost by Plaintiff for thirty-six days are de minimis and do not constitute adverse action for purposes of a retaliation claim.") (citation omitted); Bartley, 2006 WL 1289256 at *7 (holding that a misbehavior report which resulted in the temporary loss of commissary privileges does not constitute adverse action because the penalty was de minimis).

**\*11** As a result of the misbehavior reports issued by Koscielniak and Wellenstein on August 1, 2015, Flynn suffered a temporary loss of privileges. Dkt. No. 20-6 at 70.

Case 9:22-cv-00102-BKS-ML    Document 78    Filed 12/13/23    Page 228 of 373

Flynn v. Ward, Not Reported in Fed. Supp. (2018)

Flynn was not sentenced to any disciplinary confinement or penalized as a result of the November 12, 2015, November 18, 2015 and December 11, 2015 misbehavior reports. Dkt. No. 20-6 at 25; Am. Compl. ¶¶ 125, 130. Therefore, because Flynn has failed to show that he suffered an adverse action as a result of the aforementioned tickets, the undersigned need not determine whether there is a causal connection between Flynn's protected conduct and these misbehavior reports. Accordingly, it is recommended that Defendants' motion for summary judgment and dismissal of retaliation claims based upon the August 1, 2015; November 12, 2015; November 18, 2015; and December 11, 2015 reports be granted. [16]

The Court reaches a different conclusion however, with respect to the remaining misbehavior reports. As a result of the April 30, 2015 and August 18, 2015 tickets, Flynn was sentenced to eighteen days in keeplock. Dkt. No 20-6 at 70. As a result of the August 24, 2015 misbehavior report, Flynn received a thirty day keeplock sentence. [17] Id. Accordingly, Flynn has established the second prong of the retaliation analysis with respect to these misbehavior reports. Having found that Flynn satisfied the first and second prong of the retaliation analysis with respect to these tickets, the Court turns to whether the record establishes a causal connection between the protected conduct and the adverse action.

### i. April 30, 2015

On April 30, 2015, Wellenstein issued Flynn a misbehavior report for smoking. Am. Compl. ¶ 55; Dkt. No. 64-6 at 14. Flynn contends that this misbehavior was in retaliation for his April 16, 2015 and April 28, 2015 grievances. Am. Compl. ¶ 55. First, the undersigned notes that the April 16, 2015 grieves conduct by the "law library relief officer" and makes no mention of Wellenstein. See Dkt. No. 20-3 at 31. Absent evidence by plaintiff that Wellenstein either was the library relief officer or knew of the contents of said grievance, the April 16, 2015 grievance cannot be the basis for his retaliation claim. See Tafari, 714 F. Supp. 2d at 374 (concluding that the plaintiff failed to establish a causal connection where the defendant was not named in the original grievance). Second, as to the April 28, 2015 grievance, although the temporal proximity of two days sufficiently supports an inference of causal connection, temporal proximity "without more, is insufficient to survive summary judgment." Roseboro v. Gillespie, 791 F. Supp. 2d 353, 370 (S.D.N.Y. 2011) (citing inter alia Ayers v. Stewart, 101 F.3d 687, 1996 WL

346049 (Table), at *1 (2d Cir. 1996) ("[The plaintiff's] reliance on circumstantial evidence of retaliation-namely, the proximity of the disciplinary action to his complaint where no misbehavior reports were previously filed against him-does not suffice to defeat summary judgment.") ). As to statements regarding Wellenstein's motivations, the record indicates that on May 8, 2015, Wellenstein stated, "don't you dare file any more grievances or I will slap you silly and write misbehavior reports to stop you from requesting anything." Am. Compl. ¶ 56. Assessing this statement in the light most favorable to Flynn as the non-moving party, the undersigned finds it sufficient to support "an inference of a causal connection between" plaintiff's grievances and Wellenstein's alleged filing of misbehavior reports. Baskerville, 224 F. Supp. 2d at 732.

*12 Wellenstein argues that even assuming the evidence creates a material question of fact as to whether he had retaliatory intent, he would have issued the misbehavior report even in the absence of the protected conduct. "[T]he conclusion that the state action would have been taken in the absence of improper motives is readily drawn in the context of prison administration where we have been cautioned to recognize that prison officials have broad administrative and discretionary authority over the institutions they manage." Hynes v. Squillace, 143 F.3d 653, 657 (2d Cir. 1998). "Defendants [may meet] their burden of showing that they would have disciplined the plaintiff even in the absence of the protected conduct if 'it was undisputed that [the inmate plaintiff] had in fact committed the prohibited conduct' for which he had been cited in a misbehavior report." Id. (citing Lowrance v. Achtyl, 20 F.3d 529, 535 (2d Cir. 1994) ).

In September 2013 and March 2015, Flynn was charged with smoking at Mid-State C.F. Dkt. No. 20-6 at 70. Flynn was found guilty of those charges. Id. During his deposition, Flynn admitted that he smoked in his cell in the past and conceded that he "had several disciplinary issues with smoking[.]" Dkt. No. 64-4 at 95-96. However, Flynn maintains that on April 30, 2015, he was not smoking in his cell. Id. As discussed supra, Wellenstein has not provided any sworn testimony in support of the motion, and, thus, has not met his burden of establishing that he would have filed the misbehavior report even in the absence of the protected conduct. Accordingly, there is an genuine dispute as to whether Flynn committed the charged conduct. See Gayle, 313 F.3d at 684 (denying summary judgment where it is disputed whether the plaintiff committed the

Case 9:22-cv-00102-BKS-ML    Document 78    Filed 12/13/23    Page 229 of 373

Flynn v. Ward, Not Reported in Fed. Supp. (2018)

prohibited conduct). Therefore, the undersigned recommends that Defendants' motion for summary judgment, on this basis, be denied. [18]

### ii. August 17, 2015

The August 17, 2015 misbehavior report was written by Officer Alsante. Dkt. No. 20-6 at 8. To establish a retaliation claim, a plaintiff must show "a genuine issue of material fact that the protected conduct was a substantial or motivating factor in his discipline." Graham, 89 F.3d at 81. "[I]t is difficult to establish one defendant's retaliation for complaints against another defendant." Hare v. Hayden, No. 09 Civ. 3135, 2011 WL 1453789, at *4 (S.D.N.Y. Apr. 14, 2011) (citing Wright v. Goord, 554 F.3d 255, 274 (2d Cir. 2009) ).

Here, Flynn did not file any grievances or complaints against Alsante. The record lacks any evidence establishing why Alsante would file a false misbehavior report against Flynn, on Wellenstein's behalf, beyond Flynn's conclusory allegations. Without more, the evidence does not present a genuine issue of material fact for a jury to resolve. See Ciaprazi v. Goord, No. 9:02-CV-915 (GLS/DEP), 2005 WL 3531464, at *9 (N.D.N.Y. Dec. 22, 2005) (entering summary judgment on retaliation claim where the plaintiff cited only past grievances filed against corrections officers other than the officer who disciplined the plaintiff); see also Alicea v. Maly, No. 9:12-CV-203 (MAD/TWD), 2015 WL 4326114, at *14 (N.D.N.Y. July 14, 2015); Guillory v. Ellis, No. 9:11-CV-600 (MAD/ATB), 2014 WL 4365274, at *18 (N.D.N.Y. Aug. 29, 2014). Accordingly, it is recommended that Defendants' motion for summary judgment and dismissal of retaliation claims based upon this misbehavior report be granted. [19]

### iii. August 24, 2015

On August 24, 2015, Wellenstein issued plaintiff a misbehavior report alleging that Flynn threatened and verbally harassed him. Dkt. No. 20-6 at 12. Plaintiff contends that this misbehavior report was in retaliation for his August 20, 2015 and August 22, 2015 grievances. Am. Compl. ¶ 79. However, as Defendants note, during his deposition, plaintiff admitted that he "made a smart remark about [Wellenstein] selling flowers for a living," but that Wellenstein "took that

to a whole different level." Dkt. No. 64-4 at 91, 93, 95. Thus, as plaintiff admitted to making the statement that is the basis for the August 24, 2015 misbehavior report, the evidence suggests that "plaintiff committed the most serious, if not all, of the prohibited conduct charged in the misbehavior report." Gayle, 313 F.3d at 682. Therefore, Defendants have established a non-retaliatory reason for the filing of the August 24, 2015 misbehavior report. See Hynes v. Squillace, 143 F.3d 653, 657 (2d Cir. 1998) (concluding that plaintiff's admission of the underlying conduct established a "proper, non-retaliatory reason[ ] for filing the misbehavior report."). Accordingly, it is recommended that Defendants' motion on this ground be granted.

### C. Supervisory Liability

**\*13** Defendants argue that Flynn's claims against Ward must be dismissed because Ward was not personally involved in any constitutional violations. Dkt. No. 64-6 at 20-23. Flynn does not allege, nor does the record support the conclusion that Ward directly participated in any alleged constitutional violations. Construing the Amended Complaint liberally, Flynn contends that Ward was personally involved in the alleged constitutional violations by denying his grievances.

Supervisory officials may not be held liable merely because they held a position of authority. See Black v. Coughlin, 76 F.3d 72, 74 (2d Cir. 1996). However, supervisory personnel may be considered "personally involved" if:

(1) the defendant participated directly in the alleged constitutional violation;

(2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong;

(3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom;

(4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts; or

(5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

Case 9:22-cv-00102-BKS-ML    Document 78    Filed 12/13/23    Page 230 of 373

Flynn v. Ward, Not Reported in Fed. Supp. (2018)

🚩 Colon v. Coughlin, 58 F.3d 865, 873 (2d Cir. 1995) (citing 🟨 Williams v. Smith, 781 F.2d 319, 323–24 (2d Cir. 1986) ).

Writing letters and grievances to a defendant is insufficient to establish notice and personal involvement. 🟨 Smart v. Goord, 441 F.Supp.2d 631, 643 (S.D.N.Y. 2006) ("Commissioner ... cannot be held liable on the sole basis that he did not act in response to letters of protest sent by [plaintiff]...."). Also, it is within the purview of a superior officer to delegate responsibility to others. See 🟨 Vega v. Artus, 610 F.Supp.2d 185, 198 (N.D.N.Y. 2009) (finding no personal involvement where "the only involvement of the supervisory official was to refer the inmate's complaint to the appropriate staff for investigation") (citing Ortiz-Rodriguez v. N.Y. State Dep't of Corr. Servs., 491 F.Supp.2d 342, 347 (W.D.N.Y. 2007) ).

"[I]t is well-established that the review, denial or affirmance of a denial of a grievance is insufficient to establish personal involvement." Perilla v. Fischer, No. 13-CV-398M, 2013 WL 5798557, at *7 (W.D.N.Y. Oct. 28, 2013) (citing inter alia 🔺 Farrell v. Burke, 449 F.3d 470, 484 (2d Cir. 2006) (citation omitted) ). "[W]hile personal involvement cannot be founded solely on supervision, liability can be found if the official proactively participated in reviewing the administrative appeals as opposed merely to rubber-stamping the results." Molano v. Bezio, No. 10-CV-6481, 2012 WL 1252630, at *5 (W.D.N.Y. Apr. 13, 2012) (citing Collins v. Ferguson, 804 F.Supp.2d 134, 140 (W.D.N.Y. 2011), 🟨 Black v. Coughlin, 76 F.3d 72, 74–75 (2d. Cir. 1996) ).

The record before the Court contains Superintendent responses related to six grievances. Dkt. No. 64-5 at 8, 17, 22-23, 29, 33, 38. As noted supra, the signature of the Superintendent who executed the response, in each instance, is illegible. See Part II(A)(1). In response to the May 6, 2015 grievance (MS-21970-15), the Superintendent concluded that, "[i]n this investigation, the grievant alleges that he is not being provided assistance with law library requests, his copies are purposely damaged and he is being retaliated against for filing complaints." Dkt. No. 64-5 at 22. Defendants argue that Ward was not involved in that grievance and attribute only two grievances to Ward: MS-22079-15 and MS 22200-15. Dkt. No. 64-6 at 22-23. While Defendants concede that additional grievances were appealed to the Superintendent, Defendants claim that the

remaining grievance responses were not issued by Ward and thus, Ward was not involved in the decision-making process or investigation regarding these grievances. These arguments are asserted by counsel in the Memorandum of Law, but notably absent from the record is any affidavit or declaration from Ward. Without such evidence, a factual dispute exists as to whether Ward proactively participated in the decision-making process related to Flynn's grievances. As such, there is triable issue of material fact for a jury to resolve with respect to Ward's personal involvement in Wellenstein's alleged retaliatory conduct. See 🟨 Celotex Corp., 477 U.S. at 323. Accordingly, Defendants' motion against Ward on this ground should be denied.

*14 A different conclusion is reached however, with respect to Flynn's First Amendment claims based upon access to the courts. Absent an underlying constitutional violation by a subordinate, there can be no supervisory liability. 🟨 Hernandez v. Keane, 341 F.3d 137, 145 (2d Cir. 2003); see 🟨 Elek v. Inc. Vill. of Monroe, 815 F.Supp.2d 801, 808 (S.D.N.Y. 2011) (collecting cases for the proposition that "because plaintiff has not established any underlying constitutional violation, she cannot state a claim for 1983 supervisory liability"). As discussed supra, Flynn failed to raise an issue of material fact with respect to his First Amendment claim based upon access to courts. Accordingly, the undersigned recommends that Defendants' motion for summary judgment and dismissal of Flynn's First Amendment claims against Ward based upon access to the courts be granted.

### D. Exhaustion

As an alternative ground for dismissal of the retaliation claims, Defendants contend that the motion for summary judgment must be granted because Flynn failed to exhaust his administrative remedies through available grievance procedures. See Dkt. No. 64-2 at 23-26. The PLRA requires that a prisoner exhaust any administrative remedies available to him or her before bringing an action for claims arising out of his or her incarceration. See 🟨 Porter v. Nussle, 534 U.S. 516, 524 (2002); see also 🟨 Woodford v. Ngo, 548 U.S. 81, 82 (2006). "The PLRA's exhaustion requirement is designed to 'afford [ ] corrections officials time and opportunity to address complaints internally before allowing the initiation of a federal case.' " 🟨 Johnson v. Testman, 380 F.3d 691,

Flynn v. Ward, Not Reported in Fed. Supp. (2018)

Case 9:22-cv-00102-BKS-ML    Document 78    Filed 12/13/23    Page 231 of 373

697 (2d Cir. 2004) (citing Porter, 534 U.S. at 524-25). The exhaustion requirement applies " 'to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong.' " Mauldin v. Kiff, No. 11-CV-107-A, 2014 W L 2708434, at *4 (W.D.N.Y. June 16, 2014) (quoting Porter, 534 U.S. at 532). Further, the exhaustion requirement applies even where the prisoner seeks relief not available in the administrative grievance process, such as money damages. Porter, 534 U.S. at 524. To exhaust administrative remedies, the inmate must complete the full administrative review process set forth in the rules applicable to the correctional facility in which he or she is incarcerated. See Jones v. Bock, 549 U.S. 199, 218 (2007) (internal citation omitted).

"The mere fact that an inmate plaintiff filed some grievance prior to filing suit is not enough. The grievance must also have related to the subject matter of the federal lawsuit." Allah v. Poole, 506 F. Supp. 174, 180 (W.D.N.Y. 2007) (citation omitted). The scope of a plaintiff's federal claim may not exceed that of the grievance. Donahue v. Bennett, No. 02-CV-6430, 2004 WL 1875019, at *8 (W.D.N.Y. Aug. 17, 2004).

Although the Supreme Court has deemed exhaustion mandatory, the Second Circuit has recognized that "certain caveats apply." Ruggiero v. County of Orange, 467 F.3d 170, 175 (2d Cir. 2006) (citation omitted). Until recently, courts in this district followed a three-part test established by the Second Circuit in Hemphill v. New York, 380 F.3d 680, 686 (2d Cir. 2004). Under the test established in Hemphill, a plaintiff's failure to exhaust could be excused if the plaintiff established that his or her failure to exhaust was justified by "special circumstances." Id. However, the Supreme Court recently held that "[c]ourts may not engraft an unwritten 'special circumstances' exception onto the PLRA's exhaustion requirement." Ross v. Blake, 136 S. Ct. 1850, 1862 (2016). As such, the special circumstances exception previously promulgated by the Second Circuit in Hemphill, is no longer consistent with the statutory requirements of the PLRA. See Williams v. Priatno, 829 F.3d 118, 123 (2d Cir. 2016).

*15 Although the Supreme Court's decision in Ross eliminates the "special circumstances" exception promulgated by Hemphill, courts must still consider the PLRA's "textual exception to mandatory exhaustion." Ross, 136 S. Ct. at 1858. Under this exception, courts must determine whether administrative remedies were "available" to a prisoner. Id. The Supreme Court identified three circumstances where administrative remedies may be unavailable to a prisoner. First, "an administrative procedure is unavailable when (despite what regulations or guidance materials may promise) it operates as a simple dead end —with officers unable or consistently unwilling to provide any relief to aggrieved inmates." Id. at 1859 (citing Booth v. Churner, 532 U.S. 731, 736, 738 (2001) ). "Next, an administrative scheme might be so opaque that it becomes, practically speaking, incapable of use." Id. Lastly, administrative remedies are unavailable where "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." Id. at 1860.

Here, there is no dispute that at all relevant times, DOCCS had in place a three-step inmate grievance program. N.Y. COMP. CODES R. & REGS. tit. 7, § 701.5 (2015). First, the inmate must file a complaint with an inmate grievance program ("IGP") clerk within twenty-one days of the alleged action. Id. § 701.5(a)(1). An IGP representative has sixteen calendar days to informally resolve the issue. Id. § 701.5(b)(1). If no informal resolution occurs, the full IGP committee must hold a hearing within sixteen days of receipt of the grievance and must issue a written decision within two working days after the conclusion of the hearing. Id. §§ 701.5(b)(2)(i)-(ii). If the determination is unfavorable to the inmate, the inmate may appeal the IGRC's determination to the facility superintendent within seven calendar days of receipt of the determination. Id. § 701.5(c)(1). If the superintendent's determination is unfavorable to the inmate, the inmate may appeal to the Central Office Review Committee ("CORC") within seven days after receipt of the superintendent's determination. Id. §§ 701.5(d)(i)-(ii). CORC must "review each appeal, render a decision on the grievance, and transmit its decision to the facility, with reasons stated, for the [inmate], the grievance clerk, the superintendent, and any direct parties within thirty (30) calendar days from the time the appeal was received." Id. § 701.5(d)(3)(ii).

Flynn testified that he was familiar with the grievance process and filed "numerous" grievances in 2015. Dkt. No. 64-4

Flynn v. Ward, Not Reported in Fed. Supp. (2018)

Case 9:22-cv-00102-BKS-ML    Document 78    Filed 12/13/23    Page 232 of 373

at 41–44. As discussed supra, the record contains copies of six (6) grievances that Flynn appealed to CORC and thus, Defendants concede, exhausted. [20] The record contains a certification attesting to the veracity of the grievance records. Dkt. No. 64-5 at 2.

With respect to the exhausted grievances, Defendants argue that Flynn's retaliation claims were not properly exhausted because these grievances did not contain allegations that Wellenstein retaliated against Flynn when he assaulted him and issued misbehavior reports. Dkt. No. 64-6 at 25–26. Defendants have not provided an affidavit from any DOCCS' employee with personal knowledge to support Defendants' contention that there is no connection between Flynn's grievances and the matters raised in the federal court complaint. Once again, Defendants rely upon the unsupported statements by counsel without evidentiary support. Upon review of the record, the undersigned finds that has exhausted his remaining retaliation claims. In the May 6, 2015 grievance, Flynn claimed that Wellenstein provided distorted copies of court forms and asserted, "[t]his is the 3 rd time he has deliberately ruined copies to the point they are unusable. This is deliberate harassment and the denial of legal copies." Dkt. No. 64-5 at 21. In the May 8, 2015 grievance, Flynn claimed:

> **\*16**  On 5/8/15 at 5:05 p.m. C.O Wellenstein came to my cell and started kicking the cell door and slaming [sic] feed up door, verbally harassing me and making numerous threats. For months C.O. Wellenstein has been harassing me. As a result of his harassment I am afraid to use the law library services and request legal material.

Dkt. No. 64-5 at 19.

On July 14, 2015, the Superintendent responded and categorized these claims as "retaliation" claims in response to filing prior complaints. Dkt. No. 64-5 at 22. The Superintendent conducted an investigation and interviewed Wellenstein. Id.

In the August 7, 2015 grievance, Flynn reiterated his harassment complaints claiming that, "Wellenstein has refused to make copies in retaliation for the 2 most recent grievances against him. His refusal to make copies is harassment[.]" Dkt. No. 64-5 at 26-28. On August 27, 2015, the Superintendent issued a response finding that the grievant "has not substantiated his claim that he has been the victim of harassment by staff[.]" Id. at 29. The Superintendent noted that Wellenstein denied the allegations. Dkt. No. 64-5 at 29. In his Appeal Statement, Flynn argued that Wellenstein continues to deter him from using the law library "in retaliation for filing grievances[.]" Id. On October 21, 2015, CORC issued a decision quoting Directive #4040, Section 701.6(b) related to prohibited "reprisals" against an inmate who utilizes the grievance process. [21] Id. at 24.

Drawing all inferences in Flynn's favor, the Court finds that the facts alleged in Flynn's grievances encompass the facts set forth in the Amended Complaint. See Curry v. Fischer, No. 02 Civ.4477, 2004 WL 766433, at \*8 (S.D.N.Y. Apr. 12, 2004). Accordingly, it is recommended that Defendants' Motion for Summary Judgment, insofar as it raises the affirmative defense of nonexhaustion, be denied.

### IV. Conclusion

**WHEREFORE**, based on the findings set forth above, it is hereby:

**RECOMMENDED**, that Defendants' motion for summary judgment (Dkt. No. 64) be **GRANTED IN PART**:

(1) Insofar as it seeks dismissal of Flynn's First Amendment access to the courts claims against Wellenstein and Ward;

(2) Insofar as it seeks dismissal of Flynn's retaliation claims against Wellenstein and Ward related to misbehavior reports issued on August 1, 2015, August 17, 2015, August, 24, 2015, November 12, 2015, November 18, 2015, and December 11, 2015;

(3) Insofar as it seeks dismissal of Flynn's First Amendment retaliation claims against Wellenstein and Ward for the April 30, 2015 assault; and

(4) Insofar as it seeks dismissal of Flynn's First Amendment retaliation claims against Wellenstein and Ward for threats,

the motion be **GRANTED**; and it is further

Flynn v. Ward, Not Reported in Fed. Supp. (2018)

Case 9:22-cv-00102-BKS-ML    Document 78    Filed 12/13/23    Page 233 of 373

**RECOMMENDED**, that Defendants' Motion for Summary Judgment (Dkt. No. 64) be **DENIED IN PART**:

(1) Insofar as it seeks dismissal of Flynn's First Amendment retaliation claims against Wellenstein and Ward based on access to courts and the misbehavior report issued on April 30, 2015; and

**\*17** (2) Insofar as it seeks dismissal of plaintiffs retaliation claims for access to the courts and the April 30, 2015 misbehavior report due to nonexhaustion, the motion be **DENIED**; and it is

**ORDERED**, that copies of this Report-Recommendation and Order be served on the parties in accordance with the Local Rules.

**IT IS SO ORDERED**.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW**. Roldan v. Racette, 984 F.2d 85, 89 (2d Cir. 1993) (citing Small v. Secretary of Health and Human Servs., 892 F.2d 15 (2d Cir. 1989) ); 28 U.S.C. § 636(b)(1); FED R. CIV. P. 6(a), 6(e), 72.[22]

**All Citations**

Not Reported in Fed. Supp., 2018 WL 3195095

## Footnotes

1    This matter was referred to the undersigned for report and recommendation pursuant to 28 U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(c).

2    The Amended Complaint is not notarized and does not contain any statement from Flynn certifying the veracity of the document under the penalty of perjury.

3    Citations to page numbers refer to the pagination generated by CM/ECF, not the page numbers generated by the parties.

4    Local Rule 7.1(a)(3) states:

Summary Judgment Motions

Any motion for summary judgment shall contain a Statement of Material Facts. The Statement of Material Facts shall set forth, in numbered paragraphs, each material fact about which the moving party contends there exists no genuine issue. Each fact listed shall set forth a specific citation to the record where the fact is established.

The opposing party shall file a response to the Statement of Material Facts. The non-movant's response shall mirror the movant's Statement of Material Facts by admitting and/or denying each of the movant's assertions in matching numbered paragraphs. Each denial shall set forth a specific citation to the record where the factual issue arises. The non-movant's response may also set forth any additional material facts that the non-movant contends are in dispute. Any facts set forth in the Statement of Material Facts shall be deemed admitted unless specifically controverted by the opposing party.

Local Rule 7.1(a)(3).

Flynn v. Ward, Not Reported in Fed. Supp. (2018)

Case 9:22-cv-00102-BKS-ML    Document 78    Filed 12/13/23    Page 234 of 373

5    Mid-State C.F. Facility Operations Manual No. 21.04 provided, in relevant part:

3. Inmates in SHU areas may request, in writing, legal assistance from the Law Library.

a. All requests for assistance must be sent to the Law Library Officer vi a facility mail and each request should document what kind of service is needed.

c. SHU inmates will only be allowed to have two (2) legal research resources in their possession at a time. Pick-up and delivery of legal materials will be made on a daily basis, Monday through Sunday.

Dkt. No. 20-1 at 17.

6    DOCCS Directive #4833 provided, in pertinent part:

Cell Study Services: Inmates prohibited by their confinement status from visiting the Law Library shall be allowed to study Law Library materials in their cells and obtain legal services normally available to general population inmates. Such inmates may request, in writing, a maximum of two items per day and these will be delivered, if available, within 24 hours of receipt of the request. Inmates may retain said legal materials for a period of not less than 16 hours nor more than 24 hours.

Dkt. No. 20-1 at 5.

7    The signature of the Superintendent is illegible.

8    See Footnote 8, supra.

9    See Footnote 7, supra.

10   See Footnote 7, supra.

11   See Footnote 7, supra.

12   See Footnote 7, supra.

13   The misbehavior report is not part of the record.

14   All unpublished opinions cited to by the undersigned in this Report-Recommendation are, unless otherwise noted, attached to this Report-Recommendation.

15   In light of my recommendation that Flynn's retaliation claim based upon threats be dismissed in its entirety based on the merits, I find it unnecessary to address the alternative failure to exhaust arguments related to this claim.

16   See Footnote 17, supra.

17   Defendants argue that a suspended sentence does not constitute an adverse action. Dkt. No. 64-6 at 18. Defendants claim, without evidentiary support, that Flynn did not serve keeplock or lose any privileges as a result of this misbehavior report. Id. The record before the Court establishes that the thirty day sentence was suspended until December 8, 2105. Dkt. No. 20-6 at 70. There is however, a genuine issue of fact regarding whether Flynn served the keeplock sentence. Construing the facts in a light most favorable to the pro se, non-moving party, the Court finds that Defendants have failed to meet their burden of proof with regard to this issue.

18   See Footnote 15, supra.

Flynn v. Ward, Not Reported in Fed. Supp. (2018)

Case 9:22-cv-00102-BKS-ML    Document 78    Filed 12/13/23    Page 235 of 373

19    See Footnote 17, supra.

20    Flynn filed additional grievances, but the record does not contain proof that these grievances were exhausted. To wit, Flynn testified that "at least two or three" of his grievances "made it to Albany." Dkt. No. 64-4 at 46. Flynn could not recall which grievances were appealed and testified that while nothing prevented him from exhausting of all his grievances, he did not appeal certain grievances because they were "repetitive." Id.

21    Section 701.6(b) provides:

> Reprisals prohibited. No reprisals of any kind shall be taken against an inmate or employee for good faith utilization of this grievance procedure. An inmate may pursue a complaint that a reprisal occurred through the grievance mechanism. A grievant shall not receive a misbehavior report based solely upon an allegedly false statement made by the inmate to the grievance committee.

> N.Y. COMP. CODES R. & REGS. tit. 7, § 701.6.

22    If you are proceeding pro se and are served with this Order by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date the Order was mailed to you to serve and file objections. FED. R. CIV. P. 6(d). If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday. Id. § 6(a)(1)(C).

---

End of Document

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

Flynn v. Ward, Not Reported in Fed. Supp. (2018)

Case 9:22-cv-00102-BKS-ML    Document 78    Filed 12/13/23    Page 236 of 373

2018 WL 3193201
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Bruce FLYNN, Plaintiff,

v.

Joe WARD, Acting Superintendent, Mid-State Correctional Facility, et al., Defendants.

9:15-cv-1028 (GLS/CFH)
|
Filed 06/28/2018

**Attorneys and Law Firms**

FOR PLAINTIFF: BRUCE FLYNN, 10-A-1588, Elmira Correctional Facility, P.O. Box 500, Elmira, New York 14902, pro se.

HON. BARBARA UNDERWOOD, New York Attorney General, OF COUNSEL: BRIAN W. MATULA, Assistant Attorney General, The Capitol, Albany, New York 12224.

### ORDER

Gary L. Sharpe, Senior District Judge

 **\*1** The above-captioned matter comes to this court following a Report-Recommendation and Order by Magistrate Judge Christian F. Hummel, duly filed on June 7, 2018. (Dkt. No. 66.) Following fourteen days from the service thereof, the Clerk has sent the file, including any and all objections filed by the parties herein.

No objections having been filed, and the court having reviewed the Report and Recommendation for clear error, it is hereby

**ORDERED** that the Report-Recommendation and Order (Dkt. No. 66) is **ADOPTED** in its entirety; and it is further

**ORDERED** that defendants' motion for summary judgment (Dkt. No. 64) is **GRANTED IN PART** as follows: (1) Insofar as it seeks dismissal of Flynn's First Amendment access to the courts claims against Wellenstein and Ward; (2) Insofar as it seeks dismissal of Flynn's retaliation claims against Wellenstein and Ward related to misbehavior reports issued on August 1, 2015, August 17, 2015, August 24, 2015, November 12, 2015, November 18, 2015, and December 11, 2015; (3) Insofar as it seeks dismissal fo Flynn's First Amendment retaliation claims against Wellenstein and Ward for the April 30, 2015 assault; (4) Insofar as it seeks dismissal of Flynn's First Amendment retaliation claims against Wellenstein and Ward for threats; and it is further

**ORDERED** that defendant's motion for summary judgment (Dkt. No. 64) is **DENIED IN PART** as follows: (1) Insofar as it seeks dismissal of Flynn's First Amendment retaliation claims against Wellenstein and Ward based on access to courts and the misbehavior report issued on April 30, 2015; and (2) Insofar as it seeks dismissal of plaintiff's retaliation claims for access to the courts and the April 30, 2015 misbehavior report due to nonexhaustion; and it is further

**ORDERED** that this case is deemed trial ready and a scheduling order will issue in due course; and it is further

**ORDERED** that the Clerk provide a copy of this Order to the parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2018 WL 3193201

---

**End of Document**                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW   © 2023 Thomson Reuters. No claim to original U.S. Government Works.   1

2023 WL 2864805
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Joseph WOODS, Plaintiff,
v.
Ryan CHADWICK, et al., Defendants.

9:21-CV-662 (GTS/ATB)
|
Signed January 30, 2023

**Attorneys and Law Firms**

JOSEPH WOODS, Plaintiff, pro se.

RACHEL OUIMET, Asst. Attorney General for Defendants.

### REPORT-RECOMMENDATION

ANDREW T. BAXTER, United States Magistrate Judge

**\*1** This matter has been referred to me for Report and Recommendation by United States District Judge Glenn T. Suddaby, pursuant to 28 U.S.C. § 636(b) and Local Rule N.D.N.Y. 72.3(c). In this civil rights action, plaintiff alleged various constitutional violations that occurred while he was incarcerated at Washington Correctional Facility ("Washington C.F."), in the custody of the New York State Department of Corrections and Community Supervision ("DOCCS"). Plaintiff filed his complaint on June 7, 2021. (Dkt. No. 1, Complaint ("Compl.")). On July 19, 2021, upon initial review of the complaint, Judge Suddaby ruled that only plaintiff's First Amendment retaliation claim against defendants Chadwick and Terrio, could proceed. (Dkt. No. 7 at 16-17).

Presently before the court is defendants' motion for summary judgment pursuant to Fed. R. Civ. P. 56 seeking dismissal of the sole surviving claim in the complaint. (Dkt. No. 25). Plaintiff responded in opposition to the motion on May 26, 2022. (Dkt. No. 27). For the reasons set forth below, the court recommends granting defendants' motion for summary judgment and dismissing the remaining claim in plaintiff's complaint.

### I. Summary Judgment

Summary judgment is appropriate where there exists no genuine issue of material fact and, based on the undisputed facts, the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56; Salahuddin v. Goord, 467 F.3d 263, 272-73 (2d Cir. 2006). "Only disputes over ['material'] facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986). It must be apparent that no rational finder of fact could find in favor of the non-moving party for a court to grant a motion for summary judgment. Gallo v. Prudential Residential Servs., 22 F.3d 1219, 1224 (2d Cir. 1994).

The moving party has the burden to show the absence of disputed material facts by informing the court of portions of pleadings, depositions, and affidavits which support the motion. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). If the moving party satisfies its burden, the nonmoving party must move forward with specific facts showing that there is a genuine issue for trial. Salahuddin v. Goord, 467 F.3d at 273. In that context, the nonmoving party must do more than "simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). In determining whether there is a genuine issue of material fact, a court must resolve all ambiguities, and draw all inferences, against the movant. See United States v. Diebold, Inc., 369 U.S. 654, 655 (1962); Salahuddin, 467 F.3d at 272.

### II. Factual Contentions

Plaintiff was transferred to Washington C.F. in August of 2019 and subsequently joined the Incarcerated Liaison Committee ("ILC") as a dorm representative. (Dkt. No. 27-2, Plaintiff's Memorandum of Law ("Pl.'s Mem.") at 2). Although he was appointed to the secretary executive position, plaintiff alleges that all of the executive positions were used interchangeably at Washington C.F. (*Id.*). Defendant Ryan Chadwick was the ILC staff advisor during all times relevant to the complaint. (Dkt. No. 25-3, Chadwick Decl. ¶ 3). Defendant Todd Terrio was Chadwick's supervisor. (Dkt. No. 25-4, Terrio Decl. ¶ 2).

**\*2** According to Washington C.F. internal policy, all proposed ILC agendas must be signed by the ILC chairman,

and then submitted to the ILC staff advisor for approval and signature before submission to the administration. (Terrio Decl. ¶¶ 8-9; Dkt. No. 25-2, Defs.' Statement of Material Facts ("SOMF") ¶ 9). This policy was instituted to eliminate safety and security concerns [1] . (Terrio Decl. ¶¶ 9-11). Plaintiff asserted that he had never seen such a written policy. (Pl.'s Reply to Defs.' SOMF ¶ 17, Dkt. No. 27 at 3). However, during his deposition, he acknowledged that, pursuant to the constitution and bylaws governing the ILC, ILC members are required to circulate proposed agenda to the staff advisor and not send them directly to the administration. (Pl.'s Dep. at 91, Dkt. No. 25-6 at 94). Plaintiff also acknowledged that the procedure relating to ILC agenda required that they be approved by staff advisor Chadwick before being circulated to the administration. (Pl.'s Dep. at 105, 114).

In or around November of 2020, staff advisor Chadwick alleges that he and supervisor Terrio met with plaintiff regarding an unapproved ILC agenda that plaintiff attempted to send directly to the administration. (Chadwick Decl. ¶ 9). During the meeting, Chadwick and Terrio advised plaintiff that he was prohibited from submitting any proposed ILC agendas directly to the facility administrative staff. (Id.). Plaintiff has acknowledged defendant Chadwick's deposition testimony with respect to this meeting and did not contradict it. (Pl.'s Reply to Defs.' SOMF ¶ 15, Dkt. No. 27 at 3) ("[I]n or around October or November of 2020, Mr. Chadwick and Mr. Terrio counseled Plaintiff, after they were notified by administration that Plaintiff attempted to submit an agenda to the Superintendent.... Mr. Chadwick also testified that he told plaintiff to stop writing to the Superintendent.")

Sometime in January 2021, there was an informal meeting between Chadwick, plaintiff, and another inmate in the recreation office, where a discussion about proposed ILC agenda items occurred. (Pl.'s Mem. at 3). Plaintiff typed up a written agenda per their discussion and, at defendant Chadwick's direction, submitted the agenda to Chadwick. (Pl.'s Mem. at 3; Chadwick Decl., Ex. E, 2/5/2021 Tier II Hearing Transcript, Dkt. No. 25-3 at 30-31; Pl.'s Dep. at 99-100). Plaintiff never received a response from Chadwick concerning the proposed ILC agenda. (Pl.'s Mem. at 3).

On January 24, 2021, because he had no response from defendant Chadwick, plaintiff sent, directly to multiple members of the administration, an altered version of the ILC agenda that he had previously submitted to defendant Chadwick. (Defs.' SOMF ¶ 13; Pl.'s Dep. at 91-92, 93). [2] After learning about the unapproved agenda, Chadwick and

Terrio met with plaintiff in the recreation office. (Defs.' SOMF ¶¶ 16-17; Terrio Decl. ¶ 18). During the meeting, Chadwick and Terrio allegedly threatened to issue plaintiff a misbehavior report if he didn't resign from the ILC (Compl., Dkt. No. 1 at 6). Plaintiff further alleges that Chadwick and Terrio stated "the administration was tired of [him] writing them about grievances and concerns and that [he] needed to sign off as an ILC rep." (Id.). Plaintiff responded that he has a "duty to bring these prison population issues to the Washington Correctional Facility Administration for consideration[,]" and refused to resign from the ILC. (Id.).

**\*3** On January 30, 2021, plaintiff was issued a misbehavior report, charging him with violating a direct order and improper facility correspondence. (Id.; Defs.' SOMF ¶ 20). On February 1, 2021, plaintiff filed a grievance for the misbehavior report and lack of ILC meetings. (Compl., Dkt. No. 1 at 7). [3] On February 5, 2021, a Tier II disciplinary hearing was conducted, and plaintiff was found guilty of the disciplinary charges, but the penalties were suspended. (Compl., Dkt. No. 1 at 6). On February 22, 2021, plaintiff inquired whether he was still a member of the ILC and defendant Chadwick advised him that, "per the Superintendent, Plaintiff was no longer a member of the ILC due to his receipt of a Tier II misbehavior report." (Defs.' SOMF ¶¶ 27-28). The only other sanction imposed on plaintiff was a reprimand. (Pl.'s Mem. at 12).

### DISCUSSION

### III. Retaliation

#### A. Legal Standards

To state a First Amendment claim of retaliation, an inmate must allege facts plausibly suggesting that (1) the speech or conduct at issue was protected, (2) the defendant took adverse action against the plaintiff, and (3) there was a causal connection between the protected conduct and the adverse action. ⚑ *Holland v. Goord*, 758 F.3d 215, 225 (2d Cir. 2014) (citations omitted). "Regardless of the presence of retaliatory motive, ... a defendant may be entitled to summary judgment if he can show ... that even without the improper motivation the alleged retaliatory action would have occurred." ⚑ *Scott v. Coughlin*, 344 F.3d 282, 287-88 (2d Cir. 2003) (citing ⚑ *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977)).

The court must keep in mind that claims of retaliation are "easily fabricated" and "pose a substantial risk of unwarranted judicial intrusion into matters of general prison administration." *Faulk v. Fisher*, 545 F. App'x 56, 58 (2d Cir. 2013) (quoting *Bennett v. Goord*, 343 F.3d 133, 137 (2d Cir. 2003)). In other words, we must examine prisoners' claims of retaliation with "skepticism and particular care." *Rivera v. Goord*, 119 F. Supp. 2d 327, 339 (S.D.N.Y. 2000) (quoting *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995), *abrogated on other grounds,* *Tangreti v. Bachmann*, 983 F.3d 609 (2d Cir. 2020)). Accordingly, a First Amendment retaliation claim must be supported by "specific and detailed factual allegations," and not stated in "wholly conclusory terms." *Dolan v. Connolly*, 794 F.3d 290, 295 (2d. Cir. 2015) (quoting *Flaherty v. Coughlin*, 713 F.2d 10, 13 (2d Cir. 1983), *overruled on other grounds,* *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002)).

### B. Analysis

Plaintiff contends that Chadwick and Terrio violated his First Amendment Rights by retaliating against him for "petition[ing] the government for redress of prison population grievances" through his submission of an ILC agenda directly to the administration. (Pl.'s Mem. at 6). Specifically, plaintiff claims that the defendants retaliated against him by filing a misbehavior report that caused him to be removed from the ILC dorm representative position for at least six months. (Compl., Dkt. No. 1 at 8; Chadwick Decl., Ex. G., Dkt. No. 25-3 at 53; Pl.'s Mem. at 4). [4] This court considers whether plaintiff has raised a question of material fact with respect to the elements of his retaliation claim.

First, the court must decide if plaintiff's conduct was constitutionally protected. Plaintiff argues the submission of an ILC agenda is analogous to the filing of a grievance because the ILC agenda essentially functions as a list of grievances from the prison population as a whole. (Pl.'s Mem. at 10). In *Webster v. Fischer*, the Second Circuit affirmed "the right[s] of an I.L.C. member to voice criticisms regarding prison conditions." *Webster v. Fischer*, 694 F. Supp. 2d 163, 183 (N.D.N.Y. 2010), *aff'd*, 398 F. App'x 683 (2d Cir. 2010). Similarly, in *Shaheen v. Filion*, the court held the "writing of articles critical of prison officials and his complaints to prison officials in his capacity as the chairman of the I.L.C. were clearly assertions of his constitutional rights protected by the First Amendment." *Shaheen v. Filion*, No. 9:04-CV-625 (FJS/

DRH), 2006 WL 2792739, at *3 (N.D.N.Y. Sept. 17, 2006) (citing *Simmat v. Manson*, 535 F. Supp. 1115, 1117-18 (D. Conn. 1982)).

**\*4** The defendants do not offer any arguments showing that plaintiff's conduct was not constitutionally protected, or distinguishing this case from *Webster* and *Shaheen*. (Dkt. No. 25-1, Defs.' Mem. at 8). However, it is clear from the record that plaintiff was not issued a misbehavior report because he voiced issues regarding the facility in an ILC-related meeting or in the proposed agenda that he submitted to defendant Chadwick for approval. He was sanctioned because, after a prior warning, he violated the required procedures of the ILC by circulating a revised agenda to the facility administration without prior approval of the staff advisor. This circumstance raises other issues with respect to the viability of plaintiff's retaliation claim on the merits, as well as with respect to qualified immunity, as discussed below.

With respect to the second prong of plaintiff's retaliation claim, an adverse action in the prison context is defined as one that would "deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights." *Davis v. Goord*, 320 F.3d 346, 353 (2d Cir. 2003). If the action would not deter an individual of ordinary firmness from making a complaint, the retaliatory act is de minimis and outside the realm of constitutional protection. *Id.* (quoting *Dawes v. Walker*, 239 F.3d 489, 493 (2001)).

On January 30, 2021, plaintiff was issued a misbehavior report charging him with violating a direct order and improper facility correspondence. (Chadwick Decl., Ex. D, Dkt. No. 25-3 at 20). The misbehavior report was signed by Chadwick and affirmed by Terrio. (*Id.*). The defendants specifically charged plaintiff with "attempt[ing] to submit a fraudulent agenda that was not approved by anyone...." and "submit[ing] this non-approved agenda to the administration with a fraudulent self-title of Vice-Chairman...." (*Id.*). On February 5, 2021, after the Tier II hearing, plaintiff was found guilty of both charges. (Chadwick Decl., Ex. E., Dkt. No. 25-3 at 48-49). He was sentenced to "counsel and reprimand, 15 days loss of recreation, packages, and commissary," but the sentence was suspended, and he ultimately received only a counsel and reprimand. (*Id.* at 48; Pl.'s Mem. at 12). Thereafter, Superintendent Tynon removed plaintiff from the ILC, for at least six months, because of the Tier II violation. (Defs.' SOMF ¶ 28; Dkt. No. 27-1 at 36).

The filing of a false misbehavior report that results in some form of more-than-de minimis sanction has been found sufficient to constitute adverse actions. *See, e.g., Reed v. Doe No. 1*, No. 9:11-CV-250 (TJM/DEP), 2012 WL 4486086, at *5 (N.D.N.Y. July 26, 2012) (finding that the "filing of a false misbehavior report can qualify as an adverse action for the purposes of a First Amendment retaliation" where the report resulted in a fourteen-day term in keeplock confinement), *report and recommendation adopted*, 2012 WL 4486085 (N.D.N.Y. Sept. 27, 2012); *Tafari v. McCarthy*, 714 F. Supp. 2d 317, 373 (N.D.N.Y. 2010) (finding that a misbehavior report that resulted in SHU confinement constituted an adverse action). However, the mere filing of a misbehavior report alone, without evidence of other repercussions, does not constitute an adverse action. *Bartley v. Collins*, No. 95 Civ. 10161, 2006 WL 1289256, at *7 (S.D.N.Y. May 10, 2006) (finding a misbehavior report that resulted in plaintiff's temporary loss of privileges did not amount to adverse action but a misbehavior report that resulted in keeplock confinement for ten days did). "Typically, courts require a showing of additional punishment above the filing of a misbehavior report to find an adverse action." *Vidal v. Valentin*, No. 16-CV-5745, 2019 WL 3219442, at *8 (S.D.N.Y. July 17, 2019); *see also Flynn v. Ward*, No. 15-CV-1028 (TJM/CFH), 2018 WL 3195095, at *10-11 (N.D.N.Y. June 7, 2018), *report and recommendation adopted*, 2018 WL 3193201 (N.D.N.Y. June 28, 2018).

**\*5** Plaintiff was found guilty of the disciplinary charges and the facility Superintendent removed plaintiff from the ILC for at least six months, as a result of the Tier II ticket. Because plaintiff's retaliation claim is subject to dismissal on summary judgment for other reasons, the court does not need to address whether this could qualify as an adverse action for the purposes of a retaliation claim.

With respect to the third prong, plaintiff must raise a material question of fact as to the existence of an adequate causal connection between any protected conduct and any subsequent adverse action. However, defendants have established, and defendant has not specifically rebutted, that the misbehavior report was issued based on plaintiff's violation of a facility policy prohibiting him from submitting a proposed agenda directly to the administration. (Defs.' SOMF ¶¶ 14-20; Chadwick Decl. ¶¶ 9-16, Ex. D).[5] In his description of the incident in the misbehavior report, Chadwick emphasizes that "[i]nmate Woods is not fit to be an ILC member, as he has proven he is deceptive, fraudulent, and

not fit to represent the inmate population." (Chadwick Decl., Ex. D, Dkt. No. 25-3 at 20).

It is well-settled that, even where plaintiff can make a showing of retaliatory motive, the defendant may be entitled to summary judgment if he can show that the alleged adverse action would have occurred even in the absence of the improper motivation. *Greer v. Mehiel*, 805 F. App'x 25, 29 (2d Cir. 2020), *cert. denied*, 141 S. Ct. 136 (2020), *reh'g denied*, 141 S. Ct. 217 (2020) (citing *Scott v. Coughlin*, 344 F.3d at 287-88) ("[A] defendant may be entitled to summary judgment if he can show dual motivation, i.e., that even without the improper motivation the alleged retaliatory action would have occurred.") (citing *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. at 287). The defendant bears the burden of making the showing that he would have taken exactly the same action in the absence of an improper motive. *Greer*, 805 F. App'x at 29 (citing *Scott*, 344 F.3d at 288).

In this case, although plaintiff alleges that the misbehavior report was issued in retaliation for protected conduct, he acknowledged that he was required, as part of the ILC's rules and procedures, to send the proposed ILC agenda to defendant Chadwick, not directly to the administration. (Pl.'s Dep. at 105). Plaintiff acknowledges that he sent a proposed agenda directly to the administration in violation of the established rules and procedures, even if he contends that he "did what [he] felt was right." Thus, it is clear that plaintiff would have been subjected to discipline for violating the facility policy and direct order, whether or not the defendants harbored a retaliatory motive. Because it is beyond dispute that plaintiff's discipline for circulating the proposed ILC agenda would have been pursued and imposed even in the absence of any retaliatory motive, summary judgment on his retaliation claim should be granted. *See, e.g., Stevens v. Duquette*, No. 9:20-CV-853 (BKS/ATB), 2022 WL 2292975, at *8 (N.D.N.Y. Apr. 19, 2022) (plaintiff admitted to refusing to follow a direct order from C.O. Miller; "[t]hus, defendants have established a non-retaliatory reason for C.O. Miller's filing of the subject misbehavior report, and dismissal [of the retaliation claim] is further warranted on this basis"), *report and recommendation adopted*, 2022 WL 2292047 (N.D.N.Y. June 24, 2022); *Logan v. Graham*, No. 9:18-CV-0291 (DNH/ML), 2019 WL 8015209, at *14 (N.D.N.Y. Nov. 26, 2019), *report and recommendation adopted*, 2020 WL 871197 (N.D.N.Y. Feb. 21, 2020) (defendants established non-retaliatory reason for the filing of the underlying misbehavior report where plaintiff admitted to some of the allegations

against him) (collecting cases); *Osborn v. Harris*, No. 9:20-CV-673 (TJM/ATB), 2022 WL 4124423, at *11 (N.D.N.Y. Aug. 2, 2022) (plaintiff acknowledges that he openly violated the rule against sharing food with other inmates; thus "[a]ny reasonable fact finder would necessarily conclude, based on the admissible evidence, that the disciplinary actions against plaintiff would have been initiated by the other officers regardless of whether anyone harbored some retaliatory intent"), *report and recommendation adopted*, 2022 WL 4120257 (N.D.N.Y. Sept. 9, 2022).

### IV. Qualified Immunity

**\*6** Although this court has concluded that plaintiff's retaliation claims should be dismissed on summary judgment on the merits, the court will examine alternative grounds for dismissal based on qualified immunity. For the reasons stated below, this court recommends that the named defendants also be granted summary judgment on qualified immunity grounds.

#### A. Legal Standards

The doctrine of qualified immunity generally protects governmental officials from civil liability "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). In determining if a particular right was clearly established, the court "looks to whether (1) it was defined with reasonable clarity, (2) the Supreme Court or the Second Circuit has confirmed the existence of the right, and (3) a reasonable defendant would have understood that his conduct was unlawful." *K.D. ex rel. Duncan v. White Plains School Dist.*, No. 11 Civ. 6756, 2013 WL 440556, at *10 (S.D.N.Y. Feb. 5, 2013) (citing *Doninger v. Niehoff*, 642 F.3d 334, 345 (2d Cir. 2011)). The court must ask whether the right at issue was established " 'in a particularized sense so that the contours of the right [were] clear to a reasonable official' " in light of the specific context of the case, "not as a broad general proposition." *Id.* (citing, *inter alia,* *Reichle v. Howards*, 566 U.S. 658, 665 (2012)).

A case directly on point is not required, and the question is not whether an attorney would learn about the right from researching case law, but whether existing precedent has "placed the statutory or constitutional question beyond debate." *Id.* (citing, *inter alia,* *Fabrikant v. French*, 691

F.3d 193, 213 (2d Cir. 2012)). Only Supreme Court and Second Circuit precedent, existing at the time of the alleged violation, are relevant in deciding whether the right is well established. *Moore v. Vega*, 371 F.3d 110, 114 (2d Cir. 2004).

A government actor is entitled to qualified immunity from Section 1983 suits "if either '(a) the defendant's action did not violate clearly established law, or (b) it was objectively reasonable for the defendant to believe that his action did not violate such law.' " *Johnson v. Newburgh Enlarged Sch. Dist.*, 239 F.3d 246, 250 (2d Cir. 2001) (citing *Salim v. Proulx*, 93 F.3d 86, 89 (2d Cir. 1996)). Thus, even if the constitutional privileges were clearly established, a government actor may still be shielded by qualified immunity "if it was objectively reasonable for the public official to believe that his acts did not violate those rights." *Kaminsky v. Rosenblum*, 929 F.2d 922, 925 (2d Cir. 1991).

#### B. Analysis

In the instant case, the right at issue is not a prisoner's First Amendment right to pursue grievances on behalf of other inmates in his capacity as member of the ILC, which the Second Circuit recognized in 2015. *See Dolan v. Connolly*, 794 F.3d 290, 295 (2d Cir. 2015) ("[W]e now hold that retaliation against a prisoner for filing or voicing grievances on behalf of a prison population as a member of an inmate grievance body, such as the ILC, 'violates the right to petition government for the redress of grievances guaranteed by the First and Fourteenth Amendments.' ") (citation omitted). Instead, the issue is whether, at the time of defendants' challenged conduct, precedent from the Supreme Court or the Second Circuit put prison officials on notice that they could not punish an inmate representative on the ILC for violating a facility policy, established based on safety and security concerns, that forbid submission of an unapproved ILC agenda directly to the facility administration. *See Bacon v. Phelps*, 961 F.3d 533, 545 (2d Cir. 2020) ("The Supreme Court repeatedly has instructed that courts must not define clearly established law at 'a high level of generality.' ") (citing, inter alia, *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011)).

**\*7** It was clearly established at the time of the alleged violation that some actions taken by an ILC member constitute constitutionally protected conduct. *See, e.g., Dolan*

*v. Connolly*, 794 F.3d at 295; *Webster v. Fischer*, 694 F. Supp. 2d 163, 183 ("voic[ing] criticisms regarding prison conditions" as an ILC member is a clearly established constitutional right). However, it was not clear from Supreme Court or Second Circuit authority whether the circulation of an ILC agenda, in contravention of a known prison policy requiring that the document first be approved by the ILC staff advisor, was constitutionally protected. Therefore, the prison officials at Washington C.F. were not put on notice that punishing plaintiff for his conduct violated his constitutional rights. *Cf.* 🚩 *Bacon v. Phelps*, 961 F.3d at 545. [6]

A grant of qualified immunity to the named defendants is further warranted by the fact that they were applying a facility policy, and that it was the prison Superintendent who ultimately determined what sanction would be imposed upon plaintiff for his violation of that policy. "When officials follow an established prison policy ... their entitlement to qualified immunity depends on whether a reasonable officer might have believed that the challenged order was lawful in light of legitimate penological interests supporting the directive." 🚩 *Barnes v. Furman*, 629 F. App'x 52, 57 (2d Cir. 2015) (quotation marks omitted). To this end, it is well settled that prison safety and security are legitimate penological interests. *Smith v. Artus*, No. 9:07-CV-1150 (NAM/ATB), 2015 WL 9413128, at *10 (N.D.N.Y. Dec. 22, 2015). As discussed above, the policy in question was established based on safety and security concerns triggered by a former ILC member's abuses relating to the circulation of an unapproved agenda.

Based on the record in this case, a reasonable fact finder would necessarily conclude that it was objectively reasonable for the two named defendants to believe that they were not violating plaintiff's First Amendment rights by enforcing the facility policy relating to ILC agendas. [7]

**\*8 WHEREFORE**, based on the findings above, it is

**RECOMMENDED**, that defendants' motion for summary judgment (Dkt. No. 25) be **GRANTED**, and the sole remaining retaliation claim in plaintiff's complaint be **DISMISSED**.

Pursuant to 🚩 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen (14) days within which to file written objections to the foregoing report. These objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** 🚩 *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993) (citing 🚩 *Small v. Sec'y of Health & Hum. Servs.*, 892 F.2d 15 (2d Cir. 1989)); 🚩 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72.

**All Citations**

Slip Copy, 2023 WL 2864805

## Footnotes

1    The policy was instituted after a prior ILC dorm representative submitted, directly to the administration, an ILC agenda that contained threats to a staff member. (Terrio Decl. ¶ 10).

2    The agenda sent to the administration added additional agenda items not included in the proposed agenda sent to staff advisor Chadwick, including a request for a fundraiser for the Rastafarian and Nation of Islam groups. (Pl.'s Ex. N, Dkt. No. 27-1 at 20, 22). It also included a request for the addition of the BET, Bravo, and A&E channels to the recreation room televisions. (*Id.*). This agenda also removed the requests for the purchase of new board games and the reopening of the gym. (*Id.*).

3    Plaintiff subsequently completed the process to exhaust his administrative remedies regarding his retaliation claim. (Compl., Dkt. No. 1 at 7-8).

4    Plaintiff alleges that he has "never had any serious disciplinary (action) while in DOCCS care, custody, and control[,]" and the defendants have not offered any evidence to the contrary. (Pl.'s Mem. at 11).

5    Prior to filing the misbehavior report, Chadwick and Terrio gave plaintiff the option to resign from the ILC instead of receiving a misbehavior report. (Defs.' SOMF ¶¶ 17, 19; Chadwick Decl. ¶ 13; Terrio Decl. ¶ 19).

6    The Second Circuit in *Bacon* demonstrated that the determination of whether a right is well-established must be examined at a level of specificity tailored to the issue in the particular case:

> In this case, the right at issue is not the general proposition that a prisoner has a First Amendment right to send mail and cannot be punished for its contents.... Instead, the issue is whether, at the time Bacon sent a letter to a third party expressing his desire for a woman later identified as a female correctional officer, precedent from the Supreme Court or this court put prison officials on notice that they could not punish him for his statements in that correspondence. It did not. The right therefore was not "clearly established" and the defendants hence are entitled to qualified immunity.

*Id.* (citations omitted).

7    The court acknowledges that the Second Circuit has cast some doubt about the applicability of qualified immunity to First Amendment retaliation claims when the defense is based on whether it was objectively reasonable for a defendant to believe that his actions did not violate clearly established law. *See* ⚑ *Washington v. Gonyea*, 538 F. App'x 23, 27 (2d Cir. 2013). The Second Circuit reasoned that retaliation claims explicitly require an improper retaliatory motive on the part of the defendant, and "where a more specific intent is actually an element of the plaintiff's claim as defined by clearly established law, it can never be objectively reasonable for a government official to act with the intent that is prohibited by law." *Id.* (quoting ⚑ *Locurto v. Safir*, 264 F.3d 154, 169 (2d Cir. 2001)) ("A plaintiff need only show particularized evidence of direct or circumstantial facts supporting his claim of unconstitutional motive in order to survive a motion for summary judgment on the defense of qualified immunity.") In finding the defendants are entitled to qualified immunity in this case, this court has relied, primarily, on the conclusion that they did not violate clearly established law, not on the alternative objectively-reasonable-belief prong, to which *Locurto* and its progeny apply. In any event, in this case, unlike in *Locurto* and *Washington v. Gonyea*, there is no dispute of fact that is material to the issue of whether it was objectively reasonable for the named defendants to believe that their conduct did not violate plaintiff's constitutional rights. All of the relevant facts–the existence of the facility policy requiring staff approval for circulation of an ILC calendar, the safety and security concerns that motivated that policy, and the fact that plaintiff violated the established rules and procedures–were not disputed. Whether plaintiff's First Amendment rights were violated turns on whether or not his conduct constituted protected speech, which, in this case, is also a legal issue that does not turn on a disputed issue of fact. If the defendants reasonably believed that plaintiff's conduct was not protected by the First Amendment, their pursuit of disciplinary charges against him could not be the result of an unconstitutional motivation. Because there is no disputed issue of fact material to whether defendants harbored a retaliatory motive, a grant of summary judgment on the objectively-reasonable-belief prong of the qualified immunity defense would also be warranted.

**End of Document**                                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW    © 2023 Thomson Reuters. No claim to original U.S. Government Works.    7

2023 WL 2568890
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Joseph WOODS, Plaintiff,

v.

Mr. CHADWICK, I.L.C., Staff Advisor,
Washington Corr. Fac.; and Mr. Terrio, Special
Events; Washington Corr. Fac., Defendants.

9:21-CV-0662 (GTS/ATB)
|
Signed March 20, 2023

**Attorneys and Law Firms**

JOSEPH WOODS, Plaintiff, Pro Se, 54 Lark Drive, Albany,
New York 12210.

HON. LETITIA A. JAMES, Attorney General for the State
of New York, RACHEL OUIMET, ESQ., Assistant U.S.
Attorney, Counsel for Defendants, The Capitol, Albany, New
York 12224.

**DECISION and ORDER**

GLENN T. SUDDABY, United States District Judge

 **\*1**  Currently before the Court, in this *pro se* prisoner civil
rights action filed by Joseph Woods ("Plaintiff") against
the two above-captioned employees of the New York State
Department of Corrections and Community Supervision
("Defendants") pursuant to 42 U.S.C. § 1983, are (1)
United States Magistrate Judge Andrew T. Baxter's Report-
Recommendation recommending that Defendants' motion for
summary judgment be granted and that Plaintiff's Complaint
be dismissed, and (2) Plaintiff's Objections to the Report-
Recommendation. (Dkt. Nos. 30, 32.) For the reasons set forth
below, the Report-Recommendation is accepted and adopted
in its entirety.

## I. RELEVANT BACKGROUND

### A. Magistrate Judge Baxter's Report-
### Recommendation
Generally in his Report-Recommendation, Magistrate Judge
Baxter rendered the following two findings of fact and

conclusions of law: (1) as a threshold matter, Plaintiff's First
Amendment retaliation claim should be dismissed on the
merits, because (a) the activity at which the misbehavior
report was directed was not the proposed agenda that Plaintiff
had submitted to Defendant Chadwick for approval or the
facility issues that he had voiced in an ILC-related meeting
but the revised agenda that he had circulated to the facility
administration without prior approval of the staff advisor,
which is not protected activity, and (b) in any event, no
admissible record evidence exists from which a rational fact-
finder could conclude the misbehavior report was issued
based on Plaintiff's engaging in protected activity (as opposed
to his violating a facility policy prohibiting him from
submitting a proposed agenda directly to the administration
without pre-approval); and (2) even setting aside the above-
described ground for dismissal, Defendants are protected
from liability as a matter of law with regard to Plaintiff's
First Amendment retaliation claim based on the doctrine of
qualified immunity, because a reasonable fact-finder would
necessarily conclude that it was objectively reasonable for
Defendants to believe that they were not violating Plaintiff's
First Amendment rights by enforcing the facility policy
relating to ILC agendas. (Dkt. No. 30, at Parts III-IV.)

### B. Plaintiff's Objections to the Report-
### Recommendation
Generally, in his Objection, Plaintiff asserts four specific
arguments for why his First Amendment retaliation claim
should not be dismissed: (1) Defendant Chadwick has
not substantiated his assertion that Plaintiff had submitted
unapproved agendas to the administration more than once;
(2) Defendant Chadwick's declaration reveals that the
administration was not holding monthly meetings to address
prison-population problems as required, which precludes
Plaintiff from being punished for submitted unapproved
agendas; (3) the record lacks evidence that Plaintiff ever
violated a direct order, or had been issued multiple direct
orders; and (4) the ILC Policy relied on by Defendants
(requiring pre-approval of agendas) does not apply to
Plaintiff, because it predates his arrival at the facility, does not
name him, and does not contain his signature. (Dkt. No. 32.)

## II. STANDARD OF REVIEW
 **\*2**  When a *specific* objection is made to a portion
of a magistrate judge's report-recommendation, the Court
subjects that portion of the report-recommendation to a
*de novo* review. Fed. R. Civ. P. 72(b)(2); 28 U.S.C. §

636(b)(1)(C). To be "specific," the objection must, with particularity, "identify [1] the portions of the proposed findings, recommendations, or report to which it has an objection and [2] the basis for the objection." N.D.N.Y. L.R. 72.1(c). [1] When performing such a *de novo* review, "[t]he judge may ... receive further evidence...." 28 U.S.C. § 636(b)(1). However, a district court will ordinarily refuse to consider evidentiary material that could have been, but was not, presented to the magistrate judge in the first instance. [2] Similarly, a district court will ordinarily refuse to consider argument that could have been, but was not, presented to the magistrate judge in the first instance. *See Zhao v. State Univ. of N.Y.*, 04-CV-0210, 2011 WL 3610717, at *1 (E.D.N.Y. Aug. 15, 2011) ("[I]t is established law that a district judge will not consider new arguments raised in objections to a magistrate judge's report and recommendation that could have been raised before the magistrate but were not.") (internal quotation marks and citation omitted); *Hubbard v. Kelley*, 752 F. Supp.2d 311, 312-13 (W.D.N.Y. 2009) ("In this circuit, it is established law that a district judge will not consider new arguments raised in objections to a magistrate judge's report and recommendation that could have been raised before the magistrate but were not.") (internal quotation marks omitted).

When only a *general* objection is made to a portion of a magistrate judge's report-recommendation, the Court subjects that portion of the report-recommendation to only a *clear error* review. Fed. R. Civ. P. 72(b)(2),(3); Fed. R. Civ. P. 72(b), Advisory Committee Notes: 1983 Addition; *see also Brown v. Peters*, 95-CV-1641, 1997 WL 599355, at *2-3 (N.D.N.Y. Sept. 22, 1997) (Pooler, J.) [collecting cases], *aff'd without opinion*, 175 F.3d 1007 (2d Cir. 1999). Similarly, when an objection merely reiterates the *same arguments* made by the objecting party in its original papers submitted to the magistrate judge, the Court subjects that portion of the report-recommendation challenged by those arguments to only a *clear error* review. [3] Finally, when *no* objection is made to a portion of a report-recommendation, the Court subjects that portion of the report-recommendation to only a *clear error* review. Fed. R. Civ. P. 72(b), Advisory Committee Notes: 1983 Addition. When performing such a "clear error" review, "the court need only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation." *Id.* [4]

**\*3** After conducting the appropriate review, the Court may "accept, reject, or modify, in whole or in part, the findings

or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1)(C).

### III. ANALYSIS

After carefully reviewing the relevant papers herein, including Magistrate Judge Baxter's thorough Report-Recommendation, the Court can find no error in the Report-Recommendation: Magistrate Judge Baxter employed the proper standards, accurately recited the facts, and reasonably applied the law to those facts. As a result, the Report-Recommendation is accepted and adopted in its entirety for the reasons set forth therein. To those reasons, the Court adds the following analysis.

To the extent that Plaintiff's Objections assert specific challenges to the Report-Recommendation, the Court finds they merely repeat arguments presented in his response to Defendants' motion for summary judgment. (*Compare* Dkt. No. 32, at Points 2-6, 8, and 9 *with* Dkt. No. 27, Attach. 2, at Point I.) As a result, the Court finds that the "challenged" portions of the Report-Recommendation warrant only a clear-error review. *See, supra*, Part II of this Decision and Order. The Court finds they survive that review. In any event, even if the Court were to find that Plaintiff's arguments did not merely reiterate arguments presented in his response, the Court would find that they survive a *de novo* review.

With respect to Plaintiff's first argument (that Defendant Chadwick has not substantiated his assertion that Plaintiff had submitted unapproved agendas to the administration more than once), the Court finds that Paragraph 22 of Defendant Chadwick's declaration appears to provide such evidence. (Dkt. No. 25, Attach. 3, at ¶ 22.)

With respect to Plaintiff's second argument (that Defendant Chadwick's declaration reveals that the administration was not holding monthly meetings to address prison-population problems as required), the Court is not persuaded that any such failure to hold monthly meetings (if it were established) would preclude Plaintiff from being able to be punished for submitted unapproved agendas.

With respect to Plaintiff's third argument (that the record lacks evidence that Plaintiff ever violated a direct order, or had been issued multiple direct orders), the Court finds that it appears undisputed that Plaintiff sustained a disciplinary conviction that was not reversed on appeal; and the issue of whether

Plaintiff violated multiple direct orders or only one (for which discipline was warranted) appears to be of little materiality.

Finally, with respect to Plaintiff's fourth argument (that the ILC Policy relied on by Defendants does not apply to Plaintiff, because it predates his arrival at the facility, does not name him, and does not contain his signature), the Court finds that the reasons offered by Plaintiff do not render the ILC policy inapplicable to him.

**ACCORDINGLY**, it is

**ORDERED** that Magistrate Baxter's Report-Recommendation (Dkt. No. 30) is **ACCEPTED** and **ADOPTED** in its entirety; and it is further

**ORDERED** that Defendants' motion for summary judgment (Dkt. No. 25) is **GRANTED**; and it is further

**ORDERED** that Plaintiff's Complaint (Dkt. No. 1) is **DISMISSED**.

**All Citations**

Slip Copy, 2023 WL 2568890

---

## Footnotes

1    *See also* ⚑ *Mario v. P & C Food Markets, Inc.*, 313 F.3d 758, 766 (2d Cir. 2002) ("Although Mario filed objections to the magistrate's report and recommendation, the statement with respect to his Title VII claim was not specific enough to preserve this claim for review. The only reference made to the Title VII claim was one sentence on the last page of his objections, where he stated that it was error to deny his motion on the Title VII claim '[f]or the reasons set forth in Plaintiff's Memorandum of Law in Support of Motion for Partial Summary Judgment.' This bare statement, devoid of any reference to specific findings or recommendations to which he objected and why, and unsupported by legal authority, was not sufficient to preserve the Title VII claim.").

2    *See* ⚑ *Paddington Partners v. Bouchard*, 34 F.3d 1132, 1137-38 (2d Cir. 1994) ("In objecting to a magistrate's report before the district court, a party has no right to present further testimony when it offers no justification for not offering the testimony at the hearing before the magistrate.") [internal quotation marks and citations omitted]; ⚑ *Pan Am. World Airways, Inc. v. Int'l Bhd. of Teamsters*, 894 F.2d 36, 40, n.3 (2d Cir. 1990) (finding that district court did not abuse its discretion in denying plaintiff's request to present additional testimony where plaintiff "offered no justification for not offering the testimony at the hearing before the magistrate"); *cf.* ⚑ *U. S. v. Raddatz*, 447 U.S. 667, 676, n.3 (1980) ("We conclude that to construe ⚑ § 636(b)(1) to require the district court to conduct a second hearing whenever either party objected to the magistrate's credibility findings would largely frustrate the plain objective of Congress to alleviate the increasing congestion of litigation in the district courts."); Fed. R. Civ. P. 72(b), Advisory Committee Notes: 1983 Addition ("The term 'de novo' does not indicate that a secondary evidentiary hearing is required.").

3    *See* ⚑ *Mario*, 313 F.3d at 766 ("Merely referring the court to previously filed papers or arguments does not constitute an adequate objection under either Fed. R. Civ. P. 72(b) or Local Civil Rule 72.3(a)(3)."); ⚠ *Camardo v. Gen. Motors Hourly-Rate Emp. Pension Plan*, 806 F. Supp. 380, 382 (W.D.N.Y. 1992) (explaining that court need not consider objections that merely constitute a "rehashing" of the same arguments and positions taken in original papers submitted to the magistrate judge); *accord, Praileau v. Cnty. of Schenectady*, 09-CV-0924, 2010 WL 3761902, at *1, n.1 (N.D.N.Y. Sept. 20, 2010) (McAvoy, J.); *Hickman*

*ex rel. M.A.H. v. Astrue*, 07-CV-1077, 2010 WL 2985968, at *3 & n.3 (N.D.N.Y. July 27, 2010) (Mordue, C.J.); *Almonte v. N.Y.S. Div. of Parole*, 04-CV-0484, 2006 WL 149049, at *4 (N.D.N.Y. Jan. 18, 2006) (Sharpe, J.).

4     *See also Batista v. Walker*, 94-CV-2826, 1995 WL 453299, at *1 (S.D.N.Y. July 31, 1995) (Sotomayor, J.) ("I am permitted to adopt those sections of [a magistrate judge's] report to which no specific objection is made, so long as those sections are not facially erroneous.") (internal quotation marks and citations omitted).

---

**End of Document**

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

---

Case 9:22-cv-00102-BKS-ML    Document 78    Filed 12/13/23    Page 248 of 373

Logan v. Graham, Not Reported in Fed. Supp. (2019)

2019 WL 8015209
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Seth LOGAN, Plaintiff,

v.

Superintendent GRAHAM, Auburn Correctional
Facility; C.O. Pflueger, Auburn Correctional
Facility; Officer Scott Jones, Auburn Correctional
Facility, formerly known as C.O. Smith; and C.O.
M. Gould, Auburn Correctional Facility, Defendants.

9:18-CV-0291 (DNH/ML)
|
Signed 11/26/2019

**Attorneys and Law Firms**

SETH LOGAN, Plaintiff, Pro Se, 117 Avery Avenue, Buffalo,
New York 14210.

LETITIA A. JAMES, OF COUNSEL: AIMEE COWAN,
ESQ., Assistant Attorney General, Attorney General for the
State of New York, Counsel for Defendants, 300 South State
Street, Suite 300, Syracuse, New York 13202.

**REPORT-RECOMMENDATION**

MIROSLAV LOVRIC, United States Magistrate Judge

 **\*1** This matter has been referred to me for a Report and
Recommendation by the Honorable David N. Hurd, United
States District Judge. Currently before the Court, in this
civil rights action filed by Seth Logan ("Plaintiff") against
Superintendent Graham, Auburn Correctional Facility, C.O.
Pflueger, [1] Auburn Correctional Facility, Officer Scott
Jones, Auburn Correctional Facility, formerly known as
C.O. Smith, and C.O. M. Gould, Auburn Correctional
Facility (collectively "Defendants"), is Defendants' motion
for summary judgment pursuant to Fed. R. Civ. P. 56. (Dkt.
No. 28). For the reasons set forth below, I recommend that
Defendants' motion be granted in part and denied in part.

**TABLE OF CONTENTS**

I. RELEVANT BACKGROUND...——
A. Plaintiff's Claims...——

B. Procedural History...——

C. Statement of Undisputed Material Facts...——

D. Parties' Briefing on Defendants' Motion for Summary
Judgment...——

II. RELEVANT LEGAL STANDARDS...——
A. Standard Governing a Motion for Summary
Judgment...——

B. Standard Governing Exhaustion of Administrative
Remedies...——

III. ANALYSIS...——
A. Plaintiff's Failure to Oppose the Merits of Defendants'
Summary Judgment Motion...——

B. Exhaustion of Grievances AUB-67199-15 and
AUB-67567-15...——

C. Whether Plaintiff's First Amendment Retaliation
Claims Should Nevertheless be Dismissed...——

D. Doctrine of Qualified Immunity...——

**I. RELEVANT BACKGROUND**

 **A. Plaintiff's Claims**
Generally, liberally construed, Plaintiff's Complaint asserts
claims of retaliation against Defendants in violation of the
First Amendment. (Dkt. No. 1; Dkt. No. 6.) The Court's
Decision and Order dated May 4, 2018, thoroughly outlines
Plaintiff's allegations and claims. (Dkt. No. 6.)

 **B. Procedural History**
On March 8, 2018, Plaintiff commenced this action by filing
a verified Complaint against Defendants, Lieutenant Vasill,
and Lieutenant Abate (Dkt. No. 1) together with a motion
for leave to proceed *in forma pauperis* (Dkt. No. 2). On
May 4, 2018, the Court granted Plaintiff's motion to proceed
*in forma pauperis*. (Dkt. No. 6.) In addition, the Court
ordered that Plaintiff's retaliation claims against Defendants
survive *sua sponte* review, but the Court dismissed Plaintiff's
remaining claims including those against Lieutenant Vasill
and Lieutenant Abate. (*Id.*)

Case 9:22-cv-00102-BKS-ML    Document 78    Filed 12/13/23    Page 249 of 373

Logan v. Graham, Not Reported in Fed. Supp. (2019)

On January 25, 2019, Defendants filed a letter motion requesting dismissal for failure to prosecute. (Dkt. No. 27.) On March 6, 2019, Defendants filed a motion for summary judgment pursuant to Fed. R. Civ. P. 56 and a motion to dismiss for lack of prosecution. (Dkt. No. 28.) These motions were referred to United Stated Magistrate Judge David E. Peebles for a Report and Recommendation. On March 27, 2019, Magistrate Judge Peebles issued a Report and Recommendation, which recommended that (1) the Complaint be dismissed based on Plaintiff's failure to prosecute and to comply with the Court's orders and local rules of practice, and (2) that Defendants' motion for summary judgment be denied as moot. (Dkt. No. 30.) On April 15, 2019, Plaintiff filed a change of address with the Court. (Dkt. No. 32.) As a result, on April 15, 2019, United States District Judge David N. Hurd *sua sponte* granted an extension of time to file objections to United Stated Magistrate Judge David E. Peebles's Report-Recommendation of March 27, 2019. (Dkt. No. 33.) Plaintiff did not file any objections to the Report-Recommendation dated March 27, 2019. (*See generally* Docket Sheet.)

**\*2** On July 3, 2019, the Court denied Defendants' motion to dismiss and referred to me for consideration of Defendants' motion for summary judgment. (Dkt. No. 35.) On July 3, 2019, Plaintiff was provided another opportunity to oppose Defendants' motion with a response due by August 20, 2019, and a reply due by August 26, 2019. (*See* text notice dated 7/3/19.) On September 9, 2019, the Court issued a text order granting Plaintiff yet another opportunity to oppose Defendants' motion with a deadline of September 30, 2019. (Dkt. No. 37.)

On October 1, 2019, Plaintiff filed a response in opposition to Defendants' motion. (Dkt. No. 39.)

### C. Statement of Undisputed Material Facts

Unless otherwise noted, the following facts were asserted and supported by Defendants in their Rule 7.1 Statement and not denied by Plaintiff in a Rule 7.1 Response. (*Compare* Dkt. No. 28, Attach. 1 [Defs.' Rule 7.1 Statement] *with* Dkt. No. 39 [Pl.'s Response].)

1. Plaintiff was convicted in 2009 of Attempted Assault in the First and Second Degree.

2. All claims in this matter arose out of Plaintiff's confinement at Auburn Correctional Facility ("Auburn"), as a result of his felony convictions in 2009.

3. Plaintiff was released from prison to the Division of Parole on January 7, 2019. [2]

4. In his Complaint, Plaintiff claims that on May 9, 2015, Defendant Pflueger stopped Plaintiff in the Auburn recreation yard, accused Plaintiff of being a white supremacist and stated that he would be searching Plaintiff's cell for gang material.

5. Plaintiff alleges that the next day, on May 10, 2015, Defendant Pflueger threatened him while Plaintiff was exiting his cell, stating that Plaintiff "ain't gonna be around here for long. They're gonna get you. We're not sure how yet or for what, but it's gonna happen."

6. According to Plaintiff, Defendant Pflueger did not make any specific threats about anything that he specifically was going to do to Plaintiff.

7. Plaintiff filed a grievance on May 10, 2015, complaining about the alleged incident of May 9, 2015.

8. Defendant Pflueger responded to the grievance by memo and stated that he stopped Plaintiff in the yard on May 9, 2015 after observing tattoos that could be interpreted as gang affiliation tattoos.

9. Defendant Pflueger stated that he passed the information on to the Early Warning Box—which is an avenue to convey information to Auburn Correctional Facility's intelligence unit—and denied threatening or harassing Plaintiff in any way.

**\*3** 10. Plaintiff alleges that over a month later, on June 17, 2015, Defendant Pflueger fired Plaintiff from his job as a feed up porter.

11. Plaintiff was employed as a feed up porter at Auburn for approximately one month until he was terminated on June 17, 2015.

12. A feed up porter's duties include retrieving food trays from the mess hall and feeding inmates who are confined to their cell for disciplinary reasons.

Case 9:22-cv-00102-BKS-ML    Document 78    Filed 12/13/23    Page 250 of 373

Logan v. Graham, Not Reported in Fed. Supp. (2019)

13. On the morning of June 17, 2015, Defendant Pflueger witnessed Plaintiff pass an unidentified item into the cell of another inmate.

14. Defendant Pflueger ordered Plaintiff to return to his cell.

15. Plaintiff yelled profanities as he went back to his cell.

16. While in his cell, Plaintiff yelled "that faggot motherfucker fired me."

17. Plaintiff shouted these profanities loud enough to communicate with another inmate on a different floor.

18. Plaintiff alleges that Defendant Pflueger fired him as a feed up porter in retaliation for the grievance that Plaintiff filed dated May 10, 2015.

19. Plaintiff's only basis for this belief is that there was "no other reason" for Defendant Pflueger to fire him.

20. Based on Plaintiff's behavior on the morning of June 17, 2015, Defendant Pflueger authored a misbehavior report dated June 17, 2015, that charged Plaintiff with several DOCCS Directive violations including disobeying a direct order, creating a disturbance, harassment, and making threats.

21. Defendant Correction Officer Scott Jones endorsed the misbehavior report as a witness to a portion of these events.

22. At the time Defendant Jones endorsed the misbehavior report dated June 17, 2015, he had no knowledge that Plaintiff had filed a grievance against Defendant Pflueger on May 10, 2015.

23. Plaintiff testified that he had never interacted with Defendant Jones before this incident on June 17, 2015.

24. Plaintiff testified that he had no basis to believe that at the time Defendant Jones endorsed the misbehavior report, Defendant Jones knew that Plaintiff had filed any grievances against Defendant Pflueger.

25. Plaintiff filed a grievance regarding the incident on June 17, 2015, but that grievance was denied.

26. Defendant Pflueger was never counseled or disciplined as a result of the incident on June 17, 2015.

27. As a result of the misbehavior report dated June 17, 2015, Plaintiff was found guilty of all charges at a disciplinary hearing and sentenced to 30 days of keep-lock confinement.

28. Plaintiff filed another grievance dated July 21, 2015, which alleged that on July 8, 2015, he received a false report authored by Defendant Correction Officer Mark Gould in which, Defendant Gould recommended Plaintiff be placed in administrative segregation.

29. Defendant Gould recommended that Plaintiff be placed in administrative segregation based on information he received from confidential informants, that Plaintiff planned to assault Defendant Pflueger when he was released from keep-lock confinement.

30. Plaintiff was given a hearing with respect to whether he should be in administrative segregation.

31. Plaintiff agreed with the recommendation to be placed in administrative segregation.

32. Plaintiff did not know Defendant Gould prior to his recommendation that Plaintiff be placed in administrative segregation.

 *4  33. Plaintiff testified that he believed Defendant Gould made the recommendation to place Plaintiff in administrative segregation on behalf of Defendant Pflueger in retaliation for Plaintiff's grievances, because "there [was] no other reason [for Defendant Gould] to do it."

34. Plaintiff admitted he has no direct evidence that Defendant Gould recommended administrative segregation based on the grievances filed by Plaintiff against Defendant Pflueger.

35. Plaintiff has no evidence that Defendant Gould even knew about any grievances filed by Plaintiff against Defendant Pflueger.

36. Plaintiff is not aware of any conversations that Defendant Gould had with Defendant Pflueger in which they discussed that Defendant Gould should file an administrative segregation recommendation based on false information.

37. Plaintiff also alleged that after he was removed from his cell in the Special Housing Unit on July 9, 2015, items went missing after another inmate witnessed Defendant Pflueger enter Plaintiff's cell.

Case 9:22-cv-00102-BKS-ML    Document 78    Filed 12/13/23    Page 251 of 373

Logan v. Graham, Not Reported in Fed. Supp. (2019)

38. Defendant Pflueger did not pack Plaintiff's cell and he did not remove any of Plaintiff's property.

39. The only basis for Plaintiff's contention that Defendant Pflueger destroyed his property is that Michael Betters, another inmate, reported seeing Defendant Pflueger enter Plaintiff's cell.

40. According to Plaintiff, Michael Betters could not actually see Defendant Pflueger in Plaintiff's cell.

41. Further, Plaintiff does not know who transported his property to his new cell in the Special Housing Unit.

42. Plaintiff filed another grievance alleging that on August 4, 2015, and August 6, 2015, Defendant Pflueger threatened Plaintiff while he was training another officer.

43. Defendant Pflueger responded to the grievance and affirmed that on August 4, 2015, and August 6, 2015, he showed various new officers the Special Housing Unit area, but they did not stop at Plaintiff's cell and he certainly never made any threatening or harassing statements to Plaintiff.

44. Plaintiff testified that at no point during his incarceration did Defendant Pflueger use any force against him.

45. Plaintiff is not alleging any physical injuries with respect to any of his claims.

46. The only basis on which Plaintiff brings retaliation claims against Defendant Graham is because he denied Plaintiff's grievances and allowed Defendant Pflueger's behavior to continue.

47. Other than the grievances he filed, Plaintiff never sent Defendant Graham any other correspondence about these incidents and he never spoke with Defendant Graham in person about them.

### Exhaustion of Administrative Remedies

48. Plaintiff was familiar with the grievance process at Auburn Correctional Facility during the relevant time period.

49. Plaintiff was aware of how to properly file a grievance and where to appeal if he disagreed with the decision.

50. More specifically, Plaintiff was aware that a grievance must be submitted to the Inmate Grievance Review Committee ("IGRC") and a decision by the IGRC could be appealed to the Superintendent.

51. Further, Plaintiff was aware that a decision by the Superintendent could be appealed to the Central Office Review Committee ("CORC").

52. Plaintiff testified that if an inmate does not receive a response to his appeal to CORC, he must write to CORC and inquire as to the status of his appeal.

 **5** 53. Plaintiff filed Grievance AUB-67199-15, in which he complained that he was "labeled a gang member" by Defendant Pflueger.

54. After an investigation, the Superintendent denied Plaintiff's grievance and Defendant Pflueger was never counseled or disciplined.

55. Plaintiff also filed Grievance AUB-67567-15, in which he complained that on July 8, 2015, he received a false report authored by Defendant Gould in which Defendant Gould recommended Plaintiff be placed in administrative segregation.

56. Grievance AUB 67567-15 also alleged that after Plaintiff was removed from his cell in the Special Housing Unit on July 9, 2015, items went missing after another inmate witnessed Defendant Pflueger packing Plaintiff's cell.

57. Defendant Graham denied Plaintiff's Grievance AUB-67567-15.

### D. Parties' Briefing on Defendants' Motion for Summary Judgment

#### 1. Defendants' Memorandum of Law

Generally, in support of their motion for summary judgment, Defendants assert three arguments. (*See generally* Dkt. No. 28, Attach. 3 [Defs.' Mem. of Law].)

First, Defendants argue that Plaintiff failed to exhaust his administrative remedies with respect to grievances AUB-67199-15 and AUB-675667-15. (*Id.*) More specifically,

Case 9:22-cv-00102-BKS-ML    Document 78    Filed 12/13/23    Page 252 of 373

Logan v. Graham, Not Reported in Fed. Supp. (2019)

Defendants argue that the Prison Litigation Reform Act requires prisoners who bring a lawsuit in federal court to first exhaust their available administrative remedies; this requirement is mandatory such that, failure to comply subjects the complaint to dismissal. [3] (*Id.*) Further, Defendants argue that the New York State Department of Corrections and Community Services ("DOCCS") has the following three-tiered administrative review and appeals process for prisoner grievances: (1) review by the IGRC, (2) appellate review of the IGRC decision by the prison superintendent, and (3) appellate review of the prison superintendent by CORC. (*Id.*) Defendants argue that Plaintiff failed to appeal the prison superintendent's decision with respect to grievances AUB-67199-15 and AUB-675667-15, to CORC and thus, the claims contained in those grievances should be dismissed for Plaintiff's failure to exhaust his administrative remedies. (*Id.*)

Second, Defendants argue that Plaintiff's first amendment retaliation claims should be dismissed because (a) with respect to Defendant Pflueger, (i) he lacks authority to "fire" an inmate from his job, (ii) the record lacks any evidence of a causal connection between Plaintiff's grievance of May 10, 2015, and the misbehavior report of June 17, 2015, except temporal proximity, which is insufficient to survive a motion for summary judgment, (iii) the misbehavior report of June 17, 2015, was truthful and Plaintiff admitted that he was appropriately charged with creating a disturbance and harassment, (iv) Defendants presented non-retaliatory reasons for Defendant Pflueger "firing" Plaintiff from his porter duties and authoring the misbehavior report of June 17, 2015, (v) the alleged verbal harassment and threats are not considered adverse actions for purposes of retaliation, (vi) even if the alleged verbal harassment and threats did constitute an adverse action, Plaintiff failed to demonstrate any evidence of a causal connection, (vii) there is no evidence of a causal connection between Defendant Gould's recommendation that Plaintiff be placed in administrative segregation and Plaintiff's grievances filed against Defendant Pflueger, (viii) there is no evidence that Defendant Pflueger removed or destroyed Plaintiff's property, and (ix) there is no evidence of a causal nexus between the grievances he filed and Defendant Pflueger allegedly destroying his property; (b) with respect to Defendant Jones, (i) there is no evidence that he had any knowledge that Plaintiff filed a grievance against Defendant Pflueger, and (ii) the record is devoid of any evidence establishing why he would file a false misbehavior report against Plaintiff on behalf of Defendant Pflueger; (c) with respect to Defendant Gould, (i) Plaintiff agreed with the recommendation that he remain in administrative segregation, (ii) there is no evidence in the record to support a causal connection between Plaintiff's grievance against Defendant Pflueger on May 10, 2015, and Defendant Gould's administrative segregation recommendation on July 21, 2015, and (iii) there is no evidence that Defendant Gould was aware of Plaintiff's grievance against Defendant Pflueger; and (d) with respect to Defendant Graham, (i) in the event that the claims against Defendants Pflueger, Jones, and Gould are dismissed, the claims against Defendant Graham must also be dismissed because there is no supervisor liability where there is no established underlying constitutional violation, and (ii) even if the claims against Defendants Pflueger, Jones, and Gould are not dismissed, the claims against Defendant Graham still should be dismissed because he was not personally involved in the alleged constitutional violations. (*Id.*)

*6 Third, Defendants argue that, in the alternative, they are entitled to dismissal pursuant to the doctrine of qualified immunity. (*Id.*)

### 2. Defendants' First Supplemental Letter Brief

Generally in their first supplemental letter brief, Defendants re-assert the arguments set forth in their memorandum of law and assert that (1) Plaintiff has repeatedly failed to oppose Defendants' motion despite being provided with notice of the consequences of failing to respond to the motion two times, and (2) as a result of Plaintiff's failure to respond, the Court should deem (a) Defendants' factual assertions as true, and (b) Plaintiff to have consented to the legal arguments contained in Defendants' memorandum of law. (Dkt. No. 36.)

### 3. Defendants' Second Supplemental Letter Brief

Generally in their second supplemental letter brief, Defendants re-assert the arguments set forth in their memorandum of law and assert that (1) Plaintiff sent Defendants a "Response to Dispositive Motions," which incorrectly indicated that Defendants' motion is based solely on Plaintiff's timeliness and otherwise failed to address Defendants' arguments as to the merits of his claims, (2) Plaintiff has now failed to oppose Defendants' motion three times after receiving notice that his response was required, and (3) despite Plaintiff's request in his response for additional time to respond, the Court should not grant this request because their motion has been pending for nearly one year

Case 9:22-cv-00102-BKS-ML    Document 78    Filed 12/13/23    Page 253 of 373

Logan v. Graham, Not Reported in Fed. Supp. (2019)

and Plaintiff "has been given great latitude with respect to the Court's deadlines in this matter." (Dkt. No. 38.)

#### 4. Plaintiff's "Response to Dispositive Motions"

Generally, in opposition to Defendants' motion for summary judgment, Plaintiff acknowledged his failure to meet deadlines and asked that the Court consider "many mitigating factors that have contributed to this short coming" including his release from prison, the requirements of his parole, and his criminal history. (Dkt. No. 39.) In addition, Plaintiff asserts that "all these Motions to Dismiss this complaint have been based on timeliness." (*Id.*) Plaintiff did not file a response to Defendants' Statement of Material Facts, an affidavit setting forth any factual assertions, an opposition memorandum of law, or any document that responded to Defendants' legal arguments. (*See generally* Dkt. No. 39.) In addition, Plaintiff did not request any additional time to provide a more thorough response to Defendants' motion. (*Id.*)

## II. RELEVANT LEGAL STANDARDS

### A. Standard Governing a Motion for Summary Judgment

Under Fed. R. Civ. P. 56, summary judgment is warranted if "the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute of fact is "genuine" if "the [record] evidence is such that a reasonable jury could return a verdict for the [non-movant]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). [4] As for the materiality requirement, a dispute of fact is "material" if it "might affect the outcome of the suit under the governing law.... Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson*, 477 U.S. at 248.

**\*7** In determining whether a genuine issue of material fact exists, the Court must resolve all ambiguities and draw all reasonable inferences against the movant. *Anderson*, 477 U.S. at 255. In addition, "[the movant] bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the ... [record] which it believes demonstrate[s] the absence of any genuine issue of material fact." *Celotex v. Catrett*, 477 U.S. 317, 323-24 (1986). However, when the movant has met its initial

burden, the non-movant must come forward with specific facts showing a genuine issue of material fact for trial. Fed. R. Civ. P. 56(a), (c), (e).

Implied in the above-stated burden-shifting standard is the fact that, where a non-movant willfully fails to respond to a motion for summary judgment, a district court has no duty to perform an independent review of the record to find proof of a factual dispute–even if that non-movant is proceeding *pro se.* [5] (This is because the Court extends special solicitude to the *pro se* litigant largely by ensuring that he or she has received notice of the consequences of failing to properly respond to the motion for summary judgment.) [6] As has often been recognized by both the Supreme Court and Second Circuit, even *pro se* litigants must obey a district court's procedural rules. [7]

Of course, when a non-movant willfully fails to respond to a motion for summary judgment, "[t]he fact that there has been no [such] response ... does not ... [by itself] mean that the motion is to be granted automatically." *Champion v. Artuz*, 76 F.3d 483, 486 (2d Cir. 1996). Rather, as indicated above, the Court must assure itself that, based on the undisputed material facts, the law indeed warrants judgment for the movant. *Champion*, 76 F.3d at 486; *Allen v. Comprehensive Analytical Group, Inc.*, 140 F. Supp. 2d 229, 232 (N.D.N.Y. 2001) (Scullin, C.J.); N.D.N.Y. L.R. 7.1(b)(3). What the non-movant's failure to respond to the motion does is lighten the movant's burden.

For these reasons, this Court has often enforced Local Rule 7.1(a)(3) by deeming facts set forth in a movant's statement of material facts to be admitted, where (1) those facts are supported by evidence in the record, and (2) the non-movant has willfully failed to properly respond to that statement [8] – even when the non-movant was proceeding *pro se.* [9]

Similarly, in this District, where a non-movant has willfully failed to respond to a movant's properly filed and facially meritorious memorandum of law, the non-movant is deemed to have "consented" to the legal arguments contained in that memorandum of law under Local Rule 7.1(b)(3). [10] Stated another way, when a non-movant fails to oppose a legal argument asserted by a movant, the movant may succeed on the argument by showing that the argument possesses facial merit, which has appropriately been characterized as a "modest" burden. *See* N.D.N.Y. L.R. 7.1(b)(3) ("Where a

properly filed motion is unopposed and the Court determined that the moving party has met its burden to demonstrate entitlement to the relief requested therein...."); *Rusyniak v. Gensini*, 07-CV-0279, 2009 WL 3672105, at *1, n.1 (N.D.N.Y. Oct. 30, 2009) (Suddaby, J.) (collecting cases); *Este-Green v. Astrue*, 09-CV-0722, 2009 WL2473509, at *2 & n.3 (N.D.N.Y. Aug. 7, 2009) (Suddaby, J.) (collecting cases).

### B. Standard Governing Exhaustion of Administrative Remedies

**\*8** The Prison Litigation Reform Act of 1995 ("PLRA") requires that prisoners who bring suit in federal court must first exhaust their available administrative remedies: "No action shall be brought with respect to prison conditions under § 1983 ... by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies are available are exhausted." 42 U.S.C. § 1997e. The PLRA was enacted "to reduce the quantity and improve the quality of prisoner suits" by "afford[ing] corrections officials time and opportunity to address complaints internally before allowing the initiation of a federal case." *Porter v. Nussle*, 534 U.S. 516, 524-25 (2002). In this regard, exhaustion serves two major purposes. First, it protects "administrative agency authority" by giving the agency "an opportunity to correct its own mistakes with respect to the programs it administers before it is haled into federal court, and it discourages disregard of the agency's procedures." *Woodford v. Ngo*, 548 U.S. 81, 89 (2006). Second, exhaustion promotes efficiency because (a) "[c]laims generally can be resolved much more quickly and economically in proceedings before an agency than in litigation in federal court," and (b) "even where a controversy survives administrative review, exhaustion of the administrative procedure may produce a useful record for subsequent judicial consideration." *Woodford*, 548 U.S. at 89. "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter*, 534 U.S. at 532.

In accordance with the PLRA, DOCCS has made available a well-established inmate grievance program. 7 N.Y.C.R.R. § 701.7. Generally, the DOCCS Inmate Grievance Program ("IGP") involves the following three-step procedure for the filing of grievances. 7 N.Y.C.R.R. §§ 701.5, 701.6(g),

701.7.[11] First, an inmate must file a complaint with the facility's IGP clerk within a certain number of days of the alleged occurrence.[12] If a grievance complaint form is not readily available, a complaint may be submitted on plain paper. A representative of the facility's IGRC has a certain number of days from receipt of the grievance to informally resolve the issue. If there is no such informal resolution, then the full IGRC conducts a hearing within a certain number of days of receipt of the grievance, and issues a written decision within a certain number of days of the conclusion of the hearing. Second, a grievant may appeal the IGRC decision to the facility's superintendent within a certain number of days of receipt of the IGRC's written decision. The superintendent is to issue a written decision within a certain number of days of receipt of the grievant's appeal. Third, a grievant may appeal to CORC within a certain number of days of receipt of the superintendent's written decision. CORC is to render a written decision within a certain number of days of receipt of the appeal.

In addition, "[t]he regulations [ ] provide that if the plaintiff does not get a 'receipt' from the CORC within 45 days of the date he filed his appeal, he should contact the IGP to make sure that his appeal was 'received.' " *Bell v. Napoli*, 17-CV-0850, 2018 WL 6506072, at *5 (N.D.N.Y. Dec. 11, 2018) (Baxter, M.J.) (citing 7 N.Y.C.R.R. § 701.5(d)(3)(i)).

It is important to note that these procedural requirements contain several safeguards. For example, if an inmate could not file such a complaint within the required time period after the alleged occurrence, he or she could apply to the facility's IGP Supervisor for an exception to the time limit based on mitigating circumstances. If that application was denied, the inmate could file a complaint complaining that the application was wrongfully denied.[13] Moreover, any failure by the IGRC or the superintendent to timely respond to a grievance or first-level appeal, respectively, can–and must–be appealed to the next level, including CORC, to complete the grievance process.[14]

**\*9** Generally, if a prisoner has failed to properly follow each of the required three steps of the above-described grievance procedure prior to commencing litigation, he has failed to exhaust his administrative remedies, and his claims are subject to dismissal. *Woodford*, 548 U.S. at 93; *Porter*, 534 U.S. at 524; *Ruggiero v. Cnty. of Orange*, 467 F.3d 170, 175 (2d Cir. 2006). However, a plaintiff's failure

to exhaust does not end the inquiry. The Second Circuit has held that a three-part inquiry is appropriate where a defendant contends that a prisoner has failed to exhaust his available administrative remedies, as required by the PLRA. *Hemphill v. State of New York*, 380 F.3d 680, 686, 691 (2d Cir. 2004), *accord*, *Ruggiero*, 467 F.3d at 175. First, "the court must ask whether [the] administrative remedies [not pursued by the prisoner] were in fact 'available' to the prisoner." *Hemphill*, 380 F.3d at 686 (citation omitted). Second, if those remedies were available, "the court should ... inquire as to whether [some or all of] the defendants may have forfeited the affirmative defense of non-exhaustion by failing to raise or preserve it ... or whether the defendants' own actions inhibiting the [prisoner's] exhaustion of remedies may estop one or more of the defendants from raising the plaintiff's failure to exhaust as a defense." *Id.* [citations omitted]. Third, if the remedies were available and some of the defendants did not forfeit, and were not estopped from raising, the non-exhaustion defense, "the Court should consider whether 'special circumstances' have been plausibly alleged that justify the prisoner's failure to comply with the administrative procedural requirements." *Id.* [citations and internal quotations omitted]. [15]

## III. ANALYSIS

### A. Plaintiff's Failure to Oppose the Merits of Defendants' Summary Judgment Motion

Before turning to the merits of Defendants' motion, a threshold issue to be addressed is the legal significance of Plaintiff's failure to oppose the merits of Defendants' motion.

Pursuant to Local Rule 7.1(b)(3), by failing to oppose Defendants' motion, Plaintiff has effectively consented to the granting of the relief sought. That rule provides as follows:

> Where a properly filed motion is unopposed and the Court determines that the moving party has met its burden to demonstrate entitlement to the relief requested therein, the non-moving party's failure to file or serve any papers as this Rule requires shall be deemed as consent to the granting

or denial of the motion, as the case may be, unless good cause is shown.

N.D.N.Y. L.R. 7.1(b)(3); *see also Jackson v. Fed. Express*, 766 F.3d 189, 194 (2d Cir. 2014) (holding that the district courts may enter summary judgment in favor of the moving party where the non-moving party fails to respond in opposition, but not without first "ensur[ing] that each statement of material fact is support by record evidence sufficient to satisfy the movant's burden of production" and "determin[ing] whether the legal theory of the motion is sound").

In this case, Plaintiff has not responded to the merits of Defendants' motion. The motion was properly filed by Defendants, and Defendants through their motion have met their burden of demonstrating entitlement to some of the relief requested. With respect to the question of whether Defendants have met their burden, I note that the "burden of persuasion is lightened such that, in order to succeed, [their] motion need only be 'facially meritorious.' " *See Rodriguez v. Goord*, 04-CV-0358, 2007 WL 4246443, at *1 (N.D.N.Y. Nov. 27, 2007) (Scullin, J., adopting Report-Recommendation on clear error review) (finding that determination of whether a movant has satisfied its burden to demonstrate entitlement to a dismissal under Local Rule 7.1(b)(3) "is a more limited endeavor than a review of a contested motion to dismiss" (citing cases)).

Because Defendants have accurately cited both proper legal authority and evidence in the record supporting the grounds on which their motion is based with respect to Defendants Jones and Gould as set forth below, and Plaintiff has failed to respond in opposition to the merits of the motion for summary judgment, I find that Defendants' motion is facially meritorious. *Jackson*, 766 F.3d at 194. Accordingly, I recommend that the Court grant Defendants' motion with respect to Defendants Jones and Gould on this basis.

**\*10** It should also be noted that there are additional consequences flowing from Plaintiff's failure to file an opposition to Defendants' Local Rule 7.1(a)(3) Statement of Material Facts. Local Rule 7.1 provides, in relevant part, that "[t]he Court shall deem admitted any properly supported facts set forth in the Statement of Material Facts that the opposing party does not specifically controvert." N.D.N.Y. L.R. 7.1(a)(3) (emphasis in original). Courts in this district have routinely enforced this rule in cases where a non-

Logan v. Graham, Not Reported in Fed. Supp. (2019)

Case 9:22-cv-00102-BKS-ML    Document 78    Filed 12/13/23    Page 256 of 373

movant has failed to properly respond. *See, e.g., Elgamil v. Syracuse Univ.*, 99-CV-0611, 2000 WL 1264122, at *1 (N.D.N.Y. Aug. 22, 2010) (McCurn, J.) (listing cases). Undeniably, *pro se* litigants are entitled to some measure of forbearance when defending against summary judgment motions. *Jemzura v. Public Serv. Comm'n*, 961 F. Supp. 406, 415 (N.D.N.Y. 1997) (McAvoy, J.). The deference owed to *pro se* litigants, however, does not extend to relieving them of the ramifications associated with the failure to comply with the court's local rules. *Robinson v. Delgado*, 96-CV-0169, 1998 WL 278264, at *2 (N.D.N.Y. May 22, 1998) (Pooler, J., adopting Report-Recommendation on clear error review). Stated differently, "a pro se litigant is not relieved of his duty to meet the requirements necessary to defeat a motion for summary judgment." *Latouche v. Tompkins*, 09-CV-0308, 2011 WL 1103045, at *1 (N.D.N.Y. Mar. 23, 2011) (Mordue, J.).

Here, because Plaintiff was warned of the consequences of failing to properly respond to Defendants' Local Rule 7.1 Statements (Dkt. No. 28 at 2; text notice dated July 3, 2019), and he has failed to do so, I recommend that the Court deem the facts contained in Defendants' Local Rule 7.1(a)(3) Statements as having been admitted to the extent they are supported by accurate record citations. *See, e.g., Latouche*, 2011 WL 1103045, at *1; *see also Champion v. Artuz*, 76 F.3d 483, 486 (2d Cir. 1996). As to any facts not contained in Defendants' Local Rule 7.1(a)(3) Statements, in light of the procedural posture of this case, the Court is "required to resolve all ambiguities and draw all permissible factual inferences" in favor of Plaintiff. *Terry*, 336 F.3d at 137.

### B. Exhaustion of Grievances AUB-67199-15 and AUB-67567-15

There is no dispute in this case that Plaintiff filed grievances AUB-67199-15 dated May 10, 2015, and AUB-67567-15 dated July 21, 2015, and that he appealed the denial of these grievances to the facility superintendent. The parties only dispute whether Plaintiff completed the third step in the grievance process by appealing to CORC.

Defendants submitted proof in admissible form by way of an affidavit from Rachael Seguin, the custodian of the records maintained by CORC. (Dkt. No. 28, Attach. 16.) In her affidavit, Ms. Seguin stated that she searched record appeals received by CORC filed by Plaintiff, and her search revealed "no appeal for Grievance AUB-67199-15" and "no appeal for Grievance AUB-67567-15." (*Id.* at ¶¶11-12.)

However, with respect to grievance AUB-67199-15, Plaintiff alleged in his verified Complaint [16] that "[o]n [July 3, 2015, he] received [the denial from the Superintendent] and requested that it be appealed to the Central Office Review Committee." (Dkt. No. 1 at 5.) Similarly, Plaintiff testified that after receiving the denial of his grievance from the Superintendent, he appealed to CORC. (Dkt. No. 28, Attach. 5 at 46.) Moreover, Plaintiff alleged in his verified Complaint that on August 15, 2015, he "composed a letter to the C.O.R.C. Inmate Grievance Program Supervisor Karen Bellamy inquiring as to whether or not request for appeal was received." (Dkt. No. 1 at 5.) Likewise, Plaintiff testified that he wrote a letter to CORC asking about the status of his appeal. (Dkt. No. 28, Attach. 5 a 46.) Furthermore, Plaintiff alleged in his verified Complaint that on September 2, 2015, he "composed a letter to Auburn C.F. I.G.P. Supervisor Cheryl Parmiter inquiring as to whether or not [his] appeal was submitted as requested." (Dkt. No. 1 at 5.) Similarly, Plaintiff testified that "I believe that one I never received a response from Central Office. So I wrote Albany's – Auburn's I.G.R.C. and asked them what happened and they said they never received an appeal." (Dkt. No. 28, Attach. 5 at 46.)

**\*11** In addition, with respect to grievance AUB-67567-15, Plaintiff alleged in his verified Complaint that "[o]n [August 15, 2015, he] received [the denial from the superintendent] and requested that it be appealed to the C.O.R.C." (Dkt. No. 1 at 6.) Moreover, Plaintiff's verified Complaint alleged that on September 29, 2015, he "composed another letter to C.O.R.C.'s I.G.P. Supervisor Karen Bellamy informing her of all grievances he was awaiting decisions on ... as he hadn't yet received receipt of appeal for this grievance." (Dkt. No. 1 at 6.)

Generally, conclusory allegations that an inmate appealed the superintendent's grievance denial to CORC are insufficient to withstand a motion for summary judgment. *See Gibbs v. Gadway*, 19-CV-0281, 2019 WL 5191506, at *3 (N.D.N.Y. Oct. 15, 2019) (Stewart, M.J.) (recommending dismissal based on the plaintiff's failure to exhaust his administrative remedies where the plaintiff made "a purely conclusory allegation that he appealed the grievance denial to CORC.").

However, the case law implies that where a plaintiff sets forth the date that he or she appealed the grievance to CORC, that may be enough to survive a motion for summary judgment. *C.f. Gibbs v. Gadway*, 19-CV-0281, 2019 WL 5191506, at *3 (N.D.N.Y. Oct. 15, 2019) (Stewart, M.J.) (recommending

Case 9:22-cv-00102-BKS-ML    Document 78    Filed 12/13/23    Page 257 of 373

Logan v. Graham, Not Reported in Fed. Supp. (2019)

dismissal of the plaintiff's claims for failure to exhaust his administrative remedies where the plaintiff "has not provided a copy of the grievance appeal or even asserted what date he filed the appeal."); *Gough v. Morris,* 16-CV-1107, 2018 WL 7199494, at *3 (N.D.N.Y. Dec. 14, 2018) (Stewart, M.J.) (recommending dismissal based on the plaintiff's failure to exhaust his administrative remedies where he testified that he appealed the superintendent's response to CORC but there was no evidence in the record that (a) the grievance or the superintendent's response were appealed to CORC and, (b) despite not receiving a response from CORC, the plaintiff testified that he did not write to CORC to follow-up); *Campbell v. Prue,* 16-CV-0004, 2018 WL 4635708, at *5 (N.D.N.Y. July 3, 2018) (Hummel, M.J.) ("Although [the plaintiff] alleges that he filed [a] grievance ..., plaintiff does not state when he filed such grievance.... Further, plaintiff has not provided a copy of the alleged grievance or the Marcy IGRC's denial of that grievance."); *Toliver v. Stefinik,* 12-CV-0077, 2016 WL 3349316, at *6 (N.D.N.Y. June 15, 2016) (D'Agostino, J.) ("vague and conclusory allegations ... [regarding] grievances ... do not, in light of the documentation Defendants have provided about Plaintiff's grievance history, create a factual dispute material to the issue of whether Plaintiff exhausted his administrative remedies."); *Smith v. Kelly,* 985 F. Supp. 2d 275, 289 (N.D.N.Y. 2013) (Suddaby, J.) (granting the defendants' motion for summary judgment on the issue of exhaustion where the plaintiff failed to "identify the name of the 'IGRC's supervisor' who purportedly told him that a new prisoner does not file a grievance at Auburn C.F. if it pertains to the prisoner's previous facility, nor does he specify the date, means or location of this purported communication.").

Mindful that a court should not resolve credibility issues when deciding a motion for summary judgment, and that Defendants bear the ultimate burden of proving that Plaintiff did not exhaust his administrative remedies, I conclude that there appears to be a material issue of fact regarding whether Plaintiff appealed grievances AUB-67199-15 and AUB-67567-15. [17] As a result, I recommend that Defendants' motion be denied on this basis.

### C. Whether Plaintiff's First Amendment Retaliation Claims Should Nevertheless be Dismissed

**\*12** A cognizable claim of retaliation pursuant to 42 U.S.C. § 1983 lies when prison officials take an adverse action against an inmate that is motivated by the inmate's exercise of a constitutional right, including the free speech provisions of the First Amendment. *See Friedl v. City of N.Y.,* 210 F.3d 79, 85 (2d Cir. 2000) ("In general, a section 1983 claim will lie where the government takes negative action against an individual because of his exercise of rights guaranteed by the Constitution or federal laws."). As the Second Circuit has repeatedly cautioned, however, because such claims are easily incanted and inmates often attribute adverse action, including the issuance of misbehavior reports, to retaliatory animus, courts must approach such claims "with skepticism and particular care." *Dawes v. Walker,* 239 F.3d 489, 491 (2d Cir. 2001), *overruled on other grounds by Swierkiewicz v. Sorema N.A.,* 534 U.S. 506 (2002); *accord, Davis v. Goord,* 320 F.3d 346, 352 (2d Cir. 2003).

To state a *prima facie* claim pursuant to 42 U.S.C. § 1983 for retaliatory conduct, a plaintiff must advance non-conclusory allegations establishing that (1) the conduct at issue was protected, (2) the defendants took adverse action against the plaintiff, and (3) there was a causal connection between the protected activity and the adverse action–in other words, that the protected conduct was a "substantial or motivating factor" in the prison officials' decision to take action against the plaintiff. *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287 (1977); *Dillon v. Morano,* 497 F.3d 247, 251 (2d Cir. 2007); *Garrett v. Reynolds,* No. 99-CV-2065, 2003 WL 22299359, at *4 (N.D.N.Y. Oct. 3, 2003) (Sharpe, M.J.).

If the plaintiff carries this burden, then to avoid liability the defendants must show by a preponderance of the evidence that they would have taken action against the plaintiff even in the absence of the protected conduct. *Mount Healthy,* 429 U.S. at 287. If taken for both proper and improper reasons, state action may be upheld if the action would have been taken based on the proper reasons alone. *Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir. 1996) (citations omitted).

Analysis of retaliation claims thus requires careful consideration of the protected activity in which the inmate plaintiff has engaged, the adverse action taken against him or her, and the evidence tending to link the two. When such claims, which are exceedingly case specific, are alleged in only conclusory fashion, and are not supported by evidence establishing the requisite nexus between any protected

activity and the adverse action complained of, a defendant is entitled to the entry of summary judgment dismissing plaintiff's retaliation claims. 🚩 *Flaherty v. Coughlin*, 713 F.2d 10, 13 (2d Cir. 1983), *overruled on other grounds*, 🏷 *Swiekiewicz v. Sorema N.A.*, 534 U.S. 506 (2002).

### 1. Defendant Pflueger

Plaintiff alleges that Defendant Pflueger retaliated against him during four separate incidents: (1) firing Plaintiff as a feed up porter and filing a false misbehavior report on June 17, 2015, (2) verbal harassment on (a) an unspecified dated in June or July 2015, (b) August 4, 2015, and (c) August 6, 2015, (3) causing Defendant Gould to file a false administrative segregation recommendation, and (4) the destruction of Plaintiff's personal property.

### a. Incident on June 17, 2015 [18]

**\*13** Defendants argue that Plaintiff's retaliation claim with respect to the incidents on June 17, 2015, fails based on the third element, that there is no evidence in the record to support the contention that Plaintiff was retaliated against for his protected speech. [19]

In considering whether there is a "causal connection between the protected speech and the adverse action, a court may consider a number of factors, including any statements made by the defendant concerning his motivation and the temporal proximity between the protected activity and the defendant's adverse action." *Roseboro v. Gillespie*, 719 F. Supp. 2d 353, 366 (S.D.N.Y. 2011); *see also Tuitt v. Chase*, 11-CV-0776, 2013 WL 877439, at \*7 (N.D.N.Y. Jan. 30, 2013) (Dancks, M.J.), *report and recommendation adopted*, 2013 WL 877617 (N.D.N.Y. Mar. 8, 2013) (factors relevant to a consideration of causal connection "include: (i) the temporal proximity between the protected activity and the alleged retaliatory act; (ii) the inmate's prior good disciplinary record; (iii) vindication at a hearing on the matter; and (iv) statements by the defendant concerning his or her motivation"). The Second Circuit has "held that temporal proximity between protected conduct and an adverse action constitutes circumstantial evidence of retaliation," but has also "consistently required some further evidence of retaliatory animus before permitting a prisoner to proceed to trial on a retaliation claim." *Washington v. Afify*, 681 F. App'x 43, 46 (2d Cir. 2017);

*see also Thomas v. Waugh*, 13-CV-0321, 🚩 2015 WL 5750945, at \*4 (N.D.N.Y. Sept. 30, 2015) (D'Agostino, J. adopting Report-Recommendation on *de novo* review) (citing 🏷 *Slattery v. Swiss Reinsurance Am. Corp.*, 248 F.3d 87, 95 (2d Cir. 2001)) ("temporal proximity alone is insufficient to establish an inference of retaliation.").

**\*14** Here, in addition to temporal proximity connecting Plaintiff's grievance of May 10, 2015, to the incident on June 17, 2015, [20] Defendant Pflueger's alleged statements provide circumstantial evidence of causation. Plaintiff's verified Complaint alleged that on August 4, 2015, Defendant Pflueger said to another correction officer, "[t]his is also where we keep idiots like this guy who think they can snitch on officers and nothing's going to happen to them," and "[h]ow'd that work out for you stupid? You want to help me explain to him how our grievance procedure works?" (Dkt. No. 1 at 24-25.) Moreover, the verified Complaint alleged that on August 6, 2015, Defendant Pflueger said, "[o]h, and just so you know, I didn't forget about your latest grievance either. You better say a prayer to your White Supremacist God that I'm not here on the day they bring you down to the draft room, because I'll be watching the change sheet. You're not gonna make it outta here in 1 piece." (Dkt. No. 1 at 25.) These statements provide circumstantial evidence that Defendant Pflueger's actions on June 17, 2015, firing Plaintiff from his job as a feed up porter and filing a misbehavior report against him that ultimately resulted in his placement in keep-lock confinement for thirty days, were in retaliation for Plaintiff's grievance of May 10, 2015. *See Cole v. N.Y.S. Dep't of Corr. and Cmty. Supervision*, 14-CV-0539, 2016 WL 5394752, at \*26 (N.D.N.Y. Aug. 25, 2016) (Peebles, M.J.) (finding an issue of fact as to retaliation where the defendant allegedly said (a) "Happy Anniversary" in reference to prior assaults and a lawsuit that resulted from those assaults, and (b) that the assault was "payback" for the plaintiff's grievances); *Roland v. McMonagle*, 12-CV-6331, 2015 WL 5918179, at \*6 (S.D.N.Y. Oct. 9, 2015) (finding an issue of fact as to retaliation where there was evidence that the defendants were aware of the plaintiff's complaints and mocked him for filing grievances). [21]

As a result, the burden shifts to Defendants to show by a preponderance of the evidence that they would have taken action against the plaintiff even in the absence of the protected conduct. 🏷 *Mount Healthy*, 429 U.S. at 287.

Case 9:22-cv-00102-BKS-ML    Document 78    Filed 12/13/23    Page 259 of 373

Logan v. Graham, Not Reported in Fed. Supp. (2019)

With respect to the "firing" of Plaintiff as a feed up porter, Defendants submitted a non-retaliatory reason—that Defendant Pflueger observed Plaintiff pass an unidentified object into the cell of another inmate. (Dkt. No. 28, Attach. 10 at ¶13.) However, Plaintiff testified that he did not pass any unidentified items into another inmate's cell. (Dkt. No. 28, Attach. 5 at 51-52.) As a result, I find that a material issue of fact remains for trial.

However, with respect to the allegedly false misbehavior report, Plaintiff admitted some of the allegations contained in the misbehavior report. More specifically, Plaintiff admitted that he yelled profanities as he walked back to his cell and that while in his cell, he made derogatory statements about Defendant Pflueger loud enough to be heard by an inmate on a different floor. (Dkt. No. 28, Attach. 5 at 54-55.) This admission "suggests that 'plaintiff committed the most serious, if not all, of the prohibited conduct charged in the misbehavior report.' " *Flynn v. Ward*, 15-CV-1028, 2018 WL 3195095, at *12 (N.D.N.Y. June 7, 2018) (Hummel, M.J.) (quoting *Gayle v. Gonyea*, 313 F.3d 677, 682 (2d Cir. 2002)). As a result, Defendants have established a non-retaliation reason for the filing of the misbehavior report of June 17, 2015. *Flynn, 2018 WL 3195095, at *12* (citing *Hynes v. Squillace*, 143 F.3d 653, 657 (2d Cir. 1998) (concluding that plaintiff's admission of the underlying conduct established a "proper, non-retaliatory reason[ ] for filing the misbehavior report.")); *see also Hynes v. Squillace*, 143 F.3d 653, 657 (2d Cir. 1998) (where plaintiff admitted to committing the most serious, if not all, of the prohibited conduct charged in the misbehavior report, "defendants met their burden of demonstrating proper, non-retaliatory reasons for filing the misbehavior report.").

**\*15** As a result, I recommend that Defendants' motion for summary judgment be granted with respect to the allegedly false misbehavior report of June 17, 2015, and be denied with respect to the "firing" of Plaintiff as a feed up porter.

### b. Verbal Harassment

Plaintiff alleges that sometime in June or July 2015, he was verbally harassed when Defendant Pflueger told another officer that he was going to "kick [P]laintiff's f****** a**." (Dkt. No. 1 at 19.) In addition, Plaintiff alleges that on August 4, 2015, Defendant Pflueger said to another correction officer, "[t]his is also where we keep idiots like this guy who

think they can snitch on officers and nothing's going to happen to them," and "[h]ow'd that work out for you stupid? You want to help me explain to him how our grievance procedure works?" (Dkt. No. 1 at 24-25.) [22] Moreover, Plaintiff alleges that on August 6, 2015, Defendant Pflueger said, "[o]h, and just so you know, I didn't forget about your latest grievance either. You better say a prayer to your White Supremacist God that I'm not here on the day they bring you down to the draft room, because I'll be watching the change sheet. You're not gonna make it outta here in 1 piece." (Dkt. No. 1 at 25.)

In this Circuit, allegations of verbal harassment or threats are generally an insufficient basis for an inmate's § 1983 claim. *See Purcell v. Coughlin,* 790 F.2d 263, 265 (2d Cir. 1986) ("The claim that a prison guard called Purcell names also did not allege any appreciable injury and was properly dismissed"); *Hayes v. Dahkle*, 16-CV-1368, 2017 WL 9511178, at *7 (N.D.N.Y. Oct. 30, 2017) (Hummel, M.J.) ("[v]erbal harassment absent injury, is generally insufficient to rise to the level of a constitutional violation"); *Tafari v. Paul*, 06-CV-0603, 2009 WL 3260075, at *1 (W.D.N.Y. Oct. 8, 2009) (allegations of verbal harassment or abuse, "without a showing of an actual injury, are insufficient to support a § 1983 claim") (citing *Lewis v. Casey,* 518 U.S. 343, 349-50 (1996)); *Alexander v. Deming*, 03-CV-0147, 2009 WL 1044561, at *5 (W.D.N.Y. Apr. 16, 2009) ("Courts within the Second Circuit have held that threats of disciplinary action and verbal harassment without injury are insufficient to state a constitutional violation") (citing cases); *Ramirez v. Holmes*, 921 F. Supp. 204, 210 (S.D.N.Y. 1996) ("Allegations of threats or verbal harassment, without any injury or damage, do not state a claim under 42 U.S.C. § 1983."). "Such statements are only sufficiently adverse for the purpose of a First Amendment retaliation claim if they 'would deter a similarly situated individual of ordinary firmness of exercising constitutional rights.' Verbal threats may constitute [an] adverse action if the threat is sufficiently specific. 'The less direct and specific a threat, the less likely it will deter an inmate from exercising his First Amendment rights.' "

*Hayes,* 2017 WL 9511178, at *7 (citations omitted). "The line between *de minimis* verbal harassment and retaliatory adverse action ... [hinges] on the specificity and seriousness of the words used." *Quezada v. Roy*, 14-CV-4056, 2015 WL 5970355, at *21 (S.D.N.Y. Oct. 13, 2015).

Case 9:22-cv-00102-BKS-ML    Document 78    Filed 12/13/23    Page 260 of 373

Logan v. Graham, Not Reported in Fed. Supp. (2019)

**\*16** "Mindful that inmates 'may be required to tolerate more than average citizens[ ] before a retaliatory action taken against them is considered adverse' " *Davis, 320 F.3d at 353,* I conclude that Defendant Pflueger's alleged statements constitute vague threats that lack the specificity and seriousness "to deter an inmate from exercising his First Amendment rights" as no real threat exists. *Id.; see* *Hayes, 2017 WL 9511178, at \*8* (holding that where a correction officer allegedly verbally harassed the plaintiff on two occasions "warning him to not get comfortable in his housing unit because 'you mess with one of us (C.O.'s) you got to deal with all of us' and informing plaintiff that '[another correction officer] said hi!' .... constitute vague threats that lack the specificity and seriousness 'to deter an inmate from exercising his First Amendment rights' as no real threat exists.").

Furthermore, with respect to Defendant Pflueger's alleged threats of physical injury, Plaintiff "does not ... allege that these threats were followed by any physical injury[,] and as a result, they are not actionable." *LaRocco v. N.Y.C. Dep't of Corr.,* 99-CV-9759, *2001 WL 1029044, at \*5 (S.D.N.Y. Aug. 31, 2001).* "Absent an appreciable injury following in close time to the threat of force [Defendant Pflueger's alleged] statement[ ], albeit inappropriate, lack the specificity and seriousness 'to deter an inmate from exercising his First Amendment rights.' " *Hayes, 2017 WL 9511178, at \*8* (quoting *Quezada v. Roy,* 14-CV-4056, *2015 WL 5970355, at \*21 (S.D.N.Y. Oct. 13, 2015)).*

As a result, to the extent the Complaint is construed as alleging that these incidents of verbal harassment were adverse actions—as opposed to evidence of a causal connection with respect to other adverse actions—I recommend dismissal of these claims.

### c. Causing Defendant Gould to File a False Administrative Segregation Recommendation

Plaintiff has failed to adduce evidence in the record that Defendant Pflueger directed or caused Defendant Gould to file a false misbehavior report against Plaintiff. In fact, Defendant Gould affirmed that he "had no knowledge at the time [his] recommendation was made that Plaintiff had filed any grievances against Defendant [Pflueger]." (Dkt. No. 28, Attach. 6 at ¶ 11.) In addition, Plaintiff testified that (1) he did not know Defendant Gould before Defendant Gould made the recommendation that Plaintiff be placed in administrative segregation (Dkt. No. 28, Attach. 5 at 63), (2) he has no recollection of ever seeing Defendant Gould before the recommendation (*id.*), and (3) he is not aware of any conversations that Defendant Gould had with Defendant Pflueger, in which, they discussed that Defendant Gould should file an administrative segregation recommendation based on false information (*id.* at 65).

The contention that Defendant Pflueger retaliated against Plaintiff by causing Defendant Gould to file a false administrative segregation recommendation is merely a conclusory allegation, which is insufficient to establish genuine issue of material fact for trial. In addition, this contention is sheer surmise on Plaintiff's part and unsupported by the record. (Dkt. No. 28, Attach. 5 at 64 (Plaintiff testified that the basis for his belief that Defendant Gould filed the recommendation on Defendant Pflueger's behalf is "[b]ecause there is no other reason to do it.")); *Cole, 2016 WL 5394752, at \*27.*

As a result, I recommend dismissal of Plaintiff's retaliation claim against Defendant Pflueger with respect to this allegation.

### d. Destruction of Plaintiff's Personal Property

Plaintiff failed to adduce any evidence that Defendant Pflueger destroyed (or confiscated or threw away) Plaintiff's personal property. The only evidence that Plaintiff presents in support of his contention, is that another inmate (housed three cells away) witnessed Defendant Pflueger in Plaintiff's cell. (Dkt. No. 1 at 23.) However, Plaintiff admitted that the other inmate "was inside his cell, so he couldn't see [Defendant Pflueger] inside [Plaintiff's] cell." (Dkt. No. 28, Attach. 5 at 71.) Moreover, it is undisputed that other individuals were involved in the removal of Plaintiff's property from his cell and the transportation of that property to the special housing unit. (*Id.*; Dkt. No. 1 at 23.) Plaintiff is speculating that because the other inmate saw Defendant Pflueger in Plaintiff's cell, that Defendant Pflueger is responsible for Plaintiff's alleged missing personal property. However, this speculation is insufficient to create a material issue of fact for trial because no reasonable juror could conclude that Defendant Pflueger took an adverse action against Plaintiff by destroying his property.

Case 9:22-cv-00102-BKS-ML    Document 78    Filed 12/13/23    Page 261 of 373

Logan v. Graham, Not Reported in Fed. Supp. (2019)

**\*17** As a result, I recommend dismissal of Plaintiff's retaliation claim against Defendant Pflueger with respect to this allegation.

### 2. Defendant Jones

Plaintiff failed to show a genuine issue of material fact that his protected conduct was a substantial or motivating factor in Defendant Jones's endorsement of Defendant Pflueger's misbehavior report dated June 17, 2015. *Graham v. Henderson*, 89 F.3d 75, 81 (2d Cir. 1996). "[I]t is difficult to establish one defendant's retaliation for complaints against another defendant." *Hare v. Hayden*, 09-CV-3135, 2011 WL 1453789, at \*4 (S.D.N.Y. Apr. 14, 2011) (citing *Wright v. Goord*, 554 F.3d 255, 274 (2d Cir. 2009)).

Here, Plaintiff did not file any grievances or complaints against Defendant Jones. The record lacks any evidence establishing why Defendant Jones would endorse a false misbehavior report against Plaintiff, on Defendant Pflueger's behalf, beyond Plaintiff's conclusory allegations. *See Hill v. Chalanor*, 128 F. App'x 187, 189 (2d Cir. 2005) (holding that the plaintiff's claim of a causal connection between defendant "Oliver's threats and the alleged actions of the other defendants in connection with Hill's medical care is wholly unsupported.") *Flynn v. Ward*, 15-CV-1028, 2018 WL 3195095, at \*12 (N.D.N.Y. June 7, 2018) (Hummel, M.J.) (recommending dismissal of retaliation claims where "[t]he record lacks any evidence establishing why Alsante would file a false misbehavior report against Flynn, on Wellenstein's behalf, beyond Flynn's conclusory allegations."). Without more, the evidence does not present a genuine issue of material fact for a jury to resolve. *Flynn*, 2018 WL 3195095;

*see Wright*, 554 F.3d at 274 (dismissing retaliation claim against a correction officer when the only alleged basis for retaliation was a complaint about an incident involving another correction officer); *Alicea v. Maly*, 12-CV-0203, 2015 WL 4326114, at \*14-15 (N.D.N.Y. July 14, 2015) (D'Agostino, J.) (dismissing retaliation claim which alleged that Correction Officer Trinidad retaliated against the plaintiff for protected actions he took with respect to Correction Officer Freeman, where the plaintiff alleged a close personal friendship between Trinidad and Freeman and the record was "devoid of any specifics, but replete with conclusions"); *Guillory v. Ellis*, 11-CV-0600, 2014 WL 4365274, at \*18 (N.D.N.Y. Aug. 28, 2014) (D'Agostino, J.) ("[I]t is difficult to establish one defendant's retaliation for complaints against another defendant."); *Roseboro v. Gillespie*, 791 F. Supp. 2d 353, 369 (S.D.N.Y. 2011) (plaintiff failed to provide any basis to believe that a correction counselor would retaliate for a grievance that she was not personally named in); *Ciaprai v. Goord*, 02-CV-0915, 2005 WL 3531464, at \*9 (N.D.N.Y. Dec. 22, 2005) (Sharpe, J.) (entering summary judgment on retaliation claim where the plaintiff cited only past grievances filed against correction officers other than the officer who disciplined the plaintiff).

As a result, I recommend that Plaintiff's retaliation claim against Defendant Jones be dismissed.

### 3. Defendant Gould

For the reasons set forth above in Parts III.C.1.c. and III.C.2. of this Report-Recommendation, I find that the record lacks evidence establishing a causal connection between Defendant Gould's recommendation that Plaintiff be placed in administrative segregation and Plaintiff's grievances against Defendant Pflueger, beyond Plaintiff's conclusory allegations. As a result, I recommend that Plaintiff's retaliation claim against Defendant Gould be dismissed.

### 4. Defendant Graham

**\*18** The Second Circuit has previously indicated that supervisory defendants may be considered personally involved only if they "(1) directly participated in the alleged constitutional violation, (2) failed to remedy that violation after learning of it through a report or appeal, (3) created, or allowed to continue, a policy or custom under which the violation occurred, (4) had been grossly negligent in managing subordinates who caused the violation, or (5) exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that the violation was occurring." *Rasheen v. Adner*, 356 F. Supp. 3d 222, 233 (N.D.N.Y. Jan. 28, 2019) (Hurd, D.J.) (citing *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995)).[23]

The Supreme Court's decision in *Iqbal* has raised the question of whether all of the *Colon* factors continue to be viable. *Keyes v. Annucci*, 19-CV-0372, 2019 WL 4602240, at \*17 (N.D.N.Y. Sept. 23, 2019) (Suddaby, C.J.) (citing *Montanez v. City of Syracuse*, 16-CV-0550, 2019 WL 315058, at \*17

Case 9:22-cv-00102-BKS-ML Document 78 Filed 12/13/23 Page 262 of 373

Logan v. Graham, Not Reported in Fed. Supp. (2019)

(N.D.N.Y. Jan. 23, 2019) (Sannes, J.)). Neither the Second Circuit nor the Supreme Court have made any findings on this issue. *Keyes*, 2019 WL 4602240, at *17. "Courts within the Second Circuit have taken various approaches post-*Iqbal*, from finding that only the first and third factors remain viable, to continuing to apply all factors in the absence of Second Circuit guidance, to considering the specific constitutional provision underlying the claim and applying all the *Colon* factors to claims that rely on a standard of unreasonable conduct or deliberate indifference but declining to apply all of them where the claim requires instead a showing of discriminatory intent." *Id.* (*see Montanez*, 2019 WL 315058, at *17-18 (collecting cases) (adopting the specific constitutional provision approach and applying all the *Colon* factors to the plaintiff's Fourteenth Amendment claims because they did not require a showing of discriminatory intent); *Carpenter v. Apple*, 15-CV-1269, 2017 WL 3887908, at *9-10 (N.D.N.Y. Sept. 5, 2017) (Suddaby, C.J.) (noting that the majority of district courts have continued to apply all of the *Colon* factors "where the constitutional violation at issue does not require a showing of discriminatory intent" and adopting that majority approach); *Marom v. City of New York*, 15-CV-2017, 2016 WL 916424, at *15 (S.D.N.Y. 2016) (reasoning that *Iqbal* supported the specific constitutional provision approach, and finding that all the *Colon* factors might be viable for false arrest and excessive force claims that were based on a reasonableness standard, but that the second, fourth, and fifth factors would not apply to a First Amendment retaliation claim because such claim contains an intent requirement)).

The Court agrees with the specific constitutional provision approach discussed above because it is the most consistent with the guidance provided in *Iqbal*. *See Iqbal*, 556 U.S. at 676 (noting that, "[t]he factors [related to whether a government official's individual actions violated the Constitution] necessary to establish a *Bivens* violation will vary with the constitutional provision at issue," discussing that the First and Fifth Amendments require that the official acted with a discriminatory purpose, and rejecting the argument that supervisors should be held liable on such claims merely because they knew of a subordinate's discriminatory purpose. The Court will therefore consider only the first and third *Colon* factors because Plaintiff's claims are pursuant to the First Amendment.

**\*19** "[A] retaliation claim under the First amendment requires a showing of discriminatory intent, [and as a result,]

supervisory liability will be imposed only if Plaintiff[ ]" establishes "that the officials either (a) directly participated in the alleged constitutional violation, or (b) created, or allowed to continue, a policy or custom under which the violation occurred." *Keyes*, 2019 WL 4602240, at *19.

"[W]hile personal involvement cannot be founded solely on supervision, liability can be found if the official proactively participated in reviewing the administrative appeals as opposed merely to rubber-stamping the results." *Molano v. Bezio*, 10-CV-6481, 2012 WL 1252630, at *5 (W.D.N.Y. Apr. 13, 2012) (citing *Collins v. Ferguson*, 804 F. Supp. 2d 134, 140 (W.D.N.Y. 2011); *Black v. Coughlin*, 76 F.3d 72, 74-75 (2d Cir. 1996)).

The record before the Court contains superintendent responses related to four grievances. (Dkt. No. 28, Attach. 11 at 1; Dkt. No. 28, Attach. 12 at 2; Dkt. No. 28, Attach. 14 at 1; Dkt. No. 28, Attach. 15 at 6; Dkt. No. 28, Attach. 18 at 1; Dkt. No. 28, Attach. 19 at 1.) However, the signature of the superintendent who executed the response, in each instance, is illegible. While Defendants argue that Defendant Graham merely rubber stamped the results of the investigation, "notably absent from the record is any affidavit or declaration from [Defendant Graham]" and absent "such evidence, a factual dispute exists as to whether [Defendant Graham] proactively participated in the decision-making process related to [Plaintiff's] grievances." *Flynn*, 2018 WL 3195095, at *13.

As such, I find that there is a triable issue of material fact for a jury to resolve with respect to Defendant Graham's personal involvement in Defendant Pflueger's alleged retaliatory conduct. *Flynn*, 2018 WL 3195095, at *13 (citing *Celotex v. Catrett*, 477 U.S. 317, 323 (1986)). Therefore, I recommend that Defendants' motion with respect to Defendant Graham be denied.

### D. Doctrine of Qualified Immunity

Finally, Defendants argue that, in any event, they are shielded from liability based on the doctrine of qualified immunity.

Qualified immunity shields federal and state officials from suit " 'unless [1] the official violated a statutory or constitutional right that [2] was clearly established at the time of the challenged conduct.' " *Terebesi v. Torreso*, 764 F.3d 217, 230 (2d Cir. 2014) (quoting *Reichle v. Howards*, 566

Case 9:22-cv-00102-BKS-ML    Document 78    Filed 12/13/23    Page 263 of 373

Logan v. Graham, Not Reported in Fed. Supp. (2019)

U.S. 658, 664 (2012)). "A right is 'clearly established' if 'it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted.' " *Beckles v. City of New York*, 492 F. App'x 181, 182 (2d Cir. 2012) (quoting *Saucier v. Katz*, 533 U.S. 194, 202 (2001)).

Here, while Defendants summarize general caselaw, their argument in support of the qualified immunity defense is one paragraph long, entirely conclusory, and unsupported by any facts. Accordingly, it is recommended that Defendants' motion on this ground, be denied. *Thomas v. Delany*, 17-CV-1023, 2019 WL 4247807, at *19 (N.D.N.Y. Aug. 13, 2019) (Hummel, M.J.) (citing *Roberts v. Hobbs*, 10-CV-0174, 2010 WL 5888777, at *6 (E.D. Ark. Nov. 8, 2010) (summarily denying dispositive motion containing unsupported and conclusory qualified immunity arguments that fail to address the particular facts or cite any relevant cases)).

**ACCORDINGLY**, it is

**RECOMMENDED** that Defendants' motion for summary judgment (Dkt. No. 28) be **DENIED** with respect to Plaintiff's retaliation claims against (1) Defendant Pfleuger for firing Plaintiff as a feed up porter, and (2) Defendant Graham as superintendent and **GRANTED** with respect to Plaintiff's retaliation claims against (1) Defendants Jones, (2) Defendant Gould, and (3) Defendant Pfleuger for allegedly (a) filing a false misbehavior report against Plaintiff on June 17, 2015, (b) verbally harassing Plaintiff, (c) causing Defendant Gould to file an improper recommendation of administrative segregation, and (d) destroying Plaintiff's property.

**\*20** Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen (14) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993) (citing *Small v. Sec. of Health & Human Servs.*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(e), 72.

It is hereby respectfully **ORDERED** that the Clerk of the Court shall file a copy of this Report-Recommendation on the docket of this case and serve a copy upon the parties in accordance with the local rules.[24]

**All Citations**

Not Reported in Fed. Supp., 2019 WL 8015209

---

## Footnotes

1    The Court notes that Defendants sometimes refer to Defendant Pfleuger as Defendant "Plfueger" or "Pfleuger." (*See* Dkt. No. 28, Attach. 1; Dkt. No. 28, Attach. 3; Dkt. No. 28, Attach. 10.) However, for the sake of consistency, the Court will refer to him as Defendant Pfleuger, as reflected on the docket. (*See generally* docket sheet.)

2    The Court notes that the citation provided by Defendants for this fact does not support the fact asserted. *See* New York State Dep't of Corr. And Comty. Servs., http://nysdoccslookup.doccs.ny.gov/GCA00P00/WIQ3/WINQ130 (last visited November 25, 2019). However, the Court deems the fact admitted because Plaintiff failed to deny it. *Estate of D.B. by Briggs v. Thousand Islands Cent. Sch. Dist.*, 327 F. Supp. 3d 477, 485 n.2 & n.13 (N.D.N.Y. 2018) (Suddaby, C.J.) ("where a non-movant neither admits nor disputes a fact, the response is deemed an admission"); *Costello v. N.Y. State Nurses Ass'n*, 783 F. Supp. 2d 656, 661 n.5 (S.D.N.Y. 2011) (disregarding the plaintiff's responses to the defendant's statement of material facts not in dispute where the plaintiff's response paragraphs did not specifically dispute the defendant's statements or consisted of "conclusory allegations, speculation, or conjecture."); *In re Horowitz*, 14-CV-36884, 2016 WL 1039581, at *1 n.2 (Bankr. S.D.N.Y. Mar. 15, 2016) (stating that, "a response contending to neither admit or

Logan v. Graham, Not Reported in Fed. Supp. (2019)

Case 9:22-cv-00102-BKS-ML    Document 78    Filed 12/13/23    Page 264 of 373

deny an allegation does not create a genuine issue of fact"); *accord, Piacente v. Int'l Union of Bricklayers & Allied Craftworkers*, 11-CV-1458, 2015 WL 5730095, at *2 n.3 (S.D.N.Y. Sept. 30, 2015).

3    Defendants acknowledge that there are "certain caveats" to the PLRA's exhaustion requirement, however Defendants argue that those caveats are inapplicable here.

4    As a result, "[c]onclusory allegations, conjecture and speculation ... are insufficient to create a genuine issue of fact." *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998) (citation omitted). As the Supreme Court has explained, "[The non-movant] must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986).

5    *Cusamano v. Sobek*, 604 F. Supp. 2d 416, 426 & n.2 (N.D.N.Y. 2009) (Suddaby, J.) (citing cases).

6    *Cusamano*, 604 F. Supp. 2d at 426 & n.3 (citing cases).

7    *Cusamano*, 604 F. Supp. 2d at 426-27 & n.4 (citing cases).

8    Among other things, Local Rule 7.1(a)(3) requires that the non-movant file a response to the movant's Statement of Material Facts, which admits or denies each of the movant's factual assertions in matching numbered paragraphs, and supports any denials with a specific citation to the record where the factual issue arises. N.D.N.Y. L. R. 7.1(a)(3).

9    *Cusamano*, 604 F. Supp. 2d at 427 & n.6 (citing cases); *see also Prestopnik v. Whelan*, 253 F. Supp. 2d 369, 371 (N.D.N.Y. 2003) (Hurd, J.) (holding that the Court is not required to "perform an independent review of the record to find proof of a factual dispute.").

10    *See, e.g.*, *Beers v. GMC*, 97-CV-0482, 1999 U.S. Dist. LEXIS 12285, at *27-31 (N.D.N.Y. March 17, 1999) (McCurn, J.) (deeming plaintiff's failure, in his opposition papers, to oppose several arguments by defendants in their motion for summary judgment as consent by plaintiff to the granting of summary judgment for defendants with regard to the claims that the arguments regarded, under Local Rule 7.1[b][3]); *Devito v. Smithkline Beecham Corp.*, 02-CV-0745, 2004 WL 3691343, at *3 (N.D.N.Y. Nov. 29, 2004) (McCurn, J.) (deeming plaintiff's failure to respond to "aspect" of defendant's motion to exclude expert testimony as "a concession by plaintiff that the court should exclude [the expert's] testimony" on that ground).

11    *See also Murray v. Palmer*, 03-CV-1010, 2010 WL 1235591, at *1 & n.1 (N.D.N.Y. Mar. 31, 2010) (citation omitted) (Suddaby, J.).

12    The Court uses the term "a certain number of days" rather than a particular time period because (1) since the three-step process was instituted, the time periods imposed by the process have changed, and (2) the time periods governing any particular grievance depend on the regulations and directives pending during the time in question.

13    *See Murray*, 2010 WL 1235591, at *2 & n.3 (citing *Groves v. Knight*, 05-CV-0183, Decision and Order at 3 (N.D.N.Y. filed Aug. 4, 2009), an appeal from which was subsequently dismissed as frivolous, *see Groves v. Knight*, No. 09-3641, Mandate (2d Cir. Filed Jan. 15, 2010)).

14    7 N.Y.C.R.R. § 701.6(g) ("[M]atters not decided within the time limits may be appealed to the next step."); *see also Murray*, 2010 WL 1235591, at *2 & n.4 (collecting cases).

Logan v. Graham, Not Reported in Fed. Supp. (2019)

Case 9:22-cv-00102-BKS-ML    Document 78    Filed 12/13/23    Page 265 of 373

15    The Court notes that the Supreme Court recently eliminated this third inquiry, and courts are no longer permitted to excuse a prisoner's failure to exhaust his administrative remedies because of "special circumstances." ⚑ *Ross v. Blake*, 136 S. Ct. 1850, 1856-57 (2016).

16    "Although 'a plaintiff's pro se status does not allow him to rely on conclusory allegations or unsubstantiated speculation to overcome a motion for summary judgment,' *Almonte v. Florio*, 02-CV-6722, 2004 WL 60306, at *3 n.10 (S.D.N.Y. Jan. 13, 2004) (citation and italics omitted), where a plaintiff 'verifie[s] his complaint by attesting under penalty of perjury that the statements in the complaint [are] true and to the best of his knowledge,' the 'verified complaint is to be treated as an affidavit for summary judgment purposes,' ⚑ *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995)." *King v. Puershner*, 17-CV-1373, 2019 WL 4519692, at *1 n.1 (S.D.N.Y. Sept. 19, 2019).

17    The Court notes that this conclusion is based on the special solicitude afforded to Plaintiff as a *pro se* litigant. Further, the Court notes that the evidence in the record to support the exhaustion of Plaintiff's administrative remedies is sparse. *See c.f. Richardson v. Eberth*, 14-CV-6138, 2016 WL 1271078, at *2-3 (W.D.N.Y. Mar. 29, 2016) (dismissing based on failure to exhaust administrative remedies where the plaintiff attached a copy of his original grievance which did not "bear any indicia that it was received or provided to any individual at the jail for transmission to the CORC" and his affidavit submitted in opposition failed to provide any specific details to support his allegation that he appealed his grievance to CORC (e.g. it did not state what specific person he gave it to in the prison, on what date he gave the appeal to anyone at the prison, or any other pertinent or specific information to support his allegations)); *Toliver v. Stefinik*, 12-CV-0077, 2016 WL 3349316, at *6 (June 15, 2016) (D'Agostino, J.) (dismissing for failure to exhaust administrative remedies where the plaintiff submitted a copy of a formal grievance dated March 9, 2011, that was not reflected in the defendants' records but where the plaintiff alleged that he "circulated" the grievance to the defendants and it was unclear whether the grievance was ever submitted to IGRC).

18    Defendants argue that Defendant Pflueger, as a correction officer, would not have had authority to fire Plaintiff as a feed up porter. (Dkt. No. 28, Attach. 3 at 17-18; Dkt. No. 28, Attach. 10 at ¶11.) However, there is evidence in the record that disputes this assertion and creates an issue of fact for trial. (Dkt. No. 28, Attach. 5 at 49.)

19    It is undisputed that Plaintiff engaged in constitutionally protected speech by the filing of grievances. (Dkt. No. 1 at 5-7; Dkt. No. 28, Attach. 11; Dkt. No. 28, Attach. 12; Dkt. No. 28, Attach. 14; Dkt. No. 28, Attach. 15; Dkt. No. 28, Attach. 18; Dkt. No. 28, Attach. 19.) *See also Flood v. Cappelli*, 18-CV-3897, 2019 WL 3778736, at *7 (S.D.N.Y. Aug. 2, 2019) (collecting cases) (holding that the filing of a grievance is protected speech). In addition, the alleged actions taken by Defendants constitute adverse actions because they would deter a prisoner of "ordinary firmness" from exercising his rights. *See Johnson v. Schiff*, 17-CV-8000, 2019 WL 4688542, at *24 (S.D.N.Y. Sept. 26, 2019) (collecting cases) (holding that the filing of a false misbehavior report against a prisoner is an adverse action); *Hayes v. Dahkle*, 16-CV-1368, ⚑ 2017 WL 9511178, at *11 (N.D.N.Y. Oct. 30, 2017) (Hummel, M.J.) (holding that the "filing of a falsified misbehavior report that results in disciplinary segregated confinement constitutes adverse action."); *Casey v. Pallito*, 12-CV-0284, 2016 WL 96157, at *7 (D. Vt. Jan. 7, 2016) (holding that terminating a prisoner's employment is an "adverse action."); *Chavis v. Struebel*, 317 F. Supp. 2d 232, 238 (W.D.N.Y. 2004) (noting that "assigning the inmate [to] less desirable work assignments satisfies the adverse action requirement" for purposes of a prisoner's First Amendment retaliation claim).

20    "In assessing temporal proximity, the Second Circuit has established that no more than six months between the protected activity and the adverse action establishes the temporal proximity sufficient to support an inference of causal connection." *Hayes v. Dahkle*, 16-CV-1368, ⚑ 2017 WL 9511178, at *9 (N.D.N.Y. Oct. 30, 2017) (Hummel, M.J.) (citing *King v. McIntyre*, 11-CV-1457, 2015 WL 1781256, at *5 (N.D.N.Y. Apr. 8, 2016)).

Logan v. Graham, Not Reported in Fed. Supp. (2019)

Case 9:22-cv-00102-BKS-ML    Document 78    Filed 12/13/23    Page 266 of 373

Here Plaintiff was fired as a feed up porter and Defendant Pflueger filed an allegedly false misbehavior report on June 17, 2015, which is "well within the Second Circuit's six-month time frame for establishing a causal connection between [P]laintiff's filing of a grievance" on May 10, 2015. ⚑ *Hayes*, 2017 WL 9511178, at *10.

21    While Defendant Pflueger denies making the statements on August 4, 2015, and August 6, 2015, (Dkt. No. 28, Attach. 10 at ¶¶ 25-25), "[t]he court, when faced with conflicting sworn statements, must leave such credibility determinations to a reasonable fact finder to determine." *Mack v. Wood*, 17-CV-1146, 2019 WL 5197230, at *7 (N.D.N.Y. July 26, 2019) (Baxter, M.J.).

22    While this statement suggests retaliatory animus about Plaintiff's placement in administrative segregation, for the reasons set forth in Part III.C.1.c. *infra*, there is no evidence before the Court that Defendant Pflueger had any role in Plaintiff's administrative segregation placement (other than being the alleged target of Plaintiff's planned of attack). In addition, Plaintiff accepted the recommendation that he be placed in administrative segregation. (Dkt. No. 1 at 21-22.)

23    "In addition to satisfying one of these requirements, a plaintiff must also establish that the supervisor's actions were the proximate cause of the plaintiff's constitutional deprivation." ⚑ *Raspardo v. Carlone*, 770 F.3d 97, 116 (2d Cir. 2014).

24    The Clerk shall also provide Plaintiff with copies of all unreported decisions cited herein in accordance with ⚑ *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam).

---

**End of Document**                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

Case 9:22-cv-00102-BKS-ML    Document 78    Filed 12/13/23    Page 267 of 373

Logan v. Graham, Not Reported in Fed. Supp. (2020)

2020 WL 871197
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Seth LOGAN, Plaintiff,

v.

Superintendent GRAHAM, Auburn Correctional
Facility; C.O. Pflueger, Auburn Correctional
Facility; Officer Scott Jones, Auburn Correctional
Facility, formerly known as C.O. Smith; and C.O.
M. Gould, Auburn Correctional Facility, Defendants.

9:18-CV-291 (DNH/ML)
|
Signed 02/21/2020

**Attorneys and Law Firms**

SETH LOGAN, Plaintiff pro se, 177 Avery Avenue, Buffalo,
NY 14216.

HON. LETITIA JAMES, Attorney General for the State of
New York, OF COUNSEL: AIMEE COWAN, ESQ., Ass't
Attorney General, Attorney for Defendants, 300 South State
Street, Suite 300, Syracuse, NY 13202.

**DECISION and ORDER**

DAVID N. HURD, United States District Judge

**\*1** Pro se plaintiff Seth Logan brought this civil rights
action pursuant to 42 U.S.C. § 1983. On November
26, 2019, the Honorable Miroslav Lovric, United States
Magistrate Judge, advised by Report-Recommendation that
defendants' motion for summary judgment be granted in
part and denied in part. Specifically, Magistrate Judge
Lovric recommended that defendants' motion for summary
judgment be denied with respect to plaintiff's retaliation
claims against (1) defendant Pflueger for firing plaintiff as a
feed up porter, and (2) defendant Graham as Superintendent,
and granted with respect to plaintiff's retaliation claims
against (1) defendant Jones, (2) defendant Gould, and (3)
defendant Pflueger for allegedly (a) filing a false misbehavior
report against plaintiff on June 17, 2015, (b) verbally
harassing plaintiff, (c) causing defendant Gould to file an
improper recommendation of administrative segregation, and
(d) destroying plaintiff's property. Defendants timely filed
objections to the Report-Recommendation with respect to

the retaliation claim against defendant Pflueger and the
supervisory claims against defendant Graham.

Based upon a de novo review of the portions of the Report-
Recommendation to which defendants objected, the Report-
Recommendation is accepted and adopted in all respects. See
28 U.S.C. § 636(b)(1).

Therefore, it is

ORDERED that

1. Defendants' motion for summary judgment is GRANTED
in part and DENIED in part;

2. The motion is GRANTED with respect to plaintiff's
retaliation claims against (1) defendant Jones, (2) defendant
Gould, and (3) defendant Pflueger for allegedly (a) filing
a false misbehavior report against plaintiff on June 17,
2015, (b) verbally harassing plaintiff, (c) causing defendant
Gould to file an improper recommendation of administrative
segregation, and (d) destroying plaintiff's property and those
claims are DISMISSED;

3. Defendants Jones and Gould are DISMISSED from this
action;

4. The motion is DENIED with respect to plaintiff's retaliation
claims against (1) defendant Pflueger for firing plaintiff as a
feed up porter, and (2) defendant Graham as Superintendent
(relative to defendant Pflueger's alleged retaliatory conduct
of firing plaintiff as a feed up porter) and those claims shall
proceed to trial;

5. Trial is tentatively scheduled for September 14, 2020 at
9:30 a.m. in Utica, New York. Pre-trial submissions are due
on or before August 31, 2020;

6. The parties are reminded that they have the option of
referring this case to Magistrate Judge Lovric pursuant to
28 U.S.C. § 636(c) and based on his familiarity with
the case, but are free to withhold consent without adverse
substantive consequences. The parties are directed to advise
the Court on or before April 8, 2020 whether or not a consent
to a jury trial before him will be executed; and

7. If plaintiff wishes to renew his motion for the appointment
of pro bono trial counsel, he must do so within thirty (30) days

Logan v. Graham, Not Reported in Fed. Supp. (2020)

Case 9:22-cv-00102-BKS-ML    Document 78    Filed 12/13/23    Page 268 of 373

of the date of this Decision and Order. If plaintiff makes such a motion, the Clerk is directed to mail him a long form IFP application.

**\*2**  IT IS SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2020 WL 871197

---

**End of Document**

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment

Declined to Follow by   Lewis v. Hanson,   N.D.N.Y.,   April 9, 2020

2011 WL 1453789

Only the Westlaw citation is currently available.

United States District Court,

S.D. New York.

Susan Lee HARE, Plaintiff,

v.

James HAYDEN et al., Defendants.

No. 09 Civ. 3135(RWS).

|

April 14, 2011.

OPINION

SWEET, District Judge.

**\*1** Defendants Reverend Maria Lopez ("Lopez"), Deputy Superintendant James Hayden ("Hayden"), and Grievance Supervisor Kim Watson ("Watson") (collectively, "Defendants") have filed motions for summary judgment. For the reasons stated below, these motions are granted.

### Prior Proceedings

Plaintiff Susan Lee Hare ("Hare" or "Plaintiff") filed her complaint on April 1, 2009, alleging misconduct by Superintendant Ada Perez, Superintendant Elizabeth Williams, Hayden, Lopez, and Watson. Defendants Perez, Williams, Hayden, and Watson answered on September 16, 2009. Defendant Lopez answered on August 31, 2010. On November 22, 2010, the Court signed off on the stipulated dismissal of Defendants Perez and Williams.

Defendant Lopez and Defendants Hayden and Watson filed separate motions for summary judgment on December 13, 2010 and December 14, 2010, respectively. These motions were heard on submission on January 19, 2011.

### Statement of Facta

In August 2008, Plaintiff was programmed as a Catholic clerk assisting Father O'Shea, the Catholic Chaplain at Bedford Hills Correctional Facility ("BHCF"). She was programmed for both the morning and afternoon shifts. *See*

Deposition of Susan Hare, attached to Declaration of John Knudsen ("Knudsen Dec") as Exhibit A ("Hare Dep."), at 15. On August 14, 2008, a meeting occurred between Plaintiff, Father O'Shea, and Hayden. At that meeting, Father O'Shea recommended that Plaintiff remain the Catholic clerk after his retirement on August 15, and Hayden agreed that Plaintiff remain in the position. Affirmation of James Hayden ("Hayden Aff."), ¶ 3, attached to Knudsen Dec. as Exhibit C.

Plaintiff then sent a letter dated August 16, 2008 to Hayden in which she made several allegations against Reverend Lopez, including that Lopez met with Hare on August 15, that Lopez ordered the moving of a cabinet with Catholic items, and that Lopez ordered her clerks to pack up the Catholic items in the Sacristy into bags and put them out for the trash. *See* Hare Letter dated Aug. 18, 2008, attached to Knudsen Dec. at Exhibit B at Hare 27–31. The underlying theme of Plaintiff's letter appears to have been that Reverend Lopez was using her position to defile the Catholic religion. *See Id.* at 30 ("the Catholic (sic) have been defiled by this woman and her community.") In response to Plaintiff's letter and to address the allegations, Hayden set up a meeting on August 18, 2008 with Plaintiff, Lopez and two other inmates, Tuttle and Ramsey. Hayden Aff., ¶ 5.

The August 18 meeting between Plaintiff and Reverend Lopez was very contentious. Hayden Aff. ¶ 6. During the meeting, Hayden attempted to verify the allegations made in Plaintiff's August 16 letter. *See* Hare 110–11. He could not substantiate any of Plaintiff's allegations and determined that they were largely hearsay. *Id.;* Hayden Aff, ¶ 6. According to Hayden, Lopez did not attempt to attack Plaintiff during that meeting. Hayden Aff. ¶ 7; Affirmation of John Ruiz, ¶ 2, attached to Knudsen Dec as Exhibit D.

**\*2** Plaintiff contends that on August 18, Lopez verbally abused and physically threatened her in the chapel. Pl. Opp. Aff., at 4–7. Plaintiff claims that this interaction led to an investigation which prevented her from working as Catholic clerk. *Id.* at 4. It is unclear whether this interaction was separate from the August 18, 2008 meeting.

Plaintiff filed a grievance alleging that Reverend Lopez verbally harassed her during the August 18 meeting. *See* Hare 104–105. Hayden notified the Superintendent's Office of his personal observations during that meeting, which were incorporated into the Superintendent's response. *See* Hare 103; Hayden Aff., ¶ 8. Following the August 18 meeting, Plaintiff did not appear for her program assignment as

Catholic clerk for two weeks, after which time Reverend Lopez forwarded a memorandum to counselor Greenfield on September 2, 2008, requesting that Plaintiff be removed from her position as Catholic clerk and noting that no new Catholic clerk should be named until a Catholic Priest had been hired. *See* Hare 42. Plaintiff contends that this report was false and that she showed up for work but was sent away. Pl. Opp. Aff. at 9. Counselor Greenfield contacted Hayden to discuss Lopez's request for Plaintiff's removal. Hayden Aff., ¶ 9. According to Hayden, Plaintiff was removed from her Catholic clerk position by him on September 8, 2008, at the latest. Hayden Aff., ¶ 11. Plaintiff contends that she was not removed until September 15, 2008. Pl. Opp. Aff. at 9.

Hayden claims to have removed Plaintiff from her position for multiple reasons. Initially, it was reported that plaintiff failed to report for two weeks for programming after Father O'Shea retired. Hayden Aff., ¶ 10; Hare 42. Also, Hayden determined that Plaintiff was being disruptive to the provision of Catholic services at Bedford Hills. Hayden Aff. ¶ 10. Hayden had investigated plaintiffs numerous allegations about Reverend Lopez and her alleged interference with the Catholic programs and could not substantiate any of them. *Id.* For example, Hayden states that Plaintiff was telling inmates and outside civilians in the Catholic community that Lopez had the cabinet with Catholic items in it moved, and had articles removed from the Sacristy. *Id.* Hayden had received a call from Deacon Lou Santore, a civilian volunteer, who had been told these claims by Plaintiff and was upset. Hayden investigated these claims and determined them to be inaccurate. *Id.* Instead, he determined that the cabinet was moved by a volunteer from the long-term inmate committee, and that Plaintiff appeared to be the only person with the combination to the Sacristy. *Id.;* Affirmation of Kowsillia Magoo, ¶ 4, attached to Knudsen Dec. as Exhibit E. As part of his responsibilities as Deputy Superintendent of Programs, Hayden states that he could not allow inmates to use their programming position to disrupt the inmate and civilian volunteer populations. *Id.*

 **\*3** Additionally, Hayden discussed this issue with all the other chaplains at the facility, who agreed that Plaintiff should no longer remain as the Catholic clerk. Hayden Aff., ¶ 11. This included Sister MaryAnn Collins, who was a part-time employee at the facility and apparently effectively acted as head of the Catholic community there. *Id.* Finally, Hayden determined that Plaintiff and Reverend Lopez were not able to work together. *Id.* Plaintiff drafted a handwritten grievance complaint on September 4, 2008, in which she complained

that Reverend Lopez was retaliating against her because of her prior grievance, and asked that she "stop being harassed and retaliated against by Rev. Lopez." Hare 40–41. Defendant Watson responded to that grievance, noting that Plaintiff no longer worked as a clerk and, thus, Reverend Lopez could no longer be harassing her. Hare 39. Watson states that this was an attempt by her to informally resolve Plaintiff's grievance. Affirmation of Kim Watson ("Watson Aff."), at ¶ 3, attached as Exhibit F to Knudsen Dec. Plaintiff did not request to have the grievance formally processed, but if she had, Watson claims she would have done so. *Id.* Plaintiff contends that she took Watson's response to mean that she could not file a grievance.

### Summary Judgment Standard

Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). In considering a summary judgment motion, the Court must "view the evidence in the light most favorable to the non-moving party and draw all reasonable inference in its favor, and may grant summary judgment only when no reasonable trier of fact could find in favor of the nonmoving party." *Allen v. Coughlin,* 64 F.3d 77, 79 (2d Cir.1995) (internal citations and quotation marks omitted); *see also* *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986). Affidavits submitted in opposition to summary judgment must be based on personal knowledge from a competent source, and "set forth such facts as would be admissible in evidence." *Patterson v. County of Oneida,* 375 F.3d 206, 219 (2d Cir.2004) (quoting Fed.R.Civ.P. 56(c)). Hearsay or other evidence that would be inadmissible at trial cannot be credited to defeat a summary judgment motion. *See Id.* at 219 ("an affidavit's hearsay assertion that would not be admissible at trial if testified to by the affiant is insufficient to create a genuine issue for trial.").

### Plaintiff's Retaliation Claims are Dismissed

In order to state a valid retaliation claim, a plaintiff must allege that her actions were protected by the Constitution, and that such "conduct was a substantial or motivating factor for the adverse actions taken by prison officials." *Bennett v. Goord,* 343 F.3d 133, 137 (2d Cir.2003) (internal citations omitted). There must be a "causal connection between

the protected [conduct] and the adverse action." *Gill v. Pidlypchak,* 389 F.3d 379, 380 (2d Cir.2004) (internal citation and quotations omitted). "A plaintiff cannot state a retaliation claim in wholly conclusory terms, but rather, must provide a pleading that is 'supported by specific and detailed factual allegations.' " *Anderson v. Lapolt,* No. 07 Civ. 1184, 2009 WL 3232418, at *5 (N.D.N.Y. Oct. 1, 2009) (quoting *Friedl v. City of New York,* 210 F.3d 79, 85–86 (2d Cir.2000)); *see also Sawyer v. Jowers,* No. 08 Civ. 186, 2008 WL 4791557, at *6 (N.D.Tex. Oct. 31, 2008) ("To state a claim of retaliation, the inmate must allege more than his personal belief that he is the victim of retaliation. Conclusory allegations of retaliation are not sufficient; the plaintiff must produce direct evidence of motivation or allege a chronology of events from which retaliation may plausibly be inferred") (internal citations omitted); *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995) (if plaintiff's claim of retaliation had been based on circumstantial evidence alone, and not also supported by direct evidence of defendant's admission, Court would be inclined to grant summary judgment; *Bussey v. Phillips,* 419 F.Supp.2d 569, 585 (S.D.N.Y.2006) ("In order to survive summary judgment on a retaliation claim, a plaintiff bears the burden of showing two genuine issues of material fact: first, that the plaintiff engaged in constitutionally protected conduct, and, second, that the conduct was a substantial or motivating factor for the adverse actions taken by prison officials.").

**\*4** Even where a plaintiff meets her burden of establishing a prima facie retaliation claim, it is still subject to dismissal if sufficient other non-retaliatory reasons to take the adverse action were present. *See Bussey,* 419 F.Supp.2d at 585; *Gayle v. Gonyea,* 313 F.3d 677, 682 (2d Cir.2002). Furthermore, inmates have no right, constitutional or otherwise, to any particular job or assignment within a prison. *Gill v. Mooney,* 824 F.2d 192, 194 (2d Cir.1987); *Hodges v. Jones,* 873 F.Supp. 737, 745 (N.D.N.Y.1995) (citing *Lane v. Reid,* 575 F.Supp. 37, 39 (S.D.N.Y.1983). Inmates can be removed from prison assignments for virtually any reason, provided that such decisions are not based on the inmate's race or religion. *Bussey,* 419 F.Supp.2d at 589 (S.D.N.Y.2006).

It should be noted that "courts must approach prisoner claims of retaliation with skepticism and particular care," as such claims are "easily fabricated" and run the risk of "unwarranted judicial intrusion into matters of general prison administration." *Dawes v. Walker,* 239 F.3d 489, 491 (2d

Cir.2001), overruled on other grounds in *Swierkiewicz v. Sorema N.A.,* 534 U.S. 506 (2002). *See also Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir.1996) (noting that prisoner retaliation claims are " 'prone to abuse' because prisoners can claim retaliation for every decision they dislike.") (quoting *Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983)); *Colon,* 58 F.3d at 872 ("because we recognize both the near inevitability of decisions and actions by prison officials to which prisoners will take exception and the ease with which claims of retaliation may be fabricated, we examine prisoners' claims of retaliation with skepticism and particular care."); *Gill,* 824 F.2d at 194 (because of the potential for abuse, the Court of Appeals requires a "higher level of detail in pleading [retaliation claims]").

Plaintiff contends that she was removed from her position as Catholic clerk by Hayden in retaliation for her complaints against Lopez. [1] There is no dispute that Plaintiff's complaints against Lopez are protected speech and that her removal from her position as Catholic clerk was an adverse action; however, Plaintiff fails to establish the causal link between her complaints and her dismissal, particularly in light of legitimate non-discriminatory reasons for her dismissal given by Hayden.

As a general matter, it is difficult to establish one defendant's retaliation for complaints against another defendant. *See Wright v. Goord,* 554 F.3d 255, 274 (2d Cir.2009) (dismissing retaliation claim against a corrections officer when only alleged basis for retaliation was complaint about a prior incident by another corrections officer). Here, even giving Plaintiff every reasonable inference, Plaintiff fails to establish that Hayden had a motive to retaliate arising from her complaints against Lopez, and that Hayden's retaliatory motive formed the basis for her dismissal.

**\*5** To the extent Plaintiff contends that Hayden was incompetent or covering up Lopez's misconduct, the evidence before the Court indicates otherwise. Hayden investigated Plaintiff's claims against Reverend Lopez. The August 18, 2008 meeting between Plaintiff, Hayden and Lopez was called in order for Hayden to investigate Plaintiffs allegations in her August 16 letter, *see* Hayden Aff., ¶ 5, and at that meeting, Hayden questioned both Plaintiff and Lopez to determine the veracity of Plaintiff's allegations. *See* Hare 110–111; Hare Dep., at 73–74. Plaintiff's subsequent grievance

on August 21 alleged that Lopez mistreated her during the August 18 meeting, a claim for which there was no need for Hayden to investigate since he was present for the meeting and knew what had and had not occurred. *See* Hayden Aff., ¶ 8. Finally, there is no evidence to indicate that Hayden was "covering up" for Lopez, and the record indicates that Hayden reasonably found Plaintiff's complaints against Lopez to be meritless. Plaintiff's allegations of a cover up are conclusory and are insufficient to meet Plaintiff's burden for a retaliation claim at the summary judgment stage. *See* 🚩 *Graham,* 89 F.3d at 79.

Even if the Court were persuaded that there was a causal connection between Plaintiff's complaints against Lopez and her dismissal from her position as Catholic clerk, Hayden had valid, non-discriminatory reasons for dismissing her. "A finding of sufficient permissible reasons to justify state action is 'readily drawn in the context of prison administration where ... prison officials have broad administrative and discretionary authority.' " 🚩 *Graham,* 89 F.3d at 79 (quoting 🚩 *Lowrance v. Achtyl,* 20 F.3d 529, 535 (2d Cir.1994)). Here, Hayden identified four legitimate reasons for Plaintiff's removal: (1) she failed to show up for work for 2 weeks [2]; (2) her behavior disrupted the overall provision of Catholic services at Bedford Hills; (3) her removal was recommended by all the other chaplains, including the part-time chaplain, Sister MaryAnn Collins; and (4) the inability of Plaintiff and Lopez to work together. Hayden Aff., ¶¶ 10–11.

Plaintiff's allegations that Lopez independently retaliated against her, by preventing her from returning to her program assignment, falsely reporting her absence from her job, and otherwise acting inappropriately toward her, are belied by Plaintiff's acknowledgement that Lopez never made any statement revealing that she engaged in any conduct with the intent to retaliate against Plaintiff for writing complaint letters or for any other act by Plaintiff. (Hare Dep. at 135). Plaintiff can only point to her conclusory assumptions of Lopez's motive and has failed to adequately substantiate her claims to survive this motion for summary judgment.

Furthermore, even if Plaintiff did establish that Lopez filed a false report in retaliation for her complaints, Plaintiff cannot establish that the adverse action of her dismissal from her position as Catholic clerk by Hayden arose from that allegedly false report. As discussed above, Hayden chose to dismiss Plaintiff for three other legitimate reasons and would have done so regardless of the report. Hayden Aff., ¶¶ 10–11. *See*

🚩 *Graham,* 89 F.3d at 79 (quoting 🚩 *Lowrance,* 20 F.3d at 535).

### Plaintiff's Claim that Lopez Filed a False Misbehavior Report is Dismissed

**\*6** To the extent that Plaintiff claims Lopez falsely reported her absence from work for two weeks, this allegation does not support a claim. "The Second Circuit has held that the issuance of false misbehavior reports against an inmate by corrections officers is insufficient on its own to establish a denial of due process...." [3] 🚩 *Faison v. Janicki,* No. 03 Civ. 6475, 2007 WL 529310, at \*4 (W.D.N.Y. Feb. 14, 2007) (citing 🚩 *Boddie v. Schnieder,* 105 F.3d 857, 862 (2d Cir.1997)). *See also* 🚩 *Moore v. Casselbeny,* 584 F.Supp.2d 580, 582 (W.D.N.Y.2008) ("There is no basis for a constitutional claim alleging the mere filing of a false report"); 🚩 *Flemings v. Kinney,* No. 02 Civ. 9989, 2004 WL 1672448, at \*3 (S.D.N.Y. Jul. 27, 2004) ("[i]t is well settled that 'a prison inmate has no general constitutional right to be free from being falsely accused in a misbehavior report' ") (quoting 🚩 *Boddie,* 105 F.3d at 862). Furthermore, the record does not support Plaintiff's assertion that Lopez's report was false. Officers Ruiz and Magoo both affirm that they were never instructed by Lopez not to allow Plaintiff to enter the chapel. Ruiz Aff., ¶ 3; Magoo Aff., ¶ 3. Lopez denies having falsified the report.

### Plaintiff's Claim that She was Unable to File a Grievance is Dismissed

Plaintiff alleges that she was denied the right to file a grievance when Watson responded to Plaintiff's September 4, 2008 grievance, which requested that Lopez stop retaliating against her, by noting that Plaintiff no longer worked as a clerk and, thus, Reverend Lopez could not retaliate against her. *See* Hare 39–41. Watson claims to have sent this memorandum to Plaintiff in an attempt to informally resolve the grievance, which is part of Watson's responsibilities, Watson Aff. ¶ 3, but Plaintiff alleges she understood the memorandum to indicate that she was not allowed to file a grievance. Watson claims she would have formally filed the grievance if Plaintiff had contacted her and requested that it be formally filed. *Id.*

While there is a dispute of fact as to whether Plaintiff was allowed to file a grievance, Plaintiff has no constitutionally protected right to file a grievance, and thus does not have

a cognizable § 1983 claim. *See Shell v. Brzezniak,* 365 F.Supp.2d 362, 370 (W.D.N.Y.2005) ("[I]nmate grievance programs created by state law are not required by the Constitution and consequently allegations that prison officials violated those procedures does not give rise to a cognizable § 1983 claim") (citing *Cancel v. Goord,* No. 00 Civ.2042, 2001 WL 303713, *3 (S.D.N.Y. Mar. 29, 2001)); *Mastroianni v. Reilly,* 602 F.Supp.2d 425, 437 (E.D.N.Y.2009) ("[T]he grievance procedure or lack thereof cannot itself form the basis of a Section 1983 claim because there is no constitutional right to a grievance mechanism") (citing *Swift v. Tweddell,* 582 F.Supp.2d 437, 445–46 (W.D.N.Y.2008)). Notably, Defendants do not argue that Plaintiff has failed to exhaust her claim of retaliation because this grievance was not processed through the entire grievance system.

### Plaintiff's Claims of Verbal Abuse are Dismissed

**\*7** Plaintiff accuses Lopez of approaching her on August 18, 2008 "in a menacing way, raising her hands toward plaintiff from behind in a motion as if to strangle plaintiff" (Pl. Opp. Aff. at 7) and asserts that Lopez "screamed" at her and called her a "liar" (Hare Dep. at 57) or otherwise spoke to her in an abusive manner. While Lopez denies Hare's allegations regarding her conduct, even when the evidence concerning them is viewed most favorably to Plaintiff, these allegations do not support an action pursuant to § 1983. The Eighth Amendment proscribes the " 'unnecessary and wanton infliction of pain' " on prisoners by prison officials. *Boddie,* 105 F.3d at 861 (quoting *Whitley v. Albers,* 475 U.S. 312, 319 (1986)). Hare does not claim that any actual physical harm was caused to her by Lopez, and she acknowledged in her deposition testimony that, on the occasion when she alleges Lopez approached her in a physically threatening manner, "[m]y back was to her" (Hare Dep. at 61), and "I didn't see her ...." (Hare Dep. at 58). According to Plaintiff, Officer Ruiz "stopped the whole incident" before any assault could take place. (Hare Dep. at 57).

It is undisputed that there was no actual assault, and Plaintiff's evidence, viewed most favorably to her, establishes nothing more than verbal abuse. As the Court held in *Aziz Zarif Shabazz v. Pico,* 994 F.Supp. 460, 474 (S.D.N.Y. 1998):

> [V]erbal harassment or profanity alone, "unaccompanied by any injury, no matter how inappropriate, unprofessional, or reprehensible it might seem," does not constitute the violation of any federally protected right and therefore is not actionable under *42 U.S.C. § 1983. Del Carpio v. Walker,* No. 95 Civ. 1502(RSP) (GJD), 1997 WL 642543, at * 6 (N.D.N.Y. Oct. 15, 1997) (citing *Purcell v. Coughlin,* 790 F.2d 263, 265 (2d Cir.1986) (per curiam)); *Brown v. Croce,* 967 F.Supp. 101, 104 (S.D.N.Y.1997)); *see Ramirez v. Holmes,* 921 F.Supp. 204, 210 (S.D.N.Y.1996); *Alnutt v. Cleary,* 913 F.Supp. 160, 165–66 (W.D.N.Y.1996); *Jermosen v. Coughlin,* 878 F.Supp. 444, 449 (N.D.N.Y.1995) ("Although indefensible and unprofessional, verbal threats or abuse are not sufficient to state a constitutional violation cognizable under *§ 1983.*"); *Beal v. City of New York,* No. 92 Civ. 0718(KMW), 1994 WL 163954, at *6 (S.D.N.Y. Apr. 22, 1994), *aff'd,* 89 F.3d 826, 1995 WL 722263 (2d Cir.1995); *Hurdle v. Ackerhalt,* No. 92–CV–1673, 1993 WL 71370, at *1–2 (N.D.N.Y. Mar. 8, 1993) (allegations of threats and harassment do not rise to the level of a Constitutional violation).

Plaintiff's claim fails because she does not allege that she suffered any physical injury. *See Bouknight v. Shaw,* No. 08 Civ. 5187, 2009 WL 969932, at *3 (S.D.N.Y. Apr. 6, 2009) ("Verbal harassment and name calling, absent physical injury, are not constitutional violations cognizable under *§ 1983.*") (citing *Purcell,* 790 F.2d at 265). *See also Thompson v. Carter,* 284 F.3d 411, 418 (2d Cir.2002) ("We agree with the majority of our sister circuits that [ 42 U.S.C. § ] 1997e(e) applies to claims in which a plaintiff alleges constitutional violations so that the plaintiff cannot recover damages for mental or emotional injury for a constitutional violation in the absence of a showing of actual physical injury.") Rather, Plaintiff contends that she suffered only "mental anguish" as a consequence of the Defendants' actions.

**\*8** "Under certain circumstances, the intentional infliction of psychological pain may constitute an Eighth Amendment violation, so long as the pain is not *de minimus.*" *Shabazz,* 994 F.Supp. at 475. Plaintiff stated in her deposition that she was affected by Lopez's conduct particularly because she was a domestic violence victim and because Lopez came from a position of trust. (Hare Dep. at 139). However, Plaintiff admitted during her deposition that, notwithstanding the availability of mental health services, she never sought such services, but attained sufficient relief from her distress

by speaking about it with a chaplain. (Hare Dep. at 139–40). Based on Plaintiff's allegations and record, Plaintiff's mental pain was *de minimus*. *See Shabazz,* 994 F.Supp. at 475 (mental anguish caused by repeated use of racial slurs was *de minimus* ); *Jermosen v. Coughlin,* No. 87 Civ. 6267, 1993 WL 267357, at *6 (S.D.N.Y. July 9, 1993), *aff'd,* 41 F.3d 1501 (2d Cir.1994) (*de minimus* psychological harm when correctional officers "approached plaintiff with their nightsticks raised in a threatening position" before conducting a strip frisk).

### *Plaintiff's Claims for Infringement of Her Religious Rights are Dismissed*

#### a. The Alleged Removal of Religious Objects from the Sacristy

Hare's complaint discusses at length the alleged removal of religious articles from the Catholic sacristy at BHCF, but she has acknowledges that she did not observe anyone removing those articles, and that she has no personal knowledge regarding who is responsible for any such conduct. (Hare Dep. at 137; Pl. Opp. Aff. at 7). Lopez, for her part, denies any involvement in or knowledge of this occurrence. (Lopez Aff., ¶¶ 14–15). It appears that Plaintiff's only basis for claiming that Lopez had any involvement in the alleged removal of the articles in question is her assertion that she was told by Officer Magoo and through a grapevine of other inmates that Lopez had authorized other inmates to take this action. (Hare Dep. at 37; Pl. Opp. Aff. at 9). This hearsay claim is not corroborated by Officer Magoo; in fact, he has affirmed that he did not make such a statement to Hare. (Magoo Aff., ¶ 4). Likewise, Inmate Rose Ramsey, who allegedly told Lucy Tuttle, who allegedly told Plaintiff, about Lopez's role in the removal of articles for the Catholic service has not provided an affidavit corroborating Plaintiff's contention. Thus, Hare does not present admissible evidence to support her allegation that Lopez caused the removal of items from the Catholic sacristy. *See Finnegan v. Board of Educ. of Enlarged City School Dist. of Troy,* 30 F.3d 273, 274 (2d Cir.1994) (hearsay that would not be admissible at trial cannot be relied upon in opposition to a motion for summary judgment). Without establishing Lopez's involvement in the alleged removal of Catholic items, Plaintiff has not established a claim. As the Court of Appeals has recognized, "[b]ecause Section 1983 imposes liability only upon those who actually cause a deprivation of rights, 'personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.' " *Blyden v. Mancusi,* 186 F.3d 252, 264 (2d Cir.1999) (quoting *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994)).

**\*9** Even if Plaintiff had established that Lopez bears responsibility for the removal of those articles from the sacristy, the conduct she alleges would not establish any violation of Hare's personal rights. She does not claim that any of the articles in question belonged to her, and, in the absence of specific criteria that Hare does not allege here, a plaintiff does not have standing to assert the constitutional rights of others. *Camacho v. Brandon,* 317 F.3d 153, 159 (2d Cir.2003) ("A plaintiff may assert the constitutional claims of a third party if the plaintiff can demonstrate: (1) injury to the plaintiff, (2) a close relationship between the plaintiff and the third party that would cause plaintiff to be an effective advocate for the third party's rights, and (3) 'some hindrance to the third party's ability to protect his or her own interests.' ") (quoting *Campbell v. Louisiana,* 523 U.S. 392, 397 (1998)). *Cf. Hudson v. Palmer,* 468 U.S. 517, 547 n. 13 (1984) (Stevens J., conc. in part and diss. in part) ("A prisoner's possession of ... personal property relating to religious observance, such as a Bible or a crucifix, is surely protected by the Free Exercise Clause of the First Amendment"). Thus, Hare's allegations regarding the alleged removal and desecration of objects from the Catholic sacristy does not give rise to any genuine dispute regarding facts that would be material to her § 1983 action against Lopez.

#### b. The Alleged Denial of Plaintiff's Right to Practice Her Religion

Plaintiff alleges that Lopez impermissibly infringed upon her right to practice religion. She does not allege any involvement in this deprivation by Hayden or Watson, so this claim is dismissed as to them.

In her complaint, Plaintiff asserts denial of "the right to practice Freedom of Religion," but she does not specify how this alleged violation of her civil rights occurred. In her affirmation opposing the summary judgment motions[4] , Plaintiff contends that Lopez prevented Plaintiff from continuing her Catholic video group and curtailed "all Catholic programs, which precluded plaintiff from participating in them, as they no longer were running." Pl. Opp. Aff. at 8. Also, referring to Lopez's alleged verbal abuse of Plaintiff on August 8, 2011, Plaintiff claims that "Lopez's actions effectively precluded any operations of

religious programs for Catholic inmates." Pl. Opp. Aff. at 6. These assertions are insufficient to place into issue facts that, if resolved in Plaintiff's favor, would entitle her to relief pursuant to Section 🚩 § 1983.

To establish a free exercise claim under the First Amendment, a plaintiff must demonstrate that state action substantially burdened her observation of a "central religious belief" without a "compelling government interest" justifying the burden. 🚩 *Skoros v. City of New York*, 437 F.3d 1, 39 (2d Cir.2006) (quoting 🚩 *Jimmy Swaggart Ministries v. Bd. of Equalization*, 493 U.S. 378, 384–85 (1990)). An inmate's right to the free exercise of religion is "subject to limitations that arise both as a consequence of being incarcerated and from 'valid penological objectives.' " 🚩 *Harris v. Lord*, 957 F.Supp. 471, 474 (S.D.N.Y.1997) (quoting 🚩 *O'Lone v. Estate of Shabazz*, 482 U.S. 342 (1987)).

 *10 With regard to the alleged curtailment of programs such as the "Praise Dance" or the video activities that she sought to organize, Plaintiff does not claim that these programs were "central or important" to the practice of her religion, an essential component of a claim that her religious beliefs were "substantially burdened." 🚩 *Ford v. McGinness*, 352 F.3d 582, 593–94 (2d Cir.2003).

Hare's claims regarding the "suspension" of Catholic programs appear to be linked with her role in leading such programs. Plaintiff's papers and testimony recognize, however, the Catholic Chaplain, Father O'Shea, retired in August of 2008. The subsequent temporary suspension of programs that he had supervised cannot be deemed an unreasonable infringement on Plaintiff's practice of her religion, but simply a consequence of the institution's temporary lack of a Catholic Chaplain. Plaintiff's claim appears to be premised on her assumption that, even in Father O'Shea's absence, she should have been permitted to continue running these programs. (*See* Hare Dep. at 105 ("Even if I was not a clerk, I should have been allowed to run the program")). However, as discussed above, inmates have no right to any particular position or assignment at a correctional institution. *See* 🚩 *Gill*, 824 F.2d at 194.

Plaintiff's claim that Lopez prevented her from attending Catholic Mass and other religious programming, to the extent that she asserts it, is not supported by the record and does

not survive summary judgment even when all reasonable inferences are made in her favor. At her deposition she testified as follows:

> Q. In general, do you recall at any time when you were trying to go to Catholic mass where you were not allowed to go?

> A. If [Lopez] knew I was in there, then I was harassed. If she told the officer this Sunday she found out, she would tell that officer. If that officer was there, then I would be harassed.

> Q. How were you harassed?

> A. Because I was told to leave, I'm not allowed to be there.

> Q. How many times, to the best of your recollection, were you told that you had to leave the Catholic mass?

> A. I would say a couple of times. Like I said, I got tired of being harassed, and I just stopped going.

> ...

> Q. What about programming, were you allowed to go to Catholic programming?

> A. No. Those were during the day. That's when she really got me. Then on Tuesday night she was there late. She was there until 8 o'clock at night. That was her late night. She made sure that the officer knew I was not supposed to be there.

(Hare Dep. at 106–07).

Plaintiff does not identify the officers involved or specify the dates on which she was allegedly told to leave the chapel. Plaintiff also provides no basis for her claim that, when they allegedly told her to leave, the officers were acting at the direction of Lopez, and does not claim to have observed Lopez giving any officer such instructions. Officers Ruiz and Magoo, who were stationed outside the 112 Chapel during the period in question, have affirmed that they never received any such instruction from Lopez. Ruiz Aff. ¶ 3; Magoo Aff. ¶ 3. Thus, Plaintiff has not presented any admissible evidence that would support her claim that Lopez prevented her from attending Mass or other religious services, and the record suggests that she was not denied entry to Mass.

 *11 Moreover, it is unclear whether being told to leave the chapel "a couple of times" (Hare Dep. at 107)—even

when the evidence is viewed most favorably to Plaintiff—rises to the level of a "substantial burden" on Hare's religious freedom. It is undisputed that Hare's right to free exercise of religion includes the right to attend religious services. *O'Lone,* 482 U.S. 342, 348 (1987). However, that right is not unlimited or absolute, but is subject to limitations that arise both as a consequence of being incarcerated and from "valid penological objectives." *Id.* Because Plaintiff provides no particulars as to the dates and times when she was allegedly prevented from attending Mass, and does not identify the officers who allegedly prevented her from doing so, her claims are too vague to permit the Court to determine both that the alleged removal actually occurred and, if it did, whether it was justified by a compelling government interest. *See* *Skoros,* 437 F.3d at 39.

In view of all of these circumstances, the Court concludes that Hare's claim that her freedom of religion was infringed is not based on facts that would entitle her to relief pursuant to § 1983. *See* *Salahuddin v. Coughlin,* 781 F.2d 24, 29 (2d Cir.1986) (summary judgment stage is appropriate juncture for *pro se* plaintiffs to make clear the facts they believe support their claims, and for a court to grant summary judgment where the underlying facts are insufficient).

### *Plaintiff's Reference to Additional Witnesses Does Not Merit a Denial of Summary Judgment*

Plaintiff claims that Defendants' motions for summary judgment should be denied on the grounds that two witnesses have yet to file affidavits. Four months have passed since Defendants filed their motions for summary judgment, and Plaintiff has not attempted to submit these additional affidavits. Furthermore, Plaintiffs' description of what their witnesses will say demonstrates that they would not rescue her claims.

Plaintiff contends that Inmate Lucy Tuttle observed Lopez verbally abuse and physically threaten her in the chapel on August 18, 2008 and in the subsequent meeting on that same day (to the extent that these are separate instances). As was discussed above, Lopez's alleged verbal abuse does not support a § 1983 claim for cruel and unusual punishment, as Plaintiff alleges.

Plaintiff also contends that Lieutenant Collins was Sergeant Collins at the time Lopez prevented Plaintiff from entering her work assignment as Catholic Chaplain's Clerk, again without specifying when this occurred. Lopez's alleged refusal to allow Plaintiff to work as Catholic clerk is insufficient to support a § 1983 claim, as Lopez holds no right to her prison assignment. To the extent that Collins's affidavit would support Plaintiff's allegation that Lopez falsely reported her absent from work in retaliation for the Plaintiff's complaints, Plaintiff has not established that her complaints motivated the allegedly false reporting. Furthermore, Plaintiff cannot establish that the adverse action of her removal from her position as Catholic clerk was caused by the allegedly false reports, as Hayden cited other valid reasons for his decision to remove her.

### Conclusion

**\*12** For the reasons stated above, Defendants' motions for summary judgment are granted.

It is so ordered.

### All Citations

Not Reported in F.Supp.2d, 2011 WL 1453789

---

### Footnotes

1   To the extent that Plaintiff's allegations of retaliation are not contained in her complaint, but come from her deposition testimony and other filings, they are dismissed on this independent ground. *Kearney v. County of Rockland,* 373 F.Supp.2d 434,440–41 (S.D.N.Y.2005) ("plaintiff must set forth facts that will allow each party to tailor its discovery to prepare an appropriate defense. Because a failure to assert a claim until the last minute will inevitably prejudice the defendant, courts in this District have consistently ruled that it is inappropriate to raise new claims for the first time in submissions in opposition to summary judgment.")

2    Plaintiff contends that she did show up for work but was sent away by Lopez. This claim against Lopez is addressed, infra. Hayden's reliance on Lopez's absence report was reasonable and was a legitimate basis for Hayden's decision to dismiss Plaintiff.

3    A plaintiff does have a claim "where the fabrication of evidence was motivated by a desire to retaliate for the inmate's exercise of his substantive constitutional rights." *Franco v. Kelly,* 854 F.2d 584, 588–89 (2d Cir.1988). However, as discussed above, Plaintiff, to the extent she makes such a claim, fails to establish that Lopez was motivated by Plaintiff's complaints when she filed the allegedly false report.

4    As with her retaliation claims, to the extent that Plaintiff's allegations of infringement on her rights to practice her religions are not contained in her complaint, but come from her deposition testimony and other filings, they are dismissed on this independent ground. Kearney, 373 F.Supp.2d at 440–41.

---

**End of Document**                                  © 2023 Thomson Reuters. No claim to original U.S. Government Works.

Case 9:22-cv-00102-BKS-ML Document 78 Filed 12/13/23 Page 278 of 373

Flynn v. Ward, Not Reported in Fed. Supp. (2018)

2018 WL 3195095
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Bruce FLYNN, Plaintiff,

v.

Joe WARD and Lief Wellenstein, Defendants.

No. 15-CV-1028 (TJM/CFH)
|
Signed 06/06/2018
|
Filed 06/07/2018

**Attorneys and Law Firms**

Bruce Flynn, 10-A-1558, Elmira Correctional Facility, P.O. Box 500, Elmira, NY 14902, pro se.

Attorney General for the State of New York, OF COUNSEL: BRIAN W. MATULA, ESQ., Assistant Attorney General, The Capitol, Albany, New York 12224-0341, Attorney for Defendant.

**REPORT-RECOMMENDATION AND ORDER** [1]

CHRISTIAN F. HUMMEL, U.S. MAGISTRATE JUDGE

**\*1** Plaintiff pro se Bruce Flynn ("Flynn" or "Plaintiff"), an inmate who was, at all relevant times, in the custody of the New York Department of Corrections and Community Supervision ("DOCCS"), brings this action pursuant to 42 U.S.C. § 1983 against Defendants Acting Superintendent Joe Ward ("Defendant" or "Ward") and C.O. Lief Wellenstein ("Defendant" or "Wellenstein") for violations of his rights under the First Amendment. Dkt. No. 20 ("Am. Compl."). Additional defendants were named, but the claims against them have since been dismissed. Dkt. No. 22. Presently before the undersigned is Defendants' motion for summary judgment and dismissal of the Amended Complaint pursuant to Rule 56 of the Federal Rules of Civil Procedure ("Fed. R. Civ. P."). Dkt. No. 64. Flynn did not oppose the motion. For the following reasons, it is recommended that Defendants' motion be granted in part and denied in part.

**I. Failure to Respond**

Flynn failed to submit any opposition papers to Defendants' motion for summary judgment. Flynn was notified of the consequences of failing to respond to a summary judgment motion by Defendants and the Court. Dkt. Nos. 64-1 and 65. However, "[t]he fact that there has been no response to a summary judgment motion does not ... mean that the motion is to be granted automatically." Champion v. Artuz, 76 F.3d 483, 486 (2d Cir. 1996). Even in the absence of a response, Defendants are entitled to judgment only if the material facts demonstrate their entitlement to judgment as a matter of law. Id.; FED. R. CIV. P. 56(c). While "[a] verified complaint is to be treated as an affidavit ... and [may] be considered in determining whether material issues of fact exist[,]" see Colon v. Coughlin, 58 F.3d 865, 872 (2d Cir. 1995) (citations omitted), Flynn's Amended Complaint is not verified. [2] Thus, the Amended Complaint does not have the "force and effect of an affidavit." See Tafari v. Brown, No. 9:10-CV-1065 (GTS/DRH), 2012 WL 1098447, at \*7, n. 8 (N.D.N.Y. Mar. 30, 2012) (collecting cases). Despite this fact, the Court may consider the exhibits attached to the Amended Complaint. See Dawkins v. Williams, 511 F. Supp. 2d 248, 255 (N.D.N.Y. 2007) (considering the exhibits annexed to the pro se plaintiff's amended complaint when deciding the defendant's motion for summary judgment even though that pleading was not verified). Defendants do not dispute the authenticity of the exhibits and, in fact, utilized the exhibits during Flynn's deposition and cite to the exhibits in support of the motion. Dkt. No. 64-2 ¶¶ 46-48; Dkt. No. 64-4; Dkt. No. 64-7 at 1-2. [3] Additionally, a copy of Flynn's deposition transcript is annexed as an exhibit to Defendants' motion. Dkt. No. 64-4. Consequently, the facts set forth in Defendants' Rule 7.1 Statement of Material Facts [4] are accepted as true, but only as to those facts that are not disputed by Flynn's sworn testimony or the exhibits annexed to the Amended Complaint. See N.D.N.Y. L.R. 7.1(a)(3) ("The Court shall deem admitted any properly supported facts set forth in the Statement of Facts that the opposing party does not specifically controvert.") (emphasis omitted).

**II. Background**

Case 9:22-cv-00102-BKS-ML    Document 78    Filed 12/13/23    Page 279 of 373

Flynn v. Ward, Not Reported in Fed. Supp. (2018)

## A. Facts

**\*2**  The facts are related herein in the light most favorable to Flynn as the nonmoving party. See subsection III(A) infra. The facts recited are for the relevant time period as referenced in the Amended Complaint.

At the time of the incidents described in the Amended Complaint, Flynn was confined in the Long Term Protective Custody Unit ("LTPC") at Mid-State Correctional Facility ("Mid-State C.F."). See generally Am. Compl. Wellenstein was a law library officer at Mid-State C.F. Dkt. No. 64-4 at 35-36. Ward was the Superintendent at Mid-State C.F. Id. at 10. From December 2014 through June 2015, Flynn filed numerous requests for legal materials/legal assistance. Dkt. No. 20-2.

From October 2011 until March 5, 2015, inmates in the LTPC had physical access to the law library from 4:30 p.m. until 5:45 p.m. Dkt. No. 20-1 at 2; Dkt. No. 64-4 at 35-36. On March 5, 2015, Captain Goppert issued a memorandum advising the LTPC Population that their law library services would be "modified." Dkt. No. 20-1 at 1. In accordance with Facility Operations Manual 21.04 [5] and Directive #4833, [6] LTPC inmate requests for legal assistance from the law library must be made in writing and forwarded to the law library officer through the facility mail. Dkt. No. 20-1 at 3. Inmates were permitted two requests each day. Dkt. No. 64-4 at 36; Dkt. No. 64-2 ¶ 34.

### 1. Grievances

On January 6, 2015; February 14, 2015; and February 17, 2015, Flynn filed grievances claiming that Wellenstein refused to make copies of his legal work or perform "word" and "key number searches" on the computer. Dkt. No. 64-5 at 4-7. The grievances were consolidated (MS-28194-15) and on March 11, 2015, the Superintendent responded that Flynn was being properly assisted. [7] Id. at 8. Flynn appealed the decision to the Central Office Review Committee ("CORC"), and, on January 20, 2016, CORC upheld the Superintendent's determination. Id. at 3.

On March 10, 2015, Flynn filed a grievance claiming that Wellenstein refused to accept his March 8, 2015 request and overcharged him for copies. Dkt. No. 20-3 at 12.

**\*3**  On April 5, 2015, Flynn filed a grievance alleging that Wellenstein (1) denied him access to the courts; (2) fraud; (3) destruction of property; (4) refused to provide legal materials or assistance; and (5) refused to respond to weekend requests (MS-21943-15). Dkt. No. 64-5 at 10-16. On May 6, 2015, the Superintendent responded that Flynn's concerns were being properly addressed. [8] Id. at 17. Flynn appealed the decision to CORC and on October 21, 2015, CORC upheld the Superintendent's determination. Id. at 9.

On April 17, 2015, Flynn filed a grievance claiming that Wellenstein unlawfully ordered him to remain out of his cell while he made rounds. Dkt. No. 20-3 at 33.

On April 28, 2015, Flynn filed a grievance claiming that Wellenstein was deliberately harassing him and destroying his documents. Dkt. No. 20-3 at 34.

On April 30, 2015, Flynn filed a grievance charging Wellenstein with repeated verbal harassment. Dkt. No. 20-3 at 42. Flynn claimed that Wellenstein came to his cell, accused Flynn of smoking, entered the cell, and pushed Flynn aside. Id. Flynn alleged that Wellenstein made "a couple of smart remarks" and was "angry" over the numerous grievances Flynn filed. Id.

On May 6, 2015; May 8, 2015; and May 11, 2015, Flynn filed grievances accusing Wellenstein of destroying copies, harassment, and threatening behavior. Dkt. No. 64-5 at 19-21. The grievances were consolidated (MS-21970-15), and, on July 14, 2015, after an investigation, the Superintendent issued a decision denying the grievances. [9] Id. at 22-23. Flynn appealed the decision to CORC and on September 21, 2015, the Superintendent's decision was affirmed. Id. at 18.

On May 14, 2015, Flynn filed a grievance claiming that Wellenstein refused to provide books. Dkt. No. 20-3 at 46.

On July 21, 2015, Flynn filed a grievance claiming that Wellenstein refused to provide envelopes and deliberately amended his documents. Dkt. No. 20-6 at 2.

On August 1, 2015, August 7, 2015, and August 10, 2015, Flynn filed grievances against Wellenstein claiming that he refused to make copies of documents "in retaliation for the 2 most recent grievances against him." Dkt. No. 64-5 at 26-28. The grievances were consolidated (MS-22079-15) and on August 27, 2015, after an investigation, the Superintendent

Case 9:22-cv-00102-BKS-ML    Document 78    Filed 12/13/23    Page 280 of 373

Flynn v. Ward, Not Reported in Fed. Supp. (2018)

denied the grievances.[10] Id. at 29. Flynn appealed the decision to CORC and on October 21, 2015, CORC affirmed the Superintendent's decision. Id. at 24.

On August 20, 2015, Flynn filed a grievance (MS-22105-15) claiming that Wellenstein threatened him and told him, "if I did not stop with my grievances that he, C.O.'s Jordan and Miller were going to set me up again like they have done numerous times in the past." Dkt. No. 20-6 at 10.

On October 23, 2015, Flynn filed a grievance claiming that Wellenstein refused to provide copies and purposefully delayed his access to the courts (MS-22183-15). Dkt. No. 64-5 at 31. On November 10, 2015, after an investigation, the Superintendent determined that Flynn was being provided with Law Library services pursuant to Directive #4483.[11] Id. at 33. Flynn appealed to CORC, and on February 17, 2016, CORC upheld the determination. Id. at 30.

On November 6, 2015, Flynn filed a grievance (MS-22200-15) claiming that Wellenstein's behavior prohibited him from conducting meaningful research. Dkt. No. 64-5 at 37. On December 15, 2015, after an investigation, the Superintendent denied the grievance.[12] Id. at 38. Flynn appealed the decision to CORC, and on March 23, 2016, CORC affirmed the determination. Id. at 36.

**\*4** On January 14, 2016, Flynn filed a grievance claiming that the photocopier was not functioning properly because Wellenstein manipulated the memory function. Dkt. No. 20-6 at 61.

### 2. Misbehavior Reports

On April 30, 2015, Wellenstein issued a misbehavior report charging Flynn with smoking.[13] Dkt. No. 20-6 at 70. After a Tier II disciplinary hearing, Flynn was sentenced to eighteen days in keeplock confinement. Id. Flynn served his sentence from April 30, 2015 until May 18, 2015. Id.

On August 1, 2015, Officer Koscielniak issued Flynn a misbehavior report charging him with violating facility rules related to smoking. Dkt. No. 20-6 at 6. After a Tier II disciplinary hearing, the hearing officer sentenced Flynn to a thirty day loss of recreation, commissary, and phone/package privileges. Id. at 70. On August 1, 2015, Wellenstein issued a second misbehavior report charging Flynn with

disobeying a direct order. Dkt. No. 20-6 at 5. After a Tier II disciplinary hearing, the hearing officer sentenced Flynn to a thirty day loss of recreation, commissary, and phone/package privileges for thirty days, but the sentence was suspended until November 16, 2015. Id. at 70.

On August 17, 2015, Officer Alsante issued Flynn a misbehavior report charging him with placing a three-way call in violation of facility rules. Dkt. No. 20-6 at 8. Alsante noted that, on August 17, 2015, "[a]t approx. 9:05 p.m., at the request of C.O. J. Jordan, I began monitoring 10-2 SHU phone[.]" Id. As a result of the report, Flynn was placed in keeplock for eighteen days from August 17, 2015 until September 4, 2015. Id. at 8, 70. Flynn appealed the decision to Ward claiming that Jordan asked Alsante to monitor his telephone call "as part of a campaign of harassment that CO Wellenstein has launched against those inmates in 10-2 who are trying to access the law library and [c]ourts." Id. at 9. Flynn further noted:

> CO W has written 4 misbehavior reports against me & encourages other CO's to do the same, as well as monitor our alleged activities, and in this incident no 3-way call was made & this is retaliation for my litigation.

Dkt. No. 20-6 at 9.

On August 24, 2015, Wellenstein issued a misbehavior report charging Flynn with threats and harassment. Dkt. No. 20-6 at 12. Wellenstein reported that Flynn told him, "[o]ne day when I get out, I am going to see you selling flowers on the corner and then I will take care of you the way I want to." Id. After a Tier II disciplinary hearing, Flynn was sentenced to thirty days in keeplock confinement. Id. at 70. The sentence was suspended until December 8, 2015. Id.

On November 12, 2015, Officer U. Upshaw issued Flynn a misbehavior report charging him with smoking, arson, false statements, and possessing flammable material. Dkt. No. 20-6 at 24. After a disciplinary hearing, the charges were dismissed. Id. at 25.

On November 18, 2015, Wellenstein issued a misbehavior report charging Flynn with harassment. Dkt. No. 20-6 at 16.

Flynn v. Ward, Not Reported in Fed. Supp. (2018)

Case 9:22-cv-00102-BKS-ML    Document 78    Filed 12/13/23    Page 281 of 373

The misbehavior report was dismissed by the hearing officer. Am. Compl. ¶ 125.

On December 11, 2015, Wellenstein issued a misbehavior report charging Flynn disobeying a direct order and harassment. Dkt. No. 20-6 at 26. The ticket was dismissed by the hearing officer. Am. Compl. at ¶ 130.

### 3. Legal Work

**\*5** In 2013, Flynn filed a Habeas Corpus petition in this Court. See Flynn v. J. Colvin, No. 9:13-CV-1247 (JKS) (N.D.N.Y. 2013). On October 19, 2015, Flynn filed an action in the Court of Claims against Wellenstein charging him with deliberately destroying legal documents. Dkt. No. 20-6 at 27-28. In 2014 and 2015, Flynn was researching and gathering exhibits in support of a writ of error coram nobis to vacate his conviction. Dkt. No. 64-4 at 17. In 2014 and 2015, Flynn was also working on a petition for the Department of Veterans' Affairs to increase his disability benefits, Article 78 petitions, a foreclosure action, and commenced litigation in the Court of Claims. Dkt. No. 64-4 at 18, 21, 25, 29. On August 24, 2015, Flynn commenced the within action. Dkt. No. 1.

During his deposition, Flynn testified that did not know the procedural posture of any of his actions or petitions, could not recall whether deadlines were in place in any litigation, and could not remember the details of each petition and action. Dkt. No. 64-4 at 17-31. Flynn testified that his legal work was lost and therefore, without being able to refer to his legal records, he could not state whether he suffered any negative consequences in any legal matter. Id. at 31-32, 44, 107.

In June 2016, Flynn was transferred out of Mid-State C.F. Dkt. No. 25.

### B. Procedural History

On August 24, 2015, Flynn filed the Complaint in this action. Dkt. No. 1. In a Decision and Order filed December 4, 2015 ("December Order"), the Court reviewed the Complaint in accordance with 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A, and determined that the Complaint failed to state a claim upon which relief could be granted and, therefore, was subject to dismissal. Dkt. No. 11. In light of his pro se status,

Flynn was afforded an opportunity to submit an amended complaint. Dkt. No. 11 at 18. On February 25, 2016, Flynn filed an Amended Complaint. Dkt. No. 20. Upon review of the Amended Complaint, the Court directed Wellenstein and Ward to respond to the First Amendment claims related to access to the courts and retaliation. Dkt. No. 22 at 14, 26, 29.

### III. Discussion [14]

In the Amended Complaint, Flynn alleges that his First Amendment right to access the courts was violated and further, that Wellenstein retaliated against him for filing grievances. See generally Am. Compl. Defendants move for summary judgment arguing that (1) Flynn failed to allege any "actual injury" to sustain a First Amendment claim; (2) Flynn cannot establish a retaliation claim against Wellenstein; (3) Flynn's supervisory claims against Ward must be dismissed; and (4) Flynn failed to exhaust his administrative remedies with respect to retaliatory conduct. See generally Dkt. No. 64.

### A. Legal Standard

A motion for summary judgment may be granted if there is no genuine issue as to any material fact, it was supported by affidavits or other suitable evidence, and the moving party is entitled to judgment as a matter of law. See FED. R. CIV. P. 56(a). The moving party has the burden to show the absence of disputed material facts by providing the court with portions of pleadings, depositions, and affidavits which support the motion. See FED R. CIV. P. 56; Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Facts are material if they may affect the outcome of the case as determined by substantive law. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). All ambiguities are resolved and all reasonable inferences drawn in favor of the non-moving party.

See Skubel v. Fuoroli, 113 F.3d 330, 334 (2d Cir. 1997).

**\*6** The party opposing the motion must set forth facts showing that there is a genuine issue for trial, and must do more than show that there is some doubt or speculation as to the true nature of the facts. See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). For a court to grant a motion for summary judgment, it must be apparent that no rational finder of fact could find in favor of the non-moving party. See Gallo v. Prudential Residential

Flynn v. Ward, Not Reported in Fed. Supp. (2018)

Case 9:22-cv-00102-BKS-ML    Document 78    Filed 12/13/23    Page 282 of 373

Servs., Ltd. P'ship., 22 F.3d 1219, 1223-24 (2d Cir. 1994); Graham v. Lewinski, 848 F.2d 342, 344 (2d Cir. 1998).

Where, as here, a party seeks judgment against a pro se litigant, a court must afford the non-movant special solicitude.

See Triestman v. Fed. Bureau of Prisons, 470 F.3d 471, 477 (2d Cir. 2006). As the Second Circuit has stated,

> [t]here are many cases in which we have said that a pro se litigant is entitled to "special solicitude," ... that a pro se litigant's submissions must be construed "liberally," ... and that such submissions must be read to raise the strongest arguments that they "suggest," ... At the same time, our cases have also indicated that we cannot read into pro se submissions claims that are not "consistent" with the pro se litigant's allegations, ... or arguments that the submissions themselves do not "suggest," ... that we should not "excuse frivolous or vexatious filings by pro se litigants," ... and that pro se status "does not exempt a party from compliance with relevant rules of procedural and substantive law,"...

Id. (citations and footnote omitted); see also Sealed Plaintiff v. Sealed Defendant, 537 F.3d 185, 191–92 (2d Cir. 2008).

### B. First Amendment

### 1. Access to Courts

Flynn claims that Wellenstein deliberately "mixed up" and destroyed legal exhibits, refused to accept legal requests, and failed to provide legal materials, assistance, and copies. See generally, Am. Compl. As a result, Flynn claims that he was prevented from filing a writ of coram nobis, a petition for habeas relief, a petition with the Department of Veterans' Affairs, an Article 78 petition, and an appeal with the New York State Retirement System and missed deadlines in pending litigation. See id. Defendants argue, even assuming that Flynn had demonstrated a material issue of fact as to whether Defendants acted deliberately and maliciously in failing to provide him with legal assistance and materials, the record does not support Flynn's conclusory claim that he suffered an actual injury caused by the Defendants. Dkt. No. 64-6 at 4.

Undoubtedly, prisoners have a constitutional right to meaningful access to the courts. See Bounds v. Smith, 430 U.S. 817, 824 (1977); Lewis v. Casey, 518 U.S. 343, 350 (1996) ("The right that Bounds acknowledged was the (already well-established) right of access to the courts."). This right is implicated when prison officials "actively interfer[e] with inmates' attempts to prepare legal documents[ ] or file them[.]" Lewis, 518 U.S. at 350 (internal citations omitted). To establish a denial of access to the courts claim, a plaintiff must satisfy two prongs. First, a plaintiff must show that the defendant acted deliberately and maliciously. See Davis v. Goord, 320 F.3d 346, 351 (2d Cir. 2003). Second, the plaintiff must demonstrate that he suffered an actual injury, "i.e., [the defendant] took or was responsible for actions that hindered a plaintiff's efforts to pursue a legal claim." Monsky v. Moraghan, 127 F.3d 243, 247 (2d Cir. 1997) (internal citations, quotation marks, and alterations omitted) (quoting Lewis, 518 U.S. at 329); Davis, 320 F.3d at 351 (internal quotation marks omitted). "[A] delay in being able to work on one's legal action or communicate with the courts does not rise to the level of a constitutional violation." Benjamin v. Kerik, 102 F. Supp. 2d 157, 164 (S.D.N.Y. 2000) (citation omitted), aff'd sub nom. Benjamin v. Fraser, 264 F.3d 175 (2d Cir. 2001).

**\*7** Here, while Flynn made several claims in his Amended Complaint related to pending legal matters, Flynn testified at his deposition that he could not recall what litigation he was working on in 2015, the procedural posture of any pending litigation, or whether he was subject to any Court imposed deadlines. Dkt. No. 64-4 at 12-31. Flynn testified that he filed actions in the Court of Claims against Wellenstein related to the destruction of his legal work, and that the actions were dismissed, but he could not attribute that dismissal to Wellenstein's actions or inactions. Id. at 25-26, 29, 30. Flynn explained that he could not provide any specific information related to Court deadlines or legal matters because he was compelled to send his legal work home and it was lost. Dkt. No. 64-4 at 18-19, 25, 31, 45. Flynn testified:

> ... Most of my legal work was shipped —sent home. They forced me to send most of my legal work home, so—and I haven't been able to get my legal

work sent to me. Then they lost a box of legal work, so.

Dkt. No. 64-4 at 18.

The record however, lacks any facts related to who directed Flynn to send his legal work home, when or what portion of his work was misplaced or lost, and who was responsible for his missing legal work.

Even if the undersigned accepts Flynn's explanation, the docket reports for cases pending in this Court, as well as Flynn's litigation history, belie his First Amendment claims. In October 2013, Flynn filed a Petition for Habeas Corpus relief. See Flynn v. Colvin, No. 9:13-CV-1247 (JKS), Dkt. No. 1 (N.D.N.Y. Oct. 7, 2013). From February 2014 until June 2016, Flynn filed several submissions in that case including various motions, an application for counsel, a reply to his petition, and objections to Court Orders. Id.; Dkt. Nos. 20, 22, 24, 26, 27, 29, 31, 33, 34, 35, 36, 38. In December 2016, the Petition was denied and Judgment was entered. Id.; Dkt. Nos. 47, 48. Nothing in the record suggests that the Petition was denied for failure to comply with deadlines, prosecute, or purse the action.

In August 2015, Flynn commenced the within action by filing an eighteen page complaint with over two hundred pages of exhibits, together with a motion to proceed IFP, an inmate authorization form, a motion to appoint counsel, and a motion for preliminary injunctive relief. Dkt. Nos. 1, 2, 3, 4, 5. From August 2015 until June 2016, Flynn filed letters, motions, and a fifty-four page Amended Complaint. Dkt. No. 6, 8, 10, 12, 16, 18, 20, 23. Flynn has clearly been able to proceed in his litigation of this case, despite his claims otherwise.

In December 2017 and March 2018, the Appellate Division issued Orders dismissing two such petitions. See Flynn v. Annucci, 156 A.D.3d 1105 (3d Dep't 2017); Flynn v. Annucci, 159 A.D.3d 1181, 1182 (3d Dep't 2018). In the 2018 Order, the Court affirmed the disciplinary determination after considering the documentary evidence, hearing testimony, and misbehavior report. Flynn, 159 A.D.3d at 1182. The record lacks facts establishing that these cases were dismissed due to Flynn's inability to prosecute or purse the matters or Defendants' behavior. See Davis, 320 F.3d at 352 (holding that a plaintiff must show that there is "a causal connection between the protected speech and the adverse action.") (citation omitted).

To summarize, Flynn has failed to show that Defendants' actions hindered his efforts to pursue a legal claim. Flynn was able to file several submissions in this Court, demonstrating that Defendants' alleged conduct did not prevent him from litigating actions. Flynn has failed to provide evidence of any type of actual injury which occurred as a result of Defendants' actions. Flynn has failed to identify which legal claims were frustrated, if they were meritorious, and how his access to legal materials, supplies, or the law library would have supported the viability of such claims. In the absence of any evidence that Flynn suffered any actual injury precluding him from pursuing any judicial action, it is recommended that Defendants' motion for summary judgment on this ground should be granted.

## 2. Retaliation

**\*8** To state an actionable claim for retaliation under the First Amendment, a prisoner must establish by a preponderance of the evidence that: (1) the speech or conduct at issue was protected; (2) the defendant took adverse action against the plaintiff; and (3) there was a causal connection between the protected speech and the adverse action. See Gill v. Pidlypchak, 389 F.3d 379, 380 (2d Cir. 2004) (internal quotation marks and citation omitted); Tafari v. McCarthy, 714 F.Supp.2d 317, 347 (N.D.N.Y. 2010). Courts must view retaliation claims with care and skepticism to avoid judicial intrusion into matters of prison administration. See Jackson v. Onondaga Cnty., 549 F. Supp. 2d 204, 214-15 (N.D.N.Y. 2008). Therefore, conclusory allegations alone are insufficient. See id. at 214 (citing Flaherty v. Coughlin, 713 F.2d 10, 13 (2d Cir. 1983) (explaining that "claim[s] supported by specific and detailed factual allegations ... ought usually be pursued with full discovery.") ). If the plaintiff establishes these elements, the burden shifts to the defendants to show by a preponderance of the evidence that they would have taken the same action against the plaintiff absent his engaging in the protected conduct. See Graham v. Henderson, 89 F.3d 75, 79 (2d Cir. 1996).

To satisfy the first element of a retaliation claim, a plaintiff must show that he engaged in a protected activity. See Espinal v. Goord, 558 F.3d 119, 128 (2d Cir. 2009). In the prison context, "adverse action" is objectively defined as conduct "that would deter a similarly situated individual of

Case 9:22-cv-00102-BKS-ML    Document 78    Filed 12/13/23    Page 284 of 373

Flynn v. Ward, Not Reported in Fed. Supp. (2018)

ordinary firmness from exercising ... constitutional rights." Davis v. Goord, 320 F.3d 346, 353 (2d Cir. 2003). "[A]dverse action taken for both proper and improper reasons may be upheld if the action would have been taken based on the proper reasons alone." Jackson, 549 F. Supp. 2d at 215.

The plaintiff bears the burden of establishing that "the protected conduct was a substantial or motivating factor in the prison officials' decision to discipline the plaintiff." Gayle, 313 F.3d at 682. A plaintiff "may do so with circumstantial evidence if it is 'sufficiently compelling[.]' " Kotler v. Donelli, 382 F. App'x 56, 57-58 (2d Cir. 2010) (summary order) (quoting Bennett v. Goord, 343 F.3d 133, 137 (2d Cir. 2003) ). "Types of circumstantial evidence that can show a causal connection between the protected conduct and the alleged retaliation include temporal proximity, prior good disciplinary record, finding of not guilty at the disciplinary hearing, and statements by defendants as to their motives." Barclay v. New York, 477 F. Supp. 2d 546, 588 (N.D.N.Y. 2007) (citations omitted). Temporal proximity between the protected activity and the adverse action "must be very close." Meyer v. Shulkin, —— F. App'x ——, 2018 WL 480478, at *2 (2d Cir. Jan. 19, 2018) (citation omitted).

> There is no bright line to define the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship, so courts judge the permissible inferences that can be drawn from temporal proximity in the context of particular cases. However, courts have found that six and eight month gaps between the protected conduct and adverse action were sufficient, while in other circumstances three months was considered too long.

Burton v. Lynch, 664 F.Supp.2d 349, 367 (S.D.N.Y. 2009) (internal quotation marks and citations omitted).

Flynn claims that Wellenstein assaulted him, threatened him, denied him access to the court, and filed misbehavior reports in retaliation for Flynn's grievances against Wellenstein. See generally Am. Compl. It is well-settled that the filing

of a grievance constitutes protected speech under the First Amendment. See Graham, 89 F.3d at 80; Franco v. Kelly, 854 F.2d 584, 589 (2d Cir. 1988) ("Moreover, intentional obstruction of a prisoner's right to seek redress of grievances is precisely the sort of oppression that section 1983 is intended to remedy.") (alteration and internal quotation marks omitted); see also Roseboro, 791 F. Supp. 2d at 367 (finding that the filing of a grievance is a protected activity); Mateo v. Fischer, 682 F. Supp. 2d 423, 433 (S.D.N.Y. 2010) (same). Thus, for each allegation, Flynn has satisfied the first prong of First Amendment retaliation analysis. Thus, the Court turns to whether Flynn has established that he suffered an adverse action and a causal connection between the protected conduct and the adverse action.

#### a. Assault

**\*9** Flynn alleges that Wellenstein assaulted him on April 30, 2015 in retaliation for filing grievances. See Am. Compl. ¶ 54. With respect to the second prong of the analysis, Defendants claim that the alleged action, i.e., pushing, was de minimis and thus, not an adverse action. The undersigned agrees. Although an alleged assault need not rise to the level of an Eighth Amendment excessive force violation in order to be considered an adverse action for purposes of First Amendment retaliation analysis, Flynn's allegations that Wellenstein "push[ed] him around," see Am. Compl. ¶ 54, are de minimis. See Rivera v. Goord, 119 F. Supp. 2d 327, 340 (S.D.N.Y. 2000) ("[E]ven though [the plaintiff] has alleged that the actions of [the defendants] were motivated by [the plaintiff's] filing of grievances, the alleged acts of retaliation, even if assumed to be true, are de minimis; [the plaintiff] states only that [the defendants] 'shoved' him while taking him to the 'box' (i.e., Green Haven's Special Housing Unit, or "SHU"). Such actions, even if proven at trial, would not chill a person of ordinary firmness from continuing to engage in First Amendment activity."); Sloane v. Mazzuca, No. 04 CV 8266(KMK), 2006 WL 3096031, at *13-14 (S.D.N.Y. Oct. 31, 2006) (concluding that the defendant's conduct of throwing a food tray at plaintiff did not amount to adverse action); cf. Williams v. Hesse, No. 9:16-CV-01343 (GTS/TWD), 2018 WL 1363759, at *7-8 (N.D.N.Y. Feb. 2, 2018) (concluding that the defendants' threats coupled with spitting chewing tobacco in the plaintiff's face that resulted in "severe burning, pain, and a temporary loss of vision in his right

eye for nearly six hours, and a severe headache for days" constituted adverse action) Moreover, there is no indication that plaintiff sought medical treatment or experienced severe pain or suffering as a consequence of the alleged assault. See Williams, 2018 WL 1363759, at *7-8. Therefore, because the undersigned finds that Wellenstein's alleged assault does not amount to adverse action, it is recommended that Defendants' motion on this ground be granted.

### b. Access to Courts

Flynn alleges that Wellenstein denied him access to the law library and to the courts in retaliation for filing grievances. Dkt. No. 20 ¶¶ 57, 59, 118, 119, 120, 122. Although a defendant's underlying action may not amount to a violation of a constitutionally protected right, this does not preclude such action from consideration as an adverse action. See Shariff v. Poole, 689 F. Supp. 2d 470, 478-79 (W.D.N.Y. 2010). " 'An act in retaliation for the exercise of a constitutional right is actionable under § 1983 even if the act when taken for different reasons would be proper.' " Id. (quoting Franco, 854 F.2d at 588); see Nei v. Dooley, 372 F.3d 1003, 1007 (8th Cir. 2004) (rejecting the defendants' argument that "[a]s for the inmates' claim that they were retaliated against for filing their lawsuit by being denied access to the prison law library, the officials contend the district court should have construed the claim as one of denied access to the courts, requiring proof of actual injury, rather than one of retaliation) (citation omitted)." Thus, even though the undersigned has recommended dismissal of plaintiff's access to the courts claim, Wellenstein's underlying conduct may still be assessed as adverse action.

It is well-settled that the denying an inmate access to the law library or destroying legal material constitutes adverse action. See Guillory v. Haywood, No. 9:13-CV-01564 (MAD), 2015 WL 268933, at *17 (N.D.N.Y. Jan. 21, 2015) ("Furthermore, refusing to allow Plaintiff to go to the law library knowing that it would prevent an inmate from filing papers in a pending lawsuit in a timely manner would arguably deter a similarly situated individual of ordinary firmness from exercising ... constitutional rights.") (internal quotation marks and citation omitted); see also Jean-Laurent v. Lane, No. 9:11-CV-186 (NAM/TWD), 2013 WL 600213, at *10 (N.D.N.Y. Jan. 24, 2013), report and recommendation adopted, 2013 WL 599893 (N.D.N.Y. Feb. 15, 2013) ("Destruction of Plaintiff's legal material and documents for his Second Circuit appeal

constitutes an adverse action for purposes of the retaliation analysis."). Thus, Flynn has established the second prong of the retaliation analysis.

With respect to the third prong, Flynn must establish a causal connection "sufficient to support the inference 'that the speech played a substantial part' in the [ ] adverse [ ] action." Diesel v. Town of Lewisboro, 232 F.3d 92, 107 (2d Cir. 2000) (quoting Ezekwo v. NYC Health & Hosps. Corp., 940 F.2d 775, 780-81 (2d Cir. 1991) ). As to temporal proximity, the record indicates that on March 10, 2015; April 5, 2015; April 30, 2015; May 6, 2015; May 8, 2015; May 11, 2015; May 14, 2015; July 21, 2015; August 7, 2015; October 23, 2015; and November 6, 2015, Flynn filed grievances against Wellenstein. See Dkt. N. 64-7. Although there is no "bright line" establishing the time frame appropriate for establishing temporal proximity, the short gap between the protected conduct and adverse action appears sufficiently close to support an indication of a causal connection. See Espinal, 558 F.3d at 129 (holding that passage of six months between protected conduct and adverse action sufficiently supported an inference of a causal connection); see, e.g., Morales v. Mackalm, 278 F.3d 126, 131 (2d Cir. 2002) (concluding that the short time frame between grievance and retaliatory action, along with allegation of the defendant's involvement, sufficed to support an inference of a retaliatory motive), abrogated on other grounds, Porter v. Nussle, 534 U.S. 516 (2002).

*10 However, "temporal proximity alone cannot create a genuine issue of material as to whether the motivation behind [the defendant's] actions was retaliation." Parks v. Blanchette, 144 F.Supp.3d 282, 336-37 (D. Conn. 2015). Additional circumstantial evidence supports the conclusion that Wellenstein's conduct may have been motivated by Flynn's complaints. On May 8, 2015, Flynn contends that Wellenstein stated, "don't you dare file any more grievances or I will slap you silly and write misbehavior reports to stop you from requesting anything." Am. Compl. ¶ 56. On May 11, 2015, Wellenstein stated "don't [you] dare request anything or I will write you up. I will set you up for grieving me all the time." Id. ¶ 58. Assessing these statements in the light most favorable to Flynn as the non-moving party, the statements are sufficient to support "an inference of a causal connection between" plaintiff's grievances and Wellenstein's alleged denial of legal materials and/or the law library.

Case 9:22-cv-00102-BKS-ML    Document 78    Filed 12/13/23    Page 286 of 373

Flynn v. Ward, Not Reported in Fed. Supp. (2018)

Baskerville v. Blot, 224 F. Supp. 2d 723, 732 (S.D.N.Y. 2002). Moreover, Wellenstein has not provided an affidavit or other evidence to refute Flynn's testimony. Therefore, there is a genuine triable issue of fact for a jury to consider. See Ramos v. O'Connell, 28 F. Supp. 2d 796, 803 (W.D.N.Y. 1998) (denying summary judgment where the defendants failed to submit affidavits or documents to contradict the plaintiff's account). Therefore, affording plaintiff special solicitude, it is recommended that Defendants' motion on this ground be denied.

### c. Threats

Verbal harassment and threats are generally not considered conduct "that would deter a similarly situation individual of ordinary firmness of exercising constitutional rights." Cabassa v. Smith, No. 9:08-CV-0480 (LEK/DEP), 2009 WL 1212495, at *7 (N.D.N.Y. Apr. 30, 2009) (citing Gill, 389 F.3d at 380) (additional citation omitted). Verbal threats however, may constitute adverse action for purpose of a First Amendment retaliation if the threats are sufficiently specific. Barrington v. New York, 806 F. Supp. 2d 730, 746 (S.D.N.Y. 2011); see also Ford v. Palmer, 539 F. App'x 5, 6 (2d Cir. 2013) (summary order) (finding that a verbal threat constituted adverse action where corrections officer threatened to poison the plaintiff in retaliation for filing his grievances).

Here, Flynn testified that Wellenstein threatened him and told him not to go to the law library. Dkt. No. 64-4 at 93-94. Upon further questioning, Flynn testified:

Q. Okay. When did he make threats about not going to the law library?

A. I don't recall.

Q. What about threats in writing you up, when did he say that?

A. I don't recall.

Q. Do you recall the sum and substance of any of the conversations about not going to the law library or about writing you up?

A. I don't recall right now.

Dkt. No. 64-4 at 94.

Flynn did not document or report the threats. Dkt. No. 64-4 at 96. Based upon the record, the Court concludes that Wellenstein's alleged threats are not sufficiently specific to constitute adverse action. See Bartley v. Collins, No. 95 Civ. 10161, 2006 WL 1289256, at *2-4 (S.D.N.Y. May 10, 2006) (finding no adverse action where a corrections officer tells a plaintiff that he is going to "get [him]" for filing a lawsuit); Alicea v. Howell, 387 F. Supp. 2d 227, 237 (W.D.N.Y. 2005) (finding no adverse action where a prison official told an inmate that he would "have to pay the consequences" for filing a grievance against her).

Accordingly, it is recommended that Defendants' motion for summary judgment and dismissal of retaliation claims on this ground be granted. [15]

### d. Misbehavior Reports

Flynn alleges that Wellenstein filed misbehavior reports, and directed other officers to file misbehavior reports, in retaliation for grievances. Am. Compl. ¶¶ 55, 70, 71, 73, 79. A defendant's retaliatory filing of a falsified misbehavior report that results in disciplinary segregated confinement constitutes adverse action. See Gill, 389 F.3d at 384 (finding that a false misbehavior report that resulted in the plaintiff's placement in keeplock constituted adverse action). Courts in this Circuit have held that a temporary loss of privileges does not constitute adverse action. See Smith v. City of New York, No. 14 CIV. 5927, 2017 WL 2172318, at *6 (S.D.N.Y. May 16, 2017); see also Monko v. Cusack, No. 9:11-CV-1218 (GTS/TWD), 2013 WL 5441724, at *11 (N.D.N.Y. Sept. 27, 2013) ("... the temporary loss of privileges such as the post-adjustment privileges lost by Plaintiff for thirty-six days are de minimis and do not constitute adverse action for purposes of a retaliation claim.") (citation omitted); Bartley, 2006 WL 1289256 at *7 (holding that a misbehavior report which resulted in the temporary loss of commissary privileges does not constitute adverse action because the penalty was de minimis).

**\*11** As a result of the misbehavior reports issued by Koscielniak and Wellenstein on August 1, 2015, Flynn suffered a temporary loss of privileges. Dkt. No. 20-6 at 70.

Case 9:22-cv-00102-BKS-ML    Document 78    Filed 12/13/23    Page 287 of 373

Flynn v. Ward, Not Reported in Fed. Supp. (2018)

Flynn was not sentenced to any disciplinary confinement or penalized as a result of the November 12, 2015, November 18, 2015 and December 11, 2015 misbehavior reports. Dkt. No. 20-6 at 25; Am. Compl. ¶¶ 125, 130. Therefore, because Flynn has failed to show that he suffered an adverse action as a result of the aforementioned tickets, the undersigned need not determine whether there is a causal connection between Flynn's protected conduct and these misbehavior reports. Accordingly, it is recommended that Defendants' motion for summary judgment and dismissal of retaliation claims based upon the August 1, 2015; November 12, 2015; November 18, 2015; and December 11, 2015 reports be granted. [16]

The Court reaches a different conclusion however, with respect to the remaining misbehavior reports. As a result of the April 30, 2015 and August 18, 2015 tickets, Flynn was sentenced to eighteen days in keeplock. Dkt. No 20-6 at 70. As a result of the August 24, 2015 misbehavior report, Flynn received a thirty day keeplock sentence. [17] Id. Accordingly, Flynn has established the second prong of the retaliation analysis with respect to these misbehavior reports. Having found that Flynn satisfied the first and second prong of the retaliation analysis with respect to these tickets, the Court turns to whether the record establishes a causal connection between the protected conduct and the adverse action.

### i. April 30, 2015

On April 30, 2015, Wellenstein issued Flynn a misbehavior report for smoking. Am. Compl. ¶ 55; Dkt. No. 64-6 at 14. Flynn contends that this misbehavior was in retaliation for his April 16, 2015 and April 28, 2015 grievances. Am. Compl. ¶ 55. First, the undersigned notes that the April 16, 2015 grieves conduct by the "law library relief officer" and makes no mention of Wellenstein. See Dkt. No. 20-3 at 31. Absent evidence by plaintiff that Wellenstein either was the library relief officer or knew of the contents of said grievance, the April 16, 2015 grievance cannot be the basis for his retaliation claim. See Tafari, 714 F. Supp. 2d at 374 (concluding that the plaintiff failed to establish a causal connection where the defendant was not named in the original grievance). Second, as to the April 28, 2015 grievance, although the temporal proximity of two days sufficiently supports an inference of causal connection, temporal proximity "without more, is insufficient to survive summary judgment." Roseboro v. Gillespie, 791 F. Supp. 2d 353, 370 (S.D.N.Y. 2011) (citing inter alia Ayers v. Stewart, 101 F.3d 687, 1996 WL 346049 (Table), at *1 (2d Cir. 1996) ("[The plaintiff's] reliance on circumstantial evidence of retaliation-namely, the proximity of the disciplinary action to his complaint where no misbehavior reports were previously filed against him-does not suffice to defeat summary judgment.") ). As to statements regarding Wellenstein's motivations, the record indicates that on May 8, 2015, Wellenstein stated, "don't you dare file any more grievances or I will slap you silly and write misbehavior reports to stop you from requesting anything." Am. Compl. ¶ 56. Assessing this statement in the light most favorable to Flynn as the non-moving party, the undersigned finds it sufficient to support "an inference of a causal connection between" plaintiff's grievances and Wellenstein's alleged filing of misbehavior reports. Baskerville, 224 F. Supp. 2d at 732.

*12 Wellenstein argues that even assuming the evidence creates a material question of fact as to whether he had retaliatory intent, he would have issued the misbehavior report even in the absence of the protected conduct. "[T]he conclusion that the state action would have been taken in the absence of improper motives is readily drawn in the context of prison administration where we have been cautioned to recognize that prison officials have broad administrative and discretionary authority over the institutions they manage." Hynes v. Squillace, 143 F.3d 653, 657 (2d Cir. 1998). "Defendants [may meet] their burden of showing that they would have disciplined the plaintiff even in the absence of the protected conduct if 'it was undisputed that [the inmate plaintiff] had in fact committed the prohibited conduct' for which he had been cited in a misbehavior report." Id. (citing Lowrance v. Achtyl, 20 F.3d 529, 535 (2d Cir. 1994) ).

In September 2013 and March 2015, Flynn was charged with smoking at Mid-State C.F. Dkt. No. 20-6 at 70. Flynn was found guilty of those charges. Id. During his deposition, Flynn admitted that he smoked in his cell in the past and conceded that he "had several disciplinary issues with smoking[.]" Dkt. No. 64-4 at 95-96. However, Flynn maintains that on April 30, 2015, he was not smoking in his cell. Id. As discussed supra, Wellenstein has not provided any sworn testimony in support of the motion, and, thus, has not met his burden of establishing that he would have filed the misbehavior report even in the absence of the protected conduct. Accordingly, there is an genuine dispute as to whether Flynn committed the charged conduct. See Gayle, 313 F.3d at 684 (denying summary judgment where it is disputed whether the plaintiff committed the

prohibited conduct). Therefore, the undersigned recommends that Defendants' motion for summary judgment, on this basis, be denied. [18]

### ii. August 17, 2015

The August 17, 2015 misbehavior report was written by Officer Alsante. Dkt. No. 20-6 at 8. To establish a retaliation claim, a plaintiff must show "a genuine issue of material fact that the protected conduct was a substantial or motivating factor in his discipline." Graham, 89 F.3d at 81. "[I]t is difficult to establish one defendant's retaliation for complaints against another defendant." Hare v. Hayden, No. 09 Civ. 3135, 2011 WL 1453789, at *4 (S.D.N.Y. Apr. 14, 2011) (citing Wright v. Goord, 554 F.3d 255, 274 (2d Cir. 2009) ).

Here, Flynn did not file any grievances or complaints against Alsante. The record lacks any evidence establishing why Alsante would file a false misbehavior report against Flynn, on Wellenstein's behalf, beyond Flynn's conclusory allegations. Without more, the evidence does not present a genuine issue of material fact for a jury to resolve. See Ciaprazi v. Goord, No. 9:02-CV-915 (GLS/DEP), 2005 WL 3531464, at *9 (N.D.N.Y. Dec. 22, 2005) (entering summary judgment on retaliation claim where the plaintiff cited only past grievances filed against corrections officers other than the officer who disciplined the plaintiff); see also Alicea v. Maly, No. 9:12-CV-203 (MAD/TWD), 2015 WL 4326114, at *14 (N.D.N.Y. July 14, 2015); Guillory v. Ellis, No. 9:11-CV-600 (MAD/ATB), 2014 WL 4365274, at *18 (N.D.N.Y. Aug. 29, 2014). Accordingly, it is recommended that Defendants' motion for summary judgment and dismissal of retaliation claims based upon this misbehavior report be granted. [19]

### iii. August 24, 2015

On August 24, 2015, Wellenstein issued plaintiff a misbehavior report alleging that Flynn threatened and verbally harassed him. Dkt. No. 20-6 at 12. Plaintiff contends that this misbehavior report was in retaliation for his August 20, 2015 and August 22, 2015 grievances. Am. Compl. ¶ 79. However, as Defendants note, during his deposition, plaintiff admitted that he "made a smart remark about [Wellenstein] selling flowers for a living," but that Wellenstein "took that

to a whole different level." Dkt. No. 64-4 at 91, 93, 95. Thus, as plaintiff admitted to making the statement that is the basis for the August 24, 2015 misbehavior report, the evidence suggests that "plaintiff committed the most serious, if not all, of the prohibited conduct charged in the misbehavior report." Gayle, 313 F.3d at 682. Therefore, Defendants have established a non-retaliatory reason for the filing of the August 24, 2015 misbehavior report. See Hynes v. Squillace, 143 F.3d 653, 657 (2d Cir. 1998) (concluding that plaintiff's admission of the underlying conduct established a "proper, non-retaliatory reason[ ] for filing the misbehavior report."). Accordingly, it is recommended that Defendants' motion on this ground be granted.

### C. Supervisory Liability

*13 Defendants argue that Flynn's claims against Ward must be dismissed because Ward was not personally involved in any constitutional violations. Dkt. No. 64-6 at 20-23. Flynn does not allege, nor does the record support the conclusion that Ward directly participated in any alleged constitutional violations. Construing the Amended Complaint liberally, Flynn contends that Ward was personally involved in the alleged constitutional violations by denying his grievances.

Supervisory officials may not be held liable merely because they held a position of authority. See Black v. Coughlin, 76 F.3d 72, 74 (2d Cir. 1996). However, supervisory personnel may be considered "personally involved" if:

(1) the defendant participated directly in the alleged constitutional violation;

(2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong;

(3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom;

(4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts; or

(5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

Case 9:22-cv-00102-BKS-ML    Document 78    Filed 12/13/23    Page 289 of 373

Flynn v. Ward, Not Reported in Fed. Supp. (2018)

Colon v. Coughlin, 58 F.3d 865, 873 (2d Cir. 1995) (citing Williams v. Smith, 781 F.2d 319, 323–24 (2d Cir. 1986) ).

Writing letters and grievances to a defendant is insufficient to establish notice and personal involvement. Smart v. Goord, 441 F.Supp.2d 631, 643 (S.D.N.Y. 2006) ("Commissioner ... cannot be held liable on the sole basis that he did not act in response to letters of protest sent by [plaintiff]...."). Also, it is within the purview of a superior officer to delegate responsibility to others. See Vega v. Artus, 610 F.Supp.2d 185, 198 (N.D.N.Y. 2009) (finding no personal involvement where "the only involvement of the supervisory official was to refer the inmate's complaint to the appropriate staff for investigation") (citing Ortiz-Rodriguez v. N.Y. State Dep't of Corr. Servs., 491 F.Supp.2d 342, 347 (W.D.N.Y. 2007) ).

"[I]t is well-established that the review, denial or affirmance of a denial of a grievance is insufficient to establish personal involvement." Perilla v. Fischer, No. 13-CV-398M, 2013 WL 5798557, at *7 (W.D.N.Y. Oct. 28, 2013) (citing inter alia Farrell v. Burke, 449 F.3d 470, 484 (2d Cir. 2006) (citation omitted) ). "[W]hile personal involvement cannot be founded solely on supervision, liability can be found if the official proactively participated in reviewing the administrative appeals as opposed merely to rubber-stamping the results." Molano v. Bezio, No. 10-CV-6481, 2012 WL 1252630, at *5 (W.D.N.Y. Apr. 13, 2012) (citing Collins v. Ferguson, 804 F.Supp.2d 134, 140 (W.D.N.Y. 2011), Black v. Coughlin, 76 F.3d 72, 74–75 (2d. Cir. 1996) ).

The record before the Court contains Superintendent responses related to six grievances. Dkt. No. 64-5 at 8, 17, 22-23, 29, 33, 38. As noted supra, the signature of the Superintendent who executed the response, in each instance, is illegible. See Part II(A)(1). In response to the May 6, 2015 grievance (MS-21970-15), the Superintendent concluded that, "[i]n this investigation, the grievant alleges that he is not being provided assistance with law library requests, his copies are purposely damaged and he is being retaliated against for filing complaints." Dkt. No. 64-5 at 22. Defendants argue that Ward was not involved in that grievance and attribute only two grievances to Ward: MS-22079-15 and MS 22200-15. Dkt. No. 64-6 at 22-23. While Defendants concede that additional grievances were appealed to the Superintendent, Defendants claim that the remaining grievance responses were not issued by Ward and thus, Ward was not involved in the decision-making process or investigation regarding these grievances. These arguments are asserted by counsel in the Memorandum of Law, but notably absent from the record is any affidavit or declaration from Ward. Without such evidence, a factual dispute exists as to whether Ward proactively participated in the decision-making process related to Flynn's grievances. As such, there is triable issue of material fact for a jury to resolve with respect to Ward's personal involvement in Wellenstein's alleged retaliatory conduct. See Celotex Corp., 477 U.S. at 323. Accordingly, Defendants' motion against Ward on this ground should be denied.

**\*14** A different conclusion is reached however, with respect to Flynn's First Amendment claims based upon access to the courts. Absent an underlying constitutional violation by a subordinate, there can be no supervisory liability. Hernandez v. Keane, 341 F.3d 137, 145 (2d Cir. 2003); see Elek v. Inc. Vill. of Monroe, 815 F.Supp.2d 801, 808 (S.D.N.Y. 2011) (collecting cases for the proposition that "because plaintiff has not established any underlying constitutional violation, she cannot state a claim for 1983 supervisory liability"). As discussed supra, Flynn failed to raise an issue of material fact with respect to his First Amendment claim based upon access to courts. Accordingly, the undersigned recommends that Defendants' motion for summary judgment and dismissal of Flynn's First Amendment claims against Ward based upon access to the courts be granted.

## D. Exhaustion

As an alternative ground for dismissal of the retaliation claims, Defendants contend that the motion for summary judgment must be granted because Flynn failed to exhaust his administrative remedies through available grievance procedures. See Dkt. No. 64-2 at 23-26. The PLRA requires that a prisoner exhaust any administrative remedies available to him or her before bringing an action for claims arising out of his or her incarceration. See Porter v. Nussle, 534 U.S. 516, 524 (2002); see also Woodford v. Ngo, 548 U.S. 81, 82 (2006). "The PLRA's exhaustion requirement is designed to 'afford [ ] corrections officials time and opportunity to address complaints internally before allowing the initiation of a federal case.' " Johnson v. Testman, 380 F.3d 691,

Case 9:22-cv-00102-BKS-ML   Document 78   Filed 12/13/23   Page 290 of 373

Flynn v. Ward, Not Reported in Fed. Supp. (2018)

697 (2d Cir. 2004) (citing Porter, 534 U.S. at 524-25). The exhaustion requirement applies " 'to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong.' " Mauldin v. Kiff, No. 11-CV-107-A, 2014 W L 2708434, at *4 (W.D.N.Y. June 16, 2014) (quoting Porter, 534 U.S. at 532). Further, the exhaustion requirement applies even where the prisoner seeks relief not available in the administrative grievance process, such as money damages. Porter, 534 U.S. at 524. To exhaust administrative remedies, the inmate must complete the full administrative review process set forth in the rules applicable to the correctional facility in which he or she is incarcerated. See Jones v. Bock, 549 U.S. 199, 218 (2007) (internal citation omitted).

"The mere fact that an inmate plaintiff filed some grievance prior to filing suit is not enough. The grievance must also have related to the subject matter of the federal lawsuit." Allah v. Poole, 506 F. Supp. 2d 174, 180 (W.D.N.Y. 2007) (citation omitted). The scope of a plaintiff's federal claim may not exceed that of the grievance. Donahue v. Bennett, No. 02-CV-6430, 2004 WL 1875019, at *8 (W.D.N.Y. Aug. 17, 2004).

Although the Supreme Court has deemed exhaustion mandatory, the Second Circuit has recognized that "certain caveats apply." Ruggiero v. County of Orange, 467 F.3d 170, 175 (2d Cir. 2006) (citation omitted). Until recently, courts in this district followed a three-part test established by the Second Circuit in Hemphill v. New York, 380 F.3d 680, 686 (2d Cir. 2004). Under the test established in Hemphill, a plaintiff's failure to exhaust could be excused if the plaintiff established that his or her failure to exhaust was justified by "special circumstances." Id. However, the Supreme Court recently held that "[c]ourts may not engraft an unwritten 'special circumstances' exception onto the PLRA's exhaustion requirement." Ross v. Blake, 136 S. Ct. 1850, 1862 (2016). As such, the special circumstances exception previously promulgated by the Second Circuit in Hemphill, is no longer consistent with the statutory requirements of the PLRA. See Williams v. Priatno, 829 F.3d 118, 123 (2d Cir. 2016).

*15 Although the Supreme Court's decision in Ross eliminates the "special circumstances" exception promulgated by Hemphill, courts must still consider the PLRA's "textual exception to mandatory exhaustion." Ross, 136 S. Ct. at 1858. Under this exception, courts must determine whether administrative remedies were "available" to a prisoner. Id. The Supreme Court identified three circumstances where administrative remedies may be unavailable to a prisoner. First, "an administrative procedure is unavailable when (despite what regulations or guidance materials may promise) it operates as a simple dead end —with officers unable or consistently unwilling to provide any relief to aggrieved inmates." Id. at 1859 (citing Booth v. Churner, 532 U.S. 731, 736, 738 (2001) ). "Next, an administrative scheme might be so opaque that it becomes, practically speaking, incapable of use." Id. Lastly, administrative remedies are unavailable where "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." Id. at 1860.

Here, there is no dispute that at all relevant times, DOCCS had in place a three-step inmate grievance program. N.Y. COMP. CODES R. & REGS. tit. 7, § 701.5 (2015). First, the inmate must file a complaint with an inmate grievance program ("IGP") clerk within twenty-one days of the alleged action. Id. § 701.5(a)(1). An IGP representative has sixteen calendar days to informally resolve the issue. Id. § 701.5(b)(1). If no informal resolution occurs, the full IGP committee must hold a hearing within sixteen days of receipt of the grievance and must issue a written decision within two working days after the conclusion of the hearing. Id. §§ 701.5(b)(2)(i)-(ii). If the determination is unfavorable to the inmate, the inmate may appeal the IGRC's determination to the facility superintendent within seven calendar days of receipt of the determination. Id. § 701.5(c)(1). If the superintendent's determination is unfavorable to the inmate, the inmate may appeal to the Central Office Review Committee ("CORC") within seven days after receipt of the superintendent's determination. Id. §§ 701.5(d)(i)-(ii). CORC must "review each appeal, render a decision on the grievance, and transmit its decision to the facility, with reasons stated, for the [inmate], the grievance clerk, the superintendent, and any direct parties within thirty (30) calendar days from the time the appeal was received." Id. § 701.5(d)(3)(ii).

Flynn testified that he was familiar with the grievance process and filed "numerous" grievances in 2015. Dkt. No. 64-4

Case 9:22-cv-00102-BKS-ML    Document 78    Filed 12/13/23    Page 291 of 373

Flynn v. Ward, Not Reported in Fed. Supp. (2018)

at 41-44. As discussed supra, the record contains copies of six (6) grievances that Flynn appealed to CORC and thus, Defendants concede, exhausted. [20] The record contains a certification attesting to the veracity of the grievance records. Dkt. No. 64-5 at 2.

With respect to the exhausted grievances, Defendants argue that Flynn's retaliation claims were not properly exhausted because these grievances did not contain allegations that Wellenstein retaliated against Flynn when he assaulted him and issued misbehavior reports. Dkt. No. 64-6 at 25-26. Defendants have not provided an affidavit from any DOCCS' employee with personal knowledge to support Defendants' contention that there is no connection between Flynn's grievances and the matters raised in the federal court complaint. Once again, Defendants rely upon the unsupported statements by counsel without evidentiary support. Upon review of the record, the undersigned finds that has exhausted his remaining retaliation claims. In the May 6, 2015 grievance, Flynn claimed that Wellenstein provided distorted copies of court forms and asserted, "[t]his is the 3 $^{rd}$ time he has deliberately ruined copies to the point they are unusable. This is deliberate harassment and the denial of legal copies." Dkt. No. 64-5 at 21. In the May 8, 2015 grievance, Flynn claimed:

> **\*16**  On 5/8/15 at 5:05 p.m. C.O Wellenstein came to my cell and started kicking the cell door and slaming [sic] feed up door, verbally harassing me and making numerous threats. For months C.O. Wellenstein has been harassing me. As a result of his harassment I am afraid to use the law library services and request legal material.

Dkt. No. 64-5 at 19.

On July 14, 2015, the Superintendent responded and categorized these claims as "retaliation" claims in response to filing prior complaints. Dkt. No. 64-5 at 22. The Superintendent conducted an investigation and interviewed Wellenstein. Id.

In the August 7, 2015 grievance, Flynn reiterated his harassment complaints claiming that, "Wellenstein has refused to make copies in retaliation for the 2 most recent grievances against him. His refusal to make copies is harassment[.]" Dkt. No. 64-5 at 26-28. On August 27, 2015, the Superintendent issued a response finding that the grievant "has not substantiated his claim that he has been the victim of harassment by staff[.]" Id. at 29. The Superintendent noted that Wellenstein denied the allegations. Dkt. No. 64-5 at 29. In his Appeal Statement, Flynn argued that Wellenstein continues to deter him from using the law library "in retaliation for filing grievances[.]" Id. On October 21, 2015, CORC issued a decision quoting Directive #4040, Section 701.6(b) related to prohibited "reprisals" against an inmate who utilizes the grievance process. [21] Id. at 24.

Drawing all inferences in Flynn's favor, the Court finds that the facts alleged in Flynn's grievances encompass the facts set forth in the Amended Complaint. See Curry v. Fischer, No. 02 Civ.4477, 2004 WL 766433, at *8 (S.D.N.Y. Apr. 12, 2004). Accordingly, it is recommended that Defendants' Motion for Summary Judgment, insofar as it raises the affirmative defense of nonexhaustion, be denied.

### IV. Conclusion

**WHEREFORE**, based on the findings set forth above, it is hereby:

**RECOMMENDED**, that Defendants' motion for summary judgment (Dkt. No. 64) be **GRANTED IN PART**:

(1) Insofar as it seeks dismissal of Flynn's First Amendment access to the courts claims against Wellenstein and Ward;

(2) Insofar as it seeks dismissal of Flynn's retaliation claims against Wellenstein and Ward related to misbehavior reports issued on August 1, 2015, August 17, 2015, August, 24, 2015, November 12, 2015, November 18, 2015, and December 11, 2015;

(3) Insofar as it seeks dismissal of Flynn's First Amendment retaliation claims against Wellenstein and Ward for the April 30, 2015 assault; and

(4) Insofar as it seeks dismissal of Flynn's First Amendment retaliation claims against Wellenstein and Ward for threats,

the motion be **GRANTED**; and it is further

Flynn v. Ward, Not Reported in Fed. Supp. (2018)

Case 9:22-cv-00102-BKS-ML    Document 78    Filed 12/13/23    Page 292 of 373

**RECOMMENDED**, that Defendants' Motion for Summary Judgment (Dkt. No. 64) be **DENIED IN PART**:

(1) Insofar as it seeks dismissal of Flynn's First Amendment retaliation claims against Wellenstein and Ward based on access to courts and the misbehavior report issued on April 30, 2015; and

**\*17** (2) Insofar as it seeks dismissal of plaintiffs retaliation claims for access to the courts and the April 30, 2015 misbehavior report due to nonexhaustion, the motion be **DENIED**; and it is

**ORDERED**, that copies of this Report-Recommendation and Order be served on the parties in accordance with the Local Rules.

**IT IS SO ORDERED**.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW**. Roldan v. Racette, 984 F.2d 85, 89 (2d Cir. 1993) (citing Small v. Secretary of Health and Human Servs., 892 F.2d 15 (2d Cir. 1989) ); 28 U.S.C. § 636(b)(1); FED R. CIV. P. 6(a), 6(e), 72.[22]

**All Citations**

Not Reported in Fed. Supp., 2018 WL 3195095

---

### Footnotes

1    This matter was referred to the undersigned for report and recommendation pursuant to 28 U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(c).

2    The Amended Complaint is not notarized and does not contain any statement from Flynn certifying the veracity of the document under the penalty of perjury.

3    Citations to page numbers refer to the pagination generated by CM/ECF, not the page numbers generated by the parties.

4    Local Rule 7.1(a)(3) states:

   Summary Judgment Motions

   Any motion for summary judgment shall contain a Statement of Material Facts. The Statement of Material Facts shall set forth, in numbered paragraphs, each material fact about which the moving party contends there exists no genuine issue. Each fact listed shall set forth a specific citation to the record where the fact is established.

   The opposing party shall file a response to the Statement of Material Facts. The non-movant's response shall mirror the movant's Statement of Material Facts by admitting and/or denying each of the movant's assertions in matching numbered paragraphs. Each denial shall set forth a specific citation to the record where the factual issue arises. The non-movant's response may also set forth any additional material facts that the non-movant contends are in dispute. Any facts set forth in the Statement of Material Facts shall be deemed admitted unless specifically controverted by the opposing party.

   Local Rule 7.1(a)(3).

Flynn v. Ward, Not Reported in Fed. Supp. (2018)

Case 9:22-cv-00102-BKS-ML    Document 78    Filed 12/13/23    Page 293 of 373

5    Mid-State C.F. Facility Operations Manual No. 21.04 provided, in relevant part:

> 3. Inmates in SHU areas may request, in writing, legal assistance from the Law Library.
>
> a. All requests for assistance must be sent to the Law Library Officer vi a facility mail and each request should document what kind of service is needed.
>
> c. SHU inmates will only be allowed to have two (2) legal research resources in their possession at a time. Pick-up and delivery of legal materials will be made on a daily basis, Monday through Sunday.

Dkt. No. 20-1 at 17.

6    DOCCS Directive #4833 provided, in pertinent part:

> Cell Study Services: Inmates prohibited by their confinement status from visiting the Law Library shall be allowed to study Law Library materials in their cells and obtain legal services normally available to general population inmates. Such inmates may request, in writing, a maximum of two items per day and these will be delivered, if available, within 24 hours of receipt of the request. Inmates may retain said legal materials for a period of not less than 16 hours nor more than 24 hours.

Dkt. No. 20-1 at 5.

7    The signature of the Superintendent is illegible.

8    See Footnote 8, supra.

9    See Footnote 7, supra.

10    See Footnote 7, supra.

11    See Footnote 7, supra.

12    See Footnote 7, supra.

13    The misbehavior report is not part of the record.

14    All unpublished opinions cited to by the undersigned in this Report-Recommendation are, unless otherwise noted, attached to this Report-Recommendation.

15    In light of my recommendation that Flynn's retaliation claim based upon threats be dismissed in its entirety based on the merits, I find it unnecessary to address the alternative failure to exhaust arguments related to this claim.

16    See Footnote 17, supra.

17    Defendants argue that a suspended sentence does not constitute an adverse action. Dkt. No. 64-6 at 18. Defendants claim, without evidentiary support, that Flynn did not serve keeplock or lose any privileges as a result of this misbehavior report. Id. The record before the Court establishes that the thirty day sentence was suspended until December 8, 2105. Dkt. No. 20-6 at 70. There is however, a genuine issue of fact regarding whether Flynn served the keeplock sentence. Construing the facts in a light most favorable to the pro se, non-moving party, the Court finds that Defendants have failed to meet their burden of proof with regard to this issue.

18    See Footnote 15, supra.

Flynn v. Ward, Not Reported in Fed. Supp. (2018)

Case 9:22-cv-00102-BKS-ML    Document 78    Filed 12/13/23    Page 294 of 373

19    See Footnote 17, supra.

20    Flynn filed additional grievances, but the record does not contain proof that these grievances were exhausted. To wit, Flynn testified that "at least two or three" of his grievances "made it to Albany." Dkt. No. 64-4 at 46. Flynn could not recall which grievances were appealed and testified that while nothing prevented him from exhausting all his grievances, he did not appeal certain grievances because they were "repetitive." Id.

21    Section 701.6(b) provides:

> Reprisals prohibited. No reprisals of any kind shall be taken against an inmate or employee for good faith utilization of this grievance procedure. An inmate may pursue a complaint that a reprisal occurred through the grievance mechanism. A grievant shall not receive a misbehavior report based solely upon an allegedly false statement made by the inmate to the grievance committee.

> N.Y. COMP. CODES R. & REGS. tit. 7, § 701.6.

22    If you are proceeding pro se and are served with this Order by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date the Order was mailed to you to serve and file objections. FED. R. CIV. P. 6(d). If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday. Id. § 6(a)(1)(C).

---

End of Document                                          © 2023 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW    © 2023 Thomson Reuters. No claim to original U.S. Government Works.    17

2005 WL 3531464
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Roberto CIAPRAZI, Plaintiff,

v.

Glenn S. GOORD; et al. Defendants.

No. Civ.9:02CV00915(GLS/.

|

Dec. 22, 2005.

**Attorneys and Law Firms**

Roberto Ciaprazi, Clinton Correctional Facility, Dannemora, New York, Plaintiff pro se.

Hon. Eliot Spitzer, Attorney General, State of New York, The Capitol, Albany, New York, for the Defendants.

Patrick F. MacRae, Assistant Attorney General, of counsel.

*MEMORANDUM-DECISION AND ORDER*

SHARPE, J.

### I. *Introduction*

**\*1** Plaintiff *pro se* Roberto Ciaprazi brings this action pursuant to 42 U.S.C. § 1983. Ciaprazi alleges that the defendants violated his First, Eighth, and Fourteenth Amendment rights. Pending are Ciaprazi's objections to Magistrate Judge David E. Peebles' Report-Recommendation. Upon careful consideration of the arguments, the relevant parts of the record, and the applicable law, the court adopts the Report-Recommendation in its entirety.[1]

### II. *Procedural History*

Ciaprazi commenced this action on July 15, 2002. *Dkt. No. 1.* On February 27, 2003, the defendants moved for summary judgment. *Dkt. No. 39.* On March 14, 2004, Judge Peebles issued a Report-Recommendation which recommended that the defendants' motion for summary judgment be granted in part, and denied in part. *Dkt. No. 47.* Ciaprazi objected. *Dkt. No. 48.* His objections are now before this court.

### III. *Discussion* [2]

#### A. *Standard of Review*

When objections to a magistrate judge's Report-Recommendation are lodged, the Court makes a *de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made." *See* 28 U.S.C. § 636(b)(1). After such a review, the court may "accept, reject, or modify, in whole or in part, the findings or the recommendations made by the magistrate judge." *Id.* Having reviewed the unobjected to portions of the Report-Recommendation, the court adopts them in their entirety because they are not clearly erroneous.

#### B. *Report-Recommendation*

Although Judge Peebles examined the merits of the case and found that many of Ciaprazi's claims were meritless, this court only conducts *de novo* review of the objected to portions of the Report-Recommendation. Specifically, Judge Peebles found no evidence tending to establish that the adverse actions taken against Ciaprazi were motivated by disciplinary animus, and thereby recommended dismissing Ciaprazi's First Amendment retaliation claim. *Report and Recommendation, pp. 13-23, 45, Dkt. No. 47.* He further found that Ciaprazi lacked standing to bring a cause of action challenging the Tier III disciplinary system under the Eighth Amendment. *Id. at 27.* Lastly, Judge Peebles dismissed both of Ciaprazi's claims under international law and his personal involvement claim against defendant Goord. *Id. at 41, 43-4.*[3]

#### C. *Objections*

##### 1. *First Amendment Claim*

First, Ciaprazi contends that his retaliation claim under the First Amendment should not have been dismissed because the defendants did not satisfy their initial evidentiary burden. *Pl. Objs. pp. 1-7, Dkt. No. 48.* Specifically, he argues that Judge Peebles did not properly consider the falsity of a misbehavior report as evidence of retaliation by the defendants.

The court rejects Ciaprazi's argument because as Judge Peebles noted, a prisoner does not have a right to be free from false misbehavior reports. *Freeman v. Rideout,* 808 F.2d

949, 951 (2d Cir.1986). As Judge Peebles further noted, the defendants have shown sufficient evidence to establish that there is no specific link between Ciaprazi's grievances and the defendants' actions. Accordingly, Ciaprazi's retaliation claim is dismissed.

### 2. *Eighth Amendment*

**\*2** Next, Ciaprazi objects to Judge Peebles' finding that he did not have standing to challenge the disciplinary authority of the Tier III system. *Pl. Objs. p. 7, Dkt. No. 48.* This objection is without merit. As Judge Peebles noted, since the length of Ciaprazi's disciplinary confinement was within the bounds of constitutionally acceptable levels, he has no standing to sue. Second, as Judge Peebles further noted, any generalized complaints Ciaprazi has against the Tier III system are more appropriately addressed as part of his due process claims. Accordingly, Ciaprazi's claims against the Tier III system are dismissed.

### 3. *Human Rights Claims*

Ciaprazi also objects to Judge Peebles' finding that he did not have claims under the Universal Declaration of Human Rights (UDHR) and the International Covenant on Civil and Political Rights (ICCPR). Ciaprazi's contention is without merit. As Judge Peebles noted, Ciaprazi has failed to establish that these treaties provide private causes of action. *See Report Recommendation p. 41, Dkt. No. 47.* Accordingly, Ciaprazi's claims under international law are dismissed.

### 4. *Personal Involvement*

Ciaprazi also objects to Judge Peebles' dismissal of his personal involvement claim against defendant Goord. As Judge Peebles noted, Ciaprazi merely made allegations against Goord in his supervisory capacity. Accordingly, the personal involvement claim against Goord was properly dismissed.

### IV. *Conclusion*

Having reviewed the objected-to portions of the Report and Recommendation *de novo,* the remainder under a clearly erroneous standard, and Ciaprazi's objections, this court accepts and adopts the recommendation of Judge Peebles for the reasons stated in the March 14, 2004 Report-Recommendation.

WHEREFORE, for the foregoing reasons, it is hereby

ORDERED that defendants' summary judgment motion (Dkt. No. 39) be GRANTED in part, and that all of plaintiff's claims against defendant Goord, and all of plaintiff's claims against the remaining defendants except his procedural due process and Eighth Amendment conditions of confinement causes of action, be DISMISSED, but that to the extent of those claims, with respect to which triable issues of fact exist, the defendants' motion be DENIED.

IT IS SO ORDERED.

## REPORT AND RECOMMENDATION

PEEBLES, Magistrate J.

Plaintiff Roberto Ciaprazi, a New York State prison inmate who by his own account has frequently lodged complaints against prison officials and been openly critical of their practices, has commenced this proceeding against the Commissioner of the New York State Department of Correctional Services ("DOCS") and several of that agency's employees pursuant to 42 U.S.C. § 1983, complaining of constitutional violations occurring during the course of his confinement. In his complaint, Ciaprazi alleges that 1) a misbehavior report was filed against him in retaliation for his having previously engaged in protected activity; 2) he was deprived of procedural due process during the course of the hearing and resulting adverse finding associated with that misbehavior report; and 3) the conditions which he faced while in disciplinary confinement, following that hearing, were cruel and unusual. Plaintiff asserts claims pursuant to the First, Eighth and Fourteenth Amendments to the United States Constitution, as well as under certain international human rights accords.

**\*3** Currently pending before the court is a motion by the defendants seeking summary judgment dismissing plaintiff's complaint in its entirety. Having carefully reviewed the record in light of Ciaprazi's claims and defendants' arguments, I find that many of plaintiff's causes of action are devoid of merit, as a matter of law, and thus subject to dismissal. Because I find the existence of genuinely disputed issues of material fact surrounding certain of plaintiff's claims, however, including notably his due process claim against defendants Melino, Kohl, Graham, Fitzpatrick, and Rogers, I recommend denial

of defendants' motion seeking dismissal of plaintiff's claims against them.

### I. *BACKGROUND*

At the times relevant to his complaint, Ciaprazi was a prisoner entrusted to the custody of the DOCS. Plaintiff alleges that after having been confined within the Clinton Correctional Facility since February, 1997, he was transferred into the Coxsackie Correctional Facility in April of 1998. Complaint (Dkt. No. 1) ¶ 3. Ciaprazi asserts that while at Coxsackie he was administered more than a dozen allegedly false misbehavior reports, resulting in disciplinary cell confinement of over 200 days as well as other "deprivations" of an unspecified nature. *Id.* ¶ 3. Plaintiff contends that the issuance of those misbehavior reports was motivated by his having filed multiple complaints involving conduct of corrections workers and staff at Coxsackie.

At the heart of plaintiff's claims in this action is an incident which occurred at Coxsackie on July 31, 1999. On that date, Ciaprazi and various other prisoners were taken to an enclosed holding area to provide specimens for use in conducting drug screening urinalysis testing. As a result of an interaction occurring during the course of that testing between the plaintiff and defendant Fitzpatrick, a corrections lieutenant at the facility, plaintiff was placed in keeplock confinement and issued a misbehavior report on the following day, charging him with creating a disturbance (Rule 104.13), interference with a prison employee (Rule 107.10), harassment (Rule 107.11), refusal to obey a direct order (Rule 106.10), and making threats (Rule 102.10).[1] Defendants' Motion (Dkt. No. 39) Exh. A.

On July 31, 1999, following the underlying events and the imposition of keeplock confinement but prior to receiving the misbehavior report, plaintiff filed a grievance regarding the incident; plaintiff followed the filing of that grievance with a request on August 3, 1999 for prehearing release from confinement. Complaint (Dkt. No. 1) ¶ 19. Plaintiff received no response to that grievance. *Id.*

A Tier III disciplinary hearing in connection with the charges stemming from the July 31, 1999 incident was conducted by defendant Melino, a corrections counselor at Coxsackie, beginning on August 4, 1999, and concluding on August 10, 1999. Defendants' Motion (Dkt. No. 39) Exh. A at 2; *id.* Exh. B at 17, 152.[2] Defendant Cole, who according to the plaintiff is a civilian employee working at Coxsackie,

was assigned as plaintiff's inmate assistant in connection with that hearing. The evidence adduced at that hearing included the misbehavior report, as well as testimony from the plaintiff, Corrections Lieutenant Fitzpatrick, Corrections Officer Marshal, Corrections Counselor Cole, Corrections Officer Rogers, Corrections Officer Simonik, Corrections Lieutenant McDermott, and Corrections Officer Phillips. Defendants' Motion (Dkt. No. 39) Exh. B.

**\*4** At the conclusion of the hearing, plaintiff was found guilty on all five counts, and a penalty of ten months of disciplinary confinement within the Coxsackie Special Housing Unit ("SHU"), with a corresponding loss of commissary, telephone and package privileges, was imposed.[3] Defendants' Motion (Dkt. No. 39) Exh. A at 00. Ciaprazi was not present when Hearing Officer Melino read her decision into the record, having previously been removed from the proceeding for engaging in what the hearing officer regarded as disruptive behavior. *See* Defendants' Motion (Dkt. No. 39) Exh. B at 152. Plaintiff appealed the hearing officer's decision to Donald Selsky, the DOCS Director of Special Housing/Inmate Disciplinary Program, who on September 27, 1999 affirmed the determination. Complaint (Dkt. No. 1) ¶ 51.

On August 20, 1999, plaintiff was transferred into the Upstate Correctional Facility, where he was apparently placed in SHU confinement to serve his disciplinary sentence. Complaint (Dkt. No. 1) ¶ 52. Plaintiff asserts that during that period, as well as while in keeplock confinement at Coxsackie, he was subjected to significant deprivations, which are described in summary fashion in his complaint, until September 16, 1999 when he was transferred into Clinton and exposed to similarly unpleasant conditions. *Id.* ¶¶ 53-55; Ciaprazi Aff. (Dkt. No. 46) ¶¶ 54-57. Plaintiff describes the keeplock confinement conditions at Coxsackie as even more unpleasant than those experienced in SHU, having included the deprivation of certain personal items such as food and snacks, toiletries, musical instruments, and other similar amenities. Ciaprazi Aff. (Dkt. No. 46) ¶ 54. The deprivations experienced by the plaintiff while in keeplock confinement at Coxsackie also entailed being subjected to "loud and non-stop noise from other frustrated prisoners yelling and banging on the doors," as well as the denial of access to the law library, books and other reading materials, and various programs available to those in general population. *Id.* ¶ 55. While at Upstate, plaintiff contends that he was exposed to cell lighting between 6:00 am and 1:00 am; he was denied reading materials; his medical requests "were ignored"; and

he experienced cold conditions and the inability to participate in available recreation due to the lack of warm clothing. *Id.* ¶ 57; Complaint (Dkt. No. 1) ¶ 53. Similar conditions were experienced by the plaintiff while at Clinton, including exposure to cold and lack of warm clothing and blankets, together with the deprivation of medical and mental health services. Ciaprazi Aff. (Dkt. No. 46) ¶ 57; Complaint (Dkt. No. 1) ¶ 54..

## II. *PROCEDURAL HISTORY*

The plaintiff, who is proceeding *pro se* and *in forma pauperis,* commenced this action on July 15, 2002. Dkt No. 1. Named as defendants in plaintiff's complaint are New York DOCS Commissioner Glenn S. Goord; Ellen J. Croche, Chair of the New York State Commission of Correction; Fred Lamey, a member of the New York Commission of Correction; Donald Selsky, the DOCS Director of Special Housing/ Inmate Disciplinary Program; Corrections Counselor Melino, whose first name is unknown; Cole, another DOCS employee whose complete name is unknown to the plaintiff; H.D. Graham, Deputy Superintendent for Security at Coxsackie; Corrections Lieutenant Fitzpatrick; and Corrections Officer Rogers. *Id.* In his complaint, plaintiff asserts nine separate causes of action, including claims 1) against defendants Rogers and Fitzpatrick, for infringement of his First Amendment right to free speech, and due process and equal protection violations under the United States Constitution, as well as under the Universal Declaration of Human Rights ("UDHR") and the International Covenant on Civil and Political Rights ("ICCPR"); 2) against defendant Graham, for failure to investigate plaintiff's grievance and to take actions to prevent infringement of his constitutional rights; 3) against defendant Cole, for failing to properly perform his duties as Ciaprazi's inmate assistant; 4) against defendant Melino, for deprivation of due process, based upon her conduct and bias during the disciplinary hearing; 5) of retaliation against defendant Melino, asserting that her actions were taken in response to the filing of complaints and grievances by the plaintiff; 6) against defendants Goord and Selsky, based upon their failure to overturn plaintiff's disciplinary conviction and remediate the constitutional deprivations suffered by him; 7) against defendants Goord and Selsky for retaliation, based on plaintiff's prior filing of complaints and grievances; 8) against defendants Croche, Lamey and Goord, in their supervisory capacities, for failure to properly oversee DOCS employees and enact policies to prevent such abuses; and 9) against defendants Goord, Croche and Lamey, for maintaining and fostering a policy of widespread and disportionate disciplinary punishments within the state's

prison system. Complaint (Dkt. No. 1) at 14-16. Plaintiff's complaint seeks both injunctive and monetary relief. *Id.*

**\*5** Following the filing of an answer on behalf of the eight defendants who have been served in the action on December 3, 2002, generally denying plaintiff's allegations and setting forth various affirmative defenses, Dkt. No. 13, and pretrial discovery, on February 27, 2004 those defendants moved seeking entry of summary judgment on various bases.[4] Dkt. No. 39. Aided only by plaintiff's complaint, the record related to the relevant internal disciplinary proceedings against the plaintiffs, and answers by plaintiff to defendants' interrogatories, and without the benefit of either a transcript of plaintiff's deposition or any affidavits, other than from their counsel, defendants have moved for summary judgment seeking dismissal of plaintiff's claims on various grounds. *Id.* In their motion, defendants argue that 1) plaintiff has failed to offer proof from which a reasonable factfinder could conclude that cognizable constitutional violations have occurred; 2) defendants Goord and Selsky lack the requisite personal involvement in the constitutional violations alleged; and 3) plaintiff should be denied the injunctive relief which he seeks. *Id.* Plaintiff has since submitted papers in opposition to defendants' summary judgment motion.[5] Dkt. No. 46. Defendants' motion, which is now ripe for determination, has been referred to me for the issuance of a report and recommendation, pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3(c). *See also* Fed.R.Civ.P. 72(b).

## III. *DISCUSSION*

### A. *Summary Judgment Standard*

Summary judgment is warranted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits ... show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *see Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 2509-10 (1986); *Security Insurance Co. of Hartford v. Old Dominion Freight Line, Inc.,* 391 F.3d 77, 82-83 (2d Cir.2004). When summary judgment is sought, the moving party bears an initial burden of demonstrating that there is no genuine dispute of material fact to be decided with respect to any essential element of the claim in issue; the failure to meet this burden

warrants denial of the motion. *Anderson,* 477 U.S. at 250 n. 4, 106 S.Ct. at 2511 n. 4; *Security Insurance,* 391 F.3d at 83.

In the event this initial burden is met, the opposing party must show, through affidavits or otherwise, that there is a material issue of fact for trial. [6] Fed.R.Civ.P. 56(e); *Celotex,* 477 U.S. at 324, 106 S.Ct. at 2553; *Anderson,* 477 U.S. at 250, 106 S.Ct. at 2511. When deciding a summary judgment motion, the court must resolve any ambiguities, and draw all inferences from the facts, in a light most favorable to the nonmoving party. *Wright v. Coughlin,* 132 F.3d 133, 137-38 (2d Cir.1998). Summary judgment is inappropriate where "review of the record reveals sufficient evidence for a rational trier of fact to find in the [nonmovant's] favor." *Treglia v. Town of Manlius,* 313 F.3d 713, 719 (2d Cir.2002) (citation omitted); *see also Anderson,* 477 U.S. at 250, 106 S.Ct. at 2511 (summary judgment is appropriate only when "there can be but one reasonable conclusion as to the verdict.").

### B. *Plaintiff's First Amendment Retaliation Claim*

**\*6** Plaintiff's complaint asserts several claims of unlawful retaliation. In his first cause of action, plaintiff asserts that the actions of defendants Rogers and Fitzpatrick in confining him to a cell and issuing, or directing the issuance of, misbehavior reports were taken in retaliation for his having filed prior grievances and complaints regarding DOCS officials, including those working at Coxsackie. Complaint (Dkt. No. 1) First Cause of Action. Plaintiff's second claim alleges that defendant Rogers' failure to investigate plaintiff's complaint regarding the allegedly false misbehavior report, and to order his release from confinement pending a disciplinary hearing, were similarly retaliatory. *Id.* Second Cause of Action. Plaintiff further alleges in his fifth cause of action that the actions of Hearing Officer Melino, including in finding him guilty on all five counts, were motivated by Ciaprazi's filing of prior grievances and complaints. *Id.* Fifth Cause of Action. Plaintiff's seventh claim similarly attributes the failure of defendants Goord and Selsky to reverse the hearing officer's determination, on appeal, to retaliation for his having engaged in protected activity. *Id.* Seventh Cause of Action. Defendants maintain that these retaliation claims are legally deficient, and that the record contains no evidence upon which a factfinder could conclude that unlawful retaliation occurred.

Claims of retaliation like those asserted by the plaintiff find their roots in the First Amendment. *See Gill v. Pidlypchak,* 389 F.3d 379, 380-81 (2d Cir.2004). Central to such claims is the notion that in a prison setting, corrections officials may not take actions which would have a chilling effect upon an inmate's exercise of First Amendment rights. *See id.* at 81-83. Because of the relative ease with which claims of retaliation can be incanted, however, as exemplified by plaintiff's claims in this action, the courts have scrutinized such retaliation claims with particular care. *See Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983). As the Second Circuit has noted,

> [t]his is true for several reasons. First, claims of retaliation are difficult to dispose of on the pleadings because they involve questions of intent and are therefore easily fabricated. Second, prisoners' claims of retaliation pose a substantial risk of unwarranted judicial intrusion into matters of general prison administration. This is so because virtually any adverse action taken against a prisoner by a prison official-even those otherwise not rising to the level of a constitutional violation-can be characterized as a constitutionally proscribed retaliatory act.

*Dawes v. Walker,* 239 F.3d 489, 491 (2d Cir.2001) (citations omitted), *overruled on other grounds, Swierkewicz v. Sorema N.A.,* 534 U.S. 506, 122 S.Ct. 992 (2002).

In order to state a *prima facie* claim under section 1983 for unlawful retaliation in a case such as this, a plaintiff must advance non-conclusory allegations establishing that 1) the conduct or speech at issue was protected; 2) the defendants took adverse action against the plaintiff; and 3) there was a causal connection between the protected activity and the adverse action-in other words, that the protected conduct was a "substantial or motivating factor" in the prison officials' decision to take action against the plaintiff. *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287,

97 S.Ct. 568, 576 (1977); *Gill,* 389 F.3d at 380 (citing *Dawes,* 239 F.3d at 492). If the plaintiff carries this burden, the defendants must then show, by a preponderance of the evidence, that they would have taken action against the plaintiff "even in the absence of the protected conduct ." *Mount Healthy,* 429 U.S. at 287, 97 S.Ct. at 576. Under this analysis, adverse action taken for both proper and improper reasons may be upheld if the action would have been taken based on the proper reasons alone. *Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir.1996) (citations omitted).

**\*7** As can be seen, evaluation of claims of retaliation is a particularly fact-laden exercise, since such claims revolve around both the engaging in protected conduct and establishment of a nexus between that conduct and the adverse action ultimately taken. In making the required analysis in this case, however, the court is somewhat disadvantaged by virtue of the fact that defendants' summary judgment motion is not particularly enlightening as to the basis for their claim that the court is positioned to find, as a matter of law, that plaintiff's retaliation claims are lacking in merit.

In their motion the defendants, in the context of the now-familiar standard governing analysis of First Amendment retaliation claims, acknowledge that the plaintiff, who has lodged formal complaints of prison conditions and treatment of inmates, has engaged in protected activity. That plaintiff has filed an unusually large number of grievances and lawsuits, and taken other steps to complain publicly about matters associated with his confinement by the DOCS, is both apparent from the record before the court, and not controverted by the defendants. Indeed, in his response to defendants' summary judgment motion, plaintiff proudly states that he has "systematically exposed, vehemently criticized, and even ridiculed the inappropriate and arbitrary policies and actions of the staff at Coxsackie, including the actions of defendant Goord and of the Superintendent and Deputy Superintendents of Coxsackie." [7] Plaintiff's Affidavit (Dkt. No. 46) ¶ 32. Plaintiff has therefore established, at least for purposes of the instant motion, that he was engaged in protected activity sufficient to trigger First Amendment rights against acts taken in retribution for having voiced those types of complaints. *Graham,* 89 F.3d at 80; *Morello v. James,* 810 F.2d 344, 346-47 (2d Cir.1987).

Defendants argue, however, that the record is lacking in evidence to establish the requisite connection between that protected activity and the adverse actions taken against Ciaprazi by prison officials. Defendants' legal position is advanced, in part, in an affidavit from their counsel, Patrick F. MacRae, Esq., outlining the evidence relied upon by the defendants in making their motions. [8] Defendants also note, in further support of their motion, the requirement that retaliation claims rest upon more than mere conclusory allegations regarding the state of mind of prison officials. *See* Dkt. No. 39 at 8-9; *e.g.,* *Flaherty,* 713 F.2d at 13.

As plaintiff correctly notes, the applicable pleading requirements, including Rule 8 of the Federal Rules of Civil Procedure, provide for mere "notice" pleading, and do not require that complaints contain every detail associated with a plaintiff's claims except in categories not applicable to this case. *See Leatherman v. Tarrant Cty. Narcotics Intelligence & Coordination Unit,* 507 U.S. 163, 167-69, 113 S.Ct. 1160, 1162-63 (1993). Accordingly, the mere fact that the plaintiff's retaliation claims are pleaded in non-specific, conclusory terms does not alone entitle defendants to summary dismissal of those claims.

**\*8** In this case the defendants have satisfied their initial, modest threshold burden of establishing the lack of evidentiary support for plaintiff's retaliation claims. Though conventional wisdom might dictate the submission of affidavits from the primary actors, including notably defendants Rogers and Fitzpatrick, disavowing any retaliatory motives associated with their actions, defendants' decision to rely instead upon the lack of evidentiary support for plaintiff's retaliation claims, including through plaintiff's responses to defendants' interrogatories as well as the proceedings associated with the underlying disciplinary matter, is sufficient to cast the burden upon the plaintiff to come forward with evidence demonstrating the existence of genuinely disputed material issues of fact for trial with regard to those claims. *Celotex,* 477 U.S. at 323-34, 106 S.Ct. at 2553; *see also Anderson,* 477 U.S. at 249, 106 S.Ct. at 2511. There is no requirement under Rule 56 of the Federal Rules of Civil Procedure or otherwise that a party affidavit be submitted to support such a motion, which instead can be based upon any admissible evidence. *Id.*

To demonstrate that a reasonable factfinder could discern a nexus between plaintiff's filing of grievances and the

disciplinary matters associated with the incident at issue, Ciaprazi essentially makes two arguments. First, he contends that the manifest falsity of the misbehavior report as well as testimony proffered during the disciplinary hearing give rise to an inference that the disciplinary matters are motivated toward retaliatory animus. Secondly, plaintiff argues that the sheer number of grievances and formal complaints lodged by him, including some close in temporal proximity to the underlying incident, similarly gives rise to a legitimate inference of retaliatory motivation. *See* Ciaprazi Memorandum (Dkt. No. 46) at 14.

Plaintiff's argument in this regard is significantly diluted by the sheer number of complaints lodged by him over time. By his own admission, plaintiff has regularly and openly complained of prison policies and practices and during the relevant time period prior to the July 31, 1999 incident, and indeed had filed many formal complaints regarding his treatment while at Coxsackie. Yet, plaintiff has submitted no evidence that any of those complaints related to defendants Rogers or Fitzpatrick, the two principal actors in this case, nor has he pointed to any collaboration between those named in his prior complaints and Fitzpatrick and Rogers. At best, plaintiff has argued that prior to July 31, 1999 he "filed complaints and/or grievances against Lieutenants Sweeney, Armstrong, Skrocky and McDermott, all colleagues of defendant Fitzpatrick of the same rang [sic] with defendant Fitzpatrick." *Id.* ¶ 32.

In an equally tenuous attempt to link his protected activity with the issuance of a misbehavior report, plaintiff notes that on May 26, 1999 he filed a grievance for harassment against an employee named Fitzpatrick, who was assigned to assist him in connection with another Tier III disciplinary hearing, stating his naked belief, lacking in evidentiary support, that the employee named in that complaint "may be and apparently is a relative of defendant Fitzpatrick." *Id.* ¶ 33, Exh. 39. Plaintiff also notes that on July 21, 1999 he filed a grievance accusing defendant Goord of "gross abuse of power", requesting an investigation of defendant Goord by the New York State Police and federal authorities, and that five days later, on July 26, 1999, he filed a complaint with various agencies including the United States Department of Prisons complaining of mistreatment. *Id.* ¶¶ 34, 35.

**\*9** While there is some appeal to finding the requisite fact issue to avoid the entry of summary judgment on plaintiff's retaliation claims based upon the timing of these events, that factor is undermined by the steady stream of grievances filed

by him on a regular and continuing basis. Were the plaintiff someone who had rarely if ever complained about prison conditions, but shortly before being issued a misbehavior report had lodged a formal complaint against or implicating the conduct of the officer who issued the disciplinary citation, a very different set of circumstances would be presented, and summary judgment would not be warranted. In this case, however, plaintiff can point to no complaints lodged by him against or implicating the conduct of defendant Fitzpatrick, who issued the disputed misbehavior report. Accordingly, I find that the defendants have established that they are entitled to summary dismissal of plaintiff's retaliation claims based upon plaintiff's failure to establish a basis on which a reasonable factfinder could find the requisite connection between plaintiff's grievance activities and the issuance of the misbehavior report and subsequent disciplinary hearing.[9] *E.g., Williams v. Goord,* 111 F.Supp.2d 280, 290 (S.D.N.Y.2000); *Mahotep v. DeLuca,* 3 F.Supp.2d 385, 389 (W.D.N.Y.1998).

### C. *Plaintiff's Eighth Amendment Cruel And Unusual Punishment Claim*

In his complaint Ciaprazi, in somewhat indiscriminate fashion, asserts that the actions taken against him by the various defendants resulted in his exposure to cruel and unusual punishment, in violation of the Eighth Amendment.[10] Plaintiff's cruel and unusual punishment claims appear to center upon the conditions which he faced as a result of the disciplinary proceedings against him and resulting in SHU confinement initially at Coxsackie, and later at Upstate and at Clinton. In their motion, defendants assert that these claims are similarly deficient as a matter of law.

The Eighth Amendment's prohibition of cruel and unusual punishment encompasses punishments that involve the "unnecessary and wanton infliction of pain" and are incompatible with "the evolving standards of decency that mark the progress of a maturing society." *Estelle v. Gamble,* 429 U.S. 97, 102, 104, 97 S.Ct. 285, 290, 291 (1976); *see also Whitley v. Albers,* 475 U.S. 312, 319, 106 S.Ct. 1076, 1084 (1986) (citing, *inter alia, Estelle* ). The Eighth Amendment does not mandate comfortable prisons, but yet it does not tolerate inhumane ones either; thus the conditions of an inmate's confinement are subject to Eighth Amendment scrutiny. *Farmer v. Brennan,* 511 U.S. 825, 832, 114 S.Ct.

1970, 1976 (1994) (citing *Rhodes v. Chapman,* 452 U.S. 337, 349, 101 S.Ct. 2392, 2400 (1981)).

A claim alleging that prison conditions violate the Eighth Amendment must satisfy both an objective and subjective requirement-the conditions must be "sufficiently serious" from an objective point of view, and the plaintiff must demonstrate that prison officials acted subjectively with "deliberate indifference". *See Leach v. Dufrain,* 103 F.Supp.2d 542, 546 (N.D.N.Y.2000) (Kahn, J .) (citing *Wilson v. Seiter,* 501 U.S. 294, 111 S.Ct. 2321 (1991)); *Waldo v. Goord,* No. 97-CV-1385, 1998 WL 713809, at *2 (N.D.N.Y. Oct. 1, 1998) (Kahn, J. and Homer, M.J.); *see also, generally, Wilson,* 501 U.S. 294, 111 S.Ct. 2321. Deliberate indifference exists if an official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer,* 511 U.S. at 837, 114 S.Ct. at 1978; *Leach,* 103 F.Supp.2d at 546 (citing *Farmer* ); *Waldo,* 1998 WL 713809, at *2 (same).

*10 Plaintiff's cruel and unusual punishment claim challenges the fact that 1) he was placed in a double bunk cell at Upstate; 2) was placed in isolation and exposed to light except for five hours each night; 3) was deprived of such amenities such as writing paper and envelopes, proper access to the law library, medical care, access to newspapers, magazines and books, access to the courts, and legal papers; 4) was exposed to loud and boisterous behavior on the part of other inmates; 5) was denied essential clothing and bedding as well as personal hygiene materials, radios or headphones, books, newspapers and magazines; and 6) was exposed to cold conditions, leading him to suffer at least one case of the flu. Complaint (Dkt. No. 1) ¶¶ 52-56; *see also* Plaintiff's Affidavit (Dkt. No. 46) ¶¶ 53-57. To counter these allegations, defendants have submitted nothing to reflect the lack of a basis upon which a reasonable factfinder could conclude that plaintiff was exposed to cruel and unusual punishment while in disciplinary isolation as a result of the Tier III determination now at issue. Instead, defendants' motion focuses upon a narrow aspect of plaintiff's Eighth Amendment claim, in which they assert that the lack of policies guaranteed to result in uniformity throughout the DOCS system of punishments to result in a Eighth Amendment violation.

As skeptical as perhaps one may be regarding plaintiff's ability to ultimately persuade a factfinder that the admittedly unpleasant conditions to which he was apparently exposed and the deprivations suffered while in disciplinary confinement rise to a constitutionally significant level, I am unable to state, based upon the record as currently constituted, that no reasonable factfinder could so conclude. I therefore recommend denial of defendants' motion to dismiss plaintiff's Eighth Amendment cruel and unusual punishment claim relating to the conditions of his confinement. [11]

Included within his Eighth Amendment claim, though more appropriately grouped with his due process cause of action, is plaintiff's contention that because the Tier III hearing officer was provided the unfettered discretion, in the event of finding of guilt, to impose a penalty of whatever magnitude seen fit, the disciplinary scheme in place at the DOCS is constitutionally infirm. In plaintiff's case, however, the imposed penalty of ten months of disciplinary confinement, 180 days of which were deferred, fell comfortably within the bounds of acceptable levels under the Eighth Amendment. Consequently, whatever may be said about plaintiff's arguments regarding the discretion affording to hearing officers, he lacks standing to raise such a claim. *See Trammell v. Mantello,* No. 90-CV-382, 1996 WL 863518, at *8-*9 (W.D.N.Y. June 10, 1996) (Tier III regulations pass constitutional muster).

### D. *Plaintiff's Procedural Due Process Claim*

In their motion, defendants also challenge plaintiff's contention that he was denied procedural due process during the course of the disciplinary hearing which resulted in his disciplinary confinement for a period of five months. In support of their motion, defendants argue both that plaintiff was not deprived of a constitutionally cognizable liberty interest, and that even assuming he was, he was afforded the requisite process due under the Fourteenth Amendment in connection with that deprivation.

*11 To successfully state a claim under 42 U.S.C. § 1983 for denial of due process arising out of a disciplinary hearing, a plaintiff must show that he or she both (1) possessed an actual liberty interest, and (2) was deprived of that interest without being afforded sufficient process. *See Tellier v. Fields,* 260 F.3d 69, 79-80 (2d Cir.2000) (citations omitted); *Hynes,* 143 F.3d at 658; *Bedoya v. Coughlin,* 91 F.3d 349, 351-52 (2d Cir.1996).

### 1. Liberty Interest

Addressing the first of these required showings, in *Sandin v. Conner,* 515 U.S. 472, 115 S.Ct. 2293 (1995), the United States Supreme Court determined that to establish a liberty interest, a plaintiff must sufficiently demonstrate that (1) the State actually created a protected liberty interest in being free from segregation; and that (2) the segregation would impose an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Id.* at 483-84, 115 S.Ct. at 2300; *Tellier,* 280 F.3d at 80; *Hynes,* 143 F.3d at 658.

Defendants challenge the applicability of both of these factors. Initially, defendants question whether New York has, by statute or otherwise, created a protected liberty interest in prisoners remaining free from segregation, including for disciplinary reasons, arguing that it has not. Defendants' Memorandum (Dkt. No. 39) at 14. The cases cited in support of that proposition, however, which relate to whether there is a constitutional or liberty interest in being assigned to a particular program, job assignment, or facility, are inapposite. *See, e.g.,* *Klos v. Haskell,* 48 F.3d 81, 87-88 (2d Cir.1995) (involving revocation of assignment to "shock incarceration" program); *Hall v. Unknown Named Agents of N.Y. State Dept. for Corr. Servs. for APPU Unit at Clinton Prison,* 825 F.2d 642, 645-46 (2d Cir.1987) (involving assignment to Assessment Program and Preparation Unit); *see also* *Montanye v. Haymes,* 427 U.S. 236, 243, 96 S.Ct. 2543, 2547 (1976) (no constitutional right of inmate to be placed in any particular facility); *Frazer v. Coughlin,* 81 F.3d 313, 318 (2d Cir.1996) ("no protected liberty interest in a particular job assignment"). Despite defendants' assertion to the contrary, it is now firmly established that through its regulatory scheme, New York State has created a liberty interest in prisoners remaining free from disciplinary confinement, thus satisfying the first *Sandin* factor. *See, e.g.,* *Palmer v. Richards,* 364 F.3d 60, 64 n. 2 (2d Cir.2004) (citing *Welch v. Bartlett,* 196 F.3d 389, 394 n. 4 (2d Cir.1999); *see also* *LaBounty v. Coombe,* No. 95 CIV 2617, 2001 WL 1658245, at *6 (S.D.N .Y. Dec. 26, 2001); *Alvarez v. Coughlin,* No. 94-CV-985, 2001 WL 118598, at *6 (N.D.N.Y. Feb. 6, 2001) (Kahn, J.).

Having rejected defendants' contention that the State has not created such an interest, I next turn to examination of whether the conditions of plaintiff's disciplinary confinement, as alleged by him, rise to the level of an atypical and significant hardship under *Sandin.* Atypicality in a *Sandin* inquiry normally presents a question of law. [12] *Colon v. Howard,* 215 F.3d 227, 230-31 (2d Cir.2000); *Sealey v. Giltner,* 197 F.3d 578, 585 (2d Cir.1999). When determining whether a plaintiff possesses a cognizable liberty interest, district courts must examine the specific circumstances of confinement, including analysis of both the length and conditions of confinement. *See* *Sealey,* 197 F.3d at 586; *Arce v. Walker,* 139 F.3d 329, 335-36 (2d Cir.1998); *Brooks v. DiFasi,* 112 F.3d 46, 48-49 (2d Cir.1997). In cases involving shorter periods of segregated confinement where the plaintiff has not alleged any unusual conditions, however, a detailed explanation of this analysis is not necessary. [13] *Hynes,* 143 F.3d at 658; *Arce,* 139 F.3d at 336.

**\*12** Given that plaintiff has shown that he was subjected to disciplinary confinement for a period of five months, and has alleged his exposure to conditions beyond those normally associated with such SHU confinement, as described in the applicable regulations, at this juncture I am unable to conclude, as a matter of law, that he was not deprived of a constitutionally significant liberty interest as a result of the disciplinary proceeding at issue. I therefore recommend against summary dismissal of plaintiff's due process claims on this basis.

### 2. Due Process

The procedural protections to which a prison inmate is entitled before being deprived of a recognized liberty interest are well established, the contours of the requisite protections having been articulated in *Wolff v. McDonnell,* 418 U.S. 539, 564-67, 94 S.Ct. 2963, 2978-80 (1974). Under *Wolff,* the constitutionally mandated due process requirements include 1) written notice of the charges; 2) the opportunity to appear at a disciplinary hearing and present witnesses and evidence, subject to legitimate safety and penological concerns; 3) a written statement by the hearing officer explaining his or her decision and the reasons for the action being taken; and 4) in some circumstances, the right to assistance in preparing a defense. *Wolff,* 418 U.S. at 564-67, 94 S.Ct. at 2978-80; *see also* *Eng v. Coughlin,* 858 F.2d 889, 897-98 (2d Cir.1988).

Plaintiff's procedural due process claim is multi-faceted. In that claim, Ciaprazi maintains that 1) he was denied meaningful assistance by defendant Cole, who refused his request to interview potential witnesses identified by the plaintiff; 2) Hearing Officer Melino effectively denied the plaintiff access to witnesses since witness waiver forms, not to plaintiff's liking in form, were allegedly presented by an unknowledgeable corrections officer to those inmates whose testimony was requested by Ciaprazi, following which those inmates apparently refused to sign the waiver forms and appear to testify on his behalf; 3) the hearing officer was biased and partial, and demonstrated open hostility toward the plaintiff; 4) the hearing officer's disciplinary determination was not supported by the evidence; and 5) the hearing officer refused plaintiff's suggestion to administer polygraph tests to defendants Rogers and Fitzpatrick, as well as to Ciaprazi. Also implicit in plaintiff's due process claim is his contention that his constitutional rights were violated through the issuance of a false misbehavior report. [14]

Plaintiff's arguments relating to the sufficiency of evidence supporting the hearing officer's finding of guilt can be swiftly discounted. The Constitution, including its Due Process Clause, requires only that there be some evidence of guilt supporting a prison disciplinary determination. *Superintendent, Massachusetts Corr. Inst., Walpole v. Hill,* 472 U.S. 445, 455-56, 105 S.Ct. 2768, 2774 (1985). Having reviewed the record of plaintiff's disciplinary proceeding in light of his submissions, I find that this standard has been met.

**\*13** Plaintiff's claims regarding the allegedly false misbehavior report also lack merit. It is well established that in the absence of other aggravating factors, an inmate enjoys no constitutional right against the issuance of a false misbehavior report. [15] *Freeman v. Rideout,* 808 F.2d 949, 951 (2d Cir.1986), *cert. denied,* 485 U.S. 982, 108 S.Ct. 1273 (1988). The rationale supporting this general rule is that an inmate's procedural due process rights are adequately safeguarded by the opportunity to challenge and present evidence to rebut the false accusations at a disciplinary hearing. *Freeman,* 808 F.2d at 953.

As for plaintiff's contention that his due process rights were violated when polygraph tests were not administered to key corrections officials, as requested by him, plaintiff has cited no cases-nor is the court aware of any-which require the administering of polygraph tests in connection with parties and witnesses in the context of an inmate disciplinary determination. *See Hinebaugh v. Wiley,* 137 F.Supp.2d 69, 79 (N.D.N.Y.2001) ("some evidence" does not require independent examination of credibility and therefore "certainly does not require" court to order personnel to submit to polygraph to ascertain if hearing testimony was truthful). This issue, then, provides no basis for finding the existence of a procedural due process violation.

Plaintiff's allegations regarding the ineffectiveness of his assigned assistant provide a greater basis for pause. While the requirements associated with the provision of such assistance are modest, they are not non-existent. Under *Wolff,* an inmate facing a Tier III disciplinary hearing is entitled to meaningful assistance in preparing his or her defense. *Eng,* 858 F.2d at 897-98. In this case, plaintiff asserts that while he was assigned an assistant, he was denied meaningful assistance from that individual. In support of this contention, plaintiff alleges that he identified certain witnesses critical to his defense, but that his assistant refused to interview those witnesses with an eye toward requesting their testimony during the hearing. Complaint (Dkt. No. 1) ¶¶ 20-21; Ciaprazi Aff. (Dkt. No. 46) ¶ 40. This, if true, could establish a due process violation based on the inadequacy of the inmate assistance provided to the plaintiff. *See Ayers v. Ryan,* 152 F.3d 77, 81 (2d Cir.1998).

In light of my inability to find, as a matter of law, that plaintiff did not suffer the deprivation of a liberty interest as a result of his five month period of disciplinary confinement, and additionally to conclude that no reasonable factfinder could find the existence of a due process violation associated with that disciplinary confinement, I recommend denial of the portion of defendants' summary judgment motion which seeks dismissal of plaintiff's due process claims.

*F. Equal Protection*

In his complaint plaintiff also complains of the alleged deprivation of equal protection. Defendants contend that this claim is also subject to dismissal as a matter of law.

**\*14** "The Equal Protection Clause of the Fourteenth Amendment commands that no State shall 'deny to any person within its jurisdiction the equal protection of the laws,' which is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne, Tx. v. Cleburne Living Ctr.,* 473 U.S. 432, 439, 105 S.Ct. 3249,

3254 (1985) (citation omitted). The general rule is that a policy is presumed to be valid and will be sustained if the classification drawn by that policy is rationally related to a legitimate state interest. *Id.* at 440, 105 S.Ct. at 3254. One exception to that rule, however, is when a policy classifies by race, alienage, or national origin-"[t]hese factors are so seldom relevant to the achievement of any legitimate state interest that laws grounded in such considerations are deemed to reflect prejudice and antipathy-a view that those in the burdened class are not as worthy or deserving as others." *Id.* For this reason, these policies are subjected to strict scrutiny and will be sustained only if they are suitably tailored to serve a compelling state interest. *Id.* The essence of a cognizable equal protection claim includes a showing of "clear and intentional discrimination." *Snowden v. Hughes,* 321 U.S. 1, 8, 64 S.Ct. 397, 401 (1944) (internal quotation and citations omitted).

The apparent basis for plaintiff's equal protection claim is his contention that in light of his national origin, he was treated differently than United States citizen counterparts. [16] In the face of defendants' summary judgment motion, it was incumbent upon the plaintiff to come forward with evidence which could support a claim that he was treated differently than other inmates, and that the difference in treatment could properly be attributed to his status as a Romanian. As such evidence, plaintiff offers only a statement made to him by defendant Fitzpatrick at one point, in substance, that plaintiff had "now ... learned to speak English." *See* Plaintiff's Memorandum (Dkt. No. 46) at 29. Beyond this slender reed, plaintiff offers no evidence to support his claim that he was treated differently than inmates not of his national origin, and indeed acknowledges mere speculation on his part as to this premise, arguing that "discrimination based on national origin *may* ... have placed [sic] a role in defendants' unlawful actions[.]" Plaintiff's Memorandum (Dkt. No. 46) at 29 (emphasis added). Instead, plaintiff's equal protection claims consist of mere surmise and speculation, and are subject to dismissal on this basis. *See, e.g., Barr v. Abrams,* 810 F.2d 358, 363 (2d Cir.1987) ( "complaints relying on the civil rights statutes are insufficient unless they contain some specific allegations of fact indicating a deprivation of rights, instead of a litany of general conclusions that shock but have no meaning").

Despite being obligated to do so at this juncture, plaintiff has failed to adduce any evidence to show either that he was treated differently than his non-Romanian counterparts, and

that the difference in treatment was based upon his national origin. I therefore recommend dismissal of plaintiff's equal protection claims as a matter of law.

### G. *United Nations Resolutions*

**\*15** Each of plaintiff's eight causes of action is based, in part, upon two international agreements, including the Universal Declaration of Human Rights ("UDHR") and the International Covenant on Civil and Political Rights ("ICCPR"). Defendants maintain that as a matter of law, those provisions do not support claims under section 1983.

Section 1983 provides, in pertinent part, for a right of action on behalf of any person deprived of "any rights, privileges, or immunities secured by the Constitution and laws[.]" 42 U.S.C. § 1983. Plaintiff argues that because the United States is a signatory to these two treaty-like provisions, they have the force of law and can be implemented, and individual treaty violations can give rise to recourse, under section 1983.

It is true that violation of a treaty entered into by the United States can serve as a basis for a claim for damages under section 1983, provided that the treaty allows for a private right of action to redress any alleged violations of its provisions. *Standt v. City of New York,* 153 F.Supp.2d 417, 422-30 (S.D.N.Y.2001) (finding private right of action under section 1983 for violation of the Vienna Convention on Consular Relations, 21 U.S.T. 77, 101 T.I.A .S. No. 6820, 596 U.N.T.S. 261 (April 24, 1963)). To the extent that the defendants argue otherwise, and contend that treaties-as distinct from constitutional and other types of federal statutory provisions-cannot support a claim for section 1983 liability, *see* Defendants' Memorandum (Dkt. No. 39) at 17-18, that position therefore lacks support.

As can be seen, analysis of the sufficiency of plaintiff's claims under the cited treaty provisions turns upon whether those international agreements confer individual rights of action. In order to be found deserving of enforcement under section 1983 as a "law", a treaty ratified by the Senate must either be found to be self-executing or, alternatively, must have been the subject of implementing legislation by Congress.

*Mannington Mills, Inc. v. Congoleum Corp.,* 595 F.2d 1287, 1298 (3d Cir.1979).

Since plaintiff has pointed to no applicable implementing legislation, nor is the court aware of any, the availability of the ICCPR to support plaintiff's section 1983 claim depends upon whether it is self-executing. The majority of the courts addressing this issue, however, including within the Second Circuit, have concluded that it is not. [17] *See, e.g.,* *Poindexter v. Nash,* 333 F.3d 372, 379 (2d Cir.2003); *Murray v. Warden, FCI Raybrook,* No. 9:01-CV-255, 2002 WL 31741247, at *11 n. 10 (N.D.N.Y. Dec. 5, 2002) (Sharpe, M.J.) (citing *U.S. ex rel. Perez v. Warden, FMC Rochester,* 286 F.3d 1059, 1063 (8th Cir.2002) and *Reaves v. Warden,* No. Civ. A3:01-CV-1149, 2002 WL 535398, at *9 (M.D.Pa. Mar. 22, 2002). Similarly, the UDHR has been characterized by the Second Circuit as "non-binding." *Flores v. Southern Peru Copper Corp.,* 343 F.3d 140, 167-68 (2d Cir.2003).

**\*16** Based upon the foregoing, and without deciding whether the evidence in the record demonstrates a genuine issue of material fact as to whether those provisions were violated by defendants' alleged actions toward the plaintiff, I find that Ciaprazi's claims under the ICCPR and UDHR are legally deficient as a matter of law. I therefore recommend dismissal of plaintiff's claims which are dependent on those two international agreements.

### H. *Personal Involvement*

Defendants claim that plaintiff's claims against defendants Goord and Selsky are legally deficient, in that the record fails to establish their requisite personal involvement in the constitutional violations alleged.

Personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under section 1983. *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (citing *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir.1991) and *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir.1977), *cert. denied,* 434 U.S. 1087, 98 S.Ct. 1282 (1978)). In order to prevail on a section 1983 cause of action against an individual, a plaintiff must show some tangible connection between the constitutional violation

alleged and that particular defendant. *See* *Bass v. Jackson,* 790 F.2d 260, 263 (2d Cir.1986).

A supervisor cannot be liable for damages under section 1983 solely by virtue of being a supervisor-there is no *respondeat superior* liability under section 1983. *Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003); *Wright,* 21 F.3d at 501. A supervisory official can, however, be liable in one of several ways: 1) the supervisor may have directly participated in the challenged conduct; 2) the supervisor, after learning of the violation through a report or appeal, may have failed to remedy the wrong; 3) the supervisor may have created or allowed to continue a policy or custom under which unconstitutional practices occurred; 4) the supervisor may have been grossly negligent in managing the subordinates who caused the unlawful event; or 5) the supervisor may have failed to act on information indicating that unconstitutional acts were occurring. *Richardson,* 347 F.3d at 435; *Wright,* 21 F.3d at 501; *Williams v. Smith,* 781 F.2d 319, 323-24 (2d Cir.1986).

The basis for asserting liability against defendant Selsky arises exclusively from plaintiff's appeal from his disciplinary determination. That appeal was addressed by defendant Selsky, whose review of that appeal sufficiently establishes his personal involvement in any alleged due process violations based upon his being positioned to discern and remedy the ongoing effects of any such violations. *See, e.g.,* *Gilbert v. Selsky,* 867 F.Supp. 159, 166 (S.D.N.Y.1994).

Plaintiff's claim against defendant Goord is far more tenuous. Plaintiff asserts that because his appeal was mailed directly to defendant Goord who, consistent with his established practice, then referred it to defendant Selsky for review, the Commissioner "presumably read [its] contents." *See* Plaintiff's Memorandum (Dkt. No. 46) at 32. This, coupled with his contention that as the ultimate supervisor of the DOCS defendant Goord was positioned to remedy the violations which he suffered, forms the sole basis for his claims against defendant Goord. These are merely claims against defendant Goord in his supervisory capacity; to sanction them would be to allow for *respondeat superior* liability. Since it is well established that such liability does not lie under section 1983, and there is no other discernible basis to conclude defendant Goord's awareness of or involvement in the matters alleged in plaintiff's

complaint, I recommend that defendants' motion be granted and plaintiff's claims against defendant Goord be dismissed based upon lack of personal involvement. *Richardson,* 347 F.3d at 435 (quoting *Ayers v. Coughlin,* 780 F.2d 205, 210 (2d Cir.1985); "mere 'linkage in the prison chain of command' is insufficient to implicate a state commissioner of corrections or a prison superintendent in a § 1983 claim"); *Scott v. Coughlin,* 78 F.Supp.2d 299, 312 (S.D.N.Y.2000) (Commissioner's act of forwarding appeals addressed to him to Selsky insufficient to establish personal involvement; citing, *inter alia, Sealey v. Giltner,* 116 F.3d 47, 51 (2d Cir.1991)).

### IV. *SUMMARY AND RECOMMENDATION*

 **\*17** The plaintiff, an experienced and well-versed *pro se* litigant, has commenced this action asserting various claims arising out of the issuance of a disciplinary misbehavior report and the process which followed, including the punishment received. Upon examination of the record, I find no evidence tending to demonstrate that the adverse actions taken against the plaintiff were motivated by disciplinary animus, and thereby recommend the entry of summary judgment dismissing his retaliation claim. I do, however, find the existence of triable issues of fact regarding whether or not Ciaprazi was deprived of a constitutionally significant liberty interest, and whether the assistance provided to the plaintiff in anticipation of his hearing was constitutionally adequate, and therefore recommend against summary dismissal of plaintiff's procedural due process claims.

Addressing plaintiff's Eighth Amendment claims I find, particularly in view of the lack of any evidence to the contrary, that the conditions described by the plaintiff could lead a reasonable factfinder to conclude that they amounted to cruel and unusual punishment, and therefore recommend against the entry of summary judgment dismissing plaintiff's

Eighth Amendment claim. I further find, however, no basis to conclude that a reasonable factfinder could find an Eighth amendment violation based on the Tier III regulatory scheme, a violation of the Equal Protection Clause of the Fourteenth Amendment, or that the international treaty provisions cited give rise to a private right of action. Accordingly, I recommend dismissal of those claims.

Finally, I recommend dismissal of plaintiff's claims against defendant Goord based upon his personal involvement, but against dismissal of plaintiff's claims against defendant Selsky on this basis. It is therefore hereby

RECOMMENDED that defendants' summary judgment motion (Dkt. No. 39) be GRANTED in part, and that all of plaintiff's claims against defendant Goord, and all of plaintiff's claims against the remaining defendants except his procedural due process and Eighth Amendment conditions of confinement causes of action, be DISMISSED, but that to the extent of those claims, with respect to which triable issues of fact exist, I recommend that defendants' motion be DENIED.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have TEN days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW. Fed.R.Civ.P. 6(a), 6(e), 72; 28 U.S.C. § 636(b)(1); *Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993) (citations omitted); and it is further hereby

ORDERED that the Clerk of the Court serve a copy of this Report and Recommendation upon the parties by regular mail.

### All Citations

Not Reported in F.Supp.2d, 2005 WL 3531464

### Footnotes

1    The Clerk is hereby directed to attach the Report-Recommendation to constitute a complete record of the court's decision in this matter.

2    The court adopts the factual summary in Magistrate Judge Peebles' Report-Recommendation and assumes familiarity with the facts alleged in Ciaprazi's Complaint. *Dkt. Nos. 47,1.*

3    Ciaprazi also makes several procedural objections. For instance, he asserts that defendants' motion is procedurally defective since none of the moving papers are signed, as required by FRCP 11. Second, Ciaprazi objects to the defendants' alteration of the case caption. Third, Ciaprazi objects to the defendants' use of a name that did not appear in the original complaint. These arguments are without merit and this court adopts Judge Peebles articulated reasons for the their denial. *See Report Recommendation p. 10-11 n. 5, Dkt. No. 47.*

1    Keeplock confinement is defined by regulation to include restriction to one's prison room or cell. *See, e.g.,* 7 N.Y.C.R.R. 251-2.2.

2    The DOCS conducts three types of inmate disciplinary hearings. Tier I hearings address the least serious infractions, and can result in minor punishments such as the loss of recreation privileges. Tier II hearings involve more serious infractions, and can result in penalties which include confinement for a period of time in the Special Housing Unit (SHU). Tier III hearings concern the most serious violations, and could result in unlimited SHU confinement and the loss of "good time" credits. *See* *Hynes v. Squillace,* 143 F.3d 653, 655 (2d Cir.), *cert. denied,* 525 U.S. 907, 119 S.Ct. 246 (1998).

3    Of those sanctions, five months were suspended and deferred for a to tal of one hundred eighty days. Defendants' Motion (Dkt. No. 39) Exh. A at 00. The record is unclear regarding the amount of disciplinary confinement actually served by the plaintiff as a result of the hearing determination.

4    There is no indication on the docket sheet that defendant Fitzpatrick has been served in the action. While plaintiff requested and obtained the entry of that defendant's default on June 20, 2003, *see* Dkt. Nos. 20, 21, his default was subsequently vacated by order issued by District Judge David N. Hurd on January 13, 2004, based upon plaintiff's failure to prove that defendant Fitzpatrick had in fact been served. *See* Dkt. No. 35.

5    In his papers in opposition to defendants' summary judgment motion, plaintiff has raised several procedural objections to defendants' motion papers. In addressing those objections I am mindful of the preference that matters before the court, whenever possible, be decided on their merits rather than on the basis of technical procedural shortcomings. *See, e.g., Upper Hudson Planned Parenthood, Inc. v. Doe,* 836 F.Supp. 939, 943 n. 9 (N.D.N.Y.1993) (McCurn, S.J.). In any event, plaintiff's procedural objections are not well-founded.

In his opposition papers, plaintiff asserts that defendants' motion is procedurally defective since none of the moving papers are signed, as required under Rule 11 of the Federal Rules of Civil Procedure. *See* Plaintiff's Memorandum (Dkt. No. 46) at 1. While not bearing signatures in the traditional sense, all of defendants' original moving papers, which were filed electronically with the court in accordance with this court's case management and electronic case filing requirements (*see* Northern District of New York Local Rule 5.1.2 and General Order No. 22), were properly signed.

Plaintiff also complains of alterations by the defendants to the caption of the case as set forth in his complaint. Specifically, Ciaprazi challenges defendants' addition of the word "unknown" in relation to defendants Melino and Cole, who are identified in plaintiff's complaint only by last names. Since it is well established that the caption of a pleading is not substantive in nature, and therefore does not control, the addition of that word does not provide a basis to reject defendants' motion papers. *See* 5 Charles A. Wright & Arthur R. Miller, Federal Practice & Procedure Civil § 1321 (3d ed. 2004) ("Although helpful to the district court ... the caption is not determinative as to the identity of the parties to the action"); *see also Prisco v. State of New York,* 804 F.Supp. 518, 521 (S.D.N.Y.1992) (citing an earlier edition of Wright & Miller).

As plaintiff notes, defendants' Local Rule 7.1(a)(3) statement of uncontested, material facts, submitted along with the various other papers in support of their motion, indicates that it is submitted on behalf of a defendant Landry, even though there is no person by that name identified as a defendant in plaintiff's

complaint. *See* Dkt. No. 39. Because this is an obvious typographical error, and the contents of the statement obviously relate to the facts of this case, I decline plaintiff's invitation to reject and treat the statement as a nullity on this basis.

I note that Ciaprazi, who appears to be well versed in the applicable requirements of the federal and local rules, himself has overlooked the important requirement that legal memoranda submitted in connection with motions to not exceed twenty-five pages in length. Northern District of New York Local Rule 7.1(a) (1). Plaintiff's memorandum, which is thirty-four pages in length, has been accepted by the court, without objection by the defendants, despite his failure to obtain prior permission to file an oversized brief. Plaintiff is admonished that in the future, just as he seeks to hold defendants to the requirements of the governing rules, he too must conform to those requirements.

6    A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510. Though *pro se* plaintiffs are entitled to special latitude when defending against summary judgment motions, they must establish more than merely "metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356 (1986); *but see* *Vital v. Interfaith Med. Ctr.,* 168 F.3d 615, 620-21 (2d Cir.1999) (noting obligation of court to consider whether *pro se* plaintiff understood nature of summary judgment process).

7    Plaintiff has referred to his efforts in this regard as a "blitz of grievances and complaints[.]" Plaintiff's Aff. (Dkt. No. 46) ¶ 52.

8    The attorney's affirmation in and of itself is, of course, of no evidentiary value in determining the motion for summary judgment since none of the facts upon which such a finding would ostensibly be based are within his personal knowledge. *Kamen v. American Tel. & Tel. Co.,* 791 F.2d 1006, 1011-12 (2d Cir.1986).

9    Prior to the Second Circuit's recent decision in *Gill,* defendants perhaps could have effectively argued that defendants' actions were not likely to deter, and in fact have not chilled, plaintiff's exercise of his First Amendment rights, and therefore do not give rise to a retaliation claim. *E.g.,* *Colombo v. O'Connell,* 310 F.3d 115, 117 (2d Cir.2002); *Curley v. Village of Suffern,* 268 F.3d 65, 72-73 (2d Cir.2001); *Spear v. Town of West Hartford,* 954 F.2d 63, 68 (2d Cir.1992). In its recent decision in *Gill,* however, the Second Circuit clarified that such a finding does not end the inquiry, since the critical focus is not upon the subjective element, but is instead objective, examining whether the retaliatory conduct alleged "would deter a similarly situated individual of ordinary firmness from exercising ... constitutional rights." *Gill,* 389 F.3d at 381 (quoting *Davis v. Goord,* 320 F.3d 346, 353 (2d Cir.2003), superseded by 2003 U.S.App. LEXIS 13030 (2d Cir. Feb. 10, 2003)).

10    That amendment provides, in pertinent part, that "[e]xcessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." U.S. Const. amend. VIII.

11    In their motion, defendants have not argued lack of personal involvement with regard to their Eighth Amendment claims. It therefore remains to be seen whether plaintiff can establish the defendants' participation in the Eighth Amendment violations alleged.

12    In cases where there is factual dispute concerning the conditions or duration of confinement, however, it may nonetheless be appropriate to submit those disputes to a jury for resolution. *Colon v. Howard,* 215 F.3d 227, 230-31 (2d Cir.2000); *Sealey v.. Giltner,* 197 F.3d 578, 585 (2d Cir.1999).

13    While not the only factor to be considered, the duration of a disciplinary keeplock confinement remains significant under *Sandin. Colon,* 215 F.3d at 231. Specifically, while under certain circumstances confinement of less than 101 days could be shown to meet the atypicality standard under *Sandin* (*see id.* at 232 n .5), the Second Circuit generally takes the position that SHU confinement under ordinary conditions of more than 305 days rises to the level of atypicality, whereas normal SHU confinement of 101 days or less does not. *Id.* at 231-32 (305 days of SHU confinement constitutes an atypical and sufficient departure). In fact, in *Colon v. Howard* a Second Circuit panel split markedly on whether or not adoption of a 180-day "bright line" test for examining SHU confinement would be appropriate and helpful in resolving these types of cases. *See id.* at 232-34 (Newman, C.J.), 235-37 (Walker, C.J. and Sack, C.J., concurring in part).

14    Among the due process violations alleged in plaintiff's complaint is the claim that by taking into account his prior disciplinary record when determining the appropriate punishment to be imposed based upon the finding of guilt, hearing officer Melino violated the constitutional guaranty against double jeopardy. Since it is well established that the double jeopardy clause does not apply in the prison disciplinary setting, this claim lacks merit. *Bolanos v. Coughlin,* No. 91 Civ. 5330, 1993 WL 762112, at *13 (S .D.N.Y. Oct. 15, 1993). Plaintiff's contention that the hearing officer's actions in this regard also violated an unspecified New York regulation fares no better, since such an allegation does not automatically support a claim of civil rights violations under 42 U.S.C. § 1983. *Alnutt v. Cleary,* 913 F.Supp. 160, 168 (W.D.N.Y.1996).

15    Unquestionably, a prisoner does enjoy a substantive due process right against the issuance of a false misbehavior report as retribution for having engaged in protected activity. *Jones v. Coughlin,* 45 F.3d 677, 679-80 (2d Cir.1995). In light of my finding of no connection between plaintiff's complaints and the issuance by defendant Fitzpatrick of the misbehavior report, however, such a claim does not lie in this action.

16    Plaintiff is a Romanian citizen. Complaint (Dkt. No. 1) at 3.

17    Even in one of the cases relied heavily upon by the plaintiff, *Maria v. McElroy,* 68 F.Supp.2d 206, 231 (E.D.N.Y.1999)-a case which has since been effectively overruled on other grounds, *see Restrepo v. McElroy,* 369 F.3d 627 (2d Cir.2004)-the court recognized that the ICCPR was not "self-executing". 68 F.Supp.2d at 231.

---

**End of Document**                                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

2019 WL 3958443
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

William A. OSORIO, Plaintiff,

v.

WESTCHESTER COUNTY, et al., Defendants.

No. 18-CV-5620 (KMK)
|
Signed 08/21/2019

**Attorneys and Law Firms**

William A. Osorio, Valhalla, NY, Pro Se Plaintiff.

Loren Zeitler, Esq., Westchester County Department of Law, White Plains, NY, Counsel for Defendants.

Mony B.P. Yin, Esq., Thomas J. Bracken, Esq., Bennett, Bricklin & Saltzburg, LLC, New York, NY, Counsel for Defendants.

OPINION & ORDER

KENNETH M. KARAS, United States District Judge:

**\*1** William A. Osorio ("Plaintiff") brings this pro se Action, pursuant to 42 U.S.C. § 1983, against Westchester County, Aramark Correctional Services, LLC ("Aramark"), Warden Francis Delgrosso ("Delgrosso"), and Aramark Food Service Director Manuel Mendoza ("Mendoza") (collectively, "Defendants"), alleging that Defendants provided him with substandard and unhygienic food while he incarcerated at Westchester County Jail, in violation of the Fourteenth Amendment. Before the Court is Defendants' Motion To Dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) (the "Motion"). (Not. of Mot. (Dkt. No. 17).) For the following reasons, the Motion is granted.

I. Background

A. Factual History
The following facts are drawn from Plaintiff's Complaint, (Compl. (Dkt. No. 2)), and are taken as true for purposes of resolving the instant Motion.

Plaintiff alleges that, since his arrival at Westchester County Jail ("WCJ") on October 30, 2017, Defendant Aramark has provided him with substandard and unhygienic food. (Compl. 5–6.) [1] In particular, Plaintiff — who is supposed to be on a "diabetic diet" — alleges that his meal trays arrive with "rotte[n] food[ ]"; that his "salad is always brown and soggy"; that his "meat is always raw and look[s] pink"; that he "find[s] insects" and "dead [flies]" in [his] food"; that the meal trays have "mold" and "[leftover] food from [previous] meals" on them; and that the food tastes "like pieces of plastic [are] coming off the tray and mixing with the food." (*Id.*) As a result, Plaintiff has experienced "nausea, explosive diarrhea, vomiting, stomach cramps, fatigue, headaches, hunger pangs, [and] dehydration." (*Id.* at 7.)

Plaintiff alleges that Defendant Delgrosso "knows" of the food problem "through gri[e]vances, investigations[,] and complaints, but fails to take corrective actions." (*Id.* at 5.) Plaintiff also alleges that Kitt (not named as a defendant) refused to accept his grievance on grounds that he was "not accepting Aramark grievances." (*Id.* at 6.) Finally, Plaintiff alleges that Defendants Delgrosso and Mendoza (along with Spano and Flax, not named as defendants) "attend[ ] daily meetings" in which they "discuss ... food [grievances] and lawsuits." (*Id.*)

B. Procedural History
The initial Complaint was filed on June 20, 2018. (Compl.) On July 18, 2018, the Court granted Plaintiff's request to proceed in forma pauperis ("IFP"). (Dkt. No. 4.) Defendants filed the instant Motion To Dismiss on December 5, 2018. (Not. of Mot. (Dkt. No. 17); Mem. of Law in Supp. of Mot. ("Defs.' Mem.") (Dkt. No. 18).) Plaintiff did not file a response in opposition. On May 24, 2019, the Court granted Defendants' request to consider the Motion fully submitted. (Dkt. No. 20.)

II. Discussion

Defendants principally argue that Plaintiff's Fourteenth Amendment conditions-of-confinement claim as to Westchester County, Aramark, and the individual Defendants in their official capacities fails because Plaintiff has not established *Monell* liability; that Plaintiff fails to establish the personal involvement of the individual Defendants in any constitutional violation; and that, on the merits, Plaintiff fails to state a conditions-of-confinement claim. (Defs.' Mem. 8–

Case 9:22-cv-00102-BKS-ML    Document 78    Filed 12/13/23    Page 312 of 373

Osorio v. Westchester County, Not Reported in Fed. Supp. (2019)

15.)[2]  The Court addresses each argument separately to the extent necessary.

### A. Standard of Review

**\*2**  The Supreme Court has held that although a complaint "does not need detailed factual allegations" to survive a motion to dismiss, "a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citations, quotation marks, and alterations omitted). Indeed, Rule 8 of the Federal Rules of Civil Procedure "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "Nor does a complaint suffice if it tenders naked assertions devoid of further factual enhancement." *Id.* (quotation marks and alteration omitted). Rather, a complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. Although "once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint," *id.* at 563, and a plaintiff need allege "only enough facts to state a claim to relief that is plausible on its face," *id.* at 570, if a plaintiff has not "nudged [his or her] claim[ ] across the line from conceivable to plausible, the[ ] complaint must be dismissed," *id.*; *see also* *Iqbal*, 556 U.S. at 679 ("Determining whether a complaint states a plausible claim for relief will ... be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense. But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged — but it has not 'show[n]' — 'that the pleader is entitled to relief.' " (citation omitted) (second alteration in original) (quoting Fed. R. Civ. P. 8(a)(2))); *id.* at 678–79 ("Rule 8 marks a notable and generous departure from the hypertechnical, code-pleading regime of a prior era, but it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions.").

In considering a motion to dismiss, the Court "must accept as true all of the factual allegations contained in the complaint." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (per curiam);

*see also* *Nielsen v. Rabin*, 746 F.3d 58, 62 (2d Cir. 2014) ("In addressing the sufficiency of a complaint we accept as true all factual allegations...." (quotation marks omitted)). Further, "[f]or the purpose of resolving [a] motion to dismiss, the Court ... draw[s] all reasonable inferences in favor of the plaintiff." *Daniel v. T & M Prot. Res., Inc.*, 992 F. Supp. 2d 302, 304 n.1 (S.D.N.Y. 2014) (citing *Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012)). Where, as here, a plaintiff proceeds pro se, the "complaint[ ] must be construed liberally and interpreted to raise the strongest arguments [it] suggest[s]." *Sykes v. Bank of Am.*, 723 F.3d 399, 403 (2d Cir. 2013) (per curiam) (quotation marks omitted). However, "the liberal treatment afforded to pro se litigants does not exempt a pro se party from compliance with relevant rules of procedural and substantive law." *Bell v. Jendell*, 980 F. Supp. 2d 555, 559 (S.D.N.Y. 2013) (quotation marks omitted); *see also Caidor v. Onondaga County*, 517 F.3d 601, 605 (2d Cir. 2008) ("[P]ro se litigants generally are required to inform themselves regarding procedural rules and to comply with them." (italics and quotation marks omitted)).

Generally, "[i]n adjudicating a Rule 12(b)(6) motion, a district court must confine its consideration to facts stated on the face of the complaint, in documents appended to the complaint or incorporated in the complaint by reference, and to matters of which judicial notice may be taken." *Leonard F. v. Isr. Disc. Bank of N.Y.*, 199 F.3d 99, 107 (2d Cir. 1999) (quotation marks and citation omitted). When a plaintiff proceeds pro se, however, the Court may consider "materials outside the complaint to the extent that they are consistent with the allegations in the complaint." *Alsaifullah v. Furco*, No. 12-CV-2907, 2013 WL 3972514, at \*4 n.3 (S.D.N.Y. Aug. 2, 2013) (quotation marks omitted).

### B. Analysis

#### 1. *Monell* Liability

Defendants argue that Plaintiff fails to plausibly allege *Monell* liability as to Westchester County, Aramark, and the individual Defendants in their official capacities. (Defs.' Mem. 8–11.)

"Congress did not intend municipalities to be held liable [under § 1983] unless action pursuant to official municipal

Case 9:22-cv-00102-BKS-ML    Document 78    Filed 12/13/23    Page 313 of 373

Osorio v. Westchester County, Not Reported in Fed. Supp. (2019)

policy of some nature caused a constitutional tort." *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 691 (1978); *see also Pembaur v. City of Cincinnati*, 475 U.S. 469, 478 (1986) (holding that a municipality may not be liable under § 1983 "by application of the doctrine of respondeat superior" (citation and italics omitted)). Therefore, "to prevail on a claim against a municipality under [§] 1983 based on acts of a public official, a plaintiff is required to prove: (1) actions taken under color of law; (2) deprivation of a constitutional or statutory right; (3) causation; (4) damages; and (5) that an official policy of the municipality caused the constitutional injury." *Roe v. City of Waterbury*, 542 F.3d 31, 36 (2d Cir. 2008) (citing *Monell*, 436 U.S. at 690–691). The fifth element reflects the notion that a *Monell* defendant "may not be held liable under § 1983 solely because it employs a tortfeasor." *Bd. of County Comm'rs v. Brown*, 520 U.S. 397, 403 (1997) (citation omitted). A plaintiff may satisfy the fifth element by alleging one of the following:

> **\*3** (1) a formal policy officially endorsed by the municipality; (2) actions taken by government officials responsible for establishing the municipal policies that caused the particular deprivation in question; (3) a practice so consistent and widespread that, although not expressly authorized, constitutes a custom or usage of which a supervising policy-maker must have been aware; or (4) a failure by policymakers to provide adequate training or supervision to subordinates to such an extent that it amounts to deliberate indifference to the rights of those who come into contact with the municipal employees.

*Brandon v. City of New York*, 705 F. Supp. 2d 261, 276–77 (S.D.N.Y. 2010) (citations omitted).

Here, Plaintiff does not allege the existence of a formal policy or widespread informal custom, nor does he allege

that a municipal official with policymaking authority took certain actions that caused the alleged problems at issue in this case. Rather, Plaintiff squarely alleges, under the fourth prong above, that Westchester County "fails to supervise" Aramark's food preparation at WCJ to "ensure ... compliance." (Compl. 6.) On its own, this "boilerplate" allegation "is insufficient, without more, to state a *Monell* claim." *Dawson v. Westchester County*, No. 18-CV-7790, 2019 WL 3408899, at *4 (S.D.N.Y. July 29, 2019) (citations and alterations omitted). To state a *Monell* claim based on a failure to supervise, Plaintiff must allege "(1) [that] there was a pattern of allegations of or complaints about, or a pattern of actual, similar unconstitutional activity, and (2) [that] the municipality consistently failed to investigate those allegations." *Treadwell v. County of Putnam*, No. 14-CV-10137, 2016 WL 1268279, at *4 (S.D.N.Y. Mar. 30, 2016) (citation omitted). Plaintiff must also allege that the municipality was deliberately indifferent to its employees' conduct, for example, by showing "that the need for more or better supervision to protect against constitutional violations was obvious," *Vann v. City of New York*, 72 F.3d 1040, 1049 (2d Cir. 1995). Plaintiff alleges here that Delgrosso "knows" of the food-related problems at WCJ as a result of receiving grievances, investigations, and complaints, (Compl. 5), and that Delgrosso and Mendoza (along with others not named as defendants) "attend[ ] daily meetings" in which they "discuss ... food [grievances] and lawsuits," (*id.* at 6). It is true that Plaintiff may establish deliberate indifference from the fact that there "were repeated complaints of civil rights violations" and that "the complaints [were] followed by no meaningful attempt on the part of the municipality to investigate or to forestall further incidents." *Shepherd v. Powers*, No. 11-CV-6860, 2012 WL 4477241, at *9 (S.D.N.Y. Sept. 27, 2012) (citation and quotation marks omitted); *see also Lawrence v. City of Rochester*, No. 09-CV-6078, 2015 WL 510048, at *7, 9 (W.D.N.Y. Feb. 6, 2015) (same). However, cases in which plaintiffs have successfully established deliberate indifference by pointing to previous grievances and lawsuits have involved pleadings that name and detail those previous lawsuits. *See Edwards v. City of New York*, No. 14-CV-10058, 2015 WL 5052637, at *6 (S.D.N.Y. Aug. 27, 2015) (holding that the plaintiff sufficiently alleged the need for better supervision where he "cited government reports, news articles[,] and [18] prior lawsuits" to "create a plausible inference that the [municipality] has not meaningfully acted to improve training and/or supervision to prevent further incidents"); *Tieman v. City of Newburgh*, No. 13-CV-4178, 2015 WL 1379652,

Case 9:22-cv-00102-BKS-ML    Document 78    Filed 12/13/23    Page 314 of 373

Osorio v. Westchester County, Not Reported in Fed. Supp. (2019)

at *20 (S.D.N.Y. Mar. 26, 2015) (holding that the plaintiff's "allegations [describing nine lawsuits over five years] allow[ed] the Court to plausibly infer that the [municipality] was on notice" of the allegedly unconstitutional conduct); *McCants v. City of Newburgh*, No. 14-CV-556, 2014 WL 6645987, at *4–5 (S.D.N.Y. Nov. 21, 2014) (holding that the plaintiff sufficiently alleged the need for better supervision where he listed and detailed seventeen other complaints over a seven-year period raising similar allegations against the same defendants); *Farrow v. City of Syracuse*, No. 12-CV-1401, 2014 WL 1311903, at *8 n.7 (N.D.N.Y. Mar. 31, 2014) (stating that the fact that "at least 15 excessive force complaints ha[d] been filed against the [c]ity in the past 5 years" would be sufficient to state a plausible failure to train claim); *cf.* *An v. City of New York*, 230 F. Supp. 3d 224, 231 (S.D.N.Y. 2017) (holding that citation to "six lawsuits and one newspaper article over the span of four years is insufficient to plausibly allege the [municipality's] need [to act] was obvious"). Plaintiff has failed to name or detail those alleged lawsuits, grievances, or investigations here. Therefore, Plaintiff's barebones allegation that Westchester County knew about WCJ's alleged food problems through receipt of complaints, grievances, and lawsuits does not, without more, plausibly allege a failure to supervise claim. *See* *Dawson*, 2019 WL 3408899, at *5 (dismissing *Monell* claim where the plaintiff alleged, in conclusory fashion, that WCJ and Aramark officials were aware of food preparation problems through prior lawsuits, inmate grievances, and daily meetings).

**\*4** Accordingly, Plaintiff's claims against Westchester County and Aramark are dismissed, as are his claims against the individual Defendants in their official capacities. *See* *Jackson v. Westchester County*, No. 18-CV-7207, 2019 WL 3338020, at *5 (S.D.N.Y. July 25, 2019) (dismissing claims against municipality and individual defendant in official capacity where the plaintiff failed to plausibly allege *Monell* liability).

### 2. Personal Involvement

Defendants argue that Plaintiff fails to allege the personal involvement of Delgrosso or Mendoza in any constitutional violation. (Defs.' Mem. 11–13.)

"It is well settled that, in order to establish a defendant's individual liability in a suit brought under § 1983, a plaintiff must show ... the defendant's personal involvement in the alleged constitutional deprivation." *Grullon v. City of New Haven*, 720 F.3d 133,138 (2d Cir. 2013) (citation omitted). To establish personal involvement, a plaintiff must show that:

> (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

*Id.* at 139 (citation, italics, and quotation marks omitted). In other words, "[b]ecause vicarious liability is inapplicable to ... § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Iqbal*, 556 U.S. at 676.

Here, Plaintiff alleges, as noted above, that Delgrosso "knows" of the food-related problems at WCJ as a result of receiving grievances, investigations, and complaints, (Compl. 5), and that Delgrosso and Mendoza (along with others not named as defendants) "attend[ ] daily meetings" in which they "discuss ... food [grievances] and lawsuits," (*id.* at 6). These allegations require further factual development. "Plaintiff does not provide facts alleging *what*," in particular, Delgrosso and Mendoza "knew about the poor food problem or *when* they knew about it." *Dawson*, 2019 WL 3408899, at *6 (citations, quotation marks, and alterations omitted). "Moreover, Plaintiff does not allege that" Delgrosso or Mendoza "participated directly in the preparation or distribution of food at all (let alone in the preparation or distribution of the particular food at issue), established a

Osorio v. Westchester County, Not Reported in Fed. Supp. (2019)

Case 9:22-cv-00102-BKS-ML    Document 78    Filed 12/13/23    Page 315 of 373

policy or custom that allowed for rotten food to be provided to inmates, failed to follow a policy or custom on food preparation, or were otherwise grossly negligent in allowing others to prepare food without following proper procedures." *Id.* That Delgrosso and Mendoza may hold supervisory positions at WCJ "does not change the analysis, because a defendant cannot be held liable for the service of rotten food based on a respondeat superior theory." *Id.* (citation, quotation marks, and original alterations omitted); *see also*

🔖 *Iqbal*, 556 U.S. at 676 ("[A] plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution.");

🔖 *Banks v. Annucci*, 48 F. Supp. 3d 394, 416 (N.D.N.Y. 2014) ("Where a defendant is a supervisory official, a mere 'linkage' to the unlawful conduct through the 'chain of command' (i.e., under the doctrine of respondeat superior) is insufficient to show his or her personal involvement in that unlawful conduct." (citations omitted)). There are, in sum, insufficient facts in the Complaint to plausibly suggest that Delgrosso or Mendoza were personally involved in the alleged unconstitutional deprivation at issue. *See Webster v. Fischer*, 694 F. Supp. 2d 163, 179 (N.D.N.Y. 2010) ("Vague and conclusory allegations that a supervisor has failed to train or properly monitor the actions of subordinate employees will not suffice to establish the requisite personal involvement and support a finding of liability."). Accordingly, Plaintiff's claims

against Delgrosso and Mendoza in their individual capacities are dismissed. [3]

### III. Conclusion

**\*5** For the foregoing reasons, Defendants' Motion To Dismiss is granted. Because this is the first adjudication of Plaintiff's claims, dismissal is without prejudice. If Plaintiff wishes to file an amended complaint, Plaintiff must do so within 30 days of the date of this Opinion. Plaintiff should include within that amended complaint all changes to correct the deficiencies identified in this Opinion that Plaintiff wishes the Court to consider. Plaintiff is advised that the amended complaint will replace, not supplement, all prior complaints and filings. The amended complaint must contain *all* of the defendants, claims, factual allegations, and exhibits that Plaintiff wishes the Court to consider. [4] If Plaintiff fails to abide by the 30-day deadline, his claims may be dismissed with prejudice.

SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2019 WL 3958443

### Footnotes

1    Plaintiff's filings do not use consistent pagination. To avoid confusion, the Court cites to the ECF-generated page numbers at the top right corner of the relevant page.

2    To the extent Defendants also make a qualified immunity "argument," (*see* Defs.' Mem. 15), Defendants merely restate the qualified immunity caselaw without meaningfully applying it to the facts of the case. The Court therefore declines to consider at this time whether Defendants are protected by qualified immunity.

3    Because the Court has dismissed all Defendants on other grounds, it need not fully consider whether Plaintiff states a Fourteenth Amendment claim based on the provision of substandard and unhygienic food. The Court notes, however, that the Constitution "require[s] that prisoners be served nutritionally adequate food that is prepared and served under conditions which do not present an immediate danger to the health and well being of the inmates who consume it." 🔖 *Robles v. Coughlin*, 725 F.2d 12, 15 (2d Cir. 1983) (citation and quotation marks omitted). Plaintiff's allegations that he was served — while on a "diabetic diet" — undercooked, unhygienic, and contaminated food, thereby causing him illness, (Compl. 5–7), are nearly identical to other cases in which courts have held the objective prong satisfied. *See Moore v. Westchester County*, No. 18-CV-7782, 2019 WL 3889859, at \*5 n.4 (S.D.N.Y. Aug. 19, 2019) (collecting cases in which courts have held that allegations of substandard, unhygienic, and contaminated food at WCJ satisfied the objective

**Osorio v. Westchester County, Not Reported in Fed. Supp. (2019)**

Case 9:22-cv-00102-BKS-ML    Document 78    Filed 12/13/23    Page 316 of 373

prong required to state a Fourteenth Amendment claim). The Court expects that counsel for Defendants will meaningfully address these repeated and serious allegations with their clients.

4    As Judge Briccetti recently put it in a similar case alleging deficient food at WCJ, Plaintiff should, in amending his complaint:

> 1. give the dates and times of each incident in which [he] was served the food described in his complaint;
>
> 2. describe how each defendant was involved in serving [him] such food — for example, whether the defendant personally served him that food, was present when [he] was served such food, or otherwise knew [he] was served the food;
>
> 3. describe how each defendant knew or should have known the food served to [him] was inadequate;
>
> 4. state which, if any, defendants [he] informed of the problems with his food on each such occasion, how the defendants responded to his complaints, and how the defendants' responses or lack thereof contributed to his injury;
>
> 5. include any details why [he] believes Aramark, Westchester County, or any of their employees gave him such food or failed to remedy his complaints; and
>
> 6. include any facts regarding the existence of an official Aramark or Westchester County policy or [unofficial] custom that caused the deprivation of a constitutional right.

*Crispin v. Westchester County*, No. 18-CV-7561, 2019 WL 2419661, at *5 (S.D.N.Y. June 10, 2019).

---

**End of Document**                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

2002 WL 1906029
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Diane F. GOLDSTICK, Plaintiff,

v.

THE HARTFORD, INC., et ano., Defendants.

No. 00 Civ. 8577(LAK)

|

Aug. 19, 2002.

**Synopsis**
Defendants moved to strike plaintiff's Rule 56.1 Statement, submitted in opposition to defendants' motion for summary judgment dismissing the complaint. The District Court, Kaplan, J., held that statement submitted in opposition to defendants' motion for summary judgment failed to comply with local rule by adding argumentative and often lengthy narrative.

Motion granted in part.

West Headnotes (1)

**[1]**   **Summary Judgment** 🔑 Form and requisites

Plaintiff's statement submitted in opposition to defendants' motion for summary judgment failed to comply with local rule by adding argumentative and often lengthy narrative, the object of which was to "spin" the impact of the admissions plaintiff had been compelled to make; additionally, statement was 41 pages long, a manifest evasion of the page limitation. Local Civ. R. 56.1.

59 Cases that cite this headnote

ORDER

KAPLAN, J.

**\*1** Defendants move to strike plaintiff's Rule 56.1 Statement, submitted in opposition to defendants' motion for summary judgment dismissing the complaint, on the ground that it fails to comply with Local Civ. R. 56.1 in that it goes beyond admitting or denying that the propositions of fact set forth in defendants' Rule 56.1 Statement in fact are undisputed and contains a great deal of extraneous, argumentative material, much allegedly based on inadmissible evidence.

"A proper 56.1 statement submitted by a non-movant should consist of a paragraph-by-paragraph response to the movant's 56.1 statement, much like an answer to a complaint. If the non-movant asserts that a fact claimed by the movant to be undisputed is actually in dispute, the non-movant *must* cite evidence on the record to support its contention. It is permissible for the non-movant to provide a separate statement, apart from this paragraph-by-paragraph response, in which it lists other facts it claims to be in dispute. However, this separate statement is *not* a substitute for the paragraph-by-paragraph response. The non-movant, particularly if represented by counsel, should not leave it to the Court to cull from this separate statement the pieces of evidence which would support the contentions of the non-movant asserted in its paragraph-by-paragraph response without citation.

*"Rule 56.1 statements are not argument.* They should contain factual assertions, with citation to the record. They should not contain conclusions, and they should be neither the source nor the result of 'cut-and-paste' efforts with the memorandum of law. A rule 56.1 statement that contains the same turns of phrase, if not the identical whole paragraphs, as the memorandum of law is improper." *Rodriguez v. Schneider,* No. 95 Civ. 4083(RPP,) 1999 WL 459813, *1 n. 3 (S.D.N.Y. June 29, 1999).

The plaintiff's Rule 56.1 Statement here does not comply with the rule. While in most cases it does admit or deny defendants' descriptions of the allegedly uncontested facts on a paragraph-by-paragraph basis, it adds argumentative and often lengthy narrative in almost every case the object of which is to "spin" the impact of the admissions plaintiff has been compelled to make. In consequence, the response to the 84 number assertions set forth in defendants' Rule 56.1 Statement is 41 pages long and, whether so intended or not, a manifest evasion of the page limitation on plaintiff's memorandum in opposition to the motion for summary judgment.

Case 9:22-cv-00102-BKS-ML    Document 78    Filed 12/13/23    Page 318 of 373

Goldstick v. The Hartford, Inc., Not Reported in Fed. Supp. (2002)

Accordingly, defendants' motion is granted to the extent that so much of plaintiff's responses as consists of anything more than (a) the admission or denial of the assertions set forth in defendants' Rule 56.1 Statement and the citations to the record, and (b) the section headed "additional facts" is stricken. It is denied in all other respects.

SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2002 WL 1906029

---

**End of Document**

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

🚩 KeyCite Yellow Flag - Negative Treatment

Distinguished by   Neural Magic, Inc. v. Meta Platforms, Inc.,   D.Mass.,
March 6, 2023

2004 WL 3691343

Only the Westlaw citation is currently available.

United States District Court,

N.D. New York.

Michael DEVITO, Plaintiff,

v.

SMITHKLINE BEECHAM CORPORATION

d/b/a Glaxosmithkline, Defendant.

No. Civ.A. 02–CV–0745NPM.

|

Nov. 29, 2004.

**Attorneys and Law Firms**

De Lorenzo Law Firm, LLP, Schenectady, New York, for
Plaintiff, Scott Lieberman, of counsel.

Phillips Lytle, LLP, Buffalo, New York, for Defendant, Paul
B. Zuydhoek, of counsel.

King & Spalding, LLP, Atlanta, Georgia, for Defendant,
Chilton D. Varner, of counsel.

*MEMORANDUM–DECISION AND ORDER*

MCCURN, Senior J.

I. Preclusion Motion.................................................................................................... 4

A. Standard for Admissibility of Expert Evidence......................................................... 6

1. Deborah L. Sweeney................................................................................................. 9

a. Qualified?.............................................................................................................. 9

2. Kevin W. George, M.D............................................................................................. 10

3. James T. O'Donnell................................................................................................. 13

a. General Causation................................................................................................. 14

i. Qualified?............................................................................................................ 14

ii. Reliability of Testimony?...................................................................................... 17

b. Specific Causation................................................................................................ 19

c. Warnings............................................................................................................... 19

i. Qualified?............................................................................................................ 20

ii. Reliability of Testimony?...................................................................................... 22

II. Summary Judgment Motion............................................................................................ 24

## Introduction

**\*1** "Between 1987 and 1997, the percentage of Americans being treated for depression more than tripled nationwide[.]" Shankar Vedantam, *Report Shows Big Rise in Treatment for Depression,* WASH. POST,, Jan. 9, 2002, at A01. In December 1996, plaintiff Michael DeVito became one of those Americans. At that time, his primary care physician prescribed Paxil, a selective serotonin reuptake inhibitor ("SSRI"). Mr. DeVito takes Paxil to this day, despite attempts through the years to discontinue. DeVito claims that he cannot discontinue taking Paxil because he has become "dependent" upon it. Affidavit of Robert E. Glanville (Oct. 20, 2003), exh. A thereto (Complaint) at 2, ¶ 9. More specifically, plaintiff alleges that he has been unable to stop taking Paxil due to what he characterizes as "withdrawal reactions" or "dependency/withdrawal syndrome," which according to plaintiff "includ[es], but [is] not limited to, dizziness, nausea, shaking, electrical-like shocks and horrible dreams." *Id.* at 2, ¶¶ 7 and 6.

In this lawsuit plaintiff alleges five causes of action against the manufacturer of Paxil, defendant Smithkline Beecham Corporation d/b/a Glaxo Smithkline ("Glaxo"): (1) fraud; (2) negligence; (3) strict liability; (4) breach of express warranty; and (5) breach of implied warranty. There is a great deal of overlap among these five causes of action. The thrust of plaintiff's complaint is that Glaxo failed to adequately warn of "Paxil's addictive qualities and dependency/withdrawal characteristics[.]" *Id.* at 6, ¶ 19; *see also id.* at 3, ¶ 11b); at 7, ¶ 25; and at 8, ¶ 33. [1]

Discovery is complete and Glaxo is now moving for summary judgment pursuant to Fed.R.Civ.P. 56. Pursuant to Fed.R.Evid. 702 and *Daubert v. Merrell Dow Pharm., Inc.,* 509 U.S. 579, 113 S .Ct. 2786 (1993), Glaxo is also moving to preclude the testimony of the three witnesses whom plaintiff is proffering as experts. The court will address Glaxo's motion to preclude first because if any or all of the proffered testimony is inadmissible, then that could significantly impact Glaxo's summary judgment motion in terms of the admissible proof before the court. *See Toole v. Toshin Co. Ltd .,* No. 00–CV–821S, 2004 WL 2202580, at \*4 (W.D.N.Y. Sept. 29, 2004) (granting defense motion to preclude testimony

of plaintiff's expert and declining to consider his report on summary judgment motion).

## I. Preclusion Motion

Each of the five causes of action which plaintiff alleges requires him to prove causation. "Under settled New York law, whether the action is pleaded in strict products liability, breach of warranty or negligence, the plaintiff in a products liability case bears the burden of establishing that a defect in the product as a substantial factor in causing the injury." *Prohaska v. Sofamor, S.N.C.,* 138 F.Supp.2d 422, 434 (W.D.N.Y.2001) (internal quotation marks and citation omitted). Common law fraud likewise "requires a showing of proximate causation, such that the injury is the natural and probable consequence of the defrauder's misrepresentation or ... the defrauder ought reasonably to have foreseen that the injury was a probable consequence of his fraud." *Cyber Media Group, Inc. v. Island Mortgage Network, Inc.,* 183 F.Supp.2d 559, 580 (E.D.N.Y.2002) (internal quotation marks and citation omitted). To establish causation here, plaintiff DeVito "must offer admissible testimony regarding *both* general causation," *i.e.* that Paxil can cause the type of symptoms of which plaintiff complains when attempting to discontinue that drug, *"and specific causation," i.e.* that Paxil actually caused DeVito's alleged symptoms upon discontinuation of Paxil. *See Amorgianos v. National Railroad Passenger Corporation,* 303 F.3d 256, 268 (2d Cir.2002) (citation omitted) (emphasis added); *see also Blanchard v. Eli Lilly & Co.,* 207 F.Supp.2d 308, 314 (D . Vt.2002) (citations omitted) ("Plaintiffs ... must prove both general and specific causation in order to prevail on their claim, that is, that Prozac is capable of causing and in fact did cause the deaths in this case."). In the context of Paxil litigation, "the general causation question is limited to whether discontinuation from Paxil is *capable* of causing dizziness, agitation, anxiety, nausea, etc." *In re Paxil Litigation,* 218 F.R.D. 242, 249 (C.D.Cal.2003). Specific causation, on the other hand, focuses on whether a plaintiff can "prove that [his] symptoms came from Paxil, as opposed to, for example, the relapse of the underlying illness or the consumption or discontinuation of other drugs." *Id.*

**\*2** To establish causation, plaintiff DeVito seeks to offer the testimony of three "expert" witnesses: (1) Mr. John T.

O'Donnell, a pharmacist with a Master's Degree in nutrition; (2) Dr. Kevin W. George, a former psychiatrist of plaintiff's; and (3) Ms. Deborah Sweeney, plaintiff's treating nurse practitioner. Glaxo is seeking to "preclude ... [these] experts from offering any opinion that: (I) Paxil causes substance dependence, or is either addictive or habit-forming; or (ii) that plaintiff is addicted to Paxil or has developed substance dependence as a result of taking it." Memorandum of Law in Support of Glaxosmithkline's Motion to Preclude Plaintiff's Experts' Testimony Pursuant to Fed.R.Evid. 702 and Daubert ("Def. Preclude Memo.") at 4. In preparation for trial, each of these witnesses has been deposed and Mr. O'Donnell has provided an "expert" report on plaintiff's behalf. Apart from these witnesses, plaintiff proffers no other causation evidence.

To support his theory that Paxil is defective due to an inadequate warning, plaintiff is relying solely upon the deposition testimony and "expert" report of Mr. O'Donnell. Glaxo argues for the preclusion of "[h]is warnings 'opinions' " because O'Donnell is not qualified to testify on that issue and even if he were, "his opinions are neither reliable nor scientific." Def. Preclude Memo. at 24.

### A. Standard for Admissibility of Expert Evidence

There is a two-part inquiry in deciding the admissibility of expert evidence. First, in accordance with Fed.R.Evid. 702, "[t]he court should admit specialized expert testimony if the witness is 'qualified as an expert by knowledge, skill, experience, training or education' and his testimony 'will assist the trier of fact to understand the evidence or to determine a fact in issue." " Nora Beverages, Inc. v. Perrier Group of America, Inc., 164 F.3d 736, 746 (2d Cir.1998) (quoting Fed.R.Evid. 702); see also Kass v. West Bend Company, No. 02–CV–3719, 2004 WL 2475606, at *4 (E.D.N.Y. Nov. 4, 2004) (citation omitted) ("As a threshold matter, the court must examine [the witness'] qualifications to testify about alternative ... designs.") Second, "in the form of an opinion or otherwise," the court must insure that "(1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." Fed.R.Evid. 702. In other words, whether an expert witness' "opinion is ultimately admissible depend on the reliability and relevance of the proffered testimony." Kass, 2004 WL 2475606, at *5.

In this regard, the Supreme Court has instructed the by now oft-cited rule that a district court must act as "a gatekeeper to exclude invalid and unreliable expert testimony." Bonton v. City of New York, No. 03 Civ. 2833, 2004 WL 2453603, at *2 (S.D.N.Y. Nov. 3, 2004) (citation omitted). This gatekeeping obligation applies whether the proposed expert testimony is based upon scientific knowledge, "technical," or some other "specialized" knowledge. See Kumho Tire Co. v. Carmichael, 526 U.S. 137, 141, 119 S.Ct. 1167, 1171 (1999) (citing Fed.R.Evid. 702). As with other types of evidence, the court must also bear in mind that under Rule 403, even relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of issues, or misleading the jury." Fed.R.Evid. 403. In Daubert the Supreme Court soundly reasoned that "[e]xpert evidence can be both powerful and quite misleading because of the difficulty in evaluating it. Because of this risk, the judge in weighing possible prejudice against probative force under Rule 403 ... exercises more control over experts than over lay witnesses." Daubert, 509 U.S. at 595, 113 S.Ct. at 2798 (quotation marks and citation omitted) (emphasis added). Finally, it should be noted that "[t]he proponent of expert evidence must establish admissibility under Rule 104(a) of the Federal Rules of Evidence by a preponderance of the proof." Bonton, 2004 WL 2453603, at *2 (citing Bourjaily v. United States, 483 U.S. 171, 175–76 (1987)). This burden is the same regardless of whether the issue is the "qualification[s] of a person to be a witness, ..., or the admissibility of the evidence" itself. Fed.R.Evid. 104(a). In the present case, this requires plaintiff Devito to prove by a preponderance of the evidence that each of the three witnesses whom he is proposing to call as an expert qualify as such; and that the proposed testimony of each is admissible.

**\*3** "In assessing expert qualifications, '[l]iberality and flexibility in evaluating qualifications should be the rule; the proposed expert should not be required to satisfy an overly narrow test of his own qualifications." ' Kass, 2004 WL 2475606, at *4 (quoting Lappe v. American Honda Motor Co., Inc., 857 F.Supp. 222, 227 (N.D.N.Y.1994) aff'd 101 F.3d 682 (2d Cir.1996)). "So long as the expert stays within the 'reasonable confines of his subject area,' the expert can fairly be considered to possess the 'specialized knowledge' required by Rule 702." Id. (quoting Lappe, 857 F.Supp. at 227) (other citation omitted).

"In Daubert, the Supreme Court articulated four factors pertinent to determining the reliability of an expert's reasoning or methodology: (1) whether the theory or

technique relied on has been tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) whether there is a known or potential rate of error and the existence and maintenance of standards controlling the technique's operation; and (4) whether the theory or method has been generally accepted by the scientific community." *Id.*

(citing 🔖 *Daubert,* 509 U.S. at 593–94, 113 S.Ct. at 2796– 97). "These factors do not, however, constitute a 'definitive checklist or test.' " *Id.* (quoting 🔖 *Daubert,* 509 U.S. at 593, 113 S.Ct. at 2796). "Rather, they are intended to be applied flexibly, depending on the particular circumstances of the particular case at issue." *Id.* (citing 🔖 *Kumho Tire,* 526 U.S. at 150, 119 S.Ct. at 1175).

In *Kumho,* the Supreme Court recognized that "when evaluating the admissibility of non-scientific expert testimony, the standard under Rule 702 is a liberal and flexible one, and the factors outlined in *Daubert* are merely guidelines in aiding a court's reliability determination." *Houlihan v. Marriott International, Inc.,* No. 00 Civ. 7439, 2003 WL 22271206, at *3 (S.D.N.Y. Sept. 30, 2003) (citing 🔖 *Kumho,* 526 U.S. at 151, 119 S.Ct. at 1175). "For example, in some cases, reliability concerns may focus on personal knowledge or experience rather than strict scientific methods." *Id.* (citation omitted). Regardless of which criteria a court applies to assess the admissibility of expert testimony, "the Supreme Court has made clear that the district court has a 'gatekeeping function' under Rule 702—is charged with 'the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand.' " 🔖 *Amorgianos,* 303 F.3d at 265 (quoting 🔖 *Daubert,* 509 U.S. at 597, 113 S.Ct. 2786) (other citation omitted). Finally, it should be noted that " 'the gatekeeping inquiry must be tied to the facts of a particular case[.]' " *Id.* at 266 (quoting 🔖 *Kumho Tire,* 526 U.S. at 150, 119 S.Ct. at 1175).

### 1. Deborah L. Sweeney

#### a. Qualified?

Glaxo's motion to preclude the testimony of Ms. Sweeney [2] requires little if any analysis. Glaxo is moving to preclude her testimony because it does not believe she is qualified to testify as an expert. Additionally, Glaxo contends that "her proposed opinion lacks a reliable scientific foundation." Def. Preclude Memo. at 26. Plaintiff did not bother to respond to this aspect of Glaxo's motion. This lack of response

amounts to a concession by plaintiff that the court should exclude Ms. Sweeney's testimony. *Cf. Green v. Doukas,* No. 97 CIV.8288CMGAY, 2001 WL 767069, at *8 (S.D.N.Y. June 22, 2001) (granting motion to preclude expert testimony because "plaintiff's failure to oppose the motion suggests ... it has merit[ ]"). Accordingly, the court grants Glaxo's motion to the extent it is seeking preclusion of Ms. Sweeney's testimony. *See Amaker v. Coombe,* No. 96 Civ. 1622, 2003 WL 21222534, at *6 (S.D.N.Y. May 27, 2003) (granting motion to preclude where plaintiff defaulted); *see also* ⚠ *Martinez v. Sanders,* No. 02 Civ.5624, 2004 WL 1234041, at *3 (S.D.N.Y. June 3, 2004) (because plaintiff did not respond to motion, court granted same on "default" theory) (and cases cited therein).

### 2. Kevin W. George, M.D.

**\*4** Glaxo also seeks to preclude the testimony of Dr. Kevin George. Dr. George is a psychiatrist who saw Mr. DeVito in consultation twice—once on November 2, 2001 and again on December 13, 2001. Glanville Aff., exh. G thereto at 51 and 76.

Glaxo is not challenging Dr. George's qualifications, but rather the nature of his testimony. Glaxo is seeking to exclude Dr. George's testimony because he "has expressly disavowed all of the opinions that plaintiff ascribed to him in plaintiff's expert disclosure." Def. Preclude Memo. at 25. Further, even if Dr. George had not disavowed those opinions, Glaxo argues that his "proposed testimony [is] inadmissible because it lacks any reliable scientific foundation." *Id.*

Plaintiff's response focuses almost exclusively on Dr. George's qualifications, which are not in dispute. As to the opinions which plaintiff attributes to Dr. George, the sum total of plaintiff's response is that any alleged "shortcomings" in that testimony go to weight and credibility, and not to admissibility. Memorandum of Law in Opposition to Defendant's Motion to Preclude Plaintiff's Experts ("Pl. Opp'n Preclude") at 5. The court disagrees. As will be seen, Dr. George's purported opinion testimony does not have simply a few "shortcomings." It has glaring holes in terms of reliability, not the least of which is Dr. George's unequivocal deposition testimony disavowing that he made the opinions which plaintiff claims he did.

In his expert disclosure plaintiff specifically identifies Dr. George as an "expert" whom he intends to call at the time

of trial. Glanville Aff., exh. E thereto at 1. According to plaintiff's expert disclosure, Dr. George will testify as follows:

> that in his opinion, within a degree of reasonable medical certainty, ... [1] the plaintiff is experiencing withdrawal reactions from the drug Paxil and that each time the plaintiff attempts to 'wean' himself off of the drug or to lower the dosage of the drug, the plaintiff experiences said withdrawal; 2) ... the plaintiff's withdrawal signs and symptoms are a result of the plaintiff ingesting Paxil; and 3) ... the plaintiff has sustained injury in that he has been unable to discontinue the use of Paxil and has been caused to suffer the signs and symptoms of the withdrawal syndrome associated with the use and attempted discontinuance of Paxil.

Glanville Aff., exh E thereto. Dr. George is confining his opinions to how Paxil allegedly *effected* plaintiff DeVito—not whether Paxil is *capable generally* of causing the symptoms of which DeVito complains. Therefore, although the plaintiff did not specify the purpose for which he is offering Dr. George's testimony, presumably it is being offered on the issue of specific causation.

As noted earlier, ordinarily once a court finds a witness qualified as an expert, the next issue is the admissibility of that witness' opinion testimony. Here, however, it appears that each of the opinions which plaintiff attributes to Dr. George have been expressly disavowed in his deposition. Dr. George was asked point blank whether he had formed any of the three opinions quoted above, and whether he was prepared to testify to same. Each time he answered no. *See* Glanville Aff., exh. G thereto at 88–91. Obviously, if Dr. George has not formed the opinions which plaintiff is ascribing to him, necessarily he has no foundation, scientific or otherwise, for same. Accordingly, the court excludes the opinion testimony outlined above which plaintiff is attributing to Dr. George.

**\*5** Even if Dr. George had not expressly disavowed the opinions set forth above, the court still must exclude his testimony. The crux of each of these opinions is that plaintiff

DeVito has "withdrawal reactions," or "withdrawal signs and symptoms" caused when he attempts to discontinue or taper below a certain dosage of Paxil. Glanville Aff., exh. E thereto. Dr. George's deposition testimony did not so state such. To be sure, Dr. George did testify that he used "Paxil withdrawal" as a *"label* to capture what [DeVito] was describing that he had been experiencing." *Id.,* exh. G thereto at 59 (emphasis added). When later in his deposition Dr. George was pressed as to whether or not he diagnosed plaintiff "as suffering from Paxil withdrawal [,]" he reiterated that he *"applied that label* to describe the symptoms that [DeVito] reported in relation to tapering Paxil." *Id.* at 102 (emphasis added).

There is an obvious difference between labeling a symptom which a patient describes and actually diagnosing that person. Significantly, Dr. George did *not* diagnosis plaintiff with Paxil withdrawal. Perhaps that is because "Paxil withdrawal is not a formal diagnosis within DMS–IV[.]" *Id.* at 94. ("The DSM–IV is the Diagnostic and Statistical Manual, the fourth revision of it, that psychiatrists generally base their diagnoses on." *Id.*) And, "[t]here is no criteria for diagnosing somebody with Paxil withdrawal." *Id.* at 60. For example, there are no "objective tests or assessments," aside from skin inspection for signs of sweating, "that could have been done to determine whether those reports [by DeVito] were genuine[.]" *Id.* at 62. So, Dr. George simply took plaintiff's description of his symptoms at "face value," and made no attempt to determine whether [DeVito's] report of those symptoms was genuine [.]" *Id.* at 62 and 79.

In light of the foregoing, even if Dr. George were inclined to testify that Paxil specifically caused the symptoms which plaintiff claims it did, there is no foundation for this testimony. What is particularly revealing in this regard is Dr. George's candor when asked: "Have you ever made any determination as to why Mr. DeVito's tapering off of Paxil may be taking longer than some of your other patients?' ' *Id.* at 100. Dr. George replied, "I had *no scientific way, ...,* of explaining why he was having such difficulty tapering off Paxil." *Id.* (emphasis added).

Further, plaintiff DeVito saw Dr. George in the latter's capacity as a treating psychiatrist. Thus, as is plain from Dr. George's deposition, he was concerned primarily with the symptoms of which plaintiff complained, not determining the underlying cause. *See* Munafo v. Metropolitan Transportation Authority, Nos. 98 CV–4572, 00–CV–0134, 2003 WL 21799913, at \*19 (E.D.N.Y. Jan. 22, 2003). Had Dr. George been focusing on the underlying cause, undoubtedly

he would have performed a differential diagnosis, which "typically includes a physical examination, clinical tests, and a thorough case history." *Zwillinger v. Garfield Slope Housing Corp .,* No. CV 94–4009, 1998 WL 623589, at *19 (E.D.N.Y. Aug. 17, 1998) (citations omitted). But, Dr. George did not. Without a differential diagnosis, specific causation cannot be established. *See id.* ("To establish specific causation, other possible causes for the symptoms experienced by plaintiff should be excluded by performing a 'differential diagnosis.' ')

### 3. James T. O'Donnell

**\*6** Glaxo argues that the court must preclude O'Donnell's testimony for two reasons. First, he is not qualified as an expert as to the issues upon which he is being asked to opine— general and specific causation and the adequacy of the Paxil warnings. Second, even if he does qualify as an expert, Glaxo contends that the court should preclude his opinions because they lack the requisite scientific foundation and are otherwise unreliable. Plaintiff responds that O'Donnell's "experience and credentials are impressive [,]" whether the issue is his qualifications to testify as an expert on causation or as an expert on warnings. Pl. Preclude Memo. at 4. Plaintiff further responds that regardless of whether O'Donnell is opining on causation or warnings, any alleged "shortcomings" in that testimony go to "weight and credibility, and not [to] ... admissibility." *Id.* at 5 (citation omitted).

Plaintiff DeVito is offering O'Donnell's testimony on three separate issues, which require different areas of expertise. The court will examine O'Donnell's qualifications as to each.

### a. General Causation

Glaxo offers a host of reasons as to why O'Donnell "is not an 'expert' on scientific issues concerning general *or* specific causation" with respect to SSRIs or Paxil. Def. Preclude Memo. at 7 (emphasis added). All of these reasons have merit.

### i. Qualified?

This is not the first court to be confronted with the issue of whether Mr. O'Donnell is qualified to give an expert opinion here. In 🚩*Newton v. Roche Laboratories, Inc.,* 243 F.Supp.2d 672 (W.D.Tex.2002), the court found that he was *not* qualified to render an opinion on general causation. 🚩*Id.* at 679. There, the parents of a 16 year old girl claimed that Accutane, a prescription acne medication manufactured

by the defendant, caused or precipitated the onset of their daughter's schizophrenia. In much the same way plaintiff DeVito is offering O'Donnell's testimony here, the plaintiffs in *Newton* offered O'Donnell as an expert "to testify regarding general causation, *i.e.,* that Accutane is pharmacologically capable of causing schizophrenia." *Id.* at 677. After outlining a number of ways in which O'Donnell's qualifications were lacking, the court expressly found that he was not qualified to render such an opinion.

To support that conclusion, the *Newton* court relied upon O'Donnell's deposition testimony, which is substantially similar to his deposition testimony in this case. For example, O'Donnell testified in *Newton,* as he did here, that "he has never earned an M.D., a Ph.D., or any degree in pharmacology." *Id.* at 677; *see also* O'Donnell Dep'n at 24– 25 and 53. Yet, he "still holds himself out as a 'doctor' and a pharmacologist[.]" *Id.* As in *Newton,* "O'Donnell ... [continues to] grant[ ] himself the title of 'doctor' in reliance upon his Pharm.D degree, [which] he conceded in his deposition that in the majority of pharmacy schools, th[at] ... degree is 'an entry-level degree' that pharmacists must have to ... even practice pharmacy." *Id.* at 677 n. 2 (citation omitted); *see also* O'Donnell Dep'n at 24–25. In contrast, to obtain a degree in pharmacology usually three or four years of graduate school is required. O'Donnell Dep'n at 25– 26. O'Donnell did get a graduate degree, but it was not in pharmacology. O'Donnell's formal education consists of a four year degree in pharmacy and a Master's Degree in clinical nutrition. *Id.* at 27.

**\*7** In addition to questioning O'Donnell's background generally, the *Newton* court pointed out his "lack [of] appropriate pharmacological training relevant to the issues" therein, *i.e.* "Accutane, Vitamin A, schizophrenia, or psychosis[.]" *Id.* at 678. The same may be said here. There is no factual basis upon which this court can find that O'Donnell is an expert regarding SSRIs generally, not to mention Paxil or discontinuation of Paxil. Indeed, as his deposition testimony shows, O'Donnell's asserted expertise on these subjects is non-existent. *See id.* at 21, 24; 38–40; and 45.

Given that SSRIs are a fairly recently developed class of drugs, understandably they were not the subject of O'Donnell's course work as an undergraduate, or when getting his Master's Degree in nutrition. *Id.* at 21 and 24. Since that time, O'Donnell has done nothing to advance his own knowledge as to SSRIs generally or Paxil in particular. When directly asked if he had "done any clinical research

whatsoever relating to antidepressants," O'Donnell replied that he had not. *Id.* at 38. He responded the same way when asked if he had "done any scientific research concerning Paxil or SSRI antidepressants[.]" *Id.* at 39. Moreover, O'Donnell conceded that the first time he "review[ed] ... scientific literature in connection with Paxil discontinuation symptoms[ ]" was for this case. *Id.* at 40–41.

This is the sort of "litigation-drive expertise" which courts have eschewed. To illustrate, the court in *Mancuso*, 967 F.Supp. at 1443, reasoned that it could not "help but conclude that [plaintiff's expert] was not in fact an expert ... when he was hired by the plaintiffs, but that he subsequently attempted, with dubious success, to qualify himself as such be selective review of the relevant literature." This appears to be an apt description of what Mr. O'Donnell attempted to do in the present case.

The court stresses that it is no single factor which is dispositive of whether O'Donnell qualifies as an expert on the issue of general causation. Rather, it is the cumulative effect of the foregoing which convinces the court that O'Donnell lacks the lack of relevant "knowledge, skill, experience, training or education" to testify as an expert on the issue of general causation *vis-a-vis* the discontinuation of Paxil. As he admitted, O'Donnell is *not* a pharmacologist. Therefore, he cannot, as he does in his "expert report," opine to a "reasonable pharmacological certainty," that plaintiff is experiencing "withdrawal toxicity reactions from Paxil[.]" O'Donnell Rep. Clearly, allowing a pharmacist/nutritionist such as O'Donnell to testify in that way would run afoul of the rule that an expert must stay "within the reasonable confines of his subject area[.]" ' *Kass,* 2004 WL 2475606, at *2475606, at *4 (internal quotation marks and citations omitted). Simply put, the court agrees with the court's comment in *Newton* that "[p]laintiff's attempts to present O'Donnell as an expert pharmacologist [is] ... an extremely bold stretch." *Newton,* 243 F.Supp.2d at 279. [3]

ii. Reliability of Testimony?

**\*8** O'Donnell's lack of education, training and background as to Paxil becomes even more apparent when viewed in terms of the opinions which he has rendered in this case. That is so because a "court's evaluation of qualifications is not always entirely distinct from the court's evaluation of reliability." *Pearson v. Young,* No. CIV–99–1559–F, 2002 WL 32026157, at *3 (W.D.Okla. Jan. 17, 2002).

O'Donnell's opinion as to causation is that "DeVito is experiencing withdrawal toxicity reactions from Paxil, and indeed, each time he attempts to wean or lower the dosage, he again experiences such infinity [sic]." Glanville Aff., exh. E thereto. O'Donnell states that when plaintiff's dosage of Paxil is lowered, he suffers from the following "withdrawal signs and symptoms [:] anxiety, jitery [sic], agitation, nausea, drowsiness, generalized discomfort and vertigo[.]" O'Donnell Report 2. "For this opinion to be admissible, O'Donnell must have a *reliable scientific basis* to support not only (1) a casual relationship between" Paxil and the enumerated side-effects, "but also (2) his assertion that [Paxil] will produce these side-effects." *See Newton,* 243 F.Supp.2d at 679 (emphasis added). O'Donnell's report and deposition testimony are void of a scientific basis to support either of those assertions.

In terms of publications, O'Donnell testified that he was the editor of a non-peer reviewed book entitled "Drug Injury Liability, Analysis and Prevention." *Id.* at 98–99. That book contained a mere six sentences on SSRIs, including the two sentences on Paxil. *Id.* at 99. Given that minimal reference to SSRIs, it is not surprising that that book contains nothing about discontinuation symptoms. *See id.* It further appears that he has performed absolutely no research regarding Paxil, much less its discontinuation. *Id.* at 38–39. What is more, O'Donnell has done no scientific or clinical research of any kind for almost two decades. The last time he did any such research was in he "early '80s as part of a pharmacology lab sabbatical," where he was looking at vitamins and critical care drugs used in Intensive Care Units. *Id.* at 36.

In light of the foregoing, to allow plaintiff to rely upon Mr. O'Donnell's opinions as to general causation clearly would violate *Daubert'* s "requirement that the expert testify to scientific knowledge—conclusions support by good grounds for each step in the analysis[.]" ' *Amorgianos,* 303 F.3d at 267 (citations and quotation marks omitted).

b. Specific Causation

It stands to reason that if Mr. O'Donnell lacks (which he does) the qualifications to testify as to general causation, he lacks the qualifications to testify as to specific causation. His opinion as to specific causation suffers from the same infirmities, detailed above, as to general causation. Accordingly, the court finds that Mr. O'Donnell does not have the requisite qualifications to testify as to specific causation; and even if he did, his opinions in that regard are unreliable.

c. Warnings

**\*9** Glaxo contends that because O'Donnell "lacks any pertinent qualifications[,]" Def. Memo. at 14, he should not be allowed to testify that in his opinion the "lack of ... a precaution and warning about withdrawal risk and the need to taper [when discontinuing Paxil] renders the product defective due to an inadequate warning. *See* O'Donnell Report at 3. Plaintiff did not directly respond to this argument. Included in the list of highlighted credentials in plaintiff's memorandum of law is that Mr. O'Donnell "is currently involved in the teaching of New Drug Development and Regulations [.]" Pl. Opp'n Memo. at 2. However, plaintiff does not explain, or cite to any portion of O'Donnell's deposition explaining, how or why this position qualifies him to testify as an expert on warnings.

As with the other issues upon which plaintiff intends to offer O'Donnell's testimony, plaintiff baldly retorts that O'Donnell's "extensive experience qualifies as specialized knowledge gained through experience, training, or education[.]" Pl. Memo. at 4 (internal quotation marks and citations omitted). And, once again, he relies upon the argument that Glaxo's reasons to preclude O'Donnell's testimony regarding warnings should be saved for trial, *i.e.* they should be used to attack O'Donnell's credibility and the weight which the jury might give to his opinions regarding Paxil warnings.

i. Qualified?

O'Donnell "claim[s] to be an expert in drug labeling[.]" O'Donnell Dep'n at 90. Presumably he is including drug warnings within the province of this supposed expertise. In any event, to qualify as an expert it is not enough for a witness to simply declare that he is one. Federal Rule of Evidence 702 requires more. As plaintiff acknowledged, a witness must satisfy the court that he has a certain amount of "knowledge, skill, experience, training or education [ ]" in the relevant field before he can be deemed an expert. *See* Nora Beverages, 164 F.3d at 746 (internal quotation marks and citation omitted). Close examination of O'Donnell's deposition testimony reveals that he is lacking in each of those areas when it comes to the subject of the adequacy of prescription drug warnings.

O'Donnell's claimed expertise admittedly is "through experience," not through formal education. O'Donnell Deposition at 90–92. His experience consists primarily of

having attended continuing education ("CE") programs, where drug labeling was a topic. *Id.* Those CE programs were to satisfy his pharmaceutical and nutritionist CE requirements, however; and he was unable to elaborate on the substance of same. *See id.* Furthermore, O'Donnell has not consulted with any pharmaceutical company "concerning the labeling for any antidepressant[.]" *Id.* at 96. O'Donnell agrees "that the FDA [Food and Drug Administration] is the highest authority on how drugs are labeled in this country[,]" but he has also never consulted with them "concerning the labeling for any antidepressant. *Id.* For that matter, O'Donnell has not worked for or consulted with the FDA in any capacity. *See* Glanville Aff. at 9, ¶ 39. Thus, O'Donnell's experience in this area is extremely limited.

**\*10** Moreover, O'Donnell made two especially damaging concessions which seriously undermine the suggestion that he is an expert as to the adequacy of prescription drug warnings. O'Donnell readily agreed "that in assessing the adequacy of a label for a prescription drug, the expert rendering the opinion generally should be familiar with the clinical trials data on the drug as it relates to the side effect concerning which he is opining[.]" *Id.* at 192. Yet, O'Donnell frankly admitted that he had not reviewed any of the Paxil clinical trials data. *See id.* Similarly, O'Donnell conceded that "generally to reach a conclusion regarding the adequacy of a label for a prescription drug, the expert rendering the opinion should be familiar with at least a majority of the available medical literature on the drug as it relates to the side effect on which he is opining[.]" *Id.* at 193. Despite the foregoing, O'Donnell went on to testify that he has "not read the specific literature [ ]" relating to discontinuation symptoms of Paxil. *Id.* 193 and 45. In fact, he has only read "abstracts" of articles. *Id.* at 46–47. Finally, Mr. O'Donnell has not lectured on, or written anything (peer reviewed or not) about, "Paxil discontinuation symptoms apart from [his] export [sic] report in this case[.]" *Id.* at 45. As the foregoing clearly shows, Mr. O'Donnell does not "employ[ ] in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field[,]" which here is the adequacy of prescription drug warnings and Paxil in particular. *See* Kumho Tire, 526 U .S. at 152, 119 S.Ct. at 1176.

Mr. O'Donnell may qualify as an expert in the fields of pharmacy or nutrition, but that is not the purpose for which his testimony is being offered here. Instead, his testimony is being offered on the adequacy of Paxil warnings. O'Donnell has never been drafter or been asked to draft a warning for any antidepressant, let alone for Paxil. Likewise, he has not done

any research or written any publications on prescription drug warnings. Thus, whether judged in terms of his education or experience, does not rise to the level of "expertise ... that the jury would expect from a bona fide warnings expert." *See Robertson v. Norton,* 148 F.3d 905, 907 (8 th Cir.1998) (internal quotation marks omitted).

In sum, O'Donnell is being called upon to testify regarding the adequacy of the Paxil warning, an issue which clearly is outside the "reasonable confine [s] of his subject area[s,]" which are pharmacy and nutrition. *See Kass,* 2004 WL 2475606, at *4 (internal quotation marks and citations omitted). Therefore, because O'Donnell does *not* "possess the specialized knowledge required by Rule 702[,]" the court finds that he is not qualified as an expert on the issue of the adequacy of the Paxil warning. *See id.*

ii. Reliability of Testimony?

**\*11** Given the nature of the claims which plaintiff is alleging in this case, plainly there is a close relationship between excluding the causation opinion and excluding the warning opinions which are being offered by O'Donnell. *Miller v. Pfizer, Inc.,* 196 F.Supp.2d 1062 (D.Kan.2002), *aff'd on other grounds,* 356 F.3d 1326 (10 th Cir.2004), *cert. denied,* 125 S.Ct. 40 (Oct. 4, 2004), provides a good example of how a decision to preclude causation "expert" testimony impacts upon a decision to also preclude warning testimony. The plaintiff parents in *Miller* were suing the manufacturer of Zoloft, another SSRI, alleging that it caused their son to commit suicide. Similar to the present case, the plaintiffs in *Miller* asserted state law claims for strict liability for marketing defects and misrepresentations, and negligence for failure to test and warn. The court held that an "eminent" psychiatrist and neuropsychopharmacologist's proposed testimony regarding general causation, *i.e.* that Zoloft causes suicide, did not satisfy the *Daubert* criteria for admissibility because, in short, "he lack[ed] sufficient expertise on the issue of suicide." *Id.* at 1087 and 1088. The *Miller* court, as is this court, was then confronted with the issue of whether that same doctor could qualify as an expert who would opine "that Zoloft labels do not adequately warn against the danger of SSRI-induced suicide." *Id.* at 1088. After finding that the doctor was not an expert on that issue, the court soundly reasoned, "[i]f the jury will hear no evidence that [Paxil] causes [withdrawal symptoms/ addictive], it cannot possibly conclude that [Paxil] labels do not adequately warn against the danger that [Paxil]

causes [such condition.]" *Id.* at 1089. That reasoning applies with equal force here. Even if O'Donnell qualifies as a prescription drug warning expert, because neither O'Donnell nor Dr. George (plaintiff's only proof as to causation) qualify to testify about causation, the former's warning testimony "would essentially be irrelevant to any larger issues in the case." *See id.* Accordingly, there is no need to analyze whether O'Donnell's opinions as to warnings pass muster under *Daubert.*

In short, plaintiff DeVito has not sustained his burden of proving by a preponderance of the evidence that Mr. O'Donnell is qualified to render an opinion as to general causation, specific causation, or the adequacy of Paxil warnings. Even if O'Donnell could somehow be deemed to have the requisite "specialized knowledge" to testify as to any or all of those issues, "courts do not have to credit opinion evidence connected to data 'only by the *ipse dixit* of the expert." ' *Prohaska,* 138 F.Supp.2d at 438 (quoting *General Elec. Co. v. Joiner,* 522 U.S. 136, 118 S.Ct. (1997)). That is all O'Donnell has to rely upon; simply because he offers an opinion which he claims to be valid, plaintiff assumes it is so. This court will not, however.

**\*12** For the reasons set forth above, the court grants in its entirety Glaxo's motion to preclude the testimony of Mr. O'Donnell; Dr. George; and Ms. Sweeney.

II. Summary Judgment Motion
The court assumes familiarity with the Supreme Court's trilogy of cases clarifying the governing legal standards on summary judgment motions, and sees no need to repeat those standards herein. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242 (1986); *Celotex Corp. v. Catrett,* 477 U.S. 317 (1986); and *Matsushita Elec. Industr. Co. v. Zenith Radio Corp.,* 475 U.S. 574 (1986)

It is an understatement to say that the wholesale exclusion of the testimony of O'Donnell, George and Sweeney significantly impacts plaintiff DeVito's case. As discussed at the outset causation is a necessary element of each of the five causes of action which plaintiff is alleging herein. Because plaintiff's only causation evidence has been excluded, it necessarily follows that Glaxo is entitled to summary judgment in its favor. *See Kass,* 2004 WL 2475606 (after granting motion to exclude testimony of plaintiff's

claimed expert regarding the feasibility of alternative designs, court granted defense summary judgment motion because plaintiff could not satisfy the critical element of a design defect cause of action); and *Zwillinger,* 1998 WL 623589 (where plaintiff claimed that her exposure to defendants' carpeting causes her to develop immunotoxicity syndrome, court granted summary judgment in defendants' favor after excluding the doctor's testimony, which was plaintiff's only causation evidence).

To conclude, the court hereby GRANTS the motion by Smithkline Beecham Corporation d/b/a Glaxo Smithkline, to preclude the testimony of James O'Donnell; Dr. Kevin George; and Ms. Deborah Sweeney. The court further GRANTS the motion by Smithkline Beecham Corporation d/b/a Glaxo Smithkline for summary judgment pursuant to Fed.R.Civ.P. 56 dismissing all of plaintiff Michael DeVito's claims as against it.

IT IS SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2004 WL 3691343

---

## Footnotes

1    The present action, which has been referred to as a "tag-along action," is one of a number throughout the country wherein plaintiffs are alleging that Glaxo knew of the hazardous side effects of Paxil and either concealed, misrepresented or failed to warn of them. *See In re Paxil Products Liability Litigation,* 296 F.Supp.2d 1374 (Judicial Panel on Multidistrict Litigation 2003). In mid-February 2004, this court was advised that the Judicial Panel on Multidistrict Litigation ("the Panel") had conditionally transferred this action to the United States District Court fo the Central District of California for coordinated or consolidated pretrial proceedings pursuant to 28 U.S.C. § 1407." Glaxo moved to vacate that conditional transfer as it pertained to the present case. When plaintiff did not respond, on June 15, 2004, the Panel vacated that conditional transfer as it relates to Mr. DeVito.

2    During her deposition Ms. Sweeney unequivocally testified, "I'm not a physician. I'm not a nurse practitioner." Glanville Aff ., exh H thereto at 123. She holds an associates' degree in nursing, a bachelor of science degree in health and human services, and a nurse practitioner's degree." *Id.* at 12, 17, 35–36. Thus, to refer to Ms. Sweeney as "Doctor Sweeney, as plaintiff does throughout his expert disclosure, is not only a misstatement but directly contradicts Sweeney's own testimony. Plaintiff's tendency to exaggerate or overstate certain things, as will be seen, is not limited to the qualifications of his experts.

3    O'Donnell's insistence on holding himself out as a pharmacologist, *see* O'Donnell Dep'n at 54, ignores at least one fundamental distinction between pharmacology and pharmacy—a distinction which is critical here. "Pharmacology can be fairly described as the study of the effect of drugs on living organisms. Pharmacy, on the other hand, is the profession of preparing and dispensing drugs." *Newton,* 243 F.Supp.2d at 677, n. 1. It is self-evident that there is a vast difference in the education, experience and skill necessary to obtain degrees in these two different fields.

Apparently O'Donnell recognizes this distinction because in *Newton* he "admitted ... that from approximately 1982 to 1985, he intentionally and falsely advertised that he possessed a doctorate in pharmacology in an attempt to attract more interest from lawyers for his consulting expert business." *Id.* at 677, n .3 (citation omitted). He made that same admission in this deposition herein. O'Donnell Dep'n at 28–31. O'Donnell did change this advertisement because, in his words, it was "incorrect." *Id.* at 29. This court cannot overlook what at best appears to be a serious lapse in judgment, however.

**End of Document**                                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment

Distinguished by Hendricks v. Mallozzi, N.D.N.Y., January 14, 2022

2015 WL 5750945

Only the Westlaw citation is currently available.

United States District Court,

N.D. New York.

Errol THOMAS, Plaintiff,

v.

F. WAUGH, Dicairano, Leifeld, Ronald D.

Larkin, Cheryl Morris, John N. Antonelli,

Bly, and Karen Bellamy, Defendants.

No. 9:13–CV–0321 (MAD/TWD).

|

Signed Sept. 30, 2015.

**Attorneys and Law Firms**

Errol Thomas, Coxsackie, NY, pro se.

Office of the New York, State Attorney General, Louis Jim, AAG, of Counsel, Albany, NY, for Defendants.

Hon. Eric T. Schneiderman, Attorney General for the State of New York, Tiffinay M. Rutnik, Esq., of Counsel, Albany, NY, for Defendants.

### MEMORANDUM–DECISION AND ORDER

MAE A. D'AGOSTINO, District Judge.

### I. INTRODUCTION

**\*1** Plaintiff Errol Thomas, an inmate currently in the custody of the New York State Department of Corrections and Community Supervision ("DOCCS"), commenced this action *pro se* pursuant to 42 U.S.C. § 1983. *See* Dkt. No. 1; Dkt. No. 26. Plaintiff alleges the following causes of action: (1) violation of his right to freely exercise his religion under the First Amendment and the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), (2) violation of his substantive and procedural due process rights, and (3) retaliation in violation of his First Amendment rights. *See* Dkt. No. 26 at ¶¶ 17–68.

On November 6, 2014, Defendants filed a motion to dismiss for failure to state a claim. *See* Dkt. No. 47. In a July 24, 2015 Report–Recommendation and Order, Magistrate Judge Dancks recommended that Defendants' motion to dismiss for failure to state a claim be granted in part and denied in part. *See* Dkt. No. 53. Currently before the Court are Plaintiff's objections to Magistrate Judge Dancks' Report and Recommendation. *See* Dkt. No. 56.

### II. BACKGROUND

### A. Magistrate Judge Dancks' Report and Recommendation

As there are no objections filed to the background and facts set forth in the Report–Recommendation and Order, the Court adopts and incorporates that recitation here. *See* Dkt. No. 53 at 1–5. Magistrate Judge Dancks recommended that the Court grant in part and deny in part Defendants' motion. See Dkt. No. 53. Specifically, Magistrate Judge Dancks recommended that the Court direct Defendants Waugh, Leifeld, Larkin, Morris, Antonelli, and Bly to answer Plaintiff's claims under the free exercise clause of the First Amendment and the RLUIPA because Plaintiff stated plausible facts suggesting that Defendants' refusal to permit him to wear the larger head covering substantially burdened his sincerely held religious belief. *See id.* at 7–14. Magistrate Judge Dancks next recommended that the Court dismiss Plaintiff's procedural due process claims with prejudice based on the availability of adequate state court post-deprivation remedies. *See id.* at 14–15. Magistrate Judge then recommended that Plaintiff's substantive due process claim be dismissed with prejudice because, *inter alia,* it is covered by a specific constitutional provision and must be analyzed under that standard. *See id.* at 15–16. Magistrate Judge Dancks further recommended that the Court dismiss Plaintiff's retaliation claim against Defendant Leifeld for failing to plausibly allege a causal connection between Defendant Leifeld's alleged adverse action and Plaintiff's protected speech and grant Plaintiff leave to amend. *See id.* at 17–20. In addition, Magistrate Judge Dancks recommended that the Court grant Defendants' motion to dismiss Plaintiff's claims against Defendant DiCairano for failure to allege more than mere verbal harassment and against Defendant Bellamy for lack of personal involvement. *See id.* at 20–22. Finally, Magistrate Judge Dancks recommended that Plaintiff's claims regarding the functioning of the grievance process be dismissed on the grounds that prisoners have no constitutional right to the

proper administration of the grievance process. *See id.* at 22–23.

## B. Plaintiff's Objections

**\*2** Plaintiff objects to Magistrate Judge Dancks' recommendations that his due process claims, retaliation claims, and claims against Defendant DiCairano and Defendant Bellamy be dismissed. *See* Dkt. No. 56 at 2. Specifically, Plaintiff argues that his headcovering was confiscated arbitrarily and unjustifiably, thereby denying Plaintiff substantive and procedural due process because the prison authorities could have "resolved the problem in a more appropriate fashion without resorting to the harsher solution of penalizing plaintiff with a misbehavior report and pre-hearing confinement." Dkt. 56 at 2–3. Additionally, Plaintiff argues that Magistrate Judge Dancks applied the wrong standard for appraising the sufficiency of a complaint on a motion to dismiss to his retaliation claim. *See* Dkt. 56 at 3–5. He also appears to argue that his complaint sufficiently stated a retaliation claim against Defendant DiCairano and Defendant Bellamy. *See id.* at 3.

## III. DISCUSSION

### A. Standard of Review

When a party files specific objections to a magistrate judge's report-recommendation, the district court makes a "de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b)(1). However, when a party files "[g]eneral or conclusory objections or objections which merely recite the same argument [that he presented] to the magistrate judge," the court reviews those recommendations for clear error. *O'Diah v. Mawhir,* No. 9:08–CV–322, 2011 WL 933846, \*1 (N.D.N.Y. Mar. 16, 2011) (citation and footnote omitted). After the appropriate review, "the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b) (1).

A court should not dismiss a complaint if the plaintiff has stated "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2001). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable

for the misconduct alleged." *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (citation omitted). Although the court should construe the factual allegations in the light most favorable to the plaintiff, "the tenet that a court must accept as true all of the allegations contained in a complain is inapplicable to legal conclusions." *Id.* "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* (citing *Twombly,* 550 U.S. at 555). Thus, "where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.' " *Id.* (quoting Fed.R.Civ.P. 8(a) (2)).

"[I]n a *pro se* case, the court must view the submissions by a more lenient standard than that accorded to 'formal pleadings drafted by lawyers.' " *Govan v. Campbell,* 289 F.Supp.2d 289, 295 (N.D.N.Y.2007) (quoting *Haines v. Kerner,* 404 U.S. 519, 520 (1972)) (other citations omitted). The Second Circuit has opined that the court is obligated to "make reasonable allowances to protect *pro se* litigants" from inadvertently forfeiting legal rights merely because they lack a legal education. *Govan v. Campbell,* 289 F.Supp.2d 289, 295 (N.D.N.Y.2007) (quoting *Traguth v. Zuck,* 710 F.2d 90, 95 (2d Cir.1983)). Furthermore, when a *pro se* complaint fails to state a cause of action, the court generally "should not dismiss without granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated." *Cuoco v. Moritsugu,* 222 F.3d 99, 112 (2d Cir.2000) (internal quotation marks and citations omitted). Nonetheless, an opportunity to amend is not required where "[t]he problem with [the plaintiff's] cause of action is substantive" such that "better pleading will not cure it." *Id.*

### B. Free Exercise and Grievance Process Claims

**\*3** Neither party has objected to Magistrate Judge Dancks' recommendations that Plaintiff's free exercise claim go forward and claim related to functioning of the grievance system be dismissed. The Court finds that Magistrate Judge Dancks correctly determined that Plaintiff has plausibly alleged that Defendants substantially burdened his sincerely held religious beliefs and have not identified a legitimate or compelling penological interest justifying the impingement. Accordingly, the Court denies Defendants' motion to dismiss Plaintiff's free exercise claims under the First Amendment and RLUIPA. The Court also finds that Magistrate Judge Dancks

correctly concluded that Plaintiff does not have a due process right to have proper procedures be followed with respect to his grievances. As such, the Court grants Defendants' motion to dismiss Plaintiff's claim pertaining to the functioning of the inmate grievance system.

## C. Due Process Claims

### 1. Substantive Due Process

Plaintiff argues that he sufficiently pled the elements of a substantive due process claim as set forth in *Rother v. New York State Department of Corrections and Community Supervision,* 970 F.Supp.2d 78, 100 (N.D.N.Y.2013). Specifically, Plaintiff argues that his complaint alleges "1) Plaintiff's religious headcovering was confiscated arbitrarily, denying him of his constitutionally-protected religious freedom; [and] 2) The issue of a misbehavior report is a punishment against his exercise of religion." Dkt. No. 56 at 2.

Magistrate Judge Dancks correctly determined that Plaintiff's substantive due process claim fails because Plaintiff "has not alleged any facts plausibly suggesting that Defendants' behavior was 'shocking' in a constitutional sense." Dkt. No. 53 at 16. As Magistrate Judge Dancks noted, within the context of the prison setting, "[v]ery few conditions ... have been found 'shocking' enough to violate a prisoner's right to substantive due process." *Id.* (citing 🚩 *Sadin v. Conner,* 515 U.S. 472, 479 n. 4, 484 (1995)); *Tavares v. Amato,* 954 F.Supp.2d 79, 98 (N.D.N.Y.2013)). The only facts alleged by Plaintiff in connection with his substantive due process claim are that his religious headcovering was confiscated and that he was issued a misbehavior report. *See* Dkt. No. 56 at 2. Neither of these allegations rises to the level of "shocking" that would support a substantive due process claim.

Morever, Magistrate Judge Dancks correctly determined that Plaintiff's substantive due process claim must be dismissed on the additional ground that it is duplicative of Plaintiff's First Amendment free exercise claim. *See* Dkt. No. 53 at 16; *see also Rother,* 970 F.Supp.2d at 100 ("[S]ubstantive-due-process claims must be dismissed where they are 'merely duplicative of claims explicitly protected under other constitutional sources.' (quoting *Roman v. Velleca,* No. 11–CV–1867, 2012 WL 4445475, *10 (D.Conn. Sept. 25, 2012)). Plaintiff's objections make clear that his substantive due process claim is based on Defendants' alleged violations of Plaintiff's free exercise rights. *See* Dkt. No. 56 at 2. As Magistrate Judge Dancks correctly set forth, "a constitutional

claim ... covered by a specific constitutional provision ... must be analyzed under the standard appropriate to that specific provision, not under the rubric of substantive due process." Dkt. No. 53 at 16 (quoting 🚩 *United States v. Lanier,* 520 U.S. 259, 272 n. 7 (1997)). As such, the Court grants Defendants' motion to dismiss Plaintiff's substantive due process claim without leave to amend.

### 2. Procedural Due Process Claim

*\*4* Plaintiff objects to Magistrate Judge Dancks' recommendation that his procedural due process claim be dismissed on the grounds that Defendants' deprivation of Plaintiff's property was unjustified and not implemented in an "appropriate fashion." Dkt. No. 56 at 3. However, Magistrate Judge Dancks correctly found that under Second Circuit law, the confiscation of property even in a prison context does "not constitute a Fourteenth Amendment violation for loss of property because of the availability of state court post-deprivation remedies" in the New York Court of Claims. Dkt. No. 53 at 14 (quoting 🚩 *Koehl v. Dalsheim,* 85 F.3d 86, 88 (2d Cir.1996)). Magistrate Judge Dancks also correctly concluded that better pleading cannot cure the substantive failures of Plaintiff's procedural due process claim. *See id.* at 15. Accordingly, the Court adopts Magistrate Judge Dancks' recommendation to dismiss with prejudice Plaintiff's procedural due process claim.

## D. Retaliation Claims

Magistrate Judge Dancks recommended that Plaintiff's retaliation claim against Defendant Leifeld be dismissed based on Plaintiff's failure to allege facts plausibly suggesting a causal connection between Plaintiff's protected speech and Defendant Leifeld's alleged adverse actions. *See* Dkt. No. 53 at 18–20. Plaintiff contends that Magistrate Judge Dancks applied the wrong standard in determining whether Plaintiff's complaint sufficiently states a retaliation claim. *See* Dkt. No. 56 at 4–5. Plaintiff incorrectly relies on the outdated pleading standard of *Conley v. Gibson,* which did "not require a claimant to set out in detail the facts upon which he bases his claim," but rather to set out " 'a short and plain statement of the claim' that will give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." 🚩 355 U.S. 41, 47 (1957) (quoting Fed.R.Civ.P. 8(a)(2)). Plaintiff fails to recognize that the Supreme Court's more recent decisions in *Twombly* and *Iqbal* abrogated *Conley'*s bare notice pleading requirements in favor of a standard requiring litigants to plead "enough facts to state a claim to

relief that is plausible on its face." *Twombly,* 550 U.S. at 570. As the Supreme Court stated in *Iqbal,* "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice" to state a claim for relief. *Iqbal,* 556 U.S. at 678.

Here, Magistrate Judge Dancks applied the correct standards in determining that Plaintiff has failed to plausibly allege a causal connection between Defendant Leifeld's action and Plaintiff's protected speech. As Magistrate Judge Dancks explained, the only fact Plaintiff alleged that suggests a causal connection is the fact that Defendant Leifeld's actions were taken in close temporal proximity to Plaintiff's protected speech. *See* Dkt. No. 53 at 19. Magistrate Judge Dancks further correctly explained that temporal proximity alone is insufficient to establish an inference of retaliation. *See id.* (citing *Slattery v. Swiss Reinsurance Am. Corp.,* 248 F.3d 87, 95 (2d Cir.2001)). Accordingly, Plaintiff's retaliation claim must be dismissed for failure to plausibly allege a causal connection.

**\*5** Magistrate Judge Dancks also recommended that Plaintiff be granted leave to amend his retaliation complaint. In light of Plaintiff's misplaced reliance on the *Conley* notice pleading requirements, the Court agrees that granting leave to amend is proper. Plaintiff's retaliation claim against Defendant Leifeld is thus dismissed without prejudice.

Plaintiff also argues that his claims against Defendant DiCairano and Bellamy are "part of [his] retaliation claim," as Defendants "continued to push the issue, particularly after plaintiff filed a grievance." Dkt. No. 56 at 3. Magistrate Judge Dancks construed Plaintiff's claim against Defendant DiCairano as alleging a violation of Plaintiff's free exercise rights. *See* Dkt. No. 53 at 20. That interpretation is consistent with Plaintiff's complaint, which alleged that "[D]efendant DiCairano intentionally harassed Thomas in derogation of his right to religious freedom so as to burden Thomas' exercise of his religious freedom." Dkt. No. 26 at ¶ 40. Plaintiff's retaliation claims specifically name only Defendant Leifeld. *See id.* at ¶¶ 41–47.

First, Magistrate Judge Dancks is correct in concluding that Plaintiff's allegations of verbal harassment by Defendant DiCairano are insufficient to raise a constitutional violation. *See* Dkt. No. 53 at 20. Second, Plaintiff's allegations as to Defendant DiCairano involve solely conduct that occurred prior to Plaintiff's alleged protected activity of filing a

grievance against Defendant DiCairano. *See* Dkt. No. 26 at ¶¶ 34–40. As Plaintiff has not alleged any adverse action taken by Defendant DiCairano in response to Plaintiff's protected activity, Plaintiff has failed to state a retaliation claim against Defendant DiCairano. The Court therefore accepts Magistrate Judge Dancks' recommendation and dismisses Plaintiff's claim against Defendant DiCairano with prejudice.

As to Defendant Bellamy, despite Plaintiff's contention in his objections that Defendant Bellamy was somehow involved in retaliation against Plaintiff, the only factual allegations that Plaintiff raises in his complaint are that Defendant Bellamy: (1) "advised Thomas that [the Central Office Review Committee ("CORC") ] had received his grievance appeal on September 6, 2012;" (2) "is responsible for the administrative functions of the [Inmate Grievance Program] and the CORC;" and (3) "is personally involved and appropriately named in this action for the purpose of discovery to ascertain the voting members, or their designees, present in deciding the plaintiff's grievance." Dkt. No. 26 at ¶¶ 53–55. Magistrate Judge Dancks correctly concluded that these allegations are insufficient to show Defendant Bellamy's personal involvement in the alleged constitutional violations, Dkt. No. 53 at 20–22, a point that Plaintiff conceded in his opposition to Defendants' motion to dismiss, *see* Dkt. No. 50 at 8. Moreover, the Court agrees with Magistrate Judge Dancks that allowing Plaintiff's claims to proceed against Defendant Bellamy for purposes of discovering the identity of the individuals involved in the alleged violations of his constitutional rights is unnecessary, as Plaintiff has already identified several of the individuals who allegedly violated his rights. *See* Dkt. No. 53 at 22. Consequently, the Court adopts Magistrate Judge Dancks' recommendation and dismisses Plaintiff's claim against Defendant Bellamy with prejudice.

## IV. CONCLUSION

**\*6** After carefully reviewing the entire record in this matter, the parties' submissions and the applicable law, and for the above-stated reasons, the Court hereby

**ORDERS** that Magistrate Judge Dancks' July 24, 2015 Report and Recommendation (Dkt. No. 53) is **ADOPTED** in its entirety for the reasons set forth therein; and the Court further

**ORDERS** that Defendants' motion to dismiss Plaintiff's complaint (Dkt. No. 47) is **GRANTED in part and DENIED in part;** and the Court further

**ORDERS** that Plaintiff's procedural and substantive due process claims, claims against Defendants DeCairano and Bellamy, and claims related to the proper functioning of the inmate grievance system are **DISMISSED with prejudice;** and the Court further

**ORDERS** that Plaintiff's retaliation claim against Defendant Leifeld is **DISMISSED with leave to amend;** [1] and the Court further

**ORDERS** that the Clerk of the Court shall serve a copy of this Memorandum–Decision and Order on the parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

### REPORT–RECOMMENDATION and ORDER

THÉRÈSE WILEY DANCKS, United States Magistrate Judge.

This pro se prisoner civil rights action, commenced pursuant to 42 U.S.C. § 1983, has been referred to me for Report and Recommendation by the Honorable Mae A. D'Agostino, United States District Judge, pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(c). Plaintiff Errol Thomas alleges that Defendants violated his constitutional rights by depriving him of his religious head covering. (Dkt. No. 26.) Currently pending before the Court is Defendants' motion to dismiss for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6). (Dkt. No. 47.) For the reasons that follow, I recommend that Defendants' motion be granted in part and denied in part.

### I. BACKGROUND

The following facts are derived from the face of the operative complaint and the attachments thereto and are accepted as true for the purposes of deciding the pending motion to dismiss.

Erickson v. Pardus, 551 U.S. 89, 94 (2007).

At the time of the events at issue in this case, Plaintiff was incarcerated at Eastern New York Correctional Facility. (Dkt.

No. 26 ¶ 7.) Plaintiff is a "non-mainland African American male ... and wears his hair in locks." *Id.* ¶ 19. Plaintiff is Jewish and wears a head covering to express his awe and respect for God. *Id.* ¶¶ 17–23. Plaintiff believes that "[t]he failure to wear such a religious head-covering under Jewish–Hebrew tenet is to appear nude, insolent, and indecent before God." *Id.* ¶ 24. The head covering he wears "has alternately been referred to as a large Yarmulka, Kippah or Mitznefet." *Id.* ¶ 22.

On March 18, 2012, [1] Defendant Correction Officer F. Waugh confiscated Plaintiff's head covering and issued a misbehavior report charging Plaintiff with disobeying a direct order, lying, and possessing contraband. (Dkt. No 26 ¶¶ 25–26; Dkt. No. 26 at 21 .) The misbehavior report characterized the head covering as a tam and stated that Plaintiff was not authorized to wear it because he was not registered as a Rastafarian. (Dkt. No. 26 at 21.) Plaintiff alleges that Defendant Waugh "knew that a questionable religious head [ ] covering was not to be confiscated until determined to be contraband and unlawful for that religious faith." *Id.* ¶ 27.

**\*7** On March 27, 2012, Plaintiff was found not guilty of the disciplinary charges stemming from Defendant Waugh's report after a rabbi testified at his disciplinary hearing that the head covering was appropriate for someone of the Jewish faith. (Dkt. No. 26 at 23, 25.) The hearing officer returned Plaintiff's head covering and gave Plaintiff a copy of the disciplinary disposition with instructions for Plaintiff to show it to anyone who stopped him and questioned him about his head covering. *Id.* ¶ 31.

Plaintiff alleges that Defendant Sergeant DiCairano stopped him on two occasions during the summer of 2012 and verbally harassed him about his head covering, stating that she was going to "take the matter to Albany" in order to get the result of the disciplinary hearing changed. (Dkt. No. 26 ¶¶ 9, 34–39.)

On August 6, 2012, Plaintiff filed a grievance complaining about Defendant DiCairano's harassment. (Dkt. No. 26 at 27–28.) On September 26, 2012, Defendant Sergeant B. Leifeld sent Plaintiff a memorandum as part of the grievance process. *Id.* at 40. It stated "I've enclosed an edited copy of the E-mail I received from [Defendant Cheryl] Morris Director of Ministerial Services. I will not rebuttal (sic) this issue; the last conversion (sic) we had pertaining to your religious head gear is final." *Id.* The enclosed email stated that Defendant Morris determined "the head gear is inappropriate for a Jew.

That headgear is for a Rasta." *Id.* at 42. Plaintiff alleges that Defendant Leifeld "ordered [Plaintiff] to take a picture wearing the religious headcovering so that Leifeld could send it to Albany to get the decision permitting [Plaintiff] to wear his religious headcovering changed." *Id.* ¶ 43. Plaintiff alleges that Defendant Leifeld took these actions to retaliate against Plaintiff "for filing a grievance against Leifeld's co-worker DiCairano for harassment." *Id.* ¶ 44.

Defendant Superintendent Roland D. Larkin affirmed Defendant Leifeld's determination. (Dkt. No. 26 ¶ 11; Dkt. No. 26 at 32.) The decision stated:

> IGRC investigation shows that the facility chaplain has referred the issue of religious headwear to Central Office Ministerial Services Office for determination. Grievant's headwear was not confiscated, nor has grievant been issued a misbehavior report. I find such direction is in compliance with Directive 4202 Section M–2 .3. Grievant may wear headwear until such clarification can be made.

*Id.*

Plaintiff appealed to the Central Office Review Committee ("CORC"). (Dkt. No. 26 at 34.) Defendant Karen Bellamy issued a memorandum stating that the appeal had been received. *Id.* at 36. On March 1, 2013, Defendant IGP Coordinator John N. Antonelli sent an email stating "I have reviewed this grievance with [Defendant] Assistant Commissioner Bly with the determination that the grievant should not be allowed to keep or wear the disapproved religious headwear. Please have the grievant advised of his disposal options, and forward Form # 2068 showing how and when he disposed of the item." *Id.* at 44.

**\*8** CORC affirmed the Superintendent's decision on March 6, 2013. (Dkt. No. 26 at 38.) The decision stated:

> [T]he grievant was allowed to retain the religious head covering in question until it was reviewed by the Director of Ministerial, Family & Volunteer Services. Further, it was determined that it was not approved for Jewish adherents,

and the grievant elected to mail it out of the facility when given disposal options on 3/2/13....

> CORC asserts that the employees' appropriate performance of their duties and enforcement of the rules and regulations should not be construed as harassment by the grievant. Further, CORC has not been presented with sufficient evidence to substantiate harassment or malfeasance by staff. CORC notes that the grievant may write to whomever he wishes regarding this complaint, as long as they are not on his Negative Correspondence and Telephone List.

*Id.*

In this action, Plaintiff claims that Defendants violated his right to freely exercise his religion and his right to due process, and that Defendant Leifeld retaliated against him for filing the grievance. (Dkt. No. 26.) Plaintiff requests damages and injunctive relief. *Id.* at 13–14.

Defendants now move to dismiss. (Dkt. No. 47.) Plaintiff has opposed the motion. (Dkt. No. 50.) Defendants have filed a reply. (Dkt. No. 51.)

## II. LEGAL STANDARD GOVERNING MOTIONS TO DISMISS FOR FAILURE TO STATE A CLAIM

A defendant may move to dismiss a complaint on the ground that the complaint fails to state a claim upon which relief can be granted. Fed.R.Civ.P. 12(b)(6). In order to state a claim upon which relief can be granted, a complaint must contain, *inter alia,* "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2). The requirement that a plaintiff "show" that he or she is entitled to relief means that a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is *plausible* on its face.' " *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007)) (emphasis added). "Determining whether a complaint states a plausible claim for relief ... requires the ... court to draw on its judicial experience and common sense.... [W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not shown—that the pleader is entitled to relief." *Id.* at 679 (internal citation and punctuation omitted).

"In reviewing a complaint for dismissal under Rule 12(b)(6), the court must accept the material facts alleged in the

complaint as true and construe all reasonable inferences in the plaintiff's favor ." *Hernandez v. Coughlin,* 18 F.3d 133, 136 (2d Cir.1994) (citation omitted). Courts are "obligated to construe a *pro se* complaint liberally." *Harris v. Mills,* 572 F.3d 66, 72 (2d Cir.2009) (citation omitted). However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal,* 556 U.S. at 678 (citing *Twombly,* 550 U.S. at 555).

## III. ANALYSIS

**\*9**  Defendants move to dismiss the complaint in its entirety. (Dkt. No. 47.) For the reasons discussed below, I recommend that the Court (A) direct Defendants Waugh, Leifeld, Larkin, Morris, Antonelli, and Bly to answer Plaintiff's claims under the free exercise clause of the First Amendment and the Religious Land Use and Institutionalized Persons Act ("RLUIPA"); (B) dismiss Plaintiff's due process claims without leave to amend; (C) dismiss the retaliation claim against Defendant Leifeld with leave to amend; (D) dismiss the claims against Defendant DiCairano without leave to amend; (E) dismiss the claim against Defendant Bellamy without leave to amend; and (F) dismiss any claim regarding the functioning of the grievance system without leave to amend.

### A. Religion Claims

Plaintiff claims that Defendants Waugh, Leifeld, Larkin, Morris, Antonelli, and Bly violated his right to freely exercise his religion.[2] (Dkt. No. 26 ¶¶ 33, 47, 56, 65, 68.) Plaintiff phrases his complaint in terms of RLUIPA. *Id.* ¶ 71. However, because Plaintiff seeks money damages, which are not available under RLUIPA,[3] the Court and Defendants have also construed the complaint as asserting a First Amendment free exercise claim. Defendants move to dismiss the free exercise/RLUIPA claim on the grounds that (1) Plaintiff's right to exercise his religion was not substantially burdened; and (2) Defendants had a legitimate penological purpose for their actions. (Dkt. No. 47–1 at 3–8.[4]) For the reasons discussed below, I recommend that the Court deny Defendants' motion to dismiss the First Amendment and RLUIPA claims.

### 1. *First Amendment Free Exercise*

Prisoners retain some measure of the constitutional right to the free exercise of religion guaranteed by the First Amendment. *Ford v. McGinnis,* 352 F.3d 582, 588 (2d Cir.2003). However, due to the unique concerns of the prison setting, prisoners' free exercise rights must be balanced against the interests of prison officials engaged in the complex duties of administering the penal system. *Id.* Thus, a prison regulation or individualized decision to deny a prisoner the ability to engage in a religious exercise "is judged under a reasonableness test less restrictive than that ordinarily applied [to burdens on fundamental rights]: a regulation that burdens a [prisoner's] protected right passes constitutional muster if it is reasonably related to legitimate penological interests." *Salahuddin v. Goord,* 467 F.3d 263, 274 (2d Cir.2006) (quoting *O'Lone v. Estate of Shabazz,* 482 U.S. 342, 349 (1987)) (punctuation omitted).[5]

To establish a free exercise claim, a prisoner "must show at the threshold that the disputed conduct substantially burdens[6] his sincerely held religious beliefs." *Salahuddin,* 467 F.3d at 274–75 (citing *Ford,* 352 F.3d at 591). A religious belief is "sincerely held" when the plaintiff subjectively, sincerely holds a particular belief that is religious in nature. *Ford,* 352 F.3d at 590. Here, Defendants concede for the purposes of this motion that Plaintiff's religious beliefs are sincerely held. (Dkt. No. 47–1 at 5.)

**\*10**  A prisoner's sincerely held religious belief is "substantially burdened" where "the state puts substantial pressure on an adherent to modify his behavior and to violate his beliefs." *Jolly v. Coughlin,* 76 F.3d 468, 477 (2d Cir.1996) (punctuation omitted) (holding that Rastafarian prisoner's sincerely held religious belief that he was prohibited from submitting to a test for latent tuberculosis was "substantially burdened" where he was forced to choose between "submitting to the test or adhering to [his] beliefs and enduring medical keeplock.").

Defendants argue that Plaintiff's sincere religious beliefs were not substantially burdened because he was only prohibited from wearing a "head covering [that] was more classified as appropriate for inmates with a different religious designation." (Dkt. No. 47–1 at 5.) Plaintiff, Defendants argue, was not precluded "from wearing a head covering

appropriate for adherents of plaintiff's registered religion." *Id.* Plaintiff notes, however, that Defendants "failed to consider the individual and unique circumstances which made wearing a yamaka (sic) (normally worn by those of the Jewish faith) unrealistic." (Dkt. No. 50 at 4.) Plaintiff appears to assert that a standard-sized yarmulke will not fit over his hair (Dkt. No. 26 ¶¶ 19, 22) and thus that the only way for him to honor both his Jamaican heritage and his Jewish faith is by wearing the larger head covering. (Dkt. No. 50 at 4.) Accepting this assertion as true, as the Court must for the purposes of this motion to dismiss, Plaintiff has asserted facts plausibly suggesting that Defendants' refusal to allow him to wear the larger head covering substantially burdened his sincerely held religious belief.

Once a plaintiff establishes that a sincerely held religious belief has been substantially burdened,"[t]he defendants then bear the relatively limited burden of identifying the legitimate penological interests that justify the impinging conduct; the burden remains with the prisoner to show that these articulated concerns were irrational." *Salahuddin,* 467 F.3d at 275 (quoting *Ford,* 352 F.3d at 595) (punctuation omitted). Although the defendants' burden is "relatively limited," the legitimate penological interest advanced must have been the *actual* reason for the defendants' actions. *Id.* at 276–77. The law requires that "prison officials actually had, not just could have had, a legitimate reason for burdening protected activity." *Id.* at 277. "Post hoc justifications with no record support will not suffice." *Id.*

Defendants argue that their interest in institutional security justified prohibiting Plaintiff from wearing his head covering. (Dkt. No. 47–1 at 5–7.) Defendants cite *Benjamin v. Coughlin,* 905 F.2d 571, 578–79 (2d Cir.1990), for the proposition that large head coverings, such as those worn by Rastafarians, are "capable of concealing contraband." (Dkt. No. 47–1 at 6.) Defendants argue that "the pleadings make clear that plaintiff's head covering presented the same risk to institutional security as the Rastafarian head coverings did in the *Benjamin* case." *Id.* at 6–7.

**\*11** *Benjamin* is distinguishable from at the case at bar for two reasons. First, the procedural posture of the cases is quite different. In *Benjamin,* the district court conducted a bench trial in which prison officials presented evidence about the security risks of the head coverings. Thus, the court was able to consider evidence and weigh credibility. Here, the case

is before the Court on a motion to dismiss, and thus the Court must accept all facts pleaded in the complaint as true and read all inferences in Plaintiff's favor. Second, the cases are factually distinguishable. In *Benjamin,* DOCCS facilities limited or entirely prohibited the wearing of Rastafarian head coverings by any inmate, including registered Rastafarians, on security grounds. Here, Defendants apparently allow Rastafarian inmates to wear the larger head coverings. They repeatedly advised Plaintiff that the reason he was not allowed to wear the larger head covering was because he is Jewish and not Rastafarian. (Dkt. No. 26 at 21, 38, 42.) As Plaintiff phrases it in his opposition to the motion to dismiss, "[T]here has been no claims ... that he was harassed about his head covering *because of any institutional risk.* The only claims forwarded ... are that the defendant did not believe it was appropriate for the Jewish faith." (Dkt. No. 50 at 6, emphasis in original.) Neither the face of the complaint nor the documents attached thereto allege any facts plausibly suggesting that Defendants expressed a security rationale for denying Plaintiff the right to wear his head covering. In other words, while in *Benjamin* the prison officials presented evidence of security concerns motivating their actions, here the record construed in the light most favorable to Plaintiff plausibly suggests that Defendants were not motivated by security concerns. Accordingly, Defendants have not met their burden, at this stage in the litigation, of identifying the legitimate penological interests that justified the impinging conduct. Therefore, it is recommended that the Court deny Defendants' motion to dismiss Plaintiff's free exercise claim.

### 2. *RLUIPA*

Plaintiff has also asserted his religious claim under RLUIPA. (Dkt. No 26 ¶ 71.) RLUIPA provides that "[n]o government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution [7] ... unless the government demonstrates that imposition of the burden on that person (1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000cc–1(a). As discussed above, Plaintiff has alleged facts plausibly suggesting that Defendants placed a substantial burden on his religious exercise. As discussed above, Defendants are not entitled, at this point in the litigation, to a finding that there was a legitimate penological reason for their actions. Accordingly, they have also not demonstrated that they had a compelling governmental interest and took the least restrictive means of furthering that interest. Therefore,

I recommend that the Court deny Defendants' motion to dismiss Plaintiff's RLUIPA claim.

### 3. *Qualified Immunity*

**\*12** Defendants argue that they are entitled to qualified immunity. (Dkt. No. 47–1 at 13–14.) For the reasons discussed below, I recommend that the Court reject this argument at this time.

Defendants in civil rights actions are entitled to qualified immunity from civil damages "unless defendant's alleged conduct, when committed, violated 'clearly established statutory or constitutional rights of which a reasonable person would have known.' " *Williams v. Smith,* 781 F.2d 319, 322 (2d Cir.1986) (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 815 (1982)). Thus, the qualified immunity inquiry in a prisoner civil rights case involves two issues: (1) "whether the facts, viewed in the light most favorable to the plaintiff, establish a constitutional violation"; and (2) "whether it would be clear to a reasonable officer that his conduct was unlawful in the situation confronted." *Sira v. Morton,* 380 F.3d 57, 68–69 (2d Cir.2004) (citations omitted), *accord Higazy v. Templeton,* 505 F.3d 161, 169, n. 8 (2d Cir.2007) (citations omitted).

As discussed above, the facts viewed in the light most favorable to Plaintiff establish a constitutional violation at this point in the litigation. [8] Thus, the Court must address the second question: whether it would be clear to a reasonable officer that his conduct was lawful in the situation confronted.

In determining whether it would be clear to a reasonable officer that his conduct was unlawful in the situation confronted, courts in this circuit consider three factors: (1) whether the right in question was defined with 'reasonable specificity'; (2) whether the decisional law of the Supreme Court and the applicable circuit court support the existence of the right in question; and (3) whether under preexisting law a reasonable defendant official would have understood that his or her acts were unlawful. *Jermosen v. Smith,* 945 F.2d 547, 550 (2d Cir.1991) (citations omitted).

In determining whether the right in question in a particular case was defined with reasonable specificity, courts must avoid "framing the constitutional right at too broad a level of generality." *Redd v. Wright,* 597 F.3d 532, 536 (2d. Cir.2010). Characterizing the right in question in a prisoner's First Amendment religion case as the right "not to be subjected to punishment ... as a consequence of his religious beliefs," for example, is not "reasonably specific." *Id.* On the other hand, "[t]his does not mean that there must be a factual equivalency between the case at issue and prior cases. The 'salient question' instead is whether the case law at the time in question would have put reasonable officers on 'fair warning' that their conduct violated the plaintiff's rights." *Matusick v. Erie Cnty. Water Auth.,* 757 F.3d 31, 60 (2d Cir.2014) (quoting *Hope v. Pelzer,* 536 U.S. 730, 741 (2002)).

Here, at least for the purposes of this motion, Defendants have not demonstrated that they are entitled to qualified immunity. It is well-established that "prison officials may not substantially burden inmates' right to religious exercise without some justification." *Salahuddin,* 467 F.3d at 275–76. Here, as discussed above, Defendants have not, at this point in the litigation, shown that any legitimate penological reason justified their refusal to allow Plaintiff to wear his head covering. Therefore, I recommend that the Court reject Defendants' qualified immunity argument at this time. *See, e.g., Williams v. Leonard,* No. 9:11–CV–1158 (TJM/TWD), 2013 U.S. Dist. LEXIS 142051, at \*10–11, 2013 WL 5466191, at \*4 (N.D.N.Y. Sept. 30, 2013) (rejecting qualified immunity defense at motion to dismiss stage where prison officials had not demonstrated a legitimate penological interest for a restriction on religious clothing). [9]

### B. Due Process Claims

**\*13** Plaintiff claims that Defendants Leifeld, Larkin, Morris, Antonelli, and Bly violated his right to due process. (Dkt. No. 26 ¶¶ 44, 47, 56, 65, 68.) It is not clear from the face of the complaint whether Plaintiff intends to assert a procedural due process claim or a substantive due process claim, although he asserts in opposition to the motion to dismiss that he intended to assert both. (Dkt. No. 50 at 8–9.) Defendants move to dismiss Plaintiff's due process claims, and have addressed both the procedural and the substantive aspects of the Due Process Clause. (Dkt. No. 47–1 at 11–13.) For the reasons discussed below, I recommend that the Court dismiss these claims without leave to amend.

### 1. *Procedural Due Process*

Plaintiff cannot state a procedural due process claim regarding the loss of his head covering. "[A]n unauthorized intentional deprivation of property by a state employee does not

constitute a violation of the procedural requirements of the Due Process Clause of the Fourteenth Amendment if a meaningful postdeprivation remedy for the loss is available." *Hudson v. Palmer,* 468 U.S. 517, 533 (1984) (emphasis omitted). This Circuit has held that "confiscation ... [does] not constitute a Fourteenth Amendment violation for loss of property because of the availability of state court post-deprivation remedies" in the New York Court of Claims. *Koehl v. Dalsheim,* 85 F.3d 86, 88 (2d Cir.1996); *Jackson v. Burke,* 256 F.3d 93, 96 (2d Cir.2001); *see also Parratt v. Taylor,* 451 U.S. 527, 544 (1981) ("Although the state remedies may not provide the respondent with all the relief which may have been available if he could have proceeded under § 1983, that does not mean that the state remedies are not adequate to satisfy the requirements of due process."), *overruled in part on other grounds by Daniels v. Williams,* 474 U.S. 327 (1986). Therefore, it is recommended that the Court grant the motion to dismiss Plaintiff's procedural due process claim.

Where a pro se complaint fails to state a cause of action, the court generally "should not dismiss without granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated." *Cuoco v. Moritsugu,* 222 F.3d 99, 112 (2d Cir.2000) (internal quotation and citation omitted). However, an opportunity to amend is not required where "the problem with [the plaintiff's] causes of action is substantive" such that "better pleading will not cure it." *Id.* Here, better pleading would not cure Plaintiff's procedural due process claim. Therefore, it is recommended that the Court dismiss this claim without leave to amend.

### 2. *Substantive Due Process*

Construed broadly, the complaint may also assert a substantive due process claim. However, it does not allege facts plausibly suggesting such a claim. "To state a substantive due process claim, a plaintiff must allege that (1) the complained-of state action compromised a constitutionally-protected liberty or property right, and (2) the state action that deprived him of that interest was oppressive or arbitrary." *Rother v. N.Y. State Dep't of Corr. & Cmty. Supervision,* 970 F.Supp.2d 78, 100 (N.D.N.Y.2013). Regarding the second factor, "[s]ubstantive due process protects individuals against government action that is arbitrary, ... conscience-shocking, ... or oppressive in

a constitutional sense, ... but not against constitutional action that is incorrect or ill-advised." *Lowrance v. Achtyl,* 20 F.3d 529, 537 (2d Cir.1994). Very few conditions of prison life have been found "shocking" enough to violate a prisoner's right to substantive due process. *See, e.g., Sandin v. Conner,* 515 U.S. 472, 479 n. 4, 484 (1995) (noting that an involuntary transfer to a state mental hospital or the involuntary administration of psychotropic drugs "give rise to protection by the Due Process Clause of its own force," i.e. state a substantive due process claim); *Tavares v. Amato,* 954 F.Supp.2d 79, 98 (N.D.N.Y.2013) (placement of inmate in administrative segregation for 132 days based solely on nature of his criminal record possibly "incorrect" or "ill-advised," but not conscience-shocking). Here, Plaintiff has not alleged any facts plausibly suggesting that Defendants' behavior was "shocking" in a constitutional sense.

**\*14** Plaintiff's substantive due process claim fails for another reason. "If a constitutional claim is covered by a specific constitutional provision, ... the claim must be analyzed under the standard appropriate to that specific provision, not under the rubric of substantive due process." *United States v. Lanier,* 520 U.S. 259, 272 n. 7 (1997). *See also Albright v. Oliver,* 510 U .S. 266, 273 (1994) ("Where a particular Amendment provides an explicit textual source of constitutional protection against a particular sort of government behavior, that Amendment, not the more generalized notion of substantive due process, must be the guide for analyzing these claims."). Here, as discussed above, the complaint states a First Amendment free exercise claim. As such, it is not appropriately analyzed under the rubric of substantive due process. Therefore, I recommend that the Court dismiss this claim without leave to amend.

### C. Retaliation Claim

Plaintiff alleges that Defendant Leifeld retaliated against him for filing a grievance against Defendant DiCairano. (Dkt. No. 26 ¶ 44). Specifically, Plaintiff alleges that "those intentional actions by defendant Leifeld were taken for the sole purpose of retaliating against Thomas for filing a grievance against Leifeld's co-worker DiCairano for harassment." *Id.* Defendants move to dismiss this claim. (Dkt. No. 47–1 at 8–9.) For the reasons discussed below, I recommend that the Court grant Defendants' motion to dismiss this claim with leave to amend.

Claims of retaliation find their roots in the First Amendment. *See* Gill v. Pidlypchak, 389 F.3d 379, 380–81 (2d Cir.2004). Because of the relative ease with which claims of retaliation can be incanted, however, courts have scrutinized such retaliation claims with particular care. *See* Flaherty v. Coughlin, 713 F.2d 10, 13 (2d Cir.1983). As the Second Circuit has noted,

> [t]his is true for several reasons. First, claims of retaliation are difficult to dispose of on the pleadings because they involve questions of intent and are therefore easily fabricated. Second, prisoners' claims of retaliation pose a substantial risk of unwarranted judicial intrusion into matters of general prison administration. This is so because virtually any adverse action taken against a prisoner by a prison official—even those otherwise not rising to the level of a constitutional violation—can be characterized as a constitutionally proscribed retaliatory act.

Dawes v. Walker, 239 F.3d 489, 491 (2d Cir.2001) (citations omitted), *overruled on other grounds,* Swierkiewicz v. Sorema N.A., 534 U.S. 506 (2002).

To state a retaliation claim under 42 U.S.C. § 1983, a plaintiff must allege facts plausibly suggesting that: (1) the speech or conduct at issue was "protected"; (2) the defendants took "adverse action" against the plaintiff—namely, action that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights; and (3) there was a causal connection between the protected speech and the adverse action—in other words, that the protected conduct was a "substantial or motivating factor" in the defendants' decision to take action against the plaintiff. Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 287 (1977); Gill, 389 F.3d at 380 (citing Dawes v. Walker, 239 F.3d 489, 492 (2d. Cir.2001)).

**\*15** Here, Plaintiff has alleged facts plausibly suggesting the first element. The filing of a grievance against prison officials is constitutionally protected conduct. Scott v. Coughlin, 344 F.3d 282, 288 (2d Cir.2003); Graham v. Henderson, 89 F.3d 75, 80 (2d Cir.1996). Plaintiff alleges that he filed a grievance against Defendant DiCairano. (Dkt. No. 26 at 27–28.)

Regarding the second element, the Second Circuit defines " 'adverse action' objectively, as retaliatory conduct 'that would deter a similarly situated individual of ordinary firmness from exercising ... constitutional rights.' " Gill, 389 F.3d at 381 (quoting Davis v. Goord, 320 F.3d 346, 353 (2d Cir.2003), *superseded by* 320 F.3d 346, 2003 U.S.App. LEXIS 13030, 2003 WL 360053 (2d Cir. Feb. 10, 2003)). The Second Circuit has "made clear that this objective test applies even where a particular plaintiff was not himself subjectively deterred; that is, where he continued to file grievances and lawsuits." *Id.* For the purposes of this motion, the Court will assume that denying a grievance constitutes adverse action.

Regarding the third element, several factors may be considered in determining whether a causal connection exists between the plaintiff's protected activity and a prison official's actions. Baskerville v. Blot, 224 F.Supp.2d 723, 732 (S.D.N.Y.2002) (citing Colon v. Coughlin, 58 F.3d 865, 872–73 (2d Cir.1995)). Those factors include: (1) the temporal proximity between the protected activity and the alleged retaliatory act; (2) the inmate's prior good disciplinary record; (3) vindication at a hearing on the matter; and (4) statements by the defendant concerning his or her motivation. *Id.* (citing Colon, 58 F.3d at 872–73). "The causal connection must be sufficient to support an inference that the protected conduct played a substantial part in the adverse action." *Id.* Here, Plaintiff has alleged facts plausibly suggesting temporal proximity between his protected conduct (filing the grievance) and Defendant Leifeld's adverse action (denying the grievance). Plaintiff filed the grievance on August 6, 2012. (Dkt. No. 26 at 27.) Defendant Leifeld sent Plaintiff a memorandum indicating his involvement in the matter less than two months later. (Dkt. No. 26 at 40.) The Second Circuit has held that the passage of "only six months" is sufficient to support a finding of temporal proximity. Espinal v. Goord, 558 F.3d 119, 129 (2d Cir.2009) (citing Gorman–Bakos v. Cornell Coop. Extension, 252 F.3d 545,

555 (2d Cir.2001)). However, mere temporal proximity is not enough to establish a causal connection. The Second Circuit has held that where "timing is the only basis for a claim of retaliation ... an inference of retaliation does not arise." *Slattery v. Swiss Reinsurance Am. Corp.,* 248 F.3d 87, 95 (2d Cir.2001). [10] Here, Plaintiff has not alleged any facts other than temporal proximity plausibly suggesting that Defendant Leifeld denied Plaintiff's grievance or sent pictures of Plaintiff to Albany because Plaintiff filed a grievance against Defendant DiCairano. Plaintiff has not, for instance, alleged that Defendant Leifeld made any statements to that effect. Plaintiff has not alleged that Defendant Leifeld's decision was overturned at any higher level. In fact, Plaintiff admits on the face of the complaint that Defendant Leifeld's decision was affirmed. (Dkt. No. 26 at 32, 38.) Thus, Plaintiff has not alleged facts plausibly suggesting a causal connection between the protected conduct and the adverse action. Therefore, I recommend that the Court dismiss the retaliation claim with leave to amend.

### D. Claim Against Defendant DiCairano

**\*16** Plaintiff alleges that Defendant Sergeant DiCairano stopped him on two occasions during the summer of 2012 and verbally harassed him about his head covering, stating that she was going to "take the matter to Albany" in order to get the result of the disciplinary hearing changed. (Dkt. No. 26 ¶¶ 9, 34–38.) Defendants argue that this claim should be dismissed. (Dkt. No. 47–1 at 7–8.) Defendants are correct. Verbal harassment, in and of itself, does not rise to the level of a constitutional violation. *Tafari v. McCarthy,* 714 F.Supp.2d 317, 364 (N.D.N.Y.2010); *Ramirez v. Holmes,* 921 F.Supp. 204, 210 (S.D.N.Y.1996) ("Allegations of threats or verbal harassment, without any injury or damage, do not state a claim under 42 U.S.C. § 1983."). Therefore, I recommend that the Court dismiss this claim without leave to amend.

### E. Claim Against Defendant Bellamy

Plaintiff alleges that the members of CORC violated his right to exercise his religion by directing that Plaintiff destroy his head covering or send it home. (Dkt. No. 26 ¶¶ 57–58.) The identity of the CORC members who reached that decision is not clear from the face of CORC's decision. *Id.* at 38. The complaint states that Defendant Bellamy is "appropriately named in this action for the purpose of discovery to ascertain the voting members, or their designees, present in deciding

the plaintiff's grievance." *Id.* ¶ 55. Defendants move to dismiss Defendant Bellamy for lack of personal involvement. (Dkt. No. 47–1 at 10–11.) For the reasons discussed below, I recommend that the Court grant Defendants' motion as to this claim without leave to amend.

Under Second Circuit precedent, " 'personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.' " *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (quoting *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir.1991)). In order to prevail on a § 1983 cause of action against an individual, a plaintiff must show some tangible connection between the unlawful conduct and the defendant. *Bass v. Jackson,* 790 F.2d 260, 263 (2d Cir.1986). If the defendant is a supervisory official, a mere "linkage" to the unlawful conduct through "the prison chain of command" (i.e., under the doctrine of *respondeat superior* ) is generally insufficient to show his or her personal involvement in that unlawful conduct. *Polk Cty. v. Dodson,* 454 U.S. 312, 325 (1981); *Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003); *Wright,* 21 F.3d at 501; *Ayers v. Coughlin,* 780 F.2d 205, 210 (2d Cir.1985).

However, when a prisoner does not know the identities of any of the individuals who allegedly violated his constitutional rights, it is appropriate to maintain "supervisory personnel as defendants ... until the plaintiff has been afforded an opportunity through at least brief discovery to identify the subordinate officials who have personal liability." *Davis v. Kelly,* 160 F.3d 917, 921 (2d Cir.1998). "After an opportunity for discovery, undisputed allegations that the supervisor lacked personal involvement will ultimately suffice to dismiss that official from the case, but such dismissal is premature where the opportunity to identify those involved has not yet been accorded." *Id.* at 921–22 (citations omitted). *See also Murphy v. Goord,* 445 F.Supp.2d 261 (W.D.N.Y.2006) (denying superintendent's motion for judgment on the pleadings on personal involvement grounds and allowing plaintiff to proceed with discovery to identify the Doe defendants).

**\*17** Plaintiff states in opposition to the motion to dismiss that "once, through discovery, he has ascertained the voting members that decided the plaintiff's grievance, he will

move this Honorable Court to amend his complaint for the purposes of adding said defendants to this complaint." (Dkt. No. 50 at 8.) Thus, he argues, Defendant Bellamy should remain in the action at this time. However, Plaintiff's case is distinguishable from *Davis* and *Murphy*. In *Davis* and *Murphy,* the plaintiffs did not know the identities of any of the prison employees who allegedly violated their rights. The uninvolved supervisory defendants were the sole named defendants in those cases. Here, Plaintiff knows the identities of several of the individuals who allegedly violated his rights. Thus, he will be able to seek information about the identity of the CORC panel members from the named, personally involved defendants. Therefore, I recommend that the Court grant Defendants' motion to dismiss the claim against Defendant Bellamy without leave to amend.

### F. Claim Regarding Functioning of the Grievance Process

Defendants argue that "[t]o the extent plaintiff claims that Leifeld, Larkin, and Bellamy failed to properly hear and/or consider his grievances, or appeals therefrom, those claims should be dismissed because there is no constitutional right to the grievance process." (Dkt. No. 47–1 at 8.) To the extent that Plaintiff asserts such a claim, Defendants are correct.

Prisoners do not have a due process right to a thorough investigation of grievances. *Torres v. Mazzuca,* 246 F.Supp.2d 334, 341–42 (S.D.N.Y.2003).

> The First Amendment protects a prisoner's right to meaningful access to the courts and to petition the government for the redress of grievances. However, inmate grievance programs created by state law are not required by the Constitution and consequently allegations that prison officials violated those procedures does not give rise to a cognizable § 1983 claim. If prison officials ignore a grievance that raises constitutional claims, an inmate can directly petition the government for redress of that claim. Therefore, the refusal to process an inmate's grievance or failure to

see to it that grievances are properly processed does not create a claim under § 1983.

*Shell v. Brzezniak,* 365 F.Supp.2d 362, 369–70 (W.D.N.Y.2005) (citations omitted). Therefore, I recommend that the Court dismiss any such claims without leave to amend.

**ACCORDINGLY,** it is

**RECOMMENDED** that Defendants' motion to dismiss for failure to state a claim (Dkt. No. 47) be *GRANTED IN PART AND DENIED IN PART.* Specifically, it is recommended that the Court (A) direct Defendants Waugh, Leifeld, Larkin, Morris, Antonelli, and Bly to answer Plaintiff's claims under the free exercise clause of the First Amendment and RLUIPA; (B) dismiss Plaintiff's due process claims without leave to amend; (C) dismiss the retaliation claim against Defendant Leifeld with leave to amend; (D) dismiss the claims against Defendant DiCairano without leave to amend; (E) dismiss the claim against Defendant Bellamy without leave to amend; and (F) dismiss any claim regarding the functioning of the grievance system without leave to amend; and it is further

**\*18 ORDERED** that the Clerk provide Plaintiff with a copy of *Williams v. Leonard,* No. 9:11–CV–1158 (TJM/TWD), 2013 U.S. Dist. LEXIS 142051, 2013 WL 5466191 (N.D.N.Y. Sept. 30, 2013).

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. *FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.* *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Sec'y of Health and Human Servs .,* 892 F.2d 15, 16 (2d Cir.1989) (per curiam)); 28 U.S.C. § 636(b) (1) (Supp.2013); Fed.R.Civ.P. 72, 6(a).

### All Citations

Not Reported in F.Supp.3d, 2015 WL 5750945

## Footnotes

1    As a result of this Order, should Plaintiff choose not to file an amended complaint, Plaintiff's remaining claims are his First Amendment and RLUIPA free exercise claims against Defendants Waugh, Leifeld, Larkin, Morris, Antonelli, and Bly.

1    The complaint states that this incident occurred on March 19, 2010. (Dkt. No. 26 ¶ 25.) The documents attached to the complaint make it clear that the incident occurred in 2012. (Dkt. No. 26 at 21.)

2    Plaintiff also asserts that Defendant DiCairano violated his right to freely exercise his religion. (Dkt. No. 26 ¶ 40.) However, as discussed below, the factual allegations against Defendant DiCairano amount only to a claim of verbal harassment.

3    ⚑ *Sossamon v. Texas,* 131 S.Ct. 1651 (2011).

4    Citations to page numbers in Defendants' memorandum of law refer to the page numbers in the original document rather than to the page numbers assigned by the Court's electronic filing system.

5    Although *Turner* involved prison regulations, the Second Circuit has applied the *O'Lone/Turner* analysis to individual decisions that allegedly impinge an inmate's constitutional rights. *Young v. Coughlin,* 866 F.2d 567 (2d Cir.1989).

6    Although the Second Circuit has applied the "substantial burden" test in its most recent prison free exercise cases, it has done so while explicitly refusing to adopt or endorse the test. "The *Ford* court noted that the Circuits apparently are split over whether prisoners must show a substantial burden on their religious exercise in order to maintain free exercise claims. Nevertheless, the *Ford* court held that since the plaintiff had not challenged the application of the substantial burden requirement, the court would proceed as if the requirement applied. Likewise, the *Salahuddin* court noted that '[r]esolution of this appeal does not require us to address Salahuddin's argument that a prisoner's First Amendment free-exercise claim is not governed by the 'substantial burden' threshold requirement,' because defendants 'never proceed to argue that we should find any particular burdened religious practice to be peripheral or tangential to [plaintiff's] religion.' The court then proceeded as if the substantial burden requirement applied." ⚑ *Pugh v. Goord,* 571 F.Supp.2d 477, 497 n .10 (S.D.N.Y.2008) (citations and some punctuation omitted).

7    An "institution" is any facility or institution that is "owned, operated, or managed by, or provides services on behalf of any State" and is, *inter alia,* "for persons who are mentally ill, disabled, or retarded, or chronically ill or handicapped" or "a jail, prison, or other correctional facility." ⚑ 42 U.S.C. § 1997(1) (2010).

8    I express no opinion on whether Plaintiff's claims could survive a motion for summary judgment.

9    The Court will provide Plaintiff with a copy of all unpublished decisions cited herein in accordance with the Second Circuit's decision in ⚑ *Lebron v. Sanders,* 557 F.3d 76 (2d Cir.2009) (per curiam).

10    *Slattery* was an employment case. The Second Circuit routinely cites to employment cases when discussing retaliation in the prison law context. *See e.g.* ⚑ *Espinal,* 558 F.3d at 129 (citing ⚑ *Clark Cnty. Sch. Dist. v. Breeden,* 532 U.S. 268, 273–74 (2001)). Thus, it is appropriate to apply the *Slattery* rule here.

**End of Document**                                          © 2023 Thomson Reuters. No claim to original U.S. Government Works.

Case 9:22-cv-00102-BKS-ML    Document 78    Filed 12/13/23    Page 345 of 373

Jusino v. Gallagher, Not Reported in Fed. Supp. (2022)

2022 WL 2078159
Only the Westlaw citation is currently available.
United States District Court, D. Connecticut.

Jose A. JUSINO, Plaintiff,
v.
Colleen GALLAGHER, et al., Defendants.

No. 3:21-cv-689 (SRU)
|
Signed 06/09/2022

**Attorneys and Law Firms**

Jose A. Jusino, Suffield, CT, Pro Se.

**INITIAL REVIEW ORDER**

Stefan R. Underhill, United States District Judge

**\*1**  On May 19, 2021, Jose Jusino, a sentenced inmate, commenced this action *pro se* under 🚩 42 U.S.C. § 1983. Compl., Doc. No. 1. Shortly thereafter, Jusino filed a motion to amend his complaint ("First Amended Complaint"), which I granted. *See* Mot., Doc. No. 5; Order, Doc. No. 6.

In the First Amended Complaint, Jusino alleged that several employees of the Connecticut Department of Correction ("DOC"), nearly all of whom work at MacDougall-Walker Correctional Institution ("MacDougall"), violated his constitutional rights by denying him adequate access to health care and then threatening to transfer him to a different DOC facility if he filed a lawsuit regarding the matter. I reviewed the First Amended Complaint under 🚩 28 U.S.C. §§ 1915 and 1915A and determined that Jusino had failed to allege plausible Eighth Amendment medical indifference and First Amendment retaliation claims. Initial Review Order, Doc. No. 9, at 9, 11. I dismissed the complaint but afforded Jusino one opportunity to file an amended complaint. *Id.* at 12.

On September 2, 2021, Jusino filed an amended complaint ("Second Amended Complaint"). Prior to initial review of the Second Amended Complaint, Jusino filed a motion to file another amended complaint, which I granted. *See* Order, Doc. No. 15; Mot. to Am., Doc. No. 14. Accordingly, Jusino's Third Amended Complaint is now the operative complaint.[1] *See* Third Am. Compl., Doc. No. 16.

The Third Amended Complaint asserts many of the same allegations previously reviewed but also adds new factual allegations apparently in an effort to address the deficiencies identified in the previous initial review order. This time, Jusino sues the following eight DOC employees: (1) DOC Health Program Director Colleen Gallagher; (2) Health Services Review Coordinator Ross Walker; (3) Facility Administrator Kristine Barone; (4) Gymnasium Program Coordinator, Rudy Alvarez; (5) Nurse Jean Caplan; (6) Nurse Tawanna Furtick; (7) Deputy Warden Damian Doran; and (8) Medical Regional Chief Operating Officer Kristen Shea. *Id.* at ¶¶ 2–8. I will refer to all eight defendants as "the Defendants." All of the Defendants are sued in their individual and official capacities, and Jusino seeks damages and injunctive relief.

For the following reasons, I conclude that Jusino has only stated a plausible Eighth Amendment violation against Defendant Caplan. Accordingly, I dismiss all other claims against Caplan and the other Defendants.

**I. BACKGROUND**

The events giving rise to this lawsuit commenced in March 2021. Prior to that, Jusino, while at another facility, "suffered injuries to his back and shoulder" as a result of being forced to recreate in handcuffs for one hour, five days a week over the course of an eleven-month period. *Id.* at ¶ 11.[2]

**\*2**  Once transferred to McDougall, Jusino placed several written Health Services Requests ("HSRs") for medical treatment in the Health Services Request box. *Id.* at ¶ 12. Jusino's requests for medical care were denied. *Id.* On multiple occasions, he was directed to sign up for "Prompt Care." *Id.* But he was not provided with any direction on how to sign up for Prompt Care, and neither the DOC directives nor the Facility Handbook explained the sign-up process. *Id.* at ¶ 13. Jusino later discovered that Prompt Care is only available once a week, and that inmates can only sign up for Prompt Care during a few hours one day a week. *Id.* at ¶ 14. Because of the lack of information about how to access medical care through Prompt Care, Jusino's injuries were not treated for "an unreasonably protracted period of time," which impaired his ability to sleep at night and take part in daily activities. *Id.* at ¶ 15.

Eventually, Jusino's medical requests were addressed. *Id.* at ¶ 16. Still, Jusino was not permitted to see a medical doctor. *Id.* Instead, he was treated by APRN Caplan, who is not

Jusino v. Gallagher, Not Reported in Fed. Supp. (2022)

Case 9:22-cv-00102-BKS-ML    Document 78    Filed 12/13/23    Page 346 of 373

qualified to evaluate, diagnose or treat his injuries. *Id.* Jusino was placed in the facility's "Wellness Program," which was designed to provide him with physical therapy to treat his injuries. *Id.* at ¶ 17. During his participation in the Wellness Program, Jusino experienced increased pain from his injuries. *Id.* at ¶ 18. At that time, Jusino learned that the alleged therapist providing the physical therapy was a member of the gymnasium custodial staff who was not qualified to provide physical therapy. *Id.*

Due to his continued pain, Jusino submitted an HSR to obtain more appropriate treatment for his injuries. *Id.* at ¶ 19. Caplan responded to Jusino's request. *Id.* at ¶ 20. However, Caplan's response addressed Jusino's foot, which was wholly irrelevant to the issue raised in Jusino's HSR. *Id.* Jusino never received any follow-up evaluation to assess his injuries. *Id.*

Jusino submitted another HSR regarding Caplan's lack of qualifications to treat or diagnose his injuries. *Id.* at ¶ 21. Furthermore, the HSR detailed Caplan's refusal to assess his medical needs in retaliation for his filing a complaint to her supervisors about her refusal to provide him with treatment and his request to see a qualified doctor. *Id.* at ¶¶ 21, 35. Caplan denied his HSR and his right to appeal her decision. *Id.* at ¶ 22. Additionally, she declined to provide him with medical care or treatment and refused to prescribe him a medical mattress. *Id.* at ¶¶ 22, 35.

On November 3, 2021, Jusino was seen by a specialized physical therapist at UCONN Health Center Hospital. *Id.* at ¶ 23. The physical therapist recommended a specific course of therapy for Jusino's injuries. *Id.* DOC policy requires that DOC staff meet with an inmate to discuss an "outside hospital facilities" visit upon the inmate's return to the correctional facility. *Id.* at ¶ 24. However, Jusino was not seen regarding the physical therapy prescribed at UCONN Health Center Hospital. *Id.* Caplan, too, failed to meet with Jusino to discuss his physical therapy needs, and she failed to implement the physical therapy recommendations provided by the physical therapy specialist. *Id.* at ¶ 30.

As a result of the lack of medical treatment for his injuries, Jusino suffers from extreme pain, which prevents him from engaging in many ordinary daily activities including: sleeping without interruption; lifting heavy objects; exercising; hand-washing clothing; cutting and shaving his hair; cleaning his cell; pleasuring himself; and writing. *Id.* at ¶ 26. He also has significant elevated cholesterol. *Id.* The physical pain and loss

of enjoyment in engaging in daily activities has contributed to a deterioration of his mental health. *Id.*

## II. STANDARD OF REVIEW

Under 28 U.S.C. § 1915A, I must review prisoner civil complaints and dismiss any portion of the complaint that is frivolous or malicious, that fails to state a claim upon which relief may be granted, or that seeks monetary relief from a defendant who is immune from such relief. Although detailed allegations are not required, the complaint must include sufficient facts to afford the defendants fair notice of the claims and the grounds upon which they are based and to demonstrate a plausible right to relief. *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 555–56 (2007).

**\*3** The Supreme Court has set forth a threshold "plausibility" pleading standard for courts to evaluate the adequacy of allegations in federal court complaints. A complaint must allege enough facts—as distinct from legal conclusions—that give rise to plausible grounds for relief. *See, e.g., Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Notwithstanding the rule of liberal interpretation of a *pro se* complaint, a *pro se* complaint may not survive dismissal if its factual allegations do not meet the basic plausibility standard. *See Fowlkes v. Ironworkers Local 40,* 790 F.3d 378, 387 (2d Cir. 2015) ("A *pro se* complaint must allege enough facts to state a claim to relief that is plausible on its face.") (cleaned up).

## III. DISCUSSION

Construed liberally, Jusino's complaint asserts that the Defendants violated the First, Eighth, and Fourteenth Amendments. *See* Third Am. Compl., Doc. No. 16, at ¶¶ 28–37. I consider each of these claims, beginning with the various individual capacity claims and concluding with the official capacity claims.

### A. Fourteenth Amendment Due Process

First, Jusino claims that Defendants Gallagher, Furtick, Barone, Doran, and Shea "created and implemented a procedure ('Prompt Care') that violated [Jusino's] due process rights." *Id.* at ¶ 28. According to Jusino, Prompt Care is flawed for several reasons: first, neither the DOC directives

Case 9:22-cv-00102-BKS-ML    Document 78    Filed 12/13/23    Page 347 of 373

Jusino v. Gallagher, Not Reported in Fed. Supp. (2022)

nor the facility handbook mention Prompt Care; second, "the procedure" does not ensure that an inmate can submit an HSR on a daily basis; and third, there is no mechanism for an inmate to sign up for health services through Prompt Care. *Id.*

The Fourteenth Amendment provides that a State shall not "deprive any person of life, liberty, or property, without due process of law." U.S. Const., amend. XIV, § 1. It protects both a right to "substantive" due process and "procedural" due process. *See* County of Sacramento v. Lewis, 523 U.S. 833, 845-46 (1998). Jusino does not indicate whether he raises procedural or substantive due process claims. Regardless, both claims fail.

Substantive due process "protects individuals against government action that is arbitrary, conscience-shocking, or oppressive in a constitutional sense," but "not against government action that is incorrect or ill-advised." *Tavares v. Amato*, 954 F. Supp. 2d 79, 98 (N.D.N.Y. 2013) (quoting Lowrance v. Achtyl, 20 F.3d 529, 537 (2d Cir. 1994)). "To establish a violation of substantive due process rights, a plaintiff must demonstrate that the state action was so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience." *Id.* (quoting Okin v. Village of Cornwall-On-Hudson Police Dep't, 577 F.3d 415, 431 (2d Cir. 2009)).

Procedural due process claims "proceed[ ] in two steps: [a court] first ask[s] whether there exists a liberty or property interest of which a person has been deprived, and if so ... whether the procedures followed by the State were constitutionally sufficient." Swarthout v. Cooke, 562 U.S. 216, 219 (2011). A plaintiff has a protected liberty interest only if it arises from the Constitution or from an expectation or interest created by state laws or policies, and the deprivation of that interest caused him to suffer an "atypical and significant hardship." *See* Tellier v. Fields, 280 F.3d 69, 80–81 (2d Cir. 2000).

As alleged, the Prompt Care procedures could be characterized as incorrect or ill-advised, but it does not appear that the procedures were arbitrary, conscience shocking, or constitutionally oppressive. And Jusino never alleges as much. Furthermore, Jusino has alleged no facts to suggest that he had a liberty interest in Prompt Care and its implementation. To be clear, Jusino does have a constitutionally-protected interest in his medical care. *See*

Youngberg v. Romeo, 457 U.S. 307, 324 (1982). But that is not the issue Jusino's complaint presents here because he does not claim that he was deprived of medical care due to the Prompt Care procedures. As I understand it, Jusino alleges that the Prompt Care procedures are convoluted, which made it harder for him to schedule health appointments. Although inconvenient, that burden is not an "atypical or significant hardship" that would warrant due process protection. Tellier, 280 F.3d at 80–81.

***4** But to the extent that Jusino does allege that the Prompt Care procedures deprived him of medical services, the Eighth Amendment provides "an explicit textual source of constitutional protection." *See* County of Sacramento v. Lewis, 523 U.S. 833, 842 (1998) ("[W]here a particular Amendment provides an explicit textual source of constitutional protection against a particular sort of government behavior, that Amendment, not the more generalized notion of substantive due process, must be the guide for analyzing these claims.") (cleaned up). Accordingly, Jusino's complaints about Prompt Care are not properly considered under the Fourteenth Amendment Due Process Clause. [3] Accordingly, I dismiss Jusino's claims of Fourteenth Amendment due process violations against Defendants Gallagher, Furtick, Barone, Doran, and Shea as not plausible. *See* 28 U.S.C. § 1915A(b).

### B. Eighth Amendment Deliberate Indifference

Next, Jusino contends that Defendants Caplan, Gallagher, Barone, Doran, Alvarez, Shea, Doran and Furtick acted with deliberate indifference by failing to provide him with adequate medical attention for his physical therapy needs. *See* Third Am. Compl., Doc. No. 16, at ¶¶ 29–37.

The Eighth Amendment prohibits "deliberate indifference to serious medical needs of prisoners," whether "manifested by prison doctors in their response to the prisoner's needs or by prison guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed." Estelle v. Gamble, 429 U.S. 97, 104–05 (1976) (cleaned up). However, "not every lapse in medical care is a constitutional wrong." Salahuddin v. Goord, 467 F.3d 263, 279 (2d Cir. 2006). To determine whether a plaintiff has plausibly stated an Eighth Amendment deliberate indifference claim, courts engage in a two-prong inquiry. Id. 279–80.

Case 9:22-cv-00102-BKS-ML    Document 78    Filed 12/13/23    Page 348 of 373

Jusino v. Gallagher, Not Reported in Fed. Supp. (2022)

The first prong is an objective standard and considers whether the medical condition is "sufficiently serious." *Farmer v. Brennan*, 511 U.S. 825, 834 (1994) (quoting *Wilson v. Seiter*, 501 U.S. 294, 298 (1991)). The Second Circuit has stated that a medical need is serious if it presents "a condition of urgency that may result in degeneration or extreme pain." *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998) (cleaned up). Among the relevant factors to consider are "[t]he existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain." *Id.* (quoting *McGuckin v. Smith*, 974 F.2d 1050, 1059–60 (9th Cir. 1992)). When the offending conduct is failure to treat, a court examines "the severity of the prisoner's underlying medical condition;" however, if the allegedly offending conduct is delayed treatment, a court considers "the severity of the temporary deprivation alleged by the prisoner." *Smith v. Carpenter*, 316 F.3d 178, 186 (2d Cir. 2003).

The second prong is a subjective standard requiring a plaintiff to demonstrate that the defendant acted with the requisite culpable mental state similar to that of criminal recklessness. *See Salahuddin*, 467 F.3d at 280. Negligence—which might support a claim for medical malpractice—does not rise to the level of deliberate indifference and is not cognizable under section 1983. *See Green v. McLaughlin*, 480 F. App'x 44, 48 (2d Cir. 2012). To know of and disregard an excessive risk to the plaintiff's health or safety, the defendant must be actually "aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Darnell v. Pineiro*, 849 F.3d 17, 32 (2d Cir. 2017) (citing *Brennan*, 511 U.S. at 837); *Salahuddin*, 467 F.3d at 281 (noting that the "charged official must be subjectively aware that his conduct creates [substantial] risk [of harm]").

**\*5** Finally, "[i]t is well settled in this Circuit that personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994) (cleaned up). That is true for supervisory officials, too. *See Tangreti v. Bachmann*, 983 F.3d 609, 620 (2d Cir. 2020) (explaining that to "hold a state official liable under [ section] 1983, a plaintiff must plead and prove the elements of the underlying constitutional violation directly against the official without relying on a special test for supervisory liability").

### *1. Objective Prong*

Construed most liberally in Jusino's favor, his allegations are sufficient to satisfy the objective prong. Jusino has alleged that he suffered from injuries that impaired his ability to engage in daily activities, interfered with his sleep, and caused him pain that increased during his participation in the Wellness Program. *See* Third Am. Compl., Doc. No. 16, at ¶¶ 15, 18, 26. Case law suggests that allegations of "severe pain ... [and] reduced mobility" in the shoulder are sufficient to raise a material issue of fact about a serious medical need. *Sereika v. Patel*, 411 F. Supp. 2d 397, 406 (S.D.N.Y. 2006). Likewise, a condition that hinders an inmate's ability to sleep can constitute a serious condition that satisfies the Eighth Amendment objective element. *See Walker v. Schult*, 717 F.3d 119, 127 (2d Cir. 2013) ("sleep is critical to human existence, and conditions that prevent sleep have been held to violate the Eighth Amendment"). Beyond this, Jusino has also alleged that he has yet to receive treatment. [4] Taken together, I conclude that Jusino has sufficiently alleged the objective element of the Eighth Amendment analysis.

### *2. Subjective Prong*

Next, I must consider whether Jusino has alleged that any defendant was aware of, but disregarded, his serious medical needs. To demonstrate deliberate indifference, Jusino points to several actions undertaken by the Defendants, sometimes together, or sometimes individually. I will analyze each in turn.

#### a) Claims Specific to Defendant Caplan

As I construe it, Jusino alleges that Caplan acted with deliberate indifference by failing to take four actions: (1) failing to ensure that the "Wellness Program" met his rehabilitation needs for his injuries before placing him in the

Program; (2) failing to assess his injuries sustained through the Wellness Program; (3) failing to discuss his physical therapy needs and failing to implement the physical therapy recommendations of the UCONN physical therapy specialist; and (4) refusing to prescribe him a medical mattress. *See* Third Am. Compl., Doc. No. 16, at ¶¶ 29–30, 35.

### *Placement in Wellness Program*

The act of placing Jusino in the Wellness Program in, and of itself, is not actionable under the Eighth Amendment. To begin with, it is not entirely clear from Jusino's complaint that Caplan was responsible for Jusino's placement in the Wellness Program. But even if she was, Jusino has not alleged that Caplan was aware that the Program would pose a serious risk of harm to Jusino. Without that allegation, this argument amounts to nothing more than a disagreement about a medical decision, which is insufficient to state a claim. *See Gonzalez v. Sarreck*, 2011 WL 5051341 at *18 (S.D.N.Y. Oct. 24, 2011) ("It is well settled that disagreements over medications, diagnostic techniques, forms of treatment, or the need for specialists or the timing of their intervention are insufficient under [☐ section] 1983.") (cleaned up). Caplan may have misapprehended the severity of his injuries, but she credited his complaints and provided care by placing him in the Wellness Program. Therefore, this claim is implausible, and I dismiss it. *See* 28 U.S.C. § 1915A(b).

### *Injuries Sustained During Wellness Program*

**\*6** Once Caplan was put on notice that the Wellness Program was worsening Jusino's injuries, there was an obligation to respond to that need. Yet, Jusino contends that Caplan responded to his request for medical care with only an irrelevant reference to his foot. Third Am. Compl., Doc. No. 16, at ¶ 20. One can imagine a world where Caplan's unrelated response was nothing more than an innocent mistake. Equally plausible, however, is that Caplan intentionally ignored Jusino's medical needs. Given that possibility, Jusino's allegations are sufficient to suggest that Caplan acted with conscious disregard of Jusino's medical needs regarding the injuries he sustained as a Wellness Program participant. *See Henderson v. Hannah*, 2021 WL 1565311, at *4 (D. Conn. Apr. 21, 2021) (for initial pleading purposes, plaintiff sufficiently alleged that Warden acted with conscious disregard by failing to address inmate's concerns about exercise deprivation in her response to his level one grievance). Because this act satisfies the subjective prong,

I conclude that this Eighth Amendment claim may proceed against Caplan in her individual capacity.

### *Physical Therapy Needs*

Caplan's failure to implement the recommendations by the UCONN physical therapy specialist do not rise to the level of deliberate indifference. Importantly, Jusino does not allege that he requested additional treatment after following up with the specialist. Nor does Jusino allege that Caplan intentionally disregarded the recommendations proscribed by the specialist. Instead, Jusino only posits that he never met with Caplan or any medical staff after his hospital visit, and the failure to do so violated the prison's administrative directives. Accepting that as true does nothing to bolster Jusino's argument because "failure to comply with a state law or administrative directive does not by itself establish a violation of [☐ section] 1983." *Harris v. Taylor*, 441 F. App'x 774, 775 (2d Cir. 2011). Instead, Caplan's failure to meet with Jusino to "assess his physical therapy needs" constitutes, at most, negligence. As such, this claim is dismissed. *See* 28 U.S.C. § 1915A(b).

### *Medical Mattress*

Finally, Jusino brings an Eighth Amendment claim against Caplan based on her decision not to afford him a medical mattress. Yet, Jusino fails to allege facts sufficient to plausibly infer that Caplan was aware of a substantial risk that would result from that decision. For example, Jusino states that he requested a medical mattress, but fails to allege that Caplan was aware that continuing to use his current mattress posed a substantial risk of seriously exacerbating his medical condition—as opposed to simply being uncomfortable for Jusino. In essence, Jusino disagrees with Caplan's medical decision, and is seeking to use that disagreement as a basis for an Eighth Amendment claim. He cannot. *See Stevenson v. Quiros*, 2022 WL 168799, at *8 (D. Conn. Jan. 19, 2022) (holding that, the plaintiff's claims against medical staff "amount to no more than a disagreement with their decisions not to provide him with an alternative mattress."). Accordingly, I must dismiss this claim against Caplan as not plausible. *See* 28 U.S.C. § 1915A(b).

### b) Claims Specific to Defendant Walker

As to Defendant Walker, Jusino alleges that Walker denied him medical care through her improper handling of his

Case 9:22-cv-00102-BKS-ML    Document 78    Filed 12/13/23    Page 350 of 373

Jusino v. Gallagher, Not Reported in Fed. Supp. (2022)

administrative remedies. Third Am. Compl., Doc. No. 16, at ¶ 32. A nearly identical claim was raised in Jusino's First Amended Complaint, and I dismissed it because Jusino did not "plausibly allege[ ] that Defendant Walker was aware of —and disregarded—a significant risk of substantial harm to Jusino." Initial Review Order, Doc. No. 9, at 7–8 n.4.

Here, Jusino repeats the same flaw. Yet again, his complaint is devoid of any facts about how or what Walker did specifically, other than "she had no authority on administrative remedies." Third Am. Compl., Doc. No. 16, at ¶ 32. Because Jusino's vague and conclusory allegations about Walker's conduct fail to suggest that Walker acted with a conscious disregard of his serious medical needs, I must dismiss this Eighth Amendment claim as not plausible. *See* 28 U.S.C. § 1915A(b).

**\*7** To the extent Jusino premises a 🔖 section 1983 claim on Walker's violation of the grievance procedure, that claim is also not plausible. "[I]nmate grievance programs created by state law are not required by the Constitution, and consequently allegations that prison officials violated those procedures do not give rise to a cognizable [s]ection 1983 claim." 🔖 *Alvarado v. Westchester Cty.*, 22 F. Supp. 3d 208, 214 (S.D.N.Y. 2014) (cleaned up). Accordingly, I must dismiss Jusino's claims against Walker as not plausible. *See* 28 U.S.C. § 1915A(b).

### c) Creation and Implementation of Wellness Program

Jusino claims that Defendants Gallagher, Barone, Doran, Alvarez and Caplan violated the Eighth Amendment by "creat[ing] and implement[ing]" the Wellness Program. Third Am. Compl., Doc. No. 16, at ¶¶ 31, 34. The Program was inadequate because it allowed an unqualified individual to provide physical therapy to those in need of treatment. *Id.*

Pertinently, Jusino has not alleged that any Defendant created or implemented the Wellness Program with subjective knowledge of a substantial risk of serious harm to Jusino and disregarded that risk. None of the Defendants, excluding Caplan, is even motioned in the body of Jusino's complaint. Such bare allegations are insufficient to establish that these Defendants were personally involved in any alleged constitutional violation in this case. *See* 🔖 *Grullon v. City of New Haven*, 720 F.3d 133, 138 (2d Cir. 2013). Accordingly, I dismiss the Eighth Amendment claim against Gallagher, Barone, Doran, Alvarez and Caplan based on their alleged

creation and implementation of the Wellness Program. *See* 28 U.S.C. § 1915A(b).

### d) Creation and Implementation of the Prompt Care Procedure

Similarly, Jusino asserts that Defendants Gallagher, Shea, Barone, Doran, and Furtick "acted with deliberate indifference to [his] rights by intentionally creating and implementing the procedure for 'Prompt Care' that restricted [his] access to health care." *Id.* at ¶ 33.

Once again, I conclude that Jusino has not stated facts to suggest that the Defendants were aware that creating and implementing the procedures for Prompt Care would deprive him of his access to medical care. Thus, Jusino has not plausibly alleged the subjective element of his Eighth Amendment claims against Gallagher, Shea, Barone, Doran, and Furtick, and I dismiss the claims as not plausible. *See* 28 U.S.C. § 1915A(b).

### C. First Amendment Retaliation

Rather briefly, Jusino alleges that Caplan failed to provide him with medical care because he filed a complaint about her with her supervisors. *Id.* at ¶¶ 21, 35.

A claim of First Amendment retaliation has three elements: The plaintiff must show "(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action." *Dolan v. Connolly*, 794 F.3d 290, 294 (2d Cir. 2015) (quoting 🔖 *Espinal v. Goord*, 558 F.3d 119, 128 (2d Cir. 2009)). Protected speech or activity includes filing a lawsuit, an administrative complaint, or a prison grievance. *See, e.g.*, *Townsend v. Castillo*, 2021 WL 3409326, at \*3 (D. Conn. Aug. 4, 2021); *Booth v. Comm'r of Corr.*, 2019 WL 919580, at \*5 (D. Conn. Feb. 25, 2019). An "adverse action" is "retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising constitutional rights." 🔖 *Gill v. Pidlypchak*, 389 F.3d 379, 381 (2d Cir. 2004) (cleaned up). To allege a plausible causal connection between the two, an inmate must plead facts "suggesting that the protected conduct was a substantial or motivating factor in the [defendant's] decision to take action against him." *Moore v. Peters*, 92 F. Supp. 3d 109, 121 (W.D.N.Y. 2015) (quoting

Case 9:22-cv-00102-BKS-ML    Document 78    Filed 12/13/23    Page 351 of 373

Jusino v. Gallagher, Not Reported in Fed. Supp. (2022)

*Burton v. Lynch*, 664 F. Supp. 2d 349, 367 (S.D.N.Y. 2009)) (cleaned up).

**\*8** Courts in the Second Circuit "approach prisoner retaliation claims 'with skepticism and particular care, because virtually any adverse action taken against a prisoner by a prison official—even those otherwise not rising to the level of a constitutional violation—can be characterized as a constitutionally proscribed retaliatory act.' " *Dorsey v. Fisher*, 468 F. App'x 25, 27 (2d Cir. 2012) (quoting *Davis v. Goord*, 320 F.3d 346, 352 (2d Cir. 2003)). Consequently, the Second Circuit has required that prisoner retaliation claims "be supported by specific and detailed factual allegations, not stated in wholly conclusory terms." *Dolan*, 794 F.3d at 295 (cleaned up).

Jusino has alleged his retaliation claim against Caplan in wholly conclusory terms. As a preliminary matter, I take as true that Jusino engaged in protected activity by filing a complaint. Additionally, I recognize that a failure to provide medical care can constitute adverse action for purposes of First Amendment retaliation. *See Abreu v. Lipka*, 778 F. App'x 28, 33 (2d Cir. 2019) ("[W]ithholding of medication could constitute sufficiently adverse actions that would deter a prisoner of ordinary firmness from exercising his rights.") (cleaned up). But Jusino has not alleged facts about when he filed his complaint or whether Caplan was even aware of his complaint against her so as to raise an inference of a causal connection between his protected activity and Caplan's allegedly retaliatory refusal to provide him with medical attention. *See Thomas v. Jacobs*, 2022 WL 504787, at \*15 (S.D.N.Y. Feb. 17, 2022) (noting that circumstantial facts such as temporal proximity or a retaliator's knowledge of the protected activity can suggest a causal connection).

Because Jusino has not alleged "specific and detailed facts" to support a plausible causal connection between the alleged adverse failure to provide him with medical attention and his protected activity, I must dismiss Jusino's First Amendment retaliation claim against Caplan as not plausible. *See* 28 U.S.C. § 1915A(b).

### D. Official Capacity Claims

As an initial matter, any damages sought against Defendants (who are state employees) in their official capacities are barred by the Eleventh Amendment. *See Kentucky v.*

*Graham*, 473 U.S. 159, 169 (1985). However, the Eleventh Amendment does not bar Jusino from seeking prospective injunctive relief for an ongoing constitutional violation from a state official in his or her official capacity. *See Edelman v. Jordan*, 415 U.S. 651, 677 (1974); *see also In re Deposit Ins. Agency*, 482 F. 3d 612, 617 (2d Cir. 2007) ("[A] plaintiff may sue a state official acting in his official capacity – notwithstanding the Eleventh Amendment – for 'prospective injunctive relief from violations of federal law.' ") (cleaned up). That exception, however, "does not permit judgments against state officers declaring that they violated federal law in the past." *Puerto Rico Aqueduct & Sewer Auth. v. Metcalf & Eddy*, 506 U.S. 139, 146 (1993). Instead, under the exception, "suits for prospective relief against an individual acting in his official capacity may be brought to end an ongoing violation of a federal law." *Vega v. Semple*, 963 F.3d 259, 281 (2d Cir. 2020).

Jusino seeks injunctive relief ordering that he be provided with adequate medical care, including an examination by a medical professional qualified to assess and diagnose his injuries, medication for his pain, appropriate physical therapy, and a medical mattress. Third Am. Compl, Doc. No. 16, at 11. I have determined that Jusino has alleged one plausible Eighth Amendment claim based on Caplan's failure to provide him medical treatment for his injuries sustained during his participation in the Wellness Program. Because he alleges that he is still in extreme pain, I construe his complaint most generously to state an ongoing Eighth Amendment deliberate indifference claim based on lack of medical attention for his injuries. Accordingly, I will permit Jusino to proceed on his official capacity claim for medical treatment including physical therapy for his injuries against Caplan in her official capacity. Jusino's remaining claims for injunctive relief must be denied because those claims fail to state a plausible ongoing constitutional violation.

### ORDERS

**\*9** The Court enters the following orders:

(1) Consistent with the foregoing discussion, Jusino may proceed on his claim against Defendant Jean Caplan in her individual and official capacities for an Eighth Amendment violation based on deliberate indifference to his medical treatment needs for his injuries sustained during his participation in the Wellness Program. All other claims are DISMISSED. Thus, Defendants Gallagher, Shea, Walker,

Furtick, Barone, Doran, and Alvarez are DISMISSED from this action.

(2) Because Jusino has paid the filing fee in this case, and he has not been granted *in forma pauperis* status, he is responsible for serving the Third Amended Complaint on Jean Caplan in her individual and official capacities within 90 days of the date of this Order pursuant to Rule 4, Fed. R. Civ. P. If Jusino has questions about service of the Third Amended Complaint, he may contact the Inmate Legal Aid Program ("ILAP"). Failure to effect service within the time specified may result in the dismissal of this action as to a defendant who has not been served.

The Clerk is directed to send Jusino instructions for service of the complaint on Defendant Caplan in her **individual and official** capacities, together with one copy of the Third Amended Complaint, one copy of this order, one blank Notice of Lawsuit forms, one blank Waiver of Service of Summons forms, and one summons form completed and issued by the Clerk for APRN Caplan in her **official** capacity using the address of the Office of the Attorney General, 165 Capitol Avenue, Hartford, Connecticut 06160.

(3) Jusino shall effect service of the Third Amended Complaint on Jean Caplan in her individual capacity by mailing a Notice of Lawsuit form, a Waiver of Service of Summons form, a copy of the Third Amended Complaint, and a copy of this order to Jean Caplan. **Jusino shall file a notice with the Clerk indicating the date on which he mailed the Notice of Lawsuit and Waiver of Services of Summons forms to Jean Caplan in her individual capacity. Jusino shall also file with the Clerk the signed Waiver of Service of Summons form that he receives from Caplan in her individual capacity.**

(4) Jusino shall also effect service of the Third Amended Complaint on Jean Caplan in her **official** capacity by serving a copy of the summons, Third Amended Complaint, and this order on Jean Caplan using the address of the Office of the Attorney General, 165 Capitol Avenue, Hartford, Connecticut 06160. **He shall also file a return of service documenting when Jean Caplan was served in her official capacity with a copy of the Third Amended Complaint.**

(5) The clerk shall send a courtesy copy of the Third Amended Complaint and this Order to the DOC Office of Legal Affairs and the Office of the Attorney General.

(6) Defendant Caplan shall file a response to the Third Amended Complaint, either an answer or motion to dismiss, within **sixty (60) days** from the date the notice of lawsuit and waiver of service of summons forms are mailed to her. If Defendant Caplan chooses to file an answer, she shall admit or deny the allegations and respond to the cognizable claims recited above. She may also include any and all additional defenses permitted by the Federal Rules.

**\*10** (7) Discovery, according to Federal Rules of Civil Procedure 26-37, shall be completed within **six months (180 days)** from the date of this Order. Discovery requests need not be filed with the Court.

(8) The parties must comply with the District of Connecticut "Standing Order Re: Initial Discovery Disclosures," which will be sent to both parties by the Court. The Order can also be found at http://ctd.uscourts.gov/administrative-standing-orders.

(9) All motions for summary judgment shall be filed within **seven months (210 days)** from the date of this Order.

(10) According to Local Civil Rule 7(a), a nonmoving party must respond to a dispositive motion within **twenty-one (21) days** of the date the motion was filed. If no response is filed, or the response is not timely, the dispositive motion can be granted absent objection.

(11) If Jusino changes his address at any time during the litigation of this case, Local Court Rule 83.1(c)2 provides that he MUST notify the Court. Failure to do so can result in the dismissal of the case. Jusino must give notice of a new address even if he is incarcerated. He should write "PLEASE NOTE MY NEW ADDRESS" on the notice. It is not enough to just put the new address on a letter without indicating that it is a new address. If Jusino has more than one pending case, he should indicate all of the case numbers in the notification of change of address. He should also notify Defendant or defense counsel of his new address.

(12) Jusino shall utilize the Prisoner Efiling Program when filing documents with the court. Jusino is advised that the Program may be used only to file documents with the court. Local court rules provide that discovery requests are not filed with the court. D. Conn. L. Civ. R. 5(f). Therefore, discovery requests must be served on defendant's counsel by regular mail.

Jusino v. Gallagher, Not Reported in Fed. Supp. (2022)

Case 9:22-cv-00102-BKS-ML    Document 78    Filed 12/13/23    Page 353 of 373

It is so ordered.

**All Citations**

Not Reported in Fed. Supp., 2022 WL 2078159

## Footnotes

1    Jusino has incorrectly titled this complaint as the "Second Amended Complaint." It is, however, the Third Amended Complaint. In addition, my prior order directing the clerk to docket this complaint as the Second Amended Complaint, doc. no. 15, was incorrect.

2    As I explained in my prior initial review order, Jusino has filed a separate lawsuit regarding that alleged constitutional deprivation. *See* Initial Review Order, Doc. No. 9.

3    The Court recognizes that the Eighth Amendment applies to the States through the Fourteenth Amendment. *See* *Phelps v. Kapnolas*, 308 F.3d 180, 185 (2d Cir. 2002) (cleaned up).

4    Although Jusino alleges that he never received any evaluation of those injuries, that claim is seemingly contradicted by the fact that he has affirmatively pled that he received some sort of care at the UCONN hospital. Nevertheless, I decline to reconcile that apparent inconsistency at this stage. His complaint, at the bare minimum, would suggest that he is alleging a delay in treatment. *See* *Fisk v. Letterman*, 401 F. Supp. 2d 362, 368 (S.D.N.Y. 2005) ("The Court, however, is not obliged to reconcile plaintiff's own pleadings that are contradicted by other matters asserted or relied upon or incorporated by reference by a plaintiff in drafting the complaint.")

**End of Document**    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

Case 9:22-cv-00102-BKS-ML Document 78 Filed 12/13/23 Page 354 of 373

Hayes v. Dahkle, Not Reported in Fed. Supp. (2018)

KeyCite Red Flag - Severe Negative Treatment

Affirmed in Part, Reversed in Part and Remanded by Hayes v. Dahlke, 2nd Cir.(N.Y.), October 5, 2020

2018 WL 7356343

Only the Westlaw citation is currently available.

United States District Court, N.D. New York.

Taheen HAYES, Plaintiff,

v.

T. DAHKLE, et al., Defendants.

No. 9:16-CV-1368 (TJM/CFH)

|

Signed 12/11/2018

**Attorneys and Law Firms**

Taheen Hayes, 05-A-3850, Elmira Correctional Facility, P.O. Box 500, Elmira, New York 14902, Plaintiff pro se.

OF COUNSEL: HELENA O. PEDERSON, ESQ., Assistant Attorney General, Atorney General for the State of New York, The Capitol, Albany, New York 12224, Attorney for Defendants.

**REPORT-RECOMMENDATION AND ORDER** [1]

Christian F. Hummel, U.S. Magistrate Judge

**\*1** Plaintiff pro se Taheen Hayes ("plaintiff"), an inmate who was, at all relevant times, in the custody of the New York Department of Corrections and Community Supervision ("DOCCS"), brings this action pursuant to 42 U.S.C. § 1983, alleging that defendants, Superintendent ("Supt.") Daniel F. Martuscello, Deputy Superintendent of Security ("DSS") Raymond Shanley, Corrections Officer ("C.O.") T. Dahkle, C.O. Jason A. Meier, C.O. Gregory E. Langtry, C.O. Stephen A. Bence, C.O. E. Coon, C.O. K. Hoffman, and Officer Rehabilitation Counselor ("O.R.C.") James Iarusso – who, at all relevant times, were employed at Coxsackie Correctional Facility ("Coxsackie") – violated his constitutional rights under the First and Eighth Amendments. Dkt. No. 12 ("Am. Compl."). Presently pending before the Court is defendants' Motion for Partial Summary Judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure ("Fed. R. Civ. P."). Dkt. No. 58. Plaintiff opposed defendants' motion, and defendants filed a reply. Dkt. Nos. 67, 69. For

the following reasons, it is recommended that defendants' motion be granted on the basis of plaintiff's failure to exhaust his claims, excluding his Eighth Amendment sexual assault claim. As to plaintiff's sexual assault claim, it is recommended that such claim be dismissed on the merits. Alternatively, if the District Judge should not agree with the undersigned's recommendation as to plaintiff's failure to exhaust, it is recommended that defendants' motion be granted in part and denied in part.

### I. Background

#### A. Plaintiff's Recitation of the Facts

The facts are related herein in the light most favorable to plaintiff as the nonmoving party. See subsection II infra. On or about April 15, 2016, C.O. Dahkle subjected plaintiff to sexual abuse and retaliated against him in response to plaintiff's February 2016 grievance against him. Am. Compl. ¶ 1. While conducting the frisk, C.O. Dahkle "had his lower body (genitals) pressed up against [plaintiff's] butt" and tightly pressed his hands down plaintiff's back and "into the crack of his butt (inside) all the way down and around [his] [groin]." Id. ¶ 4. During the subsequent search of plaintiff's cell, C.O. Dahkle asked, "[d]o you consider yourself a male or female?" and "[d]o you suck dick or fuck men?" Id. ¶ 6. On April 16, 2016, plaintiff reported the incident to the Prison Rape Elimination Act ("PREA") hotline. Id. ¶ 7. The next day, plaintiff again reported the incident to the PREA hotline and filed a grievance with Coxsackie. Id. ¶¶ 8-9. On April 18, 2016, plaintiff reported the sexual assault to Supt. Martuscello during the Superintendent's "rounds" in the cafeteria. Id. ¶ 10. Supt. Martuscello informed plaintiff that someone would contact him about the incident. Id. ¶ 11. Later that day, plaintiff was interviewed by the Office of Mental Health and Coxsackie Medical staff. Id. ¶ 12.

On May 15, 2016, C.O. Hoffman "falsified a misbehavior report which subjected [plaintiff] to confinement for retaliation ... because [plaintiff] filed a sexual assault complaint against T. Dahkle and was rumored by Coxsackie Correctional Officers to be working with the Office of Special Investigation." Am. Compl. ¶¶ 19, 20. The following day, plaintiff was placed in keeplock [2] pending a disciplinary hearing for C.O. Hoffman's misbehavior report. Id. ¶ 20.

**\*2**  On May 16, 2016, plaintiff met with C.O. Meier and non-party C.O. Rowe. Am. Compl. ¶ 21. When asked why he was keeplocked, plaintiff explained C.O. Hoffman's alleged retaliatory misbehavior report. Id. C.O. Meier called plaintiff a "fucking liar" and stated that he heard plaintiff telling other inmates to call the PREA hotline and falsely report incidents of sexual abuse. Id. Plaintiff assured C.O. Meier that he was mistaken, and C.O. Meier became "very upset" and agitated and ordered plaintiff back to his cell. Id. ¶¶ 21, 22. Later that day, plaintiff attended his keeplock admission interview with a non-party nurse while in the presence of C.O. Meier and C.O. Rowe. Id. ¶ 23. The nurse asked plaintiff if he had been sexually abused while in Coxsackie. Id. ¶ 24. When plaintiff answered affirmatively, C.O. Meier "went crazy," yelling, "faggots like you get C.O.'s [sic] fucking fired. You want to play these fucking games?" Id. C.O. Meier pointed his fingers directly in plaintiff's face and threatened to "fuck [plaintiff] up right now." Id. ¶¶ 26, 27.

On May 17, 2016, plaintiff was transferred to the Special Housing Unit ("SHU"). [3] Am. Compl. ¶ 30. On May 23, 2016, plaintiff again expressed his fear and frustrations about his safety to Supt. Martuscello and DSS Shanley, showing them the allegedly false May 15, 2016 misbehavior report from C.O. Hoffman and explaining C.O. Meier's threats. Id. ¶ 32. Supt. Martuscello and DSS Shanley told plaintiff to resolve his problems at an upcoming disciplinary hearing. Id.

On May 26, 2016, plaintiff filed a grievance for the "constant retaliatory practices by way of disciplinary action and harrasment [sic] from C.O. Hoffman, threats from C.O. Meier for filing grievances and a sexual complaint on Dahkle." Am. Compl. ¶ 36. In this grievance, plaintiff also "raise[d] the issue of the failure to protect" and how he feared for his life. Id. Plaintiff sent a copy of this grievance to Supt. Martuscello. Id. On June 10, 2016, plaintiff was released from SHU. Id. ¶ 37. When plaintiff asked his O.R.C. Counselor why a disciplinary hearing for C.O. Hoffman's misbehavior report had never been conducted, the Counselor told him that the misbehavior report did not exist. Id.

On June 11, 2016, Supt. Martuscello and DSS Shanley ordered plaintiff to the Captain's office. Am. Compl. ¶ 39. Supt. Martuscello yelled at plaintiff for filing complaints about the alleged sexual assault and other harassment to outside New York State agencies. Id. DSS Shanley warned plaintiff that because he was the Deputy Director of Security, if plaintiff initiated any further complaints, "anything [could] happen to [him]" for "security reasons." Id. Supt. Martuscello

threatened that if plaintiff continued to "make an issue," he would place him back in SHU. Id. ¶ 41. Four days later, plaintiff filed a grievance regarding this meeting. Id. ¶ 42. Plaintiff also filed a complaint with non-party Anthony J. Annucci, the acting Commissioner of DOCCS, regarding the sexual abuse, threats, harassment, and retaliatory practices he experienced at Coxsackie. Id.

On June 20, 2016, plaintiff was transferred to a different housing unit. Am. Compl. ¶ 43. Upon arrival, C.O. Hoffman stated, "[d]on't get comfortable Hayes, you'll be out of here soon." Id. C.O. Hoffman further stated, "you mess with one of us (C.O.'s) you got to deal with all of us." Id. On July 7, 2016, C.O. Hoffman banged on plaintiff's cell, and told him that the May 15, 2016 misbehavior report he filed against plaintiff "don't [sic] exist" and that "Dahkle said hi." Id. ¶ 47.

On July 12, 2016, plaintiff attended a grievance hearing concerning a recent grievance for SHU mail pickup. Am. Compl. ¶ 48. O.R.C. Iarusso was present at the hearing. Id. Plaintiff requested permission to inquire about his grievance against Supt. Martuscello and DSS Shanley that had not been filed, and O.R.C. Iarusso denied that request, stating that he did not care about plaintiff's grievance. Id. ¶¶ 48, 49. He further informed plaintiff that he had thrown away plaintiff's grievance and that "as far as [he] was concerned, any grievances about the Superintendent [he] would never personally file anyway." Id.

**\*3**  On July 30, 2016, C.O. Meier attacked plaintiff from behind and slammed him into the ground. Am. Compl. ¶ 55. C.O. Meier then sat on plaintiff's back and repeatedly punched him in the back, head, and face with closed fists. Id. ¶ 56. C.O. Langtry, C.O. Bence, and C.O. Coon joined in, kicking and punching plaintiff all over his body as he lay handcuffed on the floor. Id. ¶ 57.

### B. Defendants' Recitation of the Facts

In support of this motion, defendants filed a Statement of Material Facts. [4]

### 1. April 15, 2016 Pat Frisk

On April 15, 2016, plaintiff was the subject of a scheduled, routine cell search that had been pre-approved by DSS Shanley. Dkt. No. 58-3 ¶ 4. C.O. Dahkle carried out the

search. Id. Pursuant to DOCCS policy, plaintiff was pat frisked prior to the cell search. Id. ¶¶ 5, 6. As part of the pat frisk, C.O. Dahkle patted down plaintiff's arms, shoulders, chest, back, each leg, in between each leg, and along the front of plaintiff's pants' zipper. Id. ¶ 8. C.O. Dahkle conducted the entire pat frisk outside of plaintiff's clothing. Id. "The standards for inspection of an inmate's person allow for contact with the genitalia, groin, breast, inner thighs, and buttocks." Id. ¶ 9. C.O. Dahkle conducted the April 15, 2016 pat frisk without incident, and no contraband was found. Id. ¶ 10.

After the pat frisk, C.O. Dahlke ordered plaintiff to stand on the wall and observe his cell being searched. Dkt. No. 58-3 ¶ 11. C.O. Dahkle did not find contraband in plaintiff's cell, and plaintiff returned to his cell. Id. Insofar as C.O. Dahkle made contact with plaintiff's genitalia or buttocks during the pat frisk, such contact was minimal and solely as a result of conducting the pat frisk. Id. ¶ 12. C.O. Dahkle did not make any sexual or derogatory comments toward plaintiff during the pat frisk. Id. ¶ 14. Nevertheless, plaintiff reported the pat frisk as an alleged sexual assault in violation of PREA. Id. ¶ 15. An investigation following the PREA complaint found no sexual contact or abuse by C.O. Dahkle. Id. ¶ 16. During plaintiff's physical examination by the medical staff, plaintiff did not complain of injuries from the April 15, 2016 pat frisk, and the medical staff did not observe any injuries. Id. ¶ 17.

### 2. May 15, 2016 Misbehavior Report

 **\*4**  On May 15, 2016, C.O. Hoffman issued plaintiff a Tier II misbehavior report, accusing plaintiff of creating a disturbance, refusing a direct order, harassment, lying, and threats. Dkt. No. 58-3 ¶ 18. Plaintiff served one day in keeplock pending review of the May 15, 2016 misbehavior report as plaintiff received a Tier III misbehavior report on May 16, 2016, "for which he would have been confined in keeplock pending review." Id. ¶ 19. Plaintiff served thirty days in keeplock and sustained a loss of certain privileges in relation to the May 16, 2016 misbehavior report. Id. Plaintiff received a Tier III misbehavior report on May 17, 2016, which resulted in ninety days in SHU and a loss of certain privileges. Id. ¶ 20.

Pursuant to the May 15, 2016 misbehavior report, C.O. Hoffman overheard plaintiff telling another inmate about calling the PREA hotline to make "bogus complaints in order to cause trouble for staff." Dkt. No. 58-3 ¶ 21. C.O.

Hoffman gave plaintiff a direct order to stop yelling, and plaintiff stated that he had not been yelling. Id. C.O. Hoffman informed plaintiff that he had overheard his conversation, and gave plaintiff a second direct order to stop yelling. Id. The misbehavior report then states that plaintiff cursed at C.O. Hoffman, and threatened to file a complaint or lawsuit against him. Id. At the time he authored the May 15, 2015 misbehavior report, C.O. Hoffman was unaware of plaintiff's PREA complaint against C.O. Dahkle. Id. ¶ 25. Although the alleged misconduct was later corroborated during a subsequent investigation, the May 15, 2016 misbehavior report was later expunged for unknown reasons. Id. ¶¶ 27, 28-29.

### 3. Plaintiff's Verbal Complaints about C.O. Meier

"To the extent that [Supt.] Martuscello and [DSS] Shanley ever advised plaintiff to handle any issue through the disciplinary process, it would have been to handle his misbehavior reports through the disciplinary process." Dkt. No. 58-3 ¶ 30. Pursuant to DOCCS policy, "an inmate's verbal complaints of threats by a Correction Officer are delegated to a Sergeant for investigation." Id. ¶ 32. If an inmate's complaint was found to be credible, then the investigation would be referred to the Office of Special Investigations ("OSI"). Id. As such, Supt. Martuscello and DSS Shanley had no personal involvement in investigating plaintiff's complaints. Id. ¶ 33. Although neither Supt. Martuscello nor DSS Shanley recall speaking with plaintiff regarding any alleged threats by C.O. Meier in May 2016, "there is no reason to believe that the process for verbal complaints did not occur." Id. ¶ 34. Moreover, Supt. Martuscello and DSS Shanley do not have the authority to transfer plaintiff to another facility. Id. ¶¶ 41, 42. Supt. Martuscello and DSS Shanley also were not responsible for C.O. assignments, and, thus, could not assign C.O. Meier to a different housing block. Id. ¶ 43. The Use of Force report concerning C.O. Meier's alleged use indicates that "only necessary and appropriate force was used to regain control of the situation, and that such force was unrelated to any alleged threats made by [C.O.] Meier." Id. ¶ 45.

### 4. June 2016 Meeting with Supt. Martuscello and DSS Shanley

Case 9:22-cv-00102-BKS-ML    Document 78    Filed 12/13/23    Page 357 of 373

Hayes v. Dahlke, Not Reported in Fed. Supp. (2018)

An inmate who has been penalized with time in SHU may have any portion of that time deferred up to 180 days. The Hearing Officer who handles the disciplinary hearing makes the decision to defer time. If the inmate has no disciplinary infractions during the deferral period, the penalty is expunged. However, if the inmate has a subsequent disciplinary infraction during the deferral period, the deferred time may be invoked following a hearing on the subsequent disciplinary infraction. The Hearing Officer, at his or her discretion, makes the decision to invoke deferred time following the hearing on the subsequent disciplinary infraction.

**\*5** Dkt. No. 58-3 ¶ 46 (internal citations omitted). Supt. Martuscello does not recall meeting with plaintiff on June 11, 2015. Id. ¶ 48. He did not threaten plaintiff with deferred SHU time, and, as Superintendent, does not make the decision as to whether to invoke an inmate's deferred SHU time. Id. ¶¶ 47, 49. If Supt. Martuscello did discuss deferred SHU time with plaintiff, "it would have been to remind Plaintiff of the rules for deferred SHU time: that if Plaintiff received a misbehavior report for a disciplinary infraction while he had deferred SHU time, the Hearing Officer could decide to invoke that deferred SHU time." Id. ¶ 51.

### 5. July 12, 2016 Grievance Hearing

On July 12, 2016, plaintiff attended a "grievance hearing" on his complaint regarding mail in SHU. Dkt. No. 58-3 ¶ 53. On that date, O.R.C. Iarusso worked as a staff representative for the Coxsackie Inmate Grievance Program ("IGP"). Id. ¶ 54. Prior to his July 12, 2016 grievance hearing, plaintiff had attempted, on multiple occasions, to discuss other grievances, including a grievance against Supt. Martuscello, after O.R.C. Iarusso told him he would look into these grievances at a later date. Id. ¶ 56. O.R.C. Iarusso informed plaintiff that the purpose of the July 12, 2016 hearing was to discuss plaintiff's grievance regarding SHU mail. Id. ¶ 56. "As part of a broader exchange, after Plaintiff's persistent questions and demands about other grievances, Defendant Iarusso told

Plaintiff that he, personally, would not file a grievance against the Superintendent." Id. ¶ 58. As a IGP Staff Representative, O.R.C. Iarusso is not responsible for filing inmate grievances. Id. ¶ 55. O.R.C. Iarusso did not tell plaintiff that he would not file plaintiff's grievance against Supt. Martuscello and DSS Shanley, and had no intention of deterring plaintiff from filing grievances against Coxsackie staff. Id. ¶¶ 59, 62. Further, O.R.C. Iarusso did not threaten to discard plaintiff's grievance against Supt. Martuscello and DSS Shanley, nor did he discard such grievance. Id. ¶¶ 63, 64. In fact, plaintiff's grievance against Supt. Martuscello and DSS Shanley was filed and consolidated with plaintiff's grievance concerning an alleged loss of programs. Id. ¶ 65.

### 6. July 30, 2016 Use of Force

On July 30, 2016, C.O. Coon and C.O. Bence "responded to a Watch Commander Response" that stated that plaintiff had attempted to assault C.O. Meier. Dkt. No. 58-3 ¶¶ 67, 68. C.O. Meier first used his body weight to restrict plaintiff's movement until at least one of plaintiff's arms could be secured, as plaintiff resisted C.O. Meier's attempts to regain control of the situation. Id. ¶ 69. C.O. Langtry then secured plaintiff's right arm behind his back. Id. ¶ 70. When C.O. Bence arrived, he assisted C.O. Meier and C.O. Langtry by securing plaintiff's left arm behind his back until mechanical restraints could be applied. Id. ¶ 71. When C.O. Coon arrived, he observed plaintiff laying on the floor with his hands secured behind his back by the other corrections officers. Id. ¶ 72. After the corrections officers secured plaintiff's arms behind his back, C.O. Coon applied mechanical restraints to plaintiff's wrists. Id. ¶ 73. An unnamed corrections officer then escorted plaintiff to the medical department. Id. ¶ 74.

C.O. Coon and C.O. Bence authored memorandum documenting their actions on July 30, 2016 using normal and ordinary DOCCS procedure following a Use of Force incident. Dkt. No. 58-3 ¶ 76. C.O. Bence used minimal force to secure plaintiff's left arm behind his back in an attempt to regain control of the situation after plaintiff's alleged attempted assault on staff and resistance. Id. ¶ 77. C.O. Coon's only role in the July 30, 2016 Use of Force incident was to apply mechanical restraints to plaintiff's wrists. Id. ¶ 79. Plaintiff's medical records indicate that, following the July 30, 2016 Use of Force incident, he sustained a cut above his eye that required stitches.

Case 9:22-cv-00102-BKS-ML    Document 78    Filed 12/13/23    Page 358 of 373

Hayes v. Dahlke, Not Reported in Fed. Supp. (2018)

## II. Discussion [5]

### A. Legal Standard

**\*6** "A court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). The moving party has the burden of showing the absence of disputed material facts by providing the Court with portions of "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which support the motion. FED. R. CIV. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). A fact is material if it may affect the outcome of the case as determined by substantive law, such that "a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "In determining whether summary judgment is appropriate, [the Court will] resolve all ambiguities and draw all reasonable inferences against the moving party." Skubel v. Fuoroli, 113 F.3d 330, 334 (2d Cir. 1997).

To avoid summary judgment, a non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Carey v. Crescenzi, 923 F.2d 18, 19 (2d Cir. 1991) (quoting Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) ) (internal quotation marks omitted). A non-moving party must support such assertions by evidence showing the existence of a genuine issue of material fact. See id. "When no rational jury could find in favor of the non-moving party because the evidence to support is so slight, there is no genuine issue of material fact and a grant of summary judgment is proper." Gallo v. Prudential Services, Ltd. P'ship, 22 F.3d 1219, 1224 (2d Cir. 1994).

Where, as here, a party seeks judgment against a pro se litigant, a court must afford the non-movant special solicitude. See Triestman v. Fed. Bureau of Prisons, 470 F.3d 471, 477 (2d Cir. 2006). As the Second Circuit has stated,

[t]here are many cases in which we have said that a pro se litigant is entitled to "special solicitude," ... that a pro se

litigant's submissions must be construed "liberally," ... and that such submissions must be read to raise the strongest arguments that they "suggest," .... At the same time, our cases have also indicated that we cannot read into pro se submissions claims that are not "consistent" with the pro se litigant's allegations, ... or arguments that the submissions themselves do not "suggest," ... that we should not "excuse frivolous or vexatious filings by pro se litigants," ... and that pro se status "does not exempt a party from compliance with relevant rules of procedural and substantive law....

Id. (citations and footnote omitted); see also Sealed Plaintiff v. Sealed Defendant, 537 F.3d 185, 191-92 (2d Cir. 2008).

### B. Exhaustion

Defendants contend that plaintiff failed to exhaust his remaining claims except for his Eighth Amendment sexual assault claim. Def. Mem. of Law at 4 n.2, 6. Plaintiff claims that administrative remedies were unavailable to him. Dkt. No. 67-1 ("Pl. Opp.") at 4-6. The Prison Litigation Reform Act ("PLRA") requires that a prisoner exhaust any administrative remedies available to him or her before bringing an action for claims arising out of his or her incarceration. See Porter v. Nussle, 534 U.S. 516, 524, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002); see also Woodford v. Ngo, 548 U.S. 81, 82, 126 S.Ct. 2378, 165 L.Ed.2d 368 (2006). The exhaustion requirement applies "to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." Porter, 534 U.S. at 532, 122 S.Ct. 983. Further, the exhaustion requirement applies even where the prisoner seeks relief not available in the administrative grievance process, such as monetary damages. Id. at 524, 122 S.Ct. 983. To exhaust administrative remedies, the inmate must complete the full administrative review process set forth in the rules applicable to the correctional facility in which he or she is incarcerated. See Jones v. Bock, 549 U.S. 199, 218, 127 S.Ct. 910, 166 L.Ed.2d 798 (2007) (internal citation omitted).

**\*7** Although the Supreme Court has deemed exhaustion mandatory, the Second Circuit has recognized that "certain caveats apply." Ruggiero v. Cty. of Orange, 467 F.3d

Case 9:22-cv-00102-BKS-ML    Document 78    Filed 12/13/23    Page 359 of 373

Hayes v. Dahlke, Not Reported in Fed. Supp. (2018)

170, 175 (2d Cir. 2006) (citation omitted). The Supreme Court recently held that "[c]ourts may not engraft an unwritten 'special circumstances' exception onto the PLRA's exhaustion requirement." Ross v. Blake, —— U.S. ——, 136 S.Ct. 1850, 1862, 195 L.Ed.2d 117 (2016). Thus, the "special circumstances" exception in Hemphill v. New York, 380 F.3d 680, 686 (2d Cir. 2004) is no longer consistent with the statutory requirements of the PLRA. Williams v. Priatno, 829 F.3d 118, 123 (2d Cir. 2016). [6]

Although Ross eliminates the "special circumstances" exception, courts must still consider the PLRA's "textual exception to mandatory exhaustion." Ross, 136 S.Ct. at 1858. Under this exception, courts must determine whether administrative remedies were "available" to a prisoner. Id. The Supreme Court identified three circumstances where administrative remedies may be unavailable to a prisoner. First, "an administrative procedure is unavailable when (despite what regulations or guidance materials may promise) it operates as a simple dead end — with officers unable or consistently unwilling to provide any relief to aggrieved inmates." Id. at 1859 (citing Booth v. Churner, 532 U.S. 731, 736, 738, 121 S.Ct. 1819, 149 L.Ed.2d 958 (2001) ). "Next, an administrative scheme might be so opaque that it becomes, practically speaking, incapable of use." Id. Lastly, administrative remedies are unavailable where "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." Id. at 1860.

**1. Did Plaintiff Exhaust his Administrative Remedies?** [7]

**\*8** Defendants do not dispute that plaintiff filed grievances pertaining to a majority of his claims in the underlying action. However, defendants argue that plaintiff "knowingly filed the complaint before he received notice of CORC's determinations" regarding his grievances. Def. Mem. of Law at 9 (emphasis omitted). On June 17, 2016, plaintiff filed a filed grievance (CX-18983-16) alleging that C.O. Hoffman falsified a misbehavior report in retaliation for plaintiff reporting an alleged sexual assault by C.O. Dahkle. Dkt. No. 58-2 ¶ 93. CORC rendered their determination on grievance CX-18983-16 on February 22, 2017, and mailed the disposition to plaintiff on March 3, 2017. Id. ¶ 94. On July

25, 2016, plaintiff filed a grievance (CX-19053-16) alleging that O.R.C. Iarusso informed plaintiff that he would not file plaintiff's grievances complaining about Supt. Martuscello. Id. ¶ 95. Plaintiff did not claim that O.R.C. Iarusso's alleged actions were retaliatory. Id. CORC rendered their determination on grievance CX-19053-16 on April 12, 2017, and mailed the disposition to plaintiff on April 22, 2017. Id. ¶ 96.

On July 25, 2016, plaintiff filed a grievance (CX-19054-16) alleging that he had been removed from his mess hall job in retaliation for filing a PREA complaint. Dkt. No. 58-3 ¶ 97. Plaintiff also alleged that when he attempted to address his removal with Supt. Martuscello and DSS Shanley, they intimidated him, and Supt. Martuscello threatened to invoke plaintiff's "deferred time" in SHU. Id. Plaintiff claimed that Supt. Martuscello and DSS Shanley intimidated and threatened him after plaintiff brought up previous complaints and grievances. Id. CORC rendered their determination on grievance CX-19054-16 on May 3, 2017, and mailed the disposition to plaintiff on June 5, 2017. Id. ¶ 98. On August 9, 2016, plaintiff filed a grievance (CX-19094-16) alleging that C.O. Meier and other unnamed corrections officers assaulted him on July 30, 2016 in retaliation for reporting an alleged sexual assault by C.O. Dahkle. Id. ¶ 99. Plaintiff also alleged that Supt. Martuscello failed to take "responsible action to protect [plaintiff's] safety" prior to the July 30, 2016 incident. Id. Plaintiff did not allege DSS Shanley failed to protect him from the alleged excessive use of force. Id. ¶ 100. CORC rendered their determination on grievance CX-19094-16 on May 31, 2017, and mailed the disposition to plaintiff on July 10, 2017. Id. ¶ 102. Plaintiff filed the original complaint in this action on November 17, 2016. See Dkt. No. 1.

It is well-settled that "the PLRA requires that an inmate plaintiff must exhaust his available administrative remedies before commencing a lawsuit in federal court with respect to prison conditions." Peoples v. Beldock, 212 F.Supp.2d 141, 142 (W.D.N.Y. 2002); see McMillian v. Walters, No. 9:16-CV-0277 (MAD/DJS), 2017 WL 8894737, at \*2 (N.D.N.Y. Dec. 18, 2017) ("The defendant bears the burden of proving that the administrative remedies available to the plaintiff were not exhausted prior to the initiation of a civil action.") (citation omitted); White v. Drake, No. 10-CV-1034 (GTS/DRH), 2011 WL 4478988, at \*3 (N.D.N.Y. Aug. 11, 2011) ("Included within the IGP's exhaustion requirement is the prerequisite that the inmate file an appeal with CORC and receive a response from CORC prior to filing a federal lawsuit.") (citation omitted).

Case 9:22-cv-00102-BKS-ML    Document 78    Filed 12/13/23    Page 360 of 373

Hayes v. Dahlke, Not Reported in Fed. Supp. (2018)

The record is clear that plaintiff filed this action on November 17, 2016, and, at that time, CORC had yet to issue decisions on grievances CX-18983-16; CX-19053-16; CX-19054-16; and CX-19094-16. See Dkt. No. 58-18 at 9-21. DOCCS IGP Assistant Director Rachael Seguin declared that, based on her review of DOCCS records, CORC mailed their determinations on plaintiff's grievances CX-18983-16; CX-19053-16; CX-19054-16; and CX to the Coxsackie Inmate Grievance Review Committee ("IGRC") for transmittal to plaintiff on March 3, 2017; April 22, 2017; June 5, 2017; and July 10, 2017 – nearly three and a half months after plaintiff commenced this action. See Dkt. No. 58-18 ("Seguin Decl.") ¶¶ 16, 20, 24, 28. Moreover, the undersigned notes that the fact that plaintiff received the CORC responses after the filing of his original complaint does not cure the procedural defect. See Gizewski v. New York State Dep't of Corr. & Cmty. Supervision, No. 9:14-CV-0124(GTS/DJS), 2016 WL 3661434, at *13 (N.D.N.Y. July 5, 2016) ("It is well established that [r]eceiving a decision from CORC after filing a federal lawsuit does not satisfy the PLRA's requirement that administrative remedies be exhausted before filing suit, and any claim not exhausted prior to commencement of the suit must be dismissed without prejudice.") (internal quotation marks and citations omitted). Thus, the record is clear that plaintiff did not fully exhaust his administrative remedies prior to filing this lawsuit as CORC's decisions were outstanding. See Peoples, 212 F.Supp.2d at 142; McMillian, 2017 WL 8894737, at *2; White, 2011 WL 4478988, at *3.

### 2. Availability of Administrative Remedies

**\*9** Plaintiff contends that he should be excused from the exhaustion requirement because administrative remedies were unavailable to him "due to the three rules of 🚩Ross v. Blake." Pl. Opp. at 4-5. First, plaintiff maintains that he "appealed every grievance in this instant matter to the CORC," and after CORC failed to respond within the thirty-day time frame, he "didn't know what else to do." Id. at 5. Second, plaintiff claims that he was confused how to grieve his retaliation claims as he had been "directed to write the Office of Special Investigation," but never received a reply. Id. at 6. Finally, plaintiff contends that Supt. Martuscello, DSS Shanley, C.O. Hoffman, O.R.C. Iarusso, and C.O. Meier "individually and collectively thwarted him from using the grievance process." Id.

As to plaintiff's claim that the grievance process was unavailable due to CORC's delay in rendering their decision on his grievances, the undersigned notes that this is a close question. There is no dispute that plaintiff completed the grievance procedure as to grievances CX-18983-16, CX-19053-16, CX-19054-16, and CX-19094-16. See Dkt. No. 58-18 at 9-21. Courts within this Circuit are split as to whether a delay by CORC constitutes unavailability that would excuse a plaintiff's failure to exhaust his administrative remedies. Compare Casey v. Brockley, No. 9:13-CV-01271 (DNH/TWD), 2015 WL 8008728, at *6 (N.D.N.Y. Nov. 9, 2015), report-recommendation and order adopted by 2015 WL 7864161 (N.D.N.Y., Dec. 03, 2015) ("CORC's failure to act within the time frame set out in the regulations does not constitute a special circumstance justifying the failure to exhaust.") and 🚩Ford v. Smith, No. 9:12-CV-1109 (TJM/TWD), 2014 WL 652933, at *3 (N.D.N.Y. Feb. 19, 2014) (concluding that CORC's six month delay in responding to his appeal did not render the grievance process unavailable) with 🚩Rossi v. Fischer, No. 13-CV-3167 (PKC)(DF), 2015 WL 769551, at *6 (S.D.N.Y. Feb. 24, 2015) ("Because prison officials failed to respond to plaintiff's grievance within the 30 day time limit set by regulation, administrative remedies were not available to the plaintiff and dismissal for failure to exhaust is not appropriate.") and 🚩Peoples v. Fischer, No. 11 Civ. 2694(SAS), 2012 WL 1575302, *6 (S.D.N.Y. 2012) on reconsideration in part, 898 F.Supp.2d 618 (S.D.N.Y. 2012) ("When a prisoner complies with all of the administrative requirements and makes a good-faith effort to exhaust, he should not be denied the opportunity to pursue his grievance in federal court simply because the final administrative decision maker has neglected to issue a final administrative determination.").

In 🚩High v. Switz, this Court excused the plaintiff's failure to exhaust his administrative remedies

> where the plaintiff had taken all steps he could to fulfill the last step of the appeal process; where CORC had neglected to respond, not just during the thirty day time limit, but for a period of numerous months thereafter; where CORC had further neglected to respond when Plaintiff wrote to CORC regarding the status of his appeal;

Case 9:22-cv-00102-BKS-ML    Document 78    Filed 12/13/23    Page 361 of 373

Hayes v. Dahlke, Not Reported in Fed. Supp. (2018)

and where CORC had only ultimately decided the appeal a year later, after the present [motion] had been filed.

🏴 High v. Switz, No. 9:17-CV-1067 (LEK/DJS), 2018 WL 3736794, at *5 (N.D.N.Y. July 9, 2018), report-recommendation adopted by 2018 WL 3730175 (N.D.N.Y., Aug. 6, 2018). Although plaintiff authored letters dated August 11, 2016 and September 10, 2016 requesting to appeal grievances CX-18983-16 and CX-19094-16 directly to CORC due to the Superintendent's failure to render a decision within the twenty-five calendar day time limit, see Seguin Decl. ¶¶ 14, 26; Dkt. No. 58-5 at 16, 44-45, plaintiff has not proffered evidence that he wrote to the Coxsackie IGRC or CORC regarding the timeliness of CORC's response. See 7 N.Y.C.R.R § 701.5(d)(3)(i) ("If a grievant does not receive a copy of the written notice of receipt [by CORC] within 45 days of filing an appeal, the grievant should contact the IGP supervisor in writing to confirm that the appeal was filed and transmitted to CORC.").

*10 Unlike the plaintiff in 🏴 High, there is no indication in the record that plaintiff wrote to CORC regarding the status of his appeal and CORC further neglected to respond. See 🏴 2018 WL 3736794, at *5. Thus, the undersigned concludes that CORC's delay in rendering a decision on plaintiff's grievances did not excuse plaintiff from the exhaustion requirement. See Couvertier v. Jackson, No. 9:12-CV-1282 (DNH/DEP), 2014 WL 2781011, at *5 (N.D.N.Y. June 19, 2014) ("An administrative delay in processing or deciding an inmate's appeal of a grievance, however, does not constitute a special circumstance justifying excusal of the exhaustion requirement.") (citing 🚩 Ford v. Smith, No. 12-CV-1109, 2014 WL 652933, at *3 (N.D.N.Y. Feb. 19, 2014) ) ("CORC's failure to act within the time frame set out in the regulations does not constitute special circumstances justifying the failure to exhaust."); cf. 🏴 Henderson v. Annucci, No. 14-CV-445A, 2016 WL 3039687, at *10 (W.D.N.Y. Mar. 14, 2016) ("Since plaintiff has been awaiting a decision from CORC for more than two years with respect to his grievance relating to the October 22, 2013 incident, such an administrative remedy is no longer available to him for purposes of exhaustion under the PLRA.").

Next, plaintiff claims that he was confused how to grieve his retaliation claims as he had been "directed to write the Office of Special Investigation," but never received a reply. Pl. Opp. at 6. Plaintiff further states that "through the confusing text and decision [he] didn't know what to do or who should he address the retaliation from defendants about his PREA complaints." Id. In support of his argument, plaintiff cites to five entries in the record, including (1) the CORC decision's for grievances CX-18983-16, CX-19054-16, and CX-19094-16; (2) an email from non-party IGP Coordinator Chris VanBergen to the Office of Special Investigations stating that grievance CX-19054-16 appears to be related to plaintiff's April 17, 2016 PREA complaint, and forwarding that grievance to that office "for whatever action is deemed appropriate"; and (3) a memorandum authored by non-party Lt. E. Pahl, dated September 21, 2016, concerning grievance CX-19094-16 and C.O.'s Meier's alleged use of excessive force. See Dkt. No. 58-5 at 731, 761, 767, 775, 788. To the extent that plaintiff's argument can be interpreted as suggesting that he was unsure how to grieve his retaliation claim against O.R.C. Iarusso, this claim must fail. It is clear that plaintiff knew of the grievance process at Coxsackie, as he appealed the grievances in this action to CORC; moreover, plaintiff filed at least two grievances alleging retaliation by Coxsackie staff members in the underlying action. See generally Dkt. No. 58-5. Thus, plaintiff's argument suggesting that he was confused as to how to file a retaliation grievance is misplaced.

Finally, plaintiff contends that defendants Supt. Martuscello, DSS Shanley, C.O. Hoffman, C.O. Meier, and O.R.C. Iarusso thwarted him from using the grievance process. Pl. Opp. at 6. Plaintiff claims that "every[ ]time [he] use[d] the Coxsackie grievance system to report misconduct or retaliation from defendants ... [he] was further retaliated against." Dkt. No. 67-3 ¶ 65. "Administrative remedies are not available if prison officials 'interfere[ ] with an inmate's pursuit of relief' by, for example, misinforming an inmate as to the applicability of the grievance process to the inmate's claims." Kendall v. Cuomo, No.1:12-CV-3438 (ALC)(RLE), 2017 WL 4162338, at *3 (S.D.N.Y. Sept. 19, 2017) (citing 🏴 Ross, 136 S.Ct. at 1860); see also 🏴 Veloz v. New York, 339 F.Supp.2d 505, 515-16 (S.D.N.Y. 2004) (noting that "[w]hen an inmate's reasonable attempts to exhaust administrative remedies are impeded by a correctional officer" the remedy is unavailable). The undersigned concludes that there is no evidence in the record that any of the defendants interfered with plaintiff's pursuit of the grievance procedure. In fact, the record clearly establishes that plaintiff was able to access the grievance

Case 9:22-cv-00102-BKS-ML    Document 78    Filed 12/13/23    Page 362 of 373

Hayes v. Dahkle, Not Reported in Fed. Supp. (2018)

process as he filed six grievances while housed at Upstate. See Seguin Decl. at 9.

**\*11** As plaintiff's bare assertions that defendants thwarted his attempts to file grievances are insufficient to render the grievance process unavailable, defendants have met their burden of showing that plaintiff has failed to exhaust his administrative remedies as to all of his remaining claims, with the exception of his Eighth Amendment sexual assault claim. Accordingly, it is recommended that defendants' Motion for Partial Summary Judgment be granted as to these claims.

### C. Eighth Amendment

### 1. Sexual Assault Claims

Plaintiff claims that C.O. Dahkle sexually assaulted him during a pat frisk on April 15, 2016. Am. Compl. ¶ 1. Defendants argue that plaintiff's Eighth Amendment claim must fail because any contact C.O. Dahkle made with plaintiff's body was incidental and a necessary component of the pat frisk. Def. Mem. of Law at 10-13. "Because sexual abuse of a prisoner by a corrections officer may constitute serious harm inflicted by an officer with a sufficiently culpable state of mind, allegations of such abuse are cognizable as Eighth Amendment claims." Boddie v. Schnieder, 105 F.3d 857, 861 (2d Cir. 1997).

In Crawford v. Cuomo, the Second Circuit stated that a single incident of sexual abuse may violate the Eighth Amendment if it is "sufficiently severe or serious." 796 F.3d 252, 257 (2d Cir. 2015). The Crawford Court explained:

> [t]o show that an incident or series of incidents was serious enough to implicate the Constitution, an inmate need not allege that there was penetration, physical injury, or direct contact with uncovered genitalia. A corrections officer's intentional contact with an inmate's genitalia or other intimate area, which serves no penological purpose and is undertaken with the intent to gratify the officer's sexual desire or humiliate the inmate,

violates the Eighth Amendment. Similarly, if the situation is reversed and the officer intentionally brings his or her genitalia into contact with the inmate in order to arouse or gratify the officer's sexual desire or humiliate the inmate, a violation is self-evident because there can be no penological justification for such contact.

Id. Ultimately, in assessing whether an Eighth Amendment violation has occurred, "the principal inquiry is whether the contact is incidental to legitimate official duties, such as a justifiable pat frisk or strip search, or by contrast whether it is undertaken to arouse or gratify the officer or humiliate the inmate." Id. at 257-58 (citing Whitley v. Albers, 475 U.S. 312, 320, 106 S.Ct. 1078, 89 L.Ed.2d 251 (1986) (determining that an Eighth Amendment inquiry turns on "whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm.") ).

Plaintiff claims that during the pat frisk, C.O. Dahkle "had his lower body (genitals) pressed-up against [his] butt," as his hands "press[ed] tightly down [plaintiff's] back and into the crack of [his] butt (inside) all the way down and around [his] groan." Am. Compl. ¶ 4. However, as defendants indicate, the pat frisk occurred prior to a scheduled, routine search of plaintiff's cell, and pat frisks are required before a corrections officer undertakes a cell search. See Def. Mem. of Law at 11; DOCCS Dir. 4910, Dkt. No. 58-10 at 17 ("Each day, the living quarters of a number of inmates in each housing unit will be searched by correctional employees in accordance with a schedule issued by the Deputy Superintendent of Security or equivalent.... Inmates present shall be pat frisked and may also be scanned with a hand-held metal detector."). Such pat frisks relate to the safety and security of the facility by ensuring that inmates do not possess contraband. See Def. Mem. of Law at 12. Pursuant to Directive 4910, "[c]ontact through the clothing with the genitalia ... and buttocks is a necessary component of a thorough pat frisk. However, staff must avoid any penetration of the anal or genital opening through the clothing during a pat frisk." Dkt. 58-10. Although plaintiff contends that C.O. Dahkle "press[ed] tightly down [plaintiff's] back and into the crack of [his] butt," Am. Compl. ¶ 6, and testified that the search "felt funny" and "more so [a] massage or a caress," there is no indication that C.O. Dahkle

Case 9:22-cv-00102-BKS-ML   Document 78   Filed 12/13/23   Page 363 of 373

Hayes v. Dahkle, Not Reported in Fed. Supp. (2018)

penetrated plaintiff's anus, intentionally or otherwise, or in any way squeezed or fondled his genitals. See Dkt. No. 58-9 ("Pl. Dep.") at 58; Def. Mem. of Law at 12. In fact, plaintiff testified that the search occurred outside of his clothing. See Pl. Dep. at 54. Further, that C.O. Dahkle conducted a thorough search and "may have made contact with [p]laintiff's genitalia and/or buttocks" is insufficient to establish that he conducted the search with an intent to humiliate plaintiff or arouse himself. See Shaw v. Prindle, 661 F. App'x 16, 19 (2d Cir. 2016) (summary order) (concluding that the court "cannot infer solely from the thoroughness of the search" — described as "excessive searching of [the] crotch area and in between his buttocks and massaging of his rectum and groin area" — that the defendant "intended to search ... with intent to arouse or gratify [his] sexual desires or to humiliate the plaintiff]") (alterations and internal quotation marks omitted).

**\*12** Moreover, although plaintiff contends that C.O. Dahkle made statements like "[d]o you consider yourself a male or female?" and "[d]o you suck dick or fuck men?", Am. Compl. ¶ 6, these comments, made subsequent to the pat frisk, are insufficient to establish that C.O. Dahkle initiated the frisk to humiliate plaintiff or otherwise sexually gratify himself. See Shepherd v. Fischer, No. 08-CV-9297 (RA), 2018 WL 3122053, at \*4 (S.D.N.Y. June 26, 2018) ("Comments by a defendant during an interaction thus constitute relevant evidence."); Allen v. Graham, No. 9:16-CV-0047 (GTS/ATB), 2017 WL 5957742, at \*6 (N.D.N.Y. Dec. 1, 2017) (concluding that the plaintiff's allegations that the defendant corrections officer "made a few callous and/or offensive remarks while caressing Plaintiff's chest and repeatedly groping Plaintiff's genitals and buttocks" does not amount to an Eighth Amendment violation) (citing Amaker v. Fischer, No. 10-CV-0977A, 2014 WL 8663246, at \*3 W.D.N.Y. Aug. 27, 2014 (recommending the dismissal of Eighth Amendment sexual-assault claim based on a pat-frisk in which defendant "rub [bed] plaintiff's penis, fondl[ed] and squeez[ed] plaintiff's buttocks and [ran] his index finger across plaintiff's anus," while making inappropriate remarks to plaintiff), report-recommendation adopted by 2015 WL 1822541 (W.D.N.Y. Apr. 22, 2015) ). The undersigned also notes that the substance of C.O. Dahkle's alleged comments, while inappropriate, are not of the kind courts find sufficient to implicate the Eighth Amendment. See Allah v. Morrison, No. 14-CV-6735, 2016 WL 4017340, at \*3-4 (W.D.N.Y. July 22, 2016) ("[The defendant's] alleged taunts to [the plaintiff], including the statements, 'you know what I want' and 'give me what I want and you'll get what you want', suggest that [the defendant's] conduct was designed to humiliate [the

plaintiff], gratify herself, or both."); see also Crawford, 796 F.3d at 259 ("[The defendant's] demeaning comments, including the statements '[t]hat doesn't feel like a penis to me,' [and] 'I'll run my hands up the crack of your ass if I want to' ... suggest that [the defendant] undertook the search in order to arouse himself, humiliate [the plaintiff], or both.").

Thus, the undersigned finds that C.O. Dahkle's alleged contact with plaintiff was incidental to a routine pat frisk, see Crawford, 796 F.3d at 257, and it is recommended that defendants' motion on this ground be granted.

### 2. Excessive Force

Defendants move for summary judgment on plaintiff's excessive force claim as it pertains to C.O. Bence and C.O. Coon. See Def. Mem. of Law at 19-22. Plaintiff contends that during the July 30, 2016 use of force incident, C.O. Bence and C.O. Coon kicked and punched him all over his body as he lay handcuffed on the floor. Am. Compl. ¶ 57. To state a prima facie claim of excessive force under the Eighth Amendment, a plaintiff must establish both objective and subjective elements. See Blyden v. Mancusi, 186 F.3d 252, 262 (2d Cir. 1999). The objective element of the excessive force analysis is "responsive to contemporary standards of decency" and requires a showing "that the injury actually inflicted is sufficiently serious to warrant Eighth Amendment protection." Hudson v. McMillian, 503 U.S. 1, 9, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992) (internal citations omitted); Blyden, 186 F.3d at 262. However, "the malicious use of force to cause harm [ ] constitute[s an] Eighth Amendment violation per se[,]" regardless of the seriousness of the injuries. Blyden, 186 F.3d at 263 (citing Hudson, 503 U.S. at 9, 112 S.Ct. 995). "The Eighth Amendment's prohibition of cruel and unusual punishments necessarily excludes from constitutional recognition de minimis uses of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind." Hudson, 503 U.S. at 9-10, 112 S.Ct. 995 (internal quotation marks and citations omitted). "Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights." Sims v. Artuz, 230 F.3d 14, 22 (2d Cir. 2000) (citation omitted).

The subjective element requires a plaintiff to demonstrate the "necessary level of culpability, shown by actions characterized by wantonness." 🚩 Sims, 230 F.3d at 21 (internal quotation marks and citation omitted). The wantonness inquiry "turns on 'whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm.' " 🚩 Id. (quoting 🚩 Hudson, 503 U.S. at 7, 112 S.Ct. 995). In determining whether a defendant acted in a malicious or wanton manner, the Second Circuit has identified five factors to consider: "[1] the extent of the injury and the mental state of the defendant[;] [2] ... the need for the application of force; [3] the correlation between that need and the amount of force used; [4] the threat reasonably perceived by the defendants; and [5] any efforts made by the defendants to temper the severity of a forceful response." 🚩 Scott v. Coughlin, 344 F.3d 282, 291 (2d Cir. 2003) (internal quotation marks and citations omitted).

**\*13** The undersigned concludes that plaintiff has failed to establish both the objective and subjective elements of his prima facie excessive force claim. Both C.O. Bence and C.O. Coon declared that they responded to a "Watch Commander Response" on July 30, 2016 under the belief that plaintiff had attempted to assault C.O. Meier. Dkt. No. 58-11 ("Bence Decl.") ¶ 5; Dkt. No. 58-12 ("Coon Decl.") ¶ 5. C.O. Bence declared that when he arrived at the incident, he assisted other officers in securing plaintiff's left arm behind his back until mechanical restraints could be applied. Bence Decl. ¶ 7. After both of plaintiff's arms were secured behind his back, a third corrections officer applied mechanical restraints to plaintiff's wrists. Id. ¶ 8. C.O. Coon declared that he assisted in applying the mechanical restraints. Coon Decl. ¶ 7. Plaintiff was then escorted to the medical department. Bence Decl. ¶ 9. Although plaintiff contends that C.O. Coon and C.O. Bence kicked and punched him while he lay handcuffed on the ground, Am. Compl. ¶ 57, plaintiff's medical records are not consistent with such injuries. See Dkt. No. 58-8 at 18-20. [8] Moreover, plaintiff's medical records do not show injuries to plaintiff's arms or wrists that belie C.O. Bence and C.O. Coon's statements that they only secured plaintiff's arm behind his back and applied mechanical restraints, respectively. See id.; Bence Decl. ¶ 7-8; Coon Decl. ¶ 7. Still, "certain actions, including malicious use of force to cause harm, constitute Eighth Amendment violations *per se*." 🚩 Blyden, 186 F.3d at 263 (emphasis in original). Although plaintiff's medical records do not support the injuries plaintiff purports to have incurred,

"any or even no injuries resulting from the events plaintiff described could amount to a per se constitutional violation." Brown v. Dubois, No. 9:15-CV-1515 (LEK/CFH), 2017 WL 2983305, at \*9 (N.D.N.Y. June 16, 2017) (citing Baskerville v. Mulvaney, 411 F.3d 45, 48-49 (2d Cir. 2005) ); 🚩 Tafari v. McCarthy, 714 F.Supp.2d 317, 352 (N.D.N.Y. 2010) (internal quotation marks and citation omitted) (denying the defendants' motion for summary judgment because although the defendants' injuries were de minimis, "the extent of injury suffered by the inmate is only one factor that may suggest whether the use of force could plausibly have been thought necessary in a particular situation or instead evinced such wantonness with respect to the unjustified infliction of harm as is tantamount to a knowing willingness that it occur.")

The undersigned finds that there is no indication in the record that C.O. Bence or C.O. Coon acted with malicious or sadistic intent. Both defendants declared that they arrived at the incident with the understanding that plaintiff had assaulted a staff member. Bence Decl. ¶ 5; Coon Decl. ¶ 5; Dkt. No. 58-8 at 2. C.O. Bence declared that the "minimal force [he] used to secure [p]laintiff's left arm behind his back was necessary and appropriate under the circumstances, given his attempted assault on staff and resistance to staff attempts to regain control of the situation." Bence Decl. ¶ 12. Thus, "the force exerted upon plaintiff was applied in a good-faith effort by [the defendants] to maintain or restore discipline following [plaintiff's alleged] ... behavior." 🚩 Chambliss v. Rosini, 808 F.Supp.2d 658, 669 (S.D.N.Y. 2011). Moreover, as defendants point out, plaintiff testified that he "assume[d]" C.O. Bence and C.O. Coons were kicking and punching him, but that there was a possibility that they did not take part in the alleged excessive force. See Pl. Dep. at 109-110. Although plaintiff seems to walk back on this testimony in his opposition papers, see Pl. Opp. at 15-17, plaintiff has failed to proffer evidence, aside from his conclusory allegations, that contradicts defendants' account of events.

Thus, because plaintiff has not submitted "proof that tends to show that the alleged force used against him was employed maliciously and sadistically to cause harm, he has failed to satisfy the subjective prong of his excessive force claim." 🚩 Chambliss, 808 F.Supp.2d at 669 (citing ⚠ Engles v. Dunbar, No. 09 Civ. 2457(NRB), 2010 WL 5538517, at \*7 (S.D.N.Y. Dec. 30, 2010) (concluding that the subjective component of excessive force test not satisfied where uncontroverted evidence established that force was used not maliciously or sadistically, but instead to transport

Case 9:22-cv-00102-BKS-ML    Document 78    Filed 12/13/23    Page 365 of 373

Hayes v. Dahkle, Not Reported in Fed. Supp. (2018)

the plaintiff in order to receive medical attention); Houston v. Horn, No. 09 Civ. 801(DLC), 2010 WL 1948612, at *12 (S.D.N.Y. May 13, 2010) (concluding that the plaintiff failed to satisfy subjective element of excessive force claim where he failed to submit proof that contradicted evidence that force was only used to restore discipline after the plaintiff failed to comply with an officer's order) ). As such, plaintiff has failed to establish the "necessary level of culpability, shown by actions characterized by wantonness." Sims, 230 F.3d at 21. Accordingly, it is recommended that defendants' motion on this ground be granted.

### D. First Amendment

**\*14** Defendants move for summary judgment on plaintiff's retaliation claims as they pertain to C.O. Hoffman, Supt. Martuscello, and O.R.C. Iarusso. Plaintiff claims that: (1) C.O. Hoffman "falsified a misbehavior report which subjected [plaintiff] to confinement for retaliation ... because [plaintiff] filed a sexual assault complaint against T. Dahkle and was rumored by Coxsackie Correctional Officers to be working with the Office of Special Investigation," Am. Compl. ¶¶ 19, 20; (2) Supt. Martuscello threatened to invoke plaintiff's "deferred SHU time" if he continued to file grievances against Coxsackie staff, id. ¶¶ 39-41; and (3) O.R.C. Iarusso intentionally destroyed his grievances against Supt. Martuscello, id. ¶ 49.

Courts are to "approach [First Amendment] retaliation claims by prisoners 'with skepticism and particular care[.]' " See, e.g., Davis v. Goord, 320 F.3d 346, 352 (2d Cir. 2003) (quoting Dawes v. Walker, 239 F.3d 489, 491 (2d Cir. 2001), overruled on other grounds by Swierkiewicz v. Sorema, N. A., 534 U.S. 506, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002) ). A retaliation claim under Section 1983 may not be conclusory and must have some basis in specific facts that are not inherently implausible on their face. See Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009); South Cherry St., LLC v. Hennessee Grp. LLC, 573 F.3d 98, 110 (2d Cir. 2009). "To prove a First Amendment retaliation claim under Section 1983, a prisoner must show that '(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal

connection between the protected speech and the adverse action.' " Espinal v. Goord, 558 F.3d 119, 126 (2d Cir. 2009) (quoting Gill v. Pidlypchak, 389 F.3d 379, 380 (2d Cir. 2004), overruled on other grounds by Swierkiewicz, 534 U.S. at 560, 122 S.Ct. 992).

To satisfy the first element of a retaliation claim, a plaintiff must show that he engaged in a protected activity. See Espinal, 558 F.3d at 128. The Second Circuit has concluded that use of the prison grievance system constitutes a protected activity. See Gill, 389 F.3d at 384; Franco v. Kelly, 854 F.2d 584, 589 (2d Cir. 1988) ("Moreover, intentional obstruction of a prisoner's right to seek redress of grievances is precisely the sort of oppression that section 1983 is intended to remedy.") (alteration and internal quotation marks omitted); see also Roseboro v. Gillespie, 791 F.Supp.2d 353, 367 (S.D.N.Y. 2011) (finding that the filing of a grievance is a protected activity); Mateo v. Fischer, 682 F.Supp.2d 423, 433 (S.D.N.Y. 2010) (same). As plaintiff alleges that C.O. Hoffman, Supt. Martuscello, O.R.C. Iarusso retaliated against him because of his PREA complaint, plaintiff has satisfied the first prong of the test as he has engaged in a protected activity. See Gill, 389 F.3d at 384; Am. Compl. ¶¶ 19, 20, 39-41, 49.

### 1. C.O. Hoffman

Defendants argue that plaintiff's retaliation claim against C.O. Hoffman concerning the alleged falsified May 15, 2016 misbehavior report must fail because plaintiff cannot establish adverse action or causal connection. See Def. Mem. of Law at 15-16. In the prison context, "adverse action" is objectively defined as conduct "that would deter a similarly situated individual of ordinary firmness from exercising ... constitutional rights." Davis, 320 F.3d at 353. "[A]dverse action taken for both proper and improper reasons may be upheld if the action would have been taken based on the proper reasons alone." Jackson v. Onondaga Cnty., 549 F.Supp.2d 204, 215 (N.D.N.Y. 2008). A defendant's retaliatory filing of a falsified misbehavior report that results in disciplinary segregated confinement constitutes adverse action. See Gill, 389 F.3d at 384 (finding that a false misbehavior report that resulted in the plaintiff's placement

Case 9:22-cv-00102-BKS-ML   Document 78   Filed 12/13/23   Page 366 of 373

Hayes v. Dahkle, Not Reported in Fed. Supp. (2018)

in keeplock constituted adverse action); Gayle v. Gonyea, 313 F.3d 677, 682 (2d Cir. 2002) (emphasis added) ("An allegation that a prison official filed false disciplinary charges in retaliation for the exercise of a constitutionally protected right, such as the filing of a grievance, states a claim under § 1983.").

**\*15** The record indicates that plaintiff spent one day in keeplock as a result of the May 15, 2016 misbehavior report. See Dkt. No. 58-7 at 2-4. Courts in this Circuit are split as to what length of time in disciplinary segregation constitutes adverse action. See ⚠ Gill v. Hoadley, 261 F.Supp.2d 113, 123-24 (N.D.N.Y. 2003) (finding that keeplock confinement of four and twenty-one days constitutes adverse action); Gill v. Tuttle, 93 F. App'x 301, 303-04 (2d Cir. 2004) (summary order) (declining to grant summary judgment on the plaintiff's retaliation claim where the plaintiff spent nine days in keeplock). In Keesh v. Goord, the Western District of New York found that the plaintiff's one day in keeplock pursuant to an alleged false misbehavior report constituted adverse action where the record suggested that plaintiff may have been deprived of meals during his confinement. See Keesh v. Goord, No. 04-CV-0271, 2007 WL 2903682, at \*10 (W.D.N.Y. Oct. 1, 2007). Similarly, in Gill v. Tuttle, the Second Circuit found that a "genuine, material question of fact [existed] as to whether a similarly situated person of ordinary firmness would have filed such a grievance, particularly in light of the continued denial of permission to attend religious callouts." Gill, 93 F. App'x at 304. Unlike in Keesh and Gill, there is no indication that plaintiff suffered adverse conditions such as lack of food or denial of religious services during his one-day confinement. See id.; Keesh, 2007 WL 2903682, at \*10. As such, the undersigned declines to conclude that C.O. Hoffman's May 15, 2016 misbehavior report that resulted in one-day confinement in keeplock constituted an adverse action.

Even assuming plaintiff had established adverse action, the undersigned finds that such adverse action is not causally connected to plaintiff's filing of the PREA complaint against C.O. Dahkle. The plaintiff bears the burden of establishing that "the protected conduct was a substantial or motivating factor in the prison officials' decision to discipline the plaintiff." Gayle, 313 F.3d at 682. A plaintiff "may do so with circumstantial evidence if it is 'sufficiently

compelling[.]' " Kotler v. Donelli, 382 F. App'x 56, 57-58 (2d Cir. 2010) (summary order) (quoting Bennett v. Goord, 343 F.3d 133, 137 (2d Cir. 2003) ).

> In determining whether a causal connection exists between the plaintiff's protected activity and a prison official's actions, a number of factors may be considered, including: (i) the temporal proximity between the protected activity and the alleged retaliatory act; (ii) the inmate's prior good disciplinary record; (iii) vindication at a hearing on the matter; and (iv) statements by the defendant concerning his motivation.

⚠ Baskerville v. Blot, 224 F.Supp.2d 723, 732 (S.D.N.Y. 2002).

Although C.O. Hoffman's misbehavior report occurred one month after plaintiff filed the PREA complaint against C.O. Dahkle, and, therefore, demonstrates temporal proximity between the protected activity and the adverse action, see Smith v. Miller, No. 15-CV-9561 (NSR), 2017 WL 4838322, at \*8 (S.D.N.Y. Oct. 23, 2017) (concluding that the plaintiff had established temporal proximity where the plaintiff's grievance and the alleged false misbehavior report were separated by only one month), plaintiff fails to establish that his PREA complaint against C.O. Dahkle was a substantial or motivating factor in C.O. Hoffman's decision to issue him a misbehavior report. See Gayle, 313 F.3d at 682. Plaintiff seems to suggest that because C.O. Dahkle and C.O. Hoffman worked on the same unit floor on May 14 and 15, 2016, C.O. Hoffman was aware that plaintiff had filed a PREA complaint, see Pl. Opp. at 10; however, there is no indication that C.O. Hoffman knew of plaintiff's PREA complaint at the time he authored the misbehavior report. C.O. Hoffman declared that he was not aware of the PREA complaint on May 15, 2016. See Dkt. No. 58-14 ("Hoffman Decl.") ¶ 10. Plaintiff does not allege that C.O. Hoffman made any reference to the PREA complaint when he authored the misbehavior report on May 15, 2016. See Tirado v. Shutt, No. 13-CV-2848, 2015 WL 774982, at \*10 (S.D.N.Y. Feb. 23, 2015) ("Absent evidence that any defendant knew about his ... grievance, [the plaintiff] has failed to provide any basis to believe that they retaliated

Case 9:22-cv-00102-BKS-ML    Document 78    Filed 12/13/23    Page 367 of 373

Hayes v. Dahlke, Not Reported in Fed. Supp. (2018)

against him for a grievance in which they were not named."), adopted in relevant part by 2015 WL 4476027 (S.D.N.Y. July 22, 2015); Am. Compl. ¶¶ 19, 20.

**\*16** To the extent that plaintiff references statements that C.O. Hoffman allegedly made on June 20, 2016 and July 7, 2016, warning plaintiff not to get comfortable in his housing unit because "[you] mess with one of the C.O.'s [you] got to deal with all of [us]," and stating that "you won't fucking quit complaining right, well the misbehavior report don't exist anymore" and "Dahkle said hi," the undersigned notes that the Court already concluded that these statements lacked the specificity and seriousness to deter inmates from exercising their First Amendment rights. See Dkt. No. 33 at 18-19. Moreover, plaintiff alleges that these statements were made well after C.O. Hoffman issued the misbehavior report, and, therefore, do not establish that C.O. Hoffman had a retaliatory motive when he issued the misbehavior report on May 15, 2016.

Furthermore, the undersigned notes that retaliation is not "reasonably inferred" where a plaintiff's complaint does not involve the defendant alleged to have retaliated against him. Olutosin v. Lee, No. 14-CV-00685 (NSR), 2018 WL 4954107, at \*11 (S.D.N.Y. Oct. 12, 2018) (citing Wright v. Goord, 554 F.3d 255, 274 (2d Cir. 2009) ). "Retaliation claims have been dismissed when they are supported only by conclusory allegations that the retaliation was based upon complaints against another officer." Jones v. Fischer, No. 9:10-CV-1331 GLS/ATB, 2013 WL 5441353, at \*21 (N.D.N.Y. Sept. 27, 2013) (citing Hare v. Hayden, 09 Civ. 3135, 2011 WL 1453789, at \*4 (S.D.N.Y. Apr. 14, 2011) ("As a general matter, it is difficult to establish one defendant's retaliation for complaints against another defendant.") ). Plaintiff's speculation that C.O. Hoffman retaliated against him because of his PREA complaint against C.O. Dahkle is not supported by the record. Accordingly, it is recommended that defendants' motion on this ground be granted.

### 2. Supt. Martuscello

Defendants argue that plaintiff's retaliation claim against Supt. Martuscello must fail because plaintiff cannot establish adverse action or causal connection. See Def. Mem. of Law at 17-18. As to plaintiff's allegation that Supt. Martuscello threatened to invoke plaintiff's "deferred SHU time" if he continued to file grievances against Coxsackie staff, Am.

Compl. ¶¶ 39-41, the undersigned concludes that this does not amount to adverse action. "Case law reflects that verbal threats may constitute adverse action, though whether they constitute adverse action seems to depend on their specificity and the context in which they are uttered." Lunney v. Brureton, No. 04 CIV. 2438LAKGWG, 2007 WL 1544629, at \*23 (S.D.N.Y. May 29, 2007). Plaintiff contends that during an interview with Supt. Martuscello on June 11, 2016, Supt. Martuscello "started yelling at [him] about all [his] complaints to outside agencies" and reminded plaintiff of his deferred SHU time, "implying that if [plaintiff] continued to make a[n] issue, [Supt. Martuscello would] set [him] up and put [him] back in [SHU]." Am. Compl. ¶¶ 39-41. Supt. Martuscello declared that

> an inmate who has been penalized with time in SHU may have any portion of that time deferred up to 180 days. The Hearing Officer who handles the disciplinary hearing makes the decision to defer time. If the inmate has no disciplinary infractions during the deferral period, the penalty is expunged. However, if the inmate has a subsequent disciplinary infraction during the deferral period, the deferred time may be invoked following a hearing on the subsequent disciplinary infraction.

Dkt. No. 58-17 ("Martuscello Decl.") ¶ 9. Although Supt. Martuscello declared that he did not recall meeting with plaintiff on June 11, 2016, he stated that, he recalled that plaintiff had several disciplinary infractions at Coxsackie, and, to the extent that he discussed plaintiff's deferred SHU time, "it would have been to remind him of the rules for deferred SHU time: that if he received a misbehavior report for a disciplinary infraction while he had deferred SHU time, the Hearing Officer could decide to invoke that deferred SHU time." Id. ¶ 13.

**\*17** Although the undersigned previously found that, given the context and specificity of Supt. Martuscello's statements – referencing plaintiff's deferred SHU time and discussing plaintiff's grievances and complaints – similarly-situated person of ordinary firmness could be deterred from filing

Case 9:22-cv-00102-BKS-ML    Document 78    Filed 12/13/23    Page 368 of 373

Hayes v. Dahlke, Not Reported in Fed. Supp. (2018)

grievances, Dkt. No. 33 at 22, the fully developed record now establishes that, as Superintendent, Supt. Martuscello did not have the authority to determine whether to invoke an inmate's deferred SHU time. Martuscello Decl. ¶ 10. Moreover, the fact that Supt. Martuscello never followed through on his threats "softens the deterrent considerably." 🔖 Mateo v. Fischer, 682 F.Supp.2d 423, 434 (S.D.N.Y. 2010).

Furthermore, as defendants note, insofar as Supt. Martuscello did make the alleged statements, there is no indication in the record that plaintiff's complaints and/or grievances were a substantial or motivating factor in doing so, as Supt. Martuscello declared that to the extent that he spoke about deferred SHU time with plaintiff, it would have been to remind him of the rules concerning the implementation of deferred SHU time. See Martuscello Decl. ¶ 15; Def. Mem. of Law at 17-18. As defendants further note, the record indicates that plaintiff's grievances against Supt. Martuscello post-date this alleged incident, and, therefore, cannot be the basis of plaintiff's retaliation claim. See Williams v. Smith, No. 9:11-CV-0601 (LEK/TWD), 2015 WL 1179339, at *10 (N.D.N.Y. Mar. 13, 2015) ("Adverse actions that predate protected conduct cannot form the basis of a retaliation claim."); Am. Compl. ¶¶ 39, 42 (noting that the meeting between plaintiff and Supt. Martuscello occurred on June 11, 2016 and plaintiff filed a grievance against Supt. Martuscello on June 15, 2016). As such, plaintiff fails to demonstrate a causal connection between his protected conduct and Supt. Martuscello's alleged adverse action.

As plaintiff fails to set forth a prima facie retaliation claim against Supt. Martuscello, it is recommended that defendants' motion on this ground be granted.

### 3. O.R.C. Iarusso

Defendants argue that plaintiff's retaliation claim against O.R.C. Iarusso must fail because plaintiff cannot establish adverse action or causal connection. See Def. Mem. of Law at 18-19. O.R.C. Iarusso declared that on July 12, 2016, plaintiff attended a grievance hearing concerning a complaint about mail in SHU. See Dkt. No. 58-15 ("Iarusso Decl.") ¶ 12. Plaintiff attempted to discuss other grievances with O.R.C. Iarusso, who informed him that he would look into those grievances at a later date as the purpose of the hearing was to discuss the grievance regarding SHU mail. Id. ¶ 13. Plaintiff continued to discuss other grievances, and O.R.C. Iarusso informed him that he, "personally, would not file a

grievance against the Superintendent" — meaning it was not his responsibility, as IGP Staff Representative, to file inmate grievances. Id. ¶¶ 11, 14.

To the extent that plaintiff interpreted O.R.C. Iarusso's statement as a threat, "[t]hreats made to an inmate, without more, do not rise to the level of a constitutional violation." 🔖 Pledger v. Hudson, No. 99 CIV.2167LTS/THK, 2005 WL 736228, at *5 (S.D.N.Y. Mar. 31, 2005) (citing 🔖 Dawes, 239 F.3d at 489). Even if plaintiff interpreted O.R.C. Iarusso's comment as a threatening to not file his grievance against Supt. Martuscello, the record indicates that plaintiff's grievance against Supt. Martuscello was filed and combined with grievance CX-19054-16. See Iarusso Decl. ¶ 20; Dkt. No. 58-5 at 35-45. As defendants note, plaintiff testified that he knew that his grievance against Supt. Martuscello had been filed and consolidated with his grievance concerning loss of programs. Pl. Dep. at 163-64. As such, plaintiff fails to demonstrate that O.R.C. Iarusso took adverse action against him. Moreover, there is no indication in the record that plaintiff's complaints and/or grievances were a substantial or motivating factor in O.R.C. Iarusso's alleged threat. Accordingly, it is recommended that defendants' motion on this ground be granted.

### E. Supervisory Liability

**\*18** "[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under 🔖 § 1983." 🔖 Wright v. Smith, 21 F.3d 496, 501 (2d Cir. 1994) (quoting Moffitt v. Town of Brookfield, 950 F.2d 880, 885 (2d Cir. 1991) ). Thus, supervisory officials may not be held liable merely because they held a position of authority. 🔖 Id.; 🔖 Black v. Coughlin, 76 F.3d 72, 74 (2d Cir. 1996). However, supervisory personnel may be considered "personally involved" if:

(1) [T]he defendant participated directly in the alleged constitutional violation[;]

(2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong[;]

(3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom[;]

(4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts[;] or

(5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

Colon v. Coughlin, 58 F.3d 865, 873 (2d Cir. 1995) (spacing added) (citing Williams v. Smith, 781 F.2d 319, 323-24 (2d Cir. 1986) ). However, where a plaintiff's sole claim of involvement of the supervisory defendant is that a superintendent affirmed a denial of a grievance, such is not sufficient to establish personal involvement. Joyner v. Greiner, 195 F.Supp.2d 500, 506 (S.D.N.Y. 2002). Moreover, a supervisor may delegate the responsibility to others, and personal involvement does not lie where the only allegation was that the defendant referred a complaint to the appropriate department or staff for investigation. See Ortiz-Rodriguez v. N.Y. State Dep't of Corr. Servs., 491 F.Supp.2d 342, 347 (W.D.N.Y. 2007). Finally, assertions of personal involvement that are merely speculative are insufficient to establish a triable issue of fact. See, e.g., Brown v. Artus, 647 F.Supp.2d 190, 200 (N.D.N.Y. 2009).

Absent an underlying constitutional violation by a subordinate, there can be no supervisory liability. Hernandez v. Keane, 341 F.3d 137, 145 (2d Cir. 2003); see Elek v. Inc. Vill. of Monroe, 815 F.Supp.2d 801, 808 (S.D.N.Y. 2011) (collecting cases for the proposition that "because [p]laintiff has not established any underlying constitutional violation, she cannot state a claim for 1983 supervisory liability").

Plaintiff alleges that Supt. Martuscello and DSS Shanley failed to protect him from C.O. Meier's alleged retaliation and excessive force. See Am. Compl. ¶ 32. Defendants argue that plaintiff "cannot demonstrate that [DSS] Shanley and [Supt.] Martuscello failed to act on his verbal complaints about [C.O.] Meier because, as an initial matter, an inmate's verbal complaints of threats by a Correction Officer are delegated to a Sergeant for investigation." Def. Mem. of Law at 24. Defendants further argue that Supt. Martuscello and DSS Shanley took steps to address plaintiff's concerns. See id.[9]

DSS Shanley declared that

[w]hen an inmate makes a verbal complaint about alleged threats from a CO, a Sergeant is assigned to assess the credibility of the complaint and determine whether a formal investigation is required. As part of a formal investigation, the Sergeant will interview the inmate and direct the accused CO to provide written response to the allegations. Neither the Superintendent nor DSS are involved in the investigation. When an inmate files a grievance about alleged threats from a CO, the process is similar to the process for verbal complaints; the grievance is delegated to a Sergeant to investigate the grievance, and that Sergeant will interview the inmate and direct the accused CO to provide a written response to the allegations. Neither the Superintendent nor DSS are involved in the grievance investigation. If an inmate makes a verbal complaint and files a grievance about alleged threats from a Correction Officer, the grievance investigation serves as the formal investigation on the verbal complaint in order to avoid duplicating efforts.

**\*19** Dkt. No. 58-16 ("Shanley Decl.") ¶¶ 13-15. If an inmate's complaint regarding a staff member is found to be credible, the investigation is referred to OSI. Id. ¶ 16. Both Supt. Martuscello and DSS Shanley declared that, as Superintendent and Deputy Superintendent of Security, respectively, they had no involvement in the investigation of plaintiff's complaints. See Martuscello Decl. ¶ 6; Shanley Decl. ¶ 13. Both defendants reference an exhibit attached to plaintiff's amended complaint that they argue demonstrates that plaintiff's complaints regarding C.O. Meier were being handled by other staff. See Martuscello Decl. ¶ 8; Shanley Decl. ¶ 18; Dkt. No. 12-2 at 13. However, as plaintiff notes, the May 19, 2016 letter from plaintiff's social work counselor pre-dates the May 23, 2016 meeting wherein plaintiff contends that he informed Supt. Martuscello and

Case 9:22-cv-00102-BKS-ML Document 78 Filed 12/13/23 Page 370 of 373

Hayes v. Dahlke, Not Reported in Fed. Supp. (2018)

DSS Shanley of his complaints regarding C.O. Meier. Pl. Opp. at 18; Dkt. No. 12-2 at 13. Moreover, although the May 19, 2016 letter does state that "Mr. Martuscello is looking into [it] as he informed me - 'it is being handled,' " there is no indication that Supt. Martuscello was "looking into" plaintiff's complaints against C.O. Meier. See Dkt. No. 12-2 at 13.

The undersigned also notes that although defendants argue that the lack of documentation of plaintiff's verbal complaint and/or a subsequent investigation into that verbal complaint means that the assigned Sergeant found that plaintiff's complaint was not credible, Def. Mem. of Law at 24, plaintiff contends that he was never interviewed by a sergeant or other Coxsackie staff member. Pl. Opp. at 18. While C.O. Meier's alleged threats and verbal harassment do not amount to constitutional violations for which Supt. Martuscello and DSS Shanley can be held liable, they can serve as "circumstantial evidence of [his] retaliatory intent" in the alleged use of excessive force against plaintiff. See Baskerville, 224 F.Supp.2d at 733 n.6 (finding that, although the defendant's comments "did not violate plaintiff's constitutional rights" as First Amendment harassment, the plaintiff's allegations "support[ed] his retaliation claim" as "circumstantial evidence of retaliatory intent."). [10] Drawing all reasonable inferences in plaintiff's favor, a rational jury could find that Supt. Martuscello was personally involved in the alleged constitutional violations because he was in a position to refer plaintiff's complaints regarding C.O. Meier to a sergeant for investigation, and there is no indication in the record that such referral occurred. As such, it is recommended that defendants' motion, as it pertains to Supt. Martuscello's referring plaintiff's complaints against C.O. Meier for investigation, be denied.

As to DSS Shanley, the undersigned notes that Ms. Seguin declared that plaintiff failed to grieve his claim that DSS Shanley failed to protect him from C.O. Meier's alleged excessive force. Seguin Decl. ¶ 25. Although IGP regulations do not require that an inmate's grievance contain the name of the offending officer, Espinal, 558 F.3d at 126, prison officials must be afforded the time and opportunity to address a complaint internally, and "[i]n order to exhaust ... inmates must provide enough information about the conduct of which they complain to allow prison officials to take appropriate responsive measures." Johnson v. Testman, 380 F.3d 691, 697 (2d Cir. 2004). In grievance CX-19094-16, plaintiff specifically refers to Supt. Martuscello's "failure to take

reasonable action to protect [him]," Dkt. No. 58-5 at 50; however, there is nothing in plaintiff's grievance that would alert prison officials to investigate a subsequent failure to intervene claim against DSS Shanley; thus, such claim was not properly grieved. See Luckerson v. Goord, No. 00 Civ. 9508(JSR), 2002 WL 1628550, at *2 (S.D.N.Y. July 22, 2002) (determining the plaintiff's claim to be unexhausted and stating, "[f]or [the defendants] now to have to litigate a federal lawsuit premised on allegations that ... they had no reason to address [in the IGRC] would make a mockery of the exhaustion requirement."). Indeed, "the mere fact that plaintiff filed some grievance, and fully appealed all the decisions on that grievance, does not automatically mean that he can now sue anyone who was in any way connected with the events giving rise to that grievance." Turner v. Goord, 376 F.Supp.2d 321, 324 (W.D.N.Y. 2005). As such, it is recommended that defendants' motion, as it pertains to DSS Shanley, be granted.

**\*20** To the extent that plaintiff argues that Supt. Martuscello or DSS Shanley should have transferred him to a different facility or re-assign C.O. Meier to a different housing block, neither the Superintendent nor the Deputy Superintendent of Security have the authority to transfer inmates between facilities or assign corrections officers to housing blocks; these tasks are handled by the Office of Classification and Movement and the Chart Sergeants, respectively. Shanley Decl. ¶ 22.

Accordingly, it is recommended that defendants' motion be granted as to plaintiff's supervisory claims against DSS Shanley. It is further recommended that defendants' motion be denied on to plaintiff's supervisory claims against Supt. Martuscello.

### F. Qualified Immunity

Defendants argue that, even if plaintiff's First and Eighth Amendment claims are substantiated, they are entitled to qualified immunity. Def. Mem. of Law at 25-27. Qualified immunity shields public officials from being sued for conduct undertaken in the course of their duties so long as that conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982) (internal quotation marks and citation omitted); Eng v. Coughlin, 858 F.2d 889, 895

Case 9:22-cv-00102-BKS-ML    Document 78    Filed 12/13/23    Page 371 of 373

Hayes v. Dahkle, Not Reported in Fed. Supp. (2018)

(2d Cir. 1988). However, even if the constitutional privileges "are so clearly defined that a reasonable public official would know that his actions might violate those rights, qualified ... immunity might still be available ... if it was objectively reasonable for the public official to believe that his acts did not violate those rights." Kaminsky v. Rosenblum, 929 F.2d 922, 925 (2d Cir. 1991); Magnotti v. Kuntz, 918 F.2d 364, 367 (2d Cir. 1990) (internal citations omitted). A court must first determine whether, if the plaintiff's allegations are accepted as true, there would be a constitutional violation. See Saucier v. Katz, 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). Only if there is a constitutional violation does a court proceed to determine whether the constitutional rights were clearly established at the time of the alleged violation. Aiken v. Nixon, 236 F.Supp.2d 211, 230 (N.D.N.Y. 2002).

Here, plaintiff has not established a constitutional violation to satisfy the first prong of the qualified immunity test as to a majority of his claims. See subsection II.C.-D. supra, at 24-41. Because there is no constitutional violation, the undersigned does not reach whether plaintiff's constitutional rights were clearly established at the time of the alleged violation. See Aiken, 236 F.Supp.2d at 230. As to plaintiff's supervisory claims against Supt. Martuscello, the undersigned rejects defendants' argument that Supt. Martuscello was "acting in accordance with established constitutional rights when ... [he] referred [p]laintiff's verbal complaints to a Sergeant for handling" as there is no indication that such referral occurred. See subsection II.E. supra, at 41-46. Accordingly, it is recommended that defendants' motion on this ground be denied in part as to plaintiff's supervisory claim against Supt. Martuscello, and granted in part as to plaintiff's remaining claims.

### III. Conclusion

**WHEREFORE**, for the reasons stated herein, it is hereby:

**RECOMMENDED**, that defendants' Motion for Partial Summary Judgment (Dkt. No. 58) be **GRANTED**, and the following claims be **DISMISSED with prejudice**:

(1) Insofar far as it seeks dismissal for plaintiff's failure to exhaust his First Amendment retaliation claims, Eighth Amendment excessive force claims, and supervisory liability claims,

 **\*21** (2) Insofar as it seeks dismissal of plaintiff's Eighth Amendment sexual assault claim against C.O. Dahkle,

In the alternative, should the District Judge reach the merits of plaintiff's First Amendment, Eighth Amendment, and supervisory claims, it is recommended that defendants' Motion for Partial Summary Judgment be **GRANTED** as to plaintiff's (1) First Amendment retaliation claims against C.O. Hoffman, Supt. Martuscello, and O.R.C. Iarusso; (2) Eighth Amendment excessive force claims against C.O. Bence and C.O. Coon; (3) Eighth Amendment sexual assault claim against C.O. Dahkle; and (4) supervisory liability claim against DSS Shanley, and **DENIED** as to plaintiff's supervisory liability claim against Supt. Martuscello; and it is

**ORDERED**, that the Clerk of the Court serve a copy of this Report-Recommendation and Order on the parties in accordance with Local Rules.

**IT IS SO ORDERED**.

**All Citations**

Not Reported in Fed. Supp., 2018 WL 7356343

### Footnotes

1        This matter was referred to the undersigned for Report-Recommendation and Order pursuant to 28 U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(c).

Case 9:22-cv-00102-BKS-ML    Document 78    Filed 12/13/23    Page 372 of 373

Hayes v. Dahlke, Not Reported in Fed. Supp. (2018)

2    "Keeplock is a form of disciplinary confinement segregating an inmate from other inmates and depriving him of participation in normal prison activities." 🚩Green v. Bauvi, 46 F.3d 189, 192 (2d Cir. 1995); 🚩N.Y. COMP. CODES R. & REGS. tit. 7, § 301.6.

3    SHUs exist in all maximum and certain medium security facilities. The units "consist of single-occupancy cells grouped so as to provide separation from the general population...." 🚩N.Y. COMP. CODES R. & REGS. tit 7, § 300.2(b). Inmates are confined in a SHU as discipline, pending resolution of misconduct charges, for administrative or security reasons, or in other circumstances as required. Id. at pt. 301.

4    Local Rule 7.1(a)(3) states:

Summary Judgment Motions

Any motion for summary judgment shall contain a Statement of Material Facts. The Statement of Material Facts shall set forth, in numbered paragraphs, each material fact about which the moving party contends there exists no genuine issue. Each fact listed shall set forth a specific citation to the record where the fact is established. The record for purposes of the Statement of Material Facts includes the pleadings, depositions, answers to interrogatories, admissions and affidavits.

The opposing party shall file a response to the Statement of Material Facts. The non-movant's response shall mirror the movant's Statement of Material Facts by admitting and/or denying each of the movant's assertions in matching numbered paragraphs. Each denial shall set forth a specific citation to the record where the factual issue arises. The non-movant's response may also set forth any additional material facts that the non-movant contends are in dispute. Any facts set forth in the Statement of Material Facts shall be deemed admitted unless specifically controverted by the opposing party.

N.D.N.Y. L.R. 7.1(a)(3).

5    All unpublished opinions cited in this Report-Recommendation and Order, unless otherwise noted, have been provided to plaintiff.

6    In 🚩Williams v. Priatno, the Second Circuit debated Ross's effect on Hemphill's estoppel exception. See 🚩Williams, 829 F.3d at 123. The Williams Court stated that "Ross largely supplants our Hemphill inquiry by framing the exception issue entirely within the context of whether administrative remedies were actually available to the aggrieved inmate." 🚩Id. (citing 🚩Ross, 136 S.Ct. at 1858-59).

7    First, the inmate must file a complaint with an inmate grievance program ("IGP") clerk within twenty-one days of the alleged incident. N.Y. COMP. CODES R. & REGS. tit. 7, § 701.5(a)(1). An IGP representative has sixteen calendar days to informally resolve the issue. Id. § 701.5(b)(1). If no informal resolution occurs, the IGRC must hold a hearing within sixteen days of receipt of the grievance and must issue a written decision within two working days after the conclusion of the hearing. Id. §§ 701.5(b)(2)(i)-(ii). If the determination is unfavorable to the inmate, the inmate may appeal the IGRC's determination to the facility superintendent within seven calendar days of receipt of the determination. Id. § 701.5(c)(1). If the superintendent's determination is unfavorable, the inmate may appeal to CORC within seven days after receipt of the superintendent's determination. Id. §§ 701.5(d)(i)-(ii). CORC must "review each appeal, render a decision on the grievance, and transmit its decision to the facility, with reasons stated, for the [inmate], the grievance clerk, the superintendent, and any direct parties within thirty (30) calendar days from the time the appeal was received." Id. § 701.5(d)(3)(ii). Parties do not dispute that at all relevant times, DOCCS had in place a three-step inmate grievance program. N.Y. COMP. CODES R. & REGS. tit. 7, § 701.5.

**Hayes v. Dahlke, Not Reported in Fed. Supp. (2018)**

Case 9:22-cv-00102-BKS-ML    Document 78    Filed 12/13/23    Page 373 of 373

8    Although plaintiff's medical records indicate a laceration over his eye, plaintiff attributed that injury to C.O. Meier. Pl. Dep. at 103-04.

9    The undersigned addresses supervisory liability under the fifth <u>Colon</u> factor only as previously determined in the October 30, 2017 Report-Recommendation and Order. <u>See</u> Dkt. No. 33 at 35-37.

10   Notably, defendants do not move for summary judgment on plaintiff's Eighth Amendment excessive force and First Amendment retaliation claims against C.O. Meier. <u>See</u> Def. Mem. of Law at 4 n.1.

---

**End of Document**                                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.